**No. 24-7059**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

MEDIA MATTERS FOR AMERICA; ERIC HANANOKI
*Plaintiffs-Appellees,*

*v.*

WARREN KENNETH PAXTON, JR., IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF TEXAS,
*Defendant-Appellant.*

————

On Appeal from the United States District Court
for the District of Columbia, No. 1:24-cv-00147-APM
Before the Honorable Amit P. Mehta

————

## CORRECTED BRIEF FOR APPELLANT
————

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RYAN S. BAASCH
Chief, Consumer Protection Division


Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

LANORA C. PETTIT
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

JOSEPH N. MAZZARA
Assistant Solicitor General

COY ALLEN WESTBROOK
Assistant Attorney General


*Counsel for Attorney General Paxton*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**(A) Parties**

Media Matters for America and Eric Hananoki are plaintiffs in the district court and appellees in this Court.

Texas Attorney General Ken Paxton is defendant in the district court and appellant in this Court.

No amici have appeared in this matter as of this filing.

**(B) Ruling Under Review**

Appellant Attorney General Paxton appeals the April 12, 2024, order of the United States District Court for the District of Columbia (Mehta, J.), which granted a preliminary injunction preventing the Attorney General of Texas from investigating potential violations of state law. *See Media Matters for Am. v. Paxton*, No. 24-CV-147 (APM), 2024 WL 1773197 (D.D.C. Apr. 12, 2024); JA0781-0820.

**(C) Related Cases**

The ruling under review has not previously been before this Court or any other court. There are no related cases pending in this Court or any other court of which counsel are aware.

*/s/ Lanora C. Pettit*
Lanora C. Pettit

# Table of Contents

Page

Certificate as to Parties, Rulings, and Related Cases ................................i

Table of Authorities ...........................................................................iv

Glossary of Abbreviations ................................................................xiii

Introduction...........................................................................................1

Statement of Jurisdiction .....................................................................2

Issues Presented ...................................................................................3

Statutes and Regulations......................................................................3

Statement of the Case ..........................................................................3

I.   Texas's DTPA and OAG's CID Authority.............................3

II.   Factual Background ................................................................4

III.  Procedural Background..........................................................8

Summary of the Argument..................................................................10

Standard of Review ............................................................................13

Argument.............................................................................................13

I.   D.C. Federal Court Is Not the Proper Venue For this Action. .................13

A.   D.C. Courts Lack Personal Jurisdiction Over Texas's
Attorney General. ...........................................................13

1.   The D.C. long-arm statute does not reach this case. ...................14

a.   Attorney General Paxton is not a "person" within
the meaning of D.C. Code Section 13-423. ...........................15

b.   Subsection (a)(4) does not support personal
jurisdiction over Attorney General Paxton. .........................20

c.   Subsection (a)(3) also does not support personal
jurisdiction because there was no tortious act in D.C. ..........22

d.   Subsection (a)(1) does not support personal
jurisdiction because hiring a process server is not
"transacting business" in D.C. ...........................................26

       2.    Interpreting the D.C. long-arm statute broadly enough to reach this case raises serious constitutional concerns ................... 29

    B.   Venue in D.C. is Improper. ................................................. 31

II.   Media Matters' Suit Is Not Justiciable Because the CID Is Not Self-Executing. ..................................................................... 34

    A.   *Reisman* and its progeny establish that Media Matters' suit is not justiciable. .................................................................. 35

    B.   The First Amendment does not provide a loophole around *Reisman*. .......................................................................... 38

    C.   That Media Matters might have to litigate its constitutional concerns in Texas state court is no reason to disregard ordinary justiciability rules. .................................................. 43

III.  The Preliminary Injunction Was An Abuse Of Discretion. ..................... 45

    A.   Media Matters is unlikely to succeed on the merits. .......................... 45

    B.   Media Matters cannot demonstrate irreparable harm. ...................... 47

    C.   The equities favor the Attorney General. ......................................... 49

Conclusion ............................................................................................ 50

Certificate of Compliance ..................................................................... 51

Certificate of Service ............................................................................. 51

# Table of Authorities

Page(s)

Cases:

*Alden v. Maine*,
527 U.S. 706 (1999).................................................................20

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)...............................................................42

*Anheuser-Buch, Inc. v. FTC*,
359 F.2d 487 (8th Cir. 1966) ................................................ 36

*Archer v. Chisholm*,
870 F.3d 603 (7th Cir. 2017)............................................. 1, 46

*Atlantic Richfield Co. v. FTC*,
546 F.2d 646 (5th Cir. 1977)................................................ 37

*Balsly v. W. Mich. Debt Collections, Inc.*,
2012 WL 628490 (E.D. Va. Feb. 27, 2012)........................29

*Belle Fourche Pipeline Co. v. United States*,
751 F.2d 332 (10th Cir. 1984) ........................................ 35-37

*Bristol-Myers Squibb Co. v. Connors*,
979 F.3d 732 (9th Cir. 2020) ............................................... 45

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*,
582 U.S. 255 (2017)............................................................ 14

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)............................................................30

*Capel v. Capel*,
272 F. Supp. 3d 33 (D.D.C. 2017) ...................................... 27

*CBA Pharma, Inc. v. Perry*,
No. 22-5358, 2023 WL 129240, at *4 (6th Cir. Jan. 9, 2023) ..................... 37, 43

*Clapper v. Amnesty Int'l*,
568 U.S. 398 (2013)...........................................................38

*X COMSAT Corp. v. Finshipyards S.A.M.*,
900 F. Supp. 515 (D.D.C. 1995) ........................................28

*Corp. v. Media Matters*,
No. 4:23-cv-01175 (N.D. Tex. Nov. 20, 2023) ........................ 6-7, 34

*Crane v. Carr*,
    814 F.2d 758 (D.C. Cir. 1987) ......................................................... 21-22

*Cruz-Packer v. D.C.*,
    539 F. Supp. 2d 181 (D.D.C. 2008) .................................................. 23

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014).......................................................................... 30

*Dedication & Everlasting Love to Animals v. Pa., Bureau of Charitable*
    *Orgs.*, 101 F. App'x 224 (9th Cir. 2004) ......................................... 33

*Defense Distributed v. Grewal*,
    971 F.3d 485 (5th Cir. 2020) ..................................................... 20, 26

*Dental Dynamics, LLC v. Jolly Dental Group, LLC*,
    946 F.3d 1223 (10th Cir. 2020) ......................................................... 31

*Dimondstein v. Stidman*,
    986 F.3d 870 (D.C. Cir. 2021) (per curiam) .................................... 34

*Doe v. District of Columbia*,
    796 F.3d 96 (D.C.Cir.2015).............................................................. 46

*Dyson v. Dutko Ragen Homes & Invs.*,
    21-CV-02280 (APM), 2022 WL 1294484
    (D.D.C. Apr. 27, 2022) ..................................................................... 24

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
    592 U.S. 351 (2021) ................................................................. 14, 30-31

*Forras v. Rauf*,
    812 F.3d 1102 (D.C. Cir. 2016).......................... 21-22, 26-27, 30-31

*Franchise Tax Bd. of Cal. v. Hyatt*,
    587 U.S. 230 (2019) .......................................................................... 19

*Gerber Prods. Co. v. Vilsack*,
    No. 16-CV-01696 (APM), 2016 WL 4734357
    (D.D.C. Sept. 9, 2016) ...................................................................... 18

*Glossip v. Gross*,
    576 U.S. 863 (2015)............................................................................. 2

*Goodyear Dunlop Tires Operations, S. A. v. Brown*,
    564 U.S. 915 (2011) .......................................................................... 14

*Google, Inc. v. Hood*,
    822 F.3d 212 (5th Cir. 2016) .................................... 36, 38-39, 43, 45

v

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) .................................................................... 19-20

*GTE New Media Servs. Inc. v. BellSouth Corp.*,
  199 F.3d 1343 (D.C. Cir. 2000) ...................................................... 14

*Hamilton, Miller, Hudson & Fayne Travel Corp. v. Hori*,
  520 F. Supp. 67 (E.D. Mich. 1981) ................................................. 29

*Hans v. Louisiana*,
  134 U.S. 1 (1890) ..........................................................................20

*Hanson v. Denckla*,
  357 U.S. 235 (1958) ....................................................................... 30

*Hartman v. Moore*,
  547 U.S. 250 (2006) ....................................................................... 46

*Hicks v. Miranda*,
  422 U.S. 332 (1975) ....................................................................... 45

*Holder v. Haarman & Reimer Corp.*,
  779 A.2d 264 (D.C. 2001) .............................................................. 27

*Huffman v. Pursue, Ltd.*,
  420 U.S. 592 (1975) ....................................................................... 42

*Huisha-Huisha v. Mayorkas*,
  27 F.4th 718 (D.C. Cir. 2022) ........................................................ 13

*J. McIntyre Mach., Ltd. v. Nicastro*,
  564 U.S. 873 (2011) ....................................................................... 31

*Jackson v. Modly*,
  949 F.3d 763 (D.C. Cir. 2020) ....................................................... 19

*JMM Corp. v. District of Columbia*,
  378 F.3d 1117 (D.C. Cir. 2004) ...................................................44-45

*Keeton v. Hustler Magazine*,
  465 U.S. 770 (1984) ................................................................. 23, 30

*Kentucky v. Graham*,
  473 U.S. 159 (1985) ................................................................. 18-19

*Laird v. Tatum*,
  408 U.S. 1 (1972) ......................................................................38-42

*Lans v. Adduci Mastriani & Schaumberg L.L.P.*,
  786 F. Supp. 2d 240 (D.D.C. 2011) ............................................... 26

*Leroy v. Great Western United Corporation*,
    443 U.S. 173 (1979) ............................................................. 11, 32, 34

*Lewis v. Mutond*,
    62 F.4th 587 (D.C. Cir. 2023) ...........................................................30

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
    538 U.S. 600 (2003) ...........................................................................47

*Margoles v. Johns*,
    483 F.2d 1212 (D.C. Cir. 1973) .......................................................27

*Maryland v. King*,
    567 U.S. 1301 (2012) (Roberts, C.J., in chambers) .................12, 47, 49

*McDonnell v. United States*,
    579 U.S. 550 (2016) .......................................................................... 17

*Media Matters for Am. v. Paxton*,
    No. 24-CV-147 (APM), 2024 WL 1773197
    (D.D.C. Apr. 12, 2024) .......................................................................i

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*,
    457 U.S. 423 (1982) ...........................................................................44

*Moncrief Oil Int'l Inc. v. OAO Gazprom*,
    481 F.3d 309 (5th Cir. 2007) ...................................................... 22, 31

*Moncrief v. Lexington Herald-Leader Co.*,
    807 F.2d 217 (D.C. Cir. 1986) ...........................1, 11, 23-25, 27

*Monessen Sw. Ry. Co. v. Morgan*,
    486 U.S. 330 (1988) .......................................................................... 19

*Nasdaq Stock Mkt. LLC v. SEC*,
    38 F.4th 1126 (D.C. Cir. 2022) ....................................................... 17

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,
    434 U.S. 1345 (1977) (Rehnquist, J., in chambers) ..................... 12, 47

*Nken v. Holder*,
    556 U.S. 418 (2009) ...................................................................... 13, 49

*Novartis Corp. v. FTC*,
    223 F.3d 783 (D.C. Cir. 2000) ..................................................... 12, 46

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984) ............................................................................ 15

*Peterson v. Kennedy*,
    771 F.2d 1244 (9th Cir. 1985) ......................................................... 31

vii

*Pollack v. Meese*,
  737 F. Supp. 663 (D.D.C. 1990) ................................................................17, 19

*PPG Indus., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship*,
  146 S.W.3d 79 (Tex. 2004) ......................................................................4

*Rambo v. Am. S. Ins. Co.*,
  839 F.2d 1415 (10th Cir. 1988) ............................................................ 31

*Rehberg v. Paulk*,
  611 F.3d 828 (11th Cir. 2010), *aff'd*, 566 U.S. 356 (2012) ...............................46

*Reisman v. Caplin*,
  375 U.S. 440 (1964) .............................................. 2, 11, 34-38, 42-45

*Reps. Comm. for Freedom of Press v. AT&T*,
  593 F.2d 1030 (D.C. Cir. 1978) (Wilkey, J.) ..............................................39, 42

*Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.*,
  966 F. Supp. 1250 (D.D.C. 1997) ........................................................ 12, 46

*S.E.C. v. Johnson*,
  650 F.3d 710 (D.C. Cir. 2011) ........................................................... 33

*Safari Club Int'l v. Salazar*,
  852 F. Supp. 2d 102 (D.D.C. 2012) ..................................................... 12, 48

*Saline Parents v. Garland*,
  88 F.4th 298 (D.C. Cir. 2023) ............................................................40-41

*Schleit v. Warren*,
  693 F. Supp. 416 (E.D. Va. 1988) ......................................................26, 28-29

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
  549 U.S 422 (2007) ...................................................................... 13

*Sivella v. Twp. of Lyndhurst*,
  No. 20-2342, 2021 WL 3356934 (3d Cir. Aug. 3, 2011) .....................................46

*Slate v. Kamau*,
  20-CV-3732 (BAH), 2021 WL 3472438 (D.D.C. Aug. 6, 2021) ......................25

*Sprint Commc'ns, Inc. v. Jacobs*,
  571 U.S. 69 (2013) ......................................................................44

*Steinberg v. Int'l Crim. Police Org.*,
  672 F.2d 927 (D.C. Cir. 1981) .............................................................27

*Stroman Realty, Inc. v. Wercinski*,
  513 F.3d 476 (5th Cir. 2008) ..............................................................20

*Texas v. United States*,
  523 U.S. 296 (1998) .......................................................................40

*Thomas P. Gonzalez Corp. v. Consejo Nacional De Produccion De Costa Rica*,
  614 F.2d 1247 (9th Cir. 1980) ........................................................ 31

*Thompson Med. Co. v. FTC*,
  791 F.2d 189 (D.C. Cir. 1986) .................................................. 12, 46

*Thompson v. Hall*,
  426 F. App'x 855 (11th Cir. 2011) (per curiam) ............................ 1, 46

*Thompson v. Nat'l Football League*,
  2014 WL 1646929 (W.D. Pa. Apr. 24, 2014) .............................. 11, 34

*Trump v. Comm. on Ways & Means, U.S. House of Representatives*,
  415 F. Supp. 3d 98 (D.D.C. 2019) ............................................. 17, 19

*Twitter, Inc. v. Paxton*,
  56 F.4th 1170 (9th Cir. 2022) ......................... 1, 11, 37-39, 41

*United Presbyterian Church v. Reagan*,
  738 F.2d 1375 (D.C. Cir. 1984) ................................................. 39, 41

*United States v. Ferrara*,
  54 F.3d 825 (D.C. Cir. 1995) ........................... 9, 16-17, 19, 30

*United States v. Kulukundis*,
  329 F.2d 197 (2d Cir. 1964) (Friendly, J.) ...................................... 37

*United States v. Ryan*,
  402 U.S. 530 (1971) .......................................................................36

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976) ................................................................... 2, 47

*Vann v. U.S. Dep't of Interior*,
  701 F.3d 927 (D.C. Cir. 2012) ...................................................... 18

*Virginia Off. for Prot. & Advoc. v. Stewart*,
  563 U.S. 247 (2011) ..........................................................15, 18, 20

*Vishay Intertechnology, Inc. v. Delta Int'l Corp.*,
  696 F.2d 1062 (4th Cir. 1982) ............................................. 11, 28-29

*Watison v. Carter*,
  668 F.3d 1108 (9th Cir. 2012) ......................................................46

*West v. Holder*,
  60 F. Supp. 3d 190 (D.D.C. 2014) ............................................ 16-17

*West v. Lynch*,
845 F.3d 1228 (D.C. Cir. 2017) ........................................................ 16

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021) ........................................................ 44

*Will v. Mich.Dep't of State Police*,
491 U.S. 58 (1989) ........................................................ 16, 19

*Winter v. NRDC*,
555 U.S. 7 (2008) ........................................................ 11, 13, 45, 49

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,
433 F.3d 1199 (9th Cir. 2006) (per curiam) ........................................................ 31

*Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Loc. Union 639*,
883 F.2d 132 (D.C. Cir. 1989) ........................................................ 26

*Yelp Inc. v. Paxton*,
No. 23-CV-04977-TLT, 2024 WL 413464
(N.D. Cal. Feb. 1, 2024) ........................................................ 1

*Ex parte Young*,
209 U.S. 123 (1908) ........................................................ 18-19

*Younger v. Harris*,
401 U.S. 37 (1971) ........................................................ 42, 44-45

*Zazzali v. Swenson*,
852 F. Supp. 2d 438 (D. Del. 2012) ........................................................ 11, 34

**Constitutional Provisions and Statutes:**

U.S. Const.:
amend. I ........................................................ 2- 3, 9, 11, 33-34, 36-42, 45, 47-48
amend. IV ........................................................ 8
amend. XIV ........................................................ 8

28 U.S.C.:
§ 1292(a) ........................................................ 2
§ 1331 ........................................................ 2
§ 1391 ........................................................ 33, 35
§ 1391(b) ........................................................ 33
§ 1391(b)(2) ........................................................ 32-33

D.C. Code:

§ 13-421 ..................................................................... 16-18

§ 13-423 .....................................................10, 14-16, 21, 28

§ 13-423(a) ........................................................................ 17

§ 13-423(a)(1) .................................................. 9-10, 15, 26-28, 30

§ 13-423(a)(3) .................................................. 9-10, 22-26, 28, 30

§ 13-423(a)(4) ....................................................... 10, 15, 21-22

N.C.Gen.Stat. § 55-145(a)(4) ......................................................... 29

N.H.Rev.Stat. § 300:14 (1977) ........................................................ 23

Tex. Bus. & Com. Code:

ch.17, subch.E ........................................................................ 3

§ 17.44(a) ............................................................................ 3

§ 17.45(6) ........................................................................... 34

§ 17.46(a) ............................................................................ 3

§ 17.46(b)(8) ......................................................................... 3

§ 17.46(c)(1) ........................................................................ 47

§ 17.47............................................................................... 34

§ 17.61(a) ............................................................................ 4

§ 17.61(f) ............................................................................ 4

§ 17.61(g) ......................................................................... 4, 8

§ 17.62(a) ............................................................................ 4

§ 17.62(b) ........................................................................ 4, 34

§ 17.62(c) ............................................................................ 4

Va.Code:

§ 8.01-328.1...................................................................... 28-29

§ 8.01-328.1(a)(1) .................................................................. 28

§ 8.01-328.1(a)(3) .................................................................. 28

**Other Authorities:**

Antonin Scalia & Bryan A. Gardner, Reading Law: The Interpretation
of Legal Texts 107 (2012) ....................................................... 17

Eric Hananoki, *As Musk endorses antisemitic conspiracy theory, X has
been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to
pro-Nazi content*, MediaMatters (Nov. 16, 2023),
https://tinyurl.com/3bfb2e7m ...................................................... 4

Matt Gertz, *It's the antisemitism, stupid*, Media Matters (Nov. 17,
2023), https://tinyurl.com/57hj7x2t ............................................... 5

xi

*Stand with X to protect free speech, X Safety* (Nov. 18, 2023),
https://tinyurl.com/5c76ms2z............................................................................5

# Glossary of Abbreviations

| | |
|---|---|
| CID | Civil Investigative Demand |
| CPD | Consumer Protection Division of Texas's Office of the Attorney General |
| DTPA | Texas Deceptive Trade Practices Act |
| OAG | Texas Office of the Attorney General |
| TBCC | Texas Business & Commerce Code |

# Introduction

In a remarkable order, the district court held that because the Attorney General of Texas served a document request in the District of Columbia, the D.C. courts have jurisdiction to enjoin Texas from investigating alleged violations of Texas laws meant to protect Texans from fraud perpetrated in Texas. Moreover, it held that Texas *should* be enjoined from investigating such alleged fraud based on conclusory allegations that the Office of the Attorney General acted not out of a concern to protect Texas consumers but based on retaliatory animus held by the Attorney General. Although their reasoning varies, courts around this country agree: Such claims do not belong in federal court.[1]

In breaking from this line of authority, the district court committed numerous reversible errors. To start, this Court held four decades ago that something more than the Attorney General's isolated request for documents was necessary to establish jurisdiction in this forum. *Moncrief v. Lexington Herald-Leader Co.*, 807 F.2d 217 (D.C. Cir. 1986). Even if it did, the proper venue for review of that enforcement decision would be Texas—not D.C.

---

[1] *E.g.*, *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1175 (9th Cir. 2022) (dismissing on ripeness grounds); *Google, Inc. v. Hood*, 822 F.3d 212, 225 (5th Cir. 2016) (same); *Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017) (holding that retaliatory investigation is not cognizable under the First Amendment); *Thompson v. Hall*, 426 F. App'x 855, 858 (11th Cir. 2011) (per curiam) (same); *Yelp Inc. v. Paxton*, No. 23-CV-04977-TLT, 2024 WL 413464, at *3 (N.D. Cal. Feb. 1, 2024) (abstaining under *Younger*).

Even if the Court were willing to overlook all of that—and it should not—this case is nonjusticiable, and the preliminary injunction was an abuse of discretion. Courts have long held that a pre-enforcement challenge to a non-self-executing request for documents is not ripe for review. *E.g.*, *Reisman v. Caplin*, 375 U.S. 440, 442-43 (1964). Media Matters will have a "full opportunity for judicial review" in Texas "before any coercive sanctions may be imposed." *Id.* at 450. Media Matters cannot avoid this conclusion by repeatedly invoking a generalized First Amendment, which has nothing to do with the investigation undertaken by OAG's Consumer Protection Division. After all, because the First Amendment does *not* protect fraud or untruthful commercial speech, *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 752 (1976), it cannot preclude Texas from inquiring whether such fraud occurred, *cf. Glossip v. Gross*, 576 U.S. 863, 869 (2015). Because that is all that is occurring here, the district court's injunction should be vacated.

## Statement of Jurisdiction

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §1331. JA07-08. The district court issued for a preliminary injunction on April 12, 2024. JA0820. The Attorney General timely appealed on April 22, 2024. JA0825-0869. This Court has jurisdiction pursuant to 28 U.S.C. §1292(a).

2

1.    Whether D.C. federal courts are the appropriate forum to challenge the Texas's Attorney General request for documents regarding potential violations of Texas law in Texas.

2.    Whether Plaintiffs' claims are justiciable.

3.    Whether this Court's precedent regarding First Amendment retaliation permits the district court to enjoin an allegedly retaliatory investigation that has not yet materialized into an enforcement action.

## STATUTES AND REGULATIONS

All applicable statutes are in the Addendum.

## STATEMENT OF THE CASE

## I.    Texas's DTPA and OAG's CID Authority

Like the District of Columbia, Texas adopted a modified version of the Uniform Unfair and Deceptive Trade Practices Act. *See* Tex. Bus. & Com. Code ch.17, subch.E. The DTPA prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." *Id.* §17.46(a). Deceptive trade practices are defined broadly and "liberally construed." *id.* §17.44(a). As relevant here, they include "disparaging the goods, services, or business of another by false or misleading representation of facts," *id.* §17.46(b)(8).

The DTPA provides Texas's Consumer Protection Division various means to investigate and enforce violations of its provisions. *See PPG Indus., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 84-85 (Tex. 2004). In particular, CPD may

issue CIDs if it "believes that any person may be in possession, custody, or control" of "material relevant to the subject matter of an investigation of a possible violation of this subchapter." TBCC §17.61(a). Such documents are kept confidential and are releasable only with consent or by court order. *Id.* §17.61(f).

If the recipient objects to the CID, he has a statutory right to challenge it in Texas state court. TBCC §17.61(g). Alternatively, the recipient may wait for the Attorney General to decide to bring an enforcement action, where the recipient may raise any defenses. *See id.* §17.62(b). So long as the recipient does not seek to destroy documents, he faces no penalty for declining to provide documents based on a good-faith objection. *Id.* §§17.61(g), 17.62(a), (c).

## II. Factual Background

On November 16, 2023, Media Matters made serious and economically harmful allegations that X—which employs Texans in Texas—"plac[es] ads for major brands like Apple, Bravo (NBCUniversal), IBM, Oracle, and Xfinity (Comcast) next to content that touts Adolf Hitler and his Nazi Party."[2] Media Matters also reproduced alleged images of those ads next to the Hitler or Nazi Party content. *Id.* And, demonstrating the apparent objective of the document to harm X, Media Matters kept a running "update" of advertisers who withdrew their ads from X in the wake of its publication. *Id.* The next day, Media Matters continued its campaign

---

[2] Eric Hananoki, *As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*, MediaMatters (Nov. 16, 2023), https://tinyurl.com/3bfb2e7m.

of commercial disparagement by publishing another document stating that "[n]o advertiser is safe while Elon Musk controls X." Matt Gertz, *It's the antisemitism, stupid*, Media Matters (Nov. 17, 2023), https://tinyurl.com/57hj7x2t.

On November 18, X publicly responded to explain how Media Matters' statements were false or misleading. Blog post, *Stand with X to protect free speech, X Safety* (Nov. 18, 2023), https://tinyurl.com/5c76ms2z. Specifically, according to X, Media Matters deliberately "curated" an artificial experience that few (if any) X users or advertisers would ever experience, and then publicized that artificial experience as if it were organic. *Id*. According to X's blog post, some of the advertiser combinations with Hitler or Nazi content that Media Matters described were apparently "seen" by only "one user"—the "author" of Media Matters' document. *Id*.

On November 20, 2023, Texas Attorney General Paxton announced that CPD would investigate whether Media Matters' "manipulations" violated the DTPA. JA-185. The Attorney General never claimed that Media Matters had broken the law, only that his office was "troubled" by X's allegations and would be "examining the issue closely." *Id*.

Later that day, X Corp. sued Media Matters in the Northern District of Texas, claiming that "Media Matters knowingly and maliciously manufactured side-by-side images depicting advertisers' posts on X Corp.'s social media platform beside [n]eo-[n]azi and white nationalist fringe content and then portrayed these manufactured images as if they were what typical X users experience on the platform." Complaint

at ¶1, *X Corp. v. Media Matters*, No. 4:23-cv-01175 (N.D. Tex. Nov. 20, 2023) (X Lawsuit). According to X, Media Matters accessed an old X account, which bypassed X's "ad filter for new users," allowing it to follow content only "in one of two categories": (1) "those known to produce extreme fringe content," and (2) "accounts owned by X's big-name advertisers." *Id*. ¶8. According to X, Media Matters then "endlessly scroll[ed] and refresh[ed]" its account page until it generated "controversial content next to X's largest advertisers' paid posts." *Id*. ¶10. The result, according to X, was that the paid posts of IBM, Comcast, and Oracle "appeared alongside the fringe content cited by Media Matters for ***only one*** viewer (out of more than 500 million) on all of X: ***Media Matters***." *Id*. ¶13 (emphases original).

On November 21, CPD sent Media Matters a CID containing 12 document requests on three general topics. *First*, the CID sought to evaluate the veracity of X's allegations by requesting, for example, "documents sufficient to identify" Media Matters' "accounts that were used to obtain, produce, or otherwise acquire the" content published in Media Matters' November 16 document. JA0183. *Second*, because the DTPA is a Texas statute, CPD sought to evaluate the nexus of Media Matters' conduct with Texas. *Id*. To do so, it sought (among other things), "documents sufficient to identify all of Media Matters for America's sources of income originating in the State of Texas." *Id*. *Third*, because the DTPA does not regulate misleading statements in the abstract, the CID sought to evaluate the November 16 document's nexus to trade and commerce by seeking, for example,

Media Matters' "external communications" with the advertisers at the center of the controversy over the November 16 document. *Id.*

In the days that followed X's lawsuit and service of the CID, Media Matters repeatedly made public statements regarding OAG or the subject of its November 16 publication. For example:

- On November 21, 2023, after OAG issued its CID, the authority of the November 16 document reposted a social-media message concerning OAG's termination of a former employee. JA0448.

- On November 22, 2023, Media Matters' President, Angelo Carusone, reposted two social media posts concerning the underlying facts of this case. JA0456-0458.

- On November 25, Carusone stated on TV that "things [on X] appeared exactly the way we said," namely, "that ads were running alongside Nazi content," and that X serves as "a safe haven for extremists and disinformation." JA0418-0423. In Carusone's view, this is true because such content is a "reflection of [Musk's] own worldview." *Id.*

- On November 26, Carusone publicly touted Media Matters' "reports showing that [X is] sharing ad revenue with these Hitler stan account" and again blamed it on Musk's supposedly "extreme" and "antisemitic, great replacement theory." JA0425-0430.

- On December 3, Carusone publicly accused X's CEO of coercing "advertising partners . . . to really align with [X's] values." JA0432-0439.

- On December 12, 2023 Carusone, reposted an article published by NBC News titled regarding this lawsuit, "Media Matters sues Texas attorney general over response to Elon Musk dispute." JA0450; JA0454.

- On December 18, Carusone boasted how Media Matters "chronicle[d] the descent of X now into a sort of a supercharged engine of radicalization." JA0441-0446.

OAG did not amend or supplement its CID following any of these subsequent public statements.

## III. Procedural Background

Consistent with its ordinary practice and the DTPA, CPD gave Media Matters 20 days to respond. JA0177; TBCC §17.61(g) (contemplating "20 days"). This period lapsed on December 12. Media Matters neither provided documents in response to the CID nor challenged its issuance in Texas state court.

On December 12, 2023, Media Matters sued Attorney General Paxton in federal court in Maryland. JA034. As here, Media Matters alleged retaliation under the First and Fourteenth Amendments; a general violation of rights under the First, Fourth, and Fourteenth Amendments; a violation of their due-process rights under the Fourteenth Amendment; and violations of their rights under the District of Columbia's and Maryland's Reporters' Shield laws. JA099.

After a hearing on Media Matters' motion for preliminary injunction, Media Matters promptly non-suited the case and sued anew on the same theories in the court below. JA035-036; JA0788. Notwithstanding its initial decision to sue in

Maryland, Media Matters alleged D.C. courts had personal jurisdiction over Attorney General Paxton because he served a copy of CID in D.C. both by hand and by certified mail. JA036. Moreover, Media alleged that the Attorney General committed "retaliation" in D.C. and that many of the documents requested were created in D.C., and all stored here. JA036-039. The next day, Media Matters filed a motion for preliminary injunction, JA084-089,[3] which was heard on February 15, JA0582-0655.

On April 12, 2024, the district court granted Media Matters' motion for preliminary injunction. JA0781-820. With respect to personal jurisdiction, the district court rejected the Attorney General's argument that OAG—the real party in interest in this suit—was not a "person" for the purposes of D.C.'s long-arm statute under *United States v. Ferrara*, 54 F.3d 825, 831-32 (D.C. Cir. 1995). JA0790-0797. The district court then found it had personal jurisdiction over the Attorney General under Sections 13-423(a)(1) and (a)(3) of the D.C. Code, relying largely (if not entirely) on the fact that OAG had contracted with a process server in D.C. to serve Media Matters in D.C. JA0797-0808. In the district court's view, though not the injury itself, the service of process is both a business transaction and a tort by the Attorney General's agent that occurred in D.C. and that caused the chilling of Media Matters' First Amendment rights in D.C. JA0810-0815.

---

[3] Media Matters also sought a TRO, JA084-089, but any potential need for such relief was obviated when OAG agreed not to enforce the CID pending this litigation at the request of the district court, JA0788.

The district court then opined that Media Matters was likely to prevail on the merits because the Attorney General's public statements indicated retaliatory animus, and his actions chilled Media Matters' speech—notwithstanding its litany of public statements following issuance of the CID. JA0819. In so doing, the court rejected the Attorney General's arguments that any harm was self-inflicted, JA0813; JA0815-0817, and in any event, outweighed by the public interest served by enforcement of anti-fraud statutes like the DTPA, JA0820.

On April 22, 2024, the Attorney General timely appealed. JA0825.

## Summary of the Argument

**I.** D.C. federal court was never the proper forum for this lawsuit for two independent reasons. *First*, serving a request for documents to a resident of D.C.—whether by mail, by personal service, or both—does not give rise to personal jurisdiction over a foreign defendant under D.C. Code section 13-423. Media Matters has never alleged the necessary plus factors to exercise jurisdiction for a tort committed outside D.C. that causes injury in D.C. under section 13-423(a)(4). This Court has held as a matter of law that transmitting information from outside D.C. into D.C. that allegedly injures someone in D.C. is insufficient to satisfy section 13-423(a)(3). *Moncrief*, 807 F.2d at 74-76. And courts agree that using a process server is not "transacting business" within the meaning of section 13-423(a)(1) or similarly worded statutes. *See, e.g.*, *Vishay Intertechnology, Inc. v. Delta Int'l Corp.*, 696 F.2d 1062 (4th Cir. 1982).

*Second*, for similar reasons, venue is improper in D.C. *See, e.g.*, *Leroy v. Great Western United Corporation*, 443 U.S. 173 (1979). Moreover, X's litigation in the Northern District of Texas involves a "related" set of facts, which is a factor that courts commonly consider in determining the appropriate venue. *See Thompson v. Nat'l Football League*, 2014 WL 1646929, at *3 (W.D. Pa. Apr. 24, 2014); *Zazzali v. Swenson*, 852 F. Supp. 2d 438, 448 (D. Del. 2012).

**II.**    Even if this were the appropriate forum, this case is not justiciable. It is well-established that the federal courts do not hear pre-enforcement challenges to non-self-executing CIDs. *E.g.*, *Twitter*, 56 F.4th at 1175. Like any other recipient of such a request, Media Matters suffers no penalty for refusing to comply until after a court adjudicates that action for enforcement *and* rules against Media Matters' defenses to compliance. Therefore, the validity of the CID may be tested only when OAG seeks to impose "coercive sanctions"—if it ever does. *Reisman*, 375 U.S. at 450.

**III.**    And if the Court ever gets past these jurisdictional hurdles (and it should not), Media Matters was not entitled to injunctive relief because it has not met the preliminary-injunction test under *Winter v. NRDC*, 555 U.S. 7, 20 (2008). In addition to being unable to show jurisdiction (which is itself a requirement to obtain a preliminary injunction), Media Matters cannot show that any of its underlying speech is protected by the First Amendment since one can constitutionally be liable for statements that are "likely to mislead or confuse consumers," even if the statements are "literally true." *Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.*, 966 F. Supp. 1250, 1268 (D.D.C. 1997); *see also, e.g.*, *Novartis Corp. v. FTC*, 223 F.3d

783, 787 & n.3 (D.C. Cir. 2000); *Thompson Med. Co. v. FTC*, 791 F.2d 189, 191 (D.C. Cir. 1986).

Texas and its citizens, not Media Matters, are irreparably harmed by the injunction. After all, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). By contrast, Media Matters' conduct—and particularly the repeated public statements of its President—belies any notion that its speech has been "chilled" by anything in the CID. *Contra* JA0111-0115; JA0149. Even if that weren't true, "[i]t is well-settled" that equity will not serve to protect "plaintiffs who decline the opportunity to avail themselves of a regulatory scheme to avoid the very harm for which they seek injunctive relief." *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012). That is precisely the case where Media Matters "decline[d] the opportunity" to use the DTPA's "regulatory scheme" to challenge the CID in Texas state court. *Id.*

And the equities favor the Attorney General. As the Supreme Court has explained, the balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). That is particularly so here where OAG seeks to enforce an anti-fraud statute designed to protect consumers.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 727 (D.C. Cir. 2022) (quoting *Winter*, 555 U.S. at 20). The district court's decision to grant such an injunction is reviewed for an "abuse of discretion, its legal conclusions *de novo*, and its findings of fact for clear error." *Id.* at 726.

## ARGUMENT

## I.  D.C. Federal Court Is Not the Proper Venue For this Action.

At the outset, the preliminary injunction was an abuse of discretion because Media Matters did not establish that D.C. is the proper forum for this dispute over an investigation by Texas's Attorney General of potential violations of Texas law in Texas to the detriment of Texas consumers. As a result, this case should have been dismissed either for lack of personal jurisdiction or improper venue. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (affording courts discretion to determine the order in which they address threshold issues that preclude relief).

### A.  D.C. courts lack personal jurisdiction over Texas's Attorney General.

Because the Texas Attorney General—who lives in McKinney and works in Austin, Texas—demonstrably is not "at home" in D.C., *Ford Motor Co. v. Montana*

*Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021), for D.C. courts to have jurisdiction, "there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State'" sufficient to satisfy both D.C.'s long-arm statute and the Due Process Clause. *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 262, 264 (2017) (quoting *Goodyear Dunlop Tires Operations, S. A. v. Brown*, 564 U.S. 915, 919 (2011)). No such affiliation exists as a statutory matter. And to read the statute so broadly as to extend to this case would raise significant constitutional questions.

### 1. The D.C. long-arm statute does not reach this case.

When conducting their specific-personal-jurisdiction analysis, D.C. courts "first examine whether jurisdiction is applicable under [D.C.'s] long-arm statute" before "determine[ing] whether a finding of jurisdiction satisfies" due process. *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). Media Matters invoked three subsections of D.C. Code §13-423, which provide in relevant part that:

> (a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's --
>
> (1) transacting any business in the District of Columbia;
>
> …
>
> (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;

> (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia[.]

D.C. Code §13-423. Although the district court declined to address (a)(4), it found that the Attorney General was a "person" within the meaning of—and subject to personal jurisdiction under—subsections (a)(3) and (a)(1). This was error.

### a. Attorney General Paxton is not a "person" within the meaning of D.C. Code Section 13-423.

**i.** To start, it is undeniable that Media Matters has sued Attorney General Paxton in his official rather than individual capacity. "[T]he 'general criterion for determining when a suit is in fact against the sovereign is the effect of the relief sought[.]'" *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 256 (2011) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 107 (1984)). Here, Media Matters seeks an injunction "enjoining [Paxton], in his official capacity as Attorney General of the State of Texas, or his officers, agents, servants, and employees, from seeking to further enforce a civil investigative demand." JA084. So the "effect of the relief sought" would be to shut down an investigation by OAG. That is plainly an official-capacity suit that is functionally against the State and not functionally against the Attorney General in his individual capacity such that he can be treated as a "person" within the meaning of the statute.

**ii.** When sued in his official capacity, the Texas Attorney General is not a "person" within the meaning of D.C. Code Section 13-423. This Court held decades

ago that D.C.'s long-arm statute does not apply to States themselves. *Ferrara*, 54 F.3d at 831-32. And lower courts have followed suit ever since, holding that "States do not fall under D.C.'s long-arm statute, because the statute only allows the District to 'exercise personal jurisdiction over a person,'" defined as "an individual, his executor, administrator, or other personal representative, or a corporation, partnership, association, or any other legal or commercial entity." *West v. Holder*, 60 F. Supp. 3d 190, 195 (D.D.C. 2014), *aff'd sub nom. West v. Lynch*, 845 F.3d 1228 (D.C. Cir. 2017) (quoting D.C. Code §§13-423(a), 13-421); *see also* D.C. Code §13-421.

The natural consequence of that rule is that the D.C. long-arm statute does not apply to state officers sued in their official capacities. After all, it has been blackletter law for over thirty years that "a suit against a state official in his or her official capacity is not a suit against the official as an individual, but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). And courts in this district have indeed held that "[t]he law is clear that a persistent course of conduct may be deemed to constitute the transaction of business for the assertion of personal jurisdiction only if that persistent conduct is undertaken in that person's individual capacity rather than an official capacity conducting business for his employer." *Pollack v. Meese*, 737 F. Supp. 663, 666 (D.D.C. 1990); *accord Trump v. Comm. on Ways & Means, U.S. House of Representatives*, 415 F. Supp. 3d 98, 106 (D.D.C. 2019); *West*, 60 F. Supp. 3d at 196.

This conclusion is fully supported by the statute's plain text, which permits courts in D.C. only to "exercise personal jurisdiction over a person." D.C. Code §13-423(a). "Person" is defined as "an individual, his executor, administrator, or other personal representative, or a corporation, partnership, association, or any other legal or commercial entity," *id*. §13-421. That definition does not include an official sued in his official capacity, because such person is considered the "State" for purposes of the D.C. long-arm statute. *Ferrara*, 54 F.3d at 831.

And it is confirmed by standard canons of textual interpretation. For example, under *expressio unius est exclusio alterius*, expressly including one item in a group is understood to exclude others not listed. *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1137 (D.C. Cir. 2022); *see also* Antonin Scalia & Bryan A. Gardner, Reading Law: The Interpretation of Legal Texts 107 (2012). Because a statewide official sued in an official capacity does not fit any of those examples of "person," its omission suggests that "government official" are not among those included in the definition of "person." The canon of *noscitur a socii* leads to the same conclusion. This canon is "'wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth.'" *McDonnell v. United States*, 579 U.S. 550, 569 (2016). Here, "individual" in section 13-421 is surrounded by other human relationships like "executor," groups of natural persons like "partnership," or creatures of statute like "corporation." The occupant of a government office sued in his official capacity only is not like those included in section 13-421's list.

**iii.** In holding to the contrary, the district court reasoned that because *Ex parte Young*, 209 U.S. 123 (1908), permitted suit against the Attorney General, he—or more specifically the state office he holds—must be deemed a "person" under D.C.'s long-arm statute. JA0797-0798. That holding is curious given that the same district judge recognized seven years ago that "*Ex parte Young* . . . does not concern personal jurisdiction." *Gerber Prods. Co. v. Vilsack*, No. 16-CV-01696 (APM), 2016 WL 4734357, at *4 n.3 (D.D.C. Sept. 9, 2016). The court got it right the first time for at least three separate reasons.

*First*, *Ex parte Young* is a "limited exception to sovereign" immunity, *id.*, which "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Stewart*, 563 U.S. at 255 (citation omitted). But he nevertheless is sued in his official rather than individual capacity. *See Vann v. U.S. Dep't of Interior*, 701 F.3d 927, 929 (D.C. Cir. 2012). This distinction is no mere technicality: "Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). In such a suit, because the agent and the State "are one and the same," any injunction against the agent is generally "binding" across the agent's entire office. *Vann*, 701 F.3d at 929. By contrast, "[p]ersonal-capacity suits seek to impose personal liability upon a governmental official for actions he takes"—not on the government he represents. *Graham*, 473 U.S. at 165-66. Thus, to hold that the Attorney General is subject to

personal jurisdiction in his official capacity in D.C. is to hold that *Texas* is subject to such jurisdiction—which it is not. *Ferrara*, 54 F.3d at 831-32; *see also Trump*, 415 F. Supp. 3d at 106 n.1 (quoting *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 236 (2019)).

*Second*, unlike *Ex parte Young*, which is a gloss on an immunity guaranteed by the constitution, the D.C. long-arm statute is just that—a statute. Courts have held for decades that it does not reach the conduct of States or state officials. *See Ferrara*, 54 F.3d at 831-32; *Trump*, 415 F. Supp. 3d at 106; *Pollack*, 737 F. Supp. at 666. If the responsible legislators thought the courts had got it wrong, they could have amended the statute. That they have not done so suggests that the current interpretation is correct. *See Jackson v. Modly*, 949 F.3d 763, 772-73 (D.C. Cir. 2020) (citing *inter alia Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330, 338 (1988)).

*Third*, the district court's reading of *Ex parte Young* to broaden D.C.'s long-arm statute reverses the ordinary rule that a legislature will not be presumed to alter the "usual constitutional balance" among sovereigns but instead "must make its intention to do so 'unmistakably clear in the language of the statute.'" *Will*, 491 U.S. at 65. "This plain statement rule" reflects "an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme." *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991). For this reason (among others), it is quite rare for State Attorneys General to be sued in federal courts outside their home State. And when they are, federal courts have not found personal jurisdiction, *e.g.*, *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 482-83 (5th Cir. 2008) (finding "no obvious

rationale" for the Texas long-arm statute to reach "nonresident individuals sued solely in their official capacity under *Ex Parte Young*."), or have dismissed the claims for other reasons.

True, *Defense Distributed v. Grewal*, 971 F.3d 485 (5th Cir. 2020), found personal jurisdiction over an out-of-State official. But there, the New Jersey Attorney General sought to force a Texas-based entity to stop "publishing its materials anywhere," including in Texas. *Id.* at 493. Here, OAG is just inquiring into *whether* Media Matters has made false, deceptive, or misleading statements that were aimed at Texas, violated Texas law, and injured a Texas resident. To claim personal jurisdiction over a sovereign State under such circumstances would be an extraordinary assertion of judicial authority with profound implications for federalism and is certainly not authorized here by either statutory definition of "person"—or possibly by the Constitution. *See Stewart*, 563 U.S. at 260 (quoting *Alden v. Maine*, 527 U.S. 706, 727 (1999) (quoting *Hans v. Louisiana*, 134 U.S. 1, 18 (1890))).

### b. Subsection (a)(4) does not support personal jurisdiction over Attorney General Paxton.

Even if the Attorney General were a "person" within the meaning of section 13-423, he still is not subject to personal jurisdiction under D.C. Code §13-423(a)(4), which appears to be the most relevant given that none of his allegedly tortious conduct occurred within the geographic confines of the District of Columbia. Section 13-423(a)(4) "permits an exercise of jurisdiction over a tortious act or omission

committed outside the District that causes injury within the District if, and only if, the defendant 'regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from . . . services rendered' in the District." *Forras v. Rauf*, 812 F.3d 1102, 1107 (D.C. Cir. 2016) (quoting D.C. Code §13-423(a)(4)). Meaning, "[t]he statute requires both an injury inside the District, and that the defendant engages in some persistent course of conduct or derives substantial revenue from the District." *Id.* at 1107-08 (cleaned up). Even if the alleged effects of the service of process could be deemed the relevant injury here (and it cannot), Media Matters has entirely failed to meet this second element of this test, which likely explains why the district court did not rely on it.

In order to "filter out cases in which the in forum impact is an isolated event" — and thus could fall outside constitutional bonds because "the defendant otherwise has no, or scant, affiliations with the forum"—this subsection requires what are known as "plus factors." *Crane v. Carr*, 814 F.2d 758, 763 (D.C. Cir. 1987). Specifically, the provision applies only if the defendant "regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from . . . services rendered" in D.C. *Forras*, 812 F.3d at 1107 (internal quotation marks omitted).

Though the district court did not consider it, none of the plus factors required by subsection (a)(4) exist in this case. Indeed, even according to the district court, the only contact between the Attorney General and D.C. relevant to this case is that members of his staff sent the CID to Media Matters, JA0799-0801, and also provided

a copy via a process server, JA0799-0800. OAG has an active docket of approximately 35,000 civil cases, 50,000 legal decisions, and numerous criminal matters per year. It is far from clear that the Attorney General even knew how the CID was transmitted. But assuming he did, that hardly establishes that he solicits or does business, engages in other persistent conduct, or derives any revenue from services in D.C. *See Crane*, 814 F.2d at 759. In short, even if this Court were to conclude as that the Attorney General acting in his official capacity is a "person" within the meaning of the DC long-arm statute, *and* it accepts the factual premises that issuing the CID in Texas amounted to tortious conduct that injured Media Matters in D.C., personal jurisdiction would still be lacking. The provisions upon which the district court relied are similarly inapplicable.

### c. Subsection (a)(3) also does not support personal jurisdiction because there was no tortious act in D.C.

**i.** Subsection (a)(3) "confers jurisdiction only over a defendant who commits an act in the District which causes an injury in the District." *Moncrief*, 807 F.2d at 221. A tortious act in D.C. is something that is lacking here. The district court found (at JA19-22) that the Attorney General's only contact with D.C. giving rise to specific personal jurisdiction was hiring a process server to deliver mail to Media Matters's registered agent. But OAG—the entity that hired the process server and that mailed the CID—has offices only in Texas. Under this Court's decision in *Moncrief*, the delivery of correspondence—whether by the U.S. Postal Service, a

private courier or a process server—is insufficient to confer jurisdiction under subsection (a)(3).

In *Moncrief*, the defendants printed outside of D.C. a newspaper with a defamatory news article, and then mailed issues of the paper containing the defamatory article into D.C., thereby injuring in D.C. the plaintiff. *Moncrief*, 807 F.2d at 218-19. This Court expressly rejected the argument that physically sending the defamatory article into D.C. where it was delivered by mail to subscribers constituted an "act" in D.C. within the scope of subsection (a)(3). *Id.* at 219-21. Illustratively, this Court distinguished D.C.'s subsection (a)(3) from the statute in *Keeton v. Hustler Magazine*, 465 U.S. 770 (1984)—N.H.Rev.Stat. §300:14 (1977)— which did not expressly require that the plaintiffs' act to cause injury in the forum. *Id.* at 220-21.

For present purposes, it does not matter whether delivery of the CID was conducted via a process server. OAG was not using service to establish personal jurisdiction over Media Matters but to obtain information about (among other things) whether Texas could exercise jurisdiction in an enforcement action under the DTPA. Under D.C. law, delivery by a mail carrier is adequate for service under such circumstances. *See, e.g.*, *Cruz-Packer v. D.C.*, 539 F. Supp. 2d 181, 187 (D.D.C. 2008).

Thus, just like the defendant in *Moncrief* that printed their allegedly injury-causing papers outside D.C. and then mailed those papers into D.C., OAG printed the CID outside D.C. and mailed it to Media Matters via a process server. It appears

generally uncontested that the CID was issued in Texas, the investigation into potential fraud is occurring in Texas, the process server was hired by the Attorney General's staff in Texas, the Attorney General's public comments with which Media Matters has taken umbrage took place in Texas, enforcement decisions can only occur in Texas, and enforcement actions can occur only in Texas courts. *C.f.*, JA055-061; JA0408. The Texas locus of all of the Attorney General's acts are in fact so strong that if there were a question of deficient service of process with respect to the CID, Texas law would clearly apply. Bottomline, under *Moncrief*, Attorney General Paxton did not commit an act in D.C. within the definition of "act" as it appears in subsection (a)(3), thru an agent or otherwise.

**ii.** Despite the clear limits of subsection (a)(3), Media Matters below mistakenly asserted that "the District of Columbia's long-arm statute is effectively congruent with the permissible limits of personal jurisdiction under the Due Process Clause." JA0121. And Media Matters attempted to establish that the mere acts of issuing the CID and serving it in D.C. were sufficient to establish jurisdiction. This contention fails for three primary reasons.

*First*, it was precisely because of the restricted character of subsection (a)(3)—and specifically the plain text's double requirement that both the act and injury occur in D.C.—that *Moncrief* interpreted subsection (a)(3) so narrowly. 807 F.2d at 220-21. And in the intervening years, D.C. courts have repeatedly held that "mailing a letter or other material into Washington, DC from outside of the District does not qualify as an 'act . . . in the District of Columbia within the meaning of subsection

(a)(3)." *Slate v. Kamau*, 20-CV-3732 (BAH), 2021 WL 3472438, at \*6 (D.D.C. Aug. 6, 2021).

*Second*, under the logic of these opinions, it makes no difference that OAG transmitted its CID to Media Matters' registered agent via both a common carrier and a process server. Regardless of the medium of transmission, "limited communications initiated from outside the District of Columbia to a District resident do not qualify as an act 'in the District' for purposes of §13-423(a)(3)." *Dyson v. Dutko Ragen Homes & Invs.*, 21-CV-02280 (APM), 2022 WL 1294484, at \*4 (D.D.C. Apr. 27, 2022). Thus, like delivering a letter from Texas, Attorney General Paxton's use of a process server to serve the CID on Media Matters is not a sufficient basis to establish personal jurisdiction because it does not satisfy the requirement that there be related minimum contacts.

*Third*, these cases do not support the notion that "jurisdiction is proper because Paxton has intentionally served a Demand on Media Matters in the District, causing a substantial and predictable chill to Media Matters." JA0120. *Contra* JA0802. To the contrary, this Court has explicitly rejected the theory that the "injury is part of the tort" as it "would obliterate subsection (3)'s careful distinction between injury' and act." *Forras*, 812 F.3d at 1107 (quotation marks omitted). Thus, even if Media Matters is "at home" in and feels any allege chill in D.C., that does not mean that the alleged tortious *conduct* occurred in D.C.

**iii.** The cases upon which the district court relied (at JA0797-0802) are not to the contrary. *Grewal* is distinguishable for the reasons already discussed. *Supra* p. 20.

And the remainder of the cases involved a different tort: abuse of process. Because the tortious act is different, these cases provide no guidance as to where *this* alleged tort occurred. Specifically, "[t]o prevail on [an] abuse of process [claim], a plaintiff must demonstrate that *process is being used* to compel the party affected by it to do some collateral thing which he could not legally and regularly be compelled to do." *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Loc. Union 639*, 883 F.2d 132, 137 (D.C. Cir. 1989), *on reh'g in part*, 913 F.2d 948 (D.C. Cir. 1990) (cleaned up) (emphasis added). Service in such cases satisfies subsection (a)(3) because the service itself is what caused the tort to accrue. Here, by contrast, the allegedly chilling act is the "demand" and investigation itself, which was all initiated in Texas.

Put another way, a "lawyer who knowingly serves abusive process in a jurisdiction may expect to be haled into court" to respond to allegations of abuse of process "where service was effectuated." *Lans v. Adduci Mastriani & Schaumberg L.L.P.*, 786 F. Supp. 2d 240, 275 n.23 (D.D.C. 2011) (quoting *Schleit*, 693 F. Supp. at 422). But that does not mean a lawyer can expect to be haled into any court anywhere for any tort just because he effectuated service—which is often accomplished through mail or even email. *See Moncrief*, 807 F.2d at 219.

### d. Subsection (a)(1) does not support personal jurisdiction because hiring a process server is not "transacting business" in D.C.

**i.**   For closely related reasons, service of process also fails to establish jurisdiction under subsection (a)(1), which requires a defendant to intentionally engage in a "*commercial or business-related activity*" directed toward D.C. persons,

like selling someone something. *See Capel v. Capel*, 272 F. Supp. 3d 33, 39 (D.D.C. 2017) (quoting *Holder v. Haarman & Reimer Corp.*, 779 A.2d 264, 270-71 (D.C. 2001)). As with all aspects of the personal jurisdiction inquiry, the focus of (a)(1) is "on where the defendant undertook the challenged (business) actions, not where the plaintiff felt the injury," *Forras*, 812 F.3d at 1106. As noted above, the use of a process server in this context adds nothing to the fact that a copy of the CID was mailed to Media Matters.

To be clear, the Attorney General is *not* asserting that "the 'transacting any business' prong" is "'necessarily limited to acts which are a part of commerce or of transactions for profit.'" *Contra* JA469-470. To the contrary, in interpreting the Maryland counterpart to D.C.'s long arm statute, this Court has established that "transacting business" can encompass non-commercial conduct. *See Steinberg v. Int'l Crim. Police Org.*, 672 F.2d 927, 931 n.7 (D.C. Cir. 1981); *see also Margoles v. Johns*, 483 F.2d 1212, 1221 (D.C. Cir. 1973). But it is similarly established that "mail and wire communications"—by whatever means—do not "standing alone, provide a basis for jurisdiction" under subsection (a)(1). *COMSAT Corp. v. Finshipyards S.A.M.*, 900 F. Supp. 515, 523 (D.D.C. 1995).

**ii.** In ruling otherwise, the district court relied again (at JA0806-87) on abusive service of process cases. *E.g.*, Order at 27 (citing *Vishay Intertechnology, Inc. v. Delta Int'l Corp.*, 696 F.2d 1062, 1067 (4th Cir. 1982)). As already discussed—and as these cases confirm—abusive process is a separate tort that is actually completed when the process server delivers the abusive process in the forum. *See also Vishay*, 696 F.2d at

1065 (explaining "abuse of process arise out of . . . tortious conduct within [the State]"). Not so here.

For example, the district court relied (at JA0800) upon *Schleit v. Warren*, 693 F. Supp. 416 (E.D. Va. 1988), which involved a Virginia statute that is substantively identical to D.C. Code §13-423: Va.Code §8.01-328.1. But jurisdiction was found in *Schleit* under Va.Code §8.01-328.1(a)(3), Virginia's analog to D.C.'s tort subsection (a)(3), which states that "[c]ausing tortious injury by an act or omission in this Commonwealth" gives Virginia courts personal jurisdiction over foreign tortfeasors. Indeed, in *Schleit*, "the 'narrow issue before the Court [was] whether a party's service of abusive process confers jurisdiction over that party in the forum where process is served under Va.Code §8.01-328.1(a)(3)'"—that is, the tort subsection of Virginia's long-arm statute. *Schleit*, 693 F. Supp. at 418. That case did not opine one whit on whether using a process server was a minimum contact sufficient to establish personal jurisdiction under Va.Code §8.01-328.1(a)(1), the identical Virginia analog to D.C.'s subsection (a)(1).

Similarly flawed is the district court's reliance (at JA0807) on *Vishay* for the notion that a single use of a process server confers personal jurisdiction under a "transacting business" theory. After all, the statute in question expressly applies to "foreign corporations *not transacting business*" in North Carolina." *Vishay*, 696 F.2d 1065 n.1 (quoting North Carolina's then in effect long-arm statute, N.C.Gen.Stat. §55-145(a)(4)) (emphasis added). Thus, in *Vishay*, use of a server fell within the reach of a section that only applied when someone was *not* transacting business in

the forum. *Vishay*, 696 F.2d at 1065. Even then, the provision gave rise to jurisdiction only for torts arising from the abusive service of process itself—not for other tortious acts like separate fraudulent communications. *Id.* at 1067.

If anything, the district court's reliance (at JA0800, 0807) on *Hamilton, Miller, Hudson & Fayne Travel Corp. v. Hori*, 520 F. Supp. 67 (E.D. Mich. 1981), and *Balsly v. W. Mich. Debt Collections, Inc.*, 2012 WL 628490 (E.D. Va. Feb. 27, 2012). *Hori* disclaimed that the Court was determining "whether the mere use of the United States mails to serve pleadings supports jurisdiction." 520 F. Supp. at 70. Indeed, *Balsly rejected* the notion that law firm transacted business within the forum sufficient to give rise to jurisdiction under Va.Code §8.01-328.1, merely because it hired a process server in the forum. *Balsly*, 2012 WL 628490, at *4. Like the court in *Schleit*, it narrowly held that the hiring of a process server was a sufficient minimum contact under Virginia's subsection (a)(3) for the tort of abuse of process because the process server was the very vehicle *by which the alleged tort was completed*. *Id.* at *5.

### 2. Interpreting the D.C. long-arm statute broadly enough to reach this case raises serious constitutional concerns.

If this Court were to interpret D.C.'s long-arm statute broadly enough to encompass the conduct at issue here, it would cause serious constitutional concerns. For the Constitution to permit D.C. Courts to exercise specific personal jurisdiction here, Attorney General Paxton must have acted in such a way that he "purposefully avail[ed himself] of the privilege of conducting activities within" D.C. *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Acts that are "random, isolated, or fortuitous"

don't cut it. *Ford Motor Co.*, 592 U.S. at 359 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)). Instead, the act must have been "such that [Attorney General Paxton] should reasonably [have] anticipate[d] being haled into" D.C. Court. *Lewis v. Mutond*, 62 F.4th 587, 591 (D.C. Cir. 2023) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

The issue rarely comes up because subsection (a)(1), the "transacting business" subsection, "allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014); *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995).[4] Nonetheless, to avoid stepping over the constitutional line, this Court has held that "[t]he plain text of subsection (a)(1) … focuses on where the defendant undertook the challenged (business) actions, not where the plaintiff felt the injury." *Forras*, 812 F.3d at 1106; *see also Ford Motor*, 592 U.S. at 369-70.

Here, the *only* connection between the alleged conduct and D.C. is that Media Matters was allegedly injured by its receipt of the CID here. The Attorney General— or more precisely his staff—both posted the CID and hired a process server from their offices in Austin, Texas. JA0408-09; JA0414-16. In doing so, neither OAG nor the Attorney General of Texas has "invok[ed] the benefits and protections of [D.C.'s] laws." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 880 (2011)

---

[4] By contrast, Subsection (a)(3) "is a precise and intentionally restricted tort section which stops short of the outer limits of due process." *Forras*, 812 F.3d at 1107 (cleaned up).

(plurality op.). Courts have expressly held "that use of the mails, telephone, or other international communications simply do[es] not qualify as purposeful activity invoking the benefits and protection of the state." *Thomas P. Gonzalez Corp. v. Consejo Nacional De Produccion De Costa Rica*, 614 F.2d 1247, 1254 (9th Cir. 1980); *see also Peterson v. Kennedy*, 771 F.2d 1244, 1262 (9th Cir. 1985) (reiterating that as a "general rule," "use of the mails" is "legally insufficient" to establish personal jurisdiction); *Rambo v. Am. S. Ins. Co.*, 839 F.2d 1415, 1418 (10th Cir. 1988) ("Ordinarily 'use of the mails, telephone, or other international communications simply do not qualify as purposeful activity.'" (quoting *Peterson*, 771 F.2d at 1262)); *Dental Dynamics, LLC v. Jolly Dental Group, LLC*, 946 F.3d 1223, 1231 (10th Cir. 2020); *cf. Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 312 (5th Cir. 2007) (holding that the "exchange of communications in the course of developing and carrying out a contract" does not qualify as purposeful availment)). Even mailing a formal legal document, such as "[a] cease and desist letter[,] is not in and of itself sufficient to establish personal jurisdiction over the sender of the letter." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1208 (9th Cir. 2006) (per curiam). Because the Attorney General is alleged to have done no more, jurisdiction is lacking.

## B. Venue in D.C. is Improper.

For similar reasons, Media Matters has not brought suit in a proper venue. No "events or omissions giving rise to [Media Matters's] claim occurred" in D.C. 28

U.S.C. §1391(b)(2). *Contra* JA0815 (dismissing venue as a "half-hearted argument").

**1.** Media Matters has argued (at JA09-10) that venue is proper in D.C. because that is where it felt the impact of OAG's conduct. Again, the Supreme Court rejected that approach. In *Leroy v. Great Western United Corp.*, a Texas corporation filed suit against Idaho officials in Texas federal court to challenge an Idaho statute that restricted activities in Texas. 443 U.S. 173. The corporation's claim was based on "action that was taken in Idaho by Idaho residents," namely "the enactment of the statute by the legislature, the review of [the Texas corporation's] filing, the forwarding of the comment letter by [an Idaho official], and the entry of the order postponing the effective date of the tender by [an Idaho official]—as well as the future action that may be taken in the State by its officials to punish or to remedy any violation of its law." *Id.* at 185-86. Based on these facts, the Court held that the suit had "only one obvious locus—the District of Idaho." *Id.* at 185. This case also has one obvious locus—Texas.

That Media Matters is headquartered in D.C. does not change that analysis. The fact that Texas was "where Idaho's statute had its impact on" the plaintiff was insufficient to keep *Leroy* in Texas. *Id.* at 186. The Court expressly stated that relying on such a fact "would subject the Idaho officials to suit in almost every district in the country." *Id.* Such an outcome is contrary to section 1391(b). *See id.* at 187.

**2.** That Congress amended section 1391 in 1990 also does not change the analysis. That amendment clarified that venue can be proper in multiple districts.

*Compare id.* at 178 n.8 (quoting the pre-amendment statute), *with* 28 U.S.C. §1391(b)(2). But *Leroy* did not turn on "whether [the pre-amendment statute] adopt[ed] the occasionally fictive assumption that a claim may arise in only one district." *Leroy*, 443 U.S. at 184-85. *Leroy*'s analysis instead turned on which events matter: the regulatory and enforcement actions taken by the defendant State. *Id.* at 185-86. And it decided that those events occurred in the defendant State, not the forum State. *See id.* And, since section 1391 was amended, courts have continued to apply *Leroy*, *see SEC v. Johnson*, 650 F.3d 710, 715 (D.C. Cir. 2011), including to protect a state agency from improper venue. *Dedication & Everlasting Love to Animals v. Pa., Bureau of Charitable Orgs.*, 101 F. App'x 224 (9th Cir. 2004) (citing *Leroy*, 443 U.S. 173 and affirming the dismissal of First Amendment challenge to a Pennsylvania law for improper venue).

The same reasoning applies to this case, which arises out of events in Texas, not D.C. The Attorney General and OAG reside in Texas. The DTPA was passed and is enforced in Texas based on conduct in Texas. The investigation was initiated in Texas. The CID was sent from Texas. If an enforcement action is necessary, it will be filed in Texas. Tex. Bus. & Com. Code §§17.47, .62(b). Furthermore, OAG investigates potential DTPA violations that affect Texas consumers, regardless of where the violator is located. Tex. Bus. & Com. Code §17.45(6). If Media Matters' venue argument were accepted, state officials would be subject to suit in every other State. That is precisely the result *Leroy* sought to avoid. 443 U.S. at 186.

**3.** That Texas is the proper venue is further underscored by the on-going litigation by X against Media Matters in the Northern District of Texas. *See X Corp. v. Media Matters*, No. 4:23-cv-01175 (N.D. Tex.).[5] X Corp's suit against Media Matters arises from the very same conduct as the Attorney General's investigation into Media Matters. That case clearly involves a "related" set of facts and will likely require that court to address all of Media Matters' arguments here over the course of discovery, which is highly relevant in determining where venue is proper. *See Zazzali*, 852 F. Supp. 2d at 448; *Thompson v*, 2014 WL 1646929, at *3.

In sum, the district court had discretion to decide personal jurisdiction and venue in either order. *Accord Dimondstein v. Stidman*, 986 F.3d 870, 871 (D.C. Cir. 2021) (per curiam). But it was an abuse of discretion to issue a preliminary injunction in the face of both obstacles because either should have led to dismissal of this case.

## II. Media Matters' Suit Is Not Justiciable Because the CID Is Not Self-Executing.

This case should also have been dismissed because the CID at issue here is not self-executing, and Media Matters thus suffers no justiciable harm for failure to comply. Instead, the accepted rule since at least 1964, *Reisman* created a general rule that an agency's non-self-executing request for documents is not justiciable in a pre-enforcement posture. Nothing about the presence of the First Amendment here changes that, and the district court's other bases for bypassing *Reisman* also fail.

---

[5] For the reasons discussed below, the proper venue is more specifically Texas *state* court. *Infra* pp. 32. But if this Court disagrees, the appropriate venue would be the Northern District of Texas where X. Corp.'s on-going litigation is filed.

## A. *Reisman* and its progeny establish that Media Matters' suit is not justiciable.

Although this Court has not had the opportunity to apply *Reisman*, it is widely understood as having "announced a rule strongly disfavoring *any* pre-enforcement review of investigative subpoenas." *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334 (10th Cir. 1984) (emphasis added). And *Reisman*'s relevant facts are materially identical to those here.

*Reisman* involved a pre-enforcement challenge to IRS subpoenas for an accounting firm's production of certain taxpayer records. 375 U.S. at 443-44. The Supreme Court concluded that the pre-enforcement challenge should be dismissed because the subpoena was not self-executing—that is, IRS had "no power to enforce compliance or to impose sanctions for noncompliance." *Id.* at 445. Instead, to compel compliance, the IRS would have to go to court, where the affected party would have ample due process protections. *Id.* at 445-446. A bare refusal to comply with the IRS's subpoena was not punishable; "only a refusal to comply with an order of the *district judge* subjects the" party to punishment *Id.* at 446 (emphasis added). Because requiring IRS subpoena recipients through this process would "work[] no

injustice and suffer[] no constitutional invalidity," the Court concluded that a pre-enforcement challenge was not justiciable. *Id.* at 450.[6]

Since 1964, this Court's sister Circuits have uniformly applied *Reisman* to deny pre-enforcement review to administrative subpoenas in a host of contexts. In *Anheuser-Buch, Inc. v. FTC*, for example, then-Judge Blackmun concluded for a unanimous Eighth Circuit that recipients of FTC administrative subpoenas could not challenge those subpoenas pre-enforcement. 359 F.2d 487 (8th Cir. 1966) ("*Reisman* is controlling"). Fifty years later, in *Google, Inc. v. Hood*, a unanimous Fifth Circuit concluded that Google's pre-enforcement First Amendment challenge to a State AG's administrative subpoena was not justiciable. 822 F.3d 212, 228 (5th Cir. 2016). Similarly, in *Belle Fouche*, a unanimous Tenth Circuit concluded that recipients of FERC administrative subpoenas could not challenge those subpoenas pre-enforcement, not even on the theory that the subpoenas "exceeded the FERC's authority." 751 F.2d at 333. And in *CBA Pharma, Inc. v. Perry*, a unanimous Sixth Circuit concluded that a Kentucky regulator's subpoena could not be challenged pre-

---

[6] True, the *Reisman* posture was unique in that the plaintiffs—the parties affected by release of documents—were seeking to enjoin the IRS from obtaining documents from a *third-party* party, not from themselves. In other contexts, that nuance sometimes supports immediate judicial review on the theory that the third-party is unlikely to fight for the affected party's rights. *See, e.g.*, *United States v. Ryan*, 402 U.S. 530, 533-34 (1971). But the *Reisman* court did not treat this nuance as relevant because the affected party had the ability to prevent the third-party's compliance absent an IRS enforcement proceeding, 375 U.S. at 450, and then a right to "intervene" if IRS initiated such a proceeding, *id.* at 445.

enforcement on a preemption theory. No. 22-5358, 2023 WL 129240, at *4 (6th Cir. Jan. 9, 2023).

Even courts that are dubious about how broadly *Reisman* itself can be applied have reached the same conclusion. In particular, though it purported not to apply *Reisman*, the Ninth Circuit unanimously has applied an identical rule to dismiss as non-justiciable a pre-enforcement challenge to an OAG administrative subpoena issued pursuant to the same statute. *Twitter*, 56 F.4th at 1178.[7] In that case, Twitter alleged materially identical First Amendment challenge to a "CID and associated investigation chill Twitter's speech." *See id.* at 1175. And Twitter identified not dissimilar public statements from the same defendant that it believed showed retaliatory intent. *See id.* at 1172. Nevertheless, the Ninth Circuit concluded that "Twitter has not suffered an Article III injury because the CID is not self-enforcing." *Id.* at 1176. That is because Twitter—like Media Matters—"never faced any penalties for its refusal to comply with the CID." *Id.* Thus, any self-censorship in reaction to the CID, *but see supra* pp. 7-8 (demonstrating that no such self-censorship happened), is "self-inflicted because the actions were voluntary." *Id.*; *Clapper v. Amnesty Int'l*, 568 U.S. 398, 418 (2013).

---

[7] *Twitter* did not consider *Reisman* applicable because it was not expressly "about the First Amendment []or ripeness." 56 F.4th at 1178. Cases from other circuits demonstrate why this was wrong. *E.g.*, *Atlantic Richfield Co. v. FTC*, 546 F.2d 646, 648 (5th Cir. 1977); *Belle Fouche*, 751 F.2d at 334-35. But the dispute is ultimately academic: Whether cast as a "ripeness" rule or something else, *Reisman* "destroy[s] the basis underlying" this pre-enforcement challenges to a non-self-executing CID. *United States v. Kulukundis*, 329 F.2d 197, 199 (2d Cir. 1964) (Friendly, J.).

**B. The First Amendment does not provide a loophole around *Reisman*.**

**1.** "[I]nvocation of the First Amendment" does not change this analysis because it "cannot substitute for the presence of an imminent, non-speculative irreparable injury." *Google*, 822 F.3d at 228 (dismissing pre-enforcement challenge to administrative subpoena). The Fifth Circuit held as much when it applied *Reisman* in the context of a First Amendment challenge. *See id* at 225-26 (explaining the suite of procedural protections if the government enforces). And though it arrived at the conclusion by a different doctrinal route, the same principle is why the Ninth Circuit concluded that "Twitter ha[d] not suffered an Article III injury." *Twitter*, 56 F.4th at 1176. Specifically, the Ninth Circuit explained noted that "the CID is not self-enforcing," and that for any number of reasons, OAG may *never* seek enforcement. *Id.* Under such circumstances, a pre-enforcement challenge like that which Media Matters pursues here necessarily "speculate[s] about injuries that have not and *may never* occur." *Id.* at 1176 (emphasis added).

Nor do "[a]llegations of a subjective 'chill'" fill the gap in Media Matters's theory of standing. *Laird v. Tatum*, 408 U.S. 1, 13 (1972). Instead, even in the First Amendment cases, a "chill" must arise from governmental action that is "regulatory, proscriptive, or compulsory in nature." *Id.* at 11. Indeed, as then-Judge Scalia noted: "All of the Supreme Court cases employing the concept of 'chilling effect' involve situations in which the plaintiff has unquestionably suffered some concrete harm (past or immediately threatened) apart from the 'chill' itself." *United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984). A non-self-

executing document demand does not fit that bill because it has no compulsory penalties but instead serves as a confirmation to a target that "a governmental agency [i]s engaged in" an investigation. *Laird*, 408 U.S. at 11. A target who gains "knowledge" of this fact through a non-self-executing demand cannot claim chill from that knowledge and then seek an injunction. *Id.*

That rule has been applied in numerous cases "considering federal administrative subpoenas that . . . were non-self-executing." *Google*, 822 F.3d at 224. And those cases uniformly reject claims like this one because "[t]here is no person in the United States" who cannot allege some "First Amendment right" that an "investigative technique" has supposedly violated, and then seek an injunction against the investigation on that basis. *Reps. Comm. for Freedom of Press v. AT&T*, 593 F.2d 1030, 1070 (D.C. Cir. 1978) (Wilkey, J.) (rejecting request for judicial supervision of alleged bad faith investigations). The "approach has no logical stopping point," *id.*; and "would have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action." *Laird*, 408 U.S. at 15; *see also, e.g.*, *Google*, 822 F.3d at 226; *Twitter*, 56 F.4th at 1176. "The only real difference" between those cases and this is that this case involves "a state, not federal, subpoena." *Google*, 882 F.3d at 226. But "[i]f anything," the Fifth Circuit explained, "comity should make [federal courts] less willing to intervene when there is no current consequence for resisting the subpoena and the same challenges raised in the federal suit could be litigated in state court." *Id.*

This very case aptly illustrates the dangers of Media Matters theory. It is functionally on the same footing as the challengers in *Laird* because OAG "has not in any way restricted or regulated [Media Matters'] activities." *Saline Parents v. Garland*, 88 F.4th 298, 308 (D.C. Cir. 2023) (rejecting First Amendment challenge on ripeness grounds). Media Matters "is 'not required to engage in, or to refrain from, any conduct' as a result of the challenged" CID. *Id.* (citing *Texas v. United States*, 523 U.S. 296, 301 (1998). And, although Media Matters "complain[s] of a chilling effect on [its] speech," the CID's non-self-executing nature means that dismissing this "pre-enforcement challenge will not subject [Media Matters] to any legally cognizable hardship." *Id.* at 307-08. Moreover, assuming Media Matters' claims of a "chill" are sincere, they are simply *too easy to make*. Media Matters' affidavits about "chill" pointed to a "general sense" of "fear," "concern," and having to "tread lightly." JA0170-71. What party could not make those claims in response to a government investigation? Media Matters also said it declined to publish certain stories. JA0171. But that is what virtually any lawyer would advise his client to do during the pendency of litigation over the supposed "chill."

**2.** Rather than heed the warnings of courts that came before it, the district court opted to break new legal ground in this case based on its view that Media Matters' sworn affidavits "demonstrated [a] profound chilling impact." JA0811 (citing JA0170-71). Media Matters' affiants alleged, for example, that the CID created a "new culture of fear" at the organization, and that there is a "general sense" there that Media Matters "must tread very lightly." JA0811 (citing JA0170-

71). But the cases discussed above were decided at the motion to dismiss—where allegations of chill had to be "taken as true" regardless of the presence or absence of affidavits. *Twitter*, 56 F.4th at 1175. Nevertheless, the courts found any such injury to be non-cognizable because they are "self-inflicted." *Id.* at 1176.

More fundamentally, the district court's theory of justiciability is directly in the teeth of binding precedent. Because Media Matters "never faced any penalties for its refusal to comply with the CID," *Twitter*, 56 F.4th at 1176, its issuance is legally no different than if the Attorney General had simply announced that he would be monitoring developments in X's related litigation to determine if Media Matters had violated the DTPA. Media Matters would have been on the same notice that the Attorney General was considering an enforcement action. But *Laird* teaches that no cognizable injury—and thus no justiciable controversy—arises "merely from [a plaintiff's] knowledge that a governmental agency was engaged in" an investigation. 408 U.S. at 11. In treating OAG's notice to the Media Matters that OAG *wants* certain of its documents as an injury of itself, the district court did exactly what *Laird* and this Court's precedent said it should not do: conflate a subjective "chilling effect" with "the immediate threat of concrete, harmful action." *United Presbyterian*, 738 F.2d at 1380; *Saline Parents*, 88 F.4th at 304.

And it would not be possible to limit the district court's rationale to just cases like this one. Instead, Judge Wilkey forecasted how a party could invoke the First Amendment to obtain relief against an investigation even when the party's underlying conduct has no First Amendment valence. *Reps. Comm. for Freedom of*

*Press*, 593 F.2d at 1070. Suppose, for example, that a suspected bank robber under investigation invokes his "First Amendment right to association" and then claims that the investigation is being used "to harass him in his personal relationships." *Id.* (proposing this hypothetical). He could then come to court seeking an injunction against the investigation on the grounds that the investigation "deters people from associating with him." *Id.*; *see, e.g.*, *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) (describing contours of First Amendment associational rights doctrine).

*Laird* teaches that a court should not intervene in that setting. And when it comes to a federal court invading the prerogative of a *state* investigation, other doctrines expressly preclude it. *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 620 (1975) (noting that once the requirements of *Younger v. Harris*, 401 U.S. 37 (1971) are met, abstention is required unless a "narrow exception[] to the doctrine" applies).

**3.** Even if an alleged First Amendment violation could, in theory, allow litigants to end-run *Reisman*, *this* case was hardly the right case to announce that new rule. As explained *supra*, Media Matters repeatedly voiced materially the same things in the media that it now alleges it was "chilled" from saying. Its President went on TV after the CID was issued to double-down; stating that "things [on X] appeared exactly the way we said, that ads were running alongside Nazi content." JA0420. On a separate TV appearance, he accused Musk of engaging "with some pretty extreme, you know, antisemitic, great replacement theory." JA0430. He said X "shar[es] ad revenue with these Hitler stan accounts." JA0430. And he boasted how Media

Matters has "chronicle[d] the descent of X now into a sort of a supercharged engine of radicalization." JA0445. That is not how chilled actors behave.

## C. That Media Matters might have to litigate its constitutional concerns in Texas state court is no reason to disregard ordinary justiciability rules.

The district court was also wrong to distinguish *Reisman* because here Media Matters (a D.C. resident) has a remedy under the CID statute only in a "foreign forum" (Texas). JA0809-10. The district court concluded that this was significant because in *Reisman* the government could seek enforcement only where the target resided or was found. JA0810. Such distinction makes no legal difference for at least two reasons.

*First*, so far as undersigned counsel is aware, nothing about the forum where a party can seek relief is relevant to the threshold question of whether that party has brought a case justiciable in federal court. *Reisman* would have precluded a Texas federal court from enjoining OAG's investigation, just like it should have precluded the district court here. *See Google*, 822 F.3d at 225-26 (applying *Reisman* to deny injunction in Mississippi federal court against Mississippi AG); *CBA Pharma*, 2023 WL 129240, at *4 (Kentucky-based entity could not enjoin Kentucky regulator's investigation through federal suit in Kentucky). To the contrary, *Leroy* suggests that the fact that Media Matters has engaged in forum shopping creates another reason to dismiss—not an end-run around ordinary justiciability rules. *Supra* Part I.B.

*Second*, the logical upshot of the district court's conclusion is that *Reisman* never applies to *state* administrative subpoenas. After all, a State has no power to force

another State's courts to hear claims for enforcement of one of its own administrative subpoenas. But a rule that precludes application of *Reisman* whenever a State investigates a company headquartered out-of-state gets *Reisman*'s equity principles backwards: The Supreme Court has repeatedly recognized that "comity," and a "proper respect for state functions" counsel *against* federal court injunctions against State enforcers. *Younger v. Harris*, 401 U.S. 37, 43-45 (1971). And even a "[m]inimal respect for the state processes ... precludes any *presumption* that the state courts will not safeguard federal constitutional rights." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982). That is why pre-enforcement review is the exception not the rule, and why many important federal rights are litigated as a defense in state enforcement actions. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 49 (2021) (no "unqualified right to pre-enforcement review").

Although these principles of comity play out under a number of doctrinal headings, they are perhaps most clearly seen under *Younger*, which requires that federal courts, "except in extraordinary circumstances," abstain from suits that would interfere with ongoing state enforcement proceedings. *JMM Corp. v. District of Columbia*, 378 F.3d 1117, 1120 (D.C. Cir. 2004); *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (*Younger* abstention is applicable to "civil enforcement proceedings"). *Younger* would bar an action concerning the underlying substantive dispute here. *See, e.g.*, *Bristol-Myers Squibb Co. v. Connors*, 979 F.3d 732, 738 (9th Cir. 2020).

*Younger* technically does not bar Media Matters' action. Because OAG has not brought—and may never bring—an action to enforce the CID, there was no "ongoing state enforcement proceeding" to trigger the doctrine. *JMM Corp*, 378 F.3d at 1120. But the district court's conclusion just incentivizes enforcers to sue in State court whenever a CID recipient brings a challenge like Media Matters'— *Younger* would "apply in full force" *regardless* of whether the State wins the race to the courthouse. *Hicks v. Miranda*, 422 U.S. 332, 349 (1975). Such a wasteful exercise benefits no one. And as the Fifth Circuit recognized, it is precisely the outcome that *Reisman* and its progeny sought to avoid. *Google*, 822 F.3d at 224-25. This Court should do the same and conclude that Media Matters' claim is non-justiciable.

## III. The Preliminary Injunction Was An Abuse Of Discretion.

Even assuming this Court has jurisdiction, that venue is proper, and this claim is justiciable, the preliminary injunction was still an abuse of discretion under the well-established *Winter* factors: Media Matters is unlikely to succeed on the merits of its First Amendment retaliation claim, they have not demonstrated irreparable harm, and the equities strongly favor the Attorney General.

### A. Media Matters is unlikely to succeed on the merits.

The district court solely analyzed (at 35) "First Amendment retaliation." But the question is whether Media Matters has a cognizable claim for a retaliatory investigation. Although the Supreme Court has expressly held open "[w]hether the expense or other adverse consequences of a retaliatory investigation would ever" support a section 1983 claim, *Hartman v. Moore*, 547 U.S. 250, 262 n.9 (2006),

several courts of appeals have foreclosed such a claim. *Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017); *Rehberg v. Paulk*, 611 F.3d 828, 850 & n.24 (11th Cir. 2010), *aff'd*, 566 U.S. 356 (2012); *Thompson v. Hall*, 426 F. App'x 855, 858 (11th Cir. 2011) (per curiam); *accord Sivella v. Twp. of Lyndhurst*, No. 20-2342, 2021 WL 3356934 (3d Cir. Aug. 3, 2011). This Court should do the same.

Even if retaliatory investigation is a cognizable claim, Media Matters still could not succeed because the first element of any retaliation claim is that the plaintiff engaged in protected activity. *See, e.g.*, *Doe v. District of Columbia*, 796 F.3d 96, 106 (D.C. Cir. 2015); *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012).[8] But it is well-established that, under laws like Texas's DTPA, a party can constitutionally be liable for statements that are "likely to mislead or confuse consumers." *Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.*, 966 F. Supp. 1250, 1268 (D.D.C. 1997); *see also Novartis Corp. v. FTC*, 223 F.3d 783, 787 & n.3 (D.C. Cir. 2000). That is true even if the statements are "literally true." *Riggs Inv.*, 966 F. Supp. at 1268. After all, that is how the Federal Trade Commission usually enforces its very similar statute. *See, e.g.*, *Thompson Medical Co. v. FTC*, 791 F.2d 189, 191 (D.C. Cir. 1986) ("likely to mislead" standard). And X Corp.'s lawsuit lays out a fact pattern that is suggestive of speech not merely "likely" to deceive viewers, but deliberately designed to do so.

---

[8] For the avoidance of doubt, the Attorney General does *not* concede that Media Matters can meet the other elements of a claim such as retaliatory animus or causation. *Hartman*, 547 U.S. at 263.

If that is the case, then it is hard to see how that same speech is constitutionally protected.[9]

The district court, as part of its First Amendment analysis, concluded that "Federal Trade Commission Act" caselaw "ha[s] no application here." JA0816 But Texas's DTPA expressly incorporates "interpretations given by the Federal Trade Commission and federal courts" to the FTC Act. TBCC §17.46(c)(1). More importantly, the First Amendment is the same whether applied to the FTC's enforcement actions or enforcement under Texas's analogous DTPA. For the same reasons, Media Matters would not be likely to succeed if it asserted this claim against the FTC—or any other federal or agency charged with enforcing an anti-fraud statute for that matter—it is not likely to succeed against the Attorney General. *See Va. State Bd. of Pharmacy*, 425 U.S. at 771; *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003).

## B. Media Matters cannot demonstrate irreparable harm.

Moreover, it is the State of Texas and its citizens that would be irreparably harmed by the injunction *not* Media Matters. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *King*, 567 U.S. at 1303 (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd.*, 434 U.S. at 1351 (Rehnquist, J., in chambers)). That

---

[9] Again, for the avoidance of doubt, OAG has never taken X Corp.'s allegations against Media Matters at face value and does not ask this Court to do so. That is the whole point of the Attorney General's *investigation*.

harm is particularly acute here because Texas is trying to enforce an anti-fraud statute designed to protect consumers.

By contrast, Media Matters will not be irreparably harmed for at least two reasons. *First*, "[i]t is well-settled that a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted." *Safari Club Int'l*, 852 F. Supp. 2d at 123 (quotations omitted). "In analogous circumstances, plaintiffs who decline the opportunity to avail themselves of a regulatory scheme to avoid the very harm for which they seek injunctive relief have been denied the [injunctive] relief." *Id.* Here, of course, Media Matters "decline[d] the opportunity" to use the DTPA's "regulatory scheme," *id.*, to set aside Defendant's CID. If there were merit to Media Matters' substantive arguments, those procedures would have provided Media Matters full relief against the harm it now characterizes as "irreparable."

*Second*, Media Matters repeated public statements demonstrate that it has *not* been chilled from exercising its First Amendment rights as a result of the investigation. *Contra* JA0101 (contenting that Media Matters "ha[s] been chilled from publishing additional criticism or coverage of X or Musk since [Defendant] announced his investigation"). After all, since the Attorney General launched this investigation, Media Matters' President went on a media blitz during which he repeated the same claims that sparked half a dozen times on national TV. *See* JA0420-44. Media Matters' President, for example, doubled down on the November 16 document ("things [on X] appeared exactly the way we said, that ads were

running alongside Nazi content"), and even asserted that the Nazi content was a "reflection of [Musk's] own worldview," *see supra* p. 7. Given such widespread public statements, it was clear error for the district court to credit Media Matters' self-serving declarations that there is a "culture of fear within Media Matters" to "speak[] on any topic related to the subject of the investigation." JA0149.

## C.  The equities favor the Attorney General.

Finally, the district court erred in failing to "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. Even worse, the district court misapplied the standard for balancing the equities when it concluded that the Attorney General's interest and the interest of the public are not one in the same. *See* JA820 n.10. As the Supreme Court has explained, the balance of the equities and the public interest "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

Looking at the equities here, the Attorney General has a duty to investigate whether the statements made by Media Matters are true, or whether they were made in an attempt to intentionally mislead the public. The district court has instead enjoined Texas's Attorney General from enforcing that State's laws. Applying the extraordinary remedy of an injunction to prohibit the Attorney General from enforcing the DTPA is a quintessential injury and directly harms the public. *Cf. King*, 567 U.S. at 130 (Roberts, C.J., in chambers). As a result, this Court should vacate the preliminary injunction.

## Conclusion

The Court should vacate the district court's preliminary injunction.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RYAN S. BAASCH
Chief, Consumer Protection
Division

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

 /s/ Lanora C. Pettit
LANORA C. PETTIT
Principal Deputy Solicitor General

JOSEPH N. MAZZARA
Assistant Solicitor General

COY ALLEN WESTBROOK
Assistant Attorney General

*Counsel for Attorney General Paxton*

## Certificate of Compliance

I hereby certify that this brief complies with the Federal Rule of Appellate Procedure 32(a)(7)(c), (f), and (g) because it contains 12,893 words, as counted by the Microsoft Word software to produce this brief, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1). This brief also complies with the requirements of Federal Rule of Appellate Procedure 27(d)(1)(E), 32(a)(5) and (6) because it was prepared in 14-point font using a proportionally spaced typeface.

*/s/ Lanora C. Pettit*
Lanora C. Pettit

## Certificate of Service

I hereby certify that I caused a copy of the foregoing brief to be filed on June 11, 2024, using the Court's CM/ECF system and that service was accomplished upon counsel of record by the Court's system.

*/s/ Lanora C. Pettit*
Lanora C. Pettit

# ADDENDUM

# STATUTES AND REGULATIONS

## Table of Contents

D.C. Code §13-423 .................................................................................... 1

Texas Business and Commerce Code §17.44 ...................................................... 3

Texas Business and Commerce Code §17.45 ...................................................... 4

Texas Business and Commerce Code §17.46 ...................................................... 5

Texas Business and Commerce Code §17.47 ...................................................... 6

Texas Business and Commerce Code §17.58 .................................................... 10

Texas Business and Commerce Code §17.60 .................................................... 12

Texas Business and Commerce Code §17.61 .................................................... 13

Texas Business and Commerce Code §17.62 .................................................... 16

## D.C. Code §13-423. Personal jurisdiction based upon conduct.

(a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's --

(1) transacting any business in the District of Columbia;

(2) contracting to supply services in the District of Columbia;

(3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;

(4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia;

(5) having an interest in, using, or possessing real property in the District of Columbia;

(6) contracting to insure or act as surety for or on any person, property, or risk, contract, obligation, or agreement located, executed, or to be performed within the District of Columbia at the time of contracting, unless the parties otherwise provide in writing; or

(7) marital or parent and child relationship in the District of Columbia if:

(A) the plaintiff resides in the District of Columbia at the time the suit is filed;

(B) such person is personally served with process; and

(C) in the case of a claim arising from a marital relationship:

(i) the District of Columbia was the matrimonial domicile of the parties immediately prior to their separation, or

(ii) the cause of action to pay spousal support arose under the laws of the District of Columbia or under an agreement executed by the parties in the District of Columbia; or

(D) in the case of a claim affecting the parent and child relationship:

(i) the child was conceived in the District of Columbia and such person is the parent or alleged parent of the child;

(ii) the child resides in the District of Columbia as a result of the acts, directives, or approval of such person; or

(iii) such person has resided with the child in the District of Columbia.

(E) Notwithstanding the provisions of subparagraphs (A) through (D), the court may exercise personal jurisdiction if there is any basis consistent with the United States Constitution for the exercise of personal jurisdiction.

(b) When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him.

Sec. 17.44. CONSTRUCTION AND APPLICATION. (a) This subchapter shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection.

. . .

**Texas Business and Commerce Code §17.45**

Sec. 17.45.  DEFINITIONS.  As used in this subchapter:

. . .

(6) "Trade" and "commerce" mean the advertising, offering for sale, sale, lease, or distribution of any good or service, of any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value, wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this state.

. . .

# Texas Business and Commerce Code §17.46

Sec. 17.46. DECEPTIVE TRADE PRACTICES UNLAWFUL. (a) False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful and are subject to action by the consumer protection division under Sections 17.47, 17.58, 17.60, and 17.61 of this code.

(b) Except as provided in Subsection (d) of this section, the term "false, misleading, or deceptive acts or practices" includes, but is not limited to, the following acts:

. . .

(8) disparaging the goods, services, or business of another by false or misleading representation of facts;

services from a third party provider, and which is not evidence of insurance coverage, unless:

(A) the discount is authorized under an agreement between the seller of the card and the provider of those goods and services or the discount or card is offered to members of the seller;

(B) the seller does not represent that the card provides insurance coverage of any kind; and

(C) the discount is not false, misleading, or deceptive; . . .

Sec. 17.47. RESTRAINING ORDERS. (a) Whenever the consumer protection division has reason to believe that any person is engaging in, has engaged in, or is about to engage in any act or practice declared to be unlawful by this subchapter, and that proceedings would be in the public interest, the division may bring an action in the name of the state against the person to restrain by temporary restraining order, temporary injunction, or permanent injunction the use of such method, act, or practice.

Nothing herein shall require the consumer protection division to notify such person that court action is or may be under consideration. Provided, however, the consumer protection division shall, at least seven days prior to instituting such court action, contact such person to inform him in general of the alleged unlawful conduct. Cessation of unlawful conduct after such prior contact shall not render such court action moot under any circumstances, and such injunctive relief shall lie even if such person has ceased such unlawful conduct after such prior contact. Such prior contact shall not be required if, in the opinion of the consumer protection division, there is good cause to believe that such person would evade service of process if prior contact were made or that such person would destroy relevant records if prior contact were made, or that such an emergency exists that immediate and irreparable injury, loss, or damage would occur as a result of such delay in obtaining a temporary restraining order.

(b)  An action brought under Subsection (a) of this section which alleges a claim to relief under this section may be commenced in the district court of the county in which the person against whom it is brought resides, has his principal place of business, has done business, or in the district court of the county where the transaction occurred, or, on the consent of the parties, in a district court of Travis County.  The court may issue temporary restraining orders, temporary or permanent injunctions to restrain and prevent violations of this subchapter and such injunctive relief shall be issued without bond.

(c)  In addition to the request for a temporary restraining order, or permanent injunction in a proceeding brought under Subsection (a) of this section, the consumer protection division may request, and the trier of fact may award, a civil penalty to be paid to the state in an amount of:

(1)  not more than $10,000 per violation; and

(2)  if the act or practice that is the subject of the proceeding was calculated to acquire or deprive money or other property from a consumer who was 65 years of age or older when the act or practice occurred, an additional amount of not more than $250,000.

(d)  The court may make such additional orders or judgments as are necessary to compensate identifiable persons for actual damages or to restore money or property, real or personal, which may have been acquired by means of any unlawful act or practice.  Damages may not include any damages incurred beyond a point two years prior to the institution of the action by the consumer protection division.

Orders of the court may also include the appointment of a receiver or a sequestration of assets if a person who has been ordered by a court to make restitution under this section has failed to do so within three months after the order to make restitution has become final and nonappealable.

(e)  Any person who violates the terms of an injunction under this section shall forfeit and pay to the state a civil penalty of not more than $10,000 per violation, not to exceed $50,000.  In determining whether or not an injunction has been violated the court shall take into consideration the maintenance of procedures reasonably adapted to insure compliance with the injunction.  For the purposes of this section, the district court issuing the injunction shall retain jurisdiction, and the cause shall be continued, and in these cases, the consumer protection division, or the district or county attorney with prior notice to the consumer protection division, acting in the name of the state, may petition for recovery of civil penalties under this section.

(f)  An order of the court awarding civil penalties under Subsection (e) of this section applies only to violations of the injunction incurred prior to the awarding of the penalty order.  Second or subsequent violations of an injunction issued under this section are subject to the same penalties set out in Subsection (e) of this section.

(g)  In determining the amount of penalty imposed under Subsection (c), the trier of fact shall consider:

(1)  the seriousness of the violation, including the nature, circumstances, extent, and gravity of any prohibited act or practice;

(2)  the history of previous violations;

(3)  the amount necessary to deter future violations;

(4)  the economic effect on the person against whom the penalty is to be assessed;

(5)  knowledge of the illegality of the act or practice;  and

(6)  any other matter that justice may require.

(h)  In bringing or participating in an action under this subchapter, the consumer protection division acts in the name of the state and does not establish an attorney-client relationship with another person, including a person to whom the consumer protection division requests that the court award relief.

Sec. 17.58. VOLUNTARY COMPLIANCE. (a) In the administration of this subchapter the consumer protection division may accept assurance of voluntary compliance with respect to any act or practice which violates this subchapter from any person who is engaging in, has engaged in, or is about to engage in the act or practice. The assurance shall be in writing and shall be filed with and subject to the approval of the district court in the county in which the alleged violator resides or does business or in the district court of Travis County.

(b) The acceptance of an assurance of voluntary compliance may be conditioned on the stipulation that the person in violation of this subchapter restore to any person in interest any money or property, real or personal, which may have been acquired by means of acts or practices which violate this subchapter.

(c) An assurance of voluntary compliance shall not be considered an admission of prior violation of this subchapter. However, unless an assurance has been rescinded by agreement of the parties or voided by a court for good cause, subsequent failure to comply with the terms of an assurance is prima facie evidence of a violation of this subchapter.

(d) Matters closed by the filing of an assurance of voluntary compliance may be reopened at any time. Assurances of voluntary compliance shall in no way affect individual rights of action under this subchapter, except that the rights of individuals with regard to money or property received pursuant to a stipulation in the voluntary

compliance under Subsection (b) of this section are governed by the terms of the voluntary compliance.

# Texas Business and Commerce Code §17.60

Sec. 17.60. REPORTS AND EXAMINATIONS.  Whenever the consumer protection division has reason to believe that a person is engaging in, has engaged in, or is about to engage in any act or practice declared to be unlawful by this subchapter, or when it reasonably believes it to be in the public interest to conduct an investigation to ascertain whether any person is engaging in, has engaged in, or is about to engage in any such act or practice, an authorized member of the division may:

(1)  require the person to file on the prescribed forms a statement or report in writing, under oath or otherwise, as to all the facts and circumstances concerning the alleged violation and such other data and information as the consumer protection division deems necessary;

(2)  examine under oath any person in connection with this alleged violation;

(3)  examine any merchandise or sample of merchandise deemed necessary and proper;  and

(4)  pursuant to an order of the appropriate court, impound any sample of merchandise that is produced in accordance with this subchapter and retain it in the possession of the division until the completion of all proceedings in connection with which the merchandise is produced.

# Texas Business and Commerce Code §17.61

Sec. 17.61. CIVIL INVESTIGATIVE DEMAND. (a) Whenever the consumer protection division believes that any person may be in possession, custody, or control of the original copy of any documentary material relevant to the subject matter of an investigation of a possible violation of this subchapter, an authorized agent of the division may execute in writing and serve on the person a civil investigative demand requiring the person to produce the documentary material and permit inspection and copying.

(b) Each demand shall:

(1) state the statute and section under which the alleged violation is being investigated, and the general subject matter of the investigation;

(2) describe the class or classes of documentary material to be produced with reasonable specificity so as to fairly indicate the material demanded;

(3) prescribe a return date within which the documentary material is to be produced; and

(4) identify the persons authorized by the consumer protection division to whom the documentary material is to be made available for inspection and copying.

(c) A civil investigative demand may contain a requirement or disclosure of documentary material which would be discoverable under the Texas Rules of Civil Procedure.

(d) Service of any demand may be made by:

(1) delivering a duly executed copy of the demand to the person to be served or to a partner or to any officer or agent authorized by appointment or by law to receive service of process on behalf of that person;

(2) delivering a duly executed copy of the demand to the principal place of business in the state of the person to be served;

(3) mailing by registered mail or certified mail a duly executed copy of the demand addressed to the person to be served at the principal place of business in this state, or if the person has no place of business in this state, to his principal office or place of business.

(e) Documentary material demanded pursuant to this section shall be produced for inspection and copying during normal business hours at the principal office or place of business of the person served, or at other times and places as may be agreed on by the person served and the consumer protection division.

(f) No documentary material produced pursuant to a demand under this section, unless otherwise ordered by a court for good cause shown, shall be produced for inspection or copying by, nor shall its contents be disclosed to any person other than the authorized employee of the office of the attorney general without the consent of the person who produced the material. The office of the attorney general shall prescribe reasonable terms and conditions allowing the documentary material to be available for inspection and copying by the person who produced the material or any duly authorized representative of that person. The office of the attorney general may use the documentary material or copies of it as it determines necessary

in the enforcement of this subchapter, including presentation before any court. Any material which contains trade secrets shall not be presented except with the approval of the court in which the action is pending after adequate notice to the person furnishing the material.

(g)  At any time before the return date specified in the demand, or within 20 days after the demand has been served, whichever period is shorter, a petition to extend the return date for, or to modify or set aside the demand, stating good cause, may be filed in the district court in the county where the parties reside, or a district court of Travis County.

(h)  A person on whom a demand is served under this section shall comply with the terms of the demand unless otherwise provided by a court order.

(i)  Personal service of a similar investigative demand under this section may be made on any person outside of this state if the person has engaged in conduct in violation of this subchapter.  Such persons shall be deemed to have submitted themselves to the jurisdiction of this state within the meaning of this section.

## Texas Business and Commerce Code §17.62

Sec. 17.62. PENALTIES. (a) Any person who, with intent to avoid, evade, or prevent compliance, in whole or in part, with Section 17.60 or 17.61 of this subchapter, removes from any place, conceals, withholds, or destroys, mutilates, alters, or by any other means falsifies any documentary material or merchandise or sample of merchandise is guilty of a misdemeanor and on conviction is punishable by a fine of not more than $5,000 or by confinement in the county jail for not more than one year, or both.

(b) If a person fails to comply with a directive of the consumer protection division under Section 17.60 of this subchapter or with a civil investigative demand for documentary material served on him under Section 17.61 of this subchapter, or if satisfactory copying or reproduction of the material cannot be done and the person refuses to surrender the material, the consumer protection division may file in the district court in the county in which the person resides, is found, or transacts business, and serve on the person, a petition for an order of the court for enforcement of Sections 17.60 and 17.61 of this subchapter. If the person transacts business in more than one county, the petition shall be filed in the county in which the person maintains his principal place of business, or in another county agreed on by the parties to the petition.

(c) When a petition is filed in the district court in any county under this section, the court shall have jurisdiction to hear and determine the matter presented and to enter any order required to carry into effect the provisions of Sections 17.60 and 17.61

of this subchapter. Any final order entered is subject to appeal to the Texas Supreme Court. Failure to comply with any final order entered under this section is punishable by contempt.