# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

MEDIA MATTERS FOR AMERICA; ERIC HANANOKI

*Plaintiffs-Appellees,*

*v.*

WARREN KENNETH PAXTON, JR., IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF TEXAS,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of Columbia, No. 24-cv-147-APM
Before the Honorable Amit P. Mehta

## APPENDIX TO THE BRIEF FOR APPELLANT
## VOLUME I

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RYAN S. BAASCH
Chief, Consumer Protection Division

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

LANORA C. PETTIT
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

JOSEPH N. MAZZARA
Assistant Solicitor General

COY ALLEN WESTBROOK
Assistant Attorney General

Counsel for Attorney General Paxton

# TABLE OF CONTENTS

Complaint ...................................................................................................... JA01

Motion for TRO and Preliminary Injunction ................................................. JA083

Response to Motion for TRO and Preliminary Injunction ............................ JA0365

Reply to Response to Motion for TRO and Preliminary Injunction .............. JA0368

Response by Texas Attorney General Paxton to Order of the Court ............. JA0375

Response to Motion for TRO and Preliminary Injunction ............................ JA0377

# Complaint

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, P.O. Box 44811, Washington, D.C. 20026; *and*, ERIC HANANOKI, Notice of address to be filed under seal pursuant to LCvR 5.1(c)(1), Plaintiffs, v. WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, P.O. Box 12548, Austin, TX 78711, Defendant. | Civil Action No. 24-cv-147 [CIVIL RIGHTS ACTION] **COMPLAINT** **(Rule 57 Speedy Hearing Request)** |

**INTRODUCTION**

1.      This case is a test of our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). At the heart of this commitment is the First Amendment's promise that the people and the press may discuss public matters—and criticize powerful people—"without . . . fear of subsequent punishment" from government officials. *Roth v. United States*, 354 U.S. 476, 488 (1957) (quoting *Thornhill v. State of Alabama*, 310 U.S. 88, 101–02 (1940)).

2.      Plaintiff Media Matters for America ("Media Matters") is a Washington, D.C. based organization dedicated to comprehensively monitoring, analyzing, and correcting

misinformation in the U.S. media. It employs over 60 reporters, writers, and researchers, who regularly publish news articles, analysis, research, and studies about a variety of issues of great public interest. Among them are Plaintiff Eric Hananoki, Media Matters's Senior Investigative Reporter, who for the past decade has specialized in reporting on extremism—including white nationalism, antisemitism, and Islamophobia—in the public square. For years, Media Matters and Mr. Hananoki have regularly published material that is critical of powerful figures, politicians, and elected officials. Their careful reporting and research work has been extensively cited and discussed by other media outlets—and even government agencies—as they have established themselves as important voices contributing to an ongoing and critical national discussion about extremism in our politics and media.

3.      Over the past year, as part of their long running work and mission, Plaintiffs have frequently reported on a major national news story—the disturbing rise of violent and extremist rhetoric on the popular social media platform X (formerly known as Twitter) since it was purchased by Elon Musk, reportedly the world's richest man, in late 2022. As Media Matters and countless others in the media have reported, as hateful rhetoric has continued to proliferate on the platform (often alongside Musk's own statements appearing to endorse extremist views and conspiracy theories), many advertisers have chosen to leave X. And much of Media Matters's reporting on the subject has come from Hananoki who, for nearly a year now, has been publishing a series of articles specifically about X's apparent inability to protect its advertisers from appearing alongside extremist content—despite X's repeated promises that it would do just that.

4.      This case arises out of an article that Media Matters and Hananoki published in November. That article was published on November 16, 2023, when Musk was in the middle of a veritable media storm resulting from his apparent endorsement on X of a fringe conspiracy theory

that postulates that Jewish people have a "hatred against whites" and support "flooding the[] country" with "hordes of minorities." That article was titled, "*As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*," and, in it, Hananoki reported that at the same time Musk appeared to endorse this antisemitic conspiracy theory, X was permitting the placement of advertisements next to pro-Nazi content. His article published several examples, such as this image of an advertisement for Oracle appearing next to an image of Adolf Hitler:



5.      Although the subject of the article—specifically X's consistent failure to protect advertisers from their advertisements appearing alongside hate speech on the platform—had been addressed in near-constant media coverage for over a year, Musk appeared to take personal offense at the November 16 article, and shortly after it was published, tweeted to his 165 million followers that X would be filing a "thermonuclear" lawsuit against Media Matters and anyone else involved

with the article. A mere two days later, Musk made good on his threat, filing suit against Media Matters and Hananoki on November 20, 2023. *See X Corp. v. Media Matters for America, et al.*, No. 4:23-cv-1175, 2023 WL 8091661 (N.D. Tex. Nov. 20, 2023). Although Media Matters and Hananoki have no meaningful contacts with Texas, X chose to file this lawsuit in federal district court for the Northern District of Texas, in the face of binding precedent that merely having a website available in a state does not supply jurisdiction.

6.      On the same day that X filed that lawsuit (indeed, within minutes of its filing), Defendant Texas Attorney General Ken Paxton—another prominent public figure about whom Hananoki and Media Matters have reported in the past—announced he was launching an investigation into Media Matters, purportedly under Texas's deceptive trade practices act. *See* Ex. A, *Att'y Gen. Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity*, Texas Att'y Gen.'s Office (Nov. 20, 2023). The press release announcing the investigation was four sentences long and identified no basis for the State of Texas to "investigate" Media Matters, a D.C.-based organization, for purported violation of Texas law. It does, however, repeatedly describe the investigation's target in troubling and nakedly partisan terms, calling Media Matters "a radical anti-free speech organization," and "a radical left-wing organization[] who would like nothing more than to limit freedom by reducing participation in the public square." It also admits that the sole bases for the "investigation" are X's own self-serving and unverified allegations about Media Matters's and Hananoki's reporting.

7.      That the "investigation" was pretext to rifle through Media Matters' internal communications and chill the reporting of Media Matters and Hananoki was proved the following day, when Paxton issued a civil investigative demand ("Demand") to Media Matters. The Demand commanding Media Matters to "produce [] documentary material[s] and permit inspection and

**JA05**

copying" of a sweeping array of materials in both Media Matters's and Hananoki's possession, including documents and communications about their research and reporting, their communications with possible sources at X and its advertisers, and other sensitive materials related to Media Matters's operations, including information about the organization's funding. Ex. B, Civil Investigative Demand, Office of the Att'y Gen. (Nov. 21, 2023) at 7. Paxton did not pause for even a moment to consider other public reporting on the same topic, or materials clearly within his office's reach, to determine either whether there was a legitimate substantive or jurisdictional basis for the investigation, before demanding these extraordinarily invasive materials from Media Matters itself. The result has been to immediately and significantly chill Plaintiffs' newsgathering, research, and reporting activities on X or Musk, by asserting an immediate, seemingly unrestrained right to any and all related materials, from now until Paxton determines the investigation is over. Ex. B at 7. And, under Texas procedure, Paxton is entitled to enforce the Demand in Texas state court *at any time*, even though Plaintiffs have no relevant connection to Texas and have been afforded *zero* explanation as to how they may have violated Texas law.

8.     Paxton's retaliatory campaign has had its intended effect: Plaintiffs have not published any articles about how Musk's ownership has triggered a rise in political extremism on X since Paxton announced his investigation—despite a flood of tips identifying extremist content on the platform—for fear of further retaliation and harassment.  Hananoki himself had two articles that were already researched and drafted—including one article that had gone through the entire editing process and was effectively ready for publication—at the time Media Matters received the Demand. But neither was published in the wake of the Demand. The chill on Hananoki's reporting is ongoing—he previously published one or two articles per week prior to receiving the Demand, but has published only two articles *altogether* since then, and none about Musk's handling of

JA06

political extremism on X. In the two articles Hananoki was able to publish, he has purposefully avoided commenting on X's content moderation policies, even where plainly relevant to the article.

9.      "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Likewise, under the Fourth Amendment, it is "contrary to the first principles of justice to allow a search through [Plaintiffs'] records, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924) (Holmes, J.). Paxton's retaliatory investigation and Demand are "premised solely upon *legal* activity" and thus "the very type of 'fishing expeditions' that were the target of Justice Holmes's assault in *American Tobacco.*" *Major League Baseball v. Crist*, 331 F.3d 1177, 1187 (11th Cir. 2003) (suppressing civil investigative demand violating Fourth Amendment).

10.      In view of Paxton's unlawful harassment and retaliation, Plaintiffs seek immediate declaratory and injunctive relief from this Court—in a jurisdiction where their constitutionally protected activities occur, where Media Matters is incorporated and has its office, where most of Media Matters's reporters and researchers live and work, and where Plaintiffs will be uniquely injured by being compelled to disclose information—to vindicate their fundamental right to gather news and hold the powerful to account. To the same end, Plaintiffs also respectfully request that the Court order a "speedy hearing" of this "declaratory-judgment" action. *See* Fed. R. Civ. P. 57.

## JURISDICTION & VENUE

11.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 because Plaintiffs' federal constitutional claims arise under the First, Fourth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983, 1988. It has authority to grant Plaintiffs declaratory, injunctive, and other relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Court's own legal and equitable powers. It also has supplemental

jurisdiction over any state law claims derived from a common nucleus of operative fact. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988).

12.     Subject matter jurisdiction further exists under Article III because Plaintiffs have suffered and will continue to suffer injuries-in-fact; there is a sufficient causal connection between Plaintiffs' injuries and Paxton's actions in pursuing his investigation and Demand, and a favorable decision from this Court granting Plaintiffs relief will redress those injuries. This dispute is ripe because Plaintiffs' rights are being violated already, and Plaintiffs will suffer further imminent invasions of those rights in the absence of relief from this Court. Plaintiffs have actual fear that the Demand will be enforced against them, which has already chilled their speech.

13.     This Court has personal jurisdiction over Defendant Paxton in his official capacity as Attorney General of Texas. The District of Columbia's long-arm statute is effectively congruent with the permissible limits of personal jurisdiction under the Due Process Clause. *See, e.g.*, *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 44 (D.C. Cir. 2020); *Mouzavires v. Baxter*, 434 A.2d 988, 993 (D.C. Cir. 1981). For constitutional purposes, specific personal jurisdiction exists where (1) the defendant has "purposefully directed" activity at residents of the forum and (2) the plaintiff's claims "arise out of or relate to the defendant's contacts with the forum." *Lewis v. Mutond*, 568 F. Supp. 3d 47, 52 (D.D.C. 2021) (first quoting *Burger King Corp v. Rudzewicz*, 471 U.S. 462, 472–73 (1985), and then quoting *Bristol-Myers Squibb v. Super. Ct. of Cal.*, 582 U.S. 255, 262 (2017)). Even "a single act, so long as it creates [a] 'substantial connection,' is sufficient." *Heller v. Nicholas Appelgate Cap. Mgmt. LLC*, 498 F. Supp. 2d 100, 109–10 (D.D.C. 2007) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 475, n.18 (1984)).

14.     The Court has at least three related bases to exercise jurisdiction over Paxton consistent with the demands of due process. First, Paxton procured the service of an agent—a

7

process server—and directed that agent to enter the District of Columbia to serve the Demand upon Media Matters. It is well-settled that "physical entry into the State—either by the defendant in person *or through an agent*" is a "relevant contact" for purposes of personal jurisdiction. *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (emphasis added); *see also IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 113 (D.D.C. 2018). Second, Paxton's Demand seeks documents from Media Matters that are overwhelmingly located in the District, where Media Matters is headquartered and where Media Matters will have to undertake any effort to comply with the Demand. By demanding such documents, Paxton has unquestionably "directed" activity at Media Matters in D.C. And Plaintiffs' claims unquestionably "arise" from those contacts because three of their claims challenge the statutory and constitutional propriety of Paxton's Demand. *See infra* Counts II–IV. Third, Plaintiffs allege unlawful retaliation in violation of the First Amendment, an intentional tort. *See infra* Count I. In intentional-tort cases, "personal jurisdiction can be based upon: (1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered— and which the defendant knows is likely to be suffered—in the forum state." *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 29 (D.D.C. 2017) (quoting *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998)), *aff'd,* No. 17-7033, 2018 WL 4440459 (D.C. Cir. July 17, 2018); *see also Calder v. Jones*, 465 U.S. 783, 788–89 (1984)*.* Here, jurisdiction is proper because Paxton has intentionally served a Demand on Media Matters in the District causing a substantial and predictable chill to Media Matters and its reporters, including Hananoki. Indeed, Paxton has conceded the Demand was "directed" at Media Matters in the District of Columbia. *See infra* ¶¶ 76–77 & note 28.

15.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Columbia. Paxton caused his

Demand to be served in the District; Media Matters's compliance or noncompliance therewith will occur in the District; and the substantial chill to Plaintiffs has been suffered, in substantial part, in the District.

<div align="center">

**PARTIES**

</div>

16.     Plaintiff Media Matters for America ("Media Matters") is a not-for-profit research center and media watchdog dedicated to comprehensively monitoring, analyzing, and correcting misinformation in the media. Media Matters routinely investigates political extremism on media platforms in the United States and publishes articles and commentary on public figures who endorse or espouse such rhetoric. It has been incorporated under the laws of, and has had its principal place of business in, the District of Columbia since its founding over twenty years ago. Most of its reporters and employees live in and work from the Washington, D.C. metropolitan area, including in Maryland and Virginia, as well as the District itself. Nearly all of Media Matters's executive leadership lives and works in the District of Columbia. Any periodic in-person meetings, trainings, and other convenings are held at Media Matters's office space in the District of Columbia, where it also stores any physical documents.

17.     Plaintiff Eric Hananoki is a Senior Investigative Reporter at Media Matters. Hananoki resides in Maryland, just outside of Washington, D.C. For over a decade, Hananoki's beat for Media Matters has included investigating, researching, and reporting on political extremism in U.S. media, including on social media platforms like X. In his role as Senior Investigative Reporter, Hananoki has written many articles about extremism, white nationalism, and anti-Semitic rhetoric espoused by politicians and public figures. Hananoki's reporting has included numerous articles about social media platform X and its owner, Elon Musk. Hananoki generally researched and wrote his articles, including the November 16 article, from his residence

<div align="center">

9

</div>

in Maryland. Although Hananoki primarily works from his Maryland home, he occasionally visits the Media Matters office in Washington, D.C. as part of his job responsibilities.

18.    Defendant Warren Kenneth Paxton, Jr. is the Attorney General of the State of Texas and is sued in his official capacity. The Texas Deceptive Trade Practices Act ("DPTA"), Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*, grants Paxton various powers in his capacity as Attorney General through the consumer protection division of his office. This includes the power to issue a "civil investigative demand requiring" the recipient "to produce [] documentary material[s] and permit inspection and copying." Tex. Bus. & Com. Code Ann. § 17.61(a). Under Texas law, the Attorney General is not required to show any cause or even make a threshold determination that he has jurisdiction to issue a Demand—he may do so if he "believes" the recipient to be in possession of relevant material concerning a possible violation of the DPTA. Tex. Bus. & Com. Code Ann. § 17.61(a). Paxton "may use the documentary material or copies of it as [he] determines necessary" to enforce the DPTA, including before a court. Tex. Bus. & Com. Code Ann. § 17.61(f).

## FACTS

**A.     Media Matters and Hananoki have a long track record of reporting on political extremism, including on social media platforms like X.**

19.    Since its founding in 2004, Media Matters has been dedicated to monitoring and correcting misinformation, including by publishing its own investigatory research and reporting on its website. Media Matters provides its reporters and researchers, including Hananoki, a powerful platform from which to reach the public, often in the form of research and reporting on current events and criticism of powerful public figures and politicians.

20.    Media Matters has over 100 employees—including over 60 reporters, writers, and researchers—most of whom work and reside within the Washington, D.C. metropolitan area where

Media Matters's sole office is located.[1] Media Matters does not have an office, or any other physical presence, in Texas. Media Matters does not transact any business in Texas and thus has never registered in the state. *See* Tex. Bus. Orgs. Ann. Code § 9.002(a). Media Matters is also not registered as a charity organization in Texas and does not have a registered agent in the state.

21.     Hananoki has worked at Media Matters since 2007 and is currently a Senior Investigative Reporter. Previously, Hananoki worked as a Researcher, Senior Researcher, Research Fellow, and Investigative Reporter at Media Matters. In his more than 16 years at the organization, Hananoki has researched and written countless reports and articles, often shedding light on public figures who espouse violent, extreme, or racist views. His articles and reports have been widely cited by a broad array of media outlets, including the Associated Press, CNN, Fox News, Los Angeles Times, MSNBC, New York Post, New York Times, Politico, USA Today, Wall Street Journal, and Washington Post.

22.     His long history of research and reporting has been relied upon by government officials, including under both Democratic and Republican leadership. Under President Trump, the Department of Justice cited Hananoki's research regarding a commentator who promoted and sold a bogus COVID-19 cure.[2] Special Counsel Robert Mueller cited Hananoki's reporting on

---

[1] Media Matters employees may request authorization to work remotely and, upon approval, may choose to do so from any location in the United States. Of Media Matters employees authorized to work remotely, only one employee has provided a residential address in Texas. That employee did not work with Mr. Hananoki on the November 16 article, nor any other of his articles related to X or otherwise, and works in an entirely different department. Nonetheless, since October 2023, that employee has only visited Texas for a short period during the holidays—where they only worked for a single day.

[2] *United States v. My Dr. Suggests LLC*, No. 2:20-CV-00279-DBB (D. Utah Apr. 27, 2020), Plaintiffs' Ex Parte Mot. and Mem. of Law for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue, Dkt. 2, at 13; *id.*, Decl. of Virginia Keys, Dkt. 2-1, ¶¶ 7, 28–29.

JA012

Roger Stone in his report on Russian interference in the 2016 presidential election,[3] as did a bipartisan U.S. Senate Select Committee on Intelligence report regarding the same.[4] Numerous political organizations, including the National Republican Congressional Committee, have at various times withdrawn support for political candidates after Hananoki reported on racist or extremist rhetoric from those candidates.[5]

23.    Attorney General Paxton himself has previously relied on Hananoki's work. In 2020, Hananoki uncovered "tweets filled with racist rhetoric, violent threats and coronavirus conspiracy theories" from an Assistant Attorney General in Paxton's office.[6] Paxton's office fired the employee in the wake of Hananoki's reporting.[7]

24.    As part of his work at Media Matters, Hananoki has been reporting on X—and before that, Twitter—for years. His coverage of X has increased over the past year due to a marked

---

[3] Both reports cited a Media Matters article that included a video that Hananoki found and produced. *See* Report on the Investigation into Russian Interference in the 2016 Presidential Election, Volume I of II, Special Counsel Robert S. Mueller, III, March 2019, at 57 n.233, available at https://www.justice.gov/storage/report_volume1.pdf.

[4] Select Committee on Intelligence, Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume 5: Counterintelligence Threats and Vulnerabilities, at 246 n.1638, https://www.intelligence.senate.gov/sites/default/files/documents/report_volume5.pdf.

[5] *See, e.g.*, Jonathan D. Salant, "*House Republicans withdraw support of N.J. candidate after report says he shared racist screed*," NJ.com (July 10, 2018), https://www.nj.com/politics/2018/07/house_republicans_withdraw_support_of_nj_candidate.html (noting that NRCC chair "Stivers reacted to a report by the liberal watchdog group Media Matters about [the candidate] linking to the article that ran on a white supremacist website.").

[6] Eric Hananoki, "*A Texas assistant attorney general is a Qanon conspiracy theorist who tweets out violent threats and bigoted remarks*," Media Matters for America (Sept. 3, 2020), https://www.mediamatters.org/twitter/texas-assistant-attorney-general-nick-moutos-qanon-conspiracy-theorist-who-tweets-out.

[7] Trinady Joslin, "*Assistant Texas attorney general loses job after report surfaces racist tweets*," The Texas Tribune (Sept. 3, 2020), https://www.texastribune.org/2020/09/03/nick-moutos-texas-attorney-general; *see also* Taylor Goldenstein, "*Records: Texas assistant AG who lost job over tweets was fired, had been warned about social media*," Houston Chronicle (Sept. 11, 2020),

increase in extremist rhetoric on the platform since Musk took ownership, a disturbing trend widely reported on in the media, including by outlets other than Media Matters.

**B.    Elon Musk purchases X and cuts back its content-moderation infrastructure.**

25.    On October 27, 2022, Elon Musk completed his purchase of the social media platform then known as Twitter. Musk subsequently renamed the social media platform "X," though it continues to operate at its traditional twitter.com web address. Both before and after acquiring ownership of X, Musk frequently referred to the platform as a "digital town square" or "de facto town square" for public discussion.[8]

26.    Almost immediately after his takeover, Musk began laying off key executives and content moderators at X responsible for removing hate speech and other violent rhetoric.[9] Indeed, within his first few months of ownership, Musk laid off approximately 80 percent of the company's staff, including its former CEO, general counsel, policy chief, and head of trust and safety.[10] He downsized or eliminated critical areas of the company responsible for overseeing policy, trust and safety, communications, and ethical AI, among others.[11] These deep workforce cuts raised

---

https://www.houstonchronicle.com/politics/texas/article/texas-assistant-ag-social-media-posts-fired-warned-15558487.php.

[8] Douglas Yeung, "*The 'Digital Town Square' Problem*," TheRANDBlog (Jan. 13, 2023), https://www.rand.org/pubs/commentary/2023/01/the-digital-town-square-problem.html.

[9] *See* Brian Fung & Clare Duffy, "*How a single year of Elon Musk turned Twitter into a husk of its former self*," CNN (Oct. 27, 2023), https://www.cnn.com/2023/10/27/tech/elon-musk-twitter-x-one-year-changes/index.html [hereinafter *A single year of Elon Musk turned Twitter into a husk*]; *see also* "*Musk fires outsourced content moderators who track abuse on Twitter*," MoneyWatch, CBS News (Nov. 14, 2022), https://www.cbsnews.com/news/elon-musk-twitter-layoffs-outsourced-content-moderators/.

[10] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

[11] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9; *see also* Rohan Goswami, "*X CEO Linda Yaccarino explains reason for getting rid of Twitter name*," CNBC (Aug. 10, 2023), https://www.cnbc.com/2023/08/10/x-corp-ceo-linda-yaccarino-says-she-has-autonomy-under-elon-musk.html.

questions among U.S. lawmakers and regulators about the social media platform's ability to safely respond to security and privacy threats, misinformation, and hate speech—matters of significant public concern in view of Musk's claim that the platform should serve as a digital town square.[12] Lawmakers similarly expressed concern that, in the wake of Musk's ownership, the platform had ceased to comply with two consent decrees it had entered into with the Federal Trade Commission concerning safeguards for personal data and privacy.[13]

27.     Musk also eliminated existing products and policies—many of which served to protect users from misinformation and violent content—under the auspices of promoting "free speech."[14] He reinstated suspended accounts of known white supremacists and conspiracy theorists while suspending the accounts of journalists who tracked his private air travel.[15]

28.     Unsurprisingly, after the elimination of 80 percent of X's staff and the dismantling of much of X's content moderation infrastructure, extremist and racist rhetoric surged on X in the wake of Musk's takeover. Less than a month into Musk's ownership, the Brookings Institute reported that the platform had seen a "surge in hateful language" in the wake of Musk's purchase, including "a nearly 500% increase in use of the N-word in the 12-hour window immediately

---

[12] Brian Fung, "*First on CNN: US senators question Twitter's privacy compliance under Elon Musk*," CNN (June 5, 2023), https://www.cnn.com/2023/06/05/tech/twitter-compliance-musk-senators/index.html; *see also* Brian Fung, "*Elon Musk should be forced to testify on X's 'chaotic environment,' US regulator tells court*," CNN (Sept. 12, 2023), https://www.cnn.com/2023/09/12/tech/elon-musk-testify-privacy-probe/index.html.

[13] *See* Makena Kelly, "*Republicans defend Elon Musk in FTC's Twitter probe*," The Verge (July 14, 2023), https://www.theverge.com/2023/7/14/23794363/elon-musk-twitter-ftc-lina-khan-republicans; *see also* Cat Zakrzewski, "*Musk may have violated FTC privacy order, new court filing shows*," The Washington Post (Sept. 12, 2023), https://www.washingtonpost.com/technology/2023/09/12/elon-musk-consent-order-ftc/.

[14] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

[15] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

JA015

following the shift of ownership to Musk."[16] Similarly, within the first week of his ownership, use of the word "Jew" increased fivefold, with tweets that were antisemitic receiving the most engagement.[17] Academic researchers in the School of Communication and Media at Montclair State University published a report describing how "Hate Speech Spike[d] on Twitter After Elon Musk Acquire[d] the Platform."[18]

29.     Less than two months after Musk's takeover, the New York Times reported the following about the rising hate speech on the platform:

- "Before Elon Musk bought Twitter, slurs against Black Americans showed up on the social media service an average of 1,282 times a day. After the billionaire became Twitter's owner, they jumped to 3,876 times a day."

- "Slurs against gay men appeared on Twitter 2,506 times a day on average before Mr. Musk took over. Afterward, their use rose to 3,964 times a day."

- "[A]ntisemitic posts referring to Jews or Judaism soared more than 61 percent in the two weeks after Mr. Musk acquired the site."[19]

30.     A broad array of media outlets extensively reported on this disturbing trend in Musk's self-described "digital town square."

31.     This spike in hateful rhetoric on X caught the attention of the platform's advertisers, many of whom promptly ceased advertising on the platform in the months after Musk took over.

---

[16] Rashawn Ray and Joy Anyanwu, "*Why is Elon Musk's Twitter takeover increasing hate speech?*," Brookings (Nov. 23, 2022), https://www.brookings.edu/articles/why-is-elon-musks-twitter-takeover-increasing-hate-speech/.

[17] *Id.*

[18] "*Hate Speech Spikes on Twitter After Elon Musk Acquires the Platform*," Montclair State University, (Nov. 1, 2022) https://www.montclair.edu/school-of-communication-and-media/wp-content/uploads/sites/20/2022/11/Montclair-State-SCM-Study-Increases-in-Twitter-Hate-Speech-After-Elon-Musks-Acquisition.pdf.

[19] Sheera Frenkel and Kate Conger, "*Hate Speech's Rise on Twitter Is Unprecedented, Researchers Find*," N.Y. Times (Dec. 2, 2022), https://www.nytimes.com/2022/12/02/technology/twitter-hate-speech.html.

**JA016**

Since "the early days of Musk's takeover, many of Twitter's largest advertisers—including the likes of General Mills and the Volkswagen Group—paused their spending over concerns about X's layoffs, content moderation capabilities and general uncertainty about the platform's future."[20]

32.    The pullback of the company's largest advertisers led to precipitous drops in its revenue. In July 2023, Musk reported "a 50% decline in ad revenue and heavy debt load," while in September, he reported that advertising revenue in the U.S. was "still down 60%."[21]

33.    More alarming still to X's advertisers was the fact that, after Musk's steep downsizing of company staff, the flood of hateful and violent rhetoric on the platform began appearing increasingly often alongside their advertising, creating a false association between their brands and vile hate speech. X's inability to control the appearance of extremist and violent rhetoric alongside its advertisers precipitated a broader exodus of advertisers from the platform.

34.    Indeed, the media writ large has, for over a year, consistently reported on X and Musk's failure to protect advertisers from having their brands appear next to extremist, hateful, and violent rhetoric. Some examples include:

1. **Reuters**, "*Advertisers react to Twitter's new ownership*" (Nov. 18, 2022), https://www.reuters.com/technology/advertisers-react-twitters-new-ownership-2022-11-03/.

2. **The Washington Post**, "*Amazon, Uber, Snap ads appear on Twitter pages of white nationalists restored by Musk*," Faiz Siddiqui (Dec. 6, 2022), https://www.washingtonpost.com/technology/2022/12/06/twitter-ads-elon-musk/.

---

[20] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9; *see also* Alberto Chiumento, et al., *Advertisers react to Twitter's new ownership*, Reuters (Nov. 18, 2022), https://www.reuters.com/technology/advertisers-react-twitters-new-ownership-2022-11-03/; Alan Ohnsman, *GM, Ford Say They Aren't Running Twitter Ads As They Assess Changes Under Elon Musk*, Forbes (Oct. 28, 2022), https://www.forbes.com/sites/alanohnsman/2022/10/28/gm-ford-say-they-arent-running-twitter-ads-as-they-assess-changes-under-elon-musk/?sh=1ade964b2a19.

[21] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

3.  **ARS Technica**, "*Twitter running major brands' ads with extremist tweets—until they get flagged*," Ashley Belanger (Dec. 7, 2022), https://arstechnica.com/tech-policy/2022/12/amazon-among-brands-whose-ads-appeared-in-white-nationalist-twitter-feeds/.

4.  **The Verge**, "*Twitter advertisers aren't happy with ads appearing on pages of white nationalists*," Jon Porter (Dec. 7, 2022), https://www.theverge.com/2022/12/7/23497928/twitter-advertisers-brand-safety-unbanned-accounts-white-nationalists.

5.  **Center for Countering Digital Hate**, "*Toxic Twitter: How Twitter Generates Millions in Ad Revenue by Bringing Back Banned Accounts*," (Feb. 9, 2023), https://counterhate.com/wp-content/uploads/2023/02/Toxic-Twitter_FINAL.pdf.

6.  **The Washington Post**, "*Extremist influencers are generating millions for Twitter, report says*," Taylor Lorenz (Feb. 9, 2023), https://www.washingtonpost.com/technology/2023/02/09/twitter-ads-revenue-suspended-account/.

7.  **The Kansas City Star**, "*Mizzou ad appears on racist X page as social media site faces concerned advertisers*," Jonathan Shorman (Mar. 15, 2023), https://www.kansascity.com/news/politics-government/article280309284.html.

8.  **Business Insider**, "*Disney, Microsoft, the NBA Had Twitter Ads Next to Neo-Nazi Propaganda*," Katherine Tangalakis-Lippert (June 18, 2023), https://www.businessinsider.com/disney-microsoft-nba-twitter-ads-next-to-neo-nazi-propaganda-2023-6.

9.  **The N.Y. Post**, "*Disney, Microsoft ads on Twitter show up next to neo-Nazi propaganda as advertisers return: report*," Shannon Thaler (June 19, 2023), https://nypost.com/2023/06/19/disney-microsoft-ads-on-twitter-show-up-next-to-neo-nazi-propaganda-report/.

35.   None of these articles cited or otherwise indicated that they relied on research or reporting performed by Media Matters or Hananoki.

**C.    Hananoki and Media Matters investigate and report on the surge of extremist rhetoric on X, including alongside advertisements.**

36.   As part of its long-running mission to document and report extremist political rhetoric in media, Media Matters began investigating, researching, and reporting on the rise in

17

**JA018**

political extremism and bigotry on X after Musk's changes to the platform. Hananoki, as a Senior Investigative Reporter whose beat included political extremism, was often assigned this work.

37.     From February 10, 2023 to November 17, 2023, Media Matters published at least fourteen articles about the juxtaposition of advertisements alongside hateful content on the X platform. Eleven of these articles were researched and written by Hananoki. They include:

1.     "**Under Elon Musk, Twitter is running corporate ads alongside tweets from Holocaust deniers**," Media Matters for America (Feb. 10, 2023), https://www.mediamatters.org/twitter/under-elon-musk-twitter-running-corporate-ads-alongside-tweets-holocaust-deniers.

2.     "**Linda Yaccarino just started as Twitter's new CEO, but Elon Musk already destroyed the platform for advertisers**," Media Matters for America (June 8, 2023), https://www.mediamatters.org/twitter/linda-yaccarino-just-started-twitters-new-ceo-elon-musk-already-destroyed-platform.

3.     "**Dish, Samsung, Wall Street Journal, and others are advertising on the Twitter account of a leading white nationalist group**," Media Matters for America (June 22, 2023), https://www.mediamatters.org/twitter/dish-samsung-wall-street-journal-and-others-are-advertising-twitter-account-leading-white.

4.     "**Update: Twitter placed ads for USA Today, National Women's Soccer League, and other major brands on a terrorism-linked neo-Nazi account**," Media Matters for America (July 27, 2023), https://www.mediamatters.org/twitter/twitter-placed-ads-usa-today-national-womens-soccer-league-and-other-major-brands-terrorism.

5.     "**Advertisers beware: Elon Musk and Linda Yaccarino are trying to lure you back by rebranding Twitter, but it's still a toxic cesspool**," Media Matters for America (Aug. 8, 2023), https://www.mediamatters.org/twitter/advertisers-beware-elon-musk-and-linda-yaccarino-are-trying-lure-you-back-rebranding.

6.     "**X Corp. CEO Yaccarino's interview on CNBC should alarm major advertising brands**," Media Matters for America (Aug. 11, 2023), https://www.mediamatters.org/twitter/x-corp-ceo-yaccarinos-interview-cnbc-should-alarm-major-advertising-brands.

7.     "**Update: Under Linda Yaccarino, X is placing ads for major brands on a verified pro-Hitler account**," Media Matters for America (Aug. 16, 2023), https://www.mediamatters.org/twitter/update-under-linda-yaccarino-x-placing-ads-major-brands-verified-pro-hitler-account.

8.   "**X is placing ads for brands like the NFL and MLB next to unhinged conspiracy theories about Jewish people and 9/11**," Media Matters for America (Sept. 11, 2023), https://www.mediamatters.org/twitter/x-placing-ads-brands-nfl-and-mlb-next-unhinged-conspiracy-theories-about-jewish-people-and.

9.   "**X is placing major ads on a heavily followed antisemitic account that endorses killing politicians and LGBTQ advocates**," Media Matters for America (Sept. 12, 2023), https://www.mediamatters.org/twitter/x-placing-major-ads-heavily-followed-antisemitic-account-endorses-killing-politicians-and.

10.   "**X is placing ads for the NFL on prominent white nationalist accounts**," Media Matters for America (Sept. 27, 2023), https://www.mediamatters.org/white-nationalism/x-placing-ads-nfl-prominent-white-nationalist-accounts.

11.   "**X is placing ads for MLB, the NFL, and the Pittsburgh Steelers on antisemitic and Holocaust denial accounts**," Media Matters for America (Oct. 12, 2023), https://www.mediamatters.org/twitter/x-placing-ads-mlb-nfl-and-pittsburgh-steelers-antisemitic-and-holocaust-denial-accounts.

12.   "**Pro-Hitler and Holocaust denier account: X has paid me $3,000 in ad revenue sharing**," Eric Hananoki, Media Matters for America (Nov. 13, 2023), https://www.mediamatters.org/twitter/pro-hitler-and-holocaust-denier-account-x-has-paid-me-3000-ad-revenue-sharing.

13.   "**As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content**," Media Matters for America (Nov. 16, 2023), https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.

14.   "**X is placing ads for Amazon, NBA Mexico, NBCUniversal, and others next to content with white nationalist hashtags**," Media Matters for America (Nov. 17, 2023), https://www.mediamatters.org/twitter/x-placing-ads-amazon-nba-mexico-nbcuniversal-and-others-next-content-white-nationalist.

38.   Media Matters's research and reporting echoed what was being reported widely elsewhere—that the platform was continuing to permit the placement of advertisements alongside extremist content. Hananoki and Media Matters thus joined in ongoing national conversations about an important news story—the surge of hateful and violent rhetoric in America's supposed "digital town square."

**JA020**

39.     Hananoki's research and reporting sometimes looked specifically at what advertisements X's increasingly extremist user base might see on the platform. Following ordinary journalistic investigative practices, Hananoki used an existing X research account controlled by Media Matters to follow white supremacist content and gauge the advertising that X's computer algorithm would automatically generate in response. His research confirmed that the platform's system was continuing to permit advertisements next to violent and fringe content.

40.     Hananoki published some of his findings, along with a handful of examples, in his November 16 article. That article also reported on Musk's apparent endorsement of a widespread antisemitic conspiracy theory—that Jewish people are seeking to promote "hatred against whites" and are seeking to "flood[] the[] country" with "hordes of minorities"—which drew widespread condemnation and was extensively covered in the media.[22] Hananoki's article included screenshots of six advertisements from major corporate entities appearing with at least nine posts from X users. For example, below are images of an advertisement for Oracle appearing with a quote from Adolf Hitler, as well as an advertisement for the Bravo television network next to a post praising Hitler's Nazi Party, which were included in his article:

---

[22] *See, e.g.*, David Goldman, "*Elon Musk agrees with antisemitic X post that claims Jews 'push hatred' against White people*," CNN (Nov. 17, 2023), https://www.cnn.com/2023/11/15/media/elon-musk-antisemitism-white-people/index.html.



41.     Hananoki did not say in his article that X, or anyone associated with X, was intentionally placing advertisements next to such violent or fringe content. He simply reported truthfully that the platform permitted the placements of advertisements from some of the nation's biggest advertisers next to posts that touted Hitler or the Nazi party—which the platform's algorithm obviously did, as the examples he cited showed.

42.     Hananoki researched, factchecked, and drafted the November 16 article in accordance with Media Matters's policies and standards, using similar methods to those he has used throughout his long career in journalism, and mirroring common journalistic practices.

**D.      Attorney General Paxton retaliates against Media Matters and Hananoki for their coverage of extremist rhetoric on X.**

43.     Despite the robust and ongoing reporting by Media Matters and other news outlets about X's extremist content, Musk apparently took personal offense only at Hananoki's November 16 article discussing Musk's endorsement of an antisemitic conspiracy theory.

44.     Just two days after the article was published, Musk promised to file "a thermonuclear lawsuit against Media Matters." *See* @elonmusk, X.com (Nov. 18, 2023, 2:01 AM ET), https://perma.cc/X4HN-PLJ4. The post received hundreds of thousands of likes and comments, and tens of thousands of reposts. *Id.*



45.     Musk attached a message to the post referencing Hananoki's November 16 article and accusing Media Matters of manipulating X's algorithm to artificially force the placement of ads next to extremist content. *See* @elonmusk, X.com (Nov. 18, 2023, 2:01 AM ET), https://perma.cc/X4HN-PLJ4. Musk made no mention of the year-long parade of reports and documentation illustrating this endemic problem with the architecture of the X platform.

46.     Various media and political figures—many of whom have been the subjects of Media Matters reporting over the years—leapt to Musk's defense and urged retaliation against Media Matters. For example, on November 19, former adviser to President Donald Trump Stephen Miller, discussing Media Matters's article, declared, "There are 2 dozen+ conservative state Attorneys General," seemingly urging states to investigate Plaintiffs for their article. *See* @StephenM, X.com (Nov. 19, 2023, 11:48 AM ET), https://perma.cc/9E6L-FJGY.

47.     Responding directly to Miller's call for retaliation, Missouri Attorney General Andrew Bailey announced that his "team [was] looking into" Plaintiffs' article. @AGAndrewBailey, X.com (Nov. 19, 2023, 4:46 PM ET), https://perma.cc/J463-656K.



48.     On November 20, 2023, Attorney General Paxton joined the fray, announcing via press release that he was launching an investigation into Media Matters. Ex. A. The four-sentence press release asserted that the Attorney General would "vigorously enforce" the Texas Business Organizations Code and the Deceptive Trade Practices Act but failed to explain how Media Matters—a D.C.-based non-profit media watchdog—or Hananoki—a Maryland-based reporter— were believed to have violated those laws directed at consumer protection in the carrying on of a trade or business. *Id.* Instead of providing any substantive basis that could justify the "investigation," Paxton's press release disparaged Media Matters as "a radical anti-free speech organization," and as a "radical left-wing organization[] who would like nothing more than to limit freedom by reducing participation in the public square[.]" *Id.*

49.     Paxton doubled down on his public attacks of Media Matters in subsequent interviews. In an interview with Charlie Kirk—a frequent subject of Media Matters's reporting[23]— on the Charlie Kirk Show, Paxton discussed his investigation into Media Matters, asserting that his office could "take away [Media Matters's] ability to do business in Texas[,]" and "go after"

---

[23] *See* "Charlie Kirk," Media Matters for America, https://www.mediamatters.org/charlie-kirk.

JA024

Media Matters for large amounts of money—to which Kirk replied, "I love it."[24]

50.    In a subsequent interview, activist Benny Johnson framed Paxton's investigation as "devastating" to Media Matters and "com[ing] in concert with Elon Musk dropping . . . [a] 'thermonuclear' lawsuit on Media Matters." *See* Ex. C, Nov. 28, 2023 "The Benny Show" Certified Tr. He asked Paxton if he "encourage[d] other Republican attorney generals to do this" and stated "we're so thankful that somebody is just standing up and doing something. Where are the rest of the Republican AGs? . . . Why are they so quiet on issues like this?" *See* Ex. C; *see also* @bennyjohnson, X.com (Nov. 28, 2023, 12:36 PM ET), https://perma.cc/JA55-6A8G.



51.    Paxton responded by encouraging other state attorneys general to investigate Media Matters, saying: "You know, that's a good question . . . I would encourage them to look at this. They may have just become aware of it. I mean it's a relatively new issue so hopefully over the

---

[24] RealAmericasVoice, "*'We have the right as the state of Texas to go after those damages.' - AG Ken Paxton*," Rumble (Nov. 21, 2023), https://rumble.com/v3x3aim-we-have-the-right-as-the-state-of-texas-to-go-after-those-damages.-ag-ken-p.html.

next couple of weeks, you'll see other attorney generals [sic] look at this." Ex. C. Paxton neither disputed nor qualified Johnson's framing. *Id*. Paxton later admitted in another interview that he only even became aware of Media Matters's alleged conduct through Musk's litigation, rather than any independent investigation or work by his office.[25]

52.    On November 21, 2023, the day after Paxton announced his investigation, the office of the Attorney General of Texas issued the Demand, which references and requests a broad swath of documents related to Hananoki's November 16 article. Ex. B at 7. Plaintiffs first received the Demand on November 22 via FedEx delivery at Media Matters's Washington, D.C. office. Paxton later dispatched a process server, who attempted to serve the Demand on Media Matters at its office in the District of Columbia on November 30, 2023. The Demand was subsequently served on Media Matters's District of Columbia-based outside counsel at their Washington, D.C. office, on December 1, 2023. The Demand has a return date of December 12, 2023. *Id.* at 1.

53.    Paxton's Demand, like his press release, provides no explanation for how Media Matters or Hananoki could have violated Texas's Deceptive Trade Practices Act, nor any explanation for how Paxton could exercise the State's coercive power over them. *See generally* Ex. A; Ex. B. To date, Paxton has provided no explanation at all for how Plaintiffs may have violated Texas law, or are plausibly subject to Texas's jurisdiction, and has continued to point to Musk's allegations as the sole basis of his investigation.

54.    The overbroad Demand requests that Media Matters produce "all documents related to internal and external communications relating to the article titled '*As Musk endorses antisemitic*

---

[25] *See also* Newsmax, "*Texas A.G. Ken Paxton probes Media Matters for 'Fraudulent Activity,'*" Rumble (Nov. 21, 2023), available at https://rumble.com/v3x4olk-texas-a.g.-ken-paxton-probes-media-matters-for-fraudulent-activity.html. *See id.* at 2:12 ("So we learned about this actually through the actual lawsuit that Elon Musk filed and then the reporting of it.").

*conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*' by Eric Hananoki." Ex. B at 7. The Demand also requests documents sufficient to identify Media Matters's organizational structure; sources of income originating in Texas; operational expenditures in Texas; current and past X accounts, including those used to obtain the screenshots contained in the November 16 article; and direct and indirect sources of funding for operations involving X research and publications. *Id.*

55.     Paxton's Demand also requests that Media Matters produce—on an ongoing basis—all documents related to its internal and external communications, from as far back as January 1, 2022, regarding X CEO Linda Yaccarino and Musk's purchase of X; all internal and external communications regarding the November 16 article; external communications with employees and representatives of X, from November 1, 2023 to November 21, 2023; and external communications with ten corporate entities, from November 1, 2023 to November 21, 2023. *Id.* It is, in effect, an ongoing demand for virtually any materials Media Matters and Hananoki might generate as a result of future coverage of X and Musk.

56.     On December 12, as requested in the Demand, Media Matters responded to the Attorney General's Office, setting forth why it believed Paxton's conduct to be unlawful and raising objections to the Demand. Paxton's office responded on December 29. Paxton's letter confirms he intends to enforce the Demand without any showing of jurisdiction or cause. Texas law, he claims, grants him "broad discretion in the overall breadth and relevance of the materials that may be sought in the course of a pre-suit investigation" and requires him to provide his targets with only "the general subject matter of the investigation." Plaintiffs' rights in responding are constricted because "a CID issued by [Paxton] is not limited by the Texas Rules of Civil Procedure." Paxton reserves his "right to pursue appropriate legal action to enforce" the Demand

and asserts that Plaintiffs' only option to "resist the Attorney General's investigation" is "to establish that there were zero permissible justifications" for it. The letter requested an answer by January 4, at which point counsel for Media Matters responded to Paxton's December 29 correspondence to reassert all objections to the Demand, and reiterate that Defendant's office is without jurisdiction to conduct the investigation of Media Matters, and that Defendant's investigation constitutes unlawful retaliation in violation of the First Amendment.

**E.     Attorney General Paxton chilled, and continues to chill, Media Matters's and Hananoki's speech and reporting.**

57.     Paxton's investigation and Demand have chilled Media Matters's and Hananoki's speech and press activities. It has further resulted in a slew of threats against Media Matters and its staff. Hananoki has been harassed and has received hateful messages, requiring him to increase his home and personal security. Media Matters has been forced to retain an outside security firm to protect its employees in response.

58.     Hananoki's research and writing have been severely impaired and disrupted by Paxton's baseless investigation. Prior to Paxton's Demand, Hananoki published approximately one or two articles per week; in the eight weeks since Paxton issued the Demand, Hananoki has published only two articles altogether, or roughly one per month. Draft articles he intended to publish about extremism on X were cut for fear of generating documents that would be subject to Paxton's Demand and further retaliation from Paxton. In fact, since Paxton launched his investigation, Hananoki has not published any stories about the rise of extremist rhetoric in the wake of Musk's ownership after consistently doing so for months.

59.     Hananoki's diminished reporting output is not for lack of story ideas. Since Paxton's investigation began, Hananoki has continued generating potential story ideas regarding extremist content on X but has not pursued them for fear of retaliation. This includes coverage of

JA028

the reinstatement of Alex Jones, a prominent conspiracy theorist, to the X platform by Musk, and the use of an Alex Jones-related hashtag alongside advertising; antisemitic hashtags targeting Jewish people appearing alongside advertising; and advertising appearing on the X account of Stew Peters, a white nationalist internet personality who has promoted violence, as well as antisemitism, racism, and homophobia. Hananoki fears that reporting on these topics will draw further retaliation towards himself, his employer, and his colleagues. These story ideas are well within Hananoki's long-running beat, yet he was nonetheless chilled from reporting on these topics, at least one of which received extensive national coverage in other publications.[26] Even where Hananoki has been able to publish work, he has self-censored on the topic related to X's content-moderation policies, limiting the scope of his articles. For example, on January 2, 2024, he published an article describing former General Mike Flynn's appearance on Alex Jones's show but omitted any discussion of Jones's recent reinstatement on X—a plainly relevant aspect of the story.

60.     Hananoki's chill is further compounded by the fear that any materials he generated in preparing such stories will end up in Paxton's hands, which calls for the ongoing production of any and all internal communications even touching upon Musk's purchase of X or X's CEO Linda Yaccarino, who has frequently made claims (undermined by Plaintiffs' reporting) that X provides

---

[26] Clare Duffy, *'The people have spoken': Elon Musk restores the X account of conspiracy theorist Alex Jones after poll*, CNN (Dec. 10, 2023), https://www.cnn.com/2023/12/09/business/alex-jones-restored-x-elon-musk-poll/index.html; Danielle Wallace, *Elon Musk reinstates Alex Jones on X*, Fox News (Dec. 10, 2023), https://www.foxnews.com/media/elon-musk-reinstates-alex-jones-x; Kate Conger, *Elon Musk Brings Conspiracy Theorist Alex Jones Back to X*, N.Y. Times (Dec. 9, 2023), https://www.nytimes.com/2023/12/09/technology/elon-musk-alex-jones-twitter-x.html.

JA029

a safe platform for advertisers.[27] This same concern has even hampered Hananoki's ability to communicate internally with his editor—who is based in Washington, D.C.—for fear that their communications about story ideas will be turned over to the attorney general of a state with absolutely no connection to Hananoki's work.

61.     Prior to the Demand, Hananoki regularly posted commentary on X regarding his work, responded to other journalists' posts, and communicated with other journalists. Since Paxton issued the Demand, however, he no longer actively engages in such communications.

62.     As a direct result of Paxton's intrusive Demand, many other Media Matters reporters, writers, and researchers—many of whom live and work in the District of Columbia and surrounding suburbs—have also pared back reporting and publishing, particularly on any topics that could be perceived as relating to the Paxton investigation, fearful of being ensnared in Paxton's investigation, generating documents subject to Paxton's Demand, or publishing articles that would provoke additional legal action. These reporters and researchers are also aware that Media Matters's editorial team has been required to hold back stories about X and Musk due to these concerns. The Demand has effectively tied Media Matters's hands in reporting on these issues, even while it has received an outpouring of tips from people who continue to see extremist and violent content placed next to advertisements on X. Media Matters has not yet acted on these tips, afraid that under Paxton's Demand it could be compelled to turn over any work performed in response.

---

[27] *See, e.g.*, *Twitter-turned-X CEO Linda Yaccarino focuses on winning back big brands on Elon Musk's platform*, AP (Aug. 10, 2023), https://apnews.com/article/twitter-x-corp-ceo-linda-yaccarino-elon-musk-0131c61ac296955d424fd057f6b0196d; Jonathan Vanian, *Read Linda Yaccarino's message to X employees about Elon Musk's controversial DealBook interview*, CNBC (Nov. 30, 2023), https://www.cnbc.com/2023/11/30/read-linda-yaccarinos-message-to-x-employees-about-musk-interview.html.

JA030

63.     Media Matters's executive and editorial team have also been forced to become more involved in the organization's publishing decisions since Attorney General Paxton launched his investigation to protect the organization against further retaliation. This has significantly slowed down Media Matters's publication process, as the organization must carefully assess whether a new article or report could impact existing legal proceedings or spark new ones.

64.     Media Matters's associations with other groups have also been impaired by Attorney General Paxton's investigation. Groups that previously worked closely with Media Matters have reevaluated doing so, afraid that communications may be turned over to the Attorney General or spark investigations into their own publications. And Media Matters employees are self-censoring when anything related to X comes up in communications with such groups, curtailing engagement with partner organizations out of concern over potential exposure. For example, Media Matters has refrained from actively participating in discussions as part of its membership in coalitions focused on issues of hate speech on X while the Demand remains pending. Media Matters's external affairs staff have also paused sharing research regarding X and its content moderation policies with longstanding partners, refraining even from directing partners to content it has *already published* about X, for fear that any conversations or aid may lead to further retaliation against Media Matters or its partners.

65.     Paxton's investigation has also caused Media Matters's department directors to hit pause on similar reporting on content moderation and advertisement placement issues for at least one other social media platform, besides X, out of fear such reporting will lead to further retribution.

66.     Attorney General Paxton's overbroad Demand—which on its face demands associational and journalistic materials protected from disclosure by the First Amendment—

JA031

further harms Plaintiffs. Complying with the Demand would require Plaintiffs to turn over sensitive documents and communications, including materials Hananoki prepared to write his November 16 article, in addition to sensitive operational information about Media Matters's employees, donors, funding, expenditures, and confidential sources. With this Demand looming over them, Plaintiffs have been chilled from publishing, and in some cases generating, new research and investigatory work product that could be subject to compelled disclosure.

67.     The scope of the Demand extends far beyond any document requests Plaintiffs may receive in X's civil suit—should that matter proceed past the pleading stage and reach discovery. Whereas X's civil suit is focused exclusively on Plaintiffs' *past* coverage of X and Musk— specifically the November 16 and 17 articles written by Hananoki—Paxton's Demand requires ongoing production of materials pertaining to *future* articles that Plaintiffs may wish to prepare, chilling their speech indefinitely. Even if X's suit reaches discovery (and given X's choice of jurisdiction and binding precedent in that jurisdiction holding a lack of jurisdiction in a similar case, it very well may not), Plaintiffs can avail themselves of the full protections of the Federal Rules of Civil Procedure which, among other protections, limit document production to "nonprivileged matter[s]" that are "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). But according to Paxton, the Texas Civil Rules of Civil Procedure do not apply to his Demand—in other words, he may demand documents regardless of relevance, overbreadth, and proportionality.

68.     The onerous Demand is backed by the threat that, if Plaintiffs do not comply, Paxton is entitled to sue Plaintiffs in a Texas court to enforce the Demand. *See* Tex. Bus. & Com. Code Ann. § 17.62(b) (authorizing the Office of the Attorney General to "file . . . a petition for an order of the court for enforcement of" a Civil Investigative Demand under Section 17.61). Such a

JA032

tribunal would be a foreign court to both Media Matters and Hananoki, who have no relevant contacts with Texas and who understandably fear having their constitutional rights adjudicated in jurisdictions with which they have no connection.

69.    Media Matters is not registered as a foreign corporation in Texas and does not "transact business" in Texas. Tex. Bus. Orgs. Code Ann § 9.002(a). It does not have a registered agent in Texas. Media Matters performs no "business practices" in Texas, Tex. Bus. & Com. Code Ann. § 17.44(a), and conducts no "trade" or "commerce" in Texas, Tex. Bus. & Com. Code Ann. §§ 17.45(6), .46(a). And, as explained, Hananoki's reporting that is the focus of Paxton's investigation occurred exclusively in Maryland and involved no contact with Texas. That Plaintiffs may be dragged to court in an unknown, unfamiliar, and untouched venue in Texas at the option of Attorney General Paxton further chills their speech.

70.    The Deceptive Trade Practices Act arms Paxton with a host of other powers with which to retaliate against Plaintiffs, including restraining orders, civil penalties, and sanctions. *See, e.g.*, Tex. Bus. & Com. Code Ann. §§ 17.47(a)–(b) (authorizing OAG to "bring an action in the name of the state" for injunctive relief), (c)–(d) (authorizing OAG to seek damages and restitution), (e)–(f) (authorizing OAG to seek monetary civil penalties for violations of injunctions).

71.    Paxton's own past words resolve any possible doubt about the uniquely injurious effects of his Demand that will be felt by Plaintiffs Hananoki and Media Matters. In 2016, alongside several other state attorneys general, Paxton filed an amicus brief excoriating Massachusetts for using its own deceptive trade practices law to serve a similar civil investigative demand on Exxon Mobil—which, notably, is involved in trade practices—regarding claims it misled consumers about the impact of its energy products on climate change. Ex. D, Brief of Amici

JA033

Curiae, *Exxon Mobil Corp. v. Healey*, No. 4:16-CV-00469-K (N.D. Tex. Sept. 8, 2016), ECF No.

63-2. Paxton, at that time, wrote:

> "The[] [First Amendment] protections afforded by the Constitution . . . [are]
> threatened by the chill of subpoenas, like Massachusetts's CID, hanging in the air.
> Thus, not only is Massachusetts attempting to silence Exxon through the issuance
> and threat of compelling a response to the CID, this very action harms everyone[.]"

*Id.* at 6. He added that "[t]he authority attorneys general have to investigate fraud does not allow

them to encroach on the constitutional freedom of others to engage in an ongoing public . . .

debate." *Id.* at 3.

      **F.**    **Plaintiffs sued Paxton to protect their First Amendment rights.**

    72.    Plaintiffs filed suit against Paxton on December 12, 2023—the return date for the

Demand. *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 1.

Plaintiffs filed suit in Maryland because that is where Hananoki lives, works, and wrote the articles

giving rise to Paxton's unlawful investigation. The Demand—which targets Hananoki's work and

communications—sought documents created and stored at Hananoki's home in Maryland.

    73.    Plaintiffs also moved for a preliminary injunction and temporary restraining order

the same day, seeking to enjoin further enforcement of the Demand. *Media Matters for America

v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF Nos. 2, 20. Plaintiffs' motion—refiled on

December 14, 2023 after completing service on Paxton—was fully briefed on January 2, 2024.

Paxton's response offered little defense on the merits, but raised ripeness, personal jurisdiction,

and venue objections.

    74.    The District Court of Maryland (Xinis, J.) held a hearing on the motion on January

8. The court indicated that if it reached the question, it would likely find that Plaintiffs' claims are

ripe, explaining at the outset it believed Plaintiffs had "jumped the broom on subject matter

jurisdiction" and had "pled enough for this [matter] to be ripe constitutionally."

**JA034**

75.     The court expressed concern, however, about whether Maryland had personal jurisdiction over Paxton. The court's concern was rooted specifically in whether Paxton had awareness of Hananoki's connections to Maryland, coupled with the fact that the Demand had been formally served on Media Matters in Washington, D.C.

76.     The court expressed little doubt, however, that the District of Columbia had specific jurisdiction over Paxton. It repeatedly stressed that Paxton had "served [the Demand] in D.C." and had "directed [his] investigation to Media Matters in D.C." The court even understood Paxton's "pleadings" to have "referenced that there is personal jurisdiction in D.C."[28]

77.     The court's reading of Paxton's pleadings was well-founded—his opposition to Plaintiffs' motion stressed that his "conduct was not in any sense 'aimed' at Maryland—indeed, [the] CID was issued to, and served in, the District of Columbia, where Media Matters resides." *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 33, at 16. And counsel for Paxton made the same point at oral argument, explaining "the civil investigation demand[] *was directed as [sic] Media Matters, which is a . . . District of Columbia corporation.*"

78.     The court did not rule on Plaintiffs' motion, or Paxton's personal jurisdiction argument, but indicated that if the parties "want a resolution that is fast and fair to both sides," they "would move it to D.C." either through "an agreement from both sides that personal jurisdiction exists in D.C." or through briefing a transfer motion. The court advised Paxton's counsel that, beyond transfer, Plaintiffs could simply "dismiss this case and refile immediately in D.C." and Paxton's counsel agreed Plaintiffs "could do that." Despite the court's offer and

---

[28] Although Paxton's prior briefing argues the District of Columbia is not the "proper venue" for this proceeding and that he is "not subject to personal jurisdiction there," he has also argued that Media Matters "could have instead sued in its home—the District of Columbia, where undersigned counsel, and other attorneys in OAG, are barred." *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 33, at 18 n.5, 24.

Plaintiffs' willingness to transfer the matter to this District, Paxton's counsel demurred and insisted the issue "need[ed] to be briefed."

79.     Accordingly, without ruling on the pending motion, the court set a briefing schedule for Paxton's motion to dismiss, through which it would further evaluate the issue of jurisdiction and, upon finding jurisdiction, evaluate the merits of Plaintiffs' motion. It advised Plaintiffs that if "in the interim" they "would just prefer to file it in D.C.," then they "can do that."

80.     While Plaintiffs continue to believe Maryland has specific jurisdiction over Paxton, and that the District of Maryland is an appropriate venue for this case, given the urgency of the relief needed, they agree with Judge Xinis's conclusion that the "fast and fair" way to resolve this dispute is by moving this matter to the District of Columbia, which also has specific jurisdiction over Paxton, where venue is also appropriate, and where both Paxton and Judge Xinis appeared to agree that jurisdiction and venue more clearly lies. Plaintiffs therefore filed a notice of voluntary dismissal of their action in the District of Maryland and have promptly refiled their complaint in this District.

## CLAIMS FOR RELIEF

## COUNT I

**First Amendment Retaliation in Violation of Plaintiffs' Rights Under the First and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983)**

81.     Plaintiffs incorporate paragraphs one through 80 above as if set forth fully herein.

82.     Attorney General Paxton violated, and continues to violate, Plaintiffs' First Amendment rights by launching an investigation and serving a burdensome Demand in retaliation for Plaintiffs' speech, press, and associational activities. Paxton's use of the power of his office is discouraging and will continue to discourage Plaintiffs from engaging in news coverage. The chill imposed by his retaliatory actions injures Plaintiffs' ability to investigate and publish news stories

JA036

and further chills their ability to participate in a robust public discussion around political extremism on the X platform. Absent relief from this Court, that chill will continue so long as Paxton's investigation and Demand are—in Paxton's own words—"hanging in the air." Ex. D at 6.

83.     "[T]he law is settled that . . . the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman*, 547 U.S. at 256. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).

84.     The D.C. Circuit has long recognized First Amendment retaliation claims as "actionable because 'retaliatory actions may tend to chill individuals' exercise of constitutional rights.'" *Crawford-El v. Britton*, 93 F.3d 813, 846 (D.C. Cir. 1996) (Henderson, J., concurring) (quoting *ACLU of Md., Inc. v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993)); *see also Perry v. Sindermann,* 408 U.S. 593, 597 (1972). That cause of action for First Amendment retaliation arises under 42 U.S.C. § 1983, which "has long [been] interpreted . . . to permit suits against officials in their individual capacities" for constitutional violations. *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020). To prevail on their retaliation claim, Plaintiffs must show: "(1) [they] engaged in conduct protected under the First Amendment; (2) [Paxton] took some retaliatory action sufficient to deter a person of ordinary firmness in [Plaintiffs'] position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Plaintiffs satisfy each element.

85.     *First*, Plaintiffs' investigative, newsgathering, and reporting activities are "legally protected interest[s]" under the First Amendment. *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227 (4th Cir. 2019) (recognizing right of local news website operator to "gather news"); *see also*

*Flynt v. Rumsfeld*, 180 F. Supp. 2d 174, 175 (D.D.C. 2002) (explaining that "under the First Amendment the press is guaranteed a right to gather and report news"). Media Matters provides journalistic research and investigative reporting on a variety of matters and figures of public importance. Hananoki is a senior investigative reporter who for over a decade has published journalism about political extremism online, including on platforms like X. The "First Amendment applies in full force" to this newsgathering and commentary, and further "protect[s] a news outlet's editorial perspective [and] the way its beat reporters cover a given" public issue. *Washington Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019) (quoting *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974)); *cf. Nat'l Org. For Women, N.Y.C Chapter v. F.C.C.*, 555 F.2d 1002, 1010 (D.C. Cir. 1977) (explaining that "[t]he exercise of such editorial discretion, especially in connection with news reporting, sharply implicates First Amendment values"). Indeed, "the constitutional protection of the press reaches its apogee" where, as here, Plaintiffs are members of the press who investigate and write about "a public figure" or "on a matter of public concern." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (citing *New York Times Co.*, 376 U.S. 254); *see also Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) ("Speech on matters of public concern is at the heart of the First Amendment's protection.") (cleaned up); *Farah v. Esquire Mag.*, 736 F.3d 528, 539 (D.C. Cir. 2013) (similar).

86.     *Second*, Paxton has taken action adverse to Plaintiffs' protected activity in response to news coverage. His investigation and intrusive Demand have already chilled Plaintiffs' speech and reporting activities and will continue to do so absent relief. Paxton's retaliatory conduct would "deter a person of ordinary firmness in [Plaintiffs'] position from speaking again." *Aref*, 833 F.3d at 258, particularly given the suite of tools Texas law provides Paxton to further punish, harass, and restrain Plaintiffs' constitutionally protected conduct. *See, e.g.*, Tex. Bus. & Com. Code Ann.

JA038

§§ 17.47, .60, .62. This chill is exacerbated by the fear Plaintiffs will be forced to defend their constitutional rights in a jurisdiction with which they have no meaningful connection.

87.     *Third*, there is no serious dispute that Paxton's investigation and Demand are causally linked to Plaintiffs' coverage of X and Musk. Attorney General Paxton has publicly admitted as much. He announced his investigation into Plaintiffs on November 20, 2023, the same day that X filed a frivolous lawsuit against Plaintiffs for the very same coverage Paxton seeks to punish. Paxton issued his retaliatory Demand only a day after announcing his investigation. Since then, Paxton has encouraged other state Attorneys General to take retaliatory action against Plaintiffs under their own state consumer laws—regardless of any connection Plaintiffs have with those states. The material sought by Attorney General Paxton's Demand further confirms the causal connection, as it singles out documents and communications related to the November 16 article, as well as X and its officers.

88.     Paxton's retaliatory campaign against Media Matters has injured Plaintiffs and will continue to do so absent relief from this Court. This harm will be redressed by an order declaring Paxton's conduct to be unlawful and enjoining him from further investigating Plaintiffs or enforcing his Demand. Such relief is appropriate under Section 1983. *Hedgepeth ex rel. Hedgepeth v. Washington Metro. Area Transit Auth.*, 386 F.3d 1148, 1152 n.3 (D.C. Cir. 2004); *Anderson v. Reilly*, 691 F. Supp. 2d 89, 92 (D.D.C. 2010).

## COUNT II

**Violation of Plaintiffs' Rights Under the First, Fourth, and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983)**

89.     Plaintiffs incorporate paragraphs one through 88 above as if set forth fully herein.

90.     Attorney General Paxton's issuance of the overbroad and retaliatory Demand further violates Plaintiffs' First and Fourth Amendment rights by unreasonably requiring them to

JA039

turn over sensitive and privileged materials, including those that impinge upon their association with other organizations.

91.     The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). The First Amendment provides Plaintiffs a privilege against disclosure of materials that would chill their constitutional rights. *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009). Where "the materials sought to be seized" by an administrative subpoena even "*may* be protected by the First Amendment," the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas,* 379 U.S. 476, 485 (1965)) (emphasis added).

92.     Defendant Paxton has shown no such "scrupulous exactitude" in his Demand. Without any showing of cause or jurisdiction, Paxton has demanded that Plaintiffs produce a broad set of documents that implicate their core First Amendment rights.

93.     The Demand seeks, for example, swathes of documents related to Plaintiffs' donors, funding sources, expenditures, and employees, all of which are protected from compelled disclosure under the First Amendment. *E.g.*, *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021); *NAACP v. Alabama*, 357 U.S. 449, 462 (1958).

94.     Relatedly, the Demand seeks various kinds of "external communications" that would expose Plaintiffs' associations and collaborations with other groups, including on efforts like ongoing coalitions that include prominent civil rights organizations as well as technology experts and research organizations focused on the challenges of content moderation on X. "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental

action." *NAACP*, 357 U.S. at 462. Compelled disclosure of such associational materials must meet "exacting scrutiny." *Bonta*, 141 S. Ct. at 2383.

95.     The Demand further requires that Plaintiffs surrender internal communications and files regarding news articles, as well as communications with employees at X and its advertisers, again with no showing of cause. Paxton may not "rummage at large in newspaper files or [] intrude into or to deter normal editorial and publication decisions" under the First Amendment. *Zurcher*, 436 U.S. at 566; *see also Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012). Such "[b]road and sweeping state inquiries into these protected areas . . . discourage citizens from exercising rights protected by the Constitution." *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971) (plurality opinion).

96.     It provides no meaningful relief to Plaintiffs that Paxton is only authorized to enforce his Demand through a petition to Texas's courts. *See* Tex. Bus. & Com. Code Ann. § 17.62(b). Texas courts plainly lack personal jurisdiction over Plaintiffs, who should not be forced to subject themselves to foreign tribunals to defend their constitutionally protected rights.

97.     Plaintiff Media Matters is incorporated under the laws of, and has its principal place of business in, the District of Columbia. Plaintiff Eric Hananoki is domiciled in Maryland. Texas courts lack general jurisdiction over Plaintiffs. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024–25 (2021).

98.     Plaintiffs have not purposefully availed themselves of the privilege of conducting activities in Texas, nor would any cause of action stemming from the Demand arise out of or relate to such purposeful contacts, if they existed. Texas courts lack specific jurisdiction to enforce the Demand against Plaintiffs. *See Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 317–18 (5th Cir. 2021), *reh'g en banc denied*, 32 F.4th 488 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 485 (2022);

*Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 140 (4th Cir. 2020); *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349–50 (D.C. Cir. 2000); *cf. Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 513, (D.C. Cir. 2002) (holding that website interacting and "entering into contracts with residents of a foreign jurisdiction" subject to personal jurisdiction (quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997))).

99.     With the Demand's return date now past, Plaintiffs are now faced with the ongoing prospect of either surrendering constitutionally protected materials in violation of their First and Fourth Amendment rights to comply with the Demand, or risk subjecting themselves to state-level proceedings in foreign courts that plainly lack jurisdiction over them should they continue to resist the Demand. That is no true choice at all.

100.    This ongoing violation of Plaintiffs' First and Fourth Amendment rights will be remedied by prompt injunctive relief from this Court setting aside the Demand.

### COUNT III

**Violation of Plaintiffs' Due Process Rights Under the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983)**

101.    Plaintiffs incorporate paragraphs one through 100 above as if set forth fully herein.

102.    The guarantee of due process in the Fourteenth Amendment "recognizes and protects an individual liberty interest" from being subjected to legal process in a jurisdiction with which a person has no contact, unless they willingly consent to such process. *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

103.    For a state to exercise personal jurisdiction over a party in a manner consistent with due process, the party must have "'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Mere "foreseeability of causing *injury* in another State" is not a "'sufficient benchmark'

41

for exercising personal jurisdiction." *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)). "Instead, 'the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 297).

104.    Here, Defendant Paxton has purported to subject Plaintiffs to legal process under Texas law—and has the power to force Plaintiffs into Texas court to defend against enforcement of his Demand—despite Plaintiffs' having no minimum contacts with Texas and not being subject to either general or specific personal jurisdiction in that state. Plaintiffs do not avail themselves of Texas law and had no reason to ever foresee being subject to Texas's deceptive trade practices act. Media Matters's mere "operation of a website accessible in [Texas] is insufficient to satisfy the minimum-contacts requirement of the personal-jurisdiction inquiry" under the Due Process clause. *Fidrych*, 952 F.3d at 140.

105.    Plaintiffs are injured by the ongoing imposition of Texas law on them by Defendant Paxton despite his clear lack of jurisdiction to do so, and will be further injured if Paxton hauls Plaintiffs into Texas state court to defend their constitutional rights in a jurisdiction with which they have no relevant contacts.

## COUNT IV

**Violation of Plaintiffs' Rights Under the District of Columbia's and Maryland's Reporters' Shield Laws**

106.    Plaintiffs incorporate paragraphs one through 105 above as if set forth fully herein.

107.    Attorney General Paxton's Demand violates Plaintiffs' rights under the District of Columbia's and Maryland's shield laws by seeking to compel disclosure of statutorily protected,

confidential sources. D.C. Code §§ 16-4702, 4703; Md. Cts. & Jud. Proc. Code Ann. § 9-112(b), (c).

108.    The D.C. shield law provides absolute protection against compelled disclosure of sources, D.C. Code § 16-4703(b), and qualified protection against compelled disclosure of other information, including "any news or information procured . . . in the course of pursuing [] professional activit[ies]," including notes, to the extent such information is not publicly disclosed, *id.* § 16-4702. *See also Grunseth v. Marriott Corp.*, 868 F. Supp. 333, 336 (D.D.C. 1994). The shield law protects media organizations and their employees acting within the scope of a contract in any "news gathering or news disseminating capacity." D.C. Code § 16-4702.

109.    Maryland's shield provides materially equivalent protections. *See* Md. Cts. & Jud. Proc. Code Ann. § 9-112(b)(3), (c)(2).

110.    To overcome even the qualified privilege for non-source information, both statutes provide that parties seeking news or information must establish by clear and convincing evidence that (1) the news or information is relevant to a significant legal issue before a party that has a power to issue a subpoena; (2) the news or information could not, with due diligence, be obtained by any alternative means; and (3) there is an overriding public interest in the disclosure. Still, courts have quashed subpoenas that seek information from news media, even when all three prongs of the qualified privilege apply. *See, e.g.*, *Bice v. Bernstein*, No. 93-CA-22258, 1994 WL 555379, at *1–*2 (Md. Cir. Ct. Apr. 20, 1994); *Grunseth*, 868 F. Supp. at 336.

111.    Attorney General Paxton's Demand is consequently infirm because its overbreadth will require that Plaintiffs turn over constitutionally protected sources. The Demand asks for any and all materials related to external *and internal* communications regarding Plaintiffs' November 16 article, as well as external communications between Plaintiffs and employees and

43

representatives of X from November 1, 2023, to November 21, 2023. What is more, the Demand

seeks numerous documents regarding Plaintiffs' organizational structure, as well as the specific X

accounts used to obtain the screenshots contained in the November 16 article. In essence, the

Demand functions as a boundless inquiry into Plaintiffs' organization and news gathering

capacity—precisely the kind of pernicious subpoena that these shield laws were designed to

combat.

112.    Attorney General Paxton's Demand not only seeks privileged material in violation

of Plaintiff's First Amendment rights, but also chills Plaintiff's news gathering capacity. An order

setting aside the Demand is the only legal mechanism to ensure that plaintiff's rights—protected

by the Constitution and promulgated by state statute—are secure.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask for the following relief:

113.    Declare Paxton's Demand constitutes a First Amendment retaliatory action in

violation of Plaintiffs' rights under the First and Fourteenth Amendments of the U.S. Constitution.

114.    Declare that Paxton's Demand violates Plaintiffs' rights under the First, Fourth, and

Fourteenth Amendments of the U.S. Constitution.

115.    Declare that courts in the State of Texas cannot exercise personal jurisdiction over

Plaintiffs in any imminent action to enforce the Demand.[29]

---

[29] It is neither unusual nor unprecedented for courts to determine whether other courts in other
circuits have jurisdiction. *See, e.g.*, *Clark v. Busey*, 959 F.2d 808, 812 (9th Cir. 1992) ("Transfer
is improper where the transferee court lacks jurisdiction and thus could not have originally heard
the suit."); *Grondal v. United States*, 513 F. Supp. 3d 1262, 1275 (E.D. Wash. 2021); *In re Asbestos
Prod. Liab. Litig. (No. VI)*, 965 F. Supp. 2d 612, 620 (E.D. Pa. 2013) ("Ohio's long-arm statute
does not confer jurisdiction"). *See also* 28 U.S.C. § 1404(a) ("a district court may transfer any civil
action to any other district or division where it might have been brought"); *id.* § 1631 ("the court
shall, if it is in the interest of justice, transfer such action or appeal to any other such court . . . in
which the action or appeal could have been brought at the time it was filed or noticed").

116.     Temporarily enjoin Paxton, his officers, agents, servants, and employees from initiating any action to enforce the Demand in violation of Plaintiffs' constitutional rights.

117.     Permanently and preliminarily enjoin Paxton, his officers, agents, servants, and employees from initiating any action to enforce the Demand or further investigating Plaintiffs in violation of their constitutional rights, as well as to the extent enforcement would require the disclosure of information protected by the Maryland and D.C. shield laws.

118.     Award Plaintiffs their costs, expenses, and reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, and any other applicable law.

119.     Grant Plaintiffs any and all other relief as the Court deems just and proper.

Dated: January 17, 2024

Respectfully submitted,
*/s/ Aria C. Branch*

**ELIAS LAW GROUP LLP**
Aria C. Branch (DC 1014541)
Elisabeth C. Frost (DC 1007632)
Jacob D. Shelly* (DC 90010127)
Elena A. Rodriguez Armenta* (DC 90018798)
Daniela Lorenzo*[+]
Omeed Alerasool* (DC 90006578)
Samuel T. Ward-Packard* (DC 90005484)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
abranch@elias.law
efrost@elias.law
jshelly@elias.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
oalerasool@elias.law
swardpackard@elias.law

Abha Khanna*
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law

**JA046**

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr. (DC 420440)
Jay P. Srinivasan*
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com
Email: jsrinivasan@gibsondunn.com

Amer S. Ahmed (DC 500630)
Anne Champion*
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com
Email: achampion@gibsondunn.com

*Pro hac vice application forthcoming
+Admission to D.C. bar pending swearing in

*Counsel for Plaintiffs Media Matters for America and Eric Hananoki*

**JA047**

## CIVIL COVER SHEET

JS-44 (Rev. 11/2020 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Media Matters for America, et al. | Warren Kenneth Paxton, Jr., in his official capacity as Attorney General of the State of Texas |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Elias Law Group, LLP
250 Massachusetts Ave. NW, Suite 400,
Washington, DC 20001
(202) 968-4652

ATTORNEYS (IF KNOWN)

---

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ● 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place an X in one category, A-N, that best represents your Cause of Action and one in a corresponding Nature of Suit)

**○ A. Antitrust**
- ☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**
- ☐ 151 Medicare Act

Social Security
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

**○ E. General Civil (Other)**   OR   **○ F. Pro Se General Civil**

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Conditions
- ☐ 560 Civil Detainee – Conditions of Confinement

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent – Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016 (DTSA)

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant)
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

Other Statutes
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc
- ☐ 460 Deportation
- ☐ 462 Naturalization Application

- ☐ 465 Other Immigration Actions
- ☐ 470 Racketeer Influenced & Corrupt Organization
- ☐ 480 Consumer Credit
- ☐ 485 Telephone Consumer Protection Act (TCPA)
- ☐ 490 Cable/Satellite TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

**JA048**

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/Privacy Act* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus – General<br>☐ 510 Motion/Vacate Sentence<br>☐ 463 Habeas Corpus – Alien Detainee | ☐ 442 Civil Rights – Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loan (excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 740 Labor Railway Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☒ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities – Employment<br>☐ 446 Americans w/Disabilities – Other<br>☐ 448 Education | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights – Voting (if Voting Rights Act) |

**V. ORIGIN**

⦿ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi-district Litigation   ○ 7 Appeal to District Judge from Mag. Judge   ○ 8 Multi-district Litigation – Direct File

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 U.S.C. §§ 1983, 1988; Suit to enjoin investigative demand violating Plaintiffs' civil rights under First, Fourth, & Fourteenth Amendments to the U.S. Constitution.

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $<br>JURY DEMAND: | Check YES only if demanded in complaint<br>YES ☐   NO ☒ |
|---|---|---|---|
| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES ☐   NO ☒ | If yes, please complete related case form |

DATE: ____1/17/2024____   SIGNATURE OF ATTORNEY OF RECORD _____ /s/ Aria C. Branch _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
**Authority for Civil Cover Sheet**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff if resident of Washington, DC, 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of the case.

VI.   CAUSE OF ACTION: Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASE(S), IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

**JA049**

AO 440 (Rev. 06/12; DC 3/15)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| Media Matters for America, et al. | ) |
| | ) |
| | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| v. | )    Civil Action No.  24-cv-147 |
| | ) |
| Warren Kenneth Paxton, Jr., in his official capacity as | ) |
| Attorney General of the State of Texas | ) |
| _Defendant(s)_ | ) |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_    Warren Kenneth Paxton, Jr., in his official capacity
as Attorney General of the State of Texas
PO Box 12548,
Austin, TX 78711


A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Aria C. Branch
ELIAS LAW GROUP LLP
250 Massachusetts Ave. NW, Suite 400,
Washington, DC 20001


If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.


_ANGELA D. CAESAR, CLERK OF COURT_


Date:         01/17/2024

_Signature of Clerk or Deputy Clerk_

**JA050**

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  24-147

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ __0.00__ .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:


**JA051**

# Exhibit A



KEN PAXTON
ATTORNEY GENERAL *of* TEXAS

**November 20, 2023 | Press Release**

# Attorney General Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity

The Office of the Attorney General ("OAG") is opening an investigation into Media Matters for potential fraudulent activity. Under the Texas Business Organizations Code and the Deceptive Trade Practices Act, the OAG will vigorously enforce against nonprofits who commit fraudulent acts in or affecting the state of Texas.

Attorney General Paxton was extremely troubled by the allegations that Media Matters, a radical anti-free speech organization, fraudulently manipulated data on X.com (formerly known as Twitter).

"We are examining the issue closely to ensure that the public has not been deceived by the schemes of radical left-wing organizations who would like nothing more than to limit freedom by reducing participation in the public square," said Attorney General Paxton.

Back to Top

JA053

# Exhibit B

JA054



OFFICE OF THE ATTORNEY GENERAL
CONSUMER PROTECTION DIVISION

# CIVIL INVESTIGATIVE DEMAND

**To:**   **Media Matters for America**       *via FedEx 7741 8756 3037*
                                              **Return Date: December 12, 2023**

**c/o**   **Angelo Carusone**
          **800 Maine Ave SW, Suite 500**
          **Washington, DC 20024**

Pursuant to this office's specific authority under § 17.61 of the Texas Deceptive Trade Practices –
Consumer Protection Act, §§ 17.41-.63, Texas Business and Commerce Code ("DTPA"), Media Matters
for America ("Media Matters") is hereby directed to produce the items listed in **"Exhibit A"** attached
hereto.

You are to make available the documentary material described in **"Exhibit A"** to the undersigned
Assistant Attorney General, or other authorized agent(s) identified by the Consumer Protection Division
("Division"), by the "Return Date" indicated above for inspection and copying. In lieu of producing the
originals for inspection and copying at your principal place of business, you may deliver true copies of
the requested documents to the Assistant Attorney General or Authorized Agent below at the Office of
the Attorney General, 300 W 15th St, Austin, TX, 78701. **Contact one of the persons listed below upon
receipt to discuss the logistics of producing the requested documents to the Division.**

The Division believes that Media Matters for America is in possession, custody, or control of documentary
material relevant to the subject matter of an investigation of possible violations of §§ 17.46(a) and (b) of
the DTPA, related to false, misleading, and/or deceptive practices in the State of Texas.

> **TAKE NOTICE THAT pursuant to section 17.62, Texas Business and Commerce Code, any
> person who attempts to avoid, evade, or prevent compliance, in whole or in part, with this
> directive by removing, concealing, withholding, destroying, mutilating, altering, or by any other
> means falsifying any documentary material may be guilty of a misdemeanor and on conviction
> is punishable by a fine of not more than $5,000.00 or by confinement in the county jail for not
> more than one year, or both.**

ISSUED THIS 21st day of November, 2023.

/s Levi Fuller                              **Authorized Agent**
Levi Fuller                                 Ryan Hanlan
Assistant Attorney General                  Investigator
(512) 936-1308                              (512) 936-3354

**JA055**

# Instructions

1. **Read These Instructions/Definitions.** Read these instructions and definitions carefully.

2. **Duty to Preserve Documents**. All documents and/or other data which relate to the subject matter or requests of this Civil Investigative Demand must be preserved. *Any ongoing, scheduled or other process of document or data destruction involving such documents or data must cease even if it is your normal or routine course of business for you to delete or destroy such documents or data and even if you believe such documents or data are protected from discovery by privilege or otherwise.* Failure to preserve such documents or data may result in legal action and may be regarded as spoliation of evidence under applicable law.

3. **Relevant Dates**. Unless otherwise noted, the requests in this Civil Investigative Demand require production of documents for each year from January 1, 2022 to the final date of your production of responsive documents, herein called "the relevant time period."

4. **Custody and Control.** In responding to this Civil Investigative Demand, you are required to produce not only all requested documents in your physical possession, but also all requested documents within your custody and control, including those within the possession of persons reasonably available to you or under your direction or control.

5. **Identification of Documents not in Custody or Control.** If any responsive document was, but no longer is, in your possession, custody or control, produce a description of each such document. The description shall include the following:

   a. The name of each author, sender, creator, and initiator of such document;

   b. the name of each recipient, addressee, or party for whom such document was intended;

   c. the date the document was created;

   d. the date(s) the document was in use;

   e. a detailed description of the content of the document;

   f. the reason it is no longer in your possession, custody or control; and

   g. the document's present whereabouts.

   If the document is no longer in existence, in addition to providing the information indicated above, state on whose instructions the document was destroyed or otherwise disposed of, and the date and manner of the destruction or disposal.

6. **Privileged Documents**. If any responsive document is withheld, in whole or in part, under any claim of privilege, provide a detailed privilege log that contains at least the following information for each document or partial document that you have withheld:

   a. the document's control numbers;

   b. all authors of the document;

   c. all addressees of the document;

   d. all recipients of the document or of any copies of the document, to the extent not included among the document's addressees;

e. the date of the document;

f. a description of the subject matter of the document sufficient to determine the applicability of the privilege;

g. the nature or type of the privilege that is being asserted for the document (e.g., "attorney-client privilege");

h. the specification(s) of the Demand to which the document is responsive;

i. the document control number(s) of any attachments to the document, regardless of whether any privilege is being asserted for such attachment(s); and

j. whether the document has been produced in redacted form, and if so, the range of the control numbers for the document.

7. **Trade Secrets.** It is your responsibility to clearly designate which, if any, of the requested documents contain trade secrets, in accordance with Section 17.61(f) of the Texas Business and Commerce Code.

8. **Consult Before Producing Documents.** Before processing or making copies of hard copy documents or electronically stored information in response to this Civil Investigative Demand, consult with the designated representative(s) of the Office of the Attorney General, ("OAG") identified above and reach agreement on the format and method of production.

Likewise, before producing any *original* documents, consult with one of the designated representatives of the OAG identified above to obtain approval. If you produce original documents, the OAG cannot guarantee their return.

9. **You May Produce Copies.** Subject to the consultation requirement noted above, you may submit photocopies (with color photocopies where necessary to interpret the document) in lieu of original hard-copy documents, provided that such copies are accompanied by an affidavit of an officer of Media Matters for America stating that the copies are true, correct, and complete copies of the original documents, and (if appropriate) were generated and maintained in the ordinary course of your business, and provided that where the original contains colored text or images, a color copy must be provided.

10. **Non-identical Copies to be Produced.** Identical copies of responsive documents need not be produced. However, any copy of a document that differs in any manner, including but not limited to the presence of handwritten notations, different senders or recipients, etc. must be produced.

11. **No Redaction**. All materials or documents produced in response to this Civil Investigative Demand shall be produced, except as deemed privileged, in complete unabridged, unedited and unredacted form, even if portions may contain information not explicitly requested, or might include interim or final editions of a document.

12. **Documents to be Bates Numbered.** Mark each page or electronic medium (e.g., disk, tape, or CD) with individual or corporate identification and eight-digit consecutive document control numbers (e.g., DOE-12345678; CORP-12345678). Hardcopy bound pamphlets or books may be marked with a single identification and control number. Documents as to which privilege is asserted are to also receive identification and control numbers.

If your production will be more than one box or piece of electronic media, number each box or electronic media, as well as the total number of boxes/media (e.g., box 1 of 13) and mark each with the name(s) of the person(s) whose files are contained therein, the requests(s) to which they are responsive, and the document control numbers contained therein.

13. **Document Organization**. *Each document and other tangible thing produced shall be clearly designated as to which request, and each sub-part of a request, that it satisfies. The documents produced shall be identified and segregated to correspond with the number and subsection of the request.*

14. **Production of Electronic Documents.**  Unless otherwise agreed to in writing by the designated OAG representative, electronically stored information shall be produced in electronic form.  Before you prepare documents or information for production in electronic form in order to comply with this Civil Investigative Demand (for example, before you attempt to process electronically stored information or image hard copy documents), you must consult with the designated representative(s) of the OAG identified above and reach agreement regarding the format and method of production.

15. **Questions.**  Questions concerning this Civil Investigative Demand should be directed to Assistant Attorney General Levi Fuller at (512) 936-1308.

# Definitions

1. **"You," "your," "the business," "Media Matters for America,"** or **"Media Matters"** means Media Matters for America, their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and includes all persons and entities acting or purporting to act under the guidance or on behalf of any of the above. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership (25 percent or more) or control between the company and any other person or entity.

2. **"X," "X Corp.," "Twitter,"** or **"Twitter, Inc."** means X, their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and includes all persons and entities acting or purporting to act under the guidance or on behalf of any of the above.

3. **"Document"** means the original and all non-identical copies (whether different from the original because of notes, underlining, attachments, or otherwise) of all computer files, and all written, printed, graphic or recorded material of every kind, regardless of authorship. It includes communications in words, symbols, pictures, photographs, sounds, films, and tapes, as well as electronically stored information, computer files, together with all codes and/or programming instructions and other materials necessary to understand and use such systems. The term "computer files" includes information stored in or accessible through computers or other information retrieval systems and includes but is not limited to drafts of documents, metadata, embedded, hidden and other bibliographic or historical data describing or relating to documents created, revised, or distributed on computer systems, as well as spreadsheets and their underlying cell formulae and other codes. Thus, you should produce documents that exist in machine-readable form, including documents stored in personal computers, portable computers, workstations, minicomputers, phones, pagers, personal data/digital assistants, archival voice storage systems, group and collaborative tools, electronic messaging devices, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether on or off your premises. This definition covers electronic mail messages ("e-mail"), text messages, voice mail, and all other documents in the possession of you and/or your directors, officers, managers, or employees, whether located at their home or office, whether on work or personal devices. Notice: Unless otherwise specified, the term "document" excludes bills of lading, invoices in non-electronic form, customs declarations, purchase orders, and other similar documents of a purely transactional nature.

4. **"Communication"** means any exchange or transmission of words or ideas to another person or an entity, including without limitation conversations, discussions, letters, memoranda, meetings, notes, speeches, or other transfer of information, whether written, oral, or by any other means, whether direct or indirect, formal or informal, and includes any document which abstracts, digests, transcribes or records any such communication. This definition extends to and encompasses electronic communications on internal chat platforms such as Slack, Microsoft Teams, Google Chat, and other similar messaging platforms.

5. **"Entity"** means legal or business entity of any kind and includes, without limitation, corporations, partnerships, joint ventures, associations, governmental bodies, and trusts.

6. **"Evidencing"** means having any tendency to make the existence of any fact related to the request more probable than it would be without the evidence.

7. **"Identify"** means

    a.  Regarding an individual, to identify that individual's:

        i.  name;

        ii.  current or last known telephone numbers at business and home; and

        iii.  current or last known business and home addresses.

    b.  Regarding a person other than an individual, to identify:

        i.  its full name;

        ii.  the nature of its organization;

        iii.  the address and telephone number of its principal offices and, if applicable, the state in which it is incorporated; and

        iv.  its principal line of business or activity.

    c.  Regarding any other tangible thing, to identify:

        i.  what it is, giving a reasonably detailed description thereof;

        ii.  when, where, and how it was made, if applicable;

        iii.  who made it, if applicable; and

        iv.  its current custodian or the person that had last known possession, custody, or control thereof.

8.  **"Including"** means including, but not limited to.

9.  **"Person"** includes you and means any entity or natural person.

10. **"Relate," "related,"** and **"relating"** mean being in any way legally, logically, or factually connected with the subject matter of the request at issue.

11. The words **"and"** and **"or"** shall be construed either conjunctively or disjunctively as required by the context to bring within the scope of the request, any document(s) that might be deemed outside its scope by another construction.

12. Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

## EXHIBIT A: DOCUMENTS TO BE PRODUCED

1. Produce documents sufficient to identify Media Matters for America's employee organizational chart.

2. Produce documents sufficient to identify all of Media Matters for America's sources of income originating in the State of Texas.

3. Produce documents sufficient to identify all of Media Matters for America's operational expenditures in the State of Texas.

4. Produce all documents related to internal and external communications by Media Matters for America regarding Elon Musk's purchase of X during the relevant time period.

5. Produce all documents related to internal and external communications by Media Matters for America regarding Linda Yaccarino during the relevant time period.

6. Produce documents sufficient to identify all current and past X accounts under the ownership, control, or operating at the behest of Media Matters for America.

7. Produce all documents related to internal and external communications relating to the article titled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" by Eric Hananoki.

8. Produce documents sufficient to identify all of Media Matters for America's owned, controlled, or authorized X accounts that were used to obtain, produce, or otherwise acquire the screenshot images contained in the article titled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" by Eric Hananoki.

9. Produce documents sufficient to identify all X accounts, profiles, and members followed by the X accounts identified in response to Demand Number 8, above.

10. Produce all of Media Matters for America's external communications with employees and representatives of X from November 1, 2023 to November 21, 2023.

11. Produce all of Media Matters for America's external communications with Apple Inc., International Business Machine Corporation (IBM), Bravo television network, NBCUniversal, Oracle Corporation, and Comcast Corporation, Lions Gate Entertainment Corporation, Warner Bros Discovery Inc., Paramount Pictures Corporation, and Sony Group Corporation from November 1, 2023 to November 21, 2023.

12. Produce documents sufficient to identify all direct and indirect sources of funding for all Media Matters for America operations involving X research or publications.

# Exhibit C



# Transcript of Recorded Conversation

**Case:** MMFA Litigation

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

In re: MMFA Litigation


RECORDED CONVERSATION


Job No.: 518338

Pages: 1 - 3

Transcribed by: Lauren Bishop

**JA064**

1          BENNY JOHNSON: So, this is obviously

2     horrifying. Devastating and comes in concert with

3     Elon Musk dropping and I quote, thermonuclear

4     lawsuit. On Media Matters, though it seems like

5     you're standing with the Missouri Attorney General,

6     do you encourage other republican attorney generals

7     to do this? We're -- we're so thankful that somebody

8     is just standing up and doing something. Where are

9     the rest of the republican AGs? There's got to be 20,

10    30 republican AGs in the country. Why are they so

11    quiet on issues like this?

12         KEN PAXTON: You know, that's a good

13    question. I -- I would -- I would encourage them to

14    look at this. They may have just become aware of it.

15    I mean it's a relatively new issue so hopefully over

16    the next couple weeks, you'll see other attorney

17    generals look at this and -- and I -- I would

18    encourage even democratic attorney generals. I know

19    they probably wont but they should because they

20    should care about free speech as much as we do.

21         (The recording was concluded.)

22

```
 1              CERTIFICATE OF TRANSCRIBER

 2         I, Lauren Bishop, do hereby certify that

 3    the transcript was prepared from the digital audio

 4    recording of the foregoing proceeding; that said

 5    proceedings were reduced to typewriting under my

 6    supervision; that said transcript is a true and

 7    accurate record of the proceedings to the best of my

 8    knowledge, skills, and ability; and that I am neither

 9    counsel for, related to, nor employed by any of the

10    parties to the case and have no interest, financial

11    or otherwise, in its outcome.

12

13         *Lauren Bishop*

14    _____

15    LAUREN BISHOP

16    Planet Depos,

17    December 8, 2023

18

19

20

21

22
```

| A | | | |
|---|---|---|---|

**A**

**ability**
3:8
**about**
2:20
**accurate**
3:7
**ags**
2:9, 2:10
**any**
3:9
**attorney**
2:5, 2:6, 2:16,
2:18
**audio**
3:3
**aware**
2:14

**B**

**because**
2:19
**become**
2:14
**benny**
2:1
**best**
3:7
**bishop**
1:22, 3:2, 3:15

**C**

**care**
2:20
**case**
3:10
**certificate**
3:1
**certify**
3:2
**comes**
2:2
**concert**
2:2
**concluded**
2:21
**conversation**
1:9

**counsel**
3:9
**country**
2:10
**couple**
2:16

**D**

**december**
3:17
**democratic**
2:18
**depos**
3:16
**devastating**
2:2
**digital**
3:3
**doing**
2:8
**dropping**
2:3

**E**

**elon**
2:3
**employed**
3:9
**encourage**
2:6, 2:13, 2:18
**even**
2:18

**F**

**financial**
3:10
**foregoing**
3:4
**free**
2:20

**G**

**general**
2:5
**generals**
2:6, 2:17, 2:18
**good**
2:12

**H**

**hereby**
3:2
**hopefully**
2:15
**horrifying**
2:2

**I**

**interest**
3:10
**issue**
2:15
**issues**
2:11
**it's**
2:15

**J**

**job**
1:20
**johnson**
2:1

**K**

**ken**
2:12
**know**
2:12, 2:18
**knowledge**
3:8

**L**

**lauren**
1:22, 3:2, 3:15
**lawsuit**
2:4
**litigation**
1:7
**look**
2:14, 2:17

**M**

**matters**
2:4
**mean**
2:15

**media**
2:4
**missouri**
2:5
**mmfa**
1:7
**much**
2:20
**musk**
2:3

**N**

**neither**
3:8
**new**
2:15
**next**
2:16

**O**

**obviously**
2:1
**other**
2:6, 2:16
**otherwise**
3:11
**outcome**
3:11
**over**
2:15

**P**

**pages**
1:21
**parties**
3:10
**paxton**
2:12
**planet**
3:16
**prepared**
3:3
**probably**
2:19
**proceeding**
3:4
**proceedings**
3:5, 3:7

| Q | | supervision | | 5 | |
|---|---|---|---|---|---|

**question**
2:13
**quiet**
2:11
**quote**
2:3

| R |
|---|

**record**
3:7
**recorded**
1:9
**recording**
2:21, 3:4
**reduced**
3:5
**related**
3:9
**relatively**
2:15
**republican**
2:6, 2:9, 2:10
**rest**
2:9

| S |
|---|

**said**
3:4, 3:6
**see**
2:16
**seems**
2:4
**should**
2:19, 2:20
**signature-p1kal**
3:13
**skills**
3:8
**somebody**
2:7
**something**
2:8
**speech**
2:20
**standing**
2:5, 2:8

**supervision**
3:6

| T |
|---|

**thankful**
2:7
**that's**
2:12
**there's**
2:9
**thermonuclear**
2:3
**transcribed**
1:22
**transcriber**
3:1
**transcript**
3:3, 3:6
**true**
3:6
**typewriting**
3:5

| U |
|---|

**under**
3:5

| W |
|---|

**weeks**
2:16
**we're**
2:7
**wont**
2:19

| Y |
|---|

**you'll**
2:16
**you're**
2:5

| 2 |
|---|

**20**
2:9
**2023**
3:17

| 3 |
|---|

**30**
2:10

**518338**
1:20

# Exhibit D

JA069

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 4:16-cv-00469-K |
| | ) | |
| MAURA TRACY HEALEY, | ) | |
| Attorney General of Massachusetts, | ) | |
| in her official capacity, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**BRIEF OF TEXAS, LOUISIANA, SOUTH CAROLINA, ALABAMA, MICHIGAN, ARIZONA, WISCONSIN, NEBRASKA, OKLAHOMA, UTAH, AND NEVADA AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

---

JA070

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* AND BACKGROUND ...........................................................1

ARGUMENT .....................................................................................................................2

    I.   Attorneys General should act impartially. ...................................................2

        A.   Attorneys General should not employ legal power to tip the
             scales in a policy debate. .........................................................3

            1.   Targeting critics. .............................................................4

            2.   Abusing subpoena power................................................5

        B.   Climate change is the subject of legitimate international
             debate. .....................................................................6

    II.   Politicized investigations undermine public confidence.............................9

CONCLUSION ..................................................................................................................9

### INTEREST OF *AMICI CURIAE* AND BACKGROUND

Exxon Mobil Corporation (Exxon) is challenging the validity of a Civil Investigative Demand (CID), a state civil administrative subpoena, issued by the Attorney General of Massachusetts (Massachusetts). Massachusetts dispatched the CID to investigate supposed violations of consumer protection laws through Exxon's marketing and sale of fossil fuel-derived products and securities. Exxon is asking the Court to issue an injunction prohibiting Massachusetts from enforcing the CID.

*Amici* possess sovereign authority to investigate violations of law. As chief legal officers, they have long used their power—including the issuance of CIDs—to determine whether unlawful conduct occurred. However, this power does not include the right to engage in unrestrained, investigative excursions to promulgate a social ideology, or chill the expression of points of view, in international policy debates.

The concerns of *Amici* and others regarding Massachusetts's tactics are expressed in a recent open letter.[1] In it, the actions of Massachusetts and others are condemned, as "this effort by our colleagues to police the global warming debate through the power of the subpoena is a grave mistake." The signatories, representing a wide range of viewpoints on climate change, "agree on at least one thing—this is not a question for the courts. Using law enforcement authority to resolve a public policy debate undermines the trust invested in our offices and threatens free speech."[2] As most recognize, "vigorous debate exists in this country regarding the risks of climate change and the appropriate response to those risks. Both sides are well-funded and sophisticated public policy participants. Whatever our country's response,

---

[1] Open Letter from Attorneys General (Luther Strange, Alabama; Bill Schuette, Michigan; Ken Paxton, Texas; Craig Richards, Alaska; Doug Peterson, Nebraska; Sean Reyes, Utah; Mark Brnovich, Arizona; Adam Laxalt, Nevada; Brad Schimel, Wisconsin; Leslie Rutledge, Arkansas; Scott Pruitt, Oklahoma; Jeff Landry, Louisiana; Alan Wilson, South Carolina) dated June 15, 2016, *available online at* http://www.ago.state.al.us/news/852.pdf.

[2] *Id.* at p.1.

**JA072**

it will affect people, communities, and businesses that all have a right to participate in this debate." Thus, attorneys general should "stop policing viewpoints."[3]

*Amici* are concerned about the unconstitutional use of investigative powers. They have an interest in preserving their roles as evenhanded enforcers of the law and, thus, have direct and vital interests in the issues before the Court.

<div align="center">ARGUMENT</div>

Attorneys General have a constitutional duty to act dispassionately in the execution of their office. The Supreme Court has explained that attorneys representing the public do not represent an ordinary party in litigation, but "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest , . . . is not that it should win a case but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). This distinctive role of the prosecutor is also expressed the Model Code of Professional Responsibility. MODEL CODE OF PROF'L RESPONSIBILITY EC 7-13 (1982) ("The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict."). Massachusetts crossed both legal and ethical lines with its CID.

# I. Attorneys General should act impartially.

Massachusetts's investigation is the product of a cultural movement "committed to aggressively protecting and building upon the recent progress the United States has made in combatting climate change."[4] And the common interest agreement of the powers aligned on this axis of ideology underscores the partiality of their endeavor, as they seek to "limit climate change and ensur[e] the dissemination

---

[3] *Id.*

[4] Press Release, New York State Attorney General, *A.G. Schneiderman, Former Vice President Al Gore And A Coalition Of Attorneys General From Across The Country Announce Historic State-Based Effort To Combat Climate Change* (March 29, 2016) (*available online at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across).

<div align="center">2</div>

<div align="right">**JA073**</div>

of accurate information about climate change." ECF No. 57 at 3.[5] And Defendant acknowledges that the issuance of the CID is part of an "aggressive approach."[6]

While *amici* have authority to conduct investigations regarding consumer protection, fraud, and deceptive trade practices, these investigations must be supported by a "reasonable belief" that there has been, or is about to be, unlawful false, misleading, or deceptive acts or practices in the conduct of any trade or commerce. *See, e.g.*, TEX. BUS. & COM. CODE §§ 17.46, 17.47, 17.60, 17.61. And while the government's power "to protect people against fraud" has "always been recognized in this country and is firmly established," *Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 190 (1948), "[s]imply labeling an action one for 'fraud,' of course, will not carry the day," *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 617 (2003).

### A. Attorneys General should not employ legal power to tip the scales in a policy debate.

The authority attorneys general have to investigate fraud does not allow them to encroach on the constitutional freedom of others to engage in an ongoing public policy debate of international importance. Thus, government action that restricts or chills speech because of the message embodied within that speech contravenes the First Amendment. Indeed, "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). The First Amendment generally prevents government from proscribing speech, *see, e.g.*, *Cantwell v. Connecticut*, 310 U.S. 296, 309–311 (1940), or even expressive conduct, *see, e.g.*, *Texas v. Johnson*, 491

---

[5] This ideology was on full display at the March 29, 2016 press conference of the so-called "AG's United for Clean Power," characterized as "the beginning of the end of our addiction to fossil fuel and the degradation of our planet." Attorney General Schneiderman, Press Conference, AGs United for Clean Power (March 29, 2016) (confirming subpoena to ExxonMobil) (*video available online at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across). Former Vice President Al Gore alleged that commercial interests (such as the Plaintiff) are "committing fraud in their communications . . . ." *Id.*

[6] *Id.*

JA074

U.S. 397, 406 (1989), for the mere disapproval of the ideas expressed. Here, the chilling effect of Massachusetts's CID should be of concern since the "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury . . . ." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The heart of viewpoint discrimination is the government preferring one message to another. But "[t]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984); *see also Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Cornelius v. NAACP*, 473 U.S. 788, 806 (1985). Viewpoint discrimination occurs when "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004).

While Massachusetts claims an interest in consumer protection as the basis for its CID, the Supreme Court has been clear that proffering what may be on its face "reasonable grounds" for the action does "not save a regulation that is in reality a facade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811.

### 1.    Targeting critics.

The First Amendment is concerned with "the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas." *Hill v. Colorado*, 530 U.S. 703, 719 (2000). Thus, it stands as a bulwark against Government action designed to suppress ideas or information, or to manipulate the public debate through coercion rather than persuasion. *See Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 510 (5th Cir. 2009).

Using CIDs to suppress policy debates is like imposing prior restraints on speech. Governmentally imposed prior restraints on speech are tantamount to censorship. *See Near v. Minnesota*, 283 U.S. 697, 713, (1931); *cf. Fernandes v.*

**JA075**

*Limmer*, 663 F.2d 619, 632 (5th Cir. Unit A Dec. 1981). Massachusetts labeling its so-called investigation (into an unsettled area of science and public policy) as related to "fraud" certainly "raise[s] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991).

But if our society refuses to tolerate *both* the proponents and critics of ideas vying for acceptance, then the marketplace of ideas becomes a mere oligarchy of consumption. As Justice Holmes put it:

> But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out.

*Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).

## 2.  Abusing subpoena power.

The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). Where subpoenaed materials may be protected by the First Amendment, the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Stanford v. Texas,* 379 U.S. 476, 485 (1965). As such, so-called "fishing expeditions," like this one, are proscribed and "[i]t is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924).

Massachusetts's abuse of its subpoena power runs afoul of the First Amendment. *See, e.g., AFL-CIO v. FEC*, 333 F.3d 168, 175 (D.C. Cir. 2003) (citing *Buckley v. Valeo*, 424 U.S. 1, 64–68 (1976) (disclosure of campaign contributions); *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462–63 (1958) (disclosure of

5

**JA076**

membership lists)). A First Amendment privilege against disclosures exists where such "will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009) (quotation omitted).

For example, subpoenas seeking investigative notes as well as the names of contacts have been held to be an invalid chilling of the free exercise of political speech and association under the First Amendment. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012) (finding "invalid" under First Amendment "subpoenas demanding that [a] paper . . . disclose its reporters' notes and reveal information about anyone who visited the New Times's [sic] website" because subpoenas would "chill speech"); *see also Pebble Ltd. P'ship v. EPA*, 310 F.R.D. 575, 582 (D. Alaska 2015) (subpoenas are invalid when they have "the tendency to chill the free exercise of political speech and association which is protected by the First Amendment").

These protections afforded by the Constitution protect us and our freedom to engage in open and candid discussions about significant issues. But the mere existence of those very discussions is threatened by the chill of subpoenas, like Massachusetts's CID, hanging in the air. Thus, not only is Massachusetts attempting to silence Exxon through the issuance and threat of compelling a response to the CID, this very action harms everyone, stifling consumers and those seeking information in order to evaluate various viewpoints in this public policy debate.

### B.   Climate change is the subject of legitimate international debate.

Massachusetts presumes that the scientific debate regarding climate change is somehow settled, along with the related and equally important public policy debate on how to respond to what science has found. Yet, neither is true. The clearest and most undeniable fact about climate change is that, like so many other areas of science and public policy, the debate is unsettled, the research far from complete, and the

6

**JA077**

path forward unclear. *Amici* agree that "[s]cientists continue to disagree about the degree and extent of global warming and its connection to the actions of mankind,"[7] as do many others. Moreover, science does not teach the obvious public policy response to its data and findings, it merely provides a starting point.

Modern science helps us better understand our world. It constantly subjects to scrutiny various hypotheses against objective data. *See, e.g., Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993). However, because it is almost never possible for all relevant data to be marshaled, scientific proclamations are always subject to change because of new data, enhanced measurements, or other unforeseen factors. *Cf.* Karl Popper, The Logic of Scientific Discovery 44, 47 (1959). Thus, "[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation." *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994)

Accordingly, the intersection of science, law, and public policy should be approached with caution and objectivity. Unfortunate results take root when government invests itself in only one side of a scientific debate since "bad ideas can persist in science for decades, and surrounded by myrmidons of furious defenders they can turn into intolerant dogmas."[8] Unfortunately,

---

[7] Scott Pruitt and Luther Strange, *The Climate-Change Gang*, National Review (May 17, 2016), *available online at* http://www.national review.com/article/435470/climate-change-attorneys-general-overstepping-their-authority.

[8] Matt Ridley, *The Climate Wars and the Damage to Science,* GWPF Essay 3 at p.3 (Global Warming Policy Foundation 2015), *available online at* http://www.thegwpf.com/content/uploads/2015/11/climate-wars.pdf. In addition to being former Science Editor of the Economist, "Matt Ridley is one of the world's foremost science writers. His books have sold over a million copies and been translated into 30 languages. His new book The Evolution of Everything was published in 2015. He is a member of the [Global Warming Policy Foundation]'s Academic Advisory Council. As a landowner, he receives a way-leave income from a coal-mining company." In the words of Ridley,

I am not a full sceptic of climate change, let alone a 'denier'. I think carbon-dioxide induced warming during this century is likely, though I think it is unlikely to prove rapid and danger-ous. So I don't agree with those who say the warming is all natural, or all driven by the sun, or only an artefact of bad measurement, but nor do I think anything excuses bad scientific practice in support of the carbon dioxide theory, and every time one of these scandals erupts and the scientific establishment asks us to ignore it, I wonder if the extreme sceptics are not

**JA078**

[t]his is precisely what has happened with the climate debate and it is at risk of damaging the whole reputation of science. The 'bad idea' in this case is not that climate changes, nor that human beings influence climate change; but that the impending change is sufficiently dangerous to require urgent policy responses. In the 1970s, when global temperatures were cooling, some scientists could not resist the lure of press attention by arguing that a new ice age was imminent. Others called this nonsense and the World Meteorological Organization rightly refused to endorse the alarm. That's science working as it should. In the 1980s, as temperatures began to rise again, some of the same scientists dusted off the greenhouse effect and began to argue that runaway warming was now likely. At first, the science establishment reacted skeptically and a diversity of views was aired. It's hard to recall now just how much you were allowed to question the claims in those days.[9]

Even the premise that "97% of all climate scientists agree on climate change" is argued by Ridley to be pseudo-science. The self-serving conclusion that "97% of all climate scientists agree on climate change" is derived from a poll involving only seventy-nine scientists[10]—hardly a statistically-relevant sample. Moreover, of those seventy-nine scientists, 97% believe that climate change is man-made—not that it was dangerous.[11] "A more recent poll of 1854 members of the American Meteorological Society found the true number is 52 per cent."[12] Indeed,

there has been a systematic and thorough campaign to rule out the middle ground as heretical: not just wrong, but mistaken, immoral and beyond the pale. That's what the word 'denier', with its deliberate connotations of Holocaust denial, is intended to do. For reasons I do not fully understand, journalists have been shamefully happy to go along with this fundamentally religious project. Politicians love this polarizing because it means they can attack a straw man.[13]

---

on to something. I feel genuinely betrayed by the profession that I have spent so much of my career championing.
*Id.* at p.10.
    [9] *Id.* at p.4.
    [10] *Id.* at p.7.
    [11] *Id.*
    [12] *Id.*
    [13] *Id.* at p.6.

**JA079**

## II.    Politicized investigations undermine public confidence.

The transcript of the press conference of the "AG's United for Clean Power" demonstrates that Massachusetts commenced its investigation precisely for the reasons the First Amendment forbids.[14] "It is one thing to use the legal system to pursue public policy outcomes; but it is quite another to use prosecutorial weapons to intimidate critics, silence free speech, or chill the robust exchange of ideas."[15]

Allowing government law enforcement officials to violate constitutional rights is to "violate the sacred trust of the people . . . ." *United States v. Costa*, 356 F. Supp. 606, 609 (D.D.C. 1973). It undermines "the right of the people to be secure in their persons, houses, papers and effects, and would obliterate one of the most fundamental distinctions between our form of government, where officers are *under* the law, and the police-state where they *are* the law." *Johnson v. United States*, 333 U.S. 10, 17 (1948) (emphasis added).

Regrettably, history is embroiled with examples where the legitimate exercise of law enforcement is soiled with political ends rather than legal ones. Massachusetts seeks to repeats that unfortunate history. That the statements and workings of the "AG's United for Clean Power" are entirely one-sided, and target only certain participants in the climate change debate, speaks loudly enough.[16]

### Conclusion

*Amici* aver that the Court should grant Exxon's motion for preliminary relief.

---

[14] *See* n.5, *supra*.

[15] Press Release, Louisiana Department of Justice, Attorney General Jeff Landry Slams Al Gore's Coalition (Mar. 30, 2016) (*available online at* https://www.ag.state.la.us/Article/2207/5).

[16] "[T]his fraud investigation targets only 'fossil fuel companies' and only statements minimizing climate change risks. If it is possible to minimize the risks of climate change, then the same goes for exaggeration. If minimization is fraud, exaggeration is fraud." *See* n.1, *supra*, at p.2. It is also worth noting that "[e]leven of the 17 attorneys general who participated [in the "AG's United for Clean Power" press conference] are the same folks who took part in the 2010 sue-and-settle lawsuit that used federal courts to try to force the adoption of the federal energy regulations that became the EPA's 'Power Plan.'" Michael Batasch, *Kansas AG takes on Al Gore's Alarmism – Won't Join Anti-Exxon "Publicity Stunt,"* The Daily Caller (Apr. 4, 2016), *available online at* http://dailycaller.com/2016/04/04/kansas-ag-takes-on-al-gores-alarmism-wont-join-ant-exxon-publicity-stunt.

JA080

Respectfully submitted this the 8th day of September, 2016,

JEFF LANDRY
Attorney General of Louisiana

ALAN WILSON
Attorney General of South Carolina

LUTHER STRANGE
Attorney General of Alabama

BILL SCHUETTE
Attorney General of Michigan

MARK BRNOVICH
Attorney General of Arizona

BRAD SCHIMEL
Attorney General of Wisconsin

DOUG PETERSON
Attorney General of Nebraska

SCOTT PRUITT
Attorney General of Oklahoma

SEAN REYES
Attorney General of Utah

ADAM LAXALT
Attorney General of Nevada

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

PRERAK SHAH
Senior Counsel to the Attorney General

*/s/ Andrew D. Leonie*
ANDREW D. LEONIE
Associate Deputy Attorney General for the
Office of Special Litigation
Andrew.Leonie@texasattorneygeneral.gov

AUSTIN R. NIMOCKS
Associate Deputy Attorney General for the
Office of Special Litigation
Austin.Nimocks@texasattorneygeneral.gov

MICHAEL TOTH
Senior Counsel for the Office of Special
Litigation

Office of Special Litigation
Texas Attorney General's Office
P.O. Box 12548, Mail Code 009
Austin, Texas 78711-2548
Tel: 512-936-1414
Fax: 512-936-0545

*ATTORNEYS FOR AMICI CURIAE*

**JA081**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of September 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which I understand to have caused service on all counsel of record.

<div align="right">

*/s/ Andrew D. Leonie III*
Andrew D. Leonie III
SBOT No. 12216500

</div>

**JA082**

# Motion for TRO and preliminary injunction

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, | |
| Plaintiffs, | Civil Action No. 24-cv-147 |
| v. | |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | **(EXPEDITED HEARING REQUESTED)** |
| Defendant. | |

## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs Media Matters for America ("Media Matters") and Eric Hananoki respectfully move pursuant to Fed. R. Civ. P. 65 and LCvR 65.1 for a temporary restraining order enjoining Defendant Warren Kenneth Paxton, Jr., in his official capacity as Attorney General of the State of Texas, or his officers, agents, servants, and employees, from seeking to further enforce a civil investigative demand served on Plaintiffs on December 1, 2023, which was issued to retaliate against Plaintiffs for engaging in core protected First Amendment conduct—specifically, media reporting about the social media platform X (formerly known as Twitter) and its owner Elon Musk. Attorney General Paxton launched this retaliatory investigation notwithstanding the fact that the articles at issue lack any connection whatsoever to the state of Texas. Plaintiffs further request that the Court grant a preliminary injunction enjoining Defendant from engaging in similar retaliatory conduct related to Plaintiffs' reporting pending full resolution of Plaintiffs' claims. This Motion is based upon the Complaint in this action, as well as the Memorandum in Support of Motion for

Temporary Restraining Order, the supporting Declarations of Cynthia Padera, Eric Hananoki, and Ben Dimiero, and the exhibits submitted with the Declaration of Aria C. Branch.

Media Matters is a Washington, D.C.-based non-profit media watchdog organization and Mr. Hananoki is a Senior Investigative Reporter at Media Matters. Plaintiffs investigate, research, and report on political extremism in the United States, including on social media platforms like X. On November 20, 2023, in response to a Media Matters article concerning X and its owner Elon Musk —and an ensuing lawsuit by X against Media Matters—Attorney General Paxton announced that he was investigating Media Matters for an unspecified violation of Texas's deceptive trade practices law. Defendant Paxton formally served a civil investigative demand ("Demand") on Media Matters in Washington, D.C. on December 1, 2023, commanding it to "produce [] documentary material [and permit] inspection and copying," and seeking a broad array of materials from Media Matters and Mr. Hananoki, including documents and communications about their research and reporting, communications with possible sources at X and its advertisers, as well as sensitive materials related to Media Matters's funding, expenditures, and employees. The Demand cites Texas's deceptive trade practices law (Tex. Bus. & Com. Code Ann. § 17.61(a)) as its authority but Plaintiffs had no reason to ever foresee being investigated by the Texas Attorney General under that law—Plaintiffs do not live or work in Texas; do not "transact business" in Texas, *see* Tex. Bus. Orgs. Code Ann. § 9.002(a); have no registered agent in Texas; do not engage in any "business practices" in Texas, Tex. Bus. & Com. Code Ann. § 17.44(a), or conduct "trade" or "commerce" in Texas, *id.* §§ 17.45(6), .46(a). By the Attorney General's own admissions, the Demand and investigation were both prompted by Plaintiffs' reporting on X's activity that lacks any connection whatsoever to the state of Texas.

JA085

Mr. Paxton's investigation and his Demand constitute a flagrant attack on Plaintiffs' First Amendment rights, and for the reasons set forth in the accompanying brief in support of this motion, Plaintiffs readily meet the factors for a temporary restraining order and preliminary injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). *First*, Plaintiffs are likely to succeed on the merits of their claims. Mr. Paxton's investigation and Demand are transparent efforts to retaliate against Plaintiffs for their constitutionally-protected speech and press activities. His retaliation has already chilled Plaintiffs from further engaging in these constitutionally protected activities and will continue to do so absent immediate relief. *See Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). The Demand further violates Plaintiffs' First and Fourth Amendment rights by unreasonably demanding that Plaintiffs turn over privileged materials, including Plaintiffs' documents and communications regarding their newsgathering and reporting, as well as sensitive organizational information about Media Matters and its donors. *See, e.g.*, *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021); *Lacey v. Maricopa County*, 693 F.3d 896, 917 (9th Cir. 2012). Many of these same materials are protected from disclosure under the District of Columbia's and Maryland's reporter shield laws. *See* D.C. Code §§ 16-4702, 4703; Md. Cts. & Jud. Proc. Code Ann. § 9-112(b)(3), (c)(2). Mr. Paxton's investigation also violates the Due Process Clause of the Fourteenth Amendment—Plaintiffs have no relevant contacts with Texas, and any imposition of legal process against them in that state is unconstitutional.

*Second*, Paxton's retaliatory investigation into Media Matters is causing Plaintiffs irreparable harm by chilling their constitutionally protected speech and press activities. *See Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (quoting

**JA086**

*Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see generally* Hananoki Decl.; Dimiero Decl.; Padera Decl.

      *Finally*, the balance of the equities and the public interests at stake weigh strongly in favor of enjoining Mr. Paxton's unlawful and retaliatory investigation and upholding Plaintiffs' constitutional rights. *See, e.g.*, *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). The public's interest in a free press weighs particularly strongly in favor of granting preliminary relief here. *See, e.g.*, *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue,* 460 U.S. 575, 585 (1983). In contrast, Defendant Paxton will suffer no harm in having his unlawful and retaliatory investigative subpoena enjoined pending full adjudication of Plaintiffs' claims.

Dated: January 18, 2024

          Respectfully submitted,
          */s/ Aria C. Branch*

          **ELIAS LAW GROUP LLP**
          Aria C. Branch (DC 1014541)
          Elisabeth C. Frost (DC 1007632)
          Jacob D. Shelly* (DC 90010127)
          Elena A. Rodriguez Armenta* (DC 90018798)
          Daniela Lorenzo*[+]
          Omeed Alerasool* (DC 90006578)
          Samuel T. Ward-Packard* (DC 90005484)
          250 Massachusetts Ave. NW, Suite 400
          Washington, DC 20001
          T: (202) 968-4652
          abranch@elias.law
          efrost@elias.law
          jshelly@elias.law
          erodriguezarmenta@elias.law
          dlorenzo@elias.law
          oalerasool@elias.law
          swardpackard@elias.law

**JA087**

Abha Khanna*
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr. (DC 420440)
Jay P. Srinivasan*
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com
Email: jsrinivasan@gibsondunn.com

Amer S. Ahmed (DC 500630)
Anne Champion*
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com
Email: achampion@gibsondunn.com

*Pro hac vice* application forthcoming
[+]Admission to D.C. bar pending swearing in

*Counsel for Plaintiffs Media Matters for America and Eric Hananoki*

**JA088**

**CERTIFICATE OF SERVICE**

I hereby certify that this document will be served on the Defendant in accordance with Federal Rule of Civil Procedure 5(a).

*/s/ Aria C. Branch*
Aria C. Branch

**JA089**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, | |
| Plaintiffs, | Civil Action No. 24-cv-147 |
| v. | |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | **(EXPEDITED HEARING REQUESTED)** |
| Defendant. | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

**JA090**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 4

     A.    Over the past year, under Musk's ownership, advertisements have frequently appeared on X alongside racist, antisemitic, and violent content. .................... 4

     B.    Media Matters and Hananoki report on X's pattern of permitting the placement of advertisements alongside extremist content. ............................... 7

     C.    Texas Attorney General Kenneth Paxton retaliates against Media Matters and Hananoki for their reporting. ............................................................................. 9

     D.    Media Matters and Hananoki are chilled from further newsgathering and reporting on X and Musk ................................................................................... 13

     E.    Plaintiffs sued Paxton to protect their First Amendment rights ....................... 17

STANDARD OF REVIEW ................................................................................................ 20

ARGUMENT ................................................................................................................... 21

I.    This Court has personal jurisdiction over Paxton. ....................................................... 21

II.    Media Matters and Hananoki are likely to prevail on the merits of their claims ........ 23

     A.    Plaintiffs are likely to establish that Paxton retaliated against their constitutionally protected activities in violation of the First Amendment. ...... 23

     B.    Plaintiffs are likely to establish that Paxton's Demand violates both the First and Fourth Amendments and the D.C. and Maryland shield laws. .................. 35

     C.    Plaintiffs are likely to establish that the legal process against them in Texas violates due process due to a lack of contact with that state. ........................... 39

III.    Plaintiffs will suffer irreparable harm absent an order restraining Paxton's investigation and enforcement of his Demand ............................................................ 40

IV.    The remaining equitable factors strongly favor granting preliminary relief .............. 44

CONCLUSION ................................................................................................................. 45

CERTIFICATE OF SERVICE .......................................................................................... 47

**JA091**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Fed. Election Comm'n*,
    333 F.3d 168 (D.C. Cir. 2003) ............................................................................36

*Am. Fed'n of Teachers.-W. Va., AFL-CIO v. Kanawha Cnty. Bd. of Educ.*,
    592 F. Supp. 2d 883 (S.D. W. Va. 2009) ...........................................................42

*Ams. for Prosperity Found. v. Bonta*,
    141 S. Ct. 2373 (2021) ...............................................................................36, 42

*Anatol Zukerman & Charles Krause Reporting, LLC, v. U.S. Postal Serv.*,
    64 F.4th 1354 (2023) ........................................................................................24

*Anderson v. Reilly*,
    691 F. Supp. 2d 89 (D.D.C. 2010) ...................................................................25

*\*Aref v. Lynch*,
    833 F.3d 242 (D.C. Cir. 2016) ......................................................24, 27, 28, 35

*Bice v. Bernstein*,
    No. 93-CA-22258, 1994 WL 555379 (Md. Cir. Ct. Apr. 20, 1994) ..................38

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996) .........................................................................................39

*In re Brewer*,
    863 F.3d 861 (D.C. Cir. 2017) ........................................................................20

*Bristol-Myers Squibb v. Super. Ct. of Cal.*,
    582 U.S. 255 (2017) .........................................................................................39

*Buckley v. Valeo*,
    424 U.S. 1 (1976) .............................................................................................36

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) .........................................................................................40

*\*Calder v. Jones*,
    465 U.S. 783 (1984) .........................................................................................22

*Centro Tepeyac v. Montgomery County*,
    722 F.3d 184 (4th Cir. 2013) ...........................................................................45

iii

**JA092**

*Chapin v. Knight-Ridder, Inc.*,
    993 F.2d 1087 (4th Cir. 1993) ............................................................26

*Constantine v. Rectors & Visitors of George Mason Univ*,
    411 F.3d 474 (4th Cir. 2005) .............................................................27

*Cooksey v. Futrell*,
    721 F.3d 226 (4th Cir. 2013) .......................................................29, 31

*Coss v. Teters*,
    No. 2:23-CV-00180, 2023 WL 3470899 (S.D. W. Va. May 12, 2023)..................28

*\*Crawford-El v. Britton*,
    93 F.3d 813 (D.C. Cir. 1996) ............................................................24

*\*Def. Distributed v. Grewal*,
    971 F.3d 485 (5th Cir. 2020) .......................................................22, 23

*El Dia, Inc. v. Rossello*,
    165 F.3d 106 (1st Cir. 1999)............................................................24

*Equitable Trust Co. v. State Comm'n on Human Relations*,
    411 A.2d 86 (Md. 1979) .................................................................38

*Experience Works, Inc. v. Chao*,
    267 F. Supp. 2d 93 (D.D.C. 2003) ......................................................21

*Farah v. Esquire Mag.*,
    736 F.3d 528 (D.C. Cir. 2013) ..........................................................26

*Fed. Trade Comm'n v. Am. Tobacco Co.*,
    264 U.S. 298 (1924).....................................................................37

*Flynt v. Rumsfeld*,
    180 F. Supp. 2d 174 (D.D.C. 2002) .....................................................26

*\*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
    141 S. Ct. 1017 (2021)..................................................................39

*Giovani Carandola, Ltd. v. Bason*,
    303 F.3d 507 (4th Cir. 2002) ...........................................................46

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011).................................................................39, 40

*Grunseth v. Marriott Corp.*,
    868 F. Supp. 333 (D.D.C. 1994) ........................................................38

iv

JA093

*Hartley v. Wilfert*,
  918 F. Supp. 2d 45 (D.D.C. 2013) .................................................................27, 31

*\*Hartman v. Moore*,
  547 U.S. 250 (2006) ...........................................................................................24

*Hedgepeth ex rel. Hedgepeth v. Washington Metro. Area Transit Auth.*,
  386 F.3d 1148 (D.C. Cir. 2004) .........................................................................25

*Heller v. Nicholas Appelgate Cap. Mgmt. LLC*,
  498 F. Supp. 2d 100 (D.D.C. 2007) ...................................................................21

*IMAPizza, LLC v. At Pizza Ltd.*,
  334 F. Supp. 3d 95 (D.D.C. 2018) .....................................................................22

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*,
  456 U.S. 694 (1982) ...........................................................................................39

*Johnson v. TheHuffingtonPost.com, Inc.*,
  21 F.4th 314 (5th Cir. 2021) ..............................................................................30

*Jones v. District of Columbia*,
  177 F. Supp. 3d 542 (D.D.C. 2016) ...................................................................42

*Karem v. Trump*,
  960 F.3d 656 (D.C. Cir. 2020) ...........................................................................45

*Klayman v. Obama*,
  142 F. Supp. 3d 172 (D.D.C. 2015) ..............................................................42, 45

*Lacey v. Maricopa Cnty.*,
  693 F.3d 896 (9th Cir. 2012) ..............................................................................37

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
  2 F.4th 330 (4th Cir. 2021) ................................................................................45

*Lewis v. Mutond*,
  568 F. Supp. 3d 47 (D.D.C. 2021) .....................................................................21

*Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y. Harbor*,
  667 F.2d 267 (2d Cir. 1981) ...............................................................................37

*Major League Baseball v. Crist*,
  331 F.3d 1177 (11th Cir. 2003) ..........................................................................37

*Marcus v. Search Warrants*,
  367 U.S. 717 (1961) ...........................................................................................36

**JA094**

*Marex Titanic, Inc. v. Wrecked & Abandoned Vessel,*
2 F.3d 544 (4th Cir. 1993) ...................................................................20

*Menken v. Emm,*
503 F.3d 1050 (9th Cir. 2007) ..............................................................22

*Miami Herald Pub. Co. v. Tornillo,*
418 U.S. 241 (1974)...............................................................................26

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue,*
460 U.S. 575 (1983)...............................................................................45

*Mouzavires v. Baxter,*
434 A.2d 988, 993 (D.C. Cir. 1981) ......................................................23

*N.J.-Phila. Presbytery of the Bible Presbyterian Church v. N.J. State Bd. of
Higher Educ.,*
654 F.2d 868 (3d Cir. 1981)...................................................................41

*NAACP v. Alabama,*
357 U.S. 449 (1958)...............................................................................36

*Nat'l Org. For Women, N.Y.C. Chapter v. F.C.C.,*
555 F.2d 1002 (D.C. Cir. 1977) ............................................................26

*\*New York Times Co. v. Sullivan,*
376 U.S. 254 (1964)..........................................................................1, 25

*New York Times Co. v. United States,*
403 U.S. 713 (1971)...............................................................................41

*Nieves v. Bartlett,*
139 S. Ct. 1715 (2019)...........................................................................35

*Nken v. Holder,*
556 U.S. 418 (2009)...............................................................................21

*Okla. Press Publ'g Co. v. Walling,*
327 U.S. 186 (1946)...............................................................................35

*Pebble Ltd. P'ship v. EPA,*
310 F.R.D. 575 (D. Alaska 2015) .....................................................35, 37

*Perry v. Schwarzenegger,*
591 F.3d 1147 (9th Cir. 2009) ..............................................................35

*Perry v. Sindermann,*
408 U.S. 593 (1972)...............................................................................24

JA095

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205,*
    391 U.S. 563 (1968) .................................................................................. 32

*Playboy Enter. v. Meese,*
    639 F. Supp. 581 (D.D.C. 1986) ............................................................... 28

*Prysmian Cables & Sys. USA, LLC v. Szymanski,*
    573 F. Supp. 3d 1021 (D.S.C. 2021) ......................................................... 45

*\*Pursuing Am.'s Greatness v. Fed. Election Comm'n,*
    831 F.3d 500 (D.C. Cir. 2016) ............................................. 21, 41, 43, 45

*Roth v. United States,*
    354 U.S. 476 (1957) ............................................................................ 25, 45

*S.C. Freedom Caucus v. Jordan,*
    No. 3:23-CV-795-CMC, 2023 WL 4010391 (D.S.C. June 13, 2023) ............ 29, 30

*Shoen v. Shoen,*
    48 F.3d 412 (9th Cir. 1995) ...................................................................... 28

*Snoeyenbos v. Curtis,*
    60 F.4th 723 (4th Cir. 2023) ..................................................................... 27

*Snyder v. Phelps,*
    562 U.S. 443 (2011) ................................................................................. 26

*Stanford v. Texas,*
    379 U.S. 476 (1965) ................................................................................. 36

*Tech. Patents, LLC v. Deutsche Telekom AG,*
    573 F. Supp. 2d 903 (D. Md. 2008) .......................................................... 30

*Time, Inc. v. Hill,*
    385 U.S. 374 (1967) ................................................................................. 25

*\*Turner v. U.S. Agency for Global Media,*
    502 F. Supp. 3d 333 (D.D.C. 2020) ................................................ 26, 31, 32

*\*Twitter, Inc. v. Paxton,*
    56 F.4th 1170 (9th Cir. 2022) ............................................................. 43, 44

*Unity08 v. FEC,*
    596 F.3d 861 (D.C. Cir. 2010) ................................................................. 44

*Urquhart-Bradley v. Mobley,*
    964 F.3d 36 (D.C. Cir. 2020) ................................................................... 23

JA096

*W.V. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*,
  553 F.3d 292 (4th Cir. 2009) ..................................................................43

*\*Walden v. Fiore*,
  571 U.S. 277 (2014)...................................................................22, 40

*Washington Post v. McManus*,
  944 F.3d 506 (4th Cir. 2019) ..................................................................26

*White v. Lee*,
  227 F.3d 1214 (9th Cir. 2000) ..................................................................29

*\*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)...................................................................................21

*Zurcher v. Stanford Daily*,
  436 U.S. 547 (1978)...........................................................................36, 37

**Statutes**

28 U.S.C. § 2201 ........................................................................................24

28 U.S.C. § 2202 ........................................................................................24

D.C. Code § 13-423(a)(1) ........................................................................24

D.C. Code § 13-423(a)(3) ........................................................................24

D.C. Code § 16-4702 ................................................................................38

D.C. Code § 16-4703 ................................................................................38

Md. Cts. & Jud. Proc. Code Ann. § 9-112(b)(3)....................................38

Md. Cts. & Jud. Proc. Code Ann. § 9-112(c)(2)....................................38

Tex. Bus. & Com. Code Ann. § 17.45(6) ...............................................17

Tex. Bus. & Com. Code Ann. § 17.46(a) ...............................................17

Tex. Bus. & Com. Code Ann. § 17.47 ..............................................28, 30

Tex. Bus. & Com. Code Ann. §§ 17.47(a)–(b).......................................17

Tex. Bus. & Com. Code Ann. § 17.62 ..............................................28, 30

Tex. Bus. & Com. Code Ann. § 17.62(b) ...............................................17

Tex. Bus. Orgs. Code Ann. § 9.002(a)....................................................17

JA097

**Other Authorities**

Fed. R. Civ. P. 26(b)(1)...........................................................................................................17, 30

**JA098**

## INTRODUCTION

Media Matters for America ("Media Matters") and Eric Hananoki research and report on political extremism in the United States media, including on social media platforms. Their work is impactful, often at the center of a vigorous ongoing national conversation about political extremism in American public life. Plaintiffs are before this Court now because of Texas Attorney General Ken Paxton's attempts to silence Plaintiffs' speech about the world's allegedly richest man—by misusing the powers of the Texas Attorney General's Office to launch a retaliatory, unlawful investigation into Plaintiffs for their constitutionally protected research and reporting on Elon Musk and the social media platform he owns, X Corp. (formerly known as Twitter). This lawless investigation—which includes a demand that Paxton be permitted to rifle through Plaintiffs' most sensitive journalistic and organizational documents—is a frontal assault on our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Plaintiffs seek immediate relief to safeguard their constitutionally protected speech and press rights, and their rights under the District of Columbia and Maryland reporters' shield laws, pending adjudication of their claims for permanent relief. Plaintiffs have been—and will continue to be—irreparably harmed without immediate relief.

Hananoki, a Senior Investigative Reporter at Media Matters, has investigated the dramatic rise in hateful rhetoric on X since it was acquired in late 2022 by Musk. Under Musk's ownership, content that promotes violence, white nationalism, antisemitism, and a host of baseless conspiracy theories has proliferated on the platform. With that rise in extremist content, advertisers who have seen their brands appear alongside vile hate speech on X have distanced themselves from the platform. Plaintiffs and many other media organizations have documented this trend in America's so-called digital town square for over a year.

1

This case arises out of Paxton's conduct following and in response to Hananoki's reporting—specifically, a November 16, 2023, article published on the Media Matters's website, titled: "*As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*." In that article, Hananoki reported on Musk's apparent support for a conspiracy theory that Jewish people have a "hatred against whites" and support "flooding the[] country" with "hordes of minorities." The article noted that at the same time Musk appeared to endorse this antisemitic conspiracy theory, X was continuing to allow advertisements to appear on the platform next to pro-Nazi content—despite X's repeated assurance to advertisers that the platform had taken measures to protect against such juxtapositions.

Under siege from a deluge of reports about both his own offensive speech and the offensive speech that continued to proliferate on his social media platform, Musk lashed out at Media Matters, threatening a "thermonuclear" lawsuit in response to Hananoki's article. Certain politicians and media figures rallied to Musk's cause, but none more enthusiastically than Paxton, who on November 20, 2023—within minutes of Musk's suing Plaintiffs—announced he was launching an "investigation" into Media Matters under Texas's deceptive trade practices act.

Paxton's short press release announcing the investigation offered no explanation as to how Media Matters—a D.C.-based non-profit—had allegedly violated Texas law, or even what possible jurisdiction he had over it (as none of its or Hananoki's work covering Musk occurred in or had anything to do with Texas). Nor did it identify any substantive grounds for the investigation, beyond that Paxton was purportedly "troubled" by Musk's "allegations." Instead, the bulk of the press release denigrated Media Matters as a "radical anti-free speech organization" that "would like nothing more than to limit freedom by reducing participation in the public square."

2

The very next day, Paxton issued a civil investigative demand ("Demand"), commanding Media Matters to turn over confidential materials, including documents and communications about its research and reporting, communications with possible sources at X and its advertisers, and sensitive materials related to Media Matters's operations. *See* Declaration of Aria C. Branch ("Branch Decl."), Ex. A.[1] The Demand has a return date of December 12, 2023, meaning that Paxton is now entitled to enforce the demand in Texas state court *at any time*. The Demand is an extraordinary intrusion into Plaintiffs' newsgathering and reporting, and is plainly intended to chill those activities, acting in effect as an ongoing demand for virtually any materials Plaintiffs have— or may create—related to their research and reporting on X or Musk. And as Paxton has emphasized in subsequent correspondence with Plaintiffs' counsel, he believes his powers to pursue Plaintiffs' documents are virtually unrestricted—in his view, he need not show that jurisdiction is proper in Texas and the ordinary rules of civil procedure do not apply.

Paxton's retaliatory investigation and Demand are transparent attempts to punish and deter Plaintiffs' speech and press activities. And they have had their intended effect: Plaintiffs have been chilled from publishing additional criticism or coverage of X or Musk since Paxton announced his investigation—despite a flood of tips identifying extremist content on the platform—for fear of further retaliation and harassment. To stanch this ongoing irreparable harm, Plaintiffs move for a temporary restraining order excusing their compliance with the Demand, as well as a preliminary injunction to maintain such relief until Plaintiffs' constitutional and state law claims are resolved on the merits. This Court has jurisdiction because this lawsuit arises from unlawful retaliatory

---

[1] Media Matters first received the Demand on November 22, 2023 via FedEx at its Washington, D.C. office and Paxton later dispatched a process server to the District of Columbia. Paxton's agent formally served the Demand on Plaintiffs' outside counsel at their Washington, D.C. office, on December 1, 2023. Branch Decl. ¶ 4.

action that, by Paxton's own admission, was "directed" at Media Matters in the District of Columbia. *See* Compl. ¶¶ 76–77. Plaintiffs request a speedy hearing under Rule 57 on their claim for declaratory relief that the Demand and the investigation violate their rights under the U.S. Constitution and D.C. and Maryland law.

## BACKGROUND

### A.   Over the past year, under Musk's ownership, advertisements have frequently appeared on X alongside racist, antisemitic, and violent content.

Elon Musk completed his purchase of the social media platform now known as X on October 27, 2022. He purchased the platform, purportedly, because of his belief that "it is important to the future of civilization to have a common digital square."[2] After taking control, Musk laid off approximately 80 percent of the platform's staff and downsized or eliminated critical areas responsible for overseeing platform policy, trust and safety, communications, and ethical AI. Compl. ¶ 26. He likewise laid off many of the content moderators responsible for keeping the platform free of harassment. *Id*. Musk's changes raised public alarm and sparked concern amongst lawmakers over the platform's ability to combat misinformation and hate speech.[3]

Under the auspices of promoting "free speech," Musk also suspended products and policies that protected users from misinformation and violent content. Compl. ¶ 27. He reinstated suspended accounts of known white supremacists and conspiracy theorists while suspending the accounts of journalists reporting on his air travel. *Id*. In the wake of Musk's deep changes to the social media platform, extremist, racist, antisemitic, and violent content surged on X. *Id*. ¶ 28.

---

[2] Douglas Yeung, *The 'Digital Town Square' Problem*, TheRANDBlog (Jan. 13, 2023), https://www.rand.org/pubs/commentary/2023/01/the-digital-town-square-problem.html.

[3] Brian Fung & Clare Duffy, *How a single year of Elon Musk turned Twitter into a husk of its former self*, CNN (Oct. 27, 2023), https://www.cnn.com/2023/10/27/tech/elon-musk-twitter-x-one-year-changes/index.html [hereinafter *A single year of Elon Musk turned Twitter into a husk*].

**JA0102**

Within the first 12 hours of Musk's takeover, there was "a nearly 500% increase in the use of the N-word." *Id*. Within the first week, use of the word "Jew" increased fivefold with antisemitic content receiving the most engagement. *Id*. Within just two months, the *New York Times* reported the following about the rise in hate speech on the platform:

- "Before Elon Musk bought Twitter, slurs against Black Americans showed up on the social media service an average of 1,282 times a day. After the billionaire became Twitter's owner, they jumped to 3,876 times a day."
- "Slurs against gay men appeared on Twitter 2,506 times a day on average before Mr. Musk took over. Afterward, their use rose to 3,964 times a day."
- "[A]ntisemitic posts referring to Jews or Judaism soared more than 61 percent in the two weeks after Mr. Musk acquired the site."

Compl. ¶ 29. The platform likewise saw a renewed explosion of baseless conspiracy theories concerning, among other things, COVID-19 vaccines and QAnon. This spike in violent and extremist content on X, as well as Musk's drastic management changes, were widely reported on by a broad array of media outlets at the time. *Id* ¶ 34 (collecting sources).

These developments quickly led to advertisers leaving the platform. Since "the early days of Musk's takeover, many of Twitter's largest advertisers—including the likes of General Mills and the Volkswagen Group—paused their spending over concerns about X's layoffs, content moderation capabilities and general uncertainty about the platform's future."[4] The result was a precipitous drop in X's revenue. In July 2023, Musk reported "a 50% decline in ad revenue and heavy debt load" and, in September, reported that advertising revenue was "still down 60%."[5] Still

---

[4] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 3; Alberto Chiumento, et al., *Advertisers react to Twitter's new ownership,* Reuters (Nov. 18, 2022), https://www.reuters.com /technology/advertisers-react-twitters-new-ownership-2022-11-03/; Alan Ohnsman, *GM, Ford Say They Aren't Running Twitter Ads As They Assess Changes Under Elon Musk*, Forbes (Oct. 28, 2022), https://www.forbes.com/sites/alanohnsman/2022/10/28/gm-ford-say-they-arent-running-twitter-ads-as-they-assess-changes-under-elon-musk.

[5] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 3.

JA0103

more advertisers began to flee X when the increasing hateful and violent rhetoric started appearing

alongside their advertising, creating a false association between their brands and vile hate speech.

X's inability to control the placement of extremist content alongside advertisements was

widely reported in the media, beginning soon after Musk's takeover. Some examples include:

1. **Reuters**, "Advertisers react to Twitter's new ownership" (Nov. 18, 2022) ("Advertisers are grappling with Twitter's new ownership under Tesla boss Elon Musk, who once tweeted 'I hate advertising.'").

2. **The Washington Post**, "Amazon, Uber ads appear on Twitter pages of white nationalists restored by Musk," Faiz Siddiqui (Dec. 6, 2022) ("Ads from dozens of major brands were appearing on white nationalist and extremist accounts.").

3. **ARS Technica**, "Twitter running major brands' ads with extremist tweets—until they get flagged," Ashley Belanger (Dec. 7, 2022) ("[T]he US Department of Health and Human Services realized its promoted tweet about updated COVID vaccines was appearing on Twitter pages of white nationalist accounts.").

4. **The Verge**, "Twitter advertisers aren't happy with ads appearing on pages of white nationalists," Jon Porter (Dec. 7, 2022).

5. **Center for Countering Digital Hate**, "Toxic Twitter: How Twitter Generates Millions in Ad Revenue by Bringing Back Banned Accounts," (Feb. 2023) ("[J]ust ten reinstated accounts renowned for publishing hateful content and dangerous conspiracies will generate up to $19 million a year in advertising revenue for Twitter.").

6. **The Washington Post**, "Extremist influencers are generating millions for Twitter, report says," Taylor Lorenz (Feb. 9, 2023).

7. **The Kansas City Star**, "Mizzou ad appears on racist X page as social media site faces concerned advertisers," Jonathan Shorman (Mar. 15, 2023) ("CNN reported on Thursday that in the past 24 hours it had spotted ads on X, formerly called Twitter, for the University of Missouri and major brands, such as Amazon, Samsung, Cox Communications and others, on the profile page of VDARE, a racist outlet.").

8. **Business Insider**, "Disney, Microsoft, the NBA Had Twitter Ads Next to Neo-Nazi Propaganda," Katherine Tangalakis-Lippert (June 18, 2023) ("Ads for Disney, ESPN, the NBA, Adobe, and Microsoft appeared . . . next to vitriolic white supremacist content.").

9. **The N.Y. Post**, "Disney, Microsoft ads on Twitter show up next to neo-Nazi propaganda as advertisers return: report," Shannon Thaler (June 19, 2023) ("Neo-Nazi propaganda continues to find a home on Twitter and is adjacent to ads from major companies").

Compl. ¶ 34. This coverage occurred independently of Plaintiffs' own reporting efforts, reflecting

the widespread interest and discussion around hate speech in America's "digital town square."

6

**JA0104**

**B.**     **Media Matters and Hananoki report on X's pattern of permitting the placement of advertisements alongside extremist content.**

Since 2004, Media Matters has reported on misinformation and bias in the media. As part of its mission to educate the public on violent extremism and political rhetoric, Media Matters began researching and reporting on the rise in extremist and fringe content on X after Musk's changes to the platform. Hananoki, a Senior Investigative Reporter at Media Matters whose beat covers political extremism, has for over a decade researched and written about extremist and violent rhetoric on social media platforms, often shining a spotlight on politicians and other public figures in the process. Hananoki Decl. ¶¶ 2, 4, 6–9. His reporting has been widely cited and discussed in America's largest news outlets. *Id.* ¶ 5. And it has been relied upon by government agencies and public officials in their work, including a Department of Justice indictment, the Mueller Report on Russian interference in the 2016 election, and a bipartisan U.S. Senate Select Committee on Intelligence report. *Id.* ¶ 6. Even Attorney General Paxton has previously relied on Hananoki's reporting. In 2020, Hananoki uncovered "tweets filled with racist rhetoric, violent threats" and conspiracy theories from an Assistant Attorney General in Texas, prompting Paxton's office to fire the employee. *Id.* ¶ 8.

Hananoki has reported on X—and before that, Twitter—for nearly a decade. *Id.* ¶ 9. In the past year, he has written numerous articles about X given the marked increase in extremism on the platform since Musk's takeover. *Id.* ¶ 10–12. Hananoki's research and reporting has often focused on what advertisements X's users may encounter on the platform. *Id.* ¶ 12. Since February 10, 2023, Media Matters has published at least 14 articles about X's placement of advertisements alongside hateful content, most of which were researched and written by Hananoki. Dimiero Decl. ¶ 12. They include:

1.     "Under Elon Musk, Twitter is running corporate ads alongside tweets from Holocaust deniers," (Feb. 10, 2023).

JA0105

2. "Linda Yaccarino just started as Twitter's new CEO, but Elon Musk already destroyed the platform for advertisers," (June 8, 2023).

3. "Dish, Samsung, Wall Street Journal, and others are advertising on the Twitter account of a leading white nationalist group," (June 22, 2023).

4. "Update: Twitter placed ads for USA Today, National Women's Soccer League, and other major brands on a terrorism-linked neo-Nazi account," (July 27, 2023).

5. "Advertisers beware: Elon Musk and Linda Yaccarino are trying to lure you back by rebranding Twitter, but it's still a toxic cesspool," (Aug. 8, 2023).

6. "X Corp. CEO Yaccarino's interview on CNBC should alarm major advertising brands," (Aug. 11, 2023).

7. "Update: Under Linda Yaccarino, X is placing ads for major brands on a verified pro-Hitler account (Aug. 16, 2023).

8. "X is placing ads for brands like the NFL and MLB next to unhinged conspiracy theories about Jewish people and 9/11," (Sept. 11, 2023).

9. "X is placing major ads on a heavily followed antisemitic account that endorses killing politicians and LGBTQ advocates," (Sept. 12, 2023).

10. "X is placing ads for the NFL on prominent white nationalist accounts," (Sept. 27, 2023).

11. "X is placing ads for MLB, the NFL, and the Pittsburgh Steelers on antisemitic and Holocaust denial accounts," (Oct. 12, 2023).

12. "Pro-Hitler and Holocaust denier account: X has paid me $3,000 in ad revenue sharing," (Nov. 13, 2023).

13. "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content," (Nov. 16, 2023).

14. "X is placing ads for Amazon, NBA Mexico, NBCUniversal, and others next to content with white nationalist hashtags," (Nov. 17, 2023).

Media Matters's reporting was consistent with the findings of other news sources—in the wake of Musk's purchase (and regardless of his intent), the X platform continued to allow the juxtaposition of advertisements alongside extremist content. *Id.* ¶ 13; Hananoki Decl. ¶ 13. Hananoki employed ordinary and unremarkable investigative journalistic practices to investigate this issue, using an existing X research account controlled by Media Matters to follow white supremacist accounts and gauge how X's automated advertising algorithm would respond. Compl. ¶¶ 39–40.

Hananoki's November 16, 2023 article reported the results of his most recent investigatory work, providing public examples of X's advertisement placement and reporting on Musk's

JA0106

apparent endorsement of a widespread antisemitic conspiracy theory that Jewish people are seeking to promote "hatred against whites" and are seeking to "flood[] the[] country" with "hordes of minorities." Hananoki Decl. ¶ 14. In researching, fact checking, and drafting the November 16 article, Hananoki complied with Media Matters's policies and used ordinary journalistic practices. Dimiero Decl. ¶¶ 7, 11–12. Hananoki typically works from home in Maryland, but sometimes visits Media Matters's District of Columbia office for work-related purposes. Hananoki Decl. ¶ 3.

### C.   Texas Attorney General Kenneth Paxton retaliates against Media Matters and Hananoki for their reporting.

Despite a year's worth of reporting by Media Matters and other outlets on X's inability to protect advertisers from extremist content, Musk singled out Hananoki's November 16 article reporting on Musk's apparent endorsement of an antisemitic conspiracy theory, for which Musk also received widespread condemnation by other news outlets. Hananoki Decl. ¶¶ 14, 16–18. Two days after the article was published, with direct reference to Hananoki's article, Musk posted on X that he would file "a thermonuclear lawsuit against Media Matters." *Id.* ¶ 16.

Certain conservative media and political figures—nearly all themselves prior subjects of Media Matters's reporting on political extremism—quickly urged retaliation against Media Matters. As an example, on November 19, 2023, President Trump's former advisor Stephen Miller declared, "There are 2 dozen+ conservative state Attorneys General," implying states should investigate Plaintiffs for their journalism. Compl. ¶ 46. Missouri Attorney General Andrew Bailey responded by announcing that his "team [was] looking into" Plaintiffs' article. *Id.* ¶ 47. Paxton went even further, (i) announcing in a November 20, 2023 press release that he was launching an "investigation" into Media Matters under Texas's deceptive trade practices act, and (ii) issuing the wide-sweeping Demand for Media Matters's internal and journalistic documents one day later, under the auspices of the same "investigation." Branch Decl., Exs. A, B.

JA0107

In Paxton's press release announcing the investigation, he failed to explain how Plaintiffs were believed to have allegedly violated Texas's consumer fraud laws or how Media Matters—a Washington, D.C.-based non-profit media organization—could even plausibly be subject to Texas's jurisdiction for reporting about X, a company organized under Nevada law with its principal place of business in California.[6] The four-sentence press release was, however, notable for its use of charged and nakedly partisan language, with the Attorney General repeatedly disparaging Media Matters as "a radical anti-free speech . . . [and] left-wing organization[] who would like nothing more than to limit freedom by reducing participation in the public square[.]" Branch Decl., Ex. B.

In interviews about the investigation, Paxton confirmed that he was targeting Media Matters based entirely on Musk's unverified and self-serving allegations about Media Matters.[7] He also broadly encouraged other Republican attorneys general to use their state powers to "investigate" the District of Columbia-based media outlet, apparently without any regard to the proper reach of their state powers. This included an interview with activist Benny Johnson, who framed Paxton's investigation as "devastating" to Media Matters and "com[ing] in concert with Elon Musk dropping . . . [a] 'thermonuclear' lawsuit on Media Matters," neither of which Paxton denied. Branch Decl., Ex. C, Nov. 28, 2023 "The Benny Show" Certified Tr. 2:2–4. And when Johnson asked Paxton if he "encourage[d] other Republican attorney generals (sic) to do this[?] . . . Where are the rest of the Republican AGs? . . . Why are they so quiet on issues like this?" Paxton

---

[6] Paxton later admitted that he became aware of Media Matters's alleged conduct only through Musk's litigation, rather than any independent investigation or work by his office. *See* Newsmax, *Texas A.G. Ken Paxton probes Media Matters for 'Fraudulent Activity'* at 2:12, Rumble (Nov. 21, 2023) ("So we learned about this actually through the actual lawsuit that Elon Musk filed and then the reporting of it."), *available at* https://rumble.com/v3x4olk-texas-a.g.-ken-paxton-probes-media-matters-for-fraudulent-activity.html.

[7] *See, e.g.*, *Texas A.G. Ken Paxton probes Media Matters for 'Fraudulent Activity,' supra* note 6.

responded by encouraging others in his position to investigate Media Matters. *Id.* at 2:4–20. Paxton confirmed on CNBC that he launched his investigation because of "the information that [Media Matters] provide[s]" the public regarding X. Branch Decl., Ex. D, Tr. 3:5–6.

Like the press release, the Demand that Paxton issued to Media Matters on November 21, 2023, provided no explanation as to how Media Matters or Hananoki might conceivably have violated Texas law, nor any basis for exercising the State's coercive power over them. Plaintiffs first received the Demand on November 22, 2023 via FedEx delivery at Media Matters's Washington, D.C. office. Paxton later dispatched a process server, who attempted to serve the Demand on Media Matters at its office in the District of Columbia on November 30, 2023. Paxton's agent ultimately served the Demand on Media Matters's outside counsel in Washington, D.C. on December 1, 2023. Branch Decl. ¶ 4. The Demand has a return date of December 12, 2023. Ex. A at 1. Media Matters's letter response on December 12, 2023 provided a range of objections to the Demand, including but not limited to the arguments raised in this motion. *See* Branch Decl., Ex. E at 2–3. Media Matters's response also provided notice of Plaintiffs' efforts to obtain preliminary relief through a lawsuit filed in federal court in Maryland. *Id.* at 1; *see* Complaint, *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 1; *see also infra* Section E (Background).

Paxton's office responded on December 29, 2023. Branch Decl., Ex. F. Its letter confirms that Paxton intends to enforce the Demand without any showing of jurisdiction or cause. Texas law, he claims, grants him "broad discretion in the overall breadth and relevance of the materials that may be sought in the course of a pre-suit investigation" and requires him to provide his targets with only "the general subject matter of the investigation." *Id.* at 1–2. Plaintiffs' rights in responding are constricted because "a CID issued by [Paxton] is not limited by the Texas Rules of

JA0109

Civil Procedure." *Id*. at 1. Paxton reserves his "right to pursue appropriate legal action to enforce" the Demand and asserts that Plaintiffs' only option to "resist the Attorney General's investigation" is "to establish that there were zero permissible justifications" for it. *Id*.[8] And yet, to date, Paxton has provided no explanation at all as to how Plaintiffs may have violated Texas law, or are plausibly subject to Texas's jurisdiction, and he has continued to point to Musk's allegations as the sole basis of his investigation. *See Media Matters for America*, ECF No. 33 at 1, 6.

On its face, the Demand is unreasonable, overbroad, and seeks materials that are protected from disclosure under the First Amendment and District of Columbia and Maryland shield laws. Ex. A at 7. The Demand requests that Media Matters produce on an ongoing basis all documents related to its internal and external communications, from as far back as January 1, 2022, regarding X CEO Linda Yaccarino and Musk's purchase of X, as well as all internal and external communications regarding the November 16 article. *Id*. at 2, 7. In other words, it operates as an ongoing demand for virtually any materials related to Plaintiffs' coverage of X and Musk. It also demands all external communications with employees and representatives of X and ten other corporate entities from November 1, 2023 to November 21, 2023, *id*.; categories of documents related to Media Matters's internal operations, including documents related to its organizational structure, sources of income originating in Texas, operational expenditures in Texas, current and past X accounts including those used to obtain the screenshots contained in the November 16 article, and sources of funding for operations involving X research and publications, *id*. The Demand is plainly overbroad and intrusive on its face, but Paxton has failed even to venture an

---

[8] Defendant's December 29, 2023 letter requested an answer by January 4, 2024. Counsel for Media Matters responded to Paxton's letter to reassert all objections to the Demand, and to reiterate that Defendant's office is without jurisdiction to conduct the investigation of Media Matters, and that Defendant's investigation constitutes unlawful retaliation in violation of the First Amendment. *See* Branch Decl., Ex. G.

explanation as to why he needs these documents. Readily available public information confirms Plaintiffs' lack of contacts with Texas, while a year's worth of articles from a bevy of publications confirms the accuracy of Hananoki's reporting.

### D. Media Matters and Hananoki are chilled from further newsgathering and reporting on X and Musk.

Paxton's investigation, public attacks, and far-reaching Demand have chilled Media Matters and Hananoki's speech and press activities. Hananoki's research and writing have been severely impaired. Prior to Paxton's Demand, Hananoki published approximately one or two articles per week; in the eight weeks since Paxton issued the Demand, Hananoki has published only two articles altogether, or roughly one per month. Dimiero Decl. ¶ 20; *see also* Hananoki Decl. ¶¶ 29–31. Draft articles he intended to publish about violent extremism on X have been held back by his editors for fear of further retaliation from Paxton. Hananoki Decl. ¶¶ 30–31. Since Paxton launched his investigation, Hananoki has not published any articles about Musk's handling of political extremism on X. *Id.* ¶ 30; Dimiero Decl. ¶¶ 17–20. Compounding this chill, Hananoki and Media Matters have been subjected to a wave of threats since Paxton's public retaliation campaign. Hananoki Decl. ¶ 27; Padera Decl. ¶ 27; Dimiero Decl. ¶ 23. In response, Hananoki has increased security at his home, Hananoki Decl. ¶ 28, and Media Matters has hired an outside security firm, Padera Decl. ¶ 28.

Hananoki's diminished reporting output is not for want of content. Since Paxton's investigation began, Hananoki has continued generating story ideas regarding extremist content on X but has not pursued them for fear of legal retaliation. Hananoki Decl. ¶¶ 29, 32. This includes coverage of Musk's reinstatement of Alex Jones, a prominent conspiracy theorist, to the X platform, and the use of an Alex Jones-related hashtag alongside advertising; antisemitic hashtags targeting Jewish people appearing alongside advertising; and advertising appearing on the X

13

account of Stew Peters, a far-right and white nationalist internet personality who has promoted violence, as well as antisemitism, racism, and homophobia. Hananoki Decl. ¶ 32. Hananoki fears that reporting on these topics will draw further retaliation against himself, his employer, and his colleagues. Hananoki Decl. ¶ 34. These story ideas are well within Hananoki's long-running beat, yet he is nonetheless chilled from reporting on these topics, Hananoki Decl. ¶ 32, at least one of which received extensive national coverage in other publications.[9] Even where Hananoki has been able to publish work, he has self-censored from writing about X's content-moderation policies, limiting the scope of his articles. For example, on January 2, 2024, he published an article describing General Mike Flynn's appearance on Alex Jones's show but omitted any discussion of Jones' recent reinstatement on X—a plainly relevant aspect of the story. Hananoki Decl. ¶ 36.

Hananoki's chill is directly connected to the fear that any materials he generates in preparing such stories are subject to the Demand, which calls for the ongoing production of all internal communications even touching upon Musk's purchase of X or X CEO Linda Yaccarino. Hananoki Decl. ¶ 34. Yaccarino has frequently made claims (undermined by Plaintiffs' reporting) that X provides a safe platform for advertisers.[10] This same concern has even hampered Hananoki's ability to communicate internally with his editor, for fear that their communications

---

[9] Clare Duffy, *'The people have spoken': Elon Musk restores the X account of conspiracy theorist Alex Jones after poll*, CNN (Dec. 10, 2023), https://www.cnn.com/2023/12/09/business/alex-jones-restored-x-elon-musk-poll/index.html; Danielle Wallace, *Elon Musk reinstates Alex Jones on X*, Fox News (Dec. 10, 2023), https://www.foxnews.com/media/elon-musk-reinstates-alex-jones-x; Kate Conger, *Elon Musk Brings Conspiracy Theorist Alex Jones Back to X*, N.Y. Times (Dec. 9, 2023), https://www.nytimes.com/2023/12/09/technology/elon-musk-alex-jones-twitter-x.html.

[10] *See, e.g.*, *Twitter-turned-X CEO Linda Yaccarino focuses on winning back big brands on Elon Musk's platform*, AP (Aug. 10, 2023), https://apnews.com/article/twitter-x-corp-ceo-linda-yaccarino-elon-musk-0131c61ac296955d424fd057f6b0196d; Jonathan Vanian, *Read Linda Yaccarino's message to X employees about Elon Musk's controversial DealBook interview*, CNBC (Nov. 30, 2023), https://www.cnbc.com/2023/11/30/read-linda-yaccarinos-message-to-x-employees-about-musk-interview.html.

about story ideas will be turned over to Paxton, the attorney general of a state with absolutely no connection to Hananoki's work. *Id.*

Other researchers and writers at Media Matters have also been constrained in their journalistic work because they are fearful of becoming embroiled in Paxton's investigation, generating documents subject to Paxton's Demand, or publishing articles that would provoke additional retaliation. Dimiero Decl. ¶¶ 16–18, 21. As a direct result of Paxton's harassment, they have pared back reporting and publishing, particularly on any topics relating to the Paxton investigation. *Id.* Media Matters's editorial team's fear of retaliation has repeatedly caused them to not publish stories about X and Musk. *Id.* ¶¶ 18–19. This is not for want of material—Media Matters has received scores of unsolicited tips from readers and X users who continue to witness extremist and violent content placed next to advertisements on X. *Id.* ¶ 18. Media Matters has not pursued these tips due to Paxton's retaliation, in part because any work created by acting on these tips may have to be disclosed to Paxton. *Id.* ¶¶ 16–18, 22.

In a radical change of operation, Media Matters's executive and editorial team have also been forced to become closely involved in the organization's publishing decisions since Paxton launched his investigation. *Id.* ¶ 21. Now, Media Matters must carefully assess whether a new article impacts existing legal proceedings or could generate new ones. *Id.* This has significantly slowed down the publication process. *Id.* Media Matters's associations with external groups have also been impacted by the investigation. Padera Decl. ¶ 25. Several groups that previously collaborated closely with Media Matters are reevaluating doing so following the commencement of Paxton's investigation, worried that any related communications may be turned over to Paxton or lead to investigations into their own work. *Id.* And Media Matters employees are self-censoring when anything related to X comes up in communications with such groups, curtailing engagement

15

with partner organizations out of concern over potential exposure to legal consequences. *Id.* For example, while the Demand remains pending, Media Matters has refrained from actively participating in discussions as part of its membership in coalitions focused on hate speech on X. *Id*.

Media Matters's external affairs staff have also self-censored communications with other groups, including pausing on sharing with longstanding Media Matters partners research regarding X and its content moderation policies. External affairs staff have even refrained from directing partners to content it has *already published* about X, for fear that any conversations or aid may lead to further retaliation against Media Matters or its partners. *Id.* Paxton's investigation has also caused Media Matters's department directors to pause similar reporting on content moderation and advertisement placement issues for at least one other social media platform, out of fear such reporting will lead to further retribution. *Id.* ¶ 26.

Paxton's overbroad and unreasonable Demand further chills Plaintiffs' speech by threatening compelled disclosure of sensitive documents and communications, including materials concerning the organization's editorial processes that Hananoki relied on to prepare his November 16 article. Ex. A at 7; Dimiero Decl. ¶¶ 15–20, 22. It would further require Media Matters to turn over operational information, Padera Decl. ¶ 21, including information about its employees, donors, funding, and expenditures. Ex. A at 7. And it does all of this without affording Media Matters the protections that apply in civil litigation to guard against irrelevant, improper, overreaching, or burdensome document requests. *See generally* Fed. R. Civ. P. 26(b)(1).

The Demand is no empty letter—it is backed by the now imminent possibility that Paxton will seek to compel compliance from Plaintiffs in a Texas court, where Paxton argues Plaintiffs have scant few avenues to fight the Demand. *See* Tex. Bus. & Com. Code Ann. § 17.62(b); *see*

JA0114

Ex. F. Media Matters and Hananoki have no relevant contacts with Texas, and thus had no reasonable expectation that they would be summoned to Texas to answer for their journalism and defend their speech and press rights (let alone be subjected to intrusive demands from the State Attorney General). Media Matters is not registered as a foreign corporation in Texas; it has no registered agent in Texas; nor does it "transact business," perform any "business practices," or conduct any "trade" or "commerce" in Texas. Tex. Bus. Orgs. Code Ann. § 9.002(a); Tex. Bus. & Com. Code Ann. §§ 17.45(6), .46(a). Paxton's investigation focuses on reporting by Hananoki that involved no contact—direct or indirect—with Texas. Hananoki Decl. ¶¶ 21–24. The prospect that Plaintiffs may be dragged into Texas court in retaliation for their D.C. and Maryland work has further chilled them and discouraged further coverage of X and Musk. *Id.* ¶ 39; Dimiero Decl. ¶¶ 16–20, 22.[11]

### E.   Plaintiffs sued Paxton to protect their First Amendment rights.

Plaintiffs filed suit against Paxton on December 12, 2023—the return date for the Demand. *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 1. Plaintiffs initially filed suit in Maryland because that is where Hananoki lives, works, and wrote the articles giving rise to Paxton's unlawful investigation. Plaintiffs moved for a preliminary injunction and temporary restraining order the same day, seeking to enjoin further enforcement of the Demand. *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 2; *see also id.*, ECF No. 20 (motion refiled on Dec. 14, 2023, after service on Paxton was complete). In support of the motion, Plaintiffs submitted several declarations from individuals at Media Matters,

---

[11] The Deceptive Trade Practices Act also arms Paxton with a host of other powers with which to retaliate against Plaintiffs, including restraining orders, civil penalties, and sanctions. *See, e.g.*, Tex. Bus. & Com. Code Ann. §§ 17.47(a)–(b) (authorizing OAG to "bring an action in the name of the state" for injunctive relief), (c)–(d) (authorizing OAG to seek damages and restitution), (e)–(f) (authorizing OAG to seek monetary civil penalties for violations of injunctions).

including declarations that detailed Media Matters's utter lack of connection to Texas, eviscerating any possible basis for any colorable claim that Texas has any authority over the District of Columbia-based organization. *Id.*, ECF Nos. 2-2, 2-3, 2-4, 38-1.[12]

Plaintiffs' motion was fully briefed on January 2, 2024. In his response in opposition, Paxton offered little defense of his investigation on the merits, instead focusing largely on ripeness, personal jurisdiction, and venue objections. *See* Branch Decl., Ex. I, *Media Matters for America*, ECF No. 33. Paxton's response also ignored the extensive declarations that Media Matters had, by then, provided to the Maryland court, which laid out Media Matters's lack of contacts with Texas. Nor did it indicate that Paxton had made any effort to "investigate" Media Matters's contacts with the forum by using databases or information surely available to him as Texas's chief law enforcement officer. Instead, Paxton has persisted in claiming that he is entitled to Media Matters's internal documents, without ever making any threshold showing of either jurisdiction or credible claims of violation of law. Ex. F.

The court held a hearing on Plaintiffs' motion for a preliminary injunction on January 8, 2024 but postponed its ruling in light of its concerns about whether, on the facts alleged and presented, it had personal jurisdiction over Paxton in Maryland.[13] That question animated nearly the entirety of the hearing, at the conclusion of which the court directed the parties to further brief the jurisdictional issue (and any other issue that Paxton wished to raise for dismissal), setting a five-week briefing schedule. Branch Decl., Ex. H, Tr. 32:2–17; *see also Media Matters for*

---

[12] Consistent with Local Rule 5.1(d), new declarations that incorporate this information have been filed in support of this motion.

[13] The Court repeatedly indicated that if it were to find personal jurisdiction, Plaintiffs' allegations would survive a ripeness challenge. Ex. H, Tr. 4:13–17; *see also id.*, Tr. 30:13–17 (noting again, later in the hearing, a strong likelihood that if the court reached the question, it was likely to "find subject matter jurisdiction").

*America,* ECF No. 47. The court advised the parties, however, that if they wanted a resolution "that is fast and fair to both sides," they "would move [the case] to D.C.," either through "an agreement from both sides that personal jurisdiction exists in D.C." or through briefing a transfer motion. Ex. H, Tr. 23:6–12. And the court advised Plaintiffs that if "in the interim" they "would just prefer to file it in D.C.," then they "can do that." *Id.*, Tr. 25:20–23.[14]

Repeatedly, the court expressed little doubt that the District of Columbia had specific jurisdiction over Paxton. It stressed that Paxton had "served [the Demand] in D.C." and had "directed [his] investigation to Media Matters in D.C." *Id.*, Tr. 11:20–23, 22:10–24; *see also id.*, Tr. 6:17–23. The court even understood Paxton's pleadings to have "referenced that there is personal jurisdiction in D.C." *Id.*, Tr. 24:6–17. The court's reading of Paxton's pleadings was well-founded. His opposition to Plaintiffs' motion stressed that his "conduct was not in any sense 'aimed' at Maryland—indeed, [the] CID was issued to, and served in, the District of Columbia, where Media Matters resides." Ex. I at 16. Paxton's response went so far as to concede that Media Matters "*could have instead sued in its home—the District of Columbia*." *Id.* at 24 (emphasis added). Counsel for Paxton reiterated the point at oral argument, explaining "the civil investigation demand[] *was directed as [sic] Media Matters, which is a . . . District of Columbia corporation.*" Ex. H, Tr. 6:17–23 (emphasis added).

While Plaintiffs maintain that personal jurisdiction over Paxton is proper in Maryland, they are suffering ongoing irreparable harm and need immediate relief. Plaintiffs accordingly have accepted the Maryland court's suggestion that the "fair and fast" way to resolve Plaintiffs' motion

---

[14] The court similarly advised Paxton that, beyond transfer, Plaintiffs could simply "dismiss this case and refile immediately in D.C." and Paxton's counsel agreed Plaintiffs "could do that." Ex. H, Tr. 24:19–22. Despite the Court's offer, and Plaintiffs' willingness, to transfer the matter to this District with the agreement of the parties, Paxton's counsel demurred and insisted the issue "need[ed] to be briefed." *Id.*, Tr. 24:6–8.

is to move it to D.C., where Paxton has all but admitted that jurisdiction is proper. *Id.* at Tr. 6:17–23; Ex. I at 15 ("Defendant announced his investigation in Texas . . . and issued the CID to Plaintiff Media Matters in the District of Columbia"); *id.* at 16 ("Defendant's conduct was not in any sense 'aimed' at Maryland—indeed, his CID was issued to, and served in, the District of Columbia, where Media Matters resides."); *id.* at 24 ("Media Matters . . . could have instead sued in its home—the District of Columbia, where undersigned counsel, and other attorneys in OAG, are barred."). Plaintiffs have therefore voluntarily dismissed their action in the District of Maryland and have promptly refiled their complaint in this District to secure urgent relief.[15]

## STANDARD OF REVIEW

To obtain a temporary restraining order or preliminary injunction, Plaintiffs must show: (1) likelihood of success on the merits; (2) likelihood of "suffer[ing] irreparable harm in the absence of preliminary relief;" (3) that "the balance of equities tips in [their] favor;" and (4) that "the injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When a temporary restraining order is sought against the government, the last two requirements merge, "because the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009). The requirements for a preliminary injunction and for a TRO are the same. *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003).

---

[15] Plaintiffs filed a Notice of Dismissal in the Maryland case prior to filing this Complaint. *See Media Matters*, ECF No. 49. Because that notice is self-executing under Rule 41, it effectuated dismissal. *See In re Brewer*, 863 F.3d 861, 868 (D.C. Cir. 2017); *Marex Titanic, Inc. v. Wrecked & Abandoned Vessel*, 2 F.3d 544, 546 (4th Cir. 1993). Plaintiffs have also provided defense counsel with a courtesy copy of the Complaint and all filings associated with this motion for a temporary restraining order and preliminary injunction. Plaintiffs' counsel have asked defense counsel whether they will accept service on behalf of their client, and defense counsel have agreed. Plaintiffs will effectuate service as soon as the summons is issued.

## ARGUMENT

**I.    This Court has personal jurisdiction over Paxton.**

This Court has personal jurisdiction over Defendant Paxton in his official capacity as Attorney General of Texas. For constitutional purposes, specific personal jurisdiction exists where (1) the defendant has "purposefully directed" activity at residents of the forum and (2) the plaintiff's claims "arise out of or relate to the defendant's contacts with the forum." *Lewis v. Mutond*, 568 F. Supp. 3d 47, 52 (D.D.C. 2021) (first quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985), and then quoting *Bristol-Myers Squibb v. Super. Ct. of Cal.*, 582 U.S. 255, 262 (2017)). Even "a single act, so long as it creates [a] 'substantial connection,' is sufficient." *Heller v. Nicholas Appelgate Cap. Mgmt. LLC*, 498 F. Supp. 2d 100, 109–10 (D.D.C. 2007) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 475 (1984)).

This Court has at least three related bases to exercise jurisdiction over Paxton consistent with the demands of due process. First, Paxton has repeatedly entered the District of Columbia for purposes of his investigation, first by using a common carrier to physically deliver the Demand to Media Matters's headquarters, and then by procuring the service of an agent—a process server—and directing that agent to enter the District of Columbia to serve the Demand upon Media Matters. It is well-settled that "although physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State—either by the defendant in person *or through an agent*, goods, *mail*, or some other means—is certainly a relevant contact" for purposes of personal jurisdiction. *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (emphases added) (citation omitted); *see also IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 113 (D.D.C. 2018). And the Demand "was served on Media Matters in the District of Columbia." Ex. H, Tr. 6:22–23; *see also id.*, Tr. 11:20–23, 17:5–7.

Second, Paxton's Demand seeks numerous categories of documents that he had reason to believe would be located primarily in the District, where Media Matters is headquartered. By

demanding reams of documents stored, and in many cases created, in the District, Paxton has unquestionably "directed" activity at the District. Indeed, Paxton admitted that the civil investigation demand[] was directed as [sic] Media Matters, which is a . . . a District of Columbia corporation." Ex. H, Tr. 6:17–23; *see id.*, Tr. 22:18–24. Plaintiffs' claims, in turn, "are based on" Paxton's Demand. *Def. Distributed v. Grewal*, 971 F.3d 485, 492 (5th Cir. 2020); *see also infra* Sections II.B–C.

Third, Plaintiffs allege unlawful retaliation in violation of the First Amendment, an intentional tort. *See infra* Section II.A. In intentional-tort cases, specific jurisdiction exists where the defendant has "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007); *see also Calder v. Jones*, 465 U.S. 783, 788–89 (1984). Here, jurisdiction is proper because Paxton has intentionally served a Demand on Media Matters in the District, causing a substantial and predictable chill to Media Matters. *See infra* Section II.A. The Fifth Circuit's decision in *Defense Distributed v. Grewal* is directly on point; the court held there that the Attorney General of New Jersey had purposefully availed himself of Texas by issuing a cease-and-desist letter to a Texas company in Texas, thereby "project[ing] himself across state lines and assert[ing] a pseudo-national executive authority." 971 F.3d at 493. The plaintiffs in *Defense Distributed* plausibly alleged the "letter had a chilling effect on the exercise of their First Amendment rights," which, "in turn, caused them to cease publication." *Id.* at 495. As the Fifth Circuit explained, "*this alone constitutes purposeful availment*" because "[t]he defendant is purposefully availing himself of 'the privilege of causing a consequence' in Texas." *Id.* at 493–94 (quoting *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999)) (emphasis added). That is precisely the case here.

JA0120

Paxton has little ground to complain now about now being haled into court in the District of Columbia. Paxton opposed the District of Maryland's exercise of personal jurisdiction over him on grounds that support this Court's authority. *See supra* Section E (Background); *see also* Ex. I at 16 (arguing that "conduct was not in any sense 'aimed' at Maryland—indeed, [the] CID was issued to, and served in, the District of Columbia, where Media Matters resides"). Indeed, he specifically objected to jurisdiction in Maryland on the grounds that Media Matters "*could have instead sued in its home—the District of Columbia*." Ex. I at 24 (emphasis added). Paxton's reliance on this line of argument was so significant that the District of Maryland court read his response to "reference[] that there is personal jurisdiction in D.C." Ex. H, Tr. 24:12–14. Plaintiffs have now acceded to Paxton's preference for litigating in this forum, which the District of Maryland court suggested was the "fast and fair" venue for resolving Plaintiffs' motion. *Id.* at Tr. 23:6–12.

As for statutory personal jurisdiction, the District of Columbia's long-arm statute is effectively congruent with the permissible limits of personal jurisdiction under the Due Process Clause. *See, e.g.*, *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 44 (D.C. Cir. 2020); *Mouzavires v. Baxter*, 434 A.2d 988, 993 (D.C. Cir. 1981). Thus, insofar as the Court may exercise personal jurisdiction over Defendant Paxton consistent with due process, it also has statutory personal jurisdiction under D.C. Code § 13-423(a)(1) and (3).

## II.    Media Matters and Hananoki are likely to prevail on the merits of their claims.

### A.    Plaintiffs are likely to establish that Paxton retaliated against their constitutionally protected activities in violation of the First Amendment.

"[T]he law is settled that . . . the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). "Official reprisal for protected speech 'offends the Constitution [because] it

**JA0121**

threatens to inhibit exercise of the protected right.'" *Id.* at 256 (quoting *Crawford–El v. Britton*, 523 U.S. 574, 588 n.10 (1998)). It is "obvious" that efforts "to punish political speech by members of the press . . . run afoul of the First Amendment." *El Dia, Inc. v. Rossello*, 165 F.3d 106, 109 (1st Cir. 1999). The D.C. Circuit has long recognized First Amendment retaliation claims as "actionable" because "'retaliatory actions may tend to chill individuals' exercise of constitutional rights.'" *Crawford-El v. Britton*, 93 F.3d 813, 846 (D.C. Cir. 1996) (Henderson, J., concurring) (quoting *ACLU of Md., Inc. v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993)); *see also Perry v. Sindermann*, 408 U.S. 593, 597 (1972). To prevail on their retaliation claim, Plaintiffs must show: "(1) [they] engaged in conduct protected under the First Amendment; (2) [Paxton] took some retaliatory action sufficient to deter a person of ordinary firmness in [Plaintiffs'] position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Plaintiffs are likely to prove each of these elements and prevail on the merits of their first claim. A declaratory judgment and injunctive relief are appropriate remedies for First Amendment injury. *See* 28 U.S.C. §§ 2201, 2202; *Anatol Zukerman & Charles Krause Reporting, LLC, v. U.S. Postal Serv.*, 64 F.4th 1354, 1366–67 (2023); *Hedgepeth ex rel. Hedgepeth v. Washington Metro. Area Transit Auth.*, 386 F.3d 1148, 1152 n.3 (D.C. Cir. 2004); *Anderson v. Reilly*, 691 F. Supp. 2d 89, 92 (D.D.C. 2010).

### 1.    Media Matters's and Hananoki's newsgathering and reporting are protected First Amendment activities.

Media Matters is a non-profit media watchdog group that provides journalistic research and investigative reporting on political extremism. *See supra* at 7. Hananoki is a senior investigative reporter for Media Matters who covers political extremism, including extensive coverage of X's ongoing placement of advertisements on racist, antisemitic, and violent accounts

on the X platform. *See supra* Section B (Background). Plaintiffs routinely investigate, publish, report, and comment on political extremism in American media, including on platforms like X.

Plaintiffs' journalistic pursuits—on topics of clear public concern and discussion—are at the core of our First Amendment freedoms. "The protection given speech and press" by the First Amendment "assure[s] [an] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957). This protection serves not only the news media itself, but society at large: "A broadly defined freedom of the press assures the maintenance of our political system and an open society," *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967). A free press is foundational to our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.*, 376 U.S. at 269–70 (explaining such "freedom of expression upon public questions is secured by the First Amendment").

Paxton is targeting Plaintiffs for retaliation because of their protected journalism and speech. As explained, since Musk purchased X in October 2022, the platform has permitted advertisements to appear next to accounts that promote racist, antisemitic, and violent content. *See supra* Section A (Background). This has been the subject of extensive public discussion and media coverage, and not only from Plaintiffs. *See supra* at 7–8. X and Musk have invited this scrutiny by repeatedly framing X as the "digital town square" for public debate. *See supra* at 6.

Plaintiffs' reporting on this issue of important national concern is unequivocally protected by the First Amendment. "Freedom of the press holds an . . . exalted place in the First Amendment firmament." *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 375 (D.D.C. 2020); *see also Flynt v. Rumsfeld*, 180 F. Supp. 2d 174, 175 (D.D.C. 2002) (explaining that "under the First Amendment the press is guaranteed a right to gather and report news"). Media Matters's own

JA0123

editorial judgment in what to publish on its platform is likewise entitled to protection; "[t]he exercise of such editorial discretion, especially in connection with news reporting, sharply implicates First Amendment values." *Nat'l Org. For Women, N.Y.C. Chapter v. F.C.C.*, 555 F.2d 1002, 1010 (D.C. Cir. 1977). This protection "unequivocally" extends to its "editorial judgment and . . . free expression of views on" matters of public concern, such as political extremism on X, "however controversial." *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 255 (1974) (quoting *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 391 (1973)). Indeed, "the constitutional protection of the press reaches its apogee" where, as here, Plaintiffs are members of the press who write about "a public figure" or "on a matter of public concern." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (citing *New York Times Co.*, 376 U.S. at 254); *see also Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) ("Speech on matters of public concern is at the heart of the First Amendment's protection.") (cleaned up); *Farah v. Esquire Mag.*, 736 F.3d 528, 539 (D.C. Cir. 2013) (similar). Simply put, "the First Amendment applies in full force to *all* 'news, comment, and advertising'" and "protect[s] a news outlet's editorial perspective [and] the way its beat reporters cover a given" public issue. *Washington Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019) (quoting *Tornillo*, 418 U.S. at 258). Plaintiffs are therefore likely to show they "engaged in conduct protected under the First Amendment," *Aref*, 833 F.3d at 258, by investigating and reporting on political extremism on X.

### 2. Paxton's retaliatory conduct has already chilled, and continues to chill, Plaintiffs' First Amendment rights.

Paxton, through his investigation and Demand, has already taken "action sufficient to deter a person of ordinary firmness in [Plaintiffs'] position from speaking again." *Aref*, 833 F.3d at 258. Though not dispositive, plaintiffs' "actual response" to the retaliatory conduct "'provides some evidence of the tendency of that conduct to chill First Amendment activity.'" *Hartley v. Wilfert*,

JA0124

918 F. Supp. 2d 45, 54 (D.D.C. 2013) (quoting *Constantine v. Rectors & Visitors of George Mason Univ*, 411 F.3d 474, 500 (4th Cir. 2005)). The "cause of action targets conduct that tends to *chill* [First Amendment] activity, not just conduct that *freezes* it completely." *Constantine,* 411 F.3d at 500 (emphases in original). Plaintiffs are *not* required to "prove that the allegedly retaliatory conduct caused [them] to cease First Amendment activity altogether." *Id.* It is sufficient to show— as Plaintiffs do—that Paxton's retaliatory acts would chill the First Amendment activity of similarly situated plaintiffs of ordinary firmness.

The Court must "conduct this inquiry on a case-by-case basis, considering the actors involved and their relationship." *Snoeyenbos v. Curtis*, 60 F.4th 723, 731 (4th Cir. 2023). Here, as the result of their reporting about a company organized under Nevada law with its principal place of business in California, a non-profit news organization headquartered in Washington, D.C.— with most of its employees, including Hananoki, working within the Washington, D.C. metropolitan area—has been made subject to an investigation in Texas seeking highly sensitive material regarding its funding, expenditures, organizational structure, communications with sources, and internal discussion of news stories. Ex. A at 7. The investigation was initiated by a State Attorney General without any showing that Plaintiffs violated that state's law or are even subject to its jurisdiction, all while that Attorney General disparages Media Matters as a "radical anti-free speech organization" that wants to "limit freedom" and must be stopped. Ex. B; *see* Ex. A. Plaintiffs had *no* reasonable expectation of ever being subject to investigation by the Texas Attorney General, never mind under the state's Deceptive Trade Practices Act—Media Matters is a non-profit media organization, does not engage in trade or commerce with consumers, and neither it nor Hananoki has any relevant connection to the state. Padera Decl. ¶¶ 5, 7–14; Hananoki Decl. ¶¶ 3, 21–23. Despite no jurisdictional nexus, Paxton demands Plaintiffs turn over their most

**JA0125**

sensitive journalistic and organizational documents. Ex. A at 7. Paxton may seek to have Plaintiffs

held in contempt or sue them in a foreign court under unspecified charges for their refusal to do

so. *See* Tex. Bus. & Com. Code Ann. §§ 17.62, 17.47. This form of retaliation is no idle threat or

mere inconvenience. It carries serious implications for Media Matters's ability to operate and

report on matters of public concern. To compound matters, Paxton has encouraged other attorneys

general to launch their own retaliatory campaigns against Plaintiffs under their state laws, again

regardless of any genuine basis to do so or any plausible basis for jurisdiction. *See supra* at 11.

Paxton's explicit retaliation against Plaintiffs for news coverage and reporting would

plainly "deter a person of ordinary firmness in plaintiff's position from speaking again." *Aref*, 833

F.3d at 258. The mere "*threat* of invoking legal sanctions and other means of coercion, persuasion,

and intimidation" can be sufficient to tend to chill protected speech. *Playboy Enter. v. Meese*, 639

F. Supp. 581, 585 (D.D.C. 1986) (emphasis added) (quoting *Bantam Books, Inc. v. Sullivan*, 372

U.S. 58, 67 (1963)); *see also Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995) (recognizing First

Amendment harm from the "threat of administrative and judicial intrusion into the newsgathering

and editorial process"); *Coss v. Teters*, No. 2:23-CV-00180, 2023 WL 3470899, at *4 (S.D. W.

Va. May 12, 2023) ("[T]hreats alone can constitute an adverse action if the threat is capable of

deterring a person of ordinary firmness from engaging in protected conduct." (quoting *Hill v.

Lappin*, 630 F.3d 468, 474 (6th Cir. 2010))). Here, moreover, Paxton's public threats to retaliate

have already moved from threat to deed—he has formally announced his investigation and issued

the Demand. Ex. B; Ex. A. And he followed up with a letter on December 29, 2023, expounding

an expansive view of his power and repeating his threat to enforce. Ex. F. Courts have, naturally,

found that the actual commencement of a threatened investigation—even before any conclusion is

reached or penalties imposed—constitutes actionable retaliation. Indeed, the Fourth Circuit found

a plaintiff's speech chilled when a state board told him that "he and his website were under investigation" and that the board had "statutory authority" to modify what content he could put on his website—actions akin to Paxton's conduct here. *Cooksey v. Futrell*, 721 F.3d 226, 237 (4th Cir. 2013). "A person of ordinary firmness would surely feel a chilling effect" under such circumstances. *Id.*; *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) (concluding government officials "unquestionably chilled the plaintiffs' exercise of their First Amendment rights" through a retaliatory investigation even though the officials "did not ban or seize the plaintiffs' materials, and . . . ultimately decided not to pursue either criminal or civil sanctions against them"). The passage of the Demand's return date exacerbates this harm. Plaintiffs remain under investigation and must now conduct their journalistic work under the ongoing specter of being haled into Texas court at any moment to defend against Paxton's efforts to rummage through their files.

The predictable—and intended—chilling effect of Paxton's investigation and Demand is reinforced by the power Texas law vests in him to further punish Plaintiffs for noncompliance— "here the penalties include public reprimands, sanctions, civil penalties," *S.C. Freedom Caucus v. Jordan*, No. 3:23-CV-795-CMC, 2023 WL 4010391, at *8 (D.S.C. June 13, 2023), as well as restraining orders and the ability to hale Plaintiffs into courts in a jurisdiction with which they have no meaningful contacts, Tex. Bus. & Com. Code Ann. §§ 17.47, 17.62; *cf. Tech. Patents, LLC v. Deutsche Telekom AG*, 573 F. Supp. 2d 903, 917 (D. Md. 2008) (recognizing the "chilling effect" of haling parties into jurisdiction with which they have limited contacts), *aff'd sub nom. Tech. Patents LLC v. T-Mobile (UK) Ltd.*, 700 F.3d 482 (Fed. Cir. 2012). These sanctions further establish an "asserted chill [that] would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *S.C. Freedom Caucus*, 2023 WL 4010391, at *8. And unlike in regular litigation, where Media Matters and Mr. Hananoki can resist burdensome discovery

29

through the rules of civil procedure, Paxton's Demand is not subject to such ordinary protections, including the requirements that his demands be relevant and proportional. Ex. F; *see generally* Fed. R. Civ. P. 26(b)(1).[16] Media Matters and Mr. Hananoki therefore have severely constrained grounds for resisting the Demand.

Notably, Paxton himself has recognized that retaliatory efforts like these are likely to chill speech. In 2016, after Massachusetts issued a similar CID to Exxon Mobil, Paxton's office authored an amicus brief on behalf of numerous other states, explaining that:

> The[] [First Amendment] protections afforded by the Constitution . . . [are] threatened by the chill of subpoenas, like Massachusetts's CID, hanging in the air. Thus, not only is Massachusetts attempting to silence Exxon through the issuance and threat of compelling a response to the CID, this very action harms everyone[.]

Branch Decl., Ex. J, Brief of Amici Curiae at 6, *Exxon Mobil Corp. v. Healey*, No. 4:16-CV-00469-K, ECF No. 63-2. Paxton's own words speak volumes about the purpose and intended effect of his own Demand here. His supposed concern that Massachusetts was using a civil investigative demand under its consumer protection laws—the same power Paxton uses here—"to engage in unrestrained, investigative excursions to promulgate a social ideology, or chill the expression of points of view, in . . . policy debates" rings even truer here. *Id.* at 1. Paxton was unequivocal that "the authority attorneys general have to investigate fraud does not allow them to encroach on the constitutional freedom of others to engage in" public debate. *Id.* at 3. Paxton was concerned such abuse of state law "chills speech" and "contravenes the First Amendment." *Id.* And he repeated

---

[16] The Demand—and Paxton's expansive view of his right to issue and enforce it, *see* Ex. F—also goes far beyond what would be permitted in ordinary civil litigation, because it dispenses of any threshold showing of jurisdiction. In civil litigation, a party is ordinarily not properly subject to discovery absent a showing of jurisdiction, and binding federal circuit precedent applicable in Texas precludes the exercise of that jurisdiction in a case where the targeted conduct consists of a story published online with no meaningful ties to Texas. *See Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 317–20 (5th Cir. 2021), *reh'g en banc denied*, 32 F.4th 488 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 485 (2022).

JA0128

these arguments in two similar amici briefs—again written by *his* office on behalf of numerous other states—in the Second Circuit and the Southern District of New York. In the former, Paxton argued that abusing civil demands to chill speech imperils "a fundamental guarantee of our Republic—the ability to have a viewpoint on a topic of public debate and not fear government retaliation for expressing it." Branch Decl., Ex. K, Brief of Amici Curiae at 10, *Exxon Mobil Corp. v. Healey*, No. 18-1170 (2d Cir.), ECF No. 77; *see also* Branch Decl., Ex. L, Brief of Amici Curiae at 10, *Exxon Mobil Corp. v. Schneiderman*, No. 1:17-cv-02301-VEC (S.D.N.Y.), ECF No. 196-1 (again arguing candid discussion was "threatened by the chill of 'investigations' hanging in the air"). Here, Paxton is employing the very same tactic he previously criticized to obtain the same unconstitutional ends.

Finally, although not dispositive, Plaintiffs' speech has already been chilled. *See Hartley*, 918 F. Supp. 2d at 53; *Cooksey*, 721 F.3d at 236 (finding plaintiff had "sufficiently shown that he has experienced a non-speculative and objectively reasonable chilling effect of his speech due to the actions of the State Board"); *Turner*, 502 F. Supp. 3d at 381. This District's decision in *Turner* is particularly relevant. There, the court granted a preliminary injunction after a retaliatory investigation caused journalists to "remove[] content perceived to be objectionable to defendants" from the publication's website. *Turner*, 502 F. Supp. 3d at 381. Notably, the publication in question was Voice of America's Urdu service, whose journalists are federal government employees. *Id.* The court granted an injunction against ongoing and future investigations even though, in considering the First Amendment right of government journalists, it was bound to weigh those rights against the government's interest in regulating speech of its employees under the *Pickering* doctrine. *Id.*; *see also Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). Although at least one investigation at issue in *Turner* had already concluded, that was not

31

JA0129

pivotal to the court's analysis. Rather, *Turner* held the state's interest as employer to be outweighed because the investigations, in general, (i) had actually "penalize[d] and chill[ed] speech," and (ii) "appear[ed] to do so on the basis of perceived viewpoint." *Turner*, 502 F. Supp. 3d at 381.

Both conditions have *already* been met here. In launching his investigation, Paxton expressed his intent to punish Plaintiffs because of their "perceived viewpoint," *id.*, calling Media Matters "a radical . . . left-wing organization," Ex. B. And Plaintiffs' speech is chilled. Hananoki Decl. ¶¶ 26–36; *see also* Dimiero Decl. ¶¶ 15–23. For starters, Hananoki, after writing articles on X for the better part of a year, has been chilled from publishing new articles about the platform because of fear of further retaliation. Hananoki Decl. ¶¶ 29–32; *see id.* ¶¶ 11–12; *see also* Dimiero Decl. ¶¶ 11–12, 15–23. His editors have instructed him that Media Matters cannot publish work he has already prepared describing extremism on X. At the same time, Media Matters has been flooded with tips about extremist content on X appearing alongside advertisements, but it has not followed up on these tips due to chill imposed by Paxton's actions—including, in particular, the concern that it would have to turn over source information to Paxton per the terms of the Demand. Dimiero Decl. ¶¶ 15–20. Hananoki—over his sixteen-year career as a reporter—has never been subject to this kind of retaliation from a government official, which has severely disrupted his writing and research. Hananoki Decl. ¶¶ 29, 38. Indeed, he continues to generate story ideas, but is deterred from pursuing them for fear that he will exacerbate retaliation against himself, his colleagues, and his employer. Hananoki Decl. ¶¶ 30–32, 34.

The chill has also impacted Media Matters more broadly. Many other Media Matters reporters have shied away from covering topics that could be perceived as related to Paxton's investigation, for fear of being targeted in return. Padera Decl. ¶ 23–24; Dimiero Decl. ¶¶ 15–18, 21–23. Media Matters's ability to release work to the public has been harmed—its publication

process has been slowed due to leadership's need to scrutinize drafts in view of Paxton's investigative intrusion. Dimiero Decl. ¶¶ 16–18, 21. Media Matters's editorial team has had to make the difficult decision not to publish articles due to threats of investigation and legal action. *Id.* ¶¶ 15–21. Likewise, Plaintiffs' ability to work with other organizations has been chilled, as groups that once routinely worked with them are reevaluating the partnership for fear that their documents and communications could be turned over to a retaliatory attorney general. Padera Decl. ¶ 25. And Media Matters is now self-censoring itself when anything related to X comes up in communications with these groups. *Id.* ¶¶ 24–26.

### 3.    Paxton's retaliatory actions are a direct causal response to Plaintiffs' constitutionally protected activities.

Plaintiffs' commentary and reporting on X, particularly Hananoki's November 16 article discussing Musk's apparent endorsement of an antisemitic conspiracy theory, is unambiguously what caught Paxton's attention. In his own words, Paxton initiated the Demand on Plaintiffs because of "the information they provide" the public regarding X. Ex. D, Tr. 3:5–6. Paxton's choice to investigate Plaintiffs—without *any* showing that they violated Texas law or are subject to its jurisdiction—immediately followed Musk's public complaints about the November 16 article. *See* Ex. A; Ex. B. Paxton announced his investigation on November 20. 2023—within minutes of Musk filing his meritless civil suit against Media Matters.[17] *See* Ex. B. Not long after launching his investigation, Paxton encouraged *other* state Attorneys General to take retaliatory actions against Plaintiffs. Ex. C, Tr. 2:12–20. And, on the next day, Paxton admitted that he

---

[17] Musk reposted the announcement, implying a connection between the investigation and Musk's and Miller's call for involvement of state attorneys general. *Compare* @elonmusk, X.com (Nov. 20, 2023 8:00 PM ET), https://twitter.com/elonmusk/status/1726767436618191177 ("Fraud has both civil & criminal penalties"), *with* @elonmusk, X.com (Nov. 19, 2023 2:19 PM ET), https://twitter.com/elonmusk/status/1726319293267407107 ("Interesting. Both civil and criminal …").

JA0131

"learned about" Media Matters's alleged conduct "through the actual lawsuit that Elon Musk filed and then the reporting of it."[18] Despite citing no basis to conclude that Media Matters is subject to Texas jurisdiction, that X's "allegations about what happened" are in fact true, or that Media Matters has violated Texas law, Paxton chose to launch his investigation with an intrusive search into Media Matters's internal files rather than first survey other public documents and articles that corroborate Media Matters's reporting to determine if more intrusive demands could be justified.[19]

The Demand also confirms that Paxton's retaliatory conduct is motivated by Plaintiffs' coverage of X and Musk. It demands that Plaintiffs turn over "all documents related to internal and external communications" concerning Hananoki's November 16 article, as well as Plaintiffs' internal and external communications "regarding Elon Musk's purchase of X" and "regarding Linda Yaccarino;" "communications with employees and representatives of X;" and "all current and past X accounts" controlled by Plaintiffs. *See* Ex. A at 7. The materials sought by these demands reflect Paxton's desire to rifle through Plaintiffs' files concerning their news coverage and reporting. There is no serious dispute that—but for Plaintiffs' constitutionally protected reporting on X—Paxton would not have launched his retaliatory investigation or served his Demand. On that basis, Plaintiffs will show "a causal link between the exercise of a constitutional right and the adverse action." *Aref*, 833 F.3d at 258; *see also Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019). Plaintiffs are therefore likely to prevail on their claim for unlawful retaliation.

---

[18] *Supra* note 6.

[19] Repeatedly, in response to Plaintiffs' preliminary injunction motion in the Maryland case, Attorney General Paxton failed to identify any threshold basis for pursuing any of these questions, effectively admitting the Demand is a fishing expedition to determine if he can obtain evidence from Media Matters to justify the investigation in the first place. *See Media Matters for America*, ECF No. 33 at 1, 6, 8–9, 20 & n.6. This would be troubling under any circumstances, but is particularly so here, where a foreign Attorney General demands internal and confidential documents from a media organization based on reporting of which he disapproves.

34

**B.      Plaintiffs are likely to establish that Paxton's Demand violates both the First and Fourth Amendments and the D.C. and Maryland shield laws.**

Plaintiffs' First Amendment retaliation claim, on its own, is sufficient to warrant a temporary restraining order or preliminary injunction. But Plaintiffs also face other imminent harms, captured by their other claims, that separately warrant immediate relief.

1.      *Constitutional Claims*. Attorney General Paxton has demanded that Plaintiffs turn over a trove of their most sensitive documents or else he may haul them into Texas court at any moment. *See supra* at 11–13, 16–17. Paxton's wide-ranging Demand touches upon nearly every part of Media Matters's operations, including its organizational and employee structure; its "sources of income;" its "operational expenditures;" its "internal [] communications" on articles and matters of public concern; its social media accounts on X; its communications with employees at X and X's advertisers (including potential sources); and "all direct and indirect sources of funding" for all "operations" relating to publications on X. Ex. A at 7. Plaintiffs are likely to show this intrusive Demand violates both the First and Fourth Amendments.

The Fourth Amendment limits the scope of administrative subpoenas. *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). Likewise, the First Amendment guards Plaintiffs from the compelled disclosure of materials that would chill their constitutional rights. *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009); *Pebble Ltd. P'ship v. EPA*, 310 F.R.D. 575, 582 (D. Alaska 2015) (subpoenas invalid when they have "the tendency to chill the free exercise of political speech and association which is protected by the First Amendment"). These twin constitutional guarantees often overlap; thus, where "the materials sought to be seized" by an administrative subpoena even simply "*may* be protected by the First Amendment," the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas*, 379 U.S. 476, 485 (1965))

35

(emphasis added). "No less a standard could be faithful to First Amendment freedoms." *Stanford,* 379 U.S. at 485. That is especially true where, as here, no cause has been shown before demanding documents—such "unrestricted power of search and seizure [can] be an instrument for stifling liberty of expression." *Marcus v. Search Warrants,* 367 U.S. 717, 729 (1961).

Paxton's Demand seeks to pry into matters protected by the First Amendment and shows no trace of "scrupulous exactitude." *Stanford*, 379 U.S. at 485. Instead, it broadly seeks information about Plaintiffs' donors, sources of funding, and expenditures in a manner designed to chill Plaintiffs' speech and press activities. Ex. A at 7. The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a . . . right to associate with others." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). The First Amendment thus "prohibit[s] . . . compelled disclosure" of documents about an organization's associational activities—including the compelled disclosures about members and donors—absent compliance with "exacting scrutiny." *Id.* at 2382–83, 2386 (holding California violated First Amendment by requiring disclosure of "donors' names and the total contributions" to charitable organization); *see also NAACP v. Alabama*, 357 U.S. 449, 462 (1958) (membership lists); *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (campaign contributions); *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Fed. Election Comm'n*, 333 F.3d 168, 176 (D.C. Cir. 2003) (identities of employees and volunteers). Paxton has sorely failed to meet the "exacting scrutiny" and "scrupulous exactitude" required to obtain these types of materials. "It is contrary to the first principles of justice to allow a search through all the respondents' r[e]cords, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924) (Holmes, J.). This Court has the power to

36

enjoin enforcement of such a constitutionally infirm subpoena. *See Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267, 274 (2d Cir. 1981).

The Demand is further infirm because it seeks journalistic materials that are afforded significant constitutional protection. Paxton may not "rummage at large in newspaper files or [] intrude into or [] deter normal editorial and publication decisions" through his search. *Zurcher*, 436 U.S. at 566. In *Zurcher*, the officers lacked "any occasion or opportunity," *id.*, for such rummaging because a judicially approved search warrant provided the necessary "exactitude" regarding the "First Amendment interests [that] would be endangered by the search," *id.* at 565. Paxton has not satisfied any such standard here, yet nonetheless seeks categories of notes and files on draft articles and communications with potential sources—clearly protected materials. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012) (quashing "broad, invalid subpoenas demanding that the paper reveal its sources [and] disclose its reporters' notes"). The Demand is not "carefully tailored to avoid unnecessary interference with protected activities." *Pebble Ltd. P'ship*, 310 F.R.D. at 582 (quashing subpoena). Fundamentally, Paxton's investigation is targeted at speech and press activities that are afforded broad constitutional protection. Such "investigations premised solely upon *legal* activity are the very type of 'fishing expeditions' that were the target of Justice Holmes's assault in *American Tobacco.*" *Major League Baseball v. Crist*, 331 F.3d 1177, 1187–88 (11th Cir. 2003) (concluding that CID violated Fourth Amendment and "that an investigation predicated solely upon legal activity does not pass muster under *any* standard").

Plaintiffs are therefore likely to prevail on their second claim that the Demand itself is an unlawful fishing expedition in violation of the First and Fourth Amendments.

***D.C. & Maryland Shield Laws.*** The Demand also seeks information protected by the District of Columbia's shield law. D.C. Code §§ 16-4702, 4703. The D.C. shield law provides

absolute protection against compelled disclosure of sources, *id.* § 16-4703(b), and qualified protection against compelled disclosure of other information, including "any news or information procured . . . in the course of pursuing [] professional activit[ies]," including notes, to the extent such information is not publicly disclosed, *id.* § 16-4702. *See also Grunseth v. Marriott Corp.*, 868 F. Supp. 333, 336 (D.D.C. 1994). The shield law protects media organizations and their employees acting within the scope of a contract in any "news gathering or news disseminating capacity." D.C. Code § 16-4702. The Demand also seeks information protected by Maryland's analogous shield law. *See* Md. Cts. & Jud. Proc. Code Ann. § 9-112(b)(3), (c)(2). The shield laws are grounds to quash or limit a subpoena. *Grunseth*, 868 F. Supp. 333, 336–37 (quashing subpoenas under the D.C. shield law); *see also Equitable Trust Co. v. State Comm'n on Human Relations*, 411 A.2d 86, 99 (Md. 1979) ("It is well established that an enforcing court may limit through modification or partial enforcement subpoenas it finds to be unduly burdensome." (quoting *Fed. Trade Comm'n v. Texaco, Inc.*, 517 F.2d 137, 149–50 (D.C. Cir. 1975)); *Bice v. Bernstein*, No. 93-CA-22258, 1994 WL 555379, at *1 (Md. Cir. Ct. Apr. 20, 1994) (quashing subpoena even where qualified disclosure test met).

Permitting attorneys general, like Paxton, to skirt another state's shield laws by misusing their statutory authority to issue subpoenas violates basic principles of federalism and would make a mockery of state shield laws. The District of Columbia and Maryland both have a profound interest in protecting their residents from being made to answer outside their home jurisdictions— by states that obviously lack personal jurisdiction over such residents—and made to divulge documents protected by D.C. and Maryland law. Texas may not "enact [] a policy for the entire Nation" by issuing CIDs that trample over another state's shield laws and deprive foreign residents of the benefits of such laws. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 571 (1996).

JA0136

**C.    Plaintiffs are likely to establish that the legal process against them in Texas violates due process due to a lack of contact with that state.**

The Due Process Clause of the Fourteenth Amendment "recognizes and protects an individual liberty interest" against being unwillingly subjected to legal process in a jurisdiction with which a person lacks meaningful contact. *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). Simply put, due process guards against forcing parties like Plaintiffs to "submit[] to the coercive power of a State that may have little legitimate interest in the claims in question." *Bristol-Myers*, 582 U.S. at 263. Such arbitrary imposition of a "State's coercive power" is "subject to review for compatibility with the Fourteenth Amendment's Due Process Clause." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011). Plaintiffs are likely to show that they are not within the personal jurisdiction of Texas, and thus not lawfully subject to Paxton's retaliatory investigation or any effort by him to enforce the Demand against Plaintiffs in Texas court.

Two flavors of personal jurisdiction exist: general and specific. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (citing *Goodyear*, 564 U.S. at 919). Plaintiffs are plainly not subject to general jurisdiction in Texas—neither is domiciled or "fairly regarded as at home" in Texas. *Goodyear*, 564 U.S. at 924; *see supra* at 10–11.

Specific jurisdiction is lacking as well. It requires "an affiliation[n] between the forum and the underlying controversy, principally, [an] activity . . . that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 564 U.S. at 919 (first alteration in original). The controversy here arises out of Plaintiffs' reporting and publishing on political extremism on X—work that occurred exclusively in D.C. and Maryland. No element of this work occurred in Texas, required interaction with Texas, or was purposefully directed towards—or intended to have an effect—in Texas. Hananoki Decl. ¶¶ 3, 21–23; *see also supra* at 9. Paxton's actions alone are

39

what connects this case to Texas, but he "cannot be the only link between" his chosen forum and Plaintiffs—"[r]ather, it is [Media Matters and Hananoki's] conduct that must form the necessary connection with the forum State" for any jurisdictional basis to exist there. *Fiore*, 571 U.S. at 285.

No such connection exists here. For a state to exercise personal jurisdiction over a party in a manner consistent with due process, the party must have "'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Mere "foreseeability of causing *injury* in another State" is not a 'sufficient benchmark' for exercising personal jurisdiction." *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)). "Instead, 'the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 297). As documented in sworn declarations filed in federal court on December 12, 2023, Media Matters does not maintain any meaningful contacts with Texas. *See* Declarations, *Media Matters*, ECF Nos. 2-2, 2-3, 2-4. Accordingly, Plaintiffs are likely to show that any imposition of Texas's coercive power by Paxton—which he continued to wield in his December 29, 2023 letter, *after* receiving Plaintiffs' declarations—violates due process.

## III. Plaintiffs will suffer irreparable harm absent an order restraining Paxton's investigation and enforcement of his Demand.

Hananoki and Media Matters have been suffering irreparable harm since Paxton first served his retaliatory and far-ranging Demand. The issuance of this Demand by a state Attorney General has reasonably chilled Plaintiffs from publishing news coverage and criticism of Musk and X. Dimiero Decl. ¶¶ 16–23; Hananoki Decl. ¶¶ 26, 29–36; *see also supra* Section D (Background). It is well established that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Pursuing Am.'s Greatness v. Fed.*

JA0138

*Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (quotation marks omitted). This harm will continue while Plaintiffs' journalistic efforts are subject to the intrusive and retaliatory demand for documents and communications from Paxton. *See id*. "[E]very moment's continuance" of Paxton's investigation into Plaintiffs' newsgathering and Demand for materials "amounts to a flagrant, indefensible, and continuing violation of the First Amendment." *New York Times Co. v. United States*, 403 U.S. 713, 714–15 (1971) (Black, J., concurring).

Plaintiffs' irreparable harm is exacerbated by the far-ranging scope and burdens of Paxton's retaliatory Demand. Among other overbroad requests, the Demand seeks "all documents" relating to "internal and external communications" regarding "Elon Musk's purchase of X" and "Linda Yaccarino" generally. Ex. A at 7. Because it requires continued production of documents until Plaintiffs' "final" production, the Demand also reaches new documents Media Matters and Hananoki create in relation to further reporting they may wish to do on the impact of Musk's purchase of the X platform—to take just one example—further chilling their ability to report and speak on such topics. The Demand even seeks "all . . . external communications with employees and representatives of X" between certain dates, effectively a demand for communications with sources at X. *Cf. N.J.-Philadelphia Presbytery of the Bible Presbyterian Church v. N.J. State Bd. of Higher Educ.*, 654 F.2d 868, 884 (3d Cir. 1981) (observing likelihood of irreparable harm in "first amendment contexts" where state action "prevent[s] a source from communicating with a reporter"). Paxton's prying into Plaintiffs' notes, research materials, and communications with any sources—in a jurisdiction where none of Plaintiffs' activities occur—adds to the harm Plaintiffs are suffering. Dimiero Decl. ¶¶ 15–23; Hananoki Decl. ¶¶ 21–23, 26, 29–36. The passage of the return date only aggravates this harm—Plaintiffs may now be dragged to Texas at any time.

The Demand poses an additional imminent and irreparable injury to Plaintiffs' associational rights. *See Bonta*, 141 S. Ct. at 2382 (2021) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). At nothing more than the whim of Paxton, Texas demands documents from Plaintiffs concerning their donors, employees, operational expenditures, and internal communications. Ex. A at 7. Defendant Paxton has offered *zero* explanation of Texas's need for these materials, never mind an explanation sufficient to meet exacting scrutiny. *Bonta*, 141 S. Ct. at 2382–83. Indeed, to date Paxton has offered no explanation at all as to how Plaintiffs have violated Texas law or are properly subject to investigation in Texas. *See generally* Ex. A. Subjecting Plaintiffs to such an "unreasonable search[]" is "sufficient to demonstrate irreparable harm." *Am. Fed'n of Teachers.-W. Va., AFL-CIO v. Kanawha Cnty. Bd. of Educ.*, 592 F. Supp. 2d 883, 892 (S.D. W. Va. 2009) (violation of Fourth Amendment constituted irreparable harm); *see also, e.g.*, *Klayman v. Obama*, 142 F. Supp. 3d 172, 195 (D.D.C. 2015).[20]

Plaintiffs' already strong showing of irreparable harm here is bolstered by the strength of their First Amendment claims. "In First Amendment cases, the likelihood of success 'will often be the determinative factor' in the preliminary injunction analysis." *Pursuing Am.'s Greatness*, 831 F.3d at 511. "[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *W.V. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009); *see also Pursuing Am.'s Greatness*, 831 F.3d at 511 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably

---

[20] The compelled disclosure of Plaintiffs' donors constitutes irreparable harm both to Plaintiffs and their donors, who lack the opportunity to protect their identities from disclosure. The irreparable harm to third parties further pushes this factor, as well as the balance of the equities, in Plaintiffs' favor. *See Jones v. District of Columbia*, 177 F. Supp. 3d 542, 546 n.3 (D.D.C. 2016).

constitutes irreparable injury." (cleaned up)). Paxton's violation of core First Amendment rights reinforces the need for swift relief to remedy Plaintiffs' ongoing harms.

That Paxton has not yet enforced the Demand in Texas court is immaterial—Plaintiffs are harmed now by the chill imposed by Paxton's retaliatory course of conduct. This case "involves the First Amendment, under which a chilling effect on speech can itself be the harm," regardless of whether the Demand is ever enforced in court. *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1175, 1178 (9th Cir. 2022) (correctly recognizing that "retaliatory framework" is "appropriate" for reviewing whether punitive issuance of administrative subpoena chills speech in violation of the First Amendment). Unlike in *Twitter*—which concerned a similar civil investigative demand served by Paxton under the same Texas law here—Plaintiffs here have adequately "allege[d] [a] chilling effect on [their] speech." *Id.* at 1175. Indeed, Plaintiffs have established a paradigmatic chill of First Amendment protected activity—they are declining to publish news articles they otherwise would have but for Paxton's retaliatory campaign. Dimiero Decl. ¶¶ 16–20; Hananoki Decl. ¶¶ 29–36. The Ninth Circuit in *Twitter* expressly recognized that "a chilling effect on speech can itself be the harm" when a plaintiff brings a First Amendment claim in response to such a demand. 56 F.4th at 1178. Once a plaintiff shows reasonable chill, "its constitutional injury has already occurred; there is no way for [a plaintiff] to avoid that alleged injury by challenging the document request later" when the CID is eventually enforced. *Id.* at 1178–79; *see also Unity08 v. FEC*, 596 F.3d 861, 865 (D.C. Cir. 2010) (expressing "reluctance to require parties to subject themselves to enforcement proceedings . . . where . . . First Amendment rights are implicated and arguably chilled by a credible threat of prosecution" (quotation marks omitted)).

And Paxton is well-aware that the law does not prohibit pre-enforcement challenges on First Amendment grounds. Not only was he a party to the *Twitter* case holding as much, he

43

previously acknowledged First Amendment activity is "chilled" by a CID "hanging in the air" and "stifling . . . those seeking information [] to evaluate various viewpoints in [a] public policy debate." Ex. J at 6; *see generally* Ex. K (reraising arguments in an amicus brief to the Second Circuit); *see also* Ex. L (reraising arguments in an amicus brief to the Southern District of New York). Paxton's prior briefing to *three* federal courts—authored by *his office* on behalf of Texas and other states—supported a pre-enforcement challenge on the basis that issuance of a CID alone can unlawfully chill speech. *See* Ex. J at 6; Ex. K at 2 (claiming that such conduct imperiled "a fundamental guarantee of our Republic—the ability to have a viewpoint on a topic of public debate and not fear government retaliation for expressing it").

Plaintiffs present clear evidence that their reporting was consistent with *a year's worth of other media coverage* about the rise of extremism on X, including the repeated placement of advertisements next to such content. Compl. ¶¶ 27–39. This includes many reports and posts by people unrelated to Media Matters who found examples of hate speech appearing adjacent to advertising on X. *Id*. Paxton's far-reaching and baseless requests have had real impacts on Plaintiffs' ability to exercise protected First Amendment speech—an irreparable harm that becomes more entrenched in the absence of judicial relief. *See, e.g.*, Hananoki Decl. ¶¶ 29–36. Paxton's willful retaliation against Plaintiffs for participating in an important national conversation about political extremism on a major social media platform injures them now.

## IV.    The remaining equitable factors strongly favor granting preliminary relief.

The remaining equitable factors favor Plaintiffs. Both "factors [are] established when there is a likely First Amendment violation." *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013); *see also Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) ("enforcement of an unconstitutional law is always contrary to the public interest" (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013))). "The public's interest in protecting First Amendment rights" is

beyond dispute: "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional" state action. *Pursuing Am.'s Greatness*, 831 F.3d at 511–12. That interest is heightened where, as here, First Amendment protections serve both Plaintiffs and the general public; "[a]n untrammeled press is a vital source of public information, and an informed public is the essence of working democracy." *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983) (cleaned up). Granting temporary relief ensures that Plaintiffs may continue to participate in the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people," *Roth*, 354 U.S. at 484, and further serves the public interest against government fishing expeditions, *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc); *see also Klayman*, 142 F. Supp. 3d at 196 ("Given . . . that plaintiffs are likely to succeed on the merits of their Fourth Amendment claim, the public interest weighs heavily in their favor.").

In contrast, granting preliminary relief does not harm Paxton. Because his investigation lacks any legitimate basis or connection to Texas, he suffers no harm in having his efforts temporarily enjoined. Paxton "cannot legitimately claim to be 'harmed' as a result of being restrained from illegal conduct." *Prysmian Cables & Sys. USA, LLC v. Szymanski*, 573 F. Supp. 3d 1021, 1044 (D.S.C. 2021) (collecting cases). "If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason,* 303 F.3d 507, 521 (4th Cir. 2002).

## CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs' motion for a temporary restraining order and a preliminary injunction. A proposed order is attached.


Dated: January 18, 2024                              Respectfully submitted,
                                                     */s/ Aria C. Branch*

**JA0143**

**ELIAS LAW GROUP LLP**
Aria C. Branch (DC 1014541)
Elisabeth C. Frost (DC 1007632)
Jacob D. Shelly* (DC 90010127)
Elena A. Rodriguez Armenta* (DC 90018798)
Daniela Lorenzo*[+]
Omeed Alerasool* (DC 90006578)
Samuel T. Ward-Packard* (DC 90005484)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
abranch@elias.law
efrost@elias.law
jshelly@elias.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
oalerasool@elias.law
swardpackard@elias.law

Abha Khanna*
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr. (DC 420440)
Jay P. Srinivasan*
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com
Email: jsrinivasan@gibsondunn.com

Amer S. Ahmed (DC 500630)
Anne Champion*
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com
Email: achampion@gibsondunn.com

*Pro hac vice* application forthcoming
[+]Admission to D.C. bar pending swearing in

*Counsel for Plaintiffs Media Matters for America and Eric Hananoki*

**JA0144**

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on the Defendant in accordance with Federal Rule of Civil Procedure 5(a).

*/s/ Aria C. Branch*
Aria C. Branch

JA0145

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 24-cv-147 |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | |
| Defendant. | |

**DECLARATION OF CYNTHIA PADERA
IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

I, Cynthia Padera, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I am the Chief Operating Officer of Media Matters for America ("Media Matters").

3.      I live in, and work from, the District of Columbia.

4.      I first joined Media Matters in April 2013 and, after leaving for a period in June 2015, returned in February 2017. I have served as Chief Operating Officer since August 2019.

5.      Media Matters is a web-based, not-for-profit, 501(c)(3) research and information center dedicated to comprehensively monitoring, analyzing, and correcting conservative misinformation in U.S. media.

6.      In my role, I support Media Matters's day-to-day operations and manage enterprise-level initiatives, technology, and administration. I engage on an as-needed basis with all of Media

1

**JA0146**

Matters's activities, and I interact with Media Matters's officers and employees at all levels.

7.      Media Matters is incorporated under the laws of the District of Columbia.

8.      Media Matters was incorporated as a nonprofit corporation in the District of Columbia over two decades ago.

9.      Media Matters has its principal place of business and physical office space in the District of Columbia. Any physical documents used institutionally are located at our office. While fully virtual or hybrid calls and meetings are common after the COVID-19 pandemic, Media Matters holds dedicated on-site meetings periodically for various departments and/or topics. For example, we held a large partner convening at our office in February 2023 and held two large staff meetings with associated trainings and social events in August 2023.

10.     Media Matters is registered to conduct business in the District of Columbia.

11.     Media Matters does not have an office, or any other physical presence, in Texas.

12.     Media Matters is not registered to conduct business in Texas.

13.     Media Matters is not registered as a charity organization in Texas.

14.     Media Matters does not have a registered agent in Texas.

15.     The Media Matters website publishes articles written by Media Matters employees in furtherance of the organization's mission to expose misinformation in the media, and in keeping with our internal guidelines for news coverage, which reflect ordinary journalistic standards.

16.     Media Matters has approximately 105 full-time employees, including at least 62 reporters, writers, and researchers.

17.     Of our 25 senior staff, 16 live and work in the District of Columbia, while another two live in Virginia within commuting distance of the office. Our senior staff includes our five executive leadership employees, three of whom live and work in the District of Columbia—

**JA0147**

including myself—and a fourth lives in Virginia and works primarily from our office in the District.

18.     Approximately 44 total employees are based in the District of Columbia, including 25 of our reporters, writers, and researchers. Approximately 16 total employees are based in the adjacent Maryland or Virginia area, including five reporters, writers, and researchers. This includes Mr. Hananoki who is a Senior Investigative Reporter employed within the Editorial Department at Media Matters. Mr. Hananoki is authorized to and performs most of his work at home in Maryland, though he may sometimes commute into the District of Columbia when he chooses to do so. To my knowledge, Mr. Hananoki has never had to travel outside of the Washington, DC metropolitan area for his work for Media Matters.

19.     As noted, Media Matters has no office in Texas. Although Media Matters employees may request authorization to work remotely and, upon approval, may choose to do so from any location in the United States, of Media Matters employees authorized to work remotely, only one has provided a residential address in Texas. That employee did not work with Mr. Hananoki on the November 16 article, nor any other of his articles related to X or otherwise, and works in an entirely different department. Moreover, while that employee has provided a residential address in Texas, that individual works from a variety of locations and seldom visits Texas: Since the start of October 2023, that employee has only visited Texas for a short period during the holidays—where they only worked for a single day.

20.     On November 20, 2023, X filed suit against Media Matters and Mr. Hananoki, complaining about Mr. Hananoki's November 16 article and a subsequent article written by him and published on November 17, 2023.

21.     On November 21, 2023, Attorney General Paxton issued a civil investigative

JA0148

demand that commanded Media Matters to produce documents and communications about our general operations, as well as the November 16 article. For example, the demand requires Media Matters to turn over, among other things "all documents related to internal and external communications" relating to the November 16 article. Attorney General Paxton served the Demand on our outside counsel on December 1, 2023.

22.     Media Matters leadership views the Attorney General's investigation as a response to Mr. Musk's complaints about Media Matters, intended to punish Media Matters for its news coverage and to curry favor with Mr. Musk and his significant online following. Executive leadership views Attorney General Paxton's investigation as the latest front in a hostile relationship between Media Matters and Attorney General Paxton. For example, in 2022, he issued a letter to DirecTV, claiming its decision to not renew its contract with conservative news outlet One America News Network was based on Media Matters's reporting and was part of a "yearlong coordinated attack." Similar to his efforts here, Paxton organized with other state attorneys general against this alleged "attack."[1]

23.     Attorney General Paxton's investigation has harmed morale at Media Matters. Numerous reporters, writers, researchers, and other employees have indicated to leadership staff that they are now fearful of being targeted in legal proceedings. The investigation has contributed to the creation of a culture of fear within Media Matters, chilling employees' willingness and comfort with speaking on any topic related to the subjects of the investigation.

24.     Media Matters employees have indicated to leadership staff that they feel

---

[1] Letter to DirecTV from Attorney General Paxton and the attorneys general of Louisiana, Mississippi, Missouri, Montana, and South Carolina (Mar. 10, 2022), https://www.oann.com/wp-content/uploads/2022/03/Texas_AG_Ken_Paxton_Troubled_by_DirecTVs_Viewpoint_Discrimination_Against_OAN.pdf.

JA0149

constrained in their ability to continue their work in the same manner as prior to the investigation.

25.     Media Matters's associations with other groups have also been impaired by Attorney General Paxton's investigation. Groups that previously worked closely with us have reevaluated doing so, afraid that communications may be turned over to the Attorney General or spark investigations into their own publications. And our employees are self-censoring when anything related to X comes up in communications with such groups and curtailing engagement with partner organizations out of concern over potential exposure. For example, Media Matters has refrained from actively participating in coalitions focused on issues of hate speech on X while the Demand remains pending. External affairs staff have also paused on sharing research regarding X and its content moderation policies with our longstanding partners, refraining even from directing partners to content *already published* about X for fear that any conversations or aid may lead to further retaliation against Media Matters or our partners.

26.     Attorney General Paxton's investigation has also caused Media Matters's department directors to hit pause on similar reporting on content moderation and advertisement placement issues for at least one other social media platform, besides X, out of fear such reporting will lead to further retribution.

27.     Attorney General Paxton's public threats against Media Matters have also resulted in a significant influx of threats against Media Matters staff and against Mr. Hananoki. We have received over one hundred threatening messages via phone or email since November 18, 2023. These threats have ranged from threats of legal retaliation to violent death threats.

28.     The increased harassment has become so severe that Media Matters has been forced to hire an outside security firm to protect its employees in response.

29.     Media Matters's senior leaders and I have had to devote the vast majority of our

JA0150

time to focusing on the legal threats, investigations, and lawsuits that began with Mr. Musk's threat on November 18, 2023, rather than our ordinary job responsibilities. This includes conferring with counsel, speaking with concerned employees, and strengthening oversight of all operations given increased risk of further retaliation by those who do not like our reporting. This distraction has further harmed our ability to produce reporting and journalism on political extremism in the United States media.

30.     Media Matters leadership, officers, and staff are seriously concerned and fearful about having to protect their constitutional rights in places where they do not live or work, as well as against a partisan state attorney general.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 1/17/2024 _____

DocuSigned by:

*Cynthia Padera*

A56EA35AFC87412...

Cynthia Padera

6

**JA0151**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MEDIA MATTERS FOR AMERICA, *et al.*,

Plaintiffs,

v.

WARREN KENNETH PAXTON JR., in his
official capacity as Attorney General of the
State of Texas,

Defendant.

Civil Action No. 24-cv-147

## DECLARATION OF ERIC HANANOKI
## IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

I, Eric Hananoki, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I am a Senior Investigative Reporter at Media Matters for America ("Media Matters"). I have worked at Media Matters since November 2007 and have had the role of Senior Investigative Reporter since August 2022. Prior to that, I held numerous other positions at Media Matters including Researcher, Senior Researcher, Research Fellow, and Investigative Reporter. I am currently a member of the Society of Professional Journalists, Investigative Reporters and Editors, and the Asian American Journalists Association.

3.      Media Matters is a web-based, nonprofit, 501(c)(3) research and information center dedicated to comprehensively monitoring, analyzing, and correcting conservative misinformation in U.S. media. It is headquartered and has its sole office in Washington, D.C. I primarily work

JA0152

remotely from my home in Maryland, but I occasionally visit our office as part of my job responsibilities.

4.      For at least the past decade, my work at Media Matters has focused on documenting extremism—including white nationalism, antisemitism, and Islamophobia    in the public square, including from public figures and officials while they appear in media outlets or when they worked as media figures.

5.      My work has been broadly cited by a wide array of other media outlets, including the Associated Press, CNN, Fox News, Los Angeles Times, MSNBC, the New York Post, the New York Times, Politico, USA Today, the Wall Street Journal, and the Washington Post.

6.      My research has also been cited to or relied upon by both government agencies, and Democratic and Republican public officials and entities. For example, under former President Trump, the United States Department of Justice cited my research regarding a far-right commentator who promoted and sold a bogus COVID-19 cure.[1] My work researching Roger Stone was cited in both Robert Mueller's report and in a bipartisan U.S. Senate Select Committee on Intelligence report on Russian interference in the 2016 presidential election.[2]

7.      My investigation into political extremism has exposed prominent individuals promoting racist, hateful, or conspiratorial content. For example, the National Republican

---

[1] *United States v. My Dr. Suggests LLC*, No. 2:20-CV-00279-DBB (D. Utah Apr. 27, 2020), Plaintiffs' Ex Parte Mot. and Mem. of Law for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue, Dkt. 2, at 13; *id.*, Decl. of Virginia Keys, Dkt. 2-1, ¶¶ 7, 28–29.

[2] Both reports cited a Media Matters article that included a video that I had found and produced. *See* Report on the Investigation into Russian Interference in the 2016 Presidential Election, Volume I of II, Special Counsel Robert S. Mueller, III, March 2019, at 57 n.233, available at https://www.justice.gov/storage/report volume1.pdf; Select Committee on Intelligence, Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume 5: Counterintelligence Threats and Vulnerabilities, at 246 n.1638, available at https://www.intelligence.senate.gov/sites/default/files/documents/report volume5.pdf.

**JA0153**

Congressional Committee withdrew support for a congressional candidate in New Jersey after my discovery that the candidate had promoted white supremacist views online.[3] Likewise, Republican leaders in California distanced themselves from a candidate for Congress after I reported on his endorsement of 9/11 conspiracy theories.[4]

8.      I have also previously reported on extremism within the Texas Attorney General's office. In 2020, I uncovered tweets filled with racist rhetoric, violent threats and conspiracy theories that had been posted by an Assistant Attorney General in the Texas Attorney General's office.[5] Attorney General Paxton's employee had, among other things, threatened violence against protestors, called Islam a "virus," referred to transgender people as "abominations," and endorsed the QAnon conspiracy theory that "President Donald Trump is secretly working to take down . . . a supposed cabal of satanic high-ranking officials who they claim are operating pedophile rings." Later on the same day that my research was published, Attorney General Paxton's office fired the attorney, explaining the person could "discredit" to the agency.[6]

---

[3] Jonathan D. Salant, "House Republicans withdraw support of N.J. candidate after report says he shared racist screed," NJ.com (July 10, 2018), https://www.nj.com/politics/2018/07/house_republicans_withdraw_support_of_nj_candidate.htm l (noting that NRCC chair "Stivers reacted to a report by the liberal watchdog group Media Matters about [the candidate] linking to the article that ran on a white supremacist website.").

[4] Eric Hananoki, "California GOP committees distance themselves from 'Bush staged 9/11' congressional candidate," Media Matters for America (Oct. 2, 2018), https://www.mediamatters.org/george-w-bush/california-gop-committees-distance-themselves-bush-staged-911-congressional-candidate.

[5] Eric Hananoki, "A Texas assistant attorney general is a QAnon conspiracy theorist who tweets out violent threats and bigoted remarks," Media Matters for America (Sept. 3, 2020), https://www.mediamatters.org/twitter/texas-assistant-attorney-general-nick-moutos-qanon-conspiracy-theorist-who-tweets-out.

[6] Trinady Joslin, "Assistant Texas attorney general loses job after report surfaces racist tweets," The Texas Tribune (Sept. 3, 2020), https://www.texastribune.org/2020/09/03/nick-moutos-texas-

JA0154

9.      As part of my beat, I both actively engage with and cover the platform now known as X, and formerly known as Twitter. In 2022, X was purchased by Elon Musk, who has repeatedly called the platform a "digital town square" or "de facto town square." I have reported on politically extreme rhetoric on Twitter (and now X) for the better part of a decade.

10.     Since Musk completed his acquisition of X, I have observed that the platform has experienced a sustained and significant surge in extremist content. This trend has been widely reported on and observed by the media for over a year. For example, over a year ago, the Washington Post reported that "ads from dozens of major brands" such as Amazon and Uber were appearing on the pages of white nationalists on X.[7] Even advertisements for the United States Department of Health and Human Services appeared on white nationalist pages at that time.

11.     As part of my long-running coverage of political extremism online, I have written numerous articles about X Corp., Musk, and the social media platform X.

12.     These articles frequently focused on the appearance of corporate advertisements alongside hateful content posted by white nationalist, antisemitic, and extremist users on X. My work on this subject matter includes the following articles:

- *Under Elon Musk, Twitter is running corporate ads alongside tweets from Holocaust deniers*, Media Matters for America (Feb. 10, 2023).[8]
- *Dish, Samsung, Wall Street Journal, and others are advertising on the Twitter account*

---

attorney-general; Taylor Goldenstein, " Records: Texas assistant AG who lost job over tweets was fired, had been warned about social media," Houston Chronicle (Sept. 11, 2020), https://www.houstonchronicle.com/politics/texas/article/texas-assistant-ag-social-media-posts-fired-warned-15558487.php.

[7] Faiz Siddiqui, "Amazon, Uber ads appear on Twitter pages of white nationalists restored by Musk," The Washington Post (Dec. 6, 2022),
https://www.washingtonpost.com/technology/2022/12/06/twitter-ads-elon-musk/.

[8] Available at https://www.mediamatters.org/twitter/under-elon-musk-twitter-running-corporate-ads-alongside-tweets-holocaust-deniers.

**JA0155**

*of a leading white nationalist group*, Media Matters for America (June 22, 2023).[9]

- *Update: Twitter placed ads for USA Today, National Women's Soccer League, and other major brands on a terrorism-linked neo-Nazi account*, Media Matters for America (July 27, 2023).[10]

- *Update: Under Linda Yaccarino, X is placing ads for major brands on a verified pro-Hitler account*, Media Matters for America (Aug. 16, 2023).[11]

- *X is placing ads for brands like the NFL and MLB next to unhinged conspiracy theories about Jewish people and 9/11*, Media Matters for America (Sept. 11, 2023).[12]

- *X is placing major ads on a heavily followed antisemitic account that endorses killing politicians and LGBTQ advocates*, Media Matters for America (Sept. 12, 2023).[13]

- *X is placing ads for the NFL on prominent white nationalist accounts*, Media Matters for America (Sept. 27, 2023).[14]

- *X is placing ads for MLB, the NFL, and the Pittsburgh Steelers on antisemitic and Holocaust denial accounts*, Media Matters for America (Oct. 12, 2023).[15]

- *Pro-Hitler and Holocaust denier account: X has paid me $3,000 in ad revenue sharing*, Media Matters for America (Nov. 13, 2023).[16]

- *As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*, Media Matters for America (Nov. 16, 2023).[17]

- *X is placing ads for Amazon, NBA Mexico, NBCUniversal, and others next to content*

---

[9] Available at https://www.mediamatters.org/twitter/dish-samsung-wall-street-journal-and-others-are-advertising-twitter-account-leading-white.

[10] Available at https://www.mediamatters.org/twitter/twitter-placed-ads-usa-today-national-womens-soccer-league-and-other-major-brands-terrorism.

[11] Available at https://www.mediamatters.org/twitter/update-under-linda-yaccarino-x-placing-ads-major-brands-verified-pro-hitler-account.

[12] Available at https://www.mediamatters.org/twitter/x-placing-ads-brands-nfl-and-mlb-next-unhinged-conspiracy-theories-about-jewish-people-and.

[13] Available at https://www.mediamatters.org/twitter/x-placing-major-ads-heavily-followed-antisemitic-account-endorses-killing-politicians-and.

[14] Available at https://www.mediamatters.org/white-nationalism/x-placing-ads-nfl-prominent-white-nationalist-accounts.

[15] Available at https://www.mediamatters.org/twitter/x-placing-ads-mlb-nfl-and-pittsburgh-steelers-antisemitic-and-holocaust-denial-accounts.

[16] Available at https://www.mediamatters.org/twitter/pro-hitler-and-holocaust-denier-account-x-has-paid-me-3000-ad-revenue-sharing.

[17] Available at https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.

JA0156

*with white nationalist hashtags*, Media Matters for America (Nov. 17, 2023).[18]

13.    X's persistent placement of advertisements next to extremist content has been widely reported in the media, apart from my own significant work on the topic.

14.    My November 16 article also reported on Musk's endorsement of a widespread antisemitic conspiracy theory that Jewish people are seeking to promote "hatred against whites" and are seeking to "flood[] the[] country" with "hordes of minorities."[19] Musk's endorsement of this antisemitic theory drew widespread condemnation, including by President Joe Biden, and was extensively covered in the media.[20]

15.    My November 16 article contains screenshots of X feeds, which include at least nine organic posts from X users and six advertisements from major corporate entities. For example, below are images of an advertisement for Oracle appearing alongside a quote from Nazi dictator Adolf Hitler, as well as an advertisement for the Bravo television network next to a post praising Hitler's Nazi party, that I included in my article:

---

[18] Available    at    https://www.mediamatters.org/twitter/x-placing-ads-amazon-nba-mexico-nbcuniversal-and-others-next-content-white-nationalist.

[19] *Supra* n.17; *see also* Blake Montgomery, "Elon Musk agrees with accusing Jewish people of 'hatred against whites,'" The Guardian (Nov. 16, 2023),
https://www.theguardian.com/technology/2023/nov/16/elon-musk-antisemitic-tweet-adl.

[20] Blake Montgomery, "White House condemns Elon Musk's 'abhorrent' antisemitic tweets," The Guardian (Nov. 17, 2023), https://www.theguardian.com/technology/2023/nov/17/white-house-biden-elon-musk-antisemitic-tweet-hate; Aimee Picchi, "Elon Musk faces growing backlash over his endorsement of antisemitic X post," CBS News (Nov. 17, 2023), https://www.cbsnews.com/news/elon-musk-actual-truth-antisemitic-post-backlash-advertisers/; Allison Morrow, "With antisemitic tweet, Elon Musk reveals his 'actual truth,'" CNN (Nov. 17, 2023), https://www.cnn.com/2023/11/17/business/elon-musk-reveals-his-actual-truth/index.html; Mike Wendling, "White House criticizes Elon Musk over 'hideous' antisemitic lie," BBC (Nov. 17, 2023), https://www.bbc.com/news/world-us-canada-67446800.

JA0157



16.     On November 18, 2023, in the wake of this coverage and condemnation, Musk threatened to "fil[e] a thermonuclear lawsuit" against Media Matters. *See* @elonmusk, X.com (Nov. 18, 2023, 2:01 AM ET), https://perma.cc/X4HN-PLJ4.



17.     The threat was apparently in response to my November 16 article.

18.    On November 20, 2023, X filed suit against me and my employer, citing two articles authored by me and published on Media Matters on November 16, 2023 and November 17, 2023.

19.    On the same day, Texas Attorney General Paxton issued a press release announcing he would investigate Media Matters "for potential fraudulent activity."[21] In that press release, Attorney General Paxton characterized Media Matters as a "radical anti-free speech organization" and referenced "allegations" that Media Matters "fraudulently manipulated data on X.com." I understood these references to allegations as direct references to my investigatory work in my articles, specifically that of the November 16 article. The press release also referred to possible deception and "schemes of radical left-wing organizations who would like nothing more than to limit freedom by reducing participation in the public square[.]" These accusations are categorically false   as a journalist, freedom of speech and freedom of the press   including the ability to report and criticize on the press itself—are at the core of my work.

20.    On November 21, 2023, Attorney General Paxton issued a civil investigative demand that requested documents about the article that I authored on November 16. The demand expressly references me in several places and demands that Media Matters turn over, among other things "all documents related to internal and external communications" relating to my November 16 article. This would include various materials I used and prepared in writing my November 16 article.

21.    I have never visited Texas for any aspect of my work at Media Matters over the

---

[21] "Attorney General Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity," Press Release, Texas Attorney General (Nov. 20, 2023), available at https://texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-opens-investigation-media-matters-potential-fraudulent-activity.

**JA0159**

past sixteen years, including for any work related to the November 16 article. No element of any of my work over the past year covering the X platform or Musk has involved speaking with any Texas residents or Texas-based businesses. I have never traveled outside of the Washington, D.C. area as part of my work for Media Matters.

22.     In preparing, researching, writing, and publishing the November 16 article, I was not aware of any connection—and continue to believe it has no connection—to Texas, Texas residents, Texas users of X, or advertisers who may transact business in Texas.

23.     I have also reviewed all the X accounts that are either referenced, or whose posts on X are reproduced as screenshots, in the November 16 article. To the best of my awareness, none of these accounts appear to be of users based in Texas. I had, and continue to have, no reason to believe any of these users are based in Texas.[22]

24.     I believe that Attorney General Paxton's request for my documents and communications is in response to Musk's highly publicized threat against Media Matters   in fact, Paxton and his office have repeatedly said as much. In addition, statements made by Paxton and his office, in the initial press release announcing the investigation, and in statements Paxton himself has made since about Media Matters and the investigation have indicated that far from this being an unbiased investigation based on good faith concerns, Attorney General Paxton is using it to increase his public stature and standing among conservative and partisan audiences, including among Musk's large online fanbase.

25.     Attorney General Paxton also appears to have a personal bone to pick with Media Matters, based on critical reporting that Media Matters has done about Paxton and his office in the

---

[22] X does not display locations by default and account holders may list a location of their choice. *See* "Post location FAQs," X.com, available at https://help.twitter.com/en/safety-and-security/post-location-settings.

JA0160

past. Attorney General Paxton mentioned this reporting during a December 1, 2023 interview on the Tudor Dixon podcast about his Media Matters investigation, in which he stated that he is "pretty sure [Media Matters has] put hit pieces out on me."[23] Nor is this the first time that Paxton has targeted Media Matters specifically. For instance, in 2022, he organized with other state attorney generals against DirecTV, accusing them of colluding with Media Matters against conservative news outlet One America News Network.[24]

26.    Attorney General Paxton's demand for documents, and other public threats and statements about Media Matters, have had an extremely negative effect on my journalistic work and have disrupted my ordinary reporting and writing. And the knowledge that both the Attorney General himself and his attorneys may hold resentment towards me and my employer based on our previous reporting only heightens my concern about this investigation, makes me more wary that these individuals may obtain access to my communications and research, and makes me fearful that they will use their power as a way to retaliate against me and Media Matters.

27.    Since Attorney General Paxton announced his investigation, both I and my employer have experienced harassment and received hateful and threatening messages.

28.    In response to this harassment, I have taken measures to increase my home security and my personal security.

29.    The investigation and demand have also forced me to curtail my work investigating

---

[23] "Ken Paxton vs. Pfizer EXCLUSIVE," The Tudor Dixon Podcast (published Dec. 1, 2023), available at https://omny.fm/shows/the-tudor-dixon-podcast/the-tudor-dixon-podcast-ken-paxton-vs-pfizer-exclu. *See id.* at 22:23.

[24] Letter to DirecTV from Attorney General Paxton and the attorneys general of Louisiana, Mississippi, Missouri, Montana, and South Carolina (March 10, 2022), https://www.oann.com/wp-content/uploads/2022/03/Texas_AG_Ken_Paxton_Troubled_by_DirecTVs_Viewpoint_Discrimination_Against_OAN.pdf.

JA0161

and covering X out of fear that I will face further harassment, threats, and legal retaliation. For example, I have prepared extensive research and draft articles about antisemitism on social media that have not, and now likely will not, be published.

30.    In fact, since Attorney General Paxton announced his investigation and issued his document demand, I have not published any articles about Musk and how his ownership of X has enabled political extremism. My editors have specifically instructed me that, due to Attorney General Paxton's investigation, Media Matters cannot publish work that I have already prepared regarding Musk and political extremism on X.

31.    The legal retaliation I have faced for my work reporting on political extremism on X has forced me to curtail my long-running work investigating and reporting on political extremism. At the time of Attorney General Paxton's demand, I had already researched and drafted two articles about antisemitism on social media that were not ultimately published due to concerns of further legal retaliation. This included a nearly ready-to-publish article detailing the timeline of X's placement of advertising alongside pro-Nazi, antisemitic, and white nationalist accounts, despite X's repeated claim that the platform is safe for advertisers. And it also included a story on viral X posts promoting the Nazi Party or white nationalism that, according to X's own metrics, received more than 100,000 views and included advertisements in the reply.

32.    Since that time, I have continued to generate potential story ideas related to the topic of extremist content on X but have not pursued them due to the fear of further legal retaliation. Specifically, since mid-December, I have generated story ideas regarding (a) the reinstatement of Alex Jones, a prominent conspiracy theorist, to the X platform by Musk, and the use of an Alex Jones-related hashtag alongside advertising; (b) antisemitic hashtags targeting Jewish people appearing alongside advertising; and (c) advertising appearing on the X account of

11

**JA0162**

Stew Peters, a far-right and white nationalist internet personality who has promoted violence, as well as antisemitism, racism, and homophobia. Each of these topics is well within my beat, and I have frequently reported on these topics, individuals, and issues in the past. These story ideas, and the research for them, were developed while I was working from my home office.

33.     Attorney General Paxton's demand has also impacted my ability to speak freely with my editor, Ben Dimiero, out of concern that our internal communications or ideas for potential future articles are subject to the ongoing Demand and will have to be turned over to the Attorney General's office.

34.     I have self-censored and declined to act on these story ideas because I fear it will draw further retaliation directed toward me and Media Matters, consistent with the steps that Attorney General Paxton has already taken in response to my November 16 article. I have also self-censored because I am concerned that any written communications I have with my editorial team, or any research I perform independently, on these ideas may be subject to Paxton's broad document demand for "all documents related to internal and external communications by Media Matters for America," "all documents related to internal and external communications by Media Matters for America regarding Linda Yaccarino," and "all documents related to internal and external communications" that are "relating" to my prior work, among other requests.

35.     My ability to collaborate with other journalists, which is important to my practice, has also been hindered by Attorney General Paxton's investigation. Because of the demand, I have had to scale back my communications with fellow journalists outside of Media Matters out of fear that my messages, emails, or any other correspondence could expose my colleagues to the same kinds of risk I am now facing. Prior to receiving the demand, I would regularly post commentary on X regarding my work, respond to other journalists' posts, and communicate with other

JA0163

journalists. With the threat of Attorney General Paxton's demand looming overhead, I no longer actively engage in these communications.

36.    The retaliation I am facing for my journalism has impacted me even when I am still able to publish work. For example, on January 2, 2024, I published an article describing former General Mike Flynn's appearance on Alex Jones' show.[25] Jones' recent reinstatement on X which made national news coverage was plainly relevant to this article, but I avoided discussing it in my article due to retaliation concerns. While outlets like CNN,[26] Fox News,[27] and the New York Times[28] can freely write and comment on this topic, I cannot so long as Attorney General Paxton's Demand looms over my work, even though it is at the core of my beat. Even where I am still able to write on certain topics, I am constantly concerned about crossing a line into anything that could subject me or my employer to more legal retaliation.

37.    Instead of my ordinary investigative work, since Attorney General Paxton threatened Media Matters, I have spent most of my time attending to legal matters, including preparing for and responding to Attorney General Paxton's investigative demand and conferring with Media Matters officers and counsel. I would otherwise be spending my time on my reporting beat.

---

[25] Eric Hananoki, *Former Trump national security adviser Mike Flynn says he's been a fan of Alex Jones since 2008*, Media Matters for America (Jan. 2, 2024), https://www.mediamatters.org/michael-flynn/former-trump-national-security-adviser-mike-flynn-says-hes-been-fan-alex-jones-2008.

[26] Clare Duffy, *'The people have spoken': Elon Musk restores the X account of conspiracy theorist Alex Jones after poll*, CNN (Dec. 10, 2023), https://www.cnn.com/2023/12/09/business/alex-jones-restored-x-elon-musk-poll/index.html.

[27] Danielle Wallace, *Elon Musk reinstates Alex Jones on X*, Fox News (Dec. 10, 2023), https://www.foxnews.com/media/elon-musk-reinstates-alex-jones-x.

[28] Kate Conger, *Elon Musk Brings Conspiracy Theorist Alex Jones Back to X*, N.Y. Times (Dec. 9, 2023), https://www.nytimes.com/2023/12/09/technology/elon-musk-alex-jones-twitter-x.html.

**JA0164**

38.    In my sixteen-year career as a researcher and reporter on political extremism, I have never been investigated by a law enforcement official or other state official for my work.

39.    I am seriously concerned and fearful about having to protect my constitutional rights against a powerful, and public-perception-driven, state attorney general in a foreign and unfamiliar jurisdiction.

I declare under penalty of perjury that the foregoing is true and correct.

1/16/2024

Executed on: _____

DocuSigned by:

D7A4138D174D4F9...

_____

Eric Hananoki

JA0165

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 24-cv-147 |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | |
| Defendant. | |

## DECLARATION OF BENJAMIN DIMIERO
## IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

I, Benjamin Dimiero, declare as follows:

1.     I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.     I am the Editor-in-Chief of Media Matters for America ("Media Matters").

3.     I live in, and work from, the District of Columbia.

4.     Media Matters is a web-based, not-for-profit, 501(c)(3) research and information center dedicated to comprehensively monitoring, analyzing, and correcting conservative misinformation in U.S. media.

5.     I first joined Media Matters as an intern in 2007. After becoming a full-time staff member in 2008, I worked in both communications and writing roles, and then became head of the investigative research team. In 2016, I became the editorial director, where I oversaw the full-time editing team and several members of our senior writing staff. In 2023, I became the Editor-in-

**JA0166**

Chief of Media Matters, and I oversee the entire Editorial Department.

6.      As Editor-in Chief, I am the last set of eyes for my team of senior writing staff, which includes setting processes for review and timing of articles, and outlining priorities for research and writing.

7.      Our editorial team, consistent with the organization's mission, is focused on researching and writing articles to expose misinformation in the media. Like the rest of the organization, we adhere to our internal guidelines for news coverage, which reflect ordinary journalistic standards.

8.      Since the start of the COVID-19 pandemic, our editorial team primarily works and meets virtually. However, we occasionally meet up and work in the Media Matters office in the District of Columbia.

9.      Our editorial team consists of nine editors, reporters, and writers, of which four are currently based in the District of Columbia, another is moving to the District of Columbia in February 2024, and the remaining team members work remotely.

10.     Our editorial team includes senior investigative reporter Eric Hananoki, with whom I work closely, and who is based just outside the District of Columbia, in Maryland.

11.     Along with other Media Matters reporters, writers, and researchers, Mr. Hananoki has written multiple articles about X Corp., its owner Elon Musk, and the social media platform X, formerly known as Twitter. These articles have often focused on the appearance of corporate advertisements alongside hateful content posted by white nationalist, antisemitic, and extremist users on X. Such articles include:

- *Under Elon Musk, Twitter is running corporate ads alongside tweets from Holocaust*

**JA0167**

*deniers*, Media Matters for America (Feb. 10, 2023).[1]

- *Linda Yaccarino just started as Twitter's new CEO, but Elon Musk already destroyed the platform for advertisers*, Media Matters for America (June 8, 2023).[2]

- *Dish, Samsung, Wall Street Journal, and others are advertising on the Twitter account of a leading white nationalist group*, Media Matters for America (June 22, 2023).[3]

- *Update: Twitter placed ads for USA Today, National Women's Soccer League, and other major brands on a terrorism-linked neo-Nazi account*, Media Matters for America (July 27, 2023).[4]

- *Advertisers beware: Elon Musk and Linda Yaccarino are trying to lure you back by rebranding Twitter, but it's still a toxic cesspool*, Media Matters for America (Aug. 8, 2023).[5]

- *X Corp. CEO Yaccarino's interview on CNBC should alarm major advertising brands*, Media Matters for America (Aug. 11, 2023).[6]

- *Update: Under Linda Yaccarino, X is placing ads for major brands on a verified pro-Hitler account*, Media Matters for America (Aug. 16, 2023).[7]

- *X is placing ads for brands like the NFL and MLB next to unhinged conspiracy theories about Jewish people and 9/11*, Media Matters for America (Sept. 11, 2023).[8]

- *X is placing major ads on a heavily followed antisemitic account that endorses killing politicians and LGBTQ advocates*, Media Matters for America (Sept. 12, 2023).[9]

- *X is placing ads for the NFL on prominent white nationalist accounts*, Media Matters

---

[1] Available at https://www.mediamatters.org/twitter/under-elon-musk-twitter-running-corporate-ads-alongside-tweets-holocaust-deniers.

[2] Available at https://www.mediamatters.org/twitter/linda-yaccarino-just-started-twitters-new-ceo-elon-musk-already-destroyed-platform.

[3] Available at https://www.mediamatters.org/twitter/dish-samsung-wall-street-journal-and-others-are-advertising-twitter-account-leading-white.

[4] Available at https://www.mediamatters.org/twitter/twitter-placed-ads-usa-today-national-womens-soccer-league-and-other-major-brands-terrorism.

[5] Available at https://www.mediamatters.org/twitter/advertisers-beware-elon-musk-and-linda-yaccarino-are-trying-lure-you-back-rebranding.

[6] Available at https://www.mediamatters.org/twitter/x-corp-ceo-yaccarinos-interview-cnbc-should-alarm-major-advertising-brands.

[7] Available at https://www.mediamatters.org/twitter/update-under-linda-yaccarino-x-placing-ads-major-brands-verified-pro-hitler-account.

[8] Available at https://www.mediamatters.org/twitter/x-placing-ads-brands-nfl-and-mlb-next-unhinged-conspiracy-theories-about-jewish-people-and.

[9] Available at https://www.mediamatters.org/twitter/x-placing-major-ads-heavily-followed-antisemitic-account-endorses-killing-politicians-and.

JA0168

for America (Sept. 27, 2023).[10]

- *X is placing ads for MLB, the NFL, and the Pittsburgh Steelers on antisemitic and Holocaust denial accounts*, Media Matters for America (Oct. 12, 2023).[11]

- *Pro-Hitler and Holocaust denier account: X has paid me $3,000 in ad revenue sharing*, Media Matters for America (Nov. 13, 2023).[12]

- *As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*, Media Matters for America (Nov. 16, 2023) (the "November 16 article" or "Nov. 16 Article").[13]

- *X is placing ads for Amazon, NBA Mexico, NBCUniversal, and others next to content with white nationalist hashtags*, Media Matters for America (Nov. 17, 2023).[14]

12.     Mr. Hananoki authored 11 of the 14 articles referenced above, including the article published on November 16, 2023. The November 16 article, in addition to reporting on the appearance of advertisements alongside extremist content, commented on Mr. Musk's recent endorsement of an antisemitic conspiracy theory.

13.     While Media Matters and Mr. Hananoki reported extensively on these topics, X's persistent placement of advertisements next to extremist content has been widely reported in the media by other sources.[15]

---

[10] Available at https://www.mediamatters.org/white-nationalism/x-placing-ads-nfl-prominent-white-nationalist-accounts.

[11] Available at https://www.mediamatters.org/twitter/x-placing-ads-mlb-nfl-and-pittsburgh-steelers-antisemitic-and-holocaust-denial-accounts.

[12] Available at https://www.mediamatters.org/twitter/pro-hitler-and-holocaust-denier-account-x-has-paid-me-3000-ad-revenue-sharing.

[13] Available at https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.

[14] Available at https://www.mediamatters.org/twitter/x-placing-ads-amazon-nba-mexico-nbcuniversal-and-others-next-content-white-nationalist.

[15] Faiz Siddiqui, "Amazon, Uber ads appear on Twitter pages of white nationalists restored by Musk," The Washington Post (Dec. 6, 2022),

JA0169

14.     On November 20, 2023, X filed a lawsuit against Media Matters and Mr. Hananoki over Mr. Hananoki's November 16 article and a subsequent article written by him and published on November 17, 2023.

15.     On November 21, 2023, Attorney General Paxton issued a civil investigative demand that commanded Media Matters to produce documents and communications related to our research and writing processes, including about the November 16 article. For example, the demand requires Media Matters to turn over, among other things "all documents related to internal and external communications" relating to the November 16 article. And, from my understanding, this request is an ongoing one without an end date.

16.     The investigation has dramatically changed my team's editorial processes and had a negative impact on morale. Concern about the investigation on our team has created a new culture of fear about what can be researched and ultimately reported by our researchers and reporters. Stories that would normally be published after our usual vetting process   including stories about media coverage of Attorney General Paxton's anti-abortion actions in Texas—now receive greater internal scrutiny and risk-calculation from myself, our senior editor, and Media Matters's leadership. And stories on other topics   such as Musk's decision to permit prominent conspiracy theorist Alex Jones back onto the platform—may go unreported on entirely. There is a general sense among our team and organization that we must tread very lightly, and be careful not to cross

---

https://www.washingtonpost.com/technology/2022/12/06/twitter-ads-elon-musk/;   Jon   Porter, "Twitter advertisers aren't happy with ads appearing on pages of white nationalists," The Verge (Dec. 7, 2022), https://www.theverge.com/2022/12/7/23497928/twitter-advertisers-brand-safety-unbanned-accounts-white-nationalists; Jonathan Shorman, "Mizzou ad appears on racist X page as social media site faces concerned advertisers," The Kansas City Star (Mar. 15, 2023), https://www.kansascity.com/news/politics-government/article280309284.html; Shannon Thaler, "Disney, Microsoft ads on Twitter show up next to neo-Nazi propaganda as advertisers return: report," The N.Y. Post (June 19, 2023), https://nypost.com/2023/06/19/disney-microsoft-ads-on-twitter-show-up-next-to-neo-nazi-propaganda-report/.

**JA0170**

lines that would jeopardize our work or our employees' safety. This heightened need for internal scrutiny and risk calculation is not due to any concerns that the reporting is fair or accurate, but because of concern that certain reporting could make us a target for further retaliation.

17.    Since Attorney General Paxton announced his investigation, Media Matters's editorial leaders have pared back reporting and publishing, particularly on any topics that could be perceived as relating to the Paxton investigation.

18.    Critically, the lawsuit and corresponding investigation from Attorney General Paxton have compelled us to change what our approach would normally be following the publication of such important articles. Without the legal proceedings and threat of legal action from a state official, our team would be focused on keeping the momentum going following stories like Mr. Hananoki's November 16 and 17 articles. We would be following up their publication and widespread coverage with additional articles, or continued research from Mr. Hananoki related to extremism on the X platform, but for fear of retaliation. Notably, since Media Matters has been threatened by Attorney General Paxton and X, we have received several tips from people who have seen advertisements for prominent brands placed alongside extremist content. Though traditionally our approach would be to pursue these tips, despite this influx of possible leads, we have limited the scope of our reporting on this topic for fear of additional retaliation.

19.    At least two articles that would have been published related to the topics in Mr. Hananoki's November 16 and November 17 articles have not been published due to concerns that their publication would lead to negative consequences and possible further legal action.

20.    Before Attorney General Paxton issued the demand, Mr. Hananoki's work was published approximately once or twice a week. Since then, however, he has only published two articles.

**JA0171**

21.     Media Matters's leadership and members of the editorial team have also been forced to take a larger role in the organization's collective publishing decisions since Attorney General Paxton announced his investigation and served his Demand. In particular, I have been in communication much more than usual with leadership about what we should and should not publish. This has significantly slowed down our editorial and publication process, as we must work with leadership to assess whether publishing new articles will impact legal proceedings. In my more than 16 years at Media Matters, I do not think the organization has found itself in this posture.

22.     Writers have expressed concern about their ability to conduct meaningful investigations that could form the basis for future publications, given concerns that legal proceedings will prevent us from publishing their work and that their notes and emails could be subject to search by hostile attorneys general like Paxton.

23.     Attorney General Paxton's public threats against Media Matters have also contributed to safety concerns against Media Matters staff, including members of my team. These increased safety concerns have added to the culture of fear at Media Matters, and operate as a serious distraction from our work, further harming our ability to produce reporting and journalism on political extremism in the United States media.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _1/16/2024_____

DocuSigned by:

*Benjamin Dimiero*

CD4B114C0DF341E

Benjamin Dimiero

7

**JA0172**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, | | |
| Plaintiffs, | | Civil Action No. 24-cv-147 |
| v. | | |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | | |
| Defendant. | | |

## DECLARATION OF ARIA C. BRANCH
## IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

I, Aria C. Branch, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I am a Partner at Elias Law Group LLP in Washington, DC. I am a member of the bar in the District of Columbia and the Commonwealth of Virginia. I am counsel for Media Matters for America and Eric Hananoki ("Plaintiffs") in this matter, I have been admitted to practice before this Court.

3.      I submit this declaration in support of Plaintiffs' Motion for Temporary Restraining Order in the above-captioned matter.

4.      On December 1, 2023, Ezra Reese, a Partner at Elias Law Group, was physically served by Attorney General Paxton's office at the Elias Law Group office building, located in the District of Columbia.

**JA0173**

5.    A true and correct copy of the Civil Investigative Demand issued on November 21, 2023 by Texas Attorney General Warren Kenneth Paxton Jr. is attached as **Exhibit A**.

6.    A true and correct copy of the November 20, 2023 press release from Attorney General Paxton's office describing the investigation is attached as **Exhibit B**.

7.    A true and correct copy of the certified transcript of Attorney General Paxton's November 28, 2023 interview with Benny Johnson is attached as **Exhibit C**.

8.    A true and correct copy of the certified transcript of Attorney General Paxton's November 21, 2023 interview with CNBC "Last Call" is attached as **Exhibit D**.

9.    Attached as **Exhibit E** is a true and correct copy of the December 12, 2023 letter response to Attorney General Paxton's Civil Investigative Demand.

10.    A true and correct copy of the December 29, 2023 response letter from OAG is attached as **Exhibit F**.

11.    Attached as **Exhibit G** is a true and correct copy of the January 4, 2024 letter response to Attorney General Paxton's December 29, 2023 letter.

12.    A true and correct copy of the transcript of the TRO hearing, held before U.S. District Court Judge Paula Xinis of the U.S. District Court for the District of Maryland at 12:30 PM on January 8, 2024, is attached as **Exhibit H**.

13.    A true and correct copy of Defendant's Opposition to Plaintiffs' Renewed Motion for Temporary Restraining Order and Preliminary Injunction in *Media Matters v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 33, is attached as **Exhibit I**.

14.    A true and correct copy of an amicus brief authored by Defendant Paxton on behalf of Texas and ten additional states in *Exxon Mobil Corp. v. Healey et al.*, Case No. 16-CV-00469-K (N.D. Tex.), ECF. No. 63-2, is attached as **Exhibit J**.

JA0174

15.     A true and correct copy of an amicus brief authored by Defendant Paxton on behalf of Texas and eleven additional states in *Exxon Mobil Corp. v. Healey et al*., Case No. 18-1170 (2d Cir.), ECF No. 77, is attached as **Exhibit K**. This brief is also available on Westlaw at 2018 WL 5298251.

16.     A true and correct copy of an amicus brief authored by Defendant Paxton on behalf of Texas and ten additional states in *Exxon Mobil Corp. v. Schneiderman et al*., Case No. 1:17-cv-02301-VEC (S.D.N.Y.), ECF No. 196-1, is attached as **Exhibit L**.


I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Aria C. Branch*
Aria C. Branch

**JA0175**

# Exhibit A

JA0176



OFFICE OF THE ATTORNEY GENERAL
CONSUMER PROTECTION DIVISION

# CIVIL INVESTIGATIVE DEMAND

**To:** **Media Matters for America**     *via FedEx 7741 8756 3037*
                                                        **Return Date: December 12, 2023**

**c/o**    **Angelo Carusone**
        **800 Maine Ave SW, Suite 500**
        **Washington, DC 20024**

Pursuant to this office's specific authority under § 17.61 of the Texas Deceptive Trade Practices – Consumer Protection Act, §§ 17.41-.63, Texas Business and Commerce Code ("DTPA"), Media Matters for America ("Media Matters") is hereby directed to produce the items listed in **"Exhibit A"** attached hereto.

You are to make available the documentary material described in **"Exhibit A"** to the undersigned Assistant Attorney General, or other authorized agent(s) identified by the Consumer Protection Division ("Division"), by the "Return Date" indicated above for inspection and copying. In lieu of producing the originals for inspection and copying at your principal place of business, you may deliver true copies of the requested documents to the Assistant Attorney General or Authorized Agent below at the Office of the Attorney General, 300 W 15th St, Austin, TX, 78701. **Contact one of the persons listed below upon receipt to discuss the logistics of producing the requested documents to the Division.**

The Division believes that Media Matters for America is in possession, custody, or control of documentary material relevant to the subject matter of an investigation of possible violations of §§ 17.46(a) and (b) of the DTPA, related to false, misleading, and/or deceptive practices in the State of Texas.

> **TAKE NOTICE THAT pursuant to section 17.62, Texas Business and Commerce Code, any person who attempts to avoid, evade, or prevent compliance, in whole or in part, with this directive by removing, concealing, withholding, destroying, mutilating, altering, or by any other means falsifying any documentary material may be guilty of a misdemeanor and on conviction is punishable by a fine of not more than $5,000.00 or by confinement in the county jail for not more than one year, or both.**

ISSUED THIS 21st day of November, 2023.

/s Levi Fuller                                   **Authorized Agent**
Levi Fuller                                        Ryan Hanlan
Assistant Attorney General                  Investigator
(512) 936-1308                                   (512) 936-3354

## Instructions

1. **Read These Instructions/Definitions.** Read these instructions and definitions carefully.

2. **Duty to Preserve Documents**. All documents and/or other data which relate to the subject matter or requests of this Civil Investigative Demand must be preserved. *Any ongoing, scheduled or other process of document or data destruction involving such documents or data must cease even if it is your normal or routine course of business for you to delete or destroy such documents or data and even if you believe such documents or data are protected from discovery by privilege or otherwise.* Failure to preserve such documents or data may result in legal action and may be regarded as spoliation of evidence under applicable law.

3. **Relevant Dates**. Unless otherwise noted, the requests in this Civil Investigative Demand require production of documents for each year from January 1, 2022 to the final date of your production of responsive documents, herein called "the relevant time period."

4. **Custody and Control.** In responding to this Civil Investigative Demand, you are required to produce not only all requested documents in your physical possession, but also all requested documents within your custody and control, including those within the possession of persons reasonably available to you or under your direction or control.

5. **Identification of Documents not in Custody or Control.** If any responsive document was, but no longer is, in your possession, custody or control, produce a description of each such document. The description shall include the following:

   a. The name of each author, sender, creator, and initiator of such document;

   b. the name of each recipient, addressee, or party for whom such document was intended;

   c. the date the document was created;

   d. the date(s) the document was in use;

   e. a detailed description of the content of the document;

   f. the reason it is no longer in your possession, custody or control; and

   g. the document's present whereabouts.

   If the document is no longer in existence, in addition to providing the information indicated above, state on whose instructions the document was destroyed or otherwise disposed of, and the date and manner of the destruction or disposal.

6. **Privileged Documents**. If any responsive document is withheld, in whole or in part, under any claim of privilege, provide a detailed privilege log that contains at least the following information for each document or partial document that you have withheld:

   a. the document's control numbers;

   b. all authors of the document;

   c. all addressees of the document;

   d. all recipients of the document or of any copies of the document, to the extent not included among the document's addressees;

e. the date of the document;

f. a description of the subject matter of the document sufficient to determine the applicability of the privilege;

g. the nature or type of the privilege that is being asserted for the document (e.g., "attorney-client privilege");

h. the specification(s) of the Demand to which the document is responsive;

i. the document control number(s) of any attachments to the document, regardless of whether any privilege is being asserted for such attachment(s); and

j. whether the document has been produced in redacted form, and if so, the range of the control numbers for the document.

7. **Trade Secrets.** It is your responsibility to clearly designate which, if any, of the requested documents contain trade secrets, in accordance with Section 17.61(f) of the Texas Business and Commerce Code.

8. **Consult Before Producing Documents.** Before processing or making copies of hard copy documents or electronically stored information in response to this Civil Investigative Demand, consult with the designated representative(s) of the Office of the Attorney General, ("OAG") identified above and reach agreement on the format and method of production.

Likewise, before producing any *original* documents, consult with one of the designated representatives of the OAG identified above to obtain approval. If you produce original documents, the OAG cannot guarantee their return.

9. **You May Produce Copies.** Subject to the consultation requirement noted above, you may submit photocopies (with color photocopies where necessary to interpret the document) in lieu of original hard-copy documents, provided that such copies are accompanied by an affidavit of an officer of Media Matters for America stating that the copies are true, correct, and complete copies of the original documents, and (if appropriate) were generated and maintained in the ordinary course of your business, and provided that where the original contains colored text or images, a color copy must be provided.

10. **Non-identical Copies to be Produced.** Identical copies of responsive documents need not be produced. However, any copy of a document that differs in any manner, including but not limited to the presence of handwritten notations, different senders or recipients, etc. must be produced.

11. **No Redaction**. All materials or documents produced in response to this Civil Investigative Demand shall be produced, except as deemed privileged, in complete unabridged, unedited and unredacted form, even if portions may contain information not explicitly requested, or might include interim or final editions of a document.

12. **Documents to be Bates Numbered.** Mark each page or electronic medium (e.g., disk, tape, or CD) with individual or corporate identification and eight-digit consecutive document control numbers (e.g., DOE-12345678; CORP-12345678). Hardcopy bound pamphlets or books may be marked with a single identification and control number. Documents as to which privilege is asserted are to also receive identification and control numbers.

If your production will be more than one box or piece of electronic media, number each box or electronic media, as well as the total number of boxes/media (e.g., box 1 of 13) and mark each with the name(s) of the person(s) whose files are contained therein, the requests(s) to which they are responsive, and the document control numbers contained therein.

13. **Document Organization.** *Each document and other tangible thing produced shall be clearly designated as to which request, and each sub-part of a request, that it satisfies. The documents produced shall be identified and segregated to correspond with the number and subsection of the request.*

14. **Production of Electronic Documents.** Unless otherwise agreed to in writing by the designated OAG representative, electronically stored information shall be produced in electronic form. Before you prepare documents or information for production in electronic form in order to comply with this Civil Investigative Demand (for example, before you attempt to process electronically stored information or image hard copy documents), you must consult with the designated representative(s) of the OAG identified above and reach agreement regarding the format and method of production.

15. **Questions.** Questions concerning this Civil Investigative Demand should be directed to Assistant Attorney General Levi Fuller at (512) 936-1308.

# Definitions

1. **"You," "your," "the business," "Media Matters for America,"** or **"Media Matters"** means Media Matters for America, their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and includes all persons and entities acting or purporting to act under the guidance or on behalf of any of the above. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership (25 percent or more) or control between the company and any other person or entity.

2. **"X," "X Corp.," "Twitter,"** or **"Twitter, Inc."** means X, their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and includes all persons and entities acting or purporting to act under the guidance or on behalf of any of the above.

3. **"Document"** means the original and all non-identical copies (whether different from the original because of notes, underlining, attachments, or otherwise) of all computer files, and all written, printed, graphic or recorded material of every kind, regardless of authorship. It includes communications in words, symbols, pictures, photographs, sounds, films, and tapes, as well as electronically stored information, computer files, together with all codes and/or programming instructions and other materials necessary to understand and use such systems. The term "computer files" includes information stored in or accessible through computers or other information retrieval systems and includes but is not limited to drafts of documents, metadata, embedded, hidden and other bibliographic or historical data describing or relating to documents created, revised, or distributed on computer systems, as well as spreadsheets and their underlying cell formulae and other codes. Thus, you should produce documents that exist in machine-readable form, including documents stored in personal computers, portable computers, workstations, minicomputers, phones, pagers, personal data/digital assistants, archival voice storage systems, group and collaborative tools, electronic messaging devices, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether on or off your premises. This definition covers electronic mail messages ("e-mail"), text messages, voice mail, and all other documents in the possession of you and/or your directors, officers, managers, or employees, whether located at their home or office, whether on work or personal devices. Notice: Unless otherwise specified, the term "document" excludes bills of lading, invoices in non-electronic form, customs declarations, purchase orders, and other similar documents of a purely transactional nature.

4. **"Communication"** means any exchange or transmission of words or ideas to another person or an entity, including without limitation conversations, discussions, letters, memoranda, meetings, notes, speeches, or other transfer of information, whether written, oral, or by any other means, whether direct or indirect, formal or informal, and includes any document which abstracts, digests, transcribes or records any such communication. This definition extends to and encompasses electronic communications on internal chat platforms such as Slack, Microsoft Teams, Google Chat, and other similar messaging platforms.

5. **"Entity"** means legal or business entity of any kind and includes, without limitation, corporations, partnerships, joint ventures, associations, governmental bodies, and trusts.

6. **"Evidencing"** means having any tendency to make the existence of any fact related to the request more probable than it would be without the evidence.

7. **"Identify"** means

**JA0181**

    a.  Regarding an individual, to identify that individual's:

        i.  name;

        ii.  current or last known telephone numbers at business and home; and

        iii.  current or last known business and home addresses.

    b.  Regarding a person other than an individual, to identify:

        i.  its full name;

        ii.  the nature of its organization;

        iii.  the address and telephone number of its principal offices and, if applicable, the state in which it is incorporated; and

        iv.  its principal line of business or activity.

    c.  Regarding any other tangible thing, to identify:

        i.  what it is, giving a reasonably detailed description thereof;

        ii.  when, where, and how it was made, if applicable;

        iii.  who made it, if applicable; and

        iv.  its current custodian or the person that had last known possession, custody, or control thereof.

8. **"Including"** means including, but not limited to.

9. **"Person"** includes you and means any entity or natural person.

10. **"Relate," "related,"** and **"relating"** mean being in any way legally, logically, or factually connected with the subject matter of the request at issue.

11. The words **"and"** and **"or"** shall be construed either conjunctively or disjunctively as required by the context to bring within the scope of the request, any document(s) that might be deemed outside its scope by another construction.

12. Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

# EXHIBIT A: DOCUMENTS TO BE PRODUCED

1. Produce documents sufficient to identify Media Matters for America's employee organizational chart.

2. Produce documents sufficient to identify all of Media Matters for America's sources of income originating in the State of Texas.

3. Produce documents sufficient to identify all of Media Matters for America's operational expenditures in the State of Texas.

4. Produce all documents related to internal and external communications by Media Matters for America regarding Elon Musk's purchase of X during the relevant time period.

5. Produce all documents related to internal and external communications by Media Matters for America regarding Linda Yaccarino during the relevant time period.

6. Produce documents sufficient to identify all current and past X accounts under the ownership, control, or operating at the behest of Media Matters for America.

7. Produce all documents related to internal and external communications relating to the article titled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" by Eric Hananoki.

8. Produce documents sufficient to identify all of Media Matters for America's owned, controlled, or authorized X accounts that were used to obtain, produce, or otherwise acquire the screenshot images contained in the article titled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" by Eric Hananoki.

9. Produce documents sufficient to identify all X accounts, profiles, and members followed by the X accounts identified in response to Demand Number 8, above.

10. Produce all of Media Matters for America's external communications with employees and representatives of X from November 1, 2023 to November 21, 2023.

11. Produce all of Media Matters for America's external communications with Apple Inc., International Business Machine Corporation (IBM), Bravo television network, NBCUniversal, Oracle Corporation, and Comcast Corporation, Lions Gate Entertainment Corporation, Warner Bros Discovery Inc., Paramount Pictures Corporation, and Sony Group Corporation from November 1, 2023 to November 21, 2023.

12. Produce documents sufficient to identify all direct and indirect sources of funding for all Media Matters for America operations involving X research or publications.

# Exhibit B

JA0184



**KEN PAXTON**
ATTORNEY GENERAL *of* TEXAS

**November 20, 2023 | Press Release**

# Attorney General Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity

The Office of the Attorney General ("OAG") is opening an investigation into Media Matters for potential fraudulent activity. Under the Texas Business Organizations Code and the Deceptive Trade Practices Act, the OAG will vigorously enforce against nonprofits who commit fraudulent acts in or affecting the state of Texas.

Attorney General Paxton was extremely troubled by the allegations that Media Matters, a radical anti-free speech organization, fraudulently manipulated data on X.com (formerly known as Twitter).

"We are examining the issue closely to ensure that the public has not been deceived by the schemes of radical left-wing organizations who would like nothing more than to limit freedom by reducing participation in the public square," said Attorney General Paxton.

Back to Top

**JA0185**

# Exhibit C

JA0186



# Transcript of Recorded Conversation

**Case:** MMFA Litigation

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

1
2
3
4
5
6
7           In re: MMFA Litigation
8
9           RECORDED CONVERSATION
10
11
12
13
14
15
16
17
18
19
20   Job No.:  518338
21   Pages:  1 - 3
22   Transcribed by: Lauren Bishop

JA0188

1    BENNY JOHNSON: So, this is obviously

2  horrifying. Devastating and comes in concert with

3  Elon Musk dropping and I quote, thermonuclear

4  lawsuit. On Media Matters, though it seems like

5  you're standing with the Missouri Attorney General,

6  do you encourage other republican attorney generals

7  to do this? We're -- we're so thankful that somebody

8  is just standing up and doing something. Where are

9  the rest of the republican AGs? There's got to be 20,

10  30 republican AGs in the country. Why are they so

11  quiet on issues like this?

12    KEN PAXTON: You know, that's a good

13  question. I -- I would -- I would encourage them to

14  look at this. They may have just become aware of it.

15  I mean it's a relatively new issue so hopefully over

16  the next couple weeks, you'll see other attorney

17  generals look at this and -- and I -- I would

18  encourage even democratic attorney generals. I know

19  they probably wont but they should because they

20  should care about free speech as much as we do.

21    (The recording was concluded.)

22

1                    CERTIFICATE OF TRANSCRIBER

2            I, Lauren Bishop, do hereby certify that

3    the transcript was prepared from the digital audio

4    recording of the foregoing proceeding; that said

5    proceedings were reduced to typewriting under my

6    supervision; that said transcript is a true and

7    accurate record of the proceedings to the best of my

8    knowledge, skills, and ability; and that I am neither

9    counsel for, related to, nor employed by any of the

10   parties to the case and have no interest, financial

11   or otherwise, in its outcome.

12

13       *Lauren Bishop*

14   _____

15   LAUREN BISHOP

16   Planet Depos,

17   December 8, 2023

18

19

20

21

22

| A | | | |
|---|---|---|---|
| **ability** 3:8 | **counsel** 3:9 | **H** | **media** 2:4 |
| **about** 2:20 | **country** 2:10 | **hereby** 3:2 | **missouri** 2:5 |
| **accurate** 3:7 | **couple** 2:16 | **hopefully** 2:15 | **mmfa** 1:7 |
| **ags** 2:9, 2:10 | **D** | **horrifying** 2:2 | **much** 2:20 |
| **any** 3:9 | **december** 3:17 | **I** | **musk** 2:3 |
| **attorney** 2:5, 2:6, 2:16, 2:18 | **democratic** 2:18 | **interest** 3:10 | **N** |
| **audio** 3:3 | **depos** 3:16 | **issue** 2:15 | **neither** 3:8 |
| **aware** 2:14 | **devastating** 2:2 | **issues** 2:11 | **new** 2:15 |
| **B** | **digital** 3:3 | **it's** 2:15 | **next** 2:16 |
| **because** 2:19 | **doing** 2:8 | **J** | **O** |
| **become** 2:14 | **dropping** 2:3 | **job** 1:20 | **obviously** 2:1 |
| **benny** 2:1 | **E** | **johnson** 2:1 | **other** 2:6, 2:16 |
| **best** 3:7 | **elon** 2:3 | **K** | **otherwise** 3:11 |
| **bishop** 1:22, 3:2, 3:15 | **employed** 3:9 | **ken** 2:12 | **outcome** 3:11 |
| **C** | **encourage** 2:6, 2:13, 2:18 | **know** 2:12, 2:18 | **over** 2:15 |
| **care** 2:20 | **even** 2:18 | **knowledge** 3:8 | **P** |
| **case** 3:10 | **F** | **L** | **pages** 1:21 |
| **certificate** 3:1 | **financial** 3:10 | **lauren** 1:22, 3:2, 3:15 | **parties** 3:10 |
| **certify** 3:2 | **foregoing** 3:4 | **lawsuit** 2:4 | **paxton** 2:12 |
| **comes** 2:2 | **free** 2:20 | **litigation** 1:7 | **planet** 3:16 |
| **concert** 2:2 | **G** | **look** 2:14, 2:17 | **prepared** 3:3 |
| **concluded** 2:21 | **general** 2:5 | **M** | **probably** 2:19 |
| **conversation** 1:9 | **generals** 2:6, 2:17, 2:18 | **matters** 2:4 | **proceeding** 3:4 |
| | **good** 2:12 | **mean** 2:15 | **proceedings** 3:5, 3:7 |

| **Q** |
|---|
| question |
| 2:13 |
| quiet |
| 2:11 |
| quote |
| 2:3 |

| **R** |
|---|
| record |
| 3:7 |
| recorded |
| 1:9 |
| recording |
| 2:21, 3:4 |
| reduced |
| 3:5 |
| related |
| 3:9 |
| relatively |
| 2:15 |
| republican |
| 2:6, 2:9, 2:10 |
| rest |
| 2:9 |

| **S** |
|---|
| said |
| 3:4, 3:6 |
| see |
| 2:16 |
| seems |
| 2:4 |
| should |
| 2:19, 2:20 |
| signature-p1ka1 |
| 3:13 |
| skills |
| 3:8 |
| somebody |
| 2:7 |
| something |
| 2:8 |
| speech |
| 2:20 |
| standing |
| 2:5, 2:8 |

| **supervision** |
|---|
| 3:6 |

| **T** |
|---|
| thankful |
| 2:7 |
| that's |
| 2:12 |
| there's |
| 2:9 |
| thermonuclear |
| 2:3 |
| transcribed |
| 1:22 |
| transcriber |
| 3:1 |
| transcript |
| 3:3, 3:6 |
| true |
| 3:6 |
| typewriting |
| 3:5 |

| **U** |
|---|
| under |
| 3:5 |

| **W** |
|---|
| weeks |
| 2:16 |
| we're |
| 2:7 |
| wont |
| 2:19 |

| **Y** |
|---|
| you'll |
| 2:16 |
| you're |
| 2:5 |

| **2** |
|---|
| 20 |
| 2:9 |
| 2023 |
| 3:17 |

| **3** |
|---|
| 30 |
| 2:10 |

| **5** |
|---|
| 518338 |
| 1:20 |

# Exhibit D

JA0193



# Transcript of Recorded Conversation

**Case:** MMFA Litigation

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

1

2

3

4

5

6

7           In re: MMFA Litigation

8

9           RECORDED CONVERSATION

10

11

12

13

14

15

16

17

18

19

20   Job No.: 517865

21   Pages: 1 - 6

22   Transcribed by: Lauren Bishop

**JA0195**

1           MALE SPEAKER 1: Let's speak with

2 Republican Attorney General of Texas, Ken Paxton.

3 Ken, Attorney General, thank you very much for

4 joining us. What specifically are you looking for in

5 this investigation?

6           KEN PAXTON: We have an obligation. I have

7 four different responsibilities into the Texas

8 Constitution. One of those is to look at any

9 fraudulent activity of a corporation and then we also

10 oversee charitable organizations. So in this case

11 with Media Matters being charitable organization,

12 nonprofit, we have the responsibility to make sure

13 that doing things that are inappropriate for

14 violating state law. We've started off with asking

15 them questions and we're going to ask them questions

16 and whether that leads to anything else will be

17 determined by their actual behavior and what

18 information they turn over.

19           MALE SPEAKER 1: There are already people

20 of course questioning the -- I won't say the

21 jurisdiction, but Texas' involvement given that X

22 formerly known as Twitter, is a California-based

1    corporation. What is the people and the state of

2    Texas' interest in this?

3           KEN PAXTON: Well, look, I mean X operates

4    in Texas. It operates all the world and Media

5    Matters, what they do to X, the information that they

6    -- they provide effects Texas. And so anything that

7    affects Texans, we have an obligation to look at and

8    that's -- that's what we're doing. So, yeah, it

9    doesn't matter whether they're incorporated, but

10   they're doing business and Texas becomes our

11   interest.

12          MALE SPEAKER 1: Well, what -- and it's

13   very complicated and of course, this is TV, so we

14   don't have a lot of time, but as I understand it

15   Attorney General Paxton, what X is alleging and --

16   and by the way Media Matters is denying -- want to

17   make that clear. Is that Media Matters created a lot

18   of fake accounts or a bunch of different accounts

19   followed a bunch of accounts that might be around or

20   involved in hateful content and sort of almost gained

21   the algorithm to force a specific result. They deny

22   it. Let's say they actually did that. Is that illegal

1  in any way?

2          KEN PAXTON: Yeah. I mean it can be.

3  Depends on exactly what they did. If it's viewed as

4  fraudulent activity under Texas law, then they can be

5  accountable to the state of Texas for that. I mean,

6  the reality is we're also -- we're in a lawsuit with

7  Twitter. We've been in a lawsuit with them for

8  several years involving kind of this similar

9  information that they might have created fake

10  accounts several years ago that were deceptively

11  providing information to advertisers and consumers

12  about how big their audience is. So we've looked at

13  actually both sides.

14          MALE SPEAKER 1: Yeah. Because there are

15  just regular users that probably have multiple

16  accounts for multiple different -- multiple different

17  reasons. Would this be more of a criminal situation

18  or a civil situation because I can -- I can go from A

19  to Z if -- if the allegations are accurate you're

20  damaging X's business by basically doing this and

21  then writing about it and then spooking advertisers

22  away.

1          KEN PAXTON: Yeah. So for us we don't have

2    any authority to investigate or do anything

3    criminally unless we're referred that by a local

4    district attorney in Texas. So district attorney in

5    Texas with to do the investigation, refer us to

6    either investigation or prosecution. Until then

7    everything that we're doing is completely civil

8    related to what -- exactly what you're talking about.

9          (The recording was concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

```
1              CERTIFICATE OF TRANSCRIBER

2         I, Lauren Bishop, do hereby certify that

3    the transcript was prepared from the digital audio

4    recording of the foregoing proceeding; that said

5    proceedings were reduced to typewriting under my

6    supervision; that said transcript is a true and

7    accurate record of the proceedings to the best of my

8    knowledge, skills, and ability; and that I am neither

9    counsel for, related to, nor employed by any of the

10   parties to the case and have no interest, financial

11   or otherwise, in its outcome.

12         *Lauren Bishop*

13

14

15   _____

16   LAUREN BISHOP

17   Planet Depos,

18   December 6, 2023

19

20

21

22
```

JA0200

| A | | | |
|---|---|---|---|

**A**

**ability**
6:8
**about**
4:12, 4:21, 5:8
**accountable**
4:5
**accounts**
3:18, 3:19,
4:10, 4:16
**accurate**
4:19, 6:7
**activity**
2:9, 4:4
**actual**
2:17
**actually**
3:22, 4:13
**advertisers**
4:11, 4:21
**affects**
3:7
**ago**
4:10
**algorithm**
3:21
**all**
3:4
**allegations**
4:19
**alleging**
3:15
**almost**
3:20
**already**
2:19
**also**
2:9, 4:6
**any**
2:8, 4:1, 5:2,
6:9
**anything**
2:16, 3:6, 5:2
**around**
3:19
**asking**
2:14

**attorney**
2:2, 2:3, 3:15,
5:4
**audience**
4:12
**audio**
6:3
**authority**
5:2
**away**
4:22

**B**

**basically**
4:20
**because**
4:14, 4:18
**becomes**
3:10
**been**
4:7
**behavior**
2:17
**being**
2:11
**best**
6:7
**big**
4:12
**bishop**
1:22, 6:2, 6:16
**both**
4:13
**bunch**
3:18, 3:19
**business**
3:10, 4:20

**C**

**california-based**
2:22
**case**
2:10, 6:10
**certificate**
6:1
**certify**
6:2
**charitable**
2:10, 2:11

**civil**
4:18, 5:7
**clear**
3:17
**completely**
5:7
**complicated**
3:13
**concluded**
5:9
**constitution**
2:8
**consumers**
4:11
**content**
3:20
**conversation**
1:9
**corporation**
2:9, 3:1
**counsel**
6:9
**course**
2:20, 3:13
**created**
3:17, 4:9
**criminal**
4:17
**criminally**
5:3

**D**

**damaging**
4:20
**december**
6:18
**deceptively**
4:10
**deny**
3:21
**denying**
3:16
**depends**
4:3
**depos**
6:17
**determined**
2:17

**different**
2:7, 3:18, 4:16
**digital**
6:3
**district**
5:4
**doing**
2:13, 3:8,
3:10, 4:20, 5:7

**E**

**effects**
3:6
**either**
5:6
**else**
2:16
**employed**
6:9
**everything**
5:7
**exactly**
4:3, 5:8

**F**

**fake**
3:18, 4:9
**financial**
6:10
**followed**
3:19
**force**
3:21
**foregoing**
6:4
**formerly**
2:22
**four**
2:7
**fraudulent**
2:9, 4:4

**G**

**gained**
3:20
**general**
2:2, 2:3, 3:15
**given**
2:21

| go | knowledge | more | proceeding |
|---|---|---|---|
| 4:18 | 6:8 | 4:17 | 6:4 |
| **going** | **known** | **much** | **proceedings** |
| 2:15 | 2:22 | 2:3 | 6:5, 6:7 |
| **H** | **L** | **multiple** | **prosecution** |
| **hateful** | **lauren** | 4:15, 4:16 | 5:6 |
| 3:20 | 1:22, 6:2, 6:16 | **N** | **provide** |
| **hereby** | **law** | **neither** | 3:6 |
| 6:2 | 2:14, 4:4 | 6:8 | **providing** |
| **I** | **lawsuit** | **nonprofit** | 4:11 |
| **illegal** | 4:6, 4:7 | 2:12 | **Q** |
| 3:22 | **leads** | **O** | **questioning** |
| **inappropriate** | 2:16 | **obligation** | 2:20 |
| 2:13 | **let's** | 2:6, 3:7 | **questions** |
| **incorporated** | 2:1, 3:22 | **one** | 2:15 |
| 3:9 | **litigation** | 2:8 | **R** |
| **information** | 1:7 | **operates** | **reality** |
| 2:18, 3:5, 4:9, | **local** | 3:3, 3:4 | 4:6 |
| 4:11 | 5:3 | **organization** | **reasons** |
| **interest** | **look** | 2:11 | 4:17 |
| 3:2, 3:11, 6:10 | 2:8, 3:3, 3:7 | **organizations** | **record** |
| **investigate** | **looked** | 2:10 | 6:7 |
| 5:2 | 4:12 | **otherwise** | **recorded** |
| **investigation** | **looking** | 6:11 | 1:9 |
| 2:5, 5:5, 5:6 | 2:4 | **outcome** | **recording** |
| **involved** | **lot** | 6:11 | 5:9, 6:4 |
| 3:20 | 3:14, 3:17 | **over** | **reduced** |
| **involvement** | **M** | 2:18 | 6:5 |
| 2:21 | **make** | **oversee** | **refer** |
| **involving** | 2:12, 3:17 | 2:10 | 5:5 |
| 4:8 | **male** | **P** | **referred** |
| **J** | 2:1, 2:19, | **pages** | 5:3 |
| **job** | 3:12, 4:14 | 1:21 | **regular** |
| 1:20 | **matter** | **parties** | 4:15 |
| **joining** | 3:9 | 6:10 | **related** |
| 2:4 | **matters** | **paxton** | 5:8, 6:9 |
| **jurisdiction** | 2:11, 3:5, | 2:2, 2:6, 3:3, | **republican** |
| 2:21 | 3:16, 3:17 | 3:15, 4:2, 5:1 | 2:2 |
| **K** | **mean** | **people** | **responsibilities** |
| **ken** | 3:3, 4:2, 4:5 | 2:19, 3:1 | 2:7 |
| 2:2, 2:3, 2:6, | **media** | **planet** | **responsibility** |
| 3:3, 4:2, 5:1 | 2:11, 3:4, | 6:17 | 2:12 |
| **kind** | 3:16, 3:17 | **prepared** | **result** |
| 4:8 | **might** | 6:3 | 3:21 |
| | 3:19, 4:9 | **probably** | **S** |
| | **mmfa** | 4:15 | **said** |
| | 1:7 | | 6:4, 6:6 |

say
2:20, 3:22
several
4:8, 4:10
sides
4:13
signature-p1kal
6:12
similar
4:8
situation
4:17, 4:18
skills
6:8
sort
3:20
speak
2:1
speaker
2:1, 2:19,
3:12, 4:14
specific
3:21
specifically
2:4
spooking
4:21
started
2:14
state
2:14, 3:1, 4:5
supervision
6:6
sure
2:12

**T**

talking
5:8
texans
3:7
texas
2:2, 2:7, 3:4,
3:6, 3:10, 4:4,
4:5, 5:4, 5:5
texas'
2:21, 3:2
thank
2:3

things
2:13
time
3:14
transcribed
1:22
transcriber
6:1
transcript
6:3, 6:6
true
6:6
turn
2:18
tv
3:13
twitter
2:22, 4:7
typewriting
6:5

**U**

under
4:4, 6:5
understand
3:14
unless
5:3
until
5:6
users
4:15

**V**

viewed
4:3
violating
2:14

**W**

want
3:16
way
3:16, 4:1
we're
2:15, 3:8, 5:3,
5:7
we've
2:14, 4:7, 4:12

we're
4:6
whether
2:16, 3:9
world
3:4
writing
4:21

**X**

x's
4:20

**Y**

yeah
3:8, 4:2, 4:14,
5:1
years
4:8, 4:10

**1**

1
2:1, 2:19,
3:12, 4:14

**2**

2023
6:18

**5**

517865
1:20

# Exhibit E

JA0204



250 Massachusetts Ave NW, Suite 400  |  Washington, DC 20001

December 12, 2023

**VIA ELECTRONIC MAIL AND FEDEX**

Levi T. Fuller
Assistant Attorney General
Special Litigation and Non-Profit Enforcement
Consumer Protection Division
Office of the Attorney General of Texas
PO Box 12548
Austin, TX 78711-2548
Levi.Fuller@oag.texas.gov

Re:   **Office of the Attorney General of Texas Civil Investigative Demand: Media Matters for America**

Dear Mr. Fuller:

We write as counsel to Media Matters for America ("Media Matters") in response to the Civil Investigative Demand ("CID") served on Media Matters on December 1, 2023. For the reasons explained below and in the lawsuit filed by Media Matters against Attorney General Paxton yesterday,[1] Media Matters objects to the CID in its entirety.

Your Office's initiation of this investigation and issuance of the CID constitutes flagrant retaliation against Media Matters for engaging in constitutionally protected speech and press activities. *See* Exhibit A (Complaint). The CID itself—served without any explanation as to how Media Matters may have violated or is even subject to Texas law on deceptive trade practices—infringes upon Media Matters's free speech and press rights under the First and Fourth Amendments, its due process rights under the Fourteenth Amendment, and its rights under the Maryland and District of Columbia reporters' shield laws. The CID has chilled and will continue to chill Media Matters from publishing additional news reports on X Corp. ("X") and Mr. Musk out of fear of further retaliation and harassment. Plaintiffs are seeking immediate relief in the form

---

[1] *See Media Matters for America, et al. v. Paxton*, Case No. 8:23-cv-3363-PX (D. Md.). As-filed copies of the operative complaint and a copy of Plaintiffs' motion for temporary restraining order, are appended to this letter as Exhibits A and B.

**JA0205**

Office of the Attorney General of Texas
December 12, 2023
Page 2

of a temporary restraining order and/or preliminary injunction to protect them from the ongoing, imminent, and irreparable injury posed by the CID.

    Background. In November 2023, Mr. Eric Hananoki, senior investigative reporter at Media Matters, published three pieces of investigatory reporting on Media Matters's website showing the placement of advertisements for major corporations next to extremist content on the social media platform formerly known as Twitter, now called X and owned by X.[2] Mr. Hananoki's reporting was consistent with a year's worth of additional reporting from an array of different media outlets showing pervasive white nationalist, antisemitic, and other extremist content available on X. *See* Ex. A at 11-21. On November 20, following the publication of these articles, X filed a lawsuit in the Northern District of Texas against Media Matters and Mr. Hananoki. *See X Corp. v. Media Matters for America, et al.*, Case No. 4:23-cv-01175 (N.D. Tex.). On the same day, the Texas Attorney General issued a press release announcing that he was opening an investigation into Media Matters "for potential fraudulent activity."[3] Rather than set out any basis for investigating Media Matters—or explaining how the Texas Office of the Attorney General could even plausibly have jurisdiction over Media Matters—the press release used charged and partisan language, characterizing Media Matters as a "a radical anti-free speech organization" and a "radical left-wing organization[] who would like nothing more than to limit freedom by reducing participation in the public square[.]"

    Media Matters received a copy of the CID via Federal Express on November 22 and was served via counsel on December 1, 2023. The CID provided a return date of December 12, 2023, less than two weeks later, and demands production of 12 overbroad categories of documents ("Demands") that overwhelmingly have nothing to do with trade practices or consumer protection. This Office's investigation, Mr. Paxton's related public statements and threats, and the issuance and substance of the CID have chilled Media Matters' protected speech and press activities. *See* Ex. A at 21-29.

    Objections to CID. *First*, this Office is plainly without jurisdiction to investigate Media Matters, which is a non-profit media watchdog group with a principal place of business in Washington, D.C., where it is registered to do business. Media Matters is not registered as a foreign corporation in Texas because it does not "transact business" in Texas. Tex. Bus. Org. Code § 9.0002(a). Nor does it have a registered agent in Texas. Media Matters does not perform any "business practices" in Texas, Bus. & Com. § 17.44(a), and does not conduct any "trade" or "commerce" in Texas, *id.* §§ 17.45(6), .46(a). Mr. Hananoki's research, drafting, preparation, and review of the news articles referenced in the CID were done at his home in Maryland, where he performs nearly all of his work for Media Matters. Mr. Hananoki has never traveled to Texas to

---

[2] Articles specifically published on MediaMatters.Org on Monday, November 13, Thursday, November 16, and Friday, November 17 (the "November Articles").

[3] Press Release, Ken Paxton, Attorney General of Texas, Attorney General Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity (Nov. 20, 20223),
https://www.oag.state.tx.us/news/releases/attorney-general-ken-paxton-opens-investigation-media-matters-potential-fraudulent-activity.

JA0206

Office of the Attorney General of Texas
December 12, 2023
Page 3

perform his duties for Media Matters, nor did his preparation of the referenced articles involve communication with any residents, consumers, or businesses located in Texas.

*Second*, the CID demands associational and journalistic materials protected from disclosure by the First Amendment. Demands 1, 2, 4, 5, and 6-12 expressly seek documents which are protected wholesale from disclosure by the First Amendment privilege guaranteed to Media Matters by the U.S. Constitution. Demand 12 in particular, seeks documents sufficient to identify Media Matters's sources of funding, in violation of Media Matters's and its donors' associational rights protected by the First Amendment. As detailed in the attached complaint and motion, Attorney General Paxton has singled out Media Matters in retaliation for its constitutionally protected speech, resulting in an infringement of its rights and work as part of the press. *See* Ex. A at 21-32. This Office's investigation and the CID constitute a First Amendment retaliatory action in violation of Plaintiffs' rights under the First and Fourteenth Amendments of the U.S. Constitution and U.S. Code Section 1983.

*Finally*, the CID seeks expansive, privileged, and objectionable categories of documents and communications, many of which dramatically exceed the scope of the purported underlying issues. Each demand is overly broad and unduly burdensome. Demands 4-5, 7, 10-11 seek the production of large amounts of documents, many of which are protected from disclosure by the attorney-client privilege. Demands 1-5 constitute far-reaching fishing expeditions into Media Matters' possible jurisdictional contacts within Texas, and as stated above, Media Matters does not conduct business activity in Texas. Demands 1-6 are wholly irrelevant to any allegedly "fraudulent activity" engaged in by Media Matters. Additionally, with few exceptions, the CID imposes an unreasonable, burdensome temporal obligation on Media Matters by seeking an ongoing production of documents from January 1, 2022 until an undefined "final date of your production of responsive documents[.]"[4] Demands 2-3, and 12, which seek financial information from Media Matters, are both vague and overbroad.

Because the production of any materials demanded by the CID would require Media Matters to comply with an unconstitutional retaliation and unreasonable request for documents, many of which are privileged, Media Matters objects to the CID in its entirety.

The objections delineated above are illustrative and are not meant to be exhaustive. Media Matters's objections to the CID are based on the information it currently has available. It reserves the right to alter, supplement, or otherwise modify these objections based on the discovery of new or additional circumstances. Nothing in this letter constitutes waiver of any additional objections Media Matters may raise in the future to the CID or to any other investigations or claims brought by this Office or any other Texas official.

---

[4] CID at 2; Demands 2-8, 12.

**JA0207**

Office of the Attorney General of Texas
December 12, 2023
Page 4

Regards,

Abha Khanna
Aria C. Branch
Christopher D. Dodge
Jacob D. Shelly
Elena A. Rodriguez Armenta
Daniela Lorenzo
Omeed Alerasool
**Elias Law Group LLP**

Theodore J. Boutrous, Jr.
Jay P. Srinivasan
Amer S. Ahmed
Anne Champion
**Gibson, Dunn & Crutcher LLP**

*Counsel to Media Matters*

**JA0208**

# Exhibit F

JA0209



## KEN PAXTON
### ATTORNEY GENERAL OF TEXAS

Abha Khanna                                                    December 29, 2023
Elias Law Group LLP
250 Massachusetts Ave. NW
Suite 400
Washington, DC 20001
AKhanna@elias.law

RE: Civil Investigative Demand Issued to Media Matters and Due on December 12, 2023

Ms. Khanna:

I am in receipt of your letter dated December 12, 2023.

As an initial matter, and as your letter acknowledges, Media Matters' responsive materials were due on or before December 12, 2023. Your client had an avenue under the Texas DTPA to seek State judicial intervention within 20 days of receipt of our CID, Tex. Bus. & Com. Code 17.61(g), but did not take it. We are submitting this letter in an effort to reach an out-of-court resolution to CID production and to your objections. You should not, however, confuse our engagement on these issues as a waiver of the State's right to pursue appropriate legal action to enforce this CID, if necessary, in the future. *See e.g. id.* at 17.62.

Even if Media Matters had sought judicial intervention from the CID at issue in this case, such a request would have been unmeritorious. Unlike other pre-suit investigative procedures provided for under Texas law, a CID issued by the Attorney General's Consumer Protection Division is not limited by the Texas Rules of Civil Procedure. *Compare* Tex. Bus. & Com. Code § 17.61(c) *with* Tex. Bus. & Com. Code § 15.10(d)(1). What is more, longstanding precedent in both the State of Texas, and the United States generally, grants Attorneys General broad discretion in the overall breadth and relevance of the materials that may be sought in the course of a pre-suit investigation. Indeed, to resist the Attorney General's investigation, Media Matters would have needed to establish that there were zero permissible justifications for the investigation. *See Lewis v. Younger*, 653 F.2d 1258, 1260 (9th Cir. 1980); *see also F.T.C. v. Ken Roberts Co.*, 276 F.3d 583, 587 (D.C. Cir. 2001).

Furthermore, in spite of your displeasure with the supposed lack of insight that our Office has provided into its confidential investigation,[1] again – unlike other statutory investigative tools – the Consumer Protection Division's only obligation is to "state the general subject matter of the

---
[1] See Tex. Bus. & Com. Code § 17.61(f).

JA0210

investigation," – which given your letter's detailed "background," you have not – and apparently cannot – contest that Media Matters was provided.

Even setting all of this aside for purposes of discussion, however, and even if the Texas Rules of Civil Procedure did apply (they do not), the Texas Rules of Civil Procedure – and the rules of courts throughout the country – uniformly require parties to put meat on the bones of their objections. It is not enough to baldly state that a request is "overly broad," "unduly burdensome," "vague," or "irrelevant." Rather, "a responding party who objects to a request for production because it is overbroad, unduly burdensome, vague, ambiguous, or unreasonably cumulative or duplicative should explain why the discovery request suffers from each asserted deficiency." *In re Park Cities Bank*, 409 S.W.3d 859, 876 (Tex. App. 2013); *In re Alford Chevrolet-Geo*, 997 S.W.2d 173, 181 (Tex. 1999) ("[a] party resisting discovery… cannot simply make conclusory allegations that the requested discovery is unduly burdensome or unnecessarily harassing"). The conclusory nature of your objections, however, appears to be a stonewall that does not enable genuine opportunity for discourse. If we cannot understand the scope of your complaints, it is impossible for us to offer any redlines in satisfaction of those complaints.

Your letter also contends that the Attorney General's Consumer Protection Division is "plainly without jurisdiction to investigate Media Matters." While that may be your position based on your review of the records demanded, this complaint exemplifies the very purpose of a pre-suit investigation: the State of Texas is not bound to accept Media Matters' unvarnished representation that it has not availed itself of this State or otherwise engaged in deceptive and misleading actions relating to Texas businesses and consumers. Indeed, as revealed by you, there is a lawsuit pending in the United States District Court for the Northern District of Texas that alleges *inter alia* that Media Matters intentionally misled and deceived millions of Texans, and created false impressions, confusion, and misunderstandings with respect to the affiliations, associations, and advertising of several major companies, whom transact massive amounts of business in this State, including X Corp. and Austin-based Oracle.

Despite your failure to avail yourself of the DTPA's allowance for State court adjudication of our CID, and without prejudice to our ability to pursue the demanded materials in full, the objective of this letter is to respectfully request that you provide a more thorough explanation of each of your complaints as applied to each specific demand. Our Office has no desire to engage in protracted, unnecessary litigation over the demands in the CID, and is more than willing to engage with you to address any good faith arguments about the First Amendment, privilege, or anything else. For example, if you believe that one of our demands is overbroad, explain the extent and reasoning of your contention, and we will make our best efforts to accommodate your objection. With this information, we can attempt to move forward towards a more efficient resolution.

We request that you provide a response to this letter by January 4, 2024.

JA0211

Sincerely,

Rob Farquharson

Assistant Attorney General
Consumer Protection Division
Office of the Attorney General of Texas

JA0212

# Exhibit G

JA0213



250 Massachusetts Ave NW, Suite 400  |  Washington, DC 20001

January 4, 2024

**VIA ELECTRONIC MAIL AND FEDEX**

Rob Farquharson
Assistant Attorney General
Consumer Protection Division
Office of the Attorney General of Texas
PO Box 12548
Austin, TX 78711-2548
Rob.Farquharson@oag.texas.gov

Re:    **Office of the Attorney General of Texas Civil Investigative Demand: Media Matters for America**

Dear Mr. Farquharson:

We are in receipt of your letter dated December 29, 2023 ("Letter"). While we appreciate your Office's invitation to "attempt to move forward towards a more efficient resolution," Letter at 2, we continue to believe that there is only one appropriate disposition to this matter—termination of your office's investigation in its entirety, including withdrawal of the civil investigative demand ("Demand") served on Media Matters on December 1, 2023. This is the case for at least two reasons.

First, as your letter acknowledges, it is our client's position that your office is plainly without jurisdiction to conduct this investigation of Media Matters, an organization with its principal place of business in Washington, D.C. that does not avail itself of Texas in any relevant respect and that has not availed itself of Texas at all, much less with respect to the facts that apparently gave rise to your investigation. This is not an "unvarnished representation" as your letter claims—your office is now in receipt of three sworn declarations filed in federal court averring to Media Matters's lack of contact with Texas. *See Media Matters for America, et al. v. Paxton*, Case No. 8:23-cv-3363-PX (D. Md.), ECF Nos. 20-2, 20-3, 20-4. A minimal investigation by your office would also reveal that Media Matters is not registered with the Texas Secretary of State to conduct any business in your jurisdiction. To date, your office has not identified a single relevant connection between Media Matters and Texas beyond the unproven (and incorrect) allegations in a lawsuit improperly filed by a private party in the Northern District of Texas that is as jurisdictionally deficient as your investigation. The notion that your office is entitled to *any*

1

**JA0214**

Office of the Attorney General of Texas
January 4, 2023
Page 2

materials, let alone the extraordinarily broad and privileged swathe of materials requested, based on such a paltry showing offends basic principles of fairness and due process.

Second, as your office is also aware, it is our position that Attorney General Paxton's investigation constitutes unlawful retaliation in violation of the First Amendment and numerous other constitutional and statutory rights and privileges held by our clients. *See Media Matters for America, et al. v. Paxton*, Case No. 8:23-cv-3363-PX (D. Md.), ECF No. 1 (Complaint). Your December 29 Letter continues this pattern of imposing extra-jurisdictional threats that operate to chill Media Matters's protected First Amendment activity. For example, your letter contends that the only way to resist the Attorney General's freewheeling investigation would be for Media Matters to show that "there were zero permissible justifications for the investigation"—while conceding that your Office has not provided any explanation of jurisdiction or how Media Matters violated Texas law beyond identifying a "general subject matter" of the investigation. Letter at 1-2. Your Office also claims that Attorney General Paxton has "broad discretion in the overall breadth and relevance" of materials he may seek from Media Matters, apparently without cause or explanation. Letter at 1. We do not agree that the Attorney General may—upon no showing of cause or jurisdiction—engage in an unlawful fishing expedition into our client's privileged and constitutionally-protected materials, or misuse Texas law to retaliate against our clients with a legally baseless Demand that chills their constitutionally-protected speech and activities.

Accordingly, because your investigation and Demand are both lacking in jurisdiction and unlawful under the United States Constitution, your requests are void from the start. But the Demand is further overbroad and burdensome for the reasons set forth in our December 12 response. *See* December 12 Letter Response at 3-4 (providing non-exhaustive list of objections). Any further discussion of those objections, however, is premature. As you are aware, your Office's retaliatory actions form the basis of a lawsuit in the District of Maryland filed by Media Matters and Mr. Eric Hananoki. *See Media Matters for America, et al. v. Paxton*, Case No. 8:23-cv-3363-PX (D. Md.). A hearing in that case on Plaintiffs' motion for a temporary restraining order and preliminary injunction is scheduled for January 8, 2024. *See* ECF No. 24 (scheduling hearing); ECF No. 31 (granting in part Defendant's request for extension). Because Plaintiffs seek to enjoin your investigation, as well as any further enforcement of the Demand, that hearing will determine whether, or to what extent, your investigation may proceed. Given that the hearing is mere days away and the Court has indicated that it intends to rule expeditiously, we do not see any utility in having further substantive discussions about the Demand until all parties receive clarification from the Court about whether the investigation may proceed.

For the avoidance of doubt, Media Matters reasserts the objections in its December 12, 2023 letter to your Office, including the objections made to individual Demands Nos. 1-12 in the CID. *See* December 12 Letter Response at 3-4 (providing non-exhaustive list of objections). And as explained above, Media Matters also reiterates its objection to the Demand (and related investigation) in its entirety due to jurisdictional and legal infirmities described in Media Matters's and Mr. Hananoki's complaint.

Office of the Attorney General of Texas
January 4, 2023
Page 3

Regards,

Abha Khanna
Aria C. Branch
Christopher D. Dodge
Jacob D. Shelly
Elena A. Rodriguez Armenta
Daniela Lorenzo
Omeed Alerasool
**Elias Law Group LLP**

Theodore J. Boutrous, Jr.
Jay P. Srinivasan
Amer S. Ahmed
Anne Champion
**Gibson, Dunn & Crutcher LLP**

*Counsel to Media Matters*

**JA0216**

# Exhibit H

JA0217

```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
 2                        GREENBELT DIVISION


 3   _____
                                         )
 4   MEDIA MATTERS FOR AMERICA, et al.,  )
                                         )
 5        Plaintiffs,                    )
                                         )Docket Number
 6             vs.                       )8:23-cv-03363-PX
                                         )
 7   WARREN KENNETH PAXTON, JR., in his  )
     official capacity as Attorney       )
 8   General of the State of Texas,      )
                                         )
 9        Defendant.                     )
     _____)
10
                       TRANSCRIPT OF TRO HEARING
11             BEFORE THE HONORABLE PAULA XINIS
                 UNITED STATES DISTRICT COURT JUDGE
12             MONDAY, JANUARY 8, 2024, AT 12:30 P.M.


13


14   APPEARANCES:

15   On Behalf of the Plaintiff:

16        ABHA KHANNA, ESQUIRE
          Elias Law Group, LLP
17        1700 Seventh Avenue, Suite 2100
          Seattle, WA  98101
18        (206)656-0177

19        CHRISTOPHER D. DODGE, ESQUIRE
          JOSEPH POSIMATO, ESQUIRE
20        Elias Law Group, LLP
          250 Massachusetts Avenue NW, Suite 400
21        Washington, DC  20001
          (202)987-4928

22


23        ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPED NOTES***


24


25
```

Paula J. Leeper, Federal Official Reporter
United States District Court
6500 Cherrywood Lane, Suite 200
Greenbelt, Maryland 20770

**JA0218**

```
 1   APPEARANCES CONTINUED:

 2   On Behalf of the Defendant:

 3        CHRISTOPHER LAVORATO, ESQUIRE
          Office of the Attorney General, Texas
 4        P.O. Box 12548
          6th Floor
 5        Austin, TX  78711
          (512)463-4380
 6
          GENE SCHAERR, ESQUIRE
 7        KENNETH KLUKOWSKI, ESQUIRE
          Schaerr Jaffe, LLP
 8        1717 K Street NW Suite 900
          Washington, DC  20006
 9        (202)787-1060

10   ALSO PRESENT:  Eric Hananoki

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2        (Court called to order.)
 3        DEPUTY CLERK:  The United States District Court of
 4   Maryland is now in session.  The Honorable Paula Xinis
 5   presiding.
 6        THE COURT:  Good afternoon, everybody.  You all can
 7   have a seat.
 8        Mr. Ulander?
 9        DEPUTY CLERK:  Yes, Your Honor.  The matter pending
10   before the Court is Civil Action Number PX23-3363, Media
11   Matters for America, et al., versus Warren Kenneth Paxton Jr.
12   The matter before this Court is a temporary restraining order
13   hearing.
14        Counsel, please identify yourselves for the record.
15        MS. KHANNA:  Good afternoon, Your Honor.  Abha Khanna
16   on behalf of plaintiffs.
17        With me at counsel table are our named plaintiff,
18   Mr. Hananoki, and as well as counsel Chris Dodge and Joseph
19   Posimato.
20        THE COURT:  Okay.  Good afternoon.  Thank you.
21        MR. SCHAERR:  Good afternoon, Your Honor.  Gene
22   Schaerr; I'm local counsel for the Texas AG's office.  And with
23   me is Mr. Chris Lavorato from the Texas AG's office, and my
24   colleague, Ken Klukowski.
25        THE COURT:  Okay.  Thank you all for being here and
```

1  for putting as much effort into this case as you have so that

2  we can have this hearing today on plaintiff's motion on

3  preliminary injunction and/or temporary restraining order.

4      Let me give you a little preview as to where I am because

5  I've thought long and hard about how to address the issues that

6  have been raised.

7      In response to plaintiff's motion, the defense has not

8  only filed a separate motion, but made the non -- not even

9  getting to the merits argument that there's lack of subject

10 matter, jurisdiction, personal jurisdiction, and I believe even

11 venue, that provisionally they have filed a separate motion

12 which has not yet been formally responded to by the plaintiffs.

13     And my view, provisionally, is that while the complaint

14 viewed in the light most favorable to the plaintiffs, I

15 believe, has jumped the broom on subject matter jurisdiction.

16 I do believe that you have pled enough for this to be ripe

17 constitutionally.

18     I'm stuck on personal jurisdiction.  And I do believe, at

19 least without yet hearing from you all, that the plaintiff has

20 not sufficiently pled personal jurisdiction.  But we can talk

21 about that.

22     What I would like to do today is really focus on that,

23 because I don't believe it's proper -- unless I make a

24 determination on personal jurisdiction in the plaintiff's

25 favor, I don't think it's proper to get into the merits at all.

1   And I know there has been some background conversation about

2   who will be called for whom as witnesses on the motion.  And I

3   do think that those conversations are important if I get to the

4   merits.  But before that, I think a proper treatment of

5   personal jurisdiction must be had.

6        So that's where I am.  And I would like to hear from you

7   all first on the defense's position that personal jurisdiction

8   in this forum is lacking.

9        Given that it is the defense's position, I know it's not

10  their motion, but since it's their position, I think we ought

11  to hear from them first, and then I'll turn to the plaintiff.

12          **MR. LAVORATO:**  Thank you, Your Honor.  Chris

13  Lavorato, again, from the Texas Attorney General's Office.

14       Your Honor, we agree that there is no personal

15  jurisdiction here.  And I do have some slides that I was going

16  to put up on the screen, if possible, that I can kind of walk

17  through this process with you in terms of talking about this

18  issue.

19       First of all, there's -- there's two separate and

20  distinct --

21          **THE COURT:**  We're in specific -- we're in -- we're in

22  did -- did you purposefully avail yourself of this

23  jurisdiction?  Not by coincidentally caused some injury --

24          **MR. LAVORATO:**  Right.

25          **THE COURT:**  -- or even negligently caused some

**JA0222**

 1  injury, but did you bring yourself into this forum?

 2          **MR. LAVORATO:**  Exactly.

 3          **THE COURT:**  That's where we are, right?

 4          **MR. LAVORATO:**  Yes, Your Honor, that's exactly where

 5  we're at.

 6      And I'm going to cite cases that actually the plaintiff

 7  cited within their brief.  They cite Carefirst, which is a case

 8  that it's 126 F.3d 625, it reaffirmed the ESAB case on the

 9  matter of personal jurisdiction.

10      And that particular case cites a U.S. Supreme Court case,

11  which basically says that some act by which the defendant

12  purposefully avails itself of the privilege of conducting

13  activities within the forum state, and thus invoking the

14  benefits of that particular state, it rises to the level of

15  where the defendant must actively seek and target the forum

16  state.

17      The facts in this particular case, Your Honor, are that,

18  number one, the CID, the civil investigation demand, was

19  directed as Media Matters, which is a Washington D -- it's a

20  District of Columbia corporation.  It has nothing to do with

21  Maryland.

22      It was served on Media Matters in the District of

23  Columbia.

24      The plaintiff in this case, Mr. Hananoki, is not a

25  plaintiff that we served with the CID.  They brought this

1  person in and --

2  **THE COURT:**  Well, you referenced the article and the

3  materials surrounding --

4  **MR. LAVORATO:**  Correct.

5  **THE COURT:**  -- at least one, maybe more, of

6  Mr. Hananoki's articles as a subject of interest for which you

7  wanted responsive documents?

8  **MR. LAVORATO:**  That's true.  There are two requests

9  in the CID.  There's 12 total, but there's two that mention his

10  name.

11  And we came to that conclusion, obviously, because it was

12  publicized that it was Mr. Hananoki that -- that wrote that

13  article or published that article.

14  Other than that, though, Your Honor, there is no --

15  absolutely no nexus with regard to the Texas attorney general's

16  direction of activities towards this particular state.

17  **THE COURT:**  And I'll give both sides an opportunity

18  to tell me this, but is there anything in the record currently

19  which suggests the attorney general had any contemporaneous

20  knowledge, even, that Mr. Hananoki lived or worked in Maryland?

21  **MR. LAVORATO:**  None, Your Honor.

22  **THE COURT:**  I didn't find any, but I -- again, I want

23  to hear from the plaintiff, but I didn't see anything.

24  **MR. LAVORATO:**  The first time that the Texas attorney

25  general learned of Mr. Hananoki was in connection with that

1    particular article.

2        And as a matter of fact, the first time a CID had ever

3    been served on Media Matters, as everybody here knows, is this

4    particular one.  Okay?

5        So there's absolutely no connection, no direct aim at the

6    state of Maryland.

7        And it's a pretty simple analysis with regard to what the

8    current case law is all the way up to the Supreme Court of the

9    United States.

10       **THE COURT:**  What -- what about *Calder?*  What if the

11   plaintiff gets up and says, well, *Calder* stands for this

12   proposition, that it's the effects -- you know, it's the

13   effects test.  And that the effect of this subpoena is to

14   essentially direct your aim at a reporter who lives and works

15   in Maryland?

16       **MR. LAVORATO:**  Well, anybody can say that, though,

17   Your Honor.  Anybody could make that particular argument that

18   because this has been directed at Media Matters, and I have

19   some relationship to Media Matters that I'm affected, and,

20   therefore, there's personal jurisdiction, that -- that --

21       **THE COURT:**  There's no limiting --

22       **MR. LAVORATO:**  There's no limiting.

23       **THE COURT:**  Yeah.

24       **MR. LAVORATO:**  It's as simple as that, Your Honor,

25   and that's where we're at.

```
 1              THE COURT:  All right.  Well, then let me turn to the

 2     plaintiff --

 3              MR. LAVORATO:  Sure.

 4              THE COURT:  -- and see what they have to say.

 5              MR. LAVORATO:  Sure.

 6              MS. KHANNA:  If you don't mind, Your Honor, I'll

 7     stand at the podium.

 8              THE COURT:  Sure, wherever you're comfortable.

 9              MS. KHANNA:  Can you take down the --

10          Thank you, Your Honor.  I appreciate your candor in

11     letting us know what is the -- what you're most interested in,

12     and want to make sure I address any concerns that the Court has

13     when it comes to personal jurisdiction.

14          I want to rest -- this Court to rest assured that this

15     Court sitting in this district has jurisdiction to hear this

16     case.

17          Mr. Paxton's CID directly targets both the past and the

18     ongoing Maryland-based activities, a Maryland resident.

19              THE COURT:  What evidence is there that Mr. Paxton

20     knew -- the attorney general knew that Mr. Hananoki was doing

21     any work in Maryland?

22              MS. KHANNA:  Well, I think it's telling, Your Honor,

23     that at no point in their papers have they asserted that they

24     did not know where Mr. Hananoki lived.

25              THE COURT:  But it's your burden.  I have to look at
```

1   the complaint in the light most favorable to you and find some

2   evidence of purposeful availment.  I mean, every case is clear.

3   There has to be something more than just fortuity, or finding

4   out later, and so where is it?

5          **MS. KHANNA:**  Certainly, Your Honor.

6      And the -- the -- whether they have shown us, or we know

7   exactly what was in their minds and what they knew of

8   Mr. Hananoki's residence, they knew that Mr. Hananoki was the

9   target of the investigation; they knew that Mr. Hananoki was

10  the source of the investigation to begin with --

11         **THE COURT:**  Frankly, you know, to be fair, the --

12  what you attach to the complaint, the actual CID has nine or

13  ten subject areas, right?  And the lion's share of them have to

14  do with Media Matters.  And we can go through them together,

15  but they have to do with the structure and the -- you know, I

16  can't remember the exact words, but I recall that there were

17  two of the nine that had to do with the articles that

18  Mr. Hananoki wrote.

19     Am I right about that?

20         **MS. KHANNA:**  Well, there were two of the nine that

21  specifically mentioned Mr. Hananoki by name.

22         **THE COURT:**  Okay.

23         **MS. KHANNA:**  But there were more of -- I think it's

24  12, actually, and we can walk through them --

25         **THE COURT:**  Sure.

1    **MS. KHANNA:**  -- but there were more of them that

2    actually hinged specifically on Mr. Hananoki's beat.  So when

3    it's seeking articles and information and documents related to

4    coverage of X more generally, coverage of its CEO, that is

5    Mr. Hananoki's beat, as alleged in our complaint and provided

6    undisputed here.

7        Mr. Hananoki -- I think Media Matters has published some,

8    what, 12 or 14 articles since February of this year

9    specifically on the Twitter -- the X platform, and since --

10   **THE COURT:**  Is there any facts in the CID or anywhere

11   in your complaint, again, that even though this is

12   Mr. Hananoki's beat, that the attorney general knew he plied

13   his trade in Maryland?  Like, he wrote in Maryland?  He created

14   these -- that's your position in the complaint, I believe, and

15   in the papers.  But, again, where is it that the AG knew?

16   **MS. KHANNA:**  So the purposeful availment is had here,

17   Your Honor, when they -- when the attorney general of Texas --

18   first of all, the fact that the attorney general of Texas

19   decided to shoot first and ask questions later not knowing --

20   **THE COURT:**  Well, even using your terms, in D.C.;

21   served it in D.C., served on your CEO, served it only as to

22   Media Matters, didn't serve it on Mr. Hananoki personally,

23   so --

24   **MS. KHANNA:**  Based solely on an article --

25   **THE COURT:**  Yeah.

**JA0228**

1          **MS. KHANNA:**  -- that Mr. Hananoki researched, wrote,

2    and published in Maryland, documents based in Maryland, and the

3    chill felt in Maryland.

4          **THE COURT:**  Is there any public record -- any public

5    record -- if I go and read this article, is it going to say in

6    Mr. Hananoki's byline that he's a resident of Maryland?

7          **MS. KHANNA:**  Not in the byline, Your Honor.  But, of

8    course, the state attorney general of Texas has the full

9    investigative power at his fingertips to find out where is his

10   action -- where are his actions going to be felt.  He does not

11   get to show up basically at our client's front door to cause

12   ongoing injury and then say, "Whoopsie, I didn't know," or that

13   "I couldn't possibly have known," particularly where the --

14         **THE COURT:**  But that's not the test.  The test -- you

15   know, the focus here -- and I got to tell you, your reply spent

16   maybe a paragraph on this.  It was like the tail wagging the

17   dog.  It was at the end of the reply as if, you know, these are

18   not threshold issues, so that's one.

19        And, two, listen, constitutional principles are equally

20   important, right?  Whether it's -- and I'm not -- I'm not --

21   please don't take my questions as somehow giving short shrift

22   to the First Amendment.  If this case, in my view, in the end,

23   is properly here, we will be talking about the merits, right?

24   But there's another animating constitutional principle, and

25   that's due process.

1    And the focus of the due process analysis in personal

2  jurisdiction is about whether the defendant should be hailed

3  into another state's forum, a foreign defendant.

4    And the Court, the high court, Fourth Circuit, spent a

5  long -- you know, fought long and hard about that line between

6  actions that a defendant takes, which happened to cause injury,

7  and actions which a defendant takes that allows this court to

8  exercise jurisdiction over that defendant.

9    And, again, on the face of the complaint, I haven't really

10  heard that I should be looking much further than the complaint

11  and the attachments, I -- I want to know what evidence there

12  is -- is your argument -- let me ask you this:

13    Is your argument a should-have-known?  Is it, you know,

14  attorney general surveying a CID of this nature should have

15  known he would be reaching into the state of Maryland when

16  doing so?

17         **MS. KHANNA:**  I believe -- yes, Your Honor.  And I

18  believe that he reasonably knew he was reaching well outside

19  his jurisdiction when he was -- sounds to me like we all agree

20  that the service of the demand in D.C. is somehow -- is

21  sufficient enough to invoke the powers of D.C.

22         **THE COURT:**  Right.  I mean, I don't think there's --

23  I don't know why you didn't bring it there, but that's for you

24  to decide, and I guess we'll talk about that in the future, but

25  you know.

**JA0230**

1          **MS. KHANNA:**  Well, certainly if this court believes

2     that the proper action is to transfer venue or to transfer to

3     the D.C. court, I don't -- that -- that -- I understand the

4     Court's position.

5          But I think specifically here when it comes to the

6     jurisdiction of Maryland, it is reasonable for when Ken Paxton,

7     as the state attorney general, whose investigative power, he's

8     enforcing, he's invoking, to understand that when he's

9     targeting a D.C.-based company and its writers, and

10    specifically one journalist in particular, that the people who

11    live and work in the D.C. metropolitan area would be most

12    affected.

13         So it would include not just the location right at the

14    headquarters, but the -- but the people who live and work in

15    that area.

16         And so I don't think that Maryland is beyond the pale --

17         **THE COURT:**  So is it your position to say that, you

18    know, Mr. Hananoki wrote some of this article on a Starbucks in

19    Virginia, now the attorney general can be sued in Maryland,

20    Virginia and D.C.?

21         **MS. KHANNA:**  No, Your Honor, and that's because the

22    locus of the activities here are sufficient.

23         The ties are sufficient, where it's just not that he

24    happened to be sitting in a Starbucks in a state, it is the

25    place where he resides, it is the place where he is authorized

1   to work.  It is the place where all the documents they are

2   seeking in their demand are located.

3         **THE COURT:**  But they knew none of that.  I mean,

4   there's no evidence that they knew any of that when they served

5   it on Media Matters, unless there's something I'm missing.

6         **MS. KHANNA:**  No.  And to your point, Your Honor, I do

7   believe there's a reasonableness standard when it comes to the

8   attorney general executive authority to know who is he -- who

9   is he targeting when he's targeting -- when he's just shooting

10  out these investigations along state lines.

11        **THE COURT:**  But I have found no case.  I mean, you've

12  cited me a number of cases.  I think it was Twitter didn't

13  really even get into the analysis.  So I can't -- I mean, that

14  district court opinion barely scratched the surface of personal

15  jurisdiction.

16        **MS. KHANNA:**  Twitter did cite *Calder*, Your Honor,

17  and --

18        **THE COURT:**  I'm sorry?

19        **MS. KHANNA:**  It did cite the *Calder* case.

20        **THE COURT:**  Right, but there have been so much --

21  there's been such development in the Fourth Circuit, and I

22  would say the Supreme Court, about *Calder* having been limited,

23  to some degree, to its facts, and its facts are very different

24  than this one.  I mean, there was at least a factual predicate

25  for a more specific targeting, right, of the Enquirer, looking

**JA0232**

1  at this actress who everybody knows is a California based

2  actress, that's where she makes her money, that's where she

3  plies her trade, and the Enquirer really targeting that.  I

4  accept those facts as true.

5      I don't think we have the same here.  And it seems like a

6  lot of your argument is resting on this is an attorney general

7  conducting an investigation, and that's a pretty big shot.

8      So is there some other case that pushes the bounds as far

9  as you have of personal jurisdiction?  Because the other ones

10  really, you know, really their AG had gone into the forum and

11  went to a meeting, or the -- the subpoena itself was served on

12  the defendant -- on the -- on the plaintiff corporation in the

13  locale -- in the forum in which the fight about personal

14  jurisdiction occurred.  Like, I'm just looking for some sort of

15  parallel.

16      **MS. KHANNA:**  And I understand, Your Honor.  Let me be

17  very clear about the actual -- for one second, let's talk about

18  the effects, the *Calder*-based effects.

19      **THE COURT:**  Okay.

20      **MS. KHANNA:**  There's no question and there's no

21  reason to dispute that Mr. Hananoki lives in Maryland; that he

22  works in Maryland; that he wrote the article that instigated

23  this entire demand in Maryland; that all of his documents

24  related to that article and the related to the CID in general

25  are in Maryland; and that the chill that he's currently

experiencing as a result of this case and as a result of the
demand is happening ongoing currently in Maryland.  So to be
sure, the effects are being felt in Maryland, and I believe
that all of the case law recognizes those as ties.

What Your Honor has mentioned is about whether or not the
CID was specifically served in Maryland.  You're correct, it
was not.  It was served at his employer's headquarters in D.C.

**THE COURT:**  It was directed to Media Matters.

**MS. KHANNA:**  And it was directed at Media Matters --
directed at Media Matters by name while mentioning Mr. Hananoki
by name.

**THE COURT:**  Right, but the responder, the respondent
is going to be Media Matters.  And you can have -- I mean
there's all kinds of, you know, intricacies of this CID where
you can raise whether your employee or your agent has
responsive documents, whether you have them, if they are in
your possession, custody, or control.

But the -- but the bright line is that it is Media
Matters' obligation to respond, not Mr. Hananoki directly,
right?

**MS. KHANNA:**  Their obligation to respond -- they can
guarantee a response but they have no possession or control
over Mr. Hananoki's work, internal documents, research.

**THE COURT:**  Who is "they"?

**MS. KHANNA:**  Media Matters.

```
 1                THE COURT:  Right.  That's my point.

 2                MS. KHANNA:  Right.

 3                THE COURT:  But your Media Matters is the plaintiff

 4    who has to respond to the CID, not Mr. Hananoki.  And so if

 5    your response to the CID is we don't have it, Mr. Hananoki has

 6    it, now the AG has to decide do they serve Mr. Hananoki with a

 7    CID.

 8        They haven't done that yet.  We're not at that stage.  If

 9    we were there, this would be a different conversation.

10                MS. KHANNA:  Yes, Your Honor.  And I understand the

11    concern.  I want to be very clear that the -- when our clients

12    read the demand --

13                THE COURT:  Yep.

14                MS. KHANNA:  -- they read Mr. Hananoki's work,

15    Mr. Hananoki's notes, Mr. Hananoki's articles as being the

16    subject of the demand, and it is Mr. Hananoki in conjunction

17    with Media Matters, generally, who is chilled.

18        I understand Your Honor's concern about what did they

19    know, or what should they have known or what could if they have

20    known.  And I hear what you're saying is it enough that they

21    probably should have known as the state investigatory arm,

22    before, you know, issuing a demand, or announcing in a press

23    release minutes after the Twitter lawsuit?  After the Elon Musk

24    lawsuit?  Should they have known?  Should they have

25    investigated?  Who they are actually affecting and where they
```

```
 1   are affecting it?  Yes, I do believe that's true.
 2        I also think, Your Honor, while it is our burden to
 3   establish that this Court has Article III jurisdiction, where
 4   the defendant has raised a personal jurisdiction defense and
 5   has not asserted, in many assertions, that they have -- that
 6   they did not know where Mr. Hananoki was located, that they
 7   have forfeited that argument here as basis for --
 8        THE COURT:  Why?  Why?  I'm looking at a facial
 9   complaint.  I'm looking at the complaint -- a complaint, and I
10   have to take all facts in the light most favorable to you and
11   decide whether there is personal jurisdiction.  Why don't we
12   just say it that way.
13        I don't see any forfeiture or waiver of any argument or
14   claim.  Okay?
15        Maybe I had inartfully said it was your burden.  What I
16   mean by that is I'm looking at it as the four corners of the
17   complaint and all the attachments.  That's where I'm living.
18   Is that wrong?
19        MS. KHANNA:  No, Your Honor, I do believe -- that's
20   not wrong, of course.
21        But where the defendant has raised a personal jurisdiction
22   defense saying, well, you know, we've not done this -- this is
23   a factual question, right, that they are raising?  I believe
24   where they have asserted many things, they have not asserted
25   lack of knowledge for Mr. Hananoki.  And that's for good
```

1   reason.  And that probably is because they probably did know.

2        And I will just say, Your Honor, I just got a note --

3        **THE COURT:**  I don't know about that.  I believe their

4   response covers this because it's logical.

5        I mean, this was a very -- I agree with Mr. Lavorato, this

6   is a really straightforward argument.  This is not counting

7   angels on the head of a hypothetical pin.  I mean, this is what

8   in the complaint makes it even plausible that there was

9   purposeful availment of this court?  Not just of a person who

10  happened to live here who maybe worked on the article when the

11  CID was issued in D.C., but purposeful availment of the forum.

12       I mean, at best you're giving me some circumstantial

13  evidence of you knew Mr. Hananoki was involved.  But I don't

14  have anything that raises the AG knew where Mr. Hananoki

15  worked, lived to make this purposeful availment of this forum

16  plausible.

17       **MS. KHANNA:**  And with respect, Your Honor, I don't

18  believe that they have made an exact claim that they did not

19  know in their papers.  And I believe that's for good reason.

20       As my counsel just pointed out to me, in the Musk

21  complaint itself, which is incorporated into our complaint, in

22  Paragraph 17 --

23       **THE COURT:**  You incorporated a complaint into a

24  complaint?

25       **MS. KHANNA:**  The lawsuit, basically, which formed

**JA0237**

1  the --

2       **THE COURT:**  Not the lawsuit.  You don't expect me to

3  go back and take all of those facts alleged by -- how am I

4  supposed to do that?

5       **MS. KHANNA:**  You don't have to take as true any of

6  the facts alleged in the complaint to know that Mr. Paxton was

7  basing his entire demand and basing his entire investigation

8  based solely on Musk's lawsuit against my clients.  And that

9  specific lawsuit identifies Mr. Hananoki as a Maryland-based

10  reporter in Paragraph 17 of that complaint.

11       **THE COURT:**  I'm not sure that I can go that far.

12  There is a complaint in Texas that identifies Media Matters and

13  Mr. Hananoki as a Maryland-based reporter.

14       **MS. KHANNA:**  There's not just a complaint in Texas,

15  there's the complaint that instigated this investigation by the

16  attorney general.

17       **THE COURT:**  And I'm not sure you made that argument

18  in your one-paragraph reply on personal jurisdiction.

19       **MS. KHANNA:**  And, Your Honor, with respect, I do not

20  believe that the attorney general made the argument that they

21  did not know where Mr. Hananoki resides for good reason, and

22  think that's because they did.  Because Mr. Musk certainly

23  knew.  And all of their information, and all of their basis for

24  bringing this investigation is because of Mr. Musk's lawsuit.

25       **THE COURT:**  Okay.  Well, then, let's go to -- give me

1  a minute, since this seems to be a cornerstone of your

2  argument, give me a minute to look at their response.

3       And the response is at -- 33, thank you.

4            **MR. SCHAERR:**  I believe it starts at Page 14, Your

5  Honor.

6            **THE COURT:**  Yes, I'm there.

7       So then, I guess, Mr. Lavorato, you would agree with the

8  plaintiff that you didn't raise the argument, that you didn't

9  know Mr. Hananoki lived in Maryland?

10           **MR. LAVORATO:**  Your Honor, my argument is more

11 centered around the issue of -- that they have the burden.

12 They have the burden to show that there's personal

13 jurisdiction.

14      So whether or not the Texas attorney general has to

15 specifically state, "I didn't know," or "I don't know where

16 Mr. Hananoki lives" wouldn't be a requirement under the law.

17      You know --

18           **THE COURT:**  Are you saying kind of like the fact of

19 the matter is, you directed your investigation to Media Matters

20 in D.C. --

21           **MR. LAVORATO:**  Absolutely.

22           **THE COURT:**  -- is sort of where it begins and ends?

23           **MR. LAVORATO:**  Or else we would have served

24 Mr. Hananoki.

25           **MS. KHANNA:**  And, Your Honor, where this case begins

**JA0239**

1   and ends is at the service of a demand in D.C., invokes for

2   jurisdiction in D.C., and if that's what Paxton's counsel is

3   saying today, we can understand that.  We would certainly

4   understand if this Court saw fit to move it to D.C. or if we

5   had to refile in D.C.

6          **THE COURT:**  I mean, that's where -- frankly, I just

7   think if you want a resolution that is fast and fair to both

8   sides, you would move it to D.C.  You would either authorize

9   that I transfer for lack of personal jurisdiction, with an

10  agreement from both sides that personal jurisdiction exists in

11  D.C., that way you're in the right forum.  That would probably

12  be the fastest way.  Or you can brief it.

13         **MR. LAVORATO:**  You want me to respond?

14         **THE COURT:**  Yeah.

15         **MS. KHANNA:**  Your Honor --

16         **THE COURT:**  I mean, it sounds like the plaintiff is

17  saying, if that's where we are, that would be the most --

18  because there's no disagreement, plaintiff, that personal

19  jurisdiction exists in D.C.

20         **MS. KHANNA:**  There's no disagreement that we have two

21  clients here, Media Matters based in D.C., Mr. Hananoki based

22  in Maryland.  We do believe that there is appropriate

23  jurisdiction here, but if that's not where the Court is

24  inclined to go, we have no objection to transferring it to D.C.

25  Certainly -- certainly the Court there has personal

 1   jurisdiction as well.

 2          **THE COURT:**  And then you can fight about whether

 3   there's -- you know, if there's -- I don't think there's a

 4   venue question.

 5       But in any event, let me see what Mr. Lavorato says.

 6          **MR. LAVORATO:**  My response to that, Your Honor, would

 7   be that that particular issue, in terms of moving it to

 8   Washington D.C., is something that needs to be briefed.

 9          **THE COURT:**  Well, let me ask you a straight question,

10   then.

11          **MR. LAVORATO:**  Sure.

12          **THE COURT:**  Did you not argue that there is -- I

13   mean, didn't you -- I thought in your pleadings that you

14   referenced that there is personal jurisdiction in D.C.

15          **MR. LAVORATO:**  I don't think we went as far as to say

16   there is personal jurisdiction in Washington D.C. and that Ken

17   Paxton is accepting that notion.

18       I think that had they --

19          **THE COURT:**  The other thing that they could do,

20   correct, is dismiss this case and refile immediately in D.C.

21   There wouldn't be any -- right?

22          **MR. LAVORATO:**  Sure, they could do that.

23          **THE COURT:**  I mean --

24          **MR. LAVORATO:**  There's certainly not jurisdiction

25   here.

1            **THE COURT:**  Well, I guess -- I guess coming to any

2    agreement is going to be a tall order, but it -- that will be a

3    question, I guess, for you, plaintiff, is if you don't have an

4    agreement that transfer is appropriate to D.C., I think where

5    I'm left with this, is in fairness to you, because it does

6    sound like you would want to persist in arguments, and perhaps

7    even additional evidence, you know -- I understand that this

8    came in as a response to your PI.  One thing I can do is deny

9    the motion for TRO PI without prejudice.

10       I'm not reaching the merits.  It's not proper because I

11   really have a personal jurisdiction concern.  And then allow

12   you an opportunity to brief it more fully, the personal

13   jurisdiction question.

14       If it stays here, then I get those briefs.  I consider

15   them with a more careful eye because it's a threshold question,

16   and I decide.

17       And if I decide in your favor, then we can move to the

18   next step.  If I don't, then there is -- it's dismissed, the

19   whole case is dismissed, and we're done, right?

20       And in the interim, if you-all decide that you would just

21   prefer to file it in D.C., then I would imagine you can do

22   that.  But that seems to be the most equitable way of hashing

23   out this very important personal jurisdiction question.

24       Thoughts on that?

25            **MR. LAVORATO:**  Your Honor, I'm not going to disagree

1   with that suggestion.  I think it's appropriate.  I think it's

2   reasonable.

3      And so from our position on that particular suggestion

4   that you just made, I don't have an objection to that.

5         **MS. KHANNA:**  And I don't want to say I don't have an

6   objection to dismissal of our motion for TR -- dismissal of our

7   complaint or for denial of a motion for TR --

8         **THE COURT:**  I can also table it, too, but that seems

9   to be -- I want the record to be clear that the reason why I'm

10  tabling it is because I -- I do not believe it's appropriate to

11  hear facts on the merits without nailing down the personal

12  jurisdiction question.

13        **MS. KHANNA:**  Absolutely, Your Honor.  And I

14  appreciate that concern.  I appreciate the effort to achieve a

15  fair resolution.

16     Like I said, we do not object to jurisdiction in D.C.

17  where we think it is certainly where our client's remained

18  chilled is there as well.

19        **THE COURT:**  Yeah.

20        **MS. KHANNA:**  And I believe that the defendant's

21  arguments in their papers and today all but concede that

22  there's jurisdiction in D.C.  I understand they are not willing

23  to do that on the record today, the same way that I can't

24  concede that we should dismiss this complaint altogether.

25        **THE COURT:**  Yeah, sure.

          **MS. KHANNA:**  I do understand that if this Court does
not believe it has the authority to exercise jurisdiction, of
this case in this circuit, we can refile, as needed, to go into
D.C.

          **THE COURT:**  And I appreciate that.

     So where I am with that, is I don't -- I also don't
believe it's appropriate to reach a final conclusion about
personal jurisdiction when the posture of the case is a motion
for temporary restraining order or preliminary injunction.

     For me to then reach beyond that and say I'm going to
finally decide the question of jurisdiction seems not prudent
because that motion is not right.

     If I understand the docket as it is, the defendant moved
to dismiss on, I think, three grounds:  Subject matter,
personal jurisdiction, and venue.  And did so in a motion out
of abundance of caution, but raised the same arguments as a
defense to the PI.

     My suggestion would be on the question of personal
jurisdiction, we have supplemental briefing.  And we can do
it -- the way I would suggest we do it, although I'll hear you
on it, is defendant goes first, since it's your motion.  Make
sure you have tagged all your bases; plaintiff responds;
defendant replies; and then I'll decide it.

     I will turn to it as quickly as I can.  And then if I --
if I find there's personal jurisdiction, we'll reach -- and I

1    can just table the PI, we'll reach it.

2        Does that make sense to you, Ms. Khanna?

3             **MS. KHANNA:**  Give me one moment to confer with my --

4             **THE COURT:**  Sure, of course.

5             **MR. LAVORATO:**  Your Honor, while they are conferring,

6    it makes sense to us, so we're in agreement with what you just

7    suggested.

8             **MS. KHANNA:**  The plaintiffs are amenable to that

9    resolution, Your Honor.  Thank you.

10           **THE COURT:**  Okay.  All right.  Then let's do this.

11       Defendants, unless you want a shorter time line, let's do

12   two weeks, two weeks, two weeks.

13            **MR. LAVORATO:**  That's fine.

14           **THE COURT:**  I don't think we need to -- you tell me,

15   though.  I would prefer to focus on the question of personal

16   jurisdiction than for you to brief all three grounds.

17       But that understanding, that's with the understanding that

18   if I deny your motion, we will move to the merits of the PI,

19   and we will also have -- well, what I'm trying to figure out,

20   frankly, is maybe -- maybe this is the best way to put it.

21       You all, again, give me your feedback on this.

22       I defer on the PI.  Your -- you're supplementing your

23   motion to dismiss, all grounds, right?

24            **MS. KHANNA:**  Yes.

25            **THE COURT:**  So that we're at the motion to dismiss

**JA0245**

1  stage.

2        **MR. LAVORATO:**  Correct.

3        **THE COURT:**  Plaintiff will respond, you will reply,

4  and I'll reach that motion as quickly as possible.

5        If I deny it, then we're moving on, you're answering the

6  complaint, and we're hearing the merits of the PI.

7        If I grant it, then you're going to another forum most

8  likely.

9        Does that make sense to both sides, just to keep it

10  streamlined?

11        **MR. LAVORATO:**  It does to us.

12        **MS. KHANNA:**  Yes, Your Honor.  Except the only thing

13  we would request is that the two weeks, two weeks, two weeks

14  you mention as the briefing schedule, if the defendant is only

15  going to be briefing the personal jurisdiction aspect of it, of

16  the motion to dismiss, we have, on defendant's request, agreed

17  to an extension of the -- their answer, their motion to dismiss

18  pending resolution -- knowing that we were going to be having

19  this hearing.

20        **THE COURT:**  Right.

21        **MS. KHANNA:**  So I -- I would request that the Court

22  shorten the time for filing -- for defendants to file that

23  motion that's focused solely on personal jurisdiction so that

24  we can speed up --

25        **THE COURT:**  And that's where I think maybe it's hard

 1  for all of us, not just -- everybody to talk in here at the

 2  same time.

 3       What I was -- I was revisiting that thought.

 4          **MS. KHANNA:**  I'm sorry.

 5          **THE COURT:**  Because I'm concerned about doing the

 6  grounds for dismissal piecemeal.

 7          **MS. KHANNA:**  I see.

 8          **THE COURT:**  So the -- the defense, in their motion,

 9  just -- it was like a one- or two-pager, right?  Said motion to

10  dismiss for subject matter, personal jurisdiction, venue.

11       My suggestion is that these pleadings address all of them.

12          **MS. KHANNA:**  Uh-huh.

13          **THE COURT:**  Because I think if I were a betting

14  person, I'm going to find subject matter jurisdiction.

15       If you convince me on personal jurisdiction, then it will

16  likely stay here, and so let's have all the jurisdictional

17  grounds briefed.

18          **MS. KHANNA:**  And I guess I would say just given the

19  extent of the briefing thus far on all of these issues, I think

20  that if the Court were willing to expedite that schedule a

21  little more so that we're not waiting, what, six weeks in order

22  to get those initial issues resolved, I think that would --

23  plaintiffs would request that we -- I don't think another two

24  weeks to brief issues that are partially, at least, been

25  briefed thus far require it.

 1        If I were a betting person, I might say that the

 2   defendants will have a hard time saying they didn't know where

 3   Mr. Hananoki resided.

 4             **THE COURT:**  Well, but that may not be -- that may be

 5   my inartful question.  I mean, I agree with the law, which is

 6   the thrust of this has to be purposeful availment of the

 7   jurisdiction.  Knowledge may be one aspect of it.  That was an

 8   illustrative way of my saying this seems very -- no more than

 9   fortuitous, at least at its current iteration.  And that if I

10   were to find personal jurisdiction here, there's also no real

11   limiting principle to how far a defendant can be hauled into a

12   foreign forum.

13             **MS. KHANNA:**  Understood, Your Honor.

14             **THE COURT:**  In any event, you're asking for a

15   shortened briefing schedule.

16             **MS. KHANNA:**  Absolutely.

17             **THE COURT:**  Mr. Lavorato, you already have tread this

18   ground, it seems like it's going to be on -- we're not

19   expanding the record.  It is what it is, so --

20             **MR. LAVORATO:**  Your Honor, I don't think the two

21   weeks, two weeks, two weeks is unreasonable.  I think it's

22   pretty quick turnaround in and of itself.  We've just -- all of

23   us have just gone through the holidays doing a lot of this.

24   And, you know, everybody has worked hard.

25        But two weeks, two weeks, two weeks seems to be pretty

1    reasonable.

2              THE COURT:  Let's do two weeks, two weeks, one week.

3              MR. LAVORATO:  Fine.

4              THE COURT:  Because by that point, it's a reply.  And

5    I want it to really be a reply, not a rehashing of all the

6    arguments.

7              MR. LAVORATO:  We're okay with that.

8              THE COURT:  Okay.  So let's do that.

9              MS. KHANNA:  Thank you, Your Honor.

10             THE COURT:  In the interim, you can decide your --

11             MS. KHANNA:  Our next step.

12             THE COURT:  -- stakes and going elsewhere, but that

13   will give everybody really enough time to handle what, in my

14   view, is -- it's a fundamental constitutional question.  It's

15   not -- it's not merely procedural.  It really does matter in

16   that regard, and I just want to get it right.

17        So let's do two weeks, two weeks, one week.

18             MS. KHANNA:  I appreciate that, Your Honor.  Thank

19   you, Your Honor.

20             THE COURT:  I will memorialize this in just a short

21   letter order so that everyone is on the same page, and you have

22   the briefing schedule.  And the order will read that for the

23   reasons discussed during today's hearing, I'm going to defer on

24   the pending motion for preliminary injunction.  I'm going to

25   permit supplemental briefing on the defendant's motion to

```
 1    dismiss at whatever ECF number that is, and I'll set out the

 2    schedule.  And as soon as we get it all together, we'll do our

 3    best to turn to it and get you a decision.  Okay?

 4               MS. KHANNA:  Thank you, Your Honor.

 5               MR. LAVORATO:  Thank you, Your Honor.

 6               THE COURT:  Okay.  Thank you all for your time.  I

 7    really appreciate it.

 8               DEPUTY CLERK:  All rise.  This Honorable Court now

 9    stands adjourned.

10         (Court adjourned at 1:06 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4        I, Paula J. Leeper, Federal Official Court Reporter, in

 5   and for the United States District Court for the District of

 6   Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that

 7   the foregoing is a true and correct transcript of the

 8   stenographically-reported proceedings held in the

 9   above-entitled matter and the transcript page format is in

10   conformance with the regulations of the Judicial Conference of

11   the United States.

12

13                           Dated this 9th day of January 2024.

14

15                           /S/ Paula J. Leeper
                             _____
16
                             Paula J. Leeper
17                           Federal Official Reporter

18

19

20

21

22

23

24

25
```

JA0251

| | | |
|---|---|---|
| **DEPUTY CLERK:** [3] | **all** [35] | **Calder-based** [1]  16/18 |
| **MR. LAVORATO:** [31]  5/12 5/24 6/2 6/4 7/4 7/8 7/21 7/24 8/16 8/22 8/24 9/3 9/5 22/10 22/21 22/23 23/12 23/21 29/2 29/11 31/20 32/3 32/7 33/5 | **allow** [1]  20/14 | **called** [2]  29/20 27/16 |
| | **allows** [1]  13/7 | **came** [2]  7/11 25/8 |
| | **along** [1]  15/10 | **can** [27]  3/6 4/2 4/20 5/16 8/16 9/9 10/14 10/24 14/19 17/13 17/15 17/21 21/11 23/3 23/12 24/2 25/8 25/17 25/21 26/8 27/3 27/19 27/24 28/1 29/24 31/11 32/10 |
| **MR. SCHAERR:** [2]  3/21 22/4 | **already** [1]  31/17 | |
| **MS. KHANNA:** [54] | **also** [6]  2/10 19/2 26/8 27/6 28/19 31/10 | |
| **THE COURT:** [82] | **although** [1]  27/20 | **can't** [3]  10/16 15/13 26/23 |
| | **altogether** [1]  24/24 | **candor** [1]  9/10 |
| **/** | **am** [5]  4/4 5/6 10/19 21/3 27/6 | **capacity** [1]  1/7 |
| | **amenable** [1]  28/8 | **Carefirst** [1]  6/7 |
| **/S** [1]  34/15 | **Amendment** [1]  12/22 | **careful** [2]  25/15 |
| | **AMERICA** [2]  1/4 3/11 | **case** [21]  4/1 6/7 6/8 6/10 6/10 6/18 8/9 8/16 10/2 12/22 15/11 15/19 16/8 17/1 17/4 22/25 24/20 25/19 27/3 27/8 |
| **0** | **analysis** [3]  8/7 13/1 15/13 | |
| | **angels** [2]  20/7 | |
| **0177** [1]  1/18 | **animating** [1]  12/24 | **cases** [2]  6/6 15/12 |
| | **announcing** [1]  18/22 | **cause** [2]  12/11 13/6 |
| **1** | **another** [4]  12/24 13/3 29/7 30/23 | **caused** [2]  5/23 5/25 |
| | **answer** [2]  29/17 | **caution** [1]  27/16 |
| **1060** [1]  2/9 | **answering** [2]  19/7 | **centered** [2]  22/11 |
| **12** [3]  7/9 10/24 11/8 | **any** [15]  7/19 7/22 9/12 9/21 11/10 12/4 12/4 15/4 19/13 19/13 21/3 24/5 24/25 24/21 25/1 31/14 | **CEO** [2]  11/4 11/21 |
| **12548** [1]  2/4 | | **certainly** [8]  10/5 14/1 21/22 23/3 23/25 23/25 24/24 26/17 |
| **126** [1]  6/8 | **anybody** [2]  8/16 8/17 | |
| **12:30** [1]  1/12 | **anything** [3]  7/18 7/23 20/14 | **CERTIFICATE** [1]  33/11 |
| **14** [2]  11/8 22/4 | **anywhere** [1]  11/10 | **certify** [1]  34/4 |
| **17** [2]  20/22 21/10 | **APPEARANCES** [2]  1/14 1/25 | **chill** [2]  12/3 16/25 |
| **1700** [1]  1/17 | **appreciate** [6]  9/10 26/14 26/14 27/5 32/18 33/7 | **chilled** [2]  18/17 26/18 |
| **1717** [1]  2/8 | **appropriate** [5]  23/22 25/4 26/1 26/10 27/7 | **Chris** [3]  3/18 3/23 5/12 |
| **1:06** [1]  33/10 | **are** [25]  3/17 5/3 6/3 6/17 7/8 12/10 12/17 12/19 14/22 14/23 15/1 15/2 15/23 16/25 17/3 17/16 18/5 19/1 19/23 23/18 23/17 26/22 28/5 28/8 30/24 | **CHRISTOPHER** [1]  1/19 2/3 |
| | | **CID** [15]  6/18 6/25 7/9 8/2 9/17 10/12 13/14 16/24 17/6 17/14 18/4 18/5 18/7 20/11 |
| **2** | | |
| **20001** [1]  1/21 | **area** [2]  14/11 14/15 | **circuit** [3]  13/4 15/21 27/3 |
| **20006** [1]  2/8 | **areas** [1]  10/13 | **circumstantial** [1]  20/12 |
| **202** [2]  1/21 2/9 | **argue** [1]  24/12 | **cite** [4]  6/6 6/7 15/16 15/19 |
| **2024** [2]  1/12 34/12 | **argument** [13]  4/9 8/17 13/12 13/13 16/6 19/7 19/13 20/6 21/17 21/20 22/2 22/8 22/10 | **cited** [2]  6/7 15/12 |
| **206** [1]  1/18 | | **cites** [1]  6/10 |
| **2100** [1]  1/17 | **arguments** [4]  25/6 26/21 27/16 32/6 | **civil** [2]  3/10 6/18 |
| **28** [1]  34/6 | **arm** [1]  18/21 | **claim** [2]  19/14 20/18 |
| | **around** [1]  22/11 | **clear** [4]  10/2 16/17 18/11 26/9 |
| **3** | **article** [11]  7/2 7/13 7/13 8/1 11/24 12/5 14/18 16/22 16/24 19/7 23/9 23/10 | **client's** [2]  12/11 26/17 |
| **33** [1]  22/3 | | **clients** [3]  18/11 21/8 23/21 |
| **3363** [1]  3/10 | **articles** [5]  7/6 10/17 11/3 11/8 18/15 | **coincidentally** [1]  5/23 |
| | **as** [47] | **colleague** [1]  3/24 |
| **4** | **ask** [3]  11/19 13/12 24/9 | **Columbia** [2]  6/20 6/23 |
| **400** [1]  1/20 | **asking** [1]  31/14 | **comes** [3]  9/13 14/5 15/7 |
| **4380** [1]  2/5 | **aspect** [2]  29/15 31/7 | **comfortable** [1]  9/8 |
| **463-4380** [1]  2/5 | **asserted** [4]  9/23 19/5 19/24 19/24 | **coming** [1]  25/1 |
| **4928** [1]  1/21 | **assertions** [1]  19/5 | **company** [1]  14/9 |
| | **assured** [1]  9/14 | **complaint** [25]  4/13 10/1 10/12 11/5 11/11 11/14 13/9 13/10 19/19 19/9 19/17 20/18 20/21 20/21 20/23 20/24 21/6 21/10 21/12 21/14 21/15 26/7 26/24 29/6 |
| **5** | **attach** [1]  10/12 | |
| **512** [1]  2/5 | **attachments** [2]  13/11 19/17 | |
| | **attorney** [19]  1/7 2/3 5/13 7/15 7/19 7/24 9/20 12/12 12/17 11/17 12/8 13/14 14/7 14/19 15/8 16/6 21/16 21/20 22/14 | |
| **6** | | **COMPUTER** [1]  1/23 |
| **625** [1]  6/8 | | **COMPUTER-AIDED** [1]  1/23 |
| **656-0177** [1]  1/18 | **Austin** [1]  2/5 | **concede** [2]  26/21 26/24 |
| **6th** [1]  2/4 | **authority** [2]  15/8 27/2 | **concern** [4]  18/11 18/18 25/11 26/14 |
| | **authorize** [1]  23/8 | **concerned** [1]  30/5 |
| **7** | **authorized** [1]  14/25 | **concerns** [1]  9/12 |
| **753** [1]  34/6 | **avail** [1]  5/22 | **conclusion** [2]  7/11 27/7 |
| **787-1060** [1]  2/9 | **availment** [6]  10/2 11/16 20/9 20/11 20/15 31/6 | **conducting** [2]  6/12 16/7 |
| **78711** [1]  2/5 | **avails** [1]  6/12 | **confer** [1]  28/3 |
| | **Avenue** [2]  1/17 1/20 | **Conference** [1]  34/10 |
| **8** | | **conferring** [1]  28/5 |
| **8:23-cv-03363-PX** [1]  1/6 | **B** | **conformance** [1]  34/10 |
| | **back** [1]  21/3 | **conjunction** [1]  18/16 |
| **9** | **background** [1]  5/1 | **connection** [2]  7/25 8/5 |
| **900** [1]  2/8 | **barely** [1]  15/14 | **consider** [1]  25/14 |
| **98101** [1]  1/17 | **based** [11]  9/18 11/24 12/2 14/9 16/1 16/18 21/8 21/9 21/13 23/2 23/6 | **constitutional** [3]  12/19 12/24 32/14 |
| **987-4928** [1]  1/21 | | **constitutionally** [1]  4/17 |
| **9th** [1]  34/12 | **bases** [1]  27/22 | **contemporaneous** [1]  7/19 |
| | **basically** [3]  6/11 12/11 20/25 | **CONTINUED** [1]  2/1 |
| **A** | **basing** [2]  21/7 21/7 | **control** [2]  17/17 17/22 |
| **ABHA** [2]  1/16 3/15 | **basis** [2]  19/7 21/23 | **conversation** [2]  5/1 18/9 |
| **about** [20]  4/5 4/21 5/1 5/17 8/10 10/19 12/23 13/2 13/5 13/24 15/22 16/13 16/17 16/17 17/5 17/5 18/18 20/3 24/2 27/7 30/5 | **be** [41] | **conversations** [1]  5/3 |
| | **beat** [3]  11/2 11/5 11/12 | **convince** [1]  30/15 |
| | **because** [20]  4/4 4/23 7/11 8/18 14/21 16/9 20/1 20/4 21/22 21/22 22/24 23/25 25/10 25/15 26/19 27/10 27/12 30/5 30/13 32/4 | **corners** [1]  19/16 |
| **above** [1]  34/9 | | **cornerstone** [1]  22/1 |
| **above-entitled** [1]  34/9 | | **corporation** [2]  6/20 16/12 |
| **absolutely** [5]  7/15 8/5 22/21 26/13 31/16 | **been** [9]  4/6 4/12 5/1 8/3 8/18 15/20 15/21 15/22 30/24 | **correct** [5]  7/4 17/6 24/20 29/2 34/7 |
| **abundance** [1]  27/16 | | **could** [4]  8/17 18/19 24/19 24/22 |
| **accept** [1]  16/4 | **before** [5]  1/11 3/10 3/12 5/4 18/22 | **couldn't** [1]  12/13 |
| **accepting** [1]  24/17 | **begin** [1]  10/10 | **counsel** [5]  3/14 3/17 3/18 3/22 20/20 23/2 |
| **achieve** [1]  26/14 | **begins** [2]  22/22 22/25 | **counting** [1]  20/6 |
| **act** [1]  6/11 | **behalf** [3]  1/15 2/2 3/16 | **course** [3]  12/8 19/20 28/4 |
| **action** [3]  3/10 12/10 14/2 | **being** [3]  3/25 17/3 18/15 | **court** [30]  1/1 1/11 3/2 3/3 3/10 7/17 14/1 14/3 15/14 15/22 19/3 20/9 29/13 29/23 23/23 23/25 29/21 30/20 33/8 33/10 34/4 34/5 |
| **actions** [3]  12/10 13/6 13/7 | **believe** [23]  4/10 4/15 4/16 4/18 4/23 11/14 13/17 13/18 15/7 17/3 19/1 19/19 19/23 20/18 20/19 21/20 22/4 23/22 26/10 26/20 27/2 27/7 | |
| **actively** [1]  6/15 | | |
| **activities** [4]  6/13 7/16 9/18 14/22 | **believes** [1]  14/1 | **Court's** [1]  14/4 |
| **actress** [2]  16/1 16/2 | **benefits** [1]  6/14 | **coverage** [2]  11/4 11/4 |
| **actual** [2]  10/12 16/17 | **best** [3]  20/12 28/20 33/3 | **covers** [1]  20/4 |
| **actually** [4]  6/6 10/24 11/2 18/25 | **betting** [2]  30/13 31/1 | **created** [1]  11/13 |
| **additional** [1]  25/7 | **between** [1]  13/5 | **current** [2]  8/8 31/9 |
| **address** [3]  4/5 9/12 30/11 | **beyond** [2]  14/16 27/10 | **currently** [3]  7/18 16/25 17/2 |
| **adjourned** [2]  33/9 33/10 | **big** [1]  16/7 | **custody** [1]  17/17 |
| **affected** [2]  18/4 18/6 | **both** [5]  7/17 9/17 23/7 23/10 29/9 | **cv** [1]  1/6 |
| **affecting** [2]  18/25 19/1 | **bounds** [1]  16/8 | |
| **after** [2]  18/23 18/23 | **Box** [1]  2/4 | **D** |
| **afternoon** [4]  3/6 3/15 3/20 3/21 | **brief** [5]  6/7 23/12 25/12 28/16 30/24 | **D.C** [28]  11/20 11/21 13/20 13/21 14/3 14/11 14/24 17/7 20/20 22/10 23/1 23/2 23/4 23/5 23/8 23/11 23/19 23/21 23/24 24/8 24/14 24/16 24/20 25/4 24/16 24/18 24/19 24/20 25/4 |
| **AG** [4]  11/15 16/10 18/6 20/14 | **briefed** [3]  24/8 30/17 30/25 | |
| **AG's** [2]  3/22 3/23 | **briefing** [7]  27/19 29/14 29/15 30/19 31/15 32/22 32/25 | |
| **again** [6]  5/13 7/22 11/11 11/15 13/9 28/21 | | |
| **against** [1]  21/8 | **briefs** [1]  25/14 | **D.C.** [1]  14/9 |
| **agent** [1]  17/15 | **bright** [1]  17/18 | **D.C.-based** [1]  14/9 |
| **agree** [5]  5/14 13/19 20/5 22/7 31/5 | **bring** [2]  11/23 | **Dated** [1]  34/12 |
| **agreed** [1]  29/16 | **bringing** [1]  21/24 | **day** [1]  34/12 |
| **agreement** [4]  13/10 25/2 25/4 28/6 | **brings** [1]  4/15 | **DC** [2]  1/21 2/8 |
| **AIDED** [1]  1/23 | **brought** [1]  6/25 | **decide** [9]  13/24 18/6 19/11 25/16 25/17 25/20 27/11 27/23 32/10 |
| **aim** [2]  8/5 8/14 | **burden** [5]  9/25 19/2 19/15 22/11 22/12 | |
| **al** [2]  1/4 3/11 | **byline** [2]  12/6 12/7 | **decided** [1]  11/19 |
| | | **decision** [1]  33/3 |
| | **C** | **defendant** [17]  1/9 2/2 6/11 6/15 13/2 13/3 13/6 |
| | **Calder** [6]  8/10 8/11 15/16 15/19 15/22 16/18 | |

**JA0252**

**D**

defendant... [10] 26/5 26/7 26/25
27/21 27/23 29/14 31/11
defendant's [3] 26/20 29/16 32/25
defendants [3] 28/11 29/22 31/2
defense [5] 4/7 19/4 19/22 27/17 30/8
defense's [2] 5/7 5/9
defer [2] 28/22 32/23
degree [1] 15/23
demand [10] 6/18 13/20 15/2 16/23 17/2 18/12 18/16
18/22 21/7 23/1
denial [1] 26/7
deny [3] 25/8 28/18 29/5
determination [1] 4/24
development [1] 15/21
did [14] 5/22 5/22 6/1 9/24 15/16 15/19 18/18 19/6
20/1 20/18 21/21 21/22 24/12 27/15
didn't [11] 7/22 7/23 11/22 12/12 12/16 13/23 15/12 22/8
22/8 22/15 24/13 31/2
different [2] 15/23 18/9
direct [2] 8/5 8/14
directed [6] 6/19 8/18 17/8 17/9 17/10 22/19
direction [1] 7/16
directly [2] 9/17 17/19
disagree [1] 25/25
disagreement [2] 23/18 23/20
discussed [1] 32/23
dismiss [9] 24/20 26/24 27/14 28/23 28/25 29/16
29/17 30/10 33/1
dismissal [3] 26/6 26/10 30/6
dismissed [2] 25/18 25/19
dispute [1] 16/21
distinct [1] 5/20
district [10] 1/1 1/1 1/11 3/3 6/20 6/22 9/15
15/14 34/5 34/5
DIVISION [1] 1/2
do [33] 4/16 4/18 4/22 5/3 5/15 6/20 10/14 10/15
10/17 15/16 18/6 19/1 19/19 21/4 21/9 23/22 24/19
24/22 25/8 25/21 26/10 26/16 26/23 27/1 27/19
27/20 28/10 28/11 32/2 32/8 32/17 33/2 34/6
docket [1] 1/5 27/13
documents [7] 7/7 11/3 12/2 15/1 16/23 17/16 17/23
DODGE [1] 1/19 3/18
does [7] 12/10 25/5 27/8 28/2 29/9 29/11 32/15
dog [1] 12/17
doing [4] 9/20 13/16 30/5 31/23
don't [30] 4/23 4/25 9/6 12/21 13/22 13/23 14/3
14/16 16/5 18/5 19/11 19/13 20/3 20/13 20/17 21/2
21/5 22/15 24/3 24/15 25/3 25/18 26/4 26/5 26/5
26/7 27/6 28/14 30/23 31/20
done [3] 18/8 19/22 25/19
door [1] 12/11
down [2] 9/9 26/11
due [2] 12/25 13/1
during [1] 32/23

**E**

ECF [1] 33/1
effect [1] 8/13
effects [5] 8/12 8/13 16/18 16/18 17/3
effort [2] 4/1 26/14
either [1] 23/8
Elias [2] 1/16 1/20
Elon [1] 18/23
else [1] 22/23
elsewhere [1] 32/12
employee [1] 17/15
employer's [1] 17/1
end [2] 12/17 12/22
ends [2] 22/22 23/1
enforcing [1] 14/8
enough [4] 4/16 13/21 18/20 32/13
Enquirer [2] 15/25 16/3
entire [3] 18/21 21/7 21/7
entitled [1] 34/9
equally [1] 12/19
equitable [2] 25/22
Eric [1] 2/10
ESAB [1] 6/8
ESQUIRE [6] 1/16 1/19 1/19 2/3 2/6 2/7
essentially [1] 8/14
establish [1] 19/3
et [2] 1/4 3/11
even [9] 4/8 4/10 5/25 7/20 11/11 11/20 15/15 20/8
25/7
event [2] 24/5 31/14
ever [1] 8/2
every [1] 10/2
everybody [3] 3/6 8/3 16/1 30/1 31/24 32/13
everyone [1] 32/21
evidence [6] 9/19 10/2 13/11 15/4 20/13 25/7
exact [2] 10/16 20/18
exactly [3] 6/2 6/4 10/7
Except [1] 29/12
executive [1] 15/8
exercise [2] 13/8 27/2
exists [2] 23/10 23/19
expanding [1] 31/19
expect [1] 21/24
expedite [1] 30/20
experiencing [1] 17/1
extension [1] 29/17
extent [1] 30/19
eye [1] 25/15

**F**

F.3d [1] 6/8
face [1] 13/9
facial [1] 19/8
fact [3] 8/12 11/18 22/18
facts [9] 6/17 11/10 15/23 15/23 16/4 19/10 21/3
21/6 26/11

---

**G (continued from second column)**

factual [2] 15/24 19/23
fairness [1] 30/2
far [6] 16/8 21/11 24/15 30/19 30/20 30/25
fast [1] 23/7
fastest [1] 23/12
favor [2] 4/25 25/17
favorable [3] 4/14 10/1 19/10
February [1] 11/8
Federal [2] 34/4 34/17
feedback [1] 28/21
felt [3] 12/2 12/10 17/3
fight [2] 16/13 24/2
figure [1] 28/19
file [2] 25/21 29/22
filed [2] 4/8 4/11
filing [1] 29/22
final [1] 27/7
finally [1] 27/11
find [6] 7/22 10/1 12/9 27/25 30/14 31/10
finding [1] 10/3
fine [2] 28/13 32/3
fingertips [1] 12/9
first [9] 5/7 5/11 5/19 7/24 8/2 11/18 11/19 12/22
27/21
fit [1] 23/4
Floor [1] 2/4
focus [2] 12/15 13/1 28/15
focused [1] 29/23
foregoing [1] 34/7
foreign [2] 13/3 31/12
forfeited [1] 19/7
forfeiture [1] 19/13
formally [1] 4/12
format [1] 34/9
formed [1] 20/25
fortuitous [1] 31/9
fortuity [1] 10/3
forum [12] 5/8 6/1 6/13 6/15 13/3 16/10 16/13
20/11 20/15 23/11 29/7 31/12
fought [1] 13/5
found [1] 15/11
four [1] 19/16
Fourth [2] 13/4 15/21
frankly [3] 10/11 23/6 28/20
front [1] 12/11
full [1] 12/8
fully [1] 25/12
fundamental [1] 32/14
further [1] 13/24
future [1] 13/24

**G**

GENE [2] 2/6 3/21
general [18] 1/8 2/3 7/19 7/25 9/20 11/12 11/17
11/18 12/8 13/14 14/7 14/19 15/8 16/6 16/24 21/16
21/20 22/14
general's [2] 5/13 7/15
generally [1] 11/4 18/17
get [9] 4/25 5/3 12/11 15/13 25/14 30/22 32/16
33/2 33/3
gets [1] 8/11
getting [1] 4/9
give [7] 4/4 7/17 21/25 22/2 28/3 28/21 32/13
given [2] 5/9 30/18
giving [2] 12/21 20/12
go [7] 10/14 12/5 21/3 21/11 21/25 23/24 27/3
goes [1] 27/21
going [6] 5/15 6/6 12/5 12/10 17/13 25/2 25/25
27/10 29/7 29/18 30/14 31/18 32/22 32/23 32/24
32/24
gone [2] 16/10 31/23
good [7] 3/6 3/15 3/20 3/21 19/25 20/19 21/21
got [2] 12/15 20/2
grant [1] 29/7
GREENBELT [1] 1/2
ground [1] 31/18
grounds [5] 27/14 28/16 28/23 30/6 30/17
Group [2] 1/16 1/20
guarantee [1] 17/22
guess [6] 13/24 22/7 25/1 25/1 25/3 30/18

**H**

had [9] 5/5 7/19 8/2 10/17 11/16 16/10 19/15 23/5
24/18
hailed [1] 13/2
Hananoki [1] 35/2
Hananoki's [10] 7/6 10/8 11/2 11/5 11/12 12/6
17/23 18/14 18/15 18/15
handle [1] 31/2
happened [3] 13/6 14/24 20/10
happening [1] 17/2
hard [5] 4/5 13/5 29/25 31/2 31/24
has [27] 4/7 4/12 4/15 4/19 5/6 6/20 8/18 9/12
9/15 10/3 10/12 11/7 12/8 17/5 17/15 18/4 18/5
18/6 19/3 19/4 19/11 19/21 22/14 23/25 27/2 31/6
31/18
hashing [1] 25/22
hauled [1] 31/11
have [56]
haven't [2] 13/9 18/8
having [2] 15/22 29/18
he [15] 11/12 11/13 11/13 12/10 13/15 13/18 13/18
13/19 14/23 14/25 14/25 16/9 16/21 16/22 16/25
he's [7] 12/16 14/7 14/8 14/8 15/9 16/19 16/25
head [1] 20/7
headquarters [2] 14/14 17/7
hear [7] 5/6 5/11 7/23 9/15 18/20 26/11 27/20
heard [1] 13/10
hearing [7] 1/10 3/13 4/2 4/19 29/6 29/19 32/23
held [1] 34/8
her [2] 16/2 16/3
here [19] 3/25 5/15 8/3 11/6 11/16 12/15 12/23

---

**I (third column)**

14/5 14/22 16/5 19/7 20/10 23/21 23/23 24/25 25/14
hereby [1] 34/6
high [1] 13/4
hinged [1] 11/2
his [11] 11/7 7/9 11/13 12/9 12/9 12/10 13/19 18/23
17/7 21/7 21/7
holidays [1] 31/9
Honor [46]
Honor's [1] 18/18
HONORABLE [1] 1/11 3/4 33/8
how [3] 4/5 27/3 31/11
huh [2] 30/12
hypothetical [1] 20/7

**I**

I'll [7] 5/11 7/17 9/6 27/20 27/23 29/4 33/1
I'm [37] 3/22 4/18 6/8 8/19 12/20 12/20 15/5 15/18
16/14 19/8 19/9 19/16 19/17 21/11 21/17 22/6 25/5
25/10 25/25 26/9 27/10 28/19 30/8 32/4 32/23
32/24
I've [4] 4/5
identifies [1] 21/9 21/12
identify [1] 3/14
III [1] 19/1
illustrative [1] 31/8
imagine [1] 25/21
immediately [1] 24/20
important [3] 5/3 12/20 25/23
inartful [1] 31/5
inartfully [1] 19/15
inclined [1] 23/24
include [1] 14/13
incorporated [2] 20/21 20/23
information [2] 11/3 21/23
initial [1] 30/22
injunction [3] 4/3 27/9 32/24
injury [4] 5/23 6/1 12/12 13/6
instigated [2] 16/22 21/15
interest [1] 7/6
interested [1] 9/11
interim [2] 25/20 32/10
internal [1] 17/23
intricacies [1] 17/14
investigated [1] 18/25
investigation [8] 6/18 10/9 10/10 16/7 21/7 21/15
21/24 22/19
investigations [1] 15/10
investigative [2] 12/9 14/7
investigatory [1] 18/21
invoke [1] 13/21
invokes [1] 23/5
invoking [2] 6/13 14/8
involved [1] 20/13
is [119]
is the [1] 9/11
issue [3] 5/18 22/11 24/7
issued [1] 29/19
issues [5] 4/5 12/18 30/19 30/22 30/24
issuing [1] 18/22
it [89]
it's [32] 4/23 4/25 5/9 5/10 6/8 6/19 8/7 8/12
8/12 8/24 9/22 9/25 10/23 11/13 12/20 20/4 20/4
25/10 25/15 25/18 26/1 26/1 26/1 26/10 27/7 27/21 29/25
31/18 31/21 32/4 32/14 32/14 32/15
iteration [1] 31/9
its [5] 11/4 14/19 15/23 15/23 31/9
itself [4] 6/12 16/11 20/21 31/22

**J**

Jaffe [1] 2/7
JANUARY [1] 1/12 34/12
JOSEPH [2] 1/19 3/18
journalist [1] 14/10
JR [2] 1/7 3/11
JUDGE [1] 1/11
Judicial [1] 34/10
jumped [1] 4/15
jurisdiction [56]
jurisdictional [1] 30/16
just [24] 10/3 14/13 14/23 15/9 16/14 19/12 20/2
20/2 20/9 20/20 21/14 23/6 25/20 26/4 28/1 28/6
29/9 30/1 30/9 30/18 31/22 31/23 32/16 32/20

**K**

keep [1] 29/9
Ken [3] 3/24 14/6 24/16
KENNETH [3] 1/7 2/7 3/11
KHANNA [3] 1/16 3/15 28/2
kind [2] 5/16 22/18
kinds [1] 17/14
KLUKOWSKI [2] 2/7 3/24
knew [13] 9/20 9/20 10/7 10/8 10/9 11/12 11/12 11/15
11/16 15/3 15/4 20/13 20/14 21/23
know [37]
knowing [2] 11/19 29/18
knowledge [1] 7/20 19/25 31/7
known [7] 12/13 13/15 13/15 18/19 18/20 18/21
18/24
knows [2] 8/3 16/1

**L**

lack [3] 4/9 19/25 23/9
lacking [1] 5/8
later [2] 10/4 11/19
LAVORATO [7] 2/3 3/23 5/13 20/5 22/7 24/5 31/17
law [6] 1/16 1/20 8/8 17/4 22/16 31/5
lawsuit [7] 18/23 18/24 20/25 21/2 21/8 21/9 21/24
learned [1] 7/5
Leeper [3] 4/19 7/5 15/24 30/24 31/9
Leeper [3] 34/4 34/15 34/16
left [1] 25/5

**L**

let [6]  4/4 9/1 9/6 23/5 25/20 30/24
let's [8]  16/17 23/11 28/11 30/16 32/2 32/8 32/17
letter [1]  32/21
letting [1]  9/11
level [1]  6/14
light [3]  4/14 10/1 19/10
like [13]  4/22 5/6 11/13 12/16 13/19 16/5 16/14 22/18 23/16 25/6 26/16 30/9 31/18
likely [2]  29/8 30/16
limited [1]  15/22
limiting [3]  18/21 8/22 31/11
line [3]  13/5 17/18 28/11
lines [1]  15/10
lion's [1]  10/13
listen [1]  12/19
little [2]  4/4 30/21
live [3]  14/11 14/14 20/10
lived [4]  7/20 9/24 20/15 22/9
lives [3]  8/14 16/21 23/11
living [1]  19/17
LLP [3]  1/16 1/20 2/7
local [1]  3/22
locale [1]  16/13
located [2]  15/2 19/6
location [1]  14/13
locus [1]  14/12
logical [1]  20/4
long [3]  4/5 13/5 13/5
look [1]  9/25 22/2
looking [5]  13/10 15/25 16/14 19/8 19/9 19/16
lot [2]  16/6 31/23

**M**

made [5]  4/8 20/18 21/17 21/20 26/4
make [7]  4/23 8/17 9/12 20/15 27/21 28/2 29/9
makes [3]  16/2 20/8 28/6
many [2]  19/5 19/24
MARYLAND [31]  1/1 3/4 6/21 7/20 8/6 8/15 9/18 9/18 9/21 11/13 11/13 12/2 12/2 12/3 12/6 13/15 14/6 14/16 14/19 16/21 16/22 16/23 16/25 17/2 17/3 17/6 19/21 19/24
Maryland-based [3]  9/18 21/9 21/13
Massachusetts [1]  1/20
materials [1]  7/3
matter [12]  3/9 3/12 4/10 4/15 6/9 8/2 22/19 27/14 30/10 30/14 32/15 34/9
MATTERS [21]  1/4 3/11 6/19 6/22 8/3 8/18 8/19 10/14 11/17 12/24 15/15 17/9 17/10 17/13 17/25 18/3 18/17 21/12 22/19 25/21
Matters' [1]  17/19
may [3]  31/4 31/4 31/7
maybe [7]  7/5 12/16 19/15 20/10 28/20 28/20 29/25
me [22]  3/17 3/23 4/4 7/18 9/1 13/12 13/19 15/12 16/16 20/12 20/20 21/2 21/25 22/2 23/13 24/5 24/9 27/10 28/3 28/14 28/21 30/15
mean [16]  10/2 13/22 15/3 15/11 15/13 15/24 17/13 19/16 20/5 20/7 20/12 23/6 23/16 24/13 24/23 31/5
MEDIA [22]  1/4 3/10 6/19 6/22 8/3 8/18 8/19 10/14 11/17 12/22 15/5 17/8 17/9 17/10 17/13 17/18 17/25 18/3 18/17 21/12 22/19 23/21
meeting [1]  16/11
memorialize [1]  32/20
mention [2]  7/9 29/14
mentioned [2]  17/21 17/5
mentioning [1]  17/10
merely [2]  32/15
merits [8]  4/9 4/25 5/4 12/23 25/10 26/11 28/18 29/6
metropolitan [1]  14/11
might [1]  31/1
mind [1]  9/6
minds [1]  10/7
minute [2]  22/1 22/2
minutes [1]  18/23
missing [1]  15/5
moment [1]  28/3
MONDAY [1]  1/12
money [1]  16/2
more [11]  7/5 10/3 10/23 11/1 11/4 15/25 22/10 25/12 25/15 30/21 31/8
most [8]  4/14 9/11 10/1 14/11 19/10 23/17 25/22 29/7
motion [24]  4/2 4/7 4/8 4/11 5/2 5/10 25/9 26/6 26/7 27/2 27/15 27/21 28/18 28/23 28/25 29/4 29/16 29/17 29/23 30/8 30/9 32/24 32/25
move [4]  23/4 23/8 25/17 28/18
moved [1]  27/13
moving [2]  24/7 29/5
Mr. [52]
Mr. Hananoki [33]  3/18 6/24 7/12 7/20 7/25 9/20 9/24 10/8 10/9 10/18 10/21 14/7 11/22 12/1 14/18 16/21 17/10 17/19 18/4 18/5 18/6 18/16 19/6 19/25 20/13 20/14 21/9 21/13 21/17 22/9 22/16 22/24 31/5
Mr. Hananoki's [10]  7/6 10/8 11/2 11/5 11/12 12/24 16/9 17/23 18/14 18/15 18/15
Mr. Lavorato [4]  20/5 22/7 24/5 31/17
Mr. Musk [1]  21/22
Mr. Musk's [1]  21/24
Mr. Paxton [2]  9/19 21/6
Mr. Paxton's [1]  9/17
Ms. [1]  28/2
Ms. Khanna [1]  28/2
much [3]  4/1 13/10 15/20
Musk [3]  18/23 20/20 21/22
Musk's [2]  21/8 21/24
must [2]  5/5 6/15
my [15]  3/23 4/13 12/21 12/22 21/8 22/10 24/6 27/18 28/3 30/11 31/5 31/8 32/13

**N**

name [1]  7/10 10/21 17/10 17/10
named [1]  3/17
nature [1]  13/14
need [1]  28/14
needed [1]  27/3
needs [1]  24/8
negligently [1]  5/25
next [2]  25/18 32/11
nexus [1]  7/15
nine [3]  10/12 10/17 10/20
no [21]  5/14 7/14 7/15 8/5 8/5 8/21 8/22 9/23 14/21 15/4 15/6 15/11 16/20 16/20 17/22 19/9 23/18 23/20 23/24 31/8 31/10
non [1]  4/8
none [2]  7/21 15/3
not [56]
note [1]  20/2
notes [1]  1/23 18/15
nothing [1]  9/24
notion [1]  24/17
now [4]  3/4 14/19 18/6 33/8
number [1]  1/5 3/10 6/18 15/12 33/1
NW [2]  1/20 2/8

**O**

object [1]  26/16
objection [3]  23/24 26/4 26/6
obligation [2]  17/19 17/21
obviously [1]  7/11
occurred [1]  16/14
office [4]  2/3 3/22 3/23 5/13
official [4]  1/7 34/1 34/4 34/17
okay [32]  3/20 3/25 8/4 10/22 16/19 19/14 21/25 28/10 32/7 32/8 33/3 33/6
one [14]  6/18 7/5 8/4 12/18 14/10 15/24 16/17 21/18 25/8 28/3 30/9 31/7 32/2 32/17
one-paragraph [1]  21/18
ones [1]  16/5
ongoing [3]  9/18 12/12 17/2
only [4]  4/8 11/21 29/12 29/14
opinion [1]  13/14
opportunity [2]  7/17 25/12
order [8]  3/2 3/12 4/3 25/2 27/9 30/21 32/21 32/22
other [4]  7/10 16/7 16/19 24/11
ought [1]  5/10
our [12]  3/17 11/5 12/11 14/11 19/2 20/21 26/3 26/6 26/6 27/10 27/17 31/31 33/2
outside [1]  3/18
over [2]  13/8 17/23

**P**

p.m [2]  1/12 33/10
P.O [1]  2/4
page [2]  22/4 32/21 34/9
pages [1]  30/9
pale [1]  14/16
papers [4]  9/23 11/15 20/19 26/21
paragraph [4]  12/16 20/22 21/10 21/18
parallel [2]  16/15
partially [1]  30/24
particular [10]  6/10 6/14 6/17 7/16 8/1 8/4 8/17 14/10 24/7 24/21
particularly [1]  12/13
past [1]  9/7
PAULA [5]  1/11 3/4 34/4 34/15 34/16
PAXTON [6]  1/7 3/11 9/19 14/6 21/6 24/17
Paxton's [2]  9/17 23/2
pending [3]  3/9 29/18 32/24
people [2]  14/10 14/14
perhaps [1]  31/6
permit [1]  32/25
persist [1]  25/6
person [4]  7/1 20/9 30/14 31/1
personal [39]
personally [1]  11/22
PI [7]  25/8 25/9 27/17 28/1 28/18 28/22 29/6
piecemeal [1]  30/6
pin [1]  20/7
place [14]  14/25 14/25 15/1
plaintiff [18]  1/15 3/17 4/19 5/11 6/6 6/24 6/25 7/23 8/11 9/2 16/12 18/3 22/8 23/16 23/18 25/3 27/22 29/3
plaintiff's [3]  4/2 4/7 4/24
plaintiffs [6]  1/5 3/16 4/12 4/14 28/8 30/23
platform [1]  11/9
plausible [2]  20/8 20/16
pleadings [2]  24/13 30/11
please [2]  3/14 12/21
pled [2]  4/16 4/20
plied [1]  11/12
plies [1]  16/3
podium [1]  9/7
point [4]  9/23 15/6 18/1 32/4
pointed [1]  20/20
POISMAYO [2]  1/19 3/19
position [7]  5/7 5/9 5/10 11/14 14/4 14/17 26/3
possession [2]  17/17 17/22
possible [2]  7/1 24/20
possibly [1]  12/13
posture [1]  27/8
power [2]  12/9 14/7
practical [1]  20/17
predicate [1]  15/24
prefer [2]  25/21 28/15
prejudice [1]  22/9
preliminary [3]  4/3 27/9 32/24
PRESENT [1]  2/10
presiding [1]  3/5

**PAGE column (right):**

press [1]  18/22
previously [1]  31/25
principal [1]  12/24
principle [2]  12/24 31/11
principles [1]  12/19
privilege [1]  6/12
probably [4]  18/21 20/1 20/1 23/11
procedural [2]  32/15
proceedings [1]  34/9
process [3]  5/17 12/25 13/1
proper [5]  4/23 4/25 5/4 14/2 25/10
properly [1]  12/23
proposition [1]  8/12
provided [1]  11/5
provisionally [2]  4/11 4/13
prudent [2]  27/11
public [2]  12/4 12/4
publicized [1]  7/12
published [3]  7/13 11/7 12/2
purposeful [6]  10/2 11/16 20/9 20/11 20/15 31/6
purposefully [2]  5/22 6/12
pursuant [1]  34/6
pushes [1]  16/8
put [2]  5/16 28/20
putting [1]  4/1
PX [1]  1/6
PX23 [1]  3/10
PX23-3363 [1]  3/10

**Q**

question [14]  16/20 19/23 24/4 24/9 25/3 25/13 25/15 25/23 26/12 27/11 27/18 28/15 31/5 32/14
questions [2]  11/19 12/21
quick [1]  31/22
quickly [2]  27/24 29/4

**R**

raise [2]  17/15 22/8
raised [4]  4/6 19/4 19/21 27/16
raises [1]  20/14
raising [1]  19/23
reach [5]  27/7 27/10 27/25 28/1 29/4
reaching [3]  13/15 13/18 25/10
read [4]  12/5 18/12 18/14 32/22
reaffirmed [1]  6/8
real [1]  31/10
really [12]  4/22 13/9 15/13 16/3 16/10 16/10 20/6 25/11 32/5 32/13 32/15 33/7
reason [5]  20/1 20/19 21/21 26/9
reasonable [3]  14/6 26/2 32/1
reasonableness [1]  15/7
reasonably [1]  13/8
reasons [1]  32/23
recall [1]  10/16
recognizes [1]  17/4
record [7]  3/14 7/18 12/4 12/5 26/9 26/23 31/19
referenced [2]  7/2 24/14
refile [3]  23/5 24/20 27/3
regard [7]  7/15 8/7 32/16
regulations [1]  34/10
rehashing [1]  32/5
related [3]  11/3 16/24 16/24
relationship [1]  8/19
release [1]  18/2
remained [1]  26/17
remember [1]  10/16
replies [1]  27/23
reply [6]  12/15 12/17 21/18 29/3 32/4 32/5
reported [1]  34/8
reporter [6]  8/14 21/10 21/13 34/1 34/4 34/17
request [4]  29/13 29/16 29/21 30/23
request that [1]  30/23
requests [1]  7/8
require [1]  30/25
requirement [2]  22/16
research [1]  17/23
researched [1]  1/24
resided [1]  31/3
residence [1]  10/8
resident [2]  9/18 12/6
resides [1]  14/25 21/21
resolution [4]  23/7 26/15 28/9 29/18
resolved [1]  30/22
respect [2]  20/17 21/19
respond [5]  17/19 17/21 18/4 23/13 29/3
responded [1]  4/12
respondent [1]  17/12
responder [1]  17/12
responds [1]  27/22
response [8]  4/7 17/22 18/5 20/4 22/2 22/3 24/6 25/8
responsive [2]  7/7 17/16
rest [2]  9/14 9/14
resting [1]  16/6
restraining [3]  3/12 4/3 27/9
result [2]  17/1 17/1
revisiting [1]  30/3
right [25]  5/24 6/3 9/1 10/13 10/19 12/20 12/23 13/22 14/13 14/15 15/25 17/12 18/1 18/2 19/23 23/11 24/21 25/19 27/12 28/10 28/23 29/20 30/9 32/16
ripe [1]  4/16
rise [1]  33/8
rises [1]  6/14

**S**

said [3]  19/15 26/16 30/9
same [5]  16/5 26/23 27/16 30/2 32/21
saw [1]  24/4
say [13]  8/16 9/4 12/5 12/12 14/17 15/22 19/12 20/2 24/15 26/5 27/10 30/18 31/1
saying [7]  18/20 19/22 22/18 23/3 23/17 31/2 31/8

**S**

says [3]  6/11 8/4
SCHAERR [3]  2/6 2/7 3/22
schedule [5]  29/14 30/20 31/15 32/22 33/2
scratched [1]  15/14
screen [1]  5/16
seat [1]  3/7
Seattle [1]  1/17
second [1]  16/17
see [5]  7/23 9/4 19/13 24/5 30/7
seek [1]  6/15
seeking [1]  11/3 15/2
seems [8]  16/5 22/1 25/22 26/8 27/11 31/8 31/18 31/25
sense [3]  28/2 28/6 29/9
separate [3]  4/8 4/11 5/19
serve [2]  11/22 18/6
served [11]  6/22 6/25 8/3 11/21 11/21 11/21 15/4 16/11 17/6 17/7 22/23
service [2]  13/20 23/1
session [1]  3/4
set [1]  33/1
Seventh [1]  1/17
share [1]  10/13
she [2]  16/2 16/2
shoot [1]  11/19
shooting [1]  15/9
short [2]  12/21 32/20
shorten [1]  29/22
shortened [1]  31/15
shorter [1]  28/11
shot [1]  16/7
should [9]  13/2 13/10 13/13 13/13 13/14 18/19 18/21 18/24 18/24 26/24
should-have-known [1]  13/13
show [2]  12/11 22/12
shown [1]  10/6
shrift [1]  12/21
sides [4]  7/17 23/8 23/10 29/9
simple [2]  8/7 8/24
since [5]  5/10 11/8 11/9 22/1 27/21
sitting [2]  9/15 14/24
six [1]  30/21
slides [1]  5/19
so [33]  4/1 5/6 8/5 10/4 11/2 11/16 11/23 12/18 13/16 14/13 14/16 14/17 15/13 15/20 16/8 17/8 22/7 22/14 24/3 27/6 27/15 28/6 28/25 29/21 29/23 30/8 30/16 30/21 31/19 32/8 32/17 32/21
solely [3]  11/24 21/8 29/23
some [13]  5/1 5/15 5/23 5/25 6/11 8/19 10/1 11/7 14/18 15/23 16/8 16/14 20/12
somehow [2]  12/21 13/20
something [3]  10/3 15/5 24/8
soon [1]  33/2
sorry [2]  15/18 30/4
sort [2]  16/14 22/22
sounds [2]  13/19 23/16
source [1]  10/10
specific [3]  5/21 15/25 21/9
specifically [7]  10/21 11/2 11/9 14/5 14/10 17/6 22/15
speed [1]  29/24
spent [2]  12/15 13/4
stage [2]  18/8 29/1
stakes [1]  32/12
stand [1]  9/7
standard [1]  15/7
stands [2]  8/11 33/9
Starbucks [2]  14/18 14/24
starts [1]  22/4
state [13]  1/8 6/13 6/14 6/16 7/16 8/6 12/8 13/15 14/7 14/24 15/10 18/21 22/15
state's [1]  13/3
STATES [6]  1/1 1/11 3/3 8/9 34/5 34/11
stay [1]  30/16
stays [1]  15/4
stenographically [1]  34/8
stenographically-reported [1]  34/8
STENOTYPED [1]  1/23
step [2]  25/18 32/11
straight [1]  24/9
straightforward [1]  20/6
streamlined [1]  29/10
Street [1]  2/8
structure [1]  10/15
stuck [1]  4/18
subject [4]  4/9 4/15 7/6 10/13 18/16 27/14 30/10 30/14
subpoena [2]  8/13 16/11
such [1]  15/21
sued [1]  14/19
sufficient [3]  13/21 14/22 14/23
sufficiently [1]  4/20
suggest [1]  27/20
suggested [1]  28/7
suggestion [4]  26/1 26/3 27/18 30/11
suggests [1]  7/19
Suite [1]  1/17 1/20 2/8
supplemental [2]  27/19 32/25
supplementing [1]  28/22
supposed [1]  21/4
Supreme [3]  6/10 8/8 15/22
sure [13]  9/3 9/5 9/8 9/12 10/25 17/3 21/11 21/17 24/11 24/22 26/25 27/22 28/4
surface [1]  15/14
surrounding [1]  7/3
surveying [1]  13/14

**T**

table [3]  3/17 26/8 28/1
tabling [1]  26/10

tagged [1]  27/22
take [3]  13/6 13/7
takes [1]  13/6 13/7
talk [4]  4/20 13/24 16/17 30/1
talking [2]  5/17 12/23
tall [1]  25/2
target [2]  6/15 10/9
targeting [5]  14/9 15/9 15/9 15/25 16/3
targets [1]  9/17
tell [3]  7/18 12/15 28/14
telling [1]  5/17
temporary [3]  3/12 4/3 27/9
ten [1]  10/13
terms [3]  5/1 11/20 24/7
test [3]  8/13 12/14 12/14
Texas [13]  1/8 2/3 3/22 3/23 5/13 7/15 7/24 11/17 11/18 12/8 21/12 21/14 22/14
than [6]  7/14 10/3 13/10 15/24 28/16 31/8
thank [11]  3/20 3/25 5/12 9/10 22/3 28/9 32/9 32/18 33/4 33/5 33/6
that [213]
that had [1]  24/18
that's [29]  5/6 6/3 6/4 7/8 8/25 11/14 12/14 12/18 12/25 13/23 14/21 16/2 16/2 16/7 18/1 19/1 19/17 19/19 19/25 20/19 21/22 23/2 23/6 23/17 23/23 28/13 28/17 29/23 29/25
their [17]  5/10 5/10 6/7 9/23 10/7 15/22 16/10 17/21 20/3 20/19 21/23 21/23 22/2 26/19 29/17 29/17 30/5
them [8]  5/11 10/13 10/14 10/24 11/1 17/16 25/15 30/11
then [19]  5/11 9/1 12/12 21/25 22/7 24/2 24/10 25/11 25/14 25/17 25/18 25/21 27/10 27/23 27/24 28/10 29/5 29/7 30/15
there [31]  5/1 5/14 7/8 7/14 7/18 9/19 10/3 10/16 10/20 10/23 11/1 11/10 12/4 13/1 13/23 15/20 15/24 16/8 18/9 19/11 20/8 21/12 22/5 23/25 24/12 24/14 24/16 24/21 25/18 26/18
there's [30]  4/9 5/19 5/19 7/9 7/9 8/5 8/20 8/21 8/22 12/24 13/22 15/3 15/5 15/17 15/21 16/20 16/20 17/14 21/14 21/15 22/12 23/18 23/20 24/3 24/3 24/3 24/24 26/22 27/25 31/10
therefore [1]  8/20
these [5]  11/14 12/17 15/10 30/11 30/19
they [50]
thing [3]  24/19 25/8 29/12
things [1]  19/24
think [31]  4/25 5/3 5/4 5/10 9/22 10/23 11/7 13/22 14/5 14/16 15/12 16/5 19/2 21/22 23/7 24/3 24/5 24/18 25/4 26/1 26/17 27/14 28/14 29/25 30/13 30/19 30/22 30/23 30/24 31/21 31/24
this [74]
those [6]  5/3 16/4 17/4 21/3 25/14 30/22
though [4]  7/14 8/16 11/11 28/15
thought [3]  4/5 24/13 30/3
Thoughts [1]  25/24
three [2]  27/14 28/16
threshold [2]  12/18 25/15
through [4]  5/17 10/14 10/24 31/23
thrust [1]  31/6
thus [3]  6/13 30/19 30/25
ties [2]  14/23 17/4
time [8]  7/24 8/2 28/11 29/22 30/2 31/2 32/13 33/6
today [5]  4/2 4/22 23/3 26/21 26/23
today's [1]  32/23
together [2]  10/14 33/2
too [1]  26/8
total [1]  7/9
towards [1]  7/16
TR [2]  26/6 26/7
trade [2]  11/13 16/3
transcript [3]  1/10 34/7 34/9
TRANSCRIPTION [1]  1/23
transfer [4]  14/2 14/2 23/9 25/4
transferring [1]  23/24
tread [1]  31/17
treatment [1]  5/2
TRO [2]  1/10 25/9
true [5]  7/8 16/4 19/1 21/5 34/7
trying [1]  28/19
turn [4]  5/11 9/1 27/24 33/3
turnaround [1]  31/22
Twitter [1]  11/9 15/12 15/16 18/23
two [25]  5/19 7/8 7/9 10/17 10/20 12/19 23/20 28/12 28/12 28/12 29/13 29/13 30/9 30/23 31/20 31/21 31/24 31/25 31/25 32/5 32/2 32/17 32/17
two-pager [1]  30/9
TX [1]  2/5

**U**

U.S [1]  6/10
U.S.C [1]  34/6
Uh [1]  30/12
Uh-huh [1]  30/12
Ulander [1]  3/8
under [1]  22/16
understand [11]  14/3 14/8 16/16 18/10 18/18 23/3 23/4 25/7 26/22 27/1 27/13
understanding [2]  28/17 28/17
Understood [1]  31/13
undisputed [1]  11/6
UNITED [6]  1/1 1/11 3/3 8/9 34/5 34/11
unless [3]  4/23 15/5 28/11
unreasonable [1]  31/21
up [5]  5/16 8/9 8/11 12/11 29/24
us [6]  9/11 10/6 28/6 29/11 30/1 31/23
using [1]  11/20

**V**

venue [5]  4/11 14/2 24/4 27/15 30/10
versus [1]  3/11

very [6]  15/23 16/17 18/11 20/5 25/23 31/8
viewed [1]  19/4
Virginia [2]  14/19 14/20
vs [1]  1/6

**W**

WA [1]  1/17
wagging [1]  12/16
waiting [1]  30/21
waiver [1]  19/13
walk [2]  5/16 10/24
want [13]  7/22 9/12 9/14 13/11 18/11 23/7 23/13 25/6 26/5 26/9 28/11 32/5 32/16
wanted [1]  7/7
WARREN [2]  1/7 3/11
was [33]  5/15 6/18 6/22 7/11 7/12 7/25 9/20 10/7 10/8 10/9 12/16 12/17 13/18 13/19 15/12 15/24 16/11 17/6 17/7 17/13 19/6 19/19 19/15 20/5 20/8 20/11 22/3 23/11 23/12 25/22 26/23 27/20 28/20 31/8
Washington [5]  1/21 2/8 6/19 24/8 24/16
way [9]  8/8 19/12 23/11 23/12 25/22 26/23 27/20 28/20 31/8
we [42]
we'll [4]  13/24 27/25 28/1 33/2
we're [14]  5/21 5/21 5/21 6/5 8/25 18/8 25/19 28/6 28/25 29/5 29/6 30/11 31/18 32/7
we've [2]  19/22 31/22
week [2]  32/2 32/17
weeks [28]  28/12 28/12 29/13 29/13 29/13 30/21 30/24 31/21 31/21 31/21 31/25 31/25 32/2 32/22 32/17 32/17
well [18]  3/18 7/2 8/11 8/16 9/1 9/22 10/20 11/20 13/18 14/1 19/22 21/25 24/1 24/9 25/1 26/18 28/19 31/4
went [2]  16/11 24/15
were [10]  6/10 10/23 11/1 18/9 29/18 30/13 30/20 31/1 31/10
what [29]  4/22 8/7 8/10 8/10 8/10 9/4 9/11 9/11 9/19 10/7 10/7 10/12 11/8 13/11 17/5 18/18 18/19 18/19 18/25 19/15 20/7 23/2 24/5 28/6 28/19 30/3 30/21 31/19 32/13
whatever [1]  33/1
when [16]  9/13 11/2 11/17 11/17 13/15 13/19 14/5 15/4 15/4 15/7 15/9 15/9 18/11 20/10 27/8
where [39]
wherever [1]  9/8
whether [9]  10/6 12/20 13/2 17/5 17/15 17/16 19/11 22/14 24/2
which [13]  4/12 6/7 6/11 6/11 6/19 7/6 7/19 13/6 13/7 16/13 20/21 20/25 31/5
while [4]  4/13 17/10 19/2 28/5
who [13]  5/2 8/14 14/10 14/14 15/8 16/1 17/24 18/4 18/17 18/25 20/9 20/10
whole [1]  25/19
whom [1]  5/2
Whoopsie [1]  12/12
whose [1]  14/7
why [5]  13/23 19/8 19/8 19/11 26/9
will [14]  5/2 12/23 20/2 25/2 27/24 28/18 28/19 29/3 29/3 30/15 31/2 32/13 32/20 32/22
willing [2]  26/22 30/20
within [2]  6/7 6/13
without [3]  4/19 25/9 26/11
witnesses [1]  5/2
words [1]  10/16
work [6]  9/21 14/11 14/14 15/1 17/23 18/14
worked [4]  7/20 20/10 20/15 31/24
works [2]  8/14 16/22
would [26]  4/22 5/6 13/15 14/11 14/13 15/22 18/9 22/7 22/23 23/7 23/8 23/8 23/11 23/17 24/6 25/6 25/20 25/21 27/18 27/20 28/15 29/13 29/21 30/18 30/22 30/23
wouldn't [2]  22/16 24/21
writers [1]  14/9
wrong [2]  19/18 19/20
wrote [6]  7/12 10/18 11/13 12/1 14/18 16/22

**X**

XINIS [2]  1/11 3/4

**Y**

Yeah [5]  8/23 11/25 23/14 26/19 26/25
year [1]  11/8
Yep [1]  18/13
yes [8]  3/9 6/4 13/17 18/10 19/1 22/6 28/24 29/12
yet [3]  4/12 4/19 18/8
you [96]
you're [10]  9/8 9/11 17/6 18/20 20/12 23/11 28/22 29/5 29/7 31/14
you've [1]  15/11
you-all [1]  25/20
your [80]
yourself [2]  5/22 6/1
yourselves [1]  3/14

# Exhibit I

JA0256

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas,<br><br>Defendant. | CIV. NO. 23-cv-3363 |

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................. 1

BACKGROUND ............................................................................................... 3

    A.   Texas's DTPA and Defendant's CID Authority ............................. 3

    B.   Factual Background ...................................................................... 4

STANDARD OF REVIEW ................................................................................ 10

ARGUMENT ................................................................................................... 11

    I.    Media Matters has not Suffered Justiciable Injury. ...................... 11

    II.   The Court Lacks Personal Jurisdiction over the Texas Attorney General. ................. 14

        A.   Defendant is not subject to general jurisdiction. ................ 15

        B.   Defendant is not subject to specific jurisdiction. ............... 15

    III.  Venue in Maryland is Improper. ................................................... 17

    IV.  Media Matters has not Shown a First Amendment Violation. ..................... 19

    V.   Media Matters Could Have Avoided Any Harm, and its Litigation Conduct is Inequitable. ................. 20

CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*Abbott v. Pastides,*
    900 F.3d 160 (4th Cir. 2018)..................................................................... 13

*ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,*
    293 F.3d 707 (4th Cir. 2002)..................................................................... 15

*Barth v. District of Columbia,*
    No. 92-7093, 1993 WL 523999 (D.C. Cir. Dec. 14, 1993)..................................... 24

*Bates v. C&S Adjusters, Inc.,*
    980 F.2d 865 (2d Cir. 1992)..................................................................... 18

*Belle Fourche Pipeline Co. v. United States,*
    751 F.2d 332 (10th Cir. 1984)............................................................... 11, 23

*Benisek v. Lamone,*
    138 S. Ct. 1942 (2018) ...................................................................... 10, 11

*Borowski v. DePuy, Inc.,*
    850 F.2d 297 (7th Cir. 1988)..................................................................... 23

*Bulkley Assocs. v. Dep't of Industrial Relations,*
    1 F.4th 346 (5th Cir. 2021)..................................................................... 18

*Calder v. Jones,*
    465 U.S. 783 (1984) .......................................................................... 15, 16

*Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs.,*
    334 F.3d 390, (4th Cir. 2003)..................................................................... 14

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ............................................................................. 13

*Cooksey v. Futrell,*
    721 F.3d 226 (4th Cir. 2013)..................................................................... 13

*Di Biase v. SPX Corp.,*
    872 F.3d 224 (4th Cir. 2017)..................................................................... 11

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.,*
    141 S. Ct. 1017 (2021) ........................................................................... 16

*Golden Eagle Distrib. Corp. v. Burroughs Corp.,*
    801 F.2d 1531 (9th Cir. 1986)................................................................... 23

*Google, Inc. v. Hood,*
    822 F.3d 212 (5th Cir. 2016).............................................................. 12, 21, 23

JA0259

*Helicopteros Nacionales de Colombia v. Hall,*
    466 U.S. 408 (1984) ................................................................................. 15

*Ins. Co. of N. Am. v. Marina Salina Cruz,*
    649 F.2d 1266 (9th Cir. 1981) .................................................................. 17

*Jorgenson v. Volusia Cnty.,*
    846 F.2d 1350 (11th Cir. 1988) ................................................................ 24

*Laird v. Tatum,*
    408 U.S. 1, 11 (1972) ............................................................................... 13

*Leroy v. Great Western United Corp.,*
    443 U.S. 173 (1979) ............................................................................ 17, 18

*Letren v. Trans Union, LLC,*
    No. 15-3361-PX, 2017 WL 4098743 (D. Md. Sept. 15, 2017) ............ 21, 25

*Lewis v. Younger,*
    653 F.2d 1258 (9th Cir. 1980) ............................................................ 12, 23

*Maages Auditorium v. Prince George's Cnty.,*
    4 F. Supp. 3d 752 (D. Md. 2014) ............................................................. 11

*Matthews v. Freedman,*
    128 F.R.D. 194 (E.D. Pa. 1989) ............................................................... 23

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ................................................................................. 10

*Music Makers Holdings v. Sarro,*
    No. 09cv1836-RWT, 2010 WL 2807805 (D. Md. July 15, 2010) ............ 18

*PPG Indus., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship,*
    146 S.W.3d 79 (Tex. 2004) ........................................................................ 4

*Reisman v. Caplin,*
    375 U.S. 440 (1964) .............................................................. 11, 21, 23, 24

*Reps. Comm. for Freedom of Press v. AT&T,*
    593 F.2d 1030 (D.C. Cir. 1978) ................................................... 1, 12, 23

*RNC v. Pelosi,*
    602 F. Supp. 3d 1 (D.D.C. 2022) ............................................................. 21

*Safari Club Int'l v. Salazar,*
    852 F. Supp. 2d 102 (D.D.C. 2012) ......................................................... 20

*Sahyers v. Prugh, Holliday & Karatinos, P.L.,*
    560 F.3d 1241 (11th Cir. 2009) ................................................................ 24

*Scotts Co. v. United Indus. Corp.,*
    315 F.3d 264 (4th Cir. 2002) .................................................................... 19

JA0260

*Stover v. O'Connell Assocs., Inc.*,
   84 F.3d 132 (4th Cir. 1996) ........................................................................ 2, 15

*Stroman Realty v. Wercinski*,
   513 F.3d 476 (5th Cir. 2008) .......................................................................... 17

*Thompson v. Nat'l Football League*,
   No. 1:13-CV-00367, 2014 WL 1646929 (W.D. Pa. Apr. 24, 2014) ................ 18

*Twitter, Inc. v. Paxton*,
   56 F.4th 1170 (9th Cir. 2022) ........................................ 2, 12, 13, 14, 21, 23

*United States v. Kulukundis*,
   329 F.2d 197 (2d Cir. 1964) ........................................................................... 12

*Universal Leather v. Koro AR*,
   773 F.3d 553 (4th Cir. 2014) .......................................................................... 14

*Vitkus v. Blinken*,
   79 F.4th 352 (4th Cir. 2023) ........................................................................... 11

*Walden v. Fiore*,
   571 U.S. 277 (2014). .................................................................................. 2, 16

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000) ........................................................................ 14

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................................... 10

*Young v. New Haven Advoc.*,
   315 F.3d 256 (4th Cir. 2002) .......................................................................... 16

*Zazzali v. Swenson*,
   852 F. Supp. 2d 438 (D. Del. 2012) ............................................................... 18

**Statutes**

28 U.S.C. § 1391 ................................................................................................. 17

Tex. Bus. & Com. Code § 17.44 ......................................................................... 4

Tex. Bus. & Com. Code § 17.46 ................................................................... 1, 3, 4

Tex. Bus. & Com. Code § 17.60 ....................................................................... 22

Tex. Bus. & Com. Code § 17.61 ................................................... 4, 7, 12, 20, 23

Tex. Bus. & Com. Code § 17.62 ......................................................................... 4

Tex. Bus. & Com. Code ch. 17, subch. E ........................................................... 3

**JA0261**

**Rules**

Fed. R. Civ. P. 11(c) ................................................................................................. 3

Local Rule 101.1.b. ................................................................................................. 24

**Other Authorities**

Compl.,
  *X Corp. v. Media Matters*,
  No. 4:23-cv-01175 (N.D. Tex.), ECF No. 1 ........................................... 6, 7, 8, 9, 18

Matt Gertz,
  *It's the antisemitism, stupid*, Media Matters (Nov. 17, 2023) ................................. 5

Eric Hananoki,
  *As Musk endorses antisemitic conspiracy theory, X has been placing ads
  for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*,
  Media Matters (Nov. 16, 2023, updated Nov. 17, 2023) ..................................... 4, 5

Order,
  *Texas All. for Retired Ams. v. Hughs*,
  28 F. 4th 669 (5th Cir. 2022) (No. 20-40643), ECF No. 101 .............................. 22

X Safety,
  *Stand with X to protect free speech,* X Blog (Nov. 18, 2023) ............................... 5, 6

**JA0262**

## INTRODUCTION

In seeking to have a federal court enjoin an ongoing State investigation, the motion by Plaintiff Media Matters for America (Media Matters) is as meritless as it is extraordinary. On November 18, 2023, it came to light that Media Matters had arguably made false and misleading statements about the inner workings of X Corp. (f/k/a Twitter). Texas's Deceptive Trade Practices Act (DTPA) makes it unlawful to "disparag[e] the . . . services[] or business of another by false or misleading representation of facts." Tex. Bus. & Com. Code § 17.46(b)(8). Accordingly, on November 20, Defendant Ken Paxton, in his capacity as Texas's Attorney General, initiated an investigation. To date, Defendant has not reached a conclusion about whether Media Matters violated the law. It is possible that Media Matters' conduct was not false or misleading, or that its conduct otherwise did not sufficiently affect trade or commerce in Texas to come within the scope of the DTPA. But that is precisely why the Attorney General launched an *investigation*—to find out.

Media Matters asks this Court to enter extraordinary and unprecedented relief to short-circuit that investigation under the premise that the investigation harms its First Amendment rights. That is not something federal courts do. "[A]ny person can establish the existence of a First Amendment right and of an investigative technique that could possibly be employed in bad faith so as to violate that right." *Reps. Comm. for Freedom of Press v. AT&T*, 593 F.2d 1030, 1070 (D.C. Cir. 1978) (Op. of Wilkey, J.). If this sufficed for a preliminary injunction, it would have "no logical stopping-point." *Id.* And for three threshold reasons, Media Matters' attempt to obtain this unprecedented relief fails.

*First*, ripeness. Defendant's announcement of the investigation and issuance of a Civil Investigative Demand (CID) do not cognizably injure Media Matters. That is crystal clear under a

host of precedent, including binding Supreme Court precedent. And it is ***especially*** clear because the only Circuit court to address this Defendant's specific CID authority concluded that a party does not suffer a cognizable injury, including any form of chilled speech, merely by virtue of receiving said CID. *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1179 (9th Cir. 2022). That is because, among other things, the "CID is not self-enforcing." *Id.* at 1176. Media Matters suffers no automatic penalties if it ignores the CID. Instead, for the Attorney General to enforce the CID, he would have to sue in Texas State Court, where Media Matters would have the right to assert a First Amendment defense, or any other arguments. *Id.* Media Matters conspicuously failed to even cite this authority in its Renewed Motion for Temporary Restraining Order and Preliminary Injunction (the Renewed Motion).

*Second*, personal jurisdiction. The Texas Attorney General and his investigation have **zero** cognizable contacts with Maryland. The CID was issued to Media Matters in the District of Columbia. *See, e.g.*, Declaration of Christopher D. Dodge ("Dodge Decl."), Ex. A (ECF No. 20-5). Although Plaintiff Eric Hananoki allegedly resides in Maryland, he was not the recipient of the CID. Nor is he the subject of the Attorney General's investigation. Nor can the CID be enforced against him. And regardless, for personal jurisdiction to exist, "the plaintiff cannot be the only link between the defendant and the forum." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). Indeed, binding precedent confirms that even far greater contacts with this State do not suffice for personal jurisdiction. *See, e.g.*, *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 134 (4th Cir. 1996) (holding no personal jurisdiction over "New York private investigation firm" who retained "Maryland investigation companies to provide it with information about Maryland subjects, including the plaintiff in this case").

**JA0264**

*Third*, venue. Contrary to Media Matters' assertion, it is untrue that "a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Maryland," *contra* Compl. ¶ 13. Even by Media Matters' telling, the overwhelming share of events giving rise to the investigation involve Media Matters' potentially false or misleading disparagement of X.com. *See, e.g.*, Renewed Motion at 3-8. And those allegations are the subject of X Corp.'s lawsuit against Media Matters in the Northern District of Texas. To the extent this case is justiciable in any federal court, it belongs in that court with that related case.

As explained in further detail below, moreover, Media Matters' merits arguments are all premature. And Media Matters also is not entitled to relief because it has acted inequitably in multiple respects. It has misled the Court about whether it was chilled by Defendant's investigation, violated its duty of candor to the Court about various other aspects of this matter, and engaged in flagrantly un-collegial litigation conduct. *See infra* at 20-25; *cf.* Fed. R. Civ. P. 11(c).

Media Matters' Renewed Motion should be denied.

## BACKGROUND

### A.     Texas's DTPA and Defendant's CID Authority

Like many States, Texas has adopted a modified version of the Uniform Unfair and Deceptive Trade Practices Act. *See* Tex. Bus. & Com. Code ch. 17, subch. E. In Texas, the Deceptive Trade Practices Act (DTPA) protects consumers by prohibiting "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." *Id.* § 17.46(a). Deceptive trade practices are defined broadly to include, among other things, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have," *id.* § 17.46(b)(5); inducing consumers to enter transactions by "failing to

3

**JA0265**

disclose information concerning goods or services which was known at the time of the transaction," *id.* § 17.46(b)(24); and, as particularly relevant here, "disparaging the goods, services, or business of another by false or misleading representation of facts," *id.* § 17.46(b)(8). By statute, these categories "shall be liberally construed." *Id.* § 17.44(a).

The DTPA also authorizes a number of enforcement mechanisms. *See PPG Indus., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 84-85 (Tex. 2004). As relevant here, the statute authorizes Defendant's Consumer Protection Division to issue a CID if the "division believes that any person may be in possession, custody, or control" of "material relevant to the subject matter of an investigation of a possible violation of this subchapter." Tex. Bus. & Com. Code § 17.61(a). If the recipient chooses to provide documents, those documents generally may not be shared outside the Office of the Attorney General (OAG) except by consent or court order. *Id.* § 17.61(f). If the recipient objects to the CID, that recipient may affirmatively challenge it in Texas state court, *id.* § 17.61(g); or it may wait to see if the Attorney General chooses to bring an enforcement action (where the recipient may raise any defenses), *see id.* § 17.62(b). So long as the recipient of a CID does not seek to destroy documents, he will not face any penalty for declining to provide documents based on a good-faith objection to that CID. *Id.* §§ 17.61(g), 17.62(a), (c).

### B.     Factual Background

On November 16, 2023, Media Matters published a document titled "*As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*."[1] This document made a number of serious and economically harmful

---

[1] Eric Hananoki, *As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*, Media Matters (Nov. 16, 2023, updated Nov. 17, 2023), https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.

Media Matters claims (at 2) that "Hananoki"—not Media Matters—published this document. Although Hananoki is listed as the author, there is no evidence in the public record or the record before this Court that Hananoki *published*

**JA0266**

allegations against X Corp., an entity that employs people in Texas. Specifically, the document claimed that X "plac[es] ads for major brands like Apple, Bravo (NBCUniversal), IBM, Oracle, and Xfinity (Comcast) next to content that touts Adolf Hitler and his Nazi Party." *Id.* And the document claimed that Media Matters "found ads for Apple, Bravo, Oracle, Xfinity, and IBM next to posts that tout Hitler and his Nazi Party on X." *Id.* Media Matters' document also reproduced what Media Matters claimed were images of those ads next to the Hitler or Nazi Party content. *Id.* Unsurprisingly, at least some of these advertisers appear to have withdrawn their advertisements from X. Indeed, that objective appears to have been the whole point of the document. Media Matters kept a running "update" of advertisers who had withdrawn their ads from X. *Id.* And, on the following day, Media Matters published another document—this one by a different author—stating that "No advertiser is safe while Elon Musk controls X." Matt Gertz, *It's the antisemitism, stupid*, Media Matters (Nov. 17, 2023), https://www.mediamatters.org/elon-musk/its-antisemitism-stupid.

On November 18, X issued a blog post alleging how Media Matters' document was false or misleading in multiple respects. X Safety, *Stand with X to protect free speech,* X Blog (Nov. 18, 2023), https://blog.twitter.com/en_us/topics/company/2023/stand-with-x-to-protect-free-speech. The upshot of X's allegations is that Media Matters' document did not describe an organic experience on X's platform. Instead, X alleged that Media Matters jury-rigged an artificial experience that few, and perhaps zero, other users or advertisers would ever experience, and then publicized that artificial experience as if it were organic to create a misleading impression. *Id.* According to X's blog post, some of the advertiser combinations with Hitler or Nazi content that

---

the document. On the contrary, the document was published on Media Matters' website and, according to Media Matters' declarant, Hananoki is an employee of Media Matters. Padera Decl. ¶ 15.

**JA0267**

Media Matters described were apparently "seen" by only "one user"—the "author" of Media Matters' document. *Id.* The blog post claimed that Media Matters apparently achieved these outlier results by "curat[ing]" their account in a way that would generate these results. *Id.*

On November 20, 2023, the Attorney General announced an investigation into Media Matters for potential fraudulent activity. Dodge Decl., Ex. B. His investigation began because he was "extremely troubled by" X's allegations about Media Matters' "manipulat[ions]." *Id.* The Attorney General, however, did not claim that Media Matters had broken the law, only that his office is "examining the issue closely." *Id.* Indeed, the Attorney General does not unreservedly accept X's allegations about what happened. Getting to the bottom of that is the whole point of the investigation.

Later that day, X Corp. filed a lawsuit against Media Matters in the Northern District of Texas over Media Matters' November 16 document. That lawsuit added significant detail to how X believed that Media Matters had created a false depiction of the X platform. Specifically, X claimed that "Media Matters knowingly and maliciously manufactured side-by-side images depicting advertisers posts on X Corp.'s social media platform beside Neo-Nazi and white supremacist fringe content and then portrayed these manufactured images as if they were what typical X users experience on the platform." Compl. ¶ 1, *X Corp. v. Media Matters*, No. 4:23-cv-01175 (N.D. Tex.), ECF No. 1 ("*X Lawsuit*"). According to X, Media Matters accessed an old X account (one that would bypass X's "ad filter for new users") and then had that account follow content **only** "in one of two categories": (1) "those known to produce extreme fringe content," and (2) "accounts owned by X's big-name advertisers." *Id.* ¶ 8. According to X, Media Matters then "endlessly scroll[ed] and refresh[ed]" its account page until it generated "controversial content next to X's largest advertisers' paid posts." *Id.* ¶ 10. The upshot, according to X, was an

6

**JA0268**

inauthentic—and objectively misleading—representation of the X platform experience. For example, X claimed that the paid posts of IBM, Comcast, and Oracle "appeared alongside the fringe content cited by Media Matters for **_only one_** viewer (out of more than 500 million) on all of X: **_Media Matters_**." *Id.* ¶ 13 (emphasis original).

On November 21, the Attorney General's office issued a CID to Media Matters requesting multiple sets of documents. As is customary under the Texas DTPA, the Attorney General gave Media Matters until December 12, 2023—20 days from service—to respond to the CID. Dodge Decl., Ex. A at 1; Tex. Bus. & Com. Code § 17.61(g) (contemplating "20 days"). Media Matters suggests (at 2) that the CID was not served until "December 1." That is highly misleading; Media Matters had already engaged OAG *about the CID* before December 1. *See* Declaration of Levi Fuller ("Fuller Decl."), Ex. B (OAG's December 1 email memorializing that Media Matters' counsel "call[ed] yesterday"—November 30—regarding CID); *see also infra* at 22-23.

Defendant's investigation is primarily designed to investigate three things: (1) the veracity of X's allegations; (2) The nexus of Media Matters' conduct to Texas; and (3) the effect of Media Matters' underlying conduct to trade and commerce. *See* Dodge Decl., Ex. A at 7.

**Veracity**: To evaluate the veracity of X's allegations, the CID requests among other things, that Media Matters produce:

- "[D]ocuments sufficient to identify" Media Matters' "accounts that were used to obtain, produce, or otherwise acquire the" content published in Media Matters' November 16 document. Dodge Decl., Ex. A at 7 No. 8; *accord X Lawsuit* ¶ 29 (alleging Media Matters used an account that enabled it to "evade X's content filters for new users");

**JA0269**

- "[D]ocuments sufficient to identify all X accounts, profiles, and members followed by the X accounts identified" in the bullet above. Dodge Decl., Ex. A at 7 No. 9; *accord X Lawsuit* ¶ 30 (alleging Media Matters "set its accounts to follow only 30 users" and that "[*a*]*ll* of these users were either already known for posting controversial content or were accounts for X's advertisers" (emphasis original)); and

- Media Matters' "external communications with" X during a critical 3-week time period. Dodge Decl., Ex. A at 7 No. 10.

**Texas Nexus**: Texas's DTPA is, of course, a Texas statute. To evaluate the nexus of Media Matters' conduct with Texas, the CID requests that Media Matters produce:

- "[D]ocuments sufficient to identify all of Media Matters for America's sources of income originating in the State of Texas."  Dodge Decl., Ex. A at 7 No. 2;

- "[D]ocuments sufficient to identify all of Media Matters for America's operational expenditures in the State of Texas." Dodge Decl., Ex. A at 7 No. 3; and

- Media Matters' "external communications" with the advertisers at the center of the controversy over the November 16 document. Dodge Decl., Ex. A at 7 No. 11; *accord X Lawsuit* ¶ 19 (alleging "Media Matters' campaign against X Corp. was purposefully directed at, among others, relationships with advertisers who are located in, have a significant presence in, or transact substantial business in Texas."). At least some of these advertisers are headquartered in Texas.

**Effect on trade and commerce**: Texas's DTPA is about trade and commerce, not merely misleading statements in the abstract. To evaluate the November 16 document's nexus to trade and commerce, the CID requests that Media Matters produce:

**JA0270**

- "[D]ocuments" related to "Elon Musk's purchase of X." Dodge Decl., Ex. A at 7 No. 4;

- Media Matters' "external communications" with the advertisers at the center of the controversy over the November 16 document. Dodge Decl., Ex. A at 7 No. 11; *accord X Lawsuit* ¶ 19 (alleging "Media Matters' campaign against X Corp. was purposefully directed at, among others, relationships with advertisers who are located in, have a significant presence in, or transact substantial business in Texas."); and

- "[D]ocuments sufficient to identify all direct and indirect sources of funding for" Media Matters' operation. Dodge Decl., Ex. A at 7 No. 12.[2]

Media Matters contends (at 3) it "ha[s] been chilled from publishing additional criticism or coverage of X or Musk since" the Attorney General announced his investigation. Media Matters' COO, for example, asserts that there is a "culture of fear within Media Matters" to "speak[] on any topic related to the subject of the investigation." Declaration of Cynthia Padera ¶ 18 ("Padera Decl."), ECF No. 20-2. But it is almost impossible to square that with the public record. For example:

- On November 25 (after Defendant announced his investigation and issued the CID), Media Matters President Angelo Carusone stated on TV that "things [on X] appeared exactly the way we said, that ads were running alongside Nazi content." Fuller Decl., Ex. D.

---

[2] Although Media Matters does not have a right to understand the possible theories of the Attorney General's investigation, Defendant lays out these specifics in detail for the benefit of the Court's evaluation. Documents regarding Media Matters' funding could be highly relevant to effects on trade and commerce because, for example, Media Matters may be funded by an economic competitor of Elon Musk or X.

**JA0271**

- On the same day, Carusone said "Musk . . . doesn't really see a problem or at least seemingly, with a lot of this content because it's also a reflection of his own worldview." *Id.*

- On the same day, Carusone said X "still provides at this point a safe haven for extremists and disinformation." *Id.*

- On November 26, Carusone similarly said on TV that "Musk . . . engag[es] with some pretty extreme, you know, antisemitic, great replacement theory." Fuller Decl., Ex. E.

- On the same day, Carusone touted Media Matters' "reports showing that [X is] sharing ad revenue with these Hitler stan accounts." *Id.*

- On December 3 Carusone went on TV to accuse X CEO Linda Yaccarino of coercing "advertising partners . . . to really align with the values of what X is trying to do." Fuller Decl., Ex. F.

- On December 18 Carusone went on TV to boast how Media Matters has "chronicle[d] the descent of X now into a sort of a supercharged engine of radicalization." Fuller Decl., Ex. G.

Defendant takes no view on whether Carusone's speech *supra* is constitutionally protected. But his conduct clearly illustrates that Media Matters' speech has not been *chilled*.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam). That burden is heavy: "[A] preliminary injunction is an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 138 S. Ct. 1942 (2018) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "As a matter of

**JA0272**

equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits. Rather, a court must also consider whether the movant has shown that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Benisek*, 138 S. Ct. at 1943-44 (internal quotations omitted); *See also Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023). The possibility that adequate relief will be available at a later date weighs heavily against a claim of irreparable harm. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citing *Sampson v. Murray*, 415 U.S. 61 (1974)). The same standards apply for a temporary restraining order. *Maages Auditorium v. Prince George's Cnty.*, 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014).

## ARGUMENT

### I.    Media Matters has not Suffered Justiciable Injury.

The accepted rule since at least the Supreme Court's 1964 *Reisman v. Caplin* decision is that an agency's non-self-executing request for documents is not reviewable until the agency tries to enforce it. 375 U.S. 440 (1964). In *Reisman*, the recipient of an administrative request for documents was not obligated to produce anything until after the agency brought an "enforcement action" where the recipient would be afforded "a judicial determination" of the lawfulness of the request and the viability of any of his defenses. *Id.* at 446. That "opportunity for judicial review before any coercive sanctions may be imposed" was an adequate "remedy"; and the court would not permit the recipient of the request to short-circuit this process by preemptively seeking an injunction in federal court. *Id.* at 450. *Reisman* is now widely understood as having "announced a rule strongly disfavoring any pre-enforcement review of investigative subpoenas." *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334 (10th Cir. 1984); *see also United States v.*

**JA0273**

*Kulukundis*, 329 F.2d 197, 199 (2d Cir. 1964) (Friendly, J.) (explaining *Reisman* "seems to destroy the basis underlying decisions of this court which authorized applications to vacate [non-self-executing subpoenas] (and appeals from their denial) in advance of any judicial proceeding by the Government for their enforcement").

The presence of a First Amendment claim changes nothing. As a respected D.C. Circuit judge put it, "[t]here is no person in the United States" who cannot allege some "First Amendment right" that an "investigative technique" has supposedly trampled on, and then seek an injunction against the investigation on that basis. *Reps. Comm. For Freedom of Press v. AT&T*, 593 F.2d 1030, 1070 (D.C. Cir. 1978) (Wilkey, J.). That "approach has no logical stopping-point" and, if ever entertained, would mire the federal courts in a flood of litigation to short-circuit investigations before the investigations can even determine whether the subject has broken the law. *Id.* No wonder the courts have rejected these kinds of actions for an injunction, even when the First Amendment is at issue. *See, e.g.*, *Google, Inc. v. Hood*, 822 F.3d 212, 226 (5th Cir. 2016) (concluding, in First Amendment context, that an "administrative subpoena is not ripe for review" because it is not "self-executing"). Instead, as then-Judge Anthony Kennedy put it in a similar context, Media Matters "can properly litigate [its legal arguments] if and when the Attorney General attempts to enforce [state] law against [it] after the completion of his investigation." *Lewis v. Younger*, 653 F.2d 1258, 1260 (9th Cir. 1980). Or, Media Matters could take advantage of the procedures that the DTPA offers to challenge the CID. *See* Tex. Bus. & Com. Code § 17.61(g). But Media Matters cannot seek pre-enforcement review of the CID in federal court.

The Ninth Circuit's decision in *Twitter, Inc. v. Paxton* removes any conceivable doubt about whether Media Matters has already suffered cognizable injury. 56 F.4th 1170. In that case, Twitter sought an injunction against this same Defendant—Attorney General Paxton—after he

**JA0274**

initiated a DTPA investigation and served a CID on Twitter. Twitter alleged materially similar

First Amendment harm as Media Matters alleges here, *id.* at 1175 (Twitter declarant alleging "the

CID and associated investigation chill Twitter's speech") and identified statements from

Defendant that it believed showed retaliatory intent, *id.* at 1172 (Defendant stated Twitter was "the

left's Chinese-style thought police" and vowed to "fight them with all I've got"). The court

concluded, however, that "Twitter has not suffered an Article III injury because the CID is not

self-enforcing." *Id.* at 1176. After all, Twitter—like Media Matters here—"never faced any

penalties for its refusal to comply with the CID." *Id.* And all the actions Twitter claimed to have

taken to self-censor in response to the CID were—much like Media Matters' alleged actions

here—"self-inflicted because the actions were voluntary." *Id.*; *accord Clapper v. Amnesty Int'l

USA*, 568 U.S. 398, 418 (2013).

      None of Media Matters' First Amendment authority supports a contrary outcome. By and

large, courts adjudicate First Amendment "retaliation" cases only where "the challenged exercise

of governmental power was regulatory, proscriptive, or compulsory in nature." *Laird v. Tatum*,

408 U.S. 1, 11 (1972). "In none of" the Supreme Court's cases does "the chilling effect arise

merely from the individual's knowledge that a governmental agency was engaged in certain

activities," *id.*, or from a non-self-executing CID. Media Matters' case citations (at 18-19) are

illustrative. For example, in one of Media Matters' authorities—*Abbott v. Pastides*—the Fourth

Circuit explained that the government entity's process of "gather[ing] information—the 'who,

what, when, whys, and hows' of [an] [e]vent"—did ***not*** establish cognizable injury. 900 F.3d 160,

166, 171 (4th Cir. 2018). That is exactly what the Attorney General is engaged in here. In *Cooksey

v. Futrell*, the court found adequate First Amendment harm, by contrast, because the defendant

state agency threatened "an injunction" against the plaintiff, returned a "red-pen mark-up" of

plaintiff's speech, and issued "unsolicited written and oral correspondence" explaining that plaintiff's "speech violated the" law. 721 F.3d 226, 236-37 (4th Cir. 2013). Here, nothing like that has happened—the Attorney General has not even determined whether Media Matters violated the law. And in *White v. Lee*, 227 F.3d 1214 (9th Cir. 2000), the court did not discuss standing, and the plaintiffs there "would have had no opportunity to challenge any aspect of the investigation until formal charges were brought, at which point they could have faced a large fine," *Twitter*, 56 F.4th at 1177. That is why the Ninth Circuit in *Twitter* concluded that its own *White v. Lee* opinion was inapposite in this exact setting.

## II.    The Court Lacks Personal Jurisdiction over the Texas Attorney General.

This Court also lacks personal jurisdiction over Attorney General Paxton. He has **zero** contacts with Maryland, and it is in any event only the truly extraordinary case where a State Attorney General will be subject to jurisdiction in another jurisdiction's courts.

For "a district court to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs.*, 334 F.3d 390, 396 (4th Cir. 2003). "Maryland courts have consistently held that the state's long-arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Constitution," so the two inquiries "merge[]" into one here. *Id.* at 396-97. Personal jurisdiction comes in two forms: general and specific. Media Matters cannot meet its burden to show either. *See Universal Leather v. Koro AR*, 773 F.3d 553, 558 (4th Cir. 2014) (holding "plaintiff has the burden of making a prima facie showing").

**JA0276**

## A.      Defendant is not subject to general jurisdiction.

General jurisdiction is obviously inapplicable here: Defendant does not have the requisite "continuous and systematic" contacts with Maryland for that exercise of jurisdiction. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 415-16 (1984).

## B.      Defendant is not subject to specific jurisdiction.

Specific jurisdiction is also lacking. Specific jurisdiction turns on a three-part test: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002) (alterations omitted).

***No Purposeful Availment:*** First, there is no credible argument that Defendant "purposefully availed" himself of the privilege of conducting activities in Maryland. *ALS Scan*, 293 F.3d at 712. On the contrary, Defendant announced his investigation in Texas, Dodge Decl., Ex. B, and issued the CID to Plaintiff Media Matters in the District of Columbia, Dodge Decl., Ex. A.

Even far greater contacts with Maryland would not support personal jurisdiction. After all, the Fourth Circuit has held that even an out-of-state "investigation" that actually retains ***Maryland*** "companies to provide . . . information about Maryland subjects" is not sufficient for personal jurisdiction over the out-of-state investigator. *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 134 (4th Cir. 1996) (holding no personal jurisdiction over "New York private investigation firm").

Media Matters is wrong (Renewed Motion at 3; Compl. ¶ 12) in claiming that the Attorney General has taken any actions "intentionally directed towards Maryland." Media Matters' argument relies (*see* Compl. ¶ 12) on the "effects" test for personal jurisdiction announced in *Calder v. Jones*, where the Court concluded that two Floridians who had defamed a Californian

**JA0277**

were subject to personal jurisdiction in California for the tort. 465 U.S. 783 (1984). The Floridians published a story that "impugned the professionalism of" the Californian, whose "career was centered in California," the story "was drawn from California sources," and "the brunt of the harm" was suffered in California. *Id.* at 788-89. Moreover, the story was published in a periodical whose "largest circulation" was in California. *Id.* at 790. That is plainly nothing like this case, but Media Matters attempts to place Plaintiff Hananoki in a position analogous to the *Calder* Californian. Namely, Media Matters contends that the November 16 document was "written by Hananoki," that Hananoki's preparation and authorship of the document occurred "in the District of Maryland," and that Defendant's CID is seeking material "in this District." Compl. ¶ 12.

Media Matters' argument is fatally flawed at multiple steps.

*First*, it is well-established that "the plaintiff cannot be the only link between the defendant and the forum." *Walden*, 571 U.S. at 285. "[T]he place of a plaintiff's injury and residence *cannot* create a defendant's contact with the forum state." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1031 (2021). Instead, this Court must look at "whether the defendant has expressly aimed or directed [his] conduct toward the forum state." *Young v. New Haven Advoc.*, 315 F.3d 256, 262 (4th Cir. 2002). And here, Defendant's conduct was not in any sense "aimed" at Maryland—indeed, his CID was issued to, and served in, the District of Columbia, where Media Matters resides. At the very most, Defendant's conduct indirectly affected a Maryland resident (it did not, *see infra* next paragraph). But that is a far cry from the Attorney General "expressly aim[ing] or direct[ing] his conduct" toward Maryland. *Id.*

*Second*, while this binding authority alone is fatal for Media Matters, the reality is a great deal worse for it because, even under Media Matters' legally flawed theory, the possibility of personal jurisdiction hinges on *Hananoki*. Compl. ¶ 12. But Hananoki is a straw plaintiff.

**JA0278**

Defendant is not investigating Hananoki. *See* Dodge Decl., Ex. B. Defendant did not serve Hananoki with a CID. *See* Dodge Decl., Ex. A at 1. And Defendant therefore cannot enforce the CID against Hananoki. Tex. Bus. & Com. Code § 17.62(b) (enforcement against entity that was "***served***" with CID (emphasis added)).[3]

  ***Exercising Jurisdiction would be Unreasonable***:  It would also be highly unreasonable for this Court to exercise jurisdiction over the Attorney General of Texas because of the resulting extreme "conflict with the sovereignty of the defendant's [S]tate." *Ins. Co. of N. Am. v. Marina Salina Cruz*, 649 F.2d 1266, 1270 (9th Cir. 1981). The "sovereign status of a defendant militates against the reasonableness of jurisdiction." *Id.* at 1272. And the default rule is that state agencies should not "have to defend [their] attempt to enforce [state] laws "—much less mere investigations under those laws—"in courts throughout the nation." *Stroman Realty v. Wercinski*, 513 F.3d 476, 487 (5th Cir. 2008).

## III. Venue in Maryland is Improper.

  Venue is also improper here for similar reasons.

  Media Matters claims "a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Maryland, where nearly all of Hananoki's work occurred." Compl. ¶ 13 (citing 28 U.S.C. § 1391(b)(2)). Of course, like Media Matters' personal jurisdiction argument, this theory depends on Hananoki's presence as a straw plaintiff.

  And, in any event, the Supreme Court has rejected this approach to venue. In *Leroy v. Great Western United Corp.*, a Texas corporation filed suit against Idaho officials in Texas federal court to challenge an Idaho statute that restricted activities in Texas. 443 U.S. 173 (1979). The

---

[3] It is particularly bizarre that Media Matters would use Hananoki as a straw plaintiff in an attempt to invoke this Court's jurisdiction when 10 of its 11 listed counsel are not even admitted here, Renewed Motion at 31-32, and when Media Matters itself is "incorporated," and has "its principal place of business in" the "District of Columbia." Compl. ¶ 15.

JA0279

corporation's claim was based on "action that was taken in Idaho by Idaho residents," namely "the enactment of the statute by the legislature, the review of [the Texas corporation's] filing, the forwarding of the comment letter by [an Idaho official], and the entry of the order postponing the effective date of the tender by [an Idaho official]—as well as the future action that may be taken in the State by its officials to punish or to remedy any violation of its law." *Id.* at 185-86. Based on these facts, the Court held that the suit had "only one obvious locus—the District of Idaho." *Id.* at 185. This case also has one obvious locus—Texas.[4]

That venue is proper in Texas alone is especially obvious here because *X already filed a lawsuit in Texas against Media Matters for the same conduct Defendant is investigating*. *X Corp. v. Media Matters*, No. 4:23-cv-01175 (N.D. Tex.). That case clearly involves a "related" set of facts, and courts commonly look to relatedness when determining where venue is proper. *See Zazzali v. Swenson*, 852 F. Supp. 2d 438, 448 (D. Del. 2012) ("A motion to transfer may also be granted if there is a related case which has been first filed or otherwise is the more appropriate vehicle to litigate the issues between the parties."); *Thompson v. Nat'l Football League*, No. 1:13-CV-00367, 2014 WL 1646929, at *3 (W.D. Pa. Apr. 24, 2014) (same).[5] Moreover, it is quite likely

---

[4] Congress's amendment of the venue statute in 1990 (after *Leroy*) is irrelevant to this point because, while that amendment clarified that venue can be proper in multiple districts, the Court's decision in *Leroy* did not turn on "whether [the pre-amendment statute] adopt[ed] the occasionally fictive assumption that a claim may arise in only one district." *Leroy*, 443 U.S. at 384-85; *accord Bates v. C&S Adjusters, Inc.*, 980 F.2d 865, 867 (2d Cir. 1992) (observing, post-amendment, that "*Leroy* . . . remain[s] [an] important source[] of guidance").

[5] Transfer is unwarranted because, as explained *supra* at 11-14, this case is not justiciable in *any* federal court. But if the Court thinks this case is justiciable, then the Northern District of Texas is manifestly the proper place for it to be litigated.

The District of Columbia would not be a proper venue under *Leroy*, and Defendant is also not subject to personal jurisdiction there. While Media Matters' case for personal jurisdiction over Defendant would not be as obviously foreclosed in D.C. as it is here, Defendant's contact with D.C.—namely, the service of a CID there—does not suffice for personal jurisdiction. *See, e.g.*, *Music Makers Holdings v. Sarro*, No. 09cv1836-RWT, 2010 WL 2807805, at *5 (D. Md. July 15, 2010) ("[R]ecent out-of-circuit court of appeals decisions have analyzed the issue in a variety of contexts and have uniformly held that cease-and-desist letters alone do not establish personal jurisdiction."); *cf. Bulkley Assocs. v. Dep't of Industrial Relations*, 1 F.4th 346, 353-54 (5th Cir. 2021) (explaining how the Fifth Circuit recognizes this rule but that the court deviated once when the New Jersey Attorney General threatened to "halt

that that court will eventually address all of the arguments Media Matters has made here if X Corp.

seeks the same material in discovery.

## IV.  Media Matters has not Shown a First Amendment Violation.

Media Matters also cannot show that the Attorney General violated its First Amendment

rights.

Media Matters admits (at 14) that, to succeed on its retaliation claim, it must show that it

"engaged in protected First Amendment activity" and that Defendant took responsive action in

retaliation for that activity. But Media Matters cannot possibly show *on this record* that the activity

at issue in the Attorney General's investigation was protected First Amendment activity. Instead,

it is well-established that, under laws like Texas's DTPA, a party can constitutionally be liable for

both "literally false" statements and statements that, "although literally true, [are] likely to mislead

and to confuse" viewers. *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 273 (4th Cir. 2002).

And X Corp.'s lawsuit lays out a fact pattern that is suggestive of speech not merely "likely" to

deceive viewers, but deliberately designed to do so. If that is the case, then it is hard to see how

that same speech is constitutionally protected.

The Attorney General does not unreservedly take X Corp.'s allegations against Media

Matters at face value, and he does not ask this Court to do so. But that is the point of Defendant's

*investigation*. Among other things, Defendant's investigation will shed significant light on whether

Media Matters' speech was actually First Amendment-protected—*i.e.*, whether it was likely, or

deliberately designed, to mislead. Media Matters' suit functionally asks the Court to assume the

---

[plaintiff's] activity nationwide, including activity [in Texas] that had no connection to New Jersey property or residents").

**JA0281**

conclusion of that investigation in a way that will be favorable to Media Matters. But the appropriate course is to see what the investigation actually yields.[6]

## V.   Media Matters Could Have Avoided Any Harm, and its Litigation Conduct is Inequitable.

Media Matters' arguments about irreparable harm also are not equitable. And its meritless harm argument, coupled with various other misrepresentations and lack of candor, raises serious questions about its good faith.

As to the alleged harm: "It is well-settled that a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted." *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012) (quotations omitted). "In analogous circumstances, plaintiffs who decline the opportunity to avail themselves of a regulatory scheme to avoid the very harm for which they seek injunctive relief have been denied the [injunctive] relief." *Id.* Here, of course, Media Matters "decline[d] the opportunity" to use the DTPA's "regulatory scheme," *id.*, to set aside Defendant's CID. If there were merit to Media Matters' substantive arguments, those procedures would have provided Media Matters full relief against the harm it now characterizes as "irreparable."

---

[6] Media Matters' other merits arguments (at 22-27) also do not support its request that the Court enjoin Defendant. Media Matters can litigate whether Defendant's demand is "overbroad, unreasonable" or "seeks to pry into matters protected by the First Amendment" under the procedures the DTPA provides. Tex. Bus. & Com. Code § 17.61(g). Or, like any other party, it can meet and confer with Defendant about the overbreadth, etc., in an attempt to narrow the requests. And at least some requests are *plainly* not overbroad, unreasonable, or seeking First Amendment protected material. *See, e.g.*, Dodge Decl., Ex. A at 7 No. 9 (narrowly tailored request for a mere three weeks of "external communications" between Media Matters and X Corp); *id.* No. 10 (similar request for communications between Media Matters and advertisers). So the sweeping relief that Media Matters seeks cannot be granted on these arguments.

Media Matters' argument about whether it is subject to personal jurisdiction in Texas fares no better. Defendant's investigation is intended in part to evaluate that exact question. *See supra* at 8-9 (explaining how some requests are intended to evaluate the breadth of Media Matters' contacts with Texas). In that respect, the CID accomplishes much the same purpose as jurisdictional discovery. Just like when jurisdictional discovery is ordered, it would make no sense here to conclude Media Matters is not subject to jurisdiction in Texas without first flushing out the facts necessary to determine whether that is true.

**JA0282**

But Media Matters' irreparable harm argument is actually a great deal more inequitable than that. Namely, Media Matters refused Defendant's offer to extend **greater** relief than **any** authority requires. Defendant's office offered to stipulate that it would not enforce the CID, or even take any related judicial or enforcement action, for months. ECF No. 28-1 at 5. That is the customary way that government enforcers relieve parties of any potential irreparable harm and allow courts time to more carefully consider a case. *See, e.g.*, *RNC v. Pelosi*, 602 F. Supp. 3d 1, 15 (D.D.C. 2022). But Media Matters refused this stipulation and insisted on pressing forward with its preliminary injunction motion on the grounds that "mere delay" of CID enforcement did not remedy its alleged injury. ECF No. 28-1 at 4. "Mere delay," however, is the **same thing** a preliminary injunction offers. Defendant recognizes that, in the absence of agreement, this Court had a judicial responsibility to require "full briefing" to "assess the strength" of Media Matters' harm argument, and to proceed with its scheduled preliminary injunction hearing. ECF No. 31. But, as the full briefing, and an overwhelming line of case law, shows (*see, e.g.*, *Reisman*, *Google v. Hood*, *Twitter v. Paxton*), Media Matters is not entitled to **any** relief in federal court. Media Matters' rejection of Defendant's offer to give the company far more than any authority requires was inequitable conduct. *See, e.g.*, ECF No. 28-1 at 5 (email putting Media Matters on notice of *Google* and *Twitter* holdings).

This conduct is independently unbecoming of officers of the Court, like Media Matters' counsel. *Accord Letren v. Trans Union, LLC*, No. 15-3361-PX, 2017 WL 4098743, at *5 (D. Md. Sept. 15, 2017) (Xinis, J.) (a "primary purpose" of sanctions is to "deter parties and their counsel from pursuing unnecessary . . . litigation"). And unfortunately, this conduct has been undertaken in combination with multiple misrepresentations and lack of candor.

JA0283

*First*, misrepresentations. Media Matters contends it "ha[s] been chilled from publishing additional criticism or coverage of X or Musk since [Defendant] announced his investigation," Renewed Motion at 3, and that there is a "culture of fear within Media Matters" to "speak[] on any topic related to the subject of the investigation," Padera Decl. ¶ 18. Someone evidently forgot to tell this to Media Matters' President, because he has been on TV at least four times since the Attorney General announced his investigation, where he has made materially the same—and even more aggressive—claims against X and Musk as those made in the November 16 document. *See supra* at 9-10. Media Matters' President, for example, doubled down on the November 16 document ("things [on X] appeared exactly the way we said, that ads were running alongside Nazi content"), and even asserted that the Nazi content was a "reflection of [Musk's] own worldview," *see supra* at 9-10. It is not apparent how Media Matters can possibly square that with its assertion here that it has been chilled from criticizing X or Musk, or that it does not want to speak on matters related to the Attorney General's investigation.

Media Matters also makes (at 10) the highly misleading assertion that Defendant's November 21 CID was served on "December 1." FedEx records show that it was delivered and accepted at Media Matters' office on November 22. Fuller Decl., Ex. A; *see* Tex. Bus. & Com. Code § 17.60(d)(3) (service). And there is **no question** Media Matters **actually** received it before December 1 because, by November 30, it had hired counsel who had already reached out to Defendant's office about the CID. *See* Fuller Decl., Ex. B (memorializing this phone call). But at that point, OAG realized that Media Matters had chosen a law firm whose name partner was recently sanctioned for lack of candor to a court. Order, *Texas All. for Retired Ams. v. Hughs*, 28 F. 4th 669 (5th Cir. 2022) (No. 20-40643), ECF No. 101 (Mar. 11, 2021 Order). OAG concluded, in an extreme abundance of caution and to preempt any possibility of gamesmanship, that it would

JA0284

re-serve Media Matters through a professional process server—this time through Media Matters' chosen law firm, which was accomplished on December 1. *See* Fuller Decl., Ex. C. Plainly, however, that was not the only time Defendant served Media Matters. And this misrepresentation is material because it created the misimpression that Defendant had given Media Matters only a 12-day window to respond to the CID, Renewed Motion at 10, whereas the DTPA contemplates a default 20-day window for CID recipients to seek review in Texas State court, Tex. Bus. & Com. Code § 17.61(g).

**Second**, lack of candor. Media Matters failed to bring to the Court's attention the veritable mountain of authority holding that non-self-executing document demands are not reviewable in federal court. *See, e.g.*, *Reisman*, 375 U.S. 440; *Belle Fourche Pipeline*, 751 F.2d 332; *Reps. Comm. for Freedom of Press*, 593 F.2d 1030; *Google*, 822 F.3d 212; *Lewis*, 653 F.2d 1258; *Twitter* 56 F.4th 1170. "Although this line of cases contains no controlling decisions by the Court of Appeals for **this** circuit, the sheer volume of uniformly contrary decisions from other courts, as well as dictum from leading Supreme Court opinions, constituted more than adequate authority to put plaintiff's counsel on notice that his [arguments] were not well grounded in law and that sanctions would be in order unless counsel bolstered his assertions with at least a modicum of argument for extension, modification, or reversal of existing law." *Matthews v. Freedman*, 128 F.R.D. 194, 202 (E.D. Pa. 1989) (emphasis added). After all, "[a] lawyer should not be able to proceed with impunity in real or feigned ignorance of authorities which render his argument meritless." *Golden Eagle Distrib. Corp. v. Burroughs Corp.,* 801 F.2d 1531, 1542 (9th Cir. 1986). *Borowski v. DePuy, Inc.,* 850 F.2d 297, 304-05 (7th Cir. 1988) (reprimanding counsel's "ostrich-like tactic of pretending that potentially dispositive authority against [his] contention does not exist[]" (internal citation omitted)).

**JA0285**

Granted, Media Matters was entitled to contend that the Supreme Court's *Reisman* decision does not control because it did not address the First Amendment. But the Ninth Circuit addressed *exactly* that argument in *Twitter* and nevertheless concluded in this exact context that the suit was not justiciable. 56 F.4th at 1178-79. And of course, Media Matters also was entitled to pursue a Circuit split with the Ninth Circuit. But Media Matters' counsel was not ethically permitted to fail to even ***apprise*** this Court of all this authority, much less the sole Circuit court case (*Twitter*) addressing this precise scenario. *Accord, e.g.*, *Jorgenson v. Volusia Cnty.*, 846 F.2d 1350 (11th Cir. 1988) (sanctions); *Barth v. District of Columbia*, No. 92-7093, 1993 WL 523999, at *4 (D.C. Cir. Dec. 14, 1993) (Henderson, J., concurring) (counsel's "ability to distinguish the omitted cases when pressed to do so should not excuse its lack of candor in its pleadings").

***Third***, Media Matters' gamesmanship and lack of collegiality have imposed unnecessary burdens on Defendant and the Court. It is well established that "civility and collegiality" in litigation are in the public interest and "greatly advance[] judicial efficiency" by promoting "inexpensive determination of every action and proceeding." *Sahyers v. Prugh, Holliday & Karatinos, P.L.*, 560 F.3d 1241, 1245 (11th Cir. 2009). But multiple of Media Matters' litigation tactics have undermined judicial efficiency and unnecessarily raised the costs of litigation. Media Matters, for example, enlisted Hananoki as a straw plaintiff as part of an apparent effort to establish personal jurisdiction over Defendant in Maryland. *See supra* at 16-17. That needlessly forced Defendant to expend resources on outside counsel. *See, e.g.*, Local Rule 101.1.b. Media Matters has offered no reason why it enlisted Hananoki in this gambit when it could have instead sued in its home—the District of Columbia, where undersigned counsel, and other attorneys in OAG, are barred.

JA0286

In addition, there are significant indicia here that Media Matters "knowingly or recklessly raise[d] a frivolous argument, or argue[d] a meritorious claim for the purpose of harassing an opponent." *Letren*, 2017 WL 4098743, at *6. Namely, Media Matters offered no comprehensible explanation why it forced Defendant's counsel, and this Court, to expend resources over the Holiday break. As noted earlier, the Attorney General offered to stipulate not to enforce the CID, or take any related action, for a period to allow a more reasonable briefing schedule and more reasonable time for this Court to evaluate the claims. *See* ECF No. 28-1. When the Attorney General implored Media Matters to explain how this did not moot any possible urgency on the Renewed Motion, Media Matters responded that its "complaint and motion speak for themselves." *Id.* But that is nonsensical—the complaint and motion were filed *before* Defendant offered his stipulation, and do not address the stipulation. Media Matters also contended that "mere delay" of enforcement would not remedy its injury. *Id.* But "mere delay" is the same thing a preliminary injunction accomplishes. And, in any event, the Attorney General did not propose the stipulation as a full-blown substitute for the preliminary injunction—rather, it was offered merely to elongate the briefing and hearing schedule on that motion so that the parties and this Court would not be burdened over the Holidays.

## CONCLUSION

The Court should deny Plaintiffs' Renewed Motion.

**JA0287**

Dated: December 30, 2023

Respectfully submitted,

*/s/ Gene C. Schaerr*
GENE C. SCHAERR (D. Md. # 22340)
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC  20006
gschaerr@schaerr-jaffe.com

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

*/s/ Ryan S. Baasch*
RYAN S. BAASCH*
(signed by Gene C. Schaerr with
permission of Ryan S. Baasch)
Division Chief
Consumer Protection Division
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 463-9917
ryan.baasch@oag.texas.gov

CHRIS LAVORATO*
Assistant Attorney General
General Litigation Division
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4476
chris.lavorato@oag.texas.gov

*Admitted *pro hac vice*

*Attorneys for Defendant*
*Ken Paxton, Attorney General*
*of the State of Texas*

**JA0288**

**CERTIFICATE OF SERVICE**

I, Gene C. Schaerr, hereby certify that on December 30, 2023, I electronically filed Defendant's Opposition to Plaintiffs' Renewed Motion for Temporary Restraining Order and Preliminary Injunction with the Clerk for the United States District Court of Maryland using the CM/ECF system, which shall send electronic notification to counsel of record.

*/s/ Gene C. Schaerr*
Gene C. Schaerr

**JA0289**

# Exhibit J

JA0290

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| Exxon Mobil Corporation, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 4:16-cv-00469-K |
| | ) | |
| Maura Tracy Healey, | ) | |
| Attorney General of Massachusetts, | ) | |
| in her official capacity, | ) | |
| | ) | |
| *Defendant.* | ) | |

**Brief of Texas, Louisiana, South Carolina, Alabama, Michigan, Arizona, Wisconsin, Nebraska, Oklahoma, Utah, and Nevada As *Amici Curiae* In Support of Plaintiff's Motion for Preliminary Injunction**

JA0291

TABLE OF CONTENTS

INTEREST OF *Amici Curiae* AND BACKGROUND ..........................................................1

ARGUMENT ............................................................................................................2

    I.    Attorneys General should act impartially. ...................................................2

        A.    Attorneys General should not employ legal power to tip the
            scales in a policy debate. ........................................................................3

            1.    Targeting critics. ............................................................................4

            2.    Abusing subpoena power...............................................................5

        B.    Climate change is the subject of legitimate international
            debate. ....................................................................................................6

    II.    Politicized investigations undermine public confidence..............................9

CONCLUSION .........................................................................................................9

### INTEREST OF *AMICI CURIAE* AND BACKGROUND

Exxon Mobil Corporation (Exxon) is challenging the validity of a Civil Investigative Demand (CID), a state civil administrative subpoena, issued by the Attorney General of Massachusetts (Massachusetts). Massachusetts dispatched the CID to investigate supposed violations of consumer protection laws through Exxon's marketing and sale of fossil fuel-derived products and securities. Exxon is asking the Court to issue an injunction prohibiting Massachusetts from enforcing the CID.

*Amici* possess sovereign authority to investigate violations of law. As chief legal officers, they have long used their power—including the issuance of CIDs—to determine whether unlawful conduct occurred. However, this power does not include the right to engage in unrestrained, investigative excursions to promulgate a social ideology, or chill the expression of points of view, in international policy debates.

The concerns of *Amici* and others regarding Massachusetts's tactics are expressed in a recent open letter.[1] In it, the actions of Massachusetts and others are condemned, as "this effort by our colleagues to police the global warming debate through the power of the subpoena is a grave mistake." The signatories, representing a wide range of viewpoints on climate change, "agree on at least one thing—this is not a question for the courts. Using law enforcement authority to resolve a public policy debate undermines the trust invested in our offices and threatens free speech."[2] As most recognize, "vigorous debate exists in this country regarding the risks of climate change and the appropriate response to those risks. Both sides are well-funded and sophisticated public policy participants. Whatever our country's response,

---

[1] Open Letter from Attorneys General (Luther Strange, Alabama; Bill Schuette, Michigan; Ken Paxton, Texas; Craig Richards, Alaska; Doug Peterson, Nebraska; Sean Reyes, Utah; Mark Brnovich, Arizona; Adam Laxalt, Nevada; Brad Schimel, Wisconsin; Leslie Rutledge, Arkansas; Scott Pruitt, Oklahoma; Jeff Landry, Louisiana; Alan Wilson, South Carolina) dated June 15, 2016, *available online at* http://www.ago.state.al.us/news/852.pdf.

[2] *Id*. at p.1.

**JA0293**

it will affect people, communities, and businesses that all have a right to participate in this debate." Thus, attorneys general should "stop policing viewpoints."[3]

*Amici* are concerned about the unconstitutional use of investigative powers. They have an interest in preserving their roles as evenhanded enforcers of the law and, thus, have direct and vital interests in the issues before the Court.

<div align="center">ARGUMENT</div>

Attorneys General have a constitutional duty to act dispassionately in the execution of their office. The Supreme Court has explained that attorneys representing the public do not represent an ordinary party in litigation, but "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest , . . . is not that it should win a case but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). This distinctive role of the prosecutor is also expressed the Model Code of Professional Responsibility. MODEL CODE OF PROF'L RESPONSIBILITY EC 7-13 (1982) ("The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict."). Massachusetts crossed both legal and ethical lines with its CID.

## I. Attorneys General should act impartially.

Massachusetts's investigation is the product of a cultural movement "committed to aggressively protecting and building upon the recent progress the United States has made in combatting climate change."[4] And the common interest agreement of the powers aligned on this axis of ideology underscores the partiality of their endeavor, as they seek to "limit climate change and ensur[e] the dissemination

---

[3] *Id.*

[4] Press Release, New York State Attorney General, *A.G. Schneiderman, Former Vice President Al Gore And A Coalition Of Attorneys General From Across The Country Announce Historic State-Based Effort To Combat Climate Change* (March 29, 2016) (*available online at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across).

<div align="center">2</div>

<div align="right">**JA0294**</div>

of accurate information about climate change." ECF No. 57 at 3.[5] And Defendant acknowledges that the issuance of the CID is part of an "aggressive approach."[6]

While *amici* have authority to conduct investigations regarding consumer protection, fraud, and deceptive trade practices, these investigations must be supported by a "reasonable belief" that there has been, or is about to be, unlawful false, misleading, or deceptive acts or practices in the conduct of any trade or commerce. *See, e.g.,* TEX. BUS. & COM. CODE §§ 17.46, 17.47, 17.60, 17.61. And while the government's power "to protect people against fraud" has "always been recognized in this country and is firmly established," *Donaldson v. Read Magazine, Inc.,* 333 U.S. 178, 190 (1948), "[s]imply labeling an action one for 'fraud,' of course, will not carry the day," *Illinois ex rel. Madigan v. Telemarketing Assocs.,* 538 U.S. 600, 617 (2003).

## A.   Attorneys General should not employ legal power to tip the scales in a policy debate.

The authority attorneys general have to investigate fraud does not allow them to encroach on the constitutional freedom of others to engage in an ongoing public policy debate of international importance. Thus, government action that restricts or chills speech because of the message embodied within that speech contravenes the First Amendment. Indeed, "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama,* 384 U.S. 214, 218 (1966). The First Amendment generally prevents government from proscribing speech, *see, e.g., Cantwell v. Connecticut,* 310 U.S. 296, 309–311 (1940), or even expressive conduct, *see, e.g., Texas v. Johnson,* 491

---

[5] This ideology was on full display at the March 29, 2016 press conference of the so-called "AG's United for Clean Power," characterized as "the beginning of the end of our addiction to fossil fuel and the degradation of our planet." Attorney General Schneiderman, Press Conference, AGs United for Clean Power (March 29, 2016) (confirming subpoena to ExxonMobil) (*video available online at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-at-torneys-general-across). Former Vice President Al Gore alleged that commercial interests (such as the Plaintiff) are "committing fraud in their communications . . . ." *Id.*

[6] *Id.*

3

**JA0295**

U.S. 397, 406 (1989), for the mere disapproval of the ideas expressed. Here, the chilling effect of Massachusetts's CID should be of concern since the "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury . . . ." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The heart of viewpoint discrimination is the government preferring one message to another. But "[t]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984); *see also Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Cornelius v. NAACP*, 473 U.S. 788, 806 (1985). Viewpoint discrimination occurs when "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004).

While Massachusetts claims an interest in consumer protection as the basis for its CID, the Supreme Court has been clear that proffering what may be on its face "reasonable grounds" for the action does "not save a regulation that is in reality a facade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811.

### 1.   Targeting critics.

The First Amendment is concerned with "the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas." *Hill v. Colorado*, 530 U.S. 703, 719 (2000). Thus, it stands as a bulwark against Government action designed to suppress ideas or information, or to manipulate the public debate through coercion rather than persuasion. *See Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 510 (5th Cir. 2009).

Using CIDs to suppress policy debates is like imposing prior restraints on speech. Governmentally imposed prior restraints on speech are tantamount to censorship. *See Near v. Minnesota*, 283 U.S. 697, 713, (1931); *cf. Fernandes v.*

**JA0296**

*Limmer*, 663 F.2d 619, 632 (5th Cir. Unit A Dec. 1981). Massachusetts labeling its so-called investigation (into an unsettled area of science and public policy) as related to "fraud" certainly "raise[s] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991).

But if our society refuses to tolerate *both* the proponents and critics of ideas vying for acceptance, then the marketplace of ideas becomes a mere oligarchy of consumption. As Justice Holmes put it:

> But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out.

*Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).

## 2.  Abusing subpoena power.

The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). Where subpoenaed materials may be protected by the First Amendment, the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Stanford v. Texas,* 379 U.S. 476, 485 (1965). As such, so-called "fishing expeditions," like this one, are proscribed and "[i]t is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924).

Massachusetts's abuse of its subpoena power runs afoul of the First Amendment. *See, e.g., AFL-CIO v. FEC*, 333 F.3d 168, 175 (D.C. Cir. 2003) (citing *Buckley v. Valeo*, 424 U.S. 1, 64–68 (1976) (disclosure of campaign contributions); *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462–63 (1958) (disclosure of

**JA0297**

membership lists)). A First Amendment privilege against disclosures exists where such "will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009) (quotation omitted).

For example, subpoenas seeking investigative notes as well as the names of contacts have been held to be an invalid chilling of the free exercise of political speech and association under the First Amendment. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012) (finding "invalid" under First Amendment "subpoenas demanding that [a] paper . . . disclose its reporters' notes and reveal information about anyone who visited the New Times's [sic] website" because subpoenas would "chill speech"); *see also Pebble Ltd. P'ship v. EPA*, 310 F.R.D. 575, 582 (D. Alaska 2015) (subpoenas are invalid when they have "the tendency to chill the free exercise of political speech and association which is protected by the First Amendment").

These protections afforded by the Constitution protect us and our freedom to engage in open and candid discussions about significant issues. But the mere existence of those very discussions is threatened by the chill of subpoenas, like Massachusetts's CID, hanging in the air. Thus, not only is Massachusetts attempting to silence Exxon through the issuance and threat of compelling a response to the CID, this very action harms everyone, stifling consumers and those seeking information in order to evaluate various viewpoints in this public policy debate.

## B.   Climate change is the subject of legitimate international debate.

Massachusetts presumes that the scientific debate regarding climate change is somehow settled, along with the related and equally important public policy debate on how to respond to what science has found. Yet, neither is true. The clearest and most undeniable fact about climate change is that, like so many other areas of science and public policy, the debate is unsettled, the research far from complete, and the

<div align="center">6</div>

<div align="right">**JA0298**</div>

path forward unclear. *Amici* agree that "[s]cientists continue to disagree about the degree and extent of global warming and its connection to the actions of mankind,"[7] as do many others. Moreover, science does not teach the obvious public policy response to its data and findings, it merely provides a starting point.

Modern science helps us better understand our world. It constantly subjects to scrutiny various hypotheses against objective data. *See, e.g.*, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993). However, because it is almost never possible for all relevant data to be marshaled, scientific proclamations are always subject to change because of new data, enhanced measurements, or other unforeseen factors. *Cf.* Karl Popper, The Logic of Scientific Discovery 44, 47 (1959). Thus, "[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation." *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994)

Accordingly, the intersection of science, law, and public policy should be approached with caution and objectivity. Unfortunate results take root when government invests itself in only one side of a scientific debate since "bad ideas can persist in science for decades, and surrounded by myrmidons of furious defenders they can turn into intolerant dogmas."[8] Unfortunately,

---

[7] Scott Pruitt and Luther Strange, *The Climate-Change Gang*, National Review (May 17, 2016), *available online at* http://www.national review.com/article/435470/climate-change-attorneys-general-overstepping-their-authority.

[8] Matt Ridley, *The Climate Wars and the Damage to Science,* GWPF Essay 3 at p.3 (Global Warming Policy Foundation 2015), *available online at* http://www.thegwpf.com/content/uploads/2015/11/climate-wars.pdf. In addition to being former Science Editor of the Economist, "Matt Ridley is one of the world's foremost science writers. His books have sold over a million copies and been translated into 30 languages. His new book The Evolution of Everything was published in 2015. He is a member of the [Global Warming Policy Foundation]'s Academic Advisory Council. As a landowner, he receives a way-leave income from a coal-mining company." In the words of Ridley,

I am not a full sceptic of climate change, let alone a 'denier'. I think carbon-dioxide induced warming during this century is likely, though I think it is unlikely to prove rapid and dangerous. So I don't agree with those who say the warming is all natural, or all driven by the sun, or only an artefact of bad measurement, but nor do I think anything excuses bad scientific practice in support of the carbon dioxide theory, and every time one of these scandals erupts and the scientific establishment asks us to ignore it, I wonder if the extreme sceptics are not

**JA0299**

> [t]his is precisely what has happened with the climate debate and it is at risk of damaging the whole reputation of science. The 'bad idea' in this case is not that climate changes, nor that human beings influence climate change; but that the impending change is sufficiently dangerous to require urgent policy responses. In the 1970s, when global temperatures were cooling, some scientists could not resist the lure of press attention by arguing that a new ice age was imminent. Others called this nonsense and the World Meteorological Organization rightly refused to endorse the alarm. That's science working as it should. In the 1980s, as temperatures began to rise again, some of the same scientists dusted off the greenhouse effect and began to argue that runaway warming was now likely. At first, the science establishment reacted skeptically and a diversity of views was aired. It's hard to recall now just how much you were allowed to question the claims in those days.[9]

Even the premise that "97% of all climate scientists agree on climate change" is argued by Ridley to be pseudo-science. The self-serving conclusion that "97% of all climate scientists agree on climate change" is derived from a poll involving only seventy-nine scientists[10]—hardly a statistically-relevant sample. Moreover, of those seventy-nine scientists, 97% believe that climate change is man-made—not that it was dangerous.[11] "A more recent poll of 1854 members of the American Meteorological Society found the true number is 52 per cent."[12] Indeed,

> there has been a systematic and thorough campaign to rule out the middle ground as heretical: not just wrong, but mistaken, immoral and beyond the pale. That's what the word 'denier', with its deliberate connotations of Holocaust denial, is intended to do. For reasons I do not fully understand, journalists have been shamefully happy to go along with this fundamentally religious project. Politicians love this polarizing because it means they can attack a straw man.[13]

---

on to something. I feel genuinely betrayed by the profession that I have spent so much of my career championing.
*Id*. at p.10.

[9] *Id*. at p.4.

[10] *Id*. at p.7.

[11] *Id*.

[12] *Id*.

[13] *Id*. at p.6.

JA0300

## II.    Politicized investigations undermine public confidence.

The transcript of the press conference of the "AG's United for Clean Power" demonstrates that Massachusetts commenced its investigation precisely for the reasons the First Amendment forbids.[14] "It is one thing to use the legal system to pursue public policy outcomes; but it is quite another to use prosecutorial weapons to intimidate critics, silence free speech, or chill the robust exchange of ideas."[15]

Allowing government law enforcement officials to violate constitutional rights is to "violate the sacred trust of the people . . . ." *United States v. Costa*, 356 F. Supp. 606, 609 (D.D.C. 1973). It undermines "the right of the people to be secure in their persons, houses, papers and effects, and would obliterate one of the most fundamental distinctions between our form of government, where officers are *under* the law, and the police-state where they *are* the law." *Johnson v. United States*, 333 U.S. 10, 17 (1948) (emphasis added).

Regrettably, history is embroiled with examples where the legitimate exercise of law enforcement is soiled with political ends rather than legal ones. Massachusetts seeks to repeats that unfortunate history. That the statements and workings of the "AG's United for Clean Power" are entirely one-sided, and target only certain participants in the climate change debate, speaks loudly enough.[16]

### CONCLUSION

*Amici* aver that the Court should grant Exxon's motion for preliminary relief.

---

[14] *See* n.5, *supra.*

[15] Press Release, Louisiana Department of Justice, Attorney General Jeff Landry Slams Al Gore's Coalition (Mar. 30, 2016) (*available online at* https://www.ag.state.la.us/Article/2207/5).

[16] "[T]his fraud investigation targets only 'fossil fuel companies' and only statements minimizing climate change risks. If it is possible to minimize the risks of climate change, then the same goes for exaggeration. If minimization is fraud, exaggeration is fraud." *See* n.1, *supra,* at p.2. It is also worth noting that "[e]leven of the 17 attorneys general who participated [in the "AG's United for Clean Power" press conference] are the same folks who took part in the 2010 sue-and-settle lawsuit that used federal courts to try to force the adoption of the federal energy regulations that became the EPA's 'Power Plan.'" Michael Batasch, *Kansas AG takes on Al Gore's Alarmism – Won't Join Anti-Exxon "Publicity Stunt,"* The Daily Caller (Apr. 4, 2016), *available online at* http://dailycaller.com/2016/04/04/kansas-ag-takes-on-al-gores-alarmism-wont-join-ant-exxon-publicity-stunt.

**JA0301**

Respectfully submitted this the 8th day of September, 2016,

JEFF LANDRY
Attorney General of Louisiana

ALAN WILSON
Attorney General of South Carolina

LUTHER STRANGE
Attorney General of Alabama

BILL SCHUETTE
Attorney General of Michigan

MARK BRNOVICH
Attorney General of Arizona

BRAD SCHIMEL
Attorney General of Wisconsin

DOUG PETERSON
Attorney General of Nebraska

SCOTT PRUITT
Attorney General of Oklahoma

SEAN REYES
Attorney General of Utah

ADAM LAXALT
Attorney General of Nevada

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

PRERAK SHAH
Senior Counsel to the Attorney General

*/s/ Andrew D. Leonie*
ANDREW D. LEONIE
Associate Deputy Attorney General for the
Office of Special Litigation
Andrew.Leonie@texasattorneygeneral.gov

AUSTIN R. NIMOCKS
Associate Deputy Attorney General for the
Office of Special Litigation
Austin.Nimocks@texasattorneygeneral.gov

MICHAEL TOTH
Senior Counsel for the Office of Special
Litigation

Office of Special Litigation
Texas Attorney General's Office
P.O. Box 12548, Mail Code 009
Austin, Texas 78711-2548
Tel: 512-936-1414
Fax: 512-936-0545

*ATTORNEYS FOR AMICI CURIAE*

10

**JA0302**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of September 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which I understand to have caused service on all counsel of record.

<div align="right">

*/s/ Andrew D. Leonie III*
Andrew D. Leonie III
SBOT No. 12216500

</div>

**JA0303**

# Exhibit K

JA0304

# 18-1170

## In the United States Court of Appeals
## for the Second Circuit

### Exxon Mobil Corporation,
*Plaintiff-Appellant,*

*v.*

### Maura Tracey Healey, in her official capacity as Attorney General of the State of Massachusetts, and Barbara D. Underwood, Attorney General of New York, in her official capacity,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of New York, Manhattan Division

## BRIEF FOR TEXAS AND ELEVEN ADDITIONAL STATES AS AMICI CURIAE IN SUPPORT OF APPELLANT AND URGING REVERSAL

Ken Paxton
Attorney General of Texas

Jeffrey C. Mateer
First Assistant Attorney General

Brantley D. Starr
Deputy First Assistant
  Attorney General

James E. Davis
Deputy Attorney General for
  Civil Litigation

David J. Hacker
Special Counsel for Civil Litigation
david.hacker@oag.texas.gov
Office of the Attorney General
P.O. Box 12548 (MC 001)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Counsel for Amici Curiae

# Table of Contents

Page

Table of Authorities .............................................................................. ii

Interest of Amici Curiae ......................................................................... 1

Summary of the Argument ..................................................................... 2

Argument ............................................................................................... 3

   I.   Attorneys General Must Act Impartially ....................................... 3

      A.  Attorneys general may not employ legal power to suppress a
          viewpoint in a public policy debate. ...................................... 5

          1.  The New York and Massachusetts Attorneys General are
               targeting critics. ............................................................... 7

          2.  The New York and Massachusetts Attorneys General are
               abusing their power. ...................................................... 11

      B.  Climate change is the subject of legitimate international
          debate. ................................................................................ 13

   II.  Politicized investigations undermine public confidence. .......... 16

Conclusion .......................................................................................... 19

Certificate of Service ........................................................................... 20

Certificate of Compliance ................................................................... 20

JA0306

# Table of Authorities

**Page(s)**

**Cases:**

*Abrams v. United States*,
250 U.S. 616 (1919) ........................................................ 7–8

*AFL-CIO v. Fed. Elec. Comm'n*,
333 F.3d 168 (D.C. Cir. 2003) ...................................... 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................ 8

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) .......................................................... 7

*Berger v. United States*,
295 U.S. 78 (1935) .......................................................... 3

*Buckley v. Valeo*,
424 U.S. 1 (1976) .......................................................... 11

*Cantwell v. Connecticut*,
310 U.S. 296 (1940) ........................................................ 5

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) ..................................................... 5, 6

*City of Lakewood v. Plain Dealer Pub. Co.*,
486 U.S. 750 (1988) ........................................................ 7

*Connick v. Myers*,
461 U.S. 138 (1983) ........................................................ 6

*Cornelius v. NAACP*,
473 U.S. 788 (1985) ........................................................ 6

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ...................................................... 14

JA0307

*Donaldson v. Read Magazine, Inc.*,
    333 U.S. 178 (1948) ................................................................. 4

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
    472 U.S. 749 (1985) ................................................................ 13

*Elrod v. Burns*,
    427 U.S. 347 (1976) ................................................................. 5

*Fed. Trade Comm'n v. Am. Tobacco Co.*,
    264 U.S. 298 (1924) ............................................................... 11

*First Nat'l Bank of Bos. v. Bellotti*,
    435 U.S. 765 (1978) ............................................................... 13

*Gaidon v. Guardian Life Ins. Co. of Am.*,
    750 N.E.2d 1078 (N.Y. 2001) ................................................ 13

*Hill v. Colorado*,
    530 U.S. 703 (2000) ................................................................. 7

*Johnson v. United States*,
    333 U.S. 10 (1948) ................................................................ 17

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
    385 U.S. 589 (1967) ................................................................. 7

*Lacey v. Maricopa Cty.*,
    693 F.3d 896 (9th Cir. 2012) ................................................. 12

*Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y.
    Harbor*,
    667 F.2d 267 (2d Cir. 1981) .................................................. 12

*Illinois ex rel. Madigan v. Telemarketing Assocs.*,
    538 U.S. 600 (2003) ................................................................. 4

*Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*,
    429 U.S. 167 (1976) ............................................................... 10

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995) ................................................................. 2

iii

**JA0308**

*Members of the City Council of L.A. v. Taxpayers for Vincent*,
    466 U.S. 789 (1984) ............................................................... 5–6

*Mills v. Alabama*,
    384 U.S. 214 (1966) ................................................................... 5

*N.Y. Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013) ..................................................... 5

*NAACP v. Ala. ex rel. Patterson*,
    357 U.S. 449 (1958) ................................................................. 11

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018) ......................................................... 2–3

*Near v. Minnesota*,
    283 U.S. 697 (1931) ................................................................... 7

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ................................................................... 6

*Okla. Press Publ'g Co. v. Walling*,
    327 U.S. 186 (1946) ................................................................. 11

*Pebble Ltd. P'ship v. EPA*,
    310 F.R.D. 575 (D. Alaska 2015) ........................................ 12

*Perry v. Schwarzenegger*,
    591 F.3d 1147 (9th Cir. 2009) .............................................. 12

*Police Dep't of Chi. v. Mosley*,
    408 U.S. 92 (1972) ..................................................................... 5

*Reed v. Town of Gilbert*,
    135 S. Ct. 2218 (2015) ........................................................... 17

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ............................................................. 5, 6

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991) ................................................................... 7

iv

JA0309

*Smith v. Cty. of Suffolk*,
  776 F.3d 114 (2d Cir. 2015) ......................................................... 17

*Stanford v. Texas*,
  379 U.S. 476 (1965) ...................................................................... 11

*Texas v. Johnson*,
  491 U.S. 397 (1989) ........................................................................ 5

*Underwager v. Salter*,
  22 F.3d 730 (7th Cir. 1994) ........................................................ 14

*United States v. Costa*,
  356 F. Supp. 606 (D.D.C. 1973) ................................................. 16

*United States v. Kokinda*,
  497 U.S. 720 (1990) ...................................................................... 10

*White v. Lee*,
  227 F.3d 1214 (9th Cir. 2000) ....................................................... 7

## Statutes

Mass. Gen. Laws ch. 93A, § 2 ........................................................ 12

Mass. Gen. Laws ch. 260, § 5A ..................................................... 12

Tex. Bus. & Com. Code §§ 17.46, 17.47, 17.60, 17.61 ................. 4

## Other Authorities

Craig D. Idso, *Why Scientists Disagree About Global Warming: The NIPCC*
  *Report on Scientific Consensus*, Nongovernmental International Panel on
  Climate Change (NIPCC) (Heartland Inst. 2016) ........................... 13

Karl Popper, The Logic of Scientific Discovery (1959) ......................... 14

Matt Ridley, *The Climate Wars and the Damage to Science*, Global Warming
  Policy Foundation Essay 3 at 3 (2015) .................................. 14, 15, 16

Model Rules of Prof'l Conduct r.3.8 cmt. (Am. Bar Ass'n 2016) ........................... 3

**JA0310**

# Interest of Amici Curiae

Plaintiff-Appellant Exxon Mobil Corporation ("ExxonMobil") challenges the validity of a civil investigative demand ("CID") issued by the Attorney General of Massachusetts, and a subpoena issued by the Attorney General of New York. The Attorneys General issued these instruments to investigate ExxonMobil's supposed violations of consumer protection laws through marketing and selling of fossil fuel-derived products and securities. ExxonMobil filed the underlying lawsuit against the Attorneys General claiming that the CID and subpoena violate its constitutional rights and common law, and are preempted by federal law.

Amici are the States of Texas, Alabama, Arkansas, Georgia, Louisiana, Maine, Michigan, Mississippi, Nebraska, Oklahoma, South Carolina, and Wisconsin, which possess sovereign authority to investigate violations of law. Their chief legal officers have long used that power—including through the issuance of CIDs or subpoenas—to identify and remedy unlawful conduct. This power, however, does not include the right to engage in unrestrained investigative excursions based on pretext to promote one side of an international public policy debate, or chill the expression of viewpoints in those debates.

Soon after the New York and Massachusetts Attorneys General issued their subpoena and CID, several attorneys general expressed their concerns about their tactics in an open letter. Jt. App. 902–05. The letter condemned the actions of the New York and Massachusetts Attorneys General, stating the "effort by our colleagues to police the global warming debate through the power of the subpoena is a grave mistake." *Id*. at 902. The signatories, representing a wide range of viewpoints on climate

change, "agree on at least one thing—this is not a question for the courts. Using law enforcement authority to resolve a public policy debate undermines the trust invested in our offices and threatens free speech." *Id*. As most recognize, "vigorous debate exists in this country regarding the risks of climate change and the appropriate response to those risks. Both sides are well-funded and sophisticated public policy participants. Whatever our country's response, it will affect people, communities, and businesses that all have a right to participate in this debate." *Id*. at 904. The letter called upon the New York and Massachusetts Attorneys General to "stop policing viewpoints." *Id*. at 905.

The unconstitutional abuse of investigative power that forms the basis for ExxonMobil's complaint concerns Amici States because state attorneys general possess an inherent duty to preserve their roles as evenhanded enforcers of the law. Thus, Amici States have a direct and vital interest in the issues before the Court and submit this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2).

## Summary of the Argument

This is not a case about the scientific validity of climate change. It's about a fundamental guarantee of our Republic—the ability to have a viewpoint on a topic of public debate and not fear government retaliation for expressing it. The freedom to express a viewpoint unpopular with the government is the very basis for the First Amendment. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995). In fact, the Supreme Court reiterated just last term that "governments have no power to

JA0312

restrict expression because of its message, its ideas, its subject matter, or its content." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (quotation marks omitted).

Alongside their oaths to uphold the Constitution, state attorneys general have a constitutional duty to act dispassionately. Attorneys representing the public do not represent an ordinary party in litigation, but "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest . . . is not that it should win a case but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). The Model Rules of Professional Conduct express this distinctive role: "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate." Model Rules of Prof'l Conduct r.3.8 cmt. (Am. Bar Ass'n 2016).

Here, the New York and Massachusetts Attorneys General are not using their power in an impartial manner. Rather, they are embracing one side of a multi-faceted and robust policy debate, and simultaneously seeking to censor opposing viewpoints. In doing so, they are violating ExxonMobil's constitutional rights, abusing their power, and eroding public confidence in public officers. The district court erred in dismissing ExxonMobil's well-pleaded complaint.

## ARGUMENT

## I.   Attorneys General Must Act Impartially.

New York and Massachusetts' investigations are the product of a cultural movement "committed to aggressively protecting and building upon the recent progress

**JA0313**

the United States has made in combatting climate change." Jt. App. 97. The common-interest agreement between the attorneys general who passionately believe in climate change underscores the partiality of their endeavor, as they seek to "limit climate change and ensur[e] the dissemination of *accurate* information about climate change."[1] *Id.* at 654 (emphasis added). In other words, the tactics of the New York and Massachusetts Attorneys General are part of an "aggressive approach" to silence dissenting viewpoints by policing the "truth" about climate change in the marketplace of ideas. *Id.* at 98.

While Amici States have authority to conduct investigations to protect consumers, unveil fraud, and stop deceptive trade practices, these inquiries must be supported by a "reasonable belief" that there has been, or is about to be, unlawful false, misleading, or deceptive acts or practices in the conduct of any trade or commerce. *See, e.g.*, Tex. Bus. & Com. Code §§ 17.46, 17.47, 17.60, 17.61. And while the government's power "to protect people against fraud" has "always been recognized in this country and is firmly established," *Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 190 (1948), "[s]imply labeling an action one for 'fraud,' of course, will not carry the day," *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 617 (2003).

---

[1] This ideology was on full display at the March 29, 2016 press conference of the so-called "AGs United for Clean Power." Former Vice President Al Gore alleged that commercial interests (such as ExxonMobil) are "committing fraud in their communications." Jt. App. 472.

4

JA0314

## A. Attorneys general may not employ legal power to suppress a viewpoint in a public policy debate.

The authority to investigate fraud does not legitimize the chilling of constitutional freedom to engage in an ongoing policy debate of international importance. The First Amendment condemns government action that restricts or chills speech because of the message conveyed. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints."); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys.") (citing *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972)).

Indeed, "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). The First Amendment generally prevents government from proscribing speech and expressive conduct for the mere disapproval of the ideas expressed. *See Texas v. Johnson*, 491 U.S. 397, 406 (1989) (expressive conduct); *Cantwell v. Connecticut*, 310 U.S. 296, 309–311 (1940) (speech). And the "'loss of First Amendment freedoms, even for minimal periods of time, constitutes irreparable injury.'" *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The heart of viewpoint discrimination is the government preferring one message to another. *See Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S.

789, 804 (1984) ("The First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."); *see also Cornelius v. NAACP*, 473 U.S. 788, 806 (1985) (noting that "government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject"). Viewpoint discrimination occurs when "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. And these protections extend to private corporations. *Citizens United*, 558 U.S. at 342-43.

While the New York and Massachusetts Attorneys General claim interests in consumer protection and prevention of securities fraud as the basis for their actions, proffering what may be on their face "reasonable grounds" for these actions does not save them from being "a facade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811. The actions of New York and Massachusetts before and after the March 29, 2016 press conference show that their investigations and document requests are designed to chill speech about climate change. This is exactly the type of speech the First Amendment protects. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (stating that the First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"). "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted).

JA0316

### 1. The New York and Massachusetts Attorneys General are targeting critics.

The First Amendment is concerned with "the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas." *Hill v. Colorado*, 530 U.S. 703, 719 (2000). Thus, it stands as a bulwark against government action designed to suppress ideas or information, or to manipulate the public debate through coercion rather than persuasion. *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 597-603 (1967).

New York and Massachusetts' actions chill ExxonMobil's (and others') speech on the topic of climate change. *See White v. Lee*, 227 F.3d 1214, 1239 (9th Cir. 2000) (holding that a federal investigation into opponents of a housing project chilled their speech in violation of the First Amendment). Using government power to suppress one side of a policy debate is a prior restraint on speech, which is tantamount to censorship. *See City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 (1963); *Near v. Minnesota*, 283 U.S. 697, 713 (1931). Labeling a so-called investigation (into an unsettled area of science and public policy) as "fraud" certainly "raise[s] the specter that the Government [is] effectively driv[ing] certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991).

If our society refuses to tolerate both the proponents and critics of ideas vying for acceptance, then the marketplace of ideas becomes a mere oligarchy of indoctrination. As Justice Holmes put it:

> [W]hen men have realized that time has upset many fighting faiths, they
> may come to believe even more than they believe the very foundations of

JA0317

their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out.

*Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).

ExxonMobil's complaint is full of *prima facie* evidence, obtained without discovery, that the New York and Massachusetts Attorneys General marshaled a well-planned effort to silence ExxonMobil and other "climate deniers" through the abusive use of CIDs and investigative subpoenas. As the complaint avers, and which the Court must accept as true at this stage of the case, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), the purpose of New York and Massachusetts' subpoenas and CID is to "delegitimize ExxonMobil as a political actor," Jt. App. 410 ¶48.

In November 2015, after issuing the subpoena to ExxonMobil, Attorney General Schneiderman publicly declared the purpose of his investigation was to investigate ExxonMobil's alleged "shift" in "point of view" on climate change. Jt. App. 401 ¶22, 573.

In January 2016, according to emails discussing the planning of the meeting, attorneys and activists met at the offices of the Rockefeller Family Fund in New York City to discuss goals of an "Exxon campaign," which sought "to delegitimize [ExxonMobil] as a political actor" and "to force officials to disassociate themselves from Exxon." Jt. App. 410 ¶48. The goals of the "Exxon campaign" are:

- To establish in the public's mind that Exxon is a corrupt institution that has pushed humanity (and all creation) towards climate chaos and grave harm.

- To delegitimize Exxon as a political actor.

8

- To force officials to disassociate themselves from Exxon, their money, and their historic opposition to climate progress, for example, by refusing campaign donations, refusing to take meetings, calling for a price on carbon, etc.
- To call into question climate advantages of fracking, compared to coal.
- To drive divestment from Exxon.
- To drive Exxon and climate change into the center of the 2016 election cycle.

*Id.*

Then at the March 2016 press conference, the New York and Massachusetts Attorneys General declared their campaign of viewpoint discrimination against ExxonMobil:

- Attorney General Healey and Attorney General Schneiderman spoke about the negative effects of climate change and the importance of taking action in the fight against climate change. *Id.* at 402–03, 467–70, 478–79.
- Attorney General Schneiderman reminded everyone of his ongoing investigation of ExxonMobil and Attorney General Healey reiterated that companies in the fossil fuel industry, such as ExxonMobil, must be held accountable for deceiving investors and the public. *Id.* at 406–07, 469, 478.
- Attorney General Healey stated that there was a troubling disconnect between what ExxonMobil knew about climate change and what ExxonMobil told investors and the public regarding climate change. *Id.* at 406–07, 478.

JA0319

In other words, the New York and Massachusetts Attorneys General declared ExxonMobil's (and others') views on climate change to be "deceiv[ing]" or incorrect. *Id.* at 404 ¶32, 478. That is textbook viewpoint discrimination against ExxonMobil's alleged views on climate change. *See United States v. Kokinda*, 497 U.S. 720, 736 (1990) (plurality) (viewpoint discrimination involves an "inten[t] to discourage one viewpoint and advance another") (citations and internal quotation marks omitted); *Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 175–176 (1976) ("to permit one side of a debatable public question to have a monopoly in expressing its views . . .is the antithesis of constitutional guarantees") (footnote omitted).

Moreover, immediately before the March 29, 2016 AGs United for Clean Power press conference, the attorneys general met with Mr. Matthew Pawa, an attorney and climate change activist, and Mr. Peter Frumhoff, a climate change activist and director of science and policy at the Union of Concerned Scientists. Jt. App. 408–09. Messrs. Pawa and Frumhoff are well-known for their desire to punish climate deniers and promotion of "the viability of diverse strategies, including the legal merits of targeting carbon producers (as opposed to carbon emitters) for U.S.-focused climate mitigation" and "strategies to win access to internal documents" of fossil fuel companies. *Id.* at 409 ¶46.

To conceal the coordinated nature of New York and Massachusetts' intended censorship, the day after the AGs United for Clean Power press conference, Mr. Pawa asked the Office of the New York Attorney General how he should respond if asked by a reporter from *The Wall Street Journal* whether he attended the closed door

**JA0320**

meeting with the attorneys general. The Office of the New York Attorney General responded by instructing Mr. Pawa "to not confirm that you attended or otherwise discuss the event." *Id*. at 410–11 ¶50. These actions are the hallmark of an organized campaign to engage in unconstitutional viewpoint discrimination and chill speech.

### 2. The New York and Massachusetts Attorneys General are abusing their power.

New York and Massachusetts are abusing the power reserved to them under the U.S. Constitution, and under their own laws governing the administration and use of that power. The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). Where subpoenaed materials may be protected by the First Amendment, the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Stanford v. Texas*, 379 U.S. 476, 485 (1965). As such, so-called "fishing expeditions," like this one, are proscribed and "[i]t is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924).

Government abuse of subpoena power runs afoul of the First Amendment. "The Supreme Court has long recognized that compelled disclosure of political affiliations and activities can impose just as substantial a burden on First Amendment rights as can direct regulation." *AFL-CIO v. Fed. Elec. Comm'n*, 333 F.3d 168, 175 (D.C. Cir. 2003) (citing *Buckley v. Valeo*, 424 U.S. 1, 64–68 (1976) (disclosure of campaign contributions); *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462–63 (1958) (disclosure of membership lists)). Thus, the government must have a compelling interest for the

JA0321

disclosure of such information from private parties. *Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267, 271 (2d Cir. 1981) (citing cases). A First Amendment privilege against disclosures exists where such "will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009) (quotation omitted).

For example, subpoenas seeking investigative notes as well as the names of contacts have been held to be an invalid chilling of the free exercise of political speech and association under the First Amendment. *See Lacey v. Maricopa Cty.*, 693 F.3d 896, 917 (9th Cir. 2012) (finding "invalid" under First Amendment "subpoenas demanding that [a] paper . . . disclose its reporters' notes and reveal information about anyone who visited the [Phoenix] New Times's website" because subpoenas would "chill speech"); *Local 1814*, 667 F.2d at 272 (holding disclosure of contributors would chill speech); *see also Pebble Ltd. P'ship v. EPA*, 310 F.R.D. 575, 582 (D. Alaska 2015) (subpoenas are invalid when they have "the tendency to chill the free exercise of political speech and association which is protected by the First Amendment").

The tactics of the New York and Massachusetts Attorneys General—seeking over 40 years of documents and communications with third party organizations deemed on the wrong side of the climate debate—exceed their lawful powers. Jt. App. 401 ¶22, 417 ¶66, 419–20 ¶71. Massachusetts is subject to a four-year statute of limitations for the law it purportedly seeks to enforce. Mass. Gen. Laws ch. 260, § 5A (referring to Mass. Gen. Laws ch. 93A, § 2). And New York limits the Attorney

General's investigatory period to three years. *Gaidon v. Guardian Life Ins. Co. of Am.*, 750 N.E.2d 1078, 1082–83 (N.Y. 2001).

The Constitution safeguards the freedom to engage in open and candid discussions about significant issues. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985) (opinion of Powell, J.) ("[S]peech on 'matters of public concern' . . . is 'at the heart of the First Amendment's protection.'" (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978)). But the mere occurrence of such discussions is threatened by the chill of "investigations" hanging in the air. Thus, New York and Massachusetts' actions not only seek to silence certain participants in a public debate, but also harm everyone, stifling consumers and those seeking information in order to evaluate various viewpoints.

## B.  Climate change is the subject of legitimate international debate.

The New York and Massachusetts Attorneys General falsely presume that the scientific debate about climate change is settled, along with the related and equally important debate on how to respond to what science has found. Yet, the most undeniable fact about climate change is that, like so many other areas of science and public policy, the debate remains unsettled, the research is far from complete, and the path forward is unclear. "Scientists continue to disagree about the degree and extent of global warming and its connection to the actions of mankind,"[2] as do many others.

---

[2] Craig D. Idso, *Why Scientists Disagree About Global Warming: The NIPCC Report on Scientific Consensus*, Nongovernmental International Panel on Climate Change (NIPCC) (Heartland Inst. 2016), http://climatechangereconsidered.org/.

**JA0323**

Moreover, science does not teach the public policy response to its data and findings; it merely provides a starting point.

Modern science helps us better understand our world. It constantly subjects to scrutiny various hypotheses against objective data. *See, e.g., Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993). But scientific theories are subject to change because of new data, enhanced measurements, or other unforeseen factors. *Cf.* Karl Popper, The Logic of Scientific Discovery 44, 47 (1959). Thus, "[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation." *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994).

Accordingly, the intersection of science, law, and public policy should be approached with caution and objectivity, and not the finality sought through litigation and legal maneuvers. Disastrous results take root when government invests itself in only one side of a scientific debate since "bad ideas can persist in science for decades, and surrounded by myrmidons of furious defenders they can turn into intolerant dogmas."[3] Unfortunately,

---

[3] Matt Ridley, *The Climate Wars and the Damage to Science*, Global Warming Policy Foundation Essay 3 at 3 (2015), http://www.thegwpf.com/content/uploads/2015/11/climate-wars.pdf. In addition to being former Science Editor of the *Economist*, "Matt Ridley is one of the world's foremost science writers. His books have sold over a million copies and been translated into 30 languages. His new book *The Evolution of Everything* was published in 2015. He is a member of the [Global Warming Policy Foundation]'s Academic Advisory Council. As a landowner, he receives a wayleave income from a coal-mining company." In the words of Ridley,

I am not a full sceptic of climate change, let alone a 'denier'. I think carbon-dioxide induced warming during this century is likely, though I think it is unlikely to prove rapid and dangerous. So I don't agree with those who say

14

[t]his is precisely what has happened with the climate debate and it is at risk of damaging the whole reputation of science. The "bad idea" in this case is not that climate changes, nor that human beings influence climate change; but that the impending change is sufficiently dangerous to require urgent policy responses. In the 1970s, when global temperatures were cooling, some scientists could not resist the lure of press attention by arguing that a new ice age was imminent. Others called this nonsense and the World Meteorological Organization rightly refused to endorse the alarm. That's science working as it should. In the 1980s, as temperatures began to rise again, some of the same scientists dusted off the greenhouse effect and began to argue that runaway warming was now likely. At first, the science establishment reacted skeptically and a diversity of views was aired. It's hard to recall now just how much you were allowed to question the claims in those days.[4]

Even the premise that "97% of all climate scientists agree on climate change" is pseudo-science. This self-serving conclusion is derived from a poll involving only seventy-nine scientists—hardly a statistically-relevant sample.[5] Moreover, of those seventy-nine scientists, 97% believe that climate change is man-made—not that it is dangerous.[6] A more recent poll of 1854 members of the American Meteorological

───────────────

the warming is all natural, or all driven by the sun, or only an artefact of bad measurement, but nor do I think anything excuses bad scientific practice in support of the carbon dioxide theory, and every time one of these scandals erupts and the scientific establishment asks us to ignore it, I wonder if the extreme sceptics are not on to something. I feel genuinely betrayed by the profession that I have spent so much of my career championing.

*Id.* at 10.

[4] *Id.* at 4.

[5] *Id.* at 7.

[6] *Id.*

JA0325

Society found 52% believe climate change is man-made.[7] Indeed, throughout all aspects of society,

> there has been a systematic and thorough campaign to rule out the middle ground [on climate change] as heretical: not just wrong, but mistaken, immoral and beyond the pale. That's what the word "denier", with its deliberate connotations of Holocaust denial, is intended to do. For reasons I do not fully understand, journalists have been shamefully happy to go along with this fundamentally religious project. Politicians love this polarizing because it means they can attack a straw man.[8]

With the debate concerning the scope and sources of climate change still raging in scientific and public circles, the New York and Massachusetts Attorneys General are using their powers to not only tilt the scales in favor of one side, but also to prevent dissenters from sharing their points of view.

## II. Politicized investigations undermine public confidence.

The press conference of the "AGs United for Clean Power" demonstrates that Massachusetts and New York commenced their investigations precisely for the reasons the First Amendment forbids. "It is one thing to use the legal system to pursue public policy outcomes; but it is quite another to use prosecutorial weapons to intimidate critics, silence free speech, or chill the robust exchange of ideas." Jt. App. 685.

Allowing law enforcement to violate constitutional rights is to "violate the sacred trust of the people." *United States v. Costa*, 356 F. Supp. 606, 609 (D.D.C. 1973). It undermines "the right of the people to be secure in their persons, houses,

---

[7] *Id.*

[8] *Id.* at 6.

JA0326

papers and effects, and would obliterate one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law." *Johnson v. United States*, 333 U.S. 10, 17 (1948) (emphasis added).

The New York and Massachusetts Attorneys General repeat an unfortunate history of law enforcement soiled with political ends. That the statements and workings of the "AGs United for Clean Power" are one-sided, and target only certain participants in the climate change debate, speaks loudly enough.[9] Viewpoint discrimination exists when the government silences speech, *Smith v. Cty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015), and although animus is not necessary to prove viewpoint discrimination, it is sufficient, *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015). New York and Massachusetts revealed their retaliatory animus toward ExxonMobil through public statements targeting "climate deniers." Jt. App. 397 ¶10, 401 ¶22, 402 ¶25, 574. The purpose of their campaign, by their own admission, is "to delegitimize Exxon as a political actor," and, "to force officials to disassociate themselves from Exxon, their money, and their historic opposition to climate progress, for example, by refusing campaign donations, refusing to take meetings, calling for a price

---

[9] "[T]his fraud investigation targets only 'fossil fuel companies' and only statements minimizing climate change risks. If it is possible to minimize the risks of climate change, then the same goes for exaggeration. If minimization is fraud, exaggeration is fraud." Jt. App. 900. It is also worth noting that "[e]leven of the 17 attorneys general who participated [in the "AGs United for Clean Power" press conference] are the same folks who took part in the 2010 sue-and-settle law-suit that used federal courts to try to force the adoption of the federal energy regulations that became the [EPA's] 'Power Plan.'" *Id.* at 893.

on carbon, etc." *Id*. at 410 ¶48, 525. This clear, *prima facie* evidence of animus shows that the motives of the New York and Massachusetts Attorneys General is not to uncover the truth and pursue justice, but rather to fulfill an improper agenda unworthy of a sovereign's chief law enforcement official. Where the express and recorded goal of government actors is to politically delegitimize an opposing viewpoint, the proper role of government is awry and room for federal court intervention is permitted. The New York and Massachusetts Attorneys General viewpoint-based investigations, laced with animus toward the investigated party, are unconstitutional and an abuse of authority.

# Conclusion

The Court should reverse the judgment of the district court and remand this case for further proceedings.

Respectfully submitted.

<div style="display:flex">

STEVE MARSHALL
Attorney General of Alabama

LESLIE RUTLEDGE
Attorney General of Arkansas

Christopher M. Carr
Attorney General of Georgia

JEFF LANDRY
Attorney General of Louisiana

PAUL R. LEPAGE
Governor of Maine

BILL SCHUETTE
Attorney General of Michigan

PHIL BRYANT
Governor of Mississippi

DOUG PETERSON
Attorney General of Nebraska

MIKE HUNTER
Attorney General of Oklahoma

ALAN WILSON
Attorney General of South Carolina

BRAD SCHIMEL
Attorney General of Wisconsin

</div>

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY D. STARR
Deputy First Assistant
  Attorney General

JAMES E. DAVIS
Deputy Attorney General for
  Civil Litigation

/s/ David J. Hacker
DAVID J. HACKER
Special Counsel for Civil Litigation
david.hacker@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 001)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for Amici Curiae

JA0329

## Certificate of Service

On August 10, 2018, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

/s/ David J. Hacker
David J. Hacker

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 4,748 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word 2016 (the same program used to calculate the word count).

/s/ David J. Hacker
David J. Hacker

JA0330

# Exhibit L

JA0331

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
## MANHATTAN DIVISION

| | |
|---|---|
| EXXON MOBIL CORPORATION, | |
| *Plaintiff,* | |
| v. | No. 1:17-cv-02301-VEC |
| ERIC TRADD SCHNEIDERMAN, Attorney General of New York, in his official capacity, and MAURA TRACY HEALEY, Attorney General of Massachusetts, in her official capacity, | |
| *Defendants.* | |

**BRIEF OF TEXAS, LOUISIANA, SOUTH CAROLINA, ALABAMA, MICHIGAN, ARIZONA, WISCONSIN, NEBRASKA, OKLAHOMA, UTAH, AND ARKANSAS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF'S REQUEST TO LIFT THE STAY OF DISCOVERY AND IN OPPOSITION TO DEFENDANTS' REQUESTS FOR DISMISSAL**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

INTEREST OF *AMICI CURIAE* ............................................................... 1

ARGUMENT .......................................................................................... 2

   I.   Attorneys general are to act impartially. ........................................ 3

       A.   Attorneys general may not employ legal power to suppress a viewpoint in a policy debate. .................................................. 4

            1.   Defendants are targeting critics. .......................................... 5

            2.   Defendants are abusing their power. ..................................... 8

       B.   Climate change is the subject of legitimate international debate. ................................................................................ 10

   II.  Politicized investigations undermine public confidence. ............... 13

   III. Bad faith gives the Court jurisdiction to resolve the dispute. ...... 14

CONCLUSION ..................................................................................... 18

**JA0333**

# TABLE OF AUTHORITIES

**Federal Cases**                                                        **Page(s)**

*Abrams v. United States,*
    250 U.S. 616 (1919) ................................................................ 6

*AFL-CIO v. FEC,*
    333 F.3d 168 (D.C. Cir. 2003) ............................................... 9

*Ballard v. Wilson,*
    856 F.2d 1568 (5th Cir. 1988) .............................................. 15

*Bantam Books, Inc. v. Sullivan,*
    372 U.S. 58 (1963) ................................................................ 6

*Berger v. United States,*
    295 U.S. 78 (1935) ................................................................ 2

*Buckley v. Valeo,*
    424 U.S. 1 (1976) .................................................................. 9

*Cantwell v. Connecticut,*
    310 U.S. 296 (1940) .............................................................. 4

*Citizens United v. FEC,*
    558 U.S. 310 (2010) .............................................................. 5

*City of Lakewood v. Plain Dealer Pub. Co.,*
    486 U.S. 750 (1988) .............................................................. 6

*Connick v. Myers,*
    461 U.S. 138 (1983) .............................................................. 5

*Cornelius v. NAACP,*
    473 U.S. 788 (1985) ........................................................... 4, 5

*Cullen v. Fliegner,*
    18 F.3d 96 (2d Cir. 1994) ......................................... 15, 16, 17

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ............................................................ 11

*Diamond "D" Const. Corp. v. McGowan,*
    282 F.3d 191 (2d Cir. 2002) ..................................... 14, 15, 16

JA0334

*Donaldson v. Read Magazine, Inc.*,
   333 U.S. 178 (1948) .......................................................................... 3

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
   472 U.S. 749 (1985) ........................................................................ 10

*Elrod v. Burns*,
   427 U.S. 347 (1976) .......................................................................... 4

*Fed. Trade Comm'n v. Am. Tobacco Co.*,
   264 U.S. 298 (1924) .......................................................................... 9

*First Nat'l Bank of Bos. v. Bellotti*,
   435 U.S. 765 (1978) ........................................................................ 10

*Hill v. Colorado*,
   530 U.S. 703 (2000) .......................................................................... 5

*In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*,
   14 F. Supp. 3d 99 (E.D.N.Y. 2014) ............................................... 10

*Huffman v. Pursue, Ltd.*,
   420 U.S. 59 (1975) .......................................................................... 14

*Johnson v. United States*,
   333 U.S. 10 (1948) .......................................................................... 13

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
   385 U.S. 589 (1967) .......................................................................... 5

*Kugler v. Helfant*,
   421 U.S. 117 (1975) ........................................................................ 14

*Lacey v. Maricopa Cty.*,
   693 F.3d 896 (9th Cir. 2012) ............................................................ 9

*Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y.
   Harbor*, 667 F.2d 267, 271 (2d Cir. 1981) ..................................... 9

*Illinois ex rel. Madigan v. Telemarketing Assocs.*,
   538 U.S. 600 (2003) .......................................................................... 3

*Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*,
   429 U.S. 167 (1976) .......................................................................... 7

*McGuire v. Reilly*,
   386 F.3d 45 (1st Cir. 2004) .............................................................. 4

iv

JA0335

*Members of the City Council of L.A. v. Taxpayers for Vincent,*
    466 U.S. 789 (1984) ............................................................................ 4

*Mills v. Alabama,*
    384 U.S. 214 (1966) ............................................................................ 4

*N.Y. Progress & Protection PAC v. Walsh,*
    733 F.3d 483 (2d Cir. 2013) ............................................................. 4

*NAACP v. Ala. ex rel. Patterson,*
    357 U.S. 449 (1958) ............................................................................ 9

*Near v. Minnesota,*
    283 U.S. 697 (1931) ............................................................................ 6

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964) ............................................................................ 5

*Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.,*
    477 U.S. 619 (1986) .......................................................................... 14

*Okla. Press Publ'g Co. v. Walling,*
    327 U.S. 186 (1946) ............................................................................ 8

*Pebble Ltd. P'ship v. EPA,*
    310 F.R.D. 575 (D. Alaska 2015) .................................................. 10

*Perez v. Ledesma,*
    401 U.S. 82 (1971) ............................................................................ 14

*Perry v. Schwarzenegger,*
    591 F.3d 1147 (9th Cir. 2009) ......................................................... 9

*Police Dep't of Chi. v. Mosley,*
    408 U.S. 92 (1972) .............................................................................. 4

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) .................................................................... 17

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ............................................................................ 4

*Schlagler v. Phillips,*
    166 F.3d 439 (2d Cir. 1999) ........................................................... 16

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.,*
    502 U.S. 105 (1991) ............................................................................ 6

v

*Smith v. Cty. of Suffolk,*
   776 F.3d 114 (2d Cir. 2015) ................................................................. 16

*Stanford v. Texas,*
   379 U.S. 476 (1965) .............................................................................. 9

*Texas v. Johnson,*
   491 U.S. 397 (1989) .............................................................................. 4

*Underwager v. Salter,*
   22 F.3d 730 (7th Cir. 1994) ................................................................. 11

*United States v. Costa,*
   356 F. Supp. 606 (D.D.C. 1973) .......................................................... 13

*United States v. Kokinda,*
   497 U.S. 720 (1990) .............................................................................. 7

*White v. Lee,*
   227 F.3d 1214 (9th Cir. 2000) ............................................................... 5

*Younger v. Harris,*
   401 U.S. 37 (1971) ........................................................................ 14, 15

**State Cases**

*Gaidon v. Guardian Life Ins. Co. of Am.,*
   750 N.E.2d 1078 (N.Y. 2001) ............................................................. 10

**State Statutes**

MASS. GEN. LAWS Chapter 93A, § 2 ............................................................. 10

MASS. GEN. LAWS Chapter 260, § 5A ........................................................... 10

TEX. BUS. & COM. CODE § 17.46 .................................................................. 3

TEX. BUS. & COM. CODE § 17.47 .............................................................. 3, 16

TEX. BUS. & COM. CODE § 17.60 .............................................................. 3, 16

TEX. BUS. & COM. CODE § 17.61 .............................................................. 3, 16

**Rules**

N.Y. C.P.L.R. 214 ...................................................................................... 10

MODEL CODE OF PROF'L RESPONSIBILITY EC 7-13 (1982) ............................. 2

JA0337

## Other Authorities

Attorney General Schneiderman, Press Conference, AGs United for Clean
    Power (March 29, 2016), *video available at* http://www.ag.ny.gov/press-
    release/ag-schneiderman-former-vice-president-al-gore-and-coalition-
    attorneys-general-across ........................................................................... 3

Craig D. Idso, *Why Scientists Disagree About Global Warming: The NIPCC
    Report on Scientific Consensus*, NONGOVERNMENTAL INTERNATIONAL
    PANEL ON CLIMATE CHANGE (NIPCC) (Heartland Inst.), 2016, *available
    at* http://climatechangereconsidered.org/ ............................................. 11

Karl Popper, THE LOGIC OF SCIENTIFIC DISCOVERY 44, 47 (1959) ............................. 11

Matt Ridley, *The Climate Wars and the Damage to Science,* GWPF Essay 3
    at 3 (Global Warming Policy Foundation 2015), *available at* http://
    www.thegwpf.com/content/uploads/2015/11/climate-wars.pdf ...................... 11, 12

Michael Batasch, *Kansas AG takes on Al Gore's Alarmism – Won't Join
    Anti-Exxon "Publicity Stunt,"* Daily Caller (Apr. 4, 2016), *available at*
    http://dailycaller.com/2016/04/04/kansas-ag-takes-on-al-gores-
    alarmism-wont-join-ant-exxon-publicity-stunt ....................................... 13

Open Letter from Attorneys General (Luther Strange, Alabama; Bill
    Schuette, Michigan; Ken Paxton, Texas; Craig Richards, Alaska; Doug
    Peterson, Nebraska; Sean Reyes, Utah; Mark Brnovich, Arizona; Adam
    Laxalt, Nevada; Brad Schimel, Wisconsin; Leslie Rutledge, Arkansas;
    Scott Pruitt, Oklahoma; Jeff Landry, Louisiana; Alan Wilson, South
    Carolina) dated June 15, 2016, *available at* http://www.ago.state.al.us/
    news/852.pdf ..................................................................................... 1, 2, 13

Press Release, Louisiana Department of Justice, Attorney General Jeff
    Landry Slams Al Gore's Coalition (Mar. 30, 2016), *available at* https://
    www.ag.state.la.us/Article/2207/5 ......................................................... 13

Press Release, New York State Attorney General, *A.G. Schneiderman,
    Former Vice President Al Gore And A Coalition Of Attorneys General
    From Across The Country Announce Historic State-Based Effort To
    Combat Climate Change* (March 29, 2016), *available at* http://
    www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-
    al-gore-and-coalition-attorneys-general-across ....................................... 3

Scott Pruitt & Luther Strange, *The Climate-Change Gang*, National
    Review (May 17, 2016), *available at* http://www.nationalreview.com/
    article/435470/climate-change-attorneys-general ................................... 11

JA0338

## INTEREST OF *AMICI CURIAE*

Exxon Mobil Corporation ("Plaintiff") is challenging the validity of a Civil Investigative Demand ("CID"), a state civil administrative subpoena, issued by the Attorney General of Massachusetts, and a subpoena issued by the Attorney General of New York (collectively, "Defendants"). Defendants issued these instruments to investigate Plaintiff's supposed violations of consumer protection laws through marketing and selling of fossil fuel-derived products and securities. Plaintiff seeks relief from complying with the CID and subpoena, claiming bad faith and violations of its constitutional rights.

*Amici* possess sovereign authority to investigate violations of law. Their chief legal officers have long used that power—including the issuance of CIDs or subpoenas—to identify and remedy unlawful conduct. This power, however, does not include the right to engage in unrestrained, pretextual investigative excursions to promote one side of an international public policy debate, or chill the expression of viewpoints in those debates.

Several attorneys general expressed their concerns about Defendants' tactics in an open letter last year.[1] The letter condemns the actions of Defendants and others, stating the "effort by our colleagues to police the global warming debate through the power of the subpoena is a grave mistake."[2] The signatories, representing a wide range of viewpoints on climate change, "agree on at least one thing—this is not a question for the courts. Using law enforcement authority to resolve a public policy

---

[1] Open Letter from Attorneys General (Luther Strange, Alabama; Bill Schuette, Michigan; Ken Paxton, Texas; Craig Richards, Alaska; Doug Peterson, Nebraska; Sean Reyes, Utah; Mark Brnovich, Arizona; Adam Laxalt, Nevada; Brad Schimel, Wisconsin; Leslie Rutledge, Arkansas; Scott Pruitt, Oklahoma; Jeff Landry, Louisiana; Alan Wilson, South Carolina) dated June 15, 2016, *available at* http://www.ago.state.al.us/news/852.pdf.

[2] *Id.* at 3.

JA0339

debate undermines the trust invested in our offices and threatens free speech."[3] As most recognize, "vigorous debate exists in this country regarding the risks of climate change and the appropriate response to those risks. Both sides are well-funded and sophisticated public policy participants. Whatever our country's response, it will affect people, communities, and businesses that all have a right to participate in this debate."[4] Defendants should "stop policing viewpoints."[5]

*Amici* are concerned about the unconstitutional abuse of investigative power. Their inherent interest in preserving their roles as evenhanded enforcers of the law creates direct and vital interests in the issues before the Court.

## ARGUMENT

Attorneys general have a constitutional duty to act dispassionately. As the Supreme Court explained, attorneys representing the public do not represent an ordinary party in litigation, but "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest . . . is not that it should win a case but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). This distinctive role is also expressed in the Model Code of Professional Responsibility: "The responsibility of a public prosecutor differs from that of the usual advocate; his [or her] duty is to seek justice, not merely to convict." MODEL CODE OF PROF'L RESPONSIBILITY EC 7-13 (1982).

Here, Defendants are not using their power in an impartial manner. Rather, they are embracing one side of a multi-faceted and robust policy debate, and simultaneously seeking to censor opposing viewpoints. This is bad faith.

---

[3] *Id.* at 3.

[4] *Id.* at 5.

[5] *Id.* at 6.

2

## I.     Attorneys general are to act impartially.

Defendants' investigation is the product of a cultural movement "committed to aggressively protecting and building upon the recent progress the United States has made in combatting climate change."[6] The common interest agreement of the powers aligned on this axis of ideology underscores the partiality of their endeavor, as they seek to "limit climate change and ensur[e] the dissemination of *accurate* information about climate change." ECF No. 57 at 3 (emphasis added).[7] In other words, Defendants' tactics are part of an "aggressive approach" to silence dissenting viewpoints by policing the "truth" about climate change in the marketplace of ideas.[8]

While *amici* have authority to conduct investigations regarding consumer protection, fraud, and deceptive trade practices, inquiries must be supported by a "reasonable belief" that there has been, or is about to be, unlawful false, misleading, or deceptive acts or practices in the conduct of any trade or commerce. *See*, *e.g.*, TEX. BUS. & COM. CODE §§ 17.46, 17.47, 17.60, 17.61. And while the government's power "to protect people against fraud" has "always been recognized in this country and is firmly established," *Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 190 (1948), "[s]imply labeling an action one for 'fraud,' of course, will not carry the day," *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 617 (2003).

---

[6] Press Release, New York State Attorney General, *A.G. Schneiderman, Former Vice President Al Gore And A Coalition Of Attorneys General From Across The Country Announce Historic State-Based Effort To Combat Climate Change* (March 29, 2016), *available at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across.

[7] This ideology was on full display at the March 29, 2016 press conference of the so-called "AG's United for Clean Power," characterized as "the beginning of the end of our addiction to fossil fuel and the degradation of our planet." Attorney General Schneiderman, Press Conference, AGs United for Clean Power (March 29, 2016) (confirming subpoena to ExxonMobil), *video available at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across. Former Vice President Al Gore alleged that commercial interests (such as the Plaintiff) are "committing fraud in their communications." *Id.*

[8] *Id.*

3

**JA0341**

A. **Attorneys general may not employ legal power to suppress a viewpoint in a policy debate.**

The authority to investigate fraud does not allow the chilling of constitutional freedom to engage in an ongoing policy debate of international importance. The First Amendment condemns government action that restricts or chills speech because of the message conveyed. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys.") (citing *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972)).

Indeed, "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). The First Amendment generally prevents government from proscribing speech, *Cantwell v. Connecticut*, 310 U.S. 296, 309–311 (1940), and expressive conduct, *Texas v. Johnson*, 491 U.S. 397, 406 (1989), for the mere disapproval of the ideas expressed. After all, the "'loss of First Amendment freedoms, even for minimal periods of time, constitutes irreparable injury.'" *N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The heart of viewpoint discrimination is the government preferring one message to another. *See Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) ("The First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."); *see also Cornelius v. NAACP*, 473 U.S. 788, 806 (1985) ("government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject"). Viewpoint discrimination occurs when "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004).

4

**JA0342**

And these protections extend to private corporations. *Citizens United v. FEC*, 558 U.S. 310, 342–43 (2010).

While Defendants claim interests in consumer protection and prevention of securities fraud as the basis for their actions, proffering what may be on its face "reasonable grounds" for the action does "not save a regulation that is in reality a facade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811. The actions of Defendants before and after the March 29, 2016 press conference show their investigations and document requests are designed to chill speech about climate change. And yet the First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted).

### 1.    Defendants are targeting critics.

The First Amendment is concerned with "the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas." *Hill v. Colorado*, 530 U.S. 703, 719 (2000). Thus, it stands as a bulwark against government action designed to suppress ideas or information, or to manipulate the public debate through coercion rather than persuasion. *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 597–603 (1967).

Defendants' actions chill Plaintiff's (and others') speech on the topic of climate change. *See White v. Lee*, 227 F.3d 1214, 1239 (9th Cir. 2000) (holding that a federal investigation into opponents of a housing project chilled their speech in violation of the First Amendment). Using government power to suppress one side of a policy debate is a prior restraint on speech. Governmentally imposed prior restraints on

5

**JA0343**

speech are tantamount to censorship. *See City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 (1963); *Near v. Minnesota*, 283 U.S. 697, 713 (1931). Labeling a so-called investigation (into an unsettled area of science and public policy) as "fraud" certainly "raise[s] the specter that the Government [is] effectively driv[ing] certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991).

If our society refuses to tolerate *both* the proponents and critics of ideas vying for acceptance, then the marketplace of ideas becomes a mere oligarchy of indoctrination. As Justice Holmes put it:

> But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out.

*Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).

The record in this case is full of *prima facie* evidence, obtained without discovery, that Defendants marshaled a well-planned effort to silence Plaintiff and other "climate deniers" through the abusive use of CIDs and investigative subpoenas. Prior to transferring this case, Judge Kinkeade identified some of the most salient, undisputed, and disturbing facts:

> Attorney General Healey, Attorney General Schneiderman, several other states' attorneys general, and former Vice President Al Gore spoke at the AGs United for Clean Power press conference. At that press conference the attorneys general spoke about the negative effects of climate change and the importance of taking action in the fight against climate change. Attorney General Schneiderman reminded everyone of his ongoing investigation of Exxon and Attorney General Healey reiterated that companies in the fossil fuel industry, such as Exxon, must be held accountable for deceiving investors and the public. Attorney General Healey stated that there was a troubling disconnect between what Exxon knew about climate change and what Exxon told investors and the public regarding climate change.

JA0344

Order 12, ECF No. 180. In other words, Defendants declared Plaintiff's (and others') views on climate change to be "deceiving" or incorrect. That is textbook viewpoint discrimination and animus toward Plaintiff's (and others') alleged views on climate change. *See United States v. Kokinda*, 497 U.S. 720, 736 (1990) (plurality) (viewpoint discrimination involves an "inten[t] to discourage one viewpoint and advance another") (citations and internal quotation marks omitted); *Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 175–176 (1976) ("to permit one side of a debatable public question to have a monopoly in expressing its views . . . is the antithesis of constitutional guarantees") (footnote omitted).

Judge Kinkeade also described Defendants' "campaign" to "delegitimize Exxon as a political actor." Order 6. The court wrote that in "January 2016, according to emails discussing the planning of the meeting, attorneys and activists met at the offices of the Rockefeller Family Fund in New York City, New York to discuss goals of an 'Exxon campaign,' which sought 'to delegitimize [Exxon] as a political actor' and 'to force officials to disassociate themselves from Exxon.'" *Id.* According to Judge Kinkeade:

> In the emails discussing the planning of the meeting at the Rockefeller Family Fund provided to the Court (the existence of these remarks is not disputed by either Attorney General Healey or Attorney General Schneiderman), the goals of the "Exxon campaign" are:
>
> - To establish in the public's mind that Exxon is a corrupt institution that has pushed humanity (and all creation) towards climate chaos and grave harm.
> - To delegitimize Exxon as a political actor. To force officials to disassociate themselves from Exxon, their money, and their historic opposition to climate progress, for example, by refusing campaign donations, refusing to take meetings, calling for a price on carbon, etc.
> - To call into question climate advantages of fracking, compared to coal.
> - To drive divestment from Exxon.
> - To drive Exxon and climate change into the center of the 2016 election cycle.

JA0345

*Id.* at 6–7. Moreover, immediately before the March 29, 2016 AGs United for Clean Power press conference, "Mr. [Matthew] Pawa, an attorney and climate change activist, and Mr. [Peter] Frumhoff, a climate change activist and director of science and policy at the Union of Concerned Scientists, presented to the attorneys general." *Id.* at 7. Moreover, in "2012, Mr. Pawa presented at a workshop organized by Mr. Frumhoff which discussed, among other things related to climate change, 'the viability of diverse strategies, including the legal merits of targeting carbon producers (as opposed to carbon emitters) for U.S.-focused climate mitigation' and 'strategies to win access to internal documents' of fossil fuel companies." *Id.* The draft agenda of Defendants' meeting with Messrs. Pawa and Frumhoff "stated that the meeting would include presentations on the 'imperative of taking action now on climate change,' presented by Mr. Frumhoff, and 'climate change litigation,' presented by Mr. Pawa." *Id.* at 8.

To conceal the coordinated nature of Defendants' intended censorship, "Mr. Pawa emailed the Office of the New York Attorney General to ask how he should respond if asked by a reporter from *The Wall Street Journal* whether he attended the closed door meeting with the attorneys general. The Office of the New York Attorney General responded by instructing Mr. Pawa 'to not confirm that you attended or otherwise discuss the event.'" *Id.* These actions are the hallmark of an organized campaign to engage in unconstitutional viewpoint discrimination and chill speech.

### 2. Defendants are abusing their power.

Massachusetts and New York are abusing the power reserved to them under the U.S. Constitution, and under their own laws governing the administration and use of that power. The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). Where subpoenaed materials may be protected by the First Amendment, the requirements

8

of the Fourth Amendment are applied with "scrupulous exactitude." *Stanford v. Texas,* 379 U.S. 476, 485 (1965). As such, so-called "fishing expeditions," like this one, are proscribed and "[i]t is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924).

Government abuse of subpoena power runs afoul of the First Amendment. "The Supreme Court has long recognized that compelled disclosure of political affiliations and activities can impose just as substantial a burden on First Amendment rights as can direct regulation." *AFL-CIO v. FEC*, 333 F.3d 168, 175 (D.C. Cir. 2003) (citing *Buckley v. Valeo*, 424 U.S. 1, 64–68 (1976) (disclosure of campaign contributions); *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462–63 (1958) (disclosure of membership lists)). Thus, the government must have a compelling interest for the disclosure of such information from private parties. *Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267, 271 (2d Cir. 1981) (citing cases). A First Amendment privilege against disclosures exists where such "will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009) (quotation omitted).

For example, subpoenas seeking investigative notes as well as the names of contacts have been held to be an invalid chilling of the free exercise of political speech and association under the First Amendment. *See Lacey v. Maricopa Cty.*, 693 F.3d 896, 917 (9th Cir. 2012) (finding "invalid" under First Amendment "subpoenas demanding that [a] paper . . . disclose its reporters' notes and reveal information about anyone who visited the [Phoenix] New Times's website" because subpoenas would "chill speech"); *Local 1814*, 667 F.2d at 272 (holding disclosure of contributors

9

JA0347

would chill speech); *see also Pebble Ltd. P'ship v. EPA*, 310 F.R.D. 575, 582 (D. Alaska 2015) (subpoenas are invalid when they have "the tendency to chill the free exercise of political speech and association which is protected by the First Amendment").

Defendants' tactics—seeking over 40 years of documents—exceed their lawful powers. *See, e.g.*, First Am. Compl. Ex. "EE" at App. 257–58, ECF No. 101-6, and Ex. "II" at App. 297, ECF No. 101-7. Massachusetts is subject to a four-year statute of limitations for the law it purportedly seeks to enforce. MASS. GEN. LAWS ch. 260, § 5A (referring to MASS. GEN. LAWS ch. 93A, § 2). And New York limits the Attorney General's investigatory period to three years. *In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*, 14 F. Supp. 3d 99, 103 (E.D.N.Y. 2014); *Gaidon v. Guardian Life Ins. Co. of Am.*, 750 N.E.2d 1078, 1082 (N.Y. 2001); N.Y. C.P.L.R. 214.

The Constitution safeguards the freedom to engage in open and candid discussions about significant issues. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985) (opinion of Powell, J.) ("[S]peech on 'matters of public concern' . . . is 'at the heart of the First Amendment's protection.'" (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978)). But the mere occurrence of such discussions is threatened by the chill of "investigations" hanging in the air. Thus, Defendants' actions not only seek to silence certain participants in a public debate, but harm everyone, stifling consumers and those seeking information in order to evaluate various viewpoints.

## B.    Climate change is the subject of legitimate international debate.

Defendants falsely presume that the scientific debate regarding climate change is settled, along with the related and equally important debate on how to respond to what science has found. Yet, the most undeniable fact about climate change is that, like so many other areas of science and public policy, the debate remains unsettled, the research far from complete, and the path forward unclear.

JA0348

"Scientists continue to disagree about the degree and extent of global warming and its connection to the actions of mankind,"[9] as do many others. Moreover, science does not teach the obvious public policy response to its data and findings, it merely provides a starting point.

Modern science helps us better understand our world. It constantly subjects to scrutiny various hypotheses against objective data. *See, e.g.*, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993). But since it is almost never possible for all relevant data to be marshaled, scientific theories are always subject to change because of new data, enhanced measurements, or other unforeseen factors. *Cf.* Karl Popper, THE LOGIC OF SCIENTIFIC DISCOVERY 44, 47 (1959). Thus, "[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation." *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994).

Accordingly, the intersection of science, law, and public policy should be approached with caution and objectivity, and not the finality sought through litigation and legal maneuvers. Disastrous results take root when government invests itself in only one side of a scientific debate since "bad ideas can persist in science for decades, and surrounded by myrmidons of furious defenders they can turn into intolerant dogmas."[10] Unfortunately,

---

[9] Scott Pruitt & Luther Strange, *The Climate-Change Gang*, National Review (May 17, 2016), *available at* http://www.nationalreview.com/article/435470/climate-change-attorneys-general; Craig D. Idso, *Why Scientists Disagree About Global Warming: The NIPCC Report on Scientific Consensus*, NONGOVERNMENTAL INTERNATIONAL PANEL ON CLIMATE CHANGE (NIPCC) (Heartland Inst.), 2016, *available at* http://climatechangereconsidered.org/.

[10] Matt Ridley, *The Climax Wars and the Damage to Science,* GWPF Essay 3 at 3 (Global Warming Policy Foundation 2015), *available at* http://www.thegwpf.com/content/uploads/2015/11/climate-wars.pdf. In addition to being former Science Editor of the Economist, "Matt Ridley is one of the world's foremost science writers. His books have sold over a million copies and been translated into 30 languages. His new book The Evolution of Everything was published in 2015. He is a member of the [Global Warming Policy Foundation]'s Academic Advisory Council. As a landowner, he receives a way-leave income from a coal-mining company." In the words of Ridley,

> I am not a full sceptic of climate change, let alone a 'denier'. I think carbon-dioxide induced warming during this century is likely, though I think it is unlikely to prove rapid and

11

**JA0349**

[t]his is precisely what has happened with the climate debate and it is at risk of damaging the whole reputation of science. The "bad idea" in this case is not that climate changes, nor that human beings influence climate change; but that the impending change is sufficiently dangerous to require urgent policy responses. In the 1970s, when global temperatures were cooling, some scientists could not resist the lure of press attention by arguing that a new ice age was imminent. Others called this nonsense and the World Meteorological Organization rightly refused to endorse the alarm. That's science working as it should. In the 1980s, as temperatures began to rise again, some of the same scientists dusted off the greenhouse effect and began to argue that runaway warming was now likely. At first, the science establishment reacted skeptically and a diversity of views was aired. It's hard to recall now just how much you were allowed to question the claims in those days.[11]

Even the premise that "97% of all climate scientists agree on climate change" is pseudo-science. This self-serving conclusion is derived from a poll involving only seventy-nine scientists[12]—hardly a statistically-relevant sample. Moreover, of those seventy-nine scientists, 97% believe that climate change is man-made—not that it is dangerous.[13] "A more recent poll of 1854 members of the American Meteorological Society found the true number is 52 per cent."[14] Indeed,

there has been a systematic and thorough campaign to rule out the middle ground as heretical: not just wrong, but mistaken, immoral and beyond the pale. That's what the word "denier", with its deliberate connotations of Holocaust denial, is intended to do. For reasons I do not fully understand, journalists have been shamefully happy to go along with this fundamentally religious project. Politicians love this polarizing because it means they can attack a straw man.[15]

---

dangerous. So I don't agree with those who say the warming is all natural, or all driven by the sun, or only an artefact of bad measurement, but nor do I think anything excuses bad scientific practice in support of the carbon dioxide theory, and every time one of these scandals erupts and the scientific establishment asks us to ignore it, I wonder if the extreme sceptics are not on to something. I feel genuinely betrayed by the profession that I have spent so much of my career championing.

*Id*. at 10.

[11] *Id*. at 4.

[12] *Id*. at 7.

[13] *Id*.

[14] *Id*.

[15] *Id*. at 6.

12

**JA0350**

## II.     Politicized investigations undermine public confidence.

The press conference of the "AG's United for Clean Power" demonstrates that Massachusetts and New York commenced their investigations precisely for the reasons the First Amendment forbids.[16] "It is one thing to use the legal system to pursue public policy outcomes; but it is quite another to use prosecutorial weapons to intimidate critics, silence free speech, or chill the robust exchange of ideas."[17]

Allowing law enforcement to violate constitutional rights is to "violate the sacred trust of the people." *United States v. Costa*, 356 F. Supp. 606, 609 (D.D.C. 1973). It undermines "the right of the people to be secure in their persons, houses, papers and effects, and would obliterate one of the most fundamental distinctions between our form of government, where officers are *under* the law, and the police-state where they *are* the law." *Johnson v. United States*, 333 U.S. 10, 17 (1948) (emphasis added).

Regrettably, history is embroiled with the exercise of law enforcement soiled with political ends rather than legal ones. Massachusetts and New York now repeat that unfortunate history. That the statements and workings of the "AG's United for Clean Power" are one-sided, and target only certain participants in the climate change debate, speaks loudly enough.[18]

---

[16] *See supra* note 7.

[17] Press Release, Louisiana Department of Justice, Attorney General Jeff Landry Slams Al Gore's Coalition (Mar. 30, 2016), *available at* https://www.ag.state.la.us/Article/2207/5.

[18] "[T]his fraud investigation targets only 'fossil fuel companies' and only statements minimizing climate change risks. If it is possible to minimize the risks of climate change, then the same goes for exaggeration. If minimization is fraud, exaggeration is fraud." *See supra* note 1 at 2. It is also worth noting that "[e]leven of the 17 attorneys general who participated [in the "AG's United for Clean Power" press conference] are the same folks who took part in the 2010 sue-and-settle lawsuit that used federal courts to try to force the adoption of the federal energy regulations that became the EPA's 'Power Plan.'" Michael Batasch, *Kansas AG takes on Al Gore's Alarmism – Won't Join Anti-Exxon "Publicity Stunt,"* The Daily Caller (Apr. 4, 2016), *available at* http://dailycaller.com/2016/04/04/kan-sas-ag-takes-on-al-gores-alarmism-wont-join-ant-exxon-publicity-stunt.

13

JA0351

## III.    Bad faith gives the Court jurisdiction to resolve the dispute.

Defendants seek to evade the jurisdiction of the Court through *Younger* abstention. Defs.' Mot. to Dismiss, ECF No. 125 at 20–22. In *Younger v. Harris*, 401 U.S. 37 (1971), the Supreme Court held that federal courts should abstain from hearing claims brought by a person currently being prosecuted in state court for a matter giving rise to that claim. This doctrine was extended later to state civil proceedings, *Huffman v. Pursue, Ltd.*, 420 U.S. 59 (1975), and administrative proceedings, *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619 (1986). Thus, *Younger* abstention prevents the Court from interfering with (1) an ongoing state proceeding, (2) that raises an important state interest, and (3) that allows the federal plaintiff an adequate opportunity for judicial review of federal constitutional claims. *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002).

But *Younger* abstention has an exception—where the prosecution is in bad faith or part of some pattern of harassment against the person or entity. *Younger*, 401 U.S. at 56. Admittedly, circumstances of legitimate bad faith are rare.

> Only in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown is federal injunctive relief against pending state prosecutions appropriate.

*Perez v. Ledesma*, 401 U.S. 82, 85 (1971); *see also Kugler v. Helfant*, 421 U.S. 117, 124–25 (1975). However, in this case, the allegations by Plaintiff, and the *prima facie* evidence of bad faith, are worthy of exploration and may preclude the Court from abstaining. *See* ECF Nos. 9 (20–22), 57 (1–4, 7–8), 60 (17–22), 90 (throughout), 127 (10–12), 144 (throughout), 165 (19–23), 167 (14–17).

To validly invoke the bad faith exception to *Younger*, a court must go beyond the face of a CID or subpoena, as "the possible unconstitutionality of a statute 'on its face' does not in itself justify an injunction against good-faith attempts to enforce it."

JA0352

*Younger*, 401 U.S. at 54. Here, the mere issuance of a CID or subpoena does not constitute bad faith any more than does the issuance of "thirty-six parking tickets" to a single individual. *Ballard v. Wilson*, 856 F.2d 1568, 1571 (5th Cir. 1988). Indeed, the existence of an instrument, in and of itself, is insufficient to sustain bad faith. In *Ballard*, for example, "there [was] nothing in the record to suggest that the citations result from the bad faith of the city officials instead of [the individual]'s own parking habits." *Id*. Here, however, the Plaintiff has alleged, and placed into evidence, undisputed facts that go beyond the face of the instruments themselves and are *prima facie* evidence of bad faith. If sustained, these facts constitute a nefarious purpose behind the CID and subpoena that negate notions of abstention.

Moreover, "the party bringing the state action must have no reasonable expectation of obtaining a favorable outcome." *Cullen v. Fliegner*, 18 F.3d 96, 103 (2d Cir. 1994). For example, the exception is met when a proceeding is "'brought to retaliate for or to deter constitutionally protected conduct, or where a prosecution of proceeding is otherwise brought in bad faith or for the purpose to harass.'" *Diamond "D" Const.*, 282 F.3d at 199 (quoting *Cullen*, 18 F.3d at 103–04). And where a district court has already found that Defendants are engaged in a "campaign" to "delegitimize Exxon as a political actor" and "force officials to disassociate themselves from Exxon," Order 6 (quotations omitted), further fact-finding is warranted.

In the Second Circuit, this very kind of improper "subjective motivation of the state authority in bringing the proceeding is critical to, if not determinative of, this inquiry [of bad faith]." *Diamond "D" Const.*, 282 F.3d at 199 (citations omitted). To be sure, a "state proceeding that is legitimate in its purpose, but unconstitutional in its execution—even when the violations of constitutional rights are egregious—will *not* warrant the application of the bad faith exception." *Id*. (emphasis added). But when "the facts show that the prosecution is in retaliation for past speech or shows a pattern of prosecution to inhibit speech beyond the acts being prosecuted, the

JA0353

exception should apply and abstention may be improper." *Schlagler v. Phillips*, 166 F.3d 439, 443 (2d Cir. 1999). Thus, the federal plaintiff must show that the Massachusetts CID and/or New York subpoena was initiated with and/or is animated by a retaliatory, harassing, or other illegitimate motive, *Diamond "D" Const.*, 282 F.3d at 199, such as animus, *Cullen*, 18 F.3d at 104.[19]

Because attorneys general enjoy broad authority and latitude in issuing civil investigative demands,[20] the exploration of bad faith in the context presented here involves the heavy burden of overcoming that discretion. Indeed, if federal courts were to routinely entertain fact-finding expeditions into allegations of bad faith, it would undercut the broad and necessary authority of government to pursue legitimate investigations of potential violations of law. Moreover, routine resorts to federal courts undermine *Younger's* essence—"concern for comity toward our co-equal sovereigns." *Diamond "D" Const.*, 282 F.3d at 199–200. "This comity and the deference to states it often requires is the cornerstone of our federal system." *Id.* at 200. As such, only in the most extreme circumstances, with clear *prima facie* evidence of improper motivation in hand, should a federal court entertain further exploration into the potential bad faith actions of attorneys general.

This case, however, meets this extremely high burden and may serve as an exception to the rule. Defendants' actions constitute unlawful viewpoint discrimination. Viewpoint discrimination is demonstrated through government animus toward speech, *Smith v. Cty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015), a

---

[19] In *Cullen*, the Second Circuit held that the bad faith exception to *Younger* applied and the federal court did *not* need to abstain. 18 F.3d at 104. There, a teacher was disciplined after he distributed leaflets opposing the re-election of certain school board members. Because of the specific, articulated facts of past history of personal conflict between Cullen and the school board, and the strictly *ad hominem* manner in which the school board had disciplined him, the court found the disciplinary proceeding was retaliatory in nature and calculated to chill First Amendment expressive activity. *Id.*

[20] *See, e.g.*, Tex. Bus. & Com. Code §§ 17.47, 17.60 17.61.

JA0354

necessary component for the bad faith exception to *Younger*, *Cullen*, 18 F.3d at 104. Although animus is not necessary to prove viewpoint discrimination, it is sufficient. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015).

Defendants' retaliatory animus toward Plaintiff is readily shown through their public statements about going after "climate deniers" and "skeptics."[21] The purpose of Defendants' campaign, by their own admission, is "to delegitimize Exxon as a political actor," and, "to force officials to disassociate themselves from Exxon, their money, and their historic opposition to climate progress, for example, by refusing campaign donations, refusing to take meetings, calling for a price on carbon, etc." This clear, *prima facie* evidence of bad faith shows that Defendants' motive is not to uncover the truth and pursue justice, but rather fulfill an improper agenda unworthy of a sovereign's chief law enforcement official. And because this evidence shows that the basis for the Defendants' actions is illegitimate—and premised on an unconstitutional animus toward a viewpoint about climate change—further analysis of the bad faith exception to *Younger* is warranted. *Cullen*, 18 F.3d at 104.

Permitting the exploration of the bad faith exception to *Younger* in this unique instance does not otherwise undercut the ability of attorneys general to conduct civil administrative investigations. Indeed, general claims of bad faith unsupported by the overwhelming and specific *prima facie* evidence of unconstitutional purposes presented here will not shield the objects of legitimate government investigations from their purposes and ends. But where the express and recorded goal of the government actors is to politically delegitimize an opposing viewpoint, the proper role of government is awry and room for federal court intervention is permitted. The *Younger* bad faith exception applies precisely because this is the unusual case.

---

[21] *See supra* notes 6 and 7.

JA0355

Defendants' viewpoint-based investigations laced with animus toward the party being investigated, are unconstitutional and an abuse of authority.

## CONCLUSION

*Amici* aver that the Court should grant Plaintiff's requested relief and deny Defendants' requests for dismissal.

JA0356

Respectfully submitted this the 19th day of April, 2017,

| | |
|---|---|
| JEFF LANDRY<br>Attorney General of Louisiana | KEN PAXTON<br>Attorney General of Texas |
| ALAN WILSON<br>Attorney General of South Carolina | JEFFREY C. MATEER<br>First Assistant Attorney General |
| STEVE MARSHALL<br>Attorney General of Alabama | BRANTLEY D. STARR<br>Deputy First Assistant Attorney General |
| BILL SCHUETTE<br>Attorney General of Michigan | MICHAEL C. TOTH<br>Special Counsel to the First Assistant<br>Attorney General |
| MARK BRNOVICH<br>Attorney General of Arizona | AUSTIN R. NIMOCKS**<br>Associate Deputy Attorney General |
| BRAD SCHIMEL<br>Attorney General of Wisconsin | */s/ Andrew D. Leonie*<br>ANDREW D. LEONIE* |
| DOUG PETERSON<br>Attorney General of Nebraska | Associate Deputy Attorney General<br>Texas Bar No. 12216500<br>andrew.leonie@oag.texas.gov |
| MIKE HUNTER<br>Attorney General of Oklahoma | DAVID J. HACKER**<br>Senior Counsel |
| SEAN REYES<br>Attorney General of Utah | JOEL STONEDALE<br>Counsel |
| LESLIE RUTLEDGE<br>Attorney General of Arkansas | Office of Special Litigation<br>ATTORNEY GENERAL OF TEXAS<br>P.O. Box 12548, Mail Code 009<br>Austin, Texas 78711-2548<br>Tel: 512-936-1414<br>Fax: 512-936-0545 |

*Application for admission *pro hac vice* filed.
**Application for admission *pro hac vice* forthcoming.

*ATTORNEYS FOR AMICI CURIAE*

JA0357

**CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of April 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which I understand to have caused service on all counsel of record.

*/s/ Andrew D. Leonie III*
Andrew D. Leonie III

JA0358

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas,<br><br>Defendant. | Civil Action No. 24-cv-147 |

## [PROPOSED] TEMPORARY RESTRAINING ORDER

On January 18, 2024, Plaintiffs Media Matters for America ("Media Matters") and Eric Hananoki filed a motion for a temporary restraining order and preliminary injunction. After considering the arguments and papers submitted, the Court **GRANTS** the motion and enters the following Temporary Restraining Order:

**ORDERED** that Warren Kenneth Paxton, Jr., Attorney General of the State of Texas, together with his agents, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction (collectively "Defendant Paxton"), is enjoined from enforcing the Civil Investigative Demand served by Attorney General Paxton to Media Matters on December 1, 2023;

**ORDERED** that Defendant Paxton is enjoined from further subjecting Plaintiffs to any legal process in Texas, including but not limited to any proceeding intended to enforce the December 1, 2023 Civil Investigative Demand, arising from Plaintiffs' research and reporting on the social media platform known as X and on Elon Musk;

**JA0359**

**ORDERED** that Defendant Paxton is enjoined from issuing any further Demands or taking steps purporting to mandate any action on behalf of Plaintiffs pursuant to Defendant Paxton's investigation in Media Matters;

This order and all supporting pleadings and opposing papers must be served on the adverse party within ___ days.

Defendant is **FURTHERED ORDERED** to show cause on _____, at _____ before this Court as to why a preliminary injunction to the same effect should not issue.

This order shall remain in effect until _____.

**IT IS SO ORDERED.**

Dated: _____

_____
Hon. _____
United States District Judge,
U.S. District Court for the District of Columbia

2

**JA0360**

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on the Defendant in accordance with Fed.

R. Civ. P. 5(a).


Dated: January 18, 2024

Respectfully submitted,
*/s/ Aria C. Branch*

**ELIAS LAW GROUP LLP**
Aria C. Branch (DC 1014541)
Elisabeth C. Frost (DC 1007632)
Jacob D. Shelly* (DC 90010127)
Elena A. Rodriguez Armenta* (DC 90018798)
Daniela Lorenzo*+
Omeed Alerasool* (DC 90006578)
Samuel T. Ward-Packard* (DC 90005484)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
abranch@elias.law
efrost@elias.law
jshelly@elias.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
oalerasool@elias.law
swardpackard@elias.law

Abha Khanna*
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law


**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr. (DC 420440)
Jay P. Srinivasan*
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com
Email: jsrinivasan@gibsondunn.com

3

**JA0361**

Amer S. Ahmed (DC 500630)
Anne Champion*
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com
Email: achampion@gibsondunn.com

*Pro hac vice application forthcoming
[+]Admission to D.C. bar pending swearing in

*Counsel for Plaintiffs Media Matters for America and Eric Hananoki*

4

**JA0362**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MEDIA MATTERS FOR AMERICA, *et al.*,

      Plaintiffs,

    v.

WARREN KENNETH PAXTON JR., in his
official capacity as Attorney General of the
State of Texas,

      Defendant.

Civil Action No. 24-cv-147

## PLAINTIFFS' CERTIFICATE OF COUNSEL PURSUANT TO LCvR 65.1

I, Aria C. Branch, certify that pursuant to LCvR 65.1(a), true and correct copies of Plaintiffs' Complaint and all other accompanying papers filed with the Court on January 17, 2024, were furnished via e-mail to counsel for Defendant Attorney General Warren Kenneth Paxton and confirmation of receipt was received. Plaintiffs, by counsel, also provided notice to Defendant, by counsel, via e-mail on January 17, 2024, of Plaintiffs' intent to file the foregoing papers, and Plaintiffs provided copies of the papers to Defendant, via email, on January 18, 2024.

Dated: January 18, 2024

Respectfully submitted,

*/s/ Aria C. Branch*

**ELIAS LAW GROUP LLP**
Aria C. Branch (DC 1014541)
Elisabeth C. Frost (DC 1007632)
Jacob D. Shelly* (DC 90010127)
Elena A. Rodriguez Armenta* (DC 90018798)
Daniela Lorenzo*+
Omeed Alerasool* (DC 90006578)
Samuel T. Ward-Packard* (DC 90005484)

JA0363

250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
abranch@elias.law
efrost@elias.law
jshelly@elias.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
oalerasool@elias.law
swardpackard@elias.law

Abha Khanna*
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr. (DC 420440)
Jay P. Srinivasan*
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com
Email: jsrinivasan@gibsondunn.com

Amer S. Ahmed (DC 500630)
Anne Champion*
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com
Email: achampion@gibsondunn.com

*Pro hac vice* application forthcoming
[+]Admission to D.C. bar pending swearing in

JA0364

# Response to motion for TRO and preliminary injunction



January 19, 2024

Hon. Amit P. Mehta
District Judge
United States District Court
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

> RE: *Media Matters for America, et al., v. Warren Kenneth Paxton Jr., in his official capacity as Attorney General of the State of Texas*
> Civil Action No. 24-cv-147-APM

Dear Judge Mehta:

I write in connection with the above-captioned case that was filed by Media Matters on January 17, 2024. Along with my co-counsel, Texas Assistant Attorney General Christopher Lavorato, on whose behalf I will presently file a motion for *pro hac vice*, I represent the Defendant in this matter.

This case concerns a civil investigation demand (CID) that was issued to Media Matters on November 21, 2023. Yesterday, Attorney General Paxton was served with Plaintiffs' Motion for Temporary Restraining Order (TRO) / Preliminary Injunction (PI) (and expedited hearing), ECF No. 4, seeking an immediate temporary injunction regarding the CID. Prior to this case being filed, Plaintiffs had already sought to enjoin Defendant's CID in the United States District Court for the District of Maryland. That case was styled No. 8:23-cv-3363-PX (*Media Matters for America, et al., v. Warren Kenneth Paxton Jr., in his official capacity as Attorney General of the State of Texas*). The Maryland case was filed by Plaintiffs on December 12, 2023.

In that Court on January 8, 2024, the parties appeared at a TRO / PI hearing before U.S. District Judge Paula Xinis. At the hearing, Judge Xinis expressed concern to Plaintiffs about the issue of whether the District of Maryland had personal jurisdiction over Attorney General Paxton. The parties were ordered to supplement briefing on the issue of jurisdiction. Thereafter (and before supplemental briefing was due), on January 17, 2024, Plaintiffs voluntarily dismissed the Maryland action—and on the same day filed the above-captioned case. Notably, before Plaintiffs' voluntary dismissal, Judge Xinis issued no temporary orders enjoining Attorney General Paxton. Indeed, Defendant had represented to Plaintiffs that he did not intend to take steps to enforce the CID, pending Judge Xinis's decision on Plaintiffs' PI motion.

**GENE C. SCHAERR** | PARTNER
Office: (202) 787-1060
Email: gschaerr@schaerr-jaffe.com

**SCHAERR** | **JAFFE** LLP
1717 K Street NW, Suite 900
Washington, DC 20006
www.schaerr-jaffe.com

Hon. Amit P. Mehta
January 19, 2024
Page 2

I am respectfully requesting on behalf of my client that this Court do the same, and issue no temporary orders regarding the CID at issue. We intend to file an opposition to Plaintiffs' motion for TRO / PI in accordance with the deadline set forth under Local Rule 65.1(c), which would make our opposition due this coming week, on January 25, 2024. This upcoming week, we also intend to file a motion to dismiss this action on jurisdictional grounds.

Meanwhile, we will honor our representation to Plaintiffs (and now, before this Court), that the CID will not be enforced against Media Matters until at a minimum the preliminary injunction is fully briefed, obviating the need for any Court action before then. Clearly, there is no evidentiary basis that there is irreparable harm, as it has been almost two months since the CID was issued, and Defendant has taken no action to enforce it, pending litigation. Furthermore, Plaintiffs' voluntary dismissal of a pending lawsuit—where the issue was already before the Court—is evidence that there is no irreparable harm warranting a TRO.

Sincerely,

Gene C. Schaerr

*Counsel for Defendant*

CC: Aria C. Branch
    Counsel for Plaintiffs

**JA0367**

**REPLY TO RESPONSE TO MOTION FOR TRO AND PRELIMINARY INJUNCTION**



250 Massachusetts Ave NW, Suite 400  |  Washington, DC 20001

January 19, 2024

**[VIA ELECTRONIC FILING]**

Hon. Amit P. Mehta
District Judge
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Ave. NW
Washington, D.C. 20001

      Re:    *Media Matters for America, et al. v. Paxton*, No. 1:24-cv-00147-APM

Dear Judge Mehta:

      I write in response to Mr. Schaerr's January 19, 2024, letter, ECF No. 7, regarding Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, ECF No. 4.

      Plaintiffs in this action, Media Matters for America ("MMFA") and MMFA Senior Investigative Reporter Eric Hananoki, are currently subject to a Civil Investigative Demand issued by Defendant Ken Paxton, the Attorney General of Texas. Defendant Paxton has provided neither a basis for the State of Texas to exert consumer-fraud jurisdiction over out-of-state entities that do not engage in any trade or commerce in Texas, nor substantive grounds for his investigation. Yet he demands a sweeping array of documents related to MMFA's ongoing work and Mr. Hananoki's widely cited reporting. Because that Demand may be enforced at any time, and because it has chilled and will continue to chill Plaintiffs' First Amendment–protected speech, Plaintiffs seek an immediate TRO against its enforcement.

      Mr. Schaerr's letter mischaracterizes both the nature and the consistency of Defendant Paxton's representations to Plaintiffs about whether and when the Demand may be enforced against them. In particular, I write to address Mr. Schaerr's representations as to three points.

      *First*, Defendant Paxton has changed positions as to whether and when he may enforce the Demand. In fact, Mr. Schaerr's letter to the Court takes a different position than he took in an email to the undersigned just yesterday afternoon. The letter indicates that "the CID will not be enforced against Media Matters until at a minimum ***the preliminary injunction is fully briefed***[.]" ECF No. 7 at 2 (emphasis added.) Yet in an email responding to service of the TRO motion, Mr. Schaerr stated that he was "authorized to represent that, assuming the Court acts on your PI motion in a

JA0369

Hon. Amit P. Mehta
January 19, 2024
Page 2

timely fashion, **the AG's office is willing to forego any action at all in furtherance of the investigation until that motion is resolved**." Exhibit A at 1–2 (emphasis added).

*Second*, Mr. Schaerr requests that the Court "issue no temporary orders regarding the CID at issue." But he omits to mention that yesterday evening, **Plaintiffs offered to withdraw the request for a TRO** in exchange for a stipulation to the enforcement terms that Mr. Schaerr appeared to then be offering—namely, that enforcement of the Demand would be suspended until Plaintiffs' motion for preliminary injunction has been resolved by the Court. Specifically, the undersigned indicated in an email responding to Mr. Schaerr that:

> If the AG's office is in fact willing to forego any action in furtherance of the investigation until the preliminary injunction motion is decided and will agree to the default briefing schedule set by the local rules, which puts the date of the AG's response due seven days from now, we would be willing to withdraw the request for a TRO in exchange and would promptly notify the court of the parties' agreement.

Exhibit A at 1. Rather than responding to that proposal, Mr. Schaerr filed his letter with the Court.

*Third*, Mr. Schaerr suggests that Plaintiffs' voluntary dismissal of the District of Maryland lawsuit "is evidence that there is no irreparable harm warranting a TRO." But as Plaintiffs' motion papers explain, Plaintiffs withdrew the Maryland lawsuit and filed in the District of Columbia— where Judge Xinis indicated personal jurisdiction was more likely to lie—precisely *because of* their need for prompt relief from ongoing irreparable injury. Indeed, Judge Xinis herself suggested that if the parties wanted a "fast and fair" resolution, the best course was to "move [the case] to D.C." ECF No. 4-1 at 28. Far from undermining Plaintiffs' allegations of irreparable harm, Plaintiffs' decision to accept that suggestion reflects the urgency of their TRO request.

Plaintiffs remain ready and willing to withdraw their request for a TRO—and spare the Court's and the parties' resources—on the terms they understood Defendant Paxton to be offering yesterday. Specifically, Plaintiffs will withdraw the TRO request in exchange for Defendant Paxton's stipulation not to enforce the Demand until the Court rules on the preliminary injunction motion. So long as the possibility of enforcement looms, however, as it does in the current posture of the parties' dealings, Plaintiffs require speedy relief. We thank the Court for its consideration.

Respectfully,

Aria C. Branch
Partner, Elias Law Group
*Counsel to Plaintiffs*

**JA0370**

# Exhibit A

JA0371

**Aria Branch**

| | |
|---|---|
| **From:** | Aria Branch |
| **Sent:** | Thursday, January 18, 2024 6:50 PM |
| **To:** | Gene Schaerr; Chris Lavorato; Ryan Baasch |
| **Cc:** | Abha Khanna; Elisabeth Frost; Chris Dodge; Tina Meng Morrison; Jacob Shelly; Elena Rodriguez Armenta; Daniela Lorenzo; Omeed Alerasool; Ahmed, Amer S.; Champion, Anne; Boutrous Jr., Theodore J.; Srinivasan, Jay P.; Reuben Blum |
| **Subject:** | Re: MMFA v. Paxton - Notice of Dismissal (D.Md.) and Complaint Filed (D.D.C.) |

Gene,

Thank you for your message. As we've explained in our discussions with your colleagues and our briefing papers, the continued threat of the Demand and investigation itself imposes a significant chill on the Plaintiffs' core protected First Amendment activities.

That said, your email seems to make a different offer than the one we previously have heard from the Attorney General's Office. **If the AG's office is in fact willing to forego any action in furtherance of the investigation until the preliminary injunction motion is decided and will agree to the default briefing schedule set by the local rules, which puts the date of the AG's response due seven days from now, we would be willing to withdraw the request for a TRO in exchange and would promptly notify the court of the parties' agreement.**

Please let me know if we are in agreement.

Best,

**Aria C. Branch**
Partner
Elias Law Group LLP
250 Massachusetts Avenue NW, Suite 400
Washington DC 20001
202-968-4518

CONFIDENTIAL: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

---

**From:** Gene Schaerr <gschaerr@schaerr-jaffe.com>
**Sent:** Thursday, January 18, 2024 2:02:52 PM
**To:** Aria Branch <abranch@elias.law>; Chris Lavorato <Chris.Lavorato@oag.texas.gov>; Ryan Baasch <Ryan.Baasch@oag.texas.gov>
**Cc:** Abha Khanna <akhanna@elias.law>; Elisabeth Frost <efrost@elias.law>; Chris Dodge <cdodge@elias.law>; Tina Meng Morrison <tmengmorrison@elias.law>; Jacob Shelly <jshelly@elias.law>; Elena Rodriguez Armenta <erodriguezarmenta@elias.law>; Daniela Lorenzo <dlorenzo@elias.law>; Omeed Alerasool <oalerasool@elias.law>; Ahmed, Amer S. <AAhmed@gibsondunn.com>; Champion, Anne <AChampion@gibsondunn.com>; Boutrous Jr., Theodore J. <TBoutrous@gibsondunn.com>; Srinivasan, Jay P. <JSrinivasan@gibsondunn.com>; Reuben Blum <Reuben.Blum@oag.texas.gov>
**Subject:** RE: MMFA v. Paxton - Notice of Dismissal (D.Md.) and Complaint Filed (D.D.C.)

Thanks, Aria.  We don't think there's a need to bother the Court or the parties with a TRO motion.  The AG's office has already agreed not to take any steps to enforce the civil investigative demand during the pendency of your PI motion.  And I am authorized to represent that, assuming the Court acts on your PI motion in a timely fashion,  the AG's

JA0372

office is willing to forego any action at all in furtherance of the investigation until that motion is resolved.   So we think the more sensible course is simply to litigate your PI motion in the ordinary course, without emergency briefing or an emergency hearing.

Please let us know if you agree.

Gene Schaerr
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900 | Washington, DC 20006
Office (202) 787-1060 | Mobile (202) 361-1061
gschaerr@schaerr-jaffe.com | www.schaerr-jaffe.com

---

**From:** Aria Branch <abranch@elias.law>
**Sent:** Thursday, January 18, 2024 12:45 PM
**To:** Chris Lavorato <Chris.Lavorato@oag.texas.gov>; Gene Schaerr <gschaerr@schaerr-jaffe.com>; Ryan Baasch <Ryan.Baasch@oag.texas.gov>
**Cc:** Abha Khanna <akhanna@elias.law>; Elisabeth Frost <efrost@elias.law>; Chris Dodge <cdodge@elias.law>; Tina Meng Morrison <tmengmorrison@elias.law>; Jacob Shelly <jshelly@elias.law>; Elena Rodriguez Armenta <erodriguezarmenta@elias.law>; Daniela Lorenzo <dlorenzo@elias.law>; Omeed Alerasool <oalerasool@elias.law>; Ahmed, Amer S. <AAhmed@gibsondunn.com>; Champion, Anne <AChampion@gibsondunn.com>; Boutrous Jr., Theodore J. <TBoutrous@gibsondunn.com>; Srinivasan, Jay P. <JSrinivasan@gibsondunn.com>; Reuben Blum <Reuben.Blum@oag.texas.gov>
**Subject:** RE: MMFA v. Paxton - Notice of Dismissal (D.Md.) and Complaint Filed (D.D.C.)

Counsel,

Thank you for your confirmation. As indicated yesterday, we are moving for a temporary restraining order and preliminary injunction. Courtesy copies of that motion and the related filings are attached.

Best,

**Aria C. Branch**
Partner
**Elias Law Group LLP**
250 Massachusetts Avenue NW, Suite 400
Washington DC 20001
202-968-4518

CONFIDENTIAL: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

---

**From:** Chris Lavorato <Chris.Lavorato@oag.texas.gov>
**Sent:** Thursday, January 18, 2024 9:08 AM
**To:** Aria Branch <abranch@elias.law>; gschaerr@schaerr-jaffe.com; Ryan Baasch <Ryan.Baasch@oag.texas.gov>
**Cc:** Abha Khanna <akhanna@elias.law>; Elisabeth Frost <efrost@elias.law>; Chris Dodge <cdodge@elias.law>; Tina Meng Morrison <tmengmorrison@elias.law>; Jacob Shelly <jshelly@elias.law>; Elena Rodriguez Armenta <erodriguezarmenta@elias.law>; Daniela Lorenzo <dlorenzo@elias.law>; Omeed Alerasool <oalerasool@elias.law>; Ahmed, Amer S. <AAhmed@gibsondunn.com>; Champion, Anne <AChampion@gibsondunn.com>; Boutrous Jr., Theodore J. <TBoutrous@gibsondunn.com>; Srinivasan, Jay P. <JSrinivasan@gibsondunn.com>; Reuben Blum <Reuben.Blum@oag.texas.gov>
**Subject:** RE: MMFA v. Paxton - Notice of Dismissal (D.Md.) and Complaint Filed (D.D.C.)

Aria,

JA0373

I am confirming receipt of your email and confirming that we will accept service of the complaint.

Regards,

**Christopher Lavorato**
Assistant Attorney General
Office of the Attorney General
Direct Line: 512-475-4476
Email: Chris.lavorato@oag.texas.gov

---

**From:** Aria Branch <abranch@elias.law>
**Sent:** Wednesday, January 17, 2024 2:54 PM
**To:** gschaerr@schaerr-jaffe.com; Ryan Baasch <Ryan.Baasch@oag.texas.gov>; Chris Lavorato <Chris.Lavorato@oag.texas.gov>
**Cc:** Abha Khanna <akhanna@elias.law>; Elisabeth Frost <efrost@elias.law>; Chris Dodge <cdodge@elias.law>; Tina Meng Morrison <tmengmorrison@elias.law>; Jacob Shelly <jshelly@elias.law>; Elena Rodriguez Armenta <erodriguezarmenta@elias.law>; Daniela Lorenzo <dlorenzo@elias.law>; Omeed Alerasool <oalerasool@elias.law>; Ahmed, Amer S. <AAhmed@gibsondunn.com>; Champion, Anne <AChampion@gibsondunn.com>; Boutrous Jr., Theodore J. <TBoutrous@gibsondunn.com>; Srinivasan, Jay P. <JSrinivasan@gibsondunn.com>
**Subject:** MMFA v. Paxton - Notice of Dismissal (D.Md.) and Complaint Filed (D.D.C.)

Counsel,

After careful consideration and in the interest of avoiding delay on the question of jurisdiction, our clients have decided to voluntarily dismiss the complaint pursuant to *Media Matters for America, et al. v. Paxton*, Case No. 8:23-cv-3363-PX (D. Md.), and refile the case in the U.S. District Court for the District of Columbia. While we continue to believe AG Paxton is subject to personal jurisdiction in Maryland, we agree with Judge Xinis that voluntary dismissal and refiling in the District of Columbia is the best way to ensure that this matter moves forward quickly and provides a forum that is "fast and fair to both sides." 01/08/24 Tr. at 23:7-8. You should have received notice of the dismissal via ECF in the former case (also attached to this email). In light of the current posture of the case and consistent with the federal rules, the dismissal is without prejudice and does not constitute waiver of any of our client's claims or allegations made in that case.

I am also attaching to this email a courtesy copy of the complaint that we just filed in the D.C. District Court. We will also shortly be filing a motion for temporary restraining order and preliminary injunction. Once filed, we will email service copies of these filings as well.

<u>Please confirm receipt of this email and advise if you will accept service of the new complaint on behalf of your client.</u>

Best,
Aria

**Aria C. Branch**
Partner
Elias Law Group LLP
250 Massachusetts Avenue NW, Suite 400
Washington DC 20001
202-968-4518

CONFIDENTIAL: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

3

**JA0374**

**RESPONSE BY TEXAS ATTORNEY GENERAL PAXTON TO ORDER OF THE COURT**



January 22, 2024

Hon. Amit P. Mehta
District Judge
United States District Court
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

     RE: *Media Matters for America, et al., v. Warren Kenneth Paxton Jr.,*
        *in his official capacity as Attorney General of the State of Texas*
        Civil Action No. 24-cv-147-APM

Dear Judge Mehta:

     In compliance with the Court's minute order of January 20, 2024, I respond on behalf of my client.

     As a matter of context—the CID was issued under Texas's Deceptive Trade Practices Act, Tex. Bus. & Com. Code 17.41-17.63 (DTPA). Under the DTPA, a CID is not self-executing, and the Attorney General may enforce it only by filing a "petition" in State court for an "order of the court for enforcement" of the CID.  *Id.* 17.62(b). Other courts have held that the non-self-executing nature of a DTPA CID renders challenges identical to Media Matters' suit here as non-ripe. *See, e.g.*, *Twitter v. Paxton*, 56 F.4th 1170, 1176 (9th Cir. 2022).

     Nevertheless, **I am confirming herein that Texas Attorney General Paxton (and his office) will not enforce the CID issued to Media Matters until Your Honor rules on Plaintiffs' motion for preliminary injunction**.  We understand that this stipulation will moot Plaintiffs' motion for a temporary restraining order.

     Sincerely,

     Gene C. Schaerr

     *Counsel for Defendant*

CC:  Aria C. Branch
     Counsel for Plaintiffs

**GENE C. SCHAERR** | PARTNER
Office:  (202) 787-1060
Email:  gschaerr@schaerr-jaffe.com

**SCHAERR** | **JAFFE** LLP
1717 K Street NW, Suite 900
Washington, DC 20006
www.schaerr-jaffe.com

JA0376

# Response to motion for TRO and preliminary injunction

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, | |
| Plaintiffs, | Civil Action No. 1:24-cv-147-APM |
| v. | |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | |
| Defendant. | |

## DEFENDANT'S OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

JA0378

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 3

    Texas's DTPA and Defendant's CID Authority ...................................................... 3

    Factual Background ................................................................................................ 4

STANDARD OF REVIEW ............................................................................................ 11

ARGUMENT ................................................................................................................. 11

    I.     The Court Lacks Personal Jurisdiction over the Texas Attorney General. ................ 11

          A.    Plaintiff has not met the personal jurisdiction threshold under the District of Columbia long-arm statute. ........................................................ 12

               i.    Subsection (a)(3) does not support personal jurisdiction. ................... 13

               ii.    Subsection (a)(4) also does not support personal jurisdiction. ........... 15

          B.    Personal jurisdiction does not meet the requirements of Due Process because Attorney General Paxton does not have minimum contacts. ............ 15

               i.    Attorney General Paxton did not purposefully direct his conduct to the District of Columbia. ............................................................... 16

               ii.    Calder and the "effects test" are inapposite to this case. .................... 17

               iii.    First Amendment concerns do not change the personal jurisdiction analysis. ....................................................................... 18

    II.    Media Matters has not Suffered Justiciable Injury. ............................................. 19

    III.    Venue in the District of Columbia is Improper. ................................................... 21

    IV.    Media Matters has not Shown a First Amendment Violation................................. 22

    V.    Media Matters Could Have Avoided Any Harm, and its Litigation Conduct is Inequitable............................................................................................................ 24

CONCLUSION.............................................................................................................. 25

JA0379

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Bates v. C&S Adjusters, Inc.*,
  980 F.2d 865 (2d Cir. 1992) ............................................................................. 22

*Belle Fourche Pipeline Co. v. United States*,
  751 F.2d 332 (10th Cir. 1984) .......................................................................... 19

*Benisek v. Lamone*,
  138 S. Ct. 1942 (2018) ...................................................................................... 11

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*,
  582 U.S. 255 (2017) ........................................................................................... 16

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ..................................................................................... 16, 17

*Calder v. Jones*, 465 U.S. 783 (1984) .................................................................... 17

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ......................................................................... 11

*Clapper v. Amnesty Int'l*,
  568 U.S. 398 (2013) ........................................................................................... 21

*Crane v. Carr*,
  814 F.2d 758 (D.C. Cir. 1987) ......................................................................... 15

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014) ........................................................................................... 12

*Dyson v. Dutko Ragen Homes & Investments*,
  No. 21-CV-02280 (APM), 2022 WL 1294484 (D.D.C. Apr. 27, 2022) .................. 14

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
  141 S. Ct. 1017 (2021) ...................................................................................... 16

*Forras v. Rauf*,
  812 F.3d 1102 (D.C. Cir. 2016) .................................................................. 14, 15

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011) ........................................................................................... 15

*Google, Inc. v. Hood*,
  822 F.3d 212 (5th Cir. 2016) ........................................................................... 20

*GTE New Media Servs. Inc. v. BellSouth Corp.*,
  199 F.3d 1343 (D.C. Cir. 2000) ....................................................................... 12

*Health Commc'ns, Inc. v. Mariner Corp.*,
  860 F.2d 460 (D.C. Cir. 1988) ........................................................................... 2

JA0380

*Helicopteros Nacionales de Colombia v. Hall*,
    466 U.S. 408 (1984) ............................................................................................. 16

*Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*,
    326 U.S. 310 (1945) ............................................................................................. 12

*Keeton v. Hustler Mag., Inc.*,
    465 U.S. 770 (1984) ............................................................................................. 17

*Laird v. Tatum*,
    408 U.S. 1 (1972) ............................................................................................. 21

*Leroy v. Great Western United Corp.*,
    443 U.S. 173 (1979) ....................................................................................... 21, 22

*Lewis v. Mutond*,
    62 F.4th 587 (D.C. Cir. 2023) ............................................................................. 16

*Lewis v. Younger*,
    653 F.2d 1258 (9th Cir. 1980) ............................................................................. 20

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ............................................................................................. 11

*Menken v. Emm*,
    503 F.3d 1050 (9th Cir. 2007) ............................................................................. 17

*Moncrief v. Lexington Herald-Leader Co.*,
    807 F.2d 217 (D.C. Cir. 1986) ............................................................... 13, 14, 17, 18

*Mouzavires v. Baxter*,
    434 A.2d 988 (D.C. Cir. 1981) ............................................................................. 12

*Music Makers Holdings v. Sarro*,
    No. RWT-09-cv-1836, 2010 WL 2807805 (D. Md. July 15, 2010) ....................... 18

*Novartis Corp. v. FTC*,
    223 F.3d 783 (D.C. Cir. 2000) ............................................................................. 23

*PPG Indus., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship*,
    146 S.W.3d 79 (Tex. 2004) ................................................................................... 3

*Reisman v. Caplin*,
    375 U.S. 440 (1964) ............................................................................................. 19

*Reps. Comm. for Freedom of Press v. AT&T*,
    593 F.2d 1030 (D.C. Cir. 1978) ................................................................... 1, 19, 20

*Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.*,
    966 F. Supp. 1250 (D.D.C. 1997) ....................................................................... 23

*Safari Club Int'l v. Salazar*,
    852 F. Supp. 2d 102 (D.D.C. 2012) ..................................................................... 24

iii

*Slate v. Kamau,*
   No. 20-CV-3732 (BAH), 2021 WL 3472438 (D.D.C. Aug. 6, 2021) ..................................... 14

*Stroman Realty v. Wercinski,*
   513 F.3d 476 (5th Cir. 2008) ........................................................................................ 18

*Thompson v. Nat'l Football League,*
   No. 1:13-cv-367, 2014 WL 1646929 (W.D. Pa. Apr. 24, 2014) ............................................ 22

*Twitter, Inc. v. Paxton,*
   56 F.4th 1170 (9th Cir. 2022) .............................................................. 2, 3, 18, 20, 21

*United States v. Kulukundis,*
   329 F.2d 197 (2d Cir. 1964) ......................................................................................... 19

*Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n,*
   259 F.2d 921 (D.C. Cir. 1958) ...................................................................................... 11

*Walden v. Fiore,*
   571 U.S. 277 (2014) ..................................................................................... 2, 16, 17

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ........................................................................................................ 11

*Zazzali v. Swenson,*
   852 F. Supp. 2d 438 (D. Del. 2012) ............................................................................. 22

*Zirkle v. Dist. of Columbia,*
   830 A.2d 1250 (D.C. Cir. 2003) ................................................................................... 11

**Statutes**

28 U.S.C. § 1391 ............................................................................................................... 21

D.C. Code § 13-423 ................................................................................................... 12, 13

Tex. Bus. & Com. Code § 17.44(a) ................................................................................... 3

Tex. Bus. & Com. Code § 17.46(a) ................................................................................... 3

Tex. Bus. & Com. Code § 17.46(b) ............................................................................. 1, 3

Tex. Bus. & Com. Code § 17.61 ................................................................... 4, 6, 20, 23

Tex. Bus. & Com. Code § 17.62 ............................................................................... 4, 18

Tex. Bus. & Com. Code §§ 17.41-17.63 (DTPA) ................................................... 3, 18

iv

**JA0382**

**INTRODUCTION**

For the second time, seeking to have a federal court enjoin an ongoing State investigation, the motion by Plaintiff Media Matters for America (Media Matters) remains as meritless as it is extraordinary. And—as with their first short lived case, Media Matters has filed it in a court that lacks jurisdiction.

On November 18, 2023, it came to light that Media Matters had arguably made false and misleading statements about the inner workings of X.com (f/k/a Twitter). Texas's Deceptive Trade Practices Act (DTPA) makes it unlawful to "disparag[e] the . . . services[] or business of another by false or misleading representation of facts." Tex. Bus. & Com. Code § 17.46(b)(8). Accordingly, on November 20, Defendant Ken Paxton, in his capacity as Texas's Attorney General, initiated an investigation and issued a Civil Investigation Demand (CID) related to Media Matters' November 18, 2023 statements. To date, Defendant has not reached a conclusion about whether Media Matters violated the law. It is possible that Media Matters' conduct was not false or misleading, or that its conduct otherwise did not sufficiently affect trade or commerce in Texas to come within the scope of the DTPA. But that is precisely why the Attorney General launched an *investigation*—to find out.

Media Matters asks this Court to enter extraordinary and unprecedented relief to short-circuit that investigation under the premise that the investigation harms its First Amendment rights. That is not something federal courts do. "[A]ny person can establish the existence of a First Amendment right and of an investigative technique that could possibly be employed in bad faith so as to violate that right." *Reps. Comm. for Freedom of Press v. AT&T*, 593 F.2d 1030, 1070 (D.C. Cir. 1978) (Op. of Wilkey, J.). If this sufficed for a preliminary injunction, it would have "no logical stopping-point." *Id.* And for three threshold reasons, Media Matters' attempt to obtain this unprecedented relief fails and should be denied.

*First*, personal jurisdiction: The Texas Attorney General and his investigation do not have legally cognizable contacts with the District of Columbia. Although the CID was issued to Media Matters in the District of Columbia, *see, e.g.*, Declaration of Aria C. Branch, Ex. A. (ECF No. 4-5), for personal jurisdiction to exist, "the plaintiff cannot be the only link between the defendant and the forum." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). Indeed, binding precedent confirms that even far greater contacts with the District do not suffice for personal jurisdiction. *See, e.g.*, *Health Commc'ns, Inc. v. Mariner Corp.*, 860 F.2d 460, 464 (D.C. Cir. 1988) (no personal jurisdiction over Texas hotel management firm who retained D.C. company for employee training, after the company issued certificates and correspondence in D.C.). *Second*, venue: Contrary to Media Matters' assertion, it is untrue that "a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Columbia," *contra* Compl. ¶ 15. Even by Media Matters' telling, the overwhelming share of events giving rise to the CID involve Media Matters' potentially false or misleading disparagement of X.com. *See, e.g.*, Motion at 3–9. And those allegations are the subject of X Corp.'s lawsuit against Media Matters in the Northern District of Texas. To the extent this case is justiciable in any federal court, it belongs in that court with that related case.

*Third*, ripeness: Defendant's announcement of the investigation and issuance of a CID do not cognizably injure Media Matters. That is crystal clear under a host of precedent, including binding Supreme Court precedent. And it is ***especially*** clear because the only Circuit court to address this Defendant's specific CID authority concluded that a party does not suffer a cognizable injury, including any form of chilled speech, merely by virtue of receiving said CID. *Twitter, Inc. v. Paxton*, 56 F.4th 1170 (9th Cir. 2022). That is because, among other things, the "CID is not self-enforcing." *Id.* at 1176. Media Matters suffers no automatic penalties if it ignores the CID. Instead, for the Attorney General to enforce the CID, he would have to sue in a Texas state court, where

**JA0384**

Media Matters would have the right to assert a First Amendment defense, or any other arguments. *Id.*

As explained in further detail below, Media Matters' merits arguments are all premature. And Media Matters also is not entitled to relief because it has acted inequitably and because, as a factual matter, it is plain that Media Matters has experienced no chill.

Media Matters' Motion should be denied.

## BACKGROUND

**Texas's DTPA and Defendant's CID Authority**

Like many States, Texas has adopted a modified version of the Uniform Unfair and Deceptive Trade Practices Act. *See* Tex. Bus. & Com. Code ch. 17, subch. E. In Texas, the Deceptive Trade Practices Act (DTPA) protects consumers by prohibiting "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." *Id.* § 17.46(a). Deceptive trade practices are defined broadly to include, among other things, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have," *id.* § 17.46(b)(5); inducing consumers to enter transactions by "failing to disclose information concerning goods or services which was known at the time of the transaction," *id.* § 17.46(b)(24); and, as particularly relevant here, "disparaging the goods, services, or business of another by false or misleading representation of facts," *id.* § 17.46(b)(8). By statute, these categories "shall be liberally construed." *Id.* § 17.44(a).

The DTPA also authorizes a number of enforcement mechanisms. *See PPG Indus., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 84–85 (Tex. 2004). As relevant here, the statute authorizes Defendant's Consumer Protection Division to issue a CID if the "division believes that any person may be in possession, custody, or control" of "material relevant to the subject matter of an investigation of a possible violation of this subchapter." Tex. Bus. & Com.

3

**JA0385**

Code § 17.61(a). If the recipient chooses to provide documents, those documents generally may not be shared outside the Office of the Attorney General (OAG) except by consent or court order. *Id.* § 17.61(f). If the recipient objects to the CID, that recipient may affirmatively challenge it in Texas state court, *id.* § 17.61(g); or it may wait to see if the Attorney General chooses to bring an enforcement action (where the recipient may raise any defenses), *see id.* § 17.62(b). So long as the recipient of a CID does not seek to destroy documents, he will not face any penalty for declining to provide documents based on a good-faith objection to that CID. *Id.* §§ 17.61(g), 17.62(a), (c).

**Factual Background**

On November 16, 2023, Media Matters published a document titled "*As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*."[1] This publication made a number of serious and economically harmful allegations against X, an entity that employs people in Texas. Specifically, the document made accusations that X "plac[es] ads for major brands like Apple, Bravo (NBCUniversal), IBM, Oracle, and Xfinity (Comcast) next to content that touts Adolf Hitler and his Nazi Party." *Id.* And the document claimed that Media Matters "found ads for Apple, Bravo, Oracle, Xfinity, and IBM next to posts that tout Hitler and his Nazi Party on X." *Id.* Media Matters' document also reproduced what Media Matters claimed were images of those ads next to the Hitler or Nazi Party content. *Id.* Unsurprisingly, at least some of these advertisers appear to have withdrawn their advertisements from X. Indeed, that objective appears to have been the whole point of the document. Media Matters kept a running "update" of advertisers who had withdrawn their ads from X. *Id.* And, on the following day, Media Matters published another document—this one by a different author—

---

[1] Eric Hananoki, *As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*, Media Matters (Nov. 16, 2023), https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.

stating that "No advertiser is safe while Elon Musk controls X." Matt Gertz, *It's the antisemitism, stupid*, Media Matters (Nov. 17, 2023), https://www.mediamatters.org/elon-musk/its-antisemitism-stupid.

On November 18, X issued a blog post alleging how Media Matters' document was false or misleading in multiple respects. X Safety, *Stand with X to protect free speech*, X Blog (Nov. 18, 2023), https://blog.twitter.com/en_us/topics/company/2023/stand-with-x-to-protect-free-speech. The upshot of X's allegations is that Media Matters' document did not describe an organic experience on X's platform. Instead, X alleged that Media Matters jury-rigged an artificial experience that few, and perhaps zero, other users or advertisers would ever experience, and then publicized that artificial experience as if it were organic to create a misleading impression. *Id.* According to X's blog post, some of the advertiser combinations with Hitler or Nazi content that Media Matters described were apparently "seen" by only "one user"—the "author" of Media Matters' document. *Id.* The blog post claimed that Media Matters apparently achieved these outlier results by "curat[ing]" their account in a way that would generate these results. *Id.*

On November 20, 2023, Texas Attorney General Paxton announced an investigation into Media Matters for potential fraudulent activity. Branch Decl., Ex. B. His investigation began because he was "extremely troubled by" X's allegations about Media Matters' "manipulat[ions]." *Id.* The Attorney General, however, did not claim that Media Matters had broken the law, only that his office is "examining the issue closely." *Id.* Indeed, the Attorney General does not unreservedly accept X's allegations about what happened. Getting to the bottom of those claims is the whole point of the investigation.

Later that day, X Corp. filed a lawsuit against Media Matters in the Northern District of Texas over Media Matters' November 16 document. That lawsuit added significant detail to how

JA0387

X believed that Media Matters had created a false depiction of the X platform. Specifically, X claimed that "Media Matters knowingly and maliciously manufactured side-by-side images depicting advertisers posts on X Corp.'s social media platform beside Neo-Nazi and white supremacist fringe content and then portrayed these manufactured images as if they were what typical X users experience on the platform." Compl. ¶ 1, *X Corp. v. Media Matters*, No. 4:23-cv-01175 (N.D. Tex.), ECF No. 1 (*X Lawsuit*). According to X, Media Matters accessed an old X account (one that would bypass X's "ad filter for new users") and then had that account follow content **only** "in one of two categories": (1) "those known to produce extreme fringe content," and (2) "accounts owned by X's big-name advertisers." *Id.* ¶ 8. According to X, Media Matters then "endlessly scroll[ed] and refresh[ed]" its account page until it generated "controversial content next to X's largest advertisers' paid posts." *Id.* ¶ 10. The upshot, according to X, was an inauthentic—and objectively misleading—representation of the X platform experience. For example, X claimed that the paid posts of IBM, Comcast, and Oracle "appeared alongside the fringe content cited by Media Matters for ***only one*** viewer (out of more than 500 million) on all of X: ***Media Matters***." *Id.* ¶ 13 (emphasis original).

On November 21, the Attorney General's office issued a CID to Media Matters containing 12 requests for various documents. As is customary under the Texas DTPA, the Attorney General gave Media Matters until December 12, 2023—20 days from service—to respond to the CID. Branch Decl., Ex. A at 1; Tex. Bus. & Com. Code § 17.61(g) (contemplating "20 days").

Defendant's investigation is primarily designed to investigate three things: (1) the veracity of X's allegations that Media Matters essentially perpetrated a fraud and misrepresentation regarding its platform; (2) The nexus of Media Matters' conduct to Texas; and (3) the effect of

**JA0388**

Media Matters' underlying conduct to trade and commerce, especially in the State of Texas. *See* Branch Decl., Ex. A at 7.

**Veracity**: To evaluate the veracity of X's allegations, the CID requests among other things, that Media Matters produce:

- "[D]ocuments sufficient to identify" Media Matters' "accounts that were used to obtain, produce, or otherwise acquire the" content published in Media Matters' November 16 document. Branch Decl., Ex. A at 7 No. 8; *accord X Lawsuit* ¶ 29 (alleging Media Matters used an account that enabled it to "evade X's content filters for new users");

- "[D]ocuments sufficient to identify all X accounts, profiles, and members followed by the X accounts identified" in the bullet above. Branch Decl., Ex. A at 7 No. 9; *accord X Lawsuit* ¶ 30 ("alleging Media Matters "set its accounts to follow only 30 users" and that "*[a]ll* of these users were either already known for posting controversial content or were accounts for X's advertisers" (emphasis original)); and

- Media Matters' "external communications with" X during a critical 3-week time period. Branch Decl., Ex. A at 7 No. 10.

**Texas Nexus**: Texas's DTPA is, of course, a Texas statute. To evaluate the nexus of Media Matters' conduct with Texas, the CID requests that Media Matters produce:

- "[D]ocuments sufficient to identify all of Media Matters for America's sources of income originating in the State of Texas." Branch Decl., Ex. A at 7 No. 2;

- "[D]ocuments sufficient to identify all of Media Matters for America's operational expenditures in the State of Texas." Branch Decl., Ex. A at 7 No. 3; and

- Media Matters' "external communications" with the advertisers at the center of the controversy over the November 16 document. Branch Decl., Ex. A at 7 No. 11; *accord X Lawsuit* ¶ 19 (alleging "Media Matters' campaign against X Corp. was purposefully directed at, among others, relationships with advertisers who are located in, have a significant presence in, or transact substantial business in Texas."). At least some of these advertisers are headquartered in Texas.

**Effect on trade and commerce**: Texas's DTPA is about trade and commerce, not merely misleading statements in the abstract. To evaluate the November 16 document's nexus to trade and commerce, the CID requests that Media Matters produce:

- "[D]ocuments" related to "Elon Musk's purchase of X." Branch Decl., Ex. A at 7 No. 4;

- Media Matters' "external communications" with the advertisers at the center of the controversy over the November 16 document. Branch Decl., Ex. A at 7 No. 11; *accord X Lawsuit* ¶ 19 (alleging "Media Matters' campaign against X Corp. was purposefully directed at, among others, relationships with advertisers who are located in, have a significant presence in, or transact substantial business in Texas."); and

- "[D]ocuments sufficient to identify all direct and indirect sources of funding for" Media Matters' operation. Branch Decl., Ex. A at 7 No. 12.[2]

---

[2] Although Media Matters does not have a right to understand the possible theories of the Attorney General's investigation, Defendant lays out these specifics in detail for the benefit of the Court's evaluation. Documents regarding Media Matters' funding could be highly relevant to effects on trade and commerce because, for example, Media Matters may be funded by an economic competitor of Elon Musk or X.

**JA0390**

Media Matters contends (ECF No. 4-1 at 3) it "ha[s] been chilled from publishing additional criticism or coverage of X or Musk since" the Attorney General announced his investigation. Media Matters' COO, for example, asserts that there is a "culture of fear within Media Matters" to "speak[] on any topic related to the subject of the investigation." Declaration of Cynthia Padera ¶ 23 (ECF No. 4-2). But it is almost impossible to square that with the public record. For example:

- On November 25 (after Defendant announced his investigation and issued the CID), Media Matters President Angelo Carusone stated on TV that "things [on X] appeared exactly the way we said, that ads were running alongside Nazi content." Fuller Decl., Ex. C.

- On the same day, Carusone said "Musk . . . doesn't really see a problem or at least seemingly, with a lot of this content because it's also a reflection of his own worldview." *Id.*

- On the same day, Carusone said X "still provides at this point a safe haven for extremists and disinformation." *Id.*

- On November 26, Carusone similarly said on TV that "Musk . . . engag[es] with some pretty extreme, you know, antisemitic, great replacement theory." Fuller Decl., Ex. D.

- On the same day, Carusone touted Media Matters' "reports showing that [X is] sharing ad revenue with these Hitler stan accounts." *Id.*

- On December 3 Carusone went on TV to accuse X CEO Linda Yaccarino of coercing "advertising partners . . . to really align with the values of what X is trying to do." Fuller Decl., Ex. E.

- On December 18 Carusone went on TV to boast how Media Matters has "chronicle[d] the descent of X now into a sort of a supercharged engine of radicalization." Fuller Decl., Ex. F.

- On November 21, 2023, Eric Hananoki reposted a social media message originally sent by a "Matthew Gertz," concerning the Texas Attorney General's office and a termination of a prior Assistant Attorney General. The date of the reposting occurs after the CID was issued to Media Matters. Fuller Decl., Ex. G.

- On December 12, 2023, the President of Media Matters, Angelo Carusone, reposted an article published by NBC News titled, "Media Matters sues Texas attorney general over response to Elon Musk dispute." Fuller Decl., Ex. H.

- On December 13, 2023, Angelo Carusone reposted a social media posting originally posted by a "Aaron Reichlin-Melnick", concerning an amicus brief from 2016 drafted by the Texas OAG. Fuller Decl., Ex. I.

- On December 12, 2023, Angelo Carusone reposted a social media posting from NBC News concerning Media Matters lawsuit against Texas Attorney General Paxton. Fuller Decl., Ex. J.

- On November 22, 2023, Angelo Carusone reposted two social media posts concerning the underlying facts of this case. Fuller Decl., Ex. K–L.

Defendant takes no position on whether Carusone's and Hananoki's speech *supra* is constitutionally protected. But their conduct clearly illustrates that Media Matters' speech has not been *chilled* and the claim that it is—should be scrutinized with caution based on the record.

10

**JA0392**

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam). That burden is heavy: "[A] preliminary injunction is an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 138 S. Ct. 1942 (2018) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)) "As a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits. Rather, a court must also consider whether the movant has shown that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Benisek*, 138 S. Ct. at 1943–44 (internal quotations omitted). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim or irreparable harm." *Zirkle v. Dist. of Columbia*, 830 A.2d 1250, 1257 (D.C. Cir. 2003) (quoting *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n,* 259 F.2d 921, 925 (D.C. Cir. 1958)). *See also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297–98 (D.C. Cir. 2006).

## ARGUMENT

## I.   The Court Lacks Personal Jurisdiction over the Texas Attorney General.

Although Media Matters' claims purportedly arise under the First Amendment, reaching the merits of this case would disturb another, equally important constitutional principle—due process—as this Court lacks personal jurisdiction over the Texas Attorney General. Media Matters initially brought this case in the State of Maryland—and voluntarily dismissed it there because of significant concerns raised by a federal district judge who rightfully questioned the issue of personal jurisdiction. Now, Media Matters has filed this suit in Washington, D.C., even though

11

D.C. does not support the court's jurisdiction here and Attorney General Paxton does not have cognizable contacts with the District of Columbia.

To establish personal jurisdiction over a non-resident defendant, District of Columbia courts "must first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process." *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). "The District of Columbia 'long-arm statute' enumerates the various acts of a nonresident defendant which support the assertion of personal jurisdiction." *Mouzavires v. Baxter*, 434 A.2d 988, 990 (D.C. Cir. 1981). Personal jurisdiction comports with due process only when the defendant has "minimum contacts with the forum state such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945).

The statutory and constitutional inquiries merge when the state's long-arm statute "allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). However, not all provisions of the D.C. long-arm statute are coextensive with the Due Process Clause. *See Mouzavires*, 434 A.2d at 990–91.

### A.      Plaintiff has not met the personal jurisdiction threshold under the District of Columbia long-arm statute.

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler*, 571 U.S. at 125. The District of Columbia long-arm statute, D.C. Code § 13-423, provides in relevant part:

> (a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's --
> . . .
> (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;

12

**JA0394**

(4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia[.]

*Id.* Although Media Matters fails to specify the application of a particular subsection, "Plaintiffs allege unlawful retaliation in violation of the First Amendment, an intentional tort." Mem. Supp. Pls.' Mot. TRO/PI, ECF No. 4-1 at 22. Therefore, the only relevant statutory justifications for this Court's jurisdiction are subsections (a)(3) and (a)(4), which pertain to tortious injury. *See* D.C. Code § 13-423.

### i.   *Subsection (a)(3) does not support personal jurisdiction.*

Subsection (a)(3) is a "precise and intentionally restricted tort section, which stops short of the outer limits of due process, and which confers jurisdiction only over a defendant who commits an act in the District which causes an injury in the District, without regard to any other contacts." *Moncrief v. Lexington Herald-Leader Co.*, 807 F.2d 217, 221 (D.C. Cir. 1986) (citations and internal quotation marks omitted). This Court does not have personal jurisdiction under subsection (a)(3) because Media Matters fails to establish that Attorney General Paxton's alleged tortious conduct occurred in D.C. Rather, Attorney General Paxton issued the CID in Texas, and the investigation is occurring in Texas to determine whether Media Matters engaged in fraud or deceptive trade practices that put Texans at risk.

Despite the clear limits of subsection (a)(3), Media Matters mistakenly asserts that "the District of Columbia's long-arm statute is effectively congruent with the permissible limits of personal jurisdiction under the Due Process Clause." ECF No. 4-1 at 23. And, Media Matters attempts—unsuccessfully—to establish that the mere acts of issuing the CID and serving it in D.C. are sufficient to establish jurisdiction. This contention fails for two reasons.

**JA0395**

First, District of Columbia courts have repeatedly held that "mailing a letter or other material into Washington, DC from outside of the District does not qualify as an 'act . . . in the District of Columbia within the meaning of subsection (a)(3)." *Slate v. Kamau*, No. 20-CV-3732 (BAH), 2021 WL 3472438, at *6 (D.D.C. Aug. 6, 2021) (internal citations omitted); *accord Moncrief*, 807 F.2d at 219–22 (holding that "no act occurred within the District of Columbia" when "the libelous article was printed, and the newspapers were mailed, outside of the District of Columbia."). Thus, the fact that Attorney General Paxton used a common carrier to deliver the CID to Media Matters' headquarters is not a sufficient basis to establish personal jurisdiction.

Media Matters nonetheless claims that "jurisdiction is proper because Paxton has intentionally served a Demand on Media Matters in the District, causing a substantial and predictable chill to Media Matters." ECF No. 4-1 at 22. This is incorrect because the D.C. Circuit explicitly rejects the theory that the "injury is part of the tort . . . because such a theory would obliterate subsection (3)'s careful distinction between injury' and act." *Forras v. Rauf*, 812 F.3d 1102, 1107 (D.C. Cir. 2016) (internal quotation marks omitted). Even if the alleged chilling effect occurred in D.C., that does not mean that the alleged tortious conduct occurred in D.C. Thus, the fact that Media Matters is "at home" in D.C., its place of incorporation, has no bearing on the application of the long-arm statute to Attorney General Paxton's conduct.

Second, Media Matters' claim also rests on the assumption that retaining a process server to serve the CID in D.C. is sufficient to establish jurisdiction. Yet, "limited communications initiated from outside the District of Columbia to a District resident do not qualify as an act 'in the District' for purposes of § 13-423(a)(3)." *Dyson v. Dutko Ragen Homes & Investments*, No. 21-CV-02280 (APM), 2022 WL 1294484, at *4 (D.D.C. Apr. 27, 2022). Thus, like delivering a letter

14

**JA0396**

from Texas, Attorney General Paxton's use of a process server to serve the CID on Media Matters is not a sufficient basis to establish personal jurisdiction either.

> ii.     *Subsection (a)(4) also does not support personal jurisdiction.*

By contrast, subsection (a)(4) of the D.C. long-arm statute "permits an exercise of jurisdiction over a tortious act or omission committed outside the District that causes injury within the District if, and only if, the defendant "regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from . . . services rendered" in the District. *Forras*, 812 F.3d at 1107. "[B]ecause the harm-generating act (or omission) occurred outside, the statute calls for something more. The 'something more' or 'plus factor' . . . serve[s] to filter out cases in which the inforum impact is an isolated event and the defendant otherwise has no, or scant, affiliations with the forum." *Crane v. Carr*, 814 F.2d 758, 763 (D.C. Cir. 1987).

This Court does not have personal jurisdiction under subsection (a)(4) because there is no "plus factor" that would establish a connection with the District of Columbia within the meaning of the statute. Attorney General Paxton does not solicit or do business, engage in other persistent conduct, or derive any revenue from services in D.C. In short, even if this Court were to accept the premise that issuing the CID in Texas amounted to tortious conduct, personal jurisdiction is not proper in the District of Columbia.

> **B.     Personal jurisdiction does not meet the requirements of Due Process because Attorney General Paxton does not have minimum contacts.**

Even if this Court were to find that the District of Columbia long-arm statute applies, "[t]he Due Process Clause of the Fourteenth Amendment sets the outer boundaries of a state tribunal's authority to proceed against a defendant." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011). There are two types of personal jurisdiction under the Constitution: general jurisdiction exists when a defendant is "essentially at home" in the forum state, and specific

<div align="center">15</div>

**JA0397**

jurisdiction exists for non-resident defendants based on the contacts between the defendant, forum state, and controversy. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024–25 (2021).

General jurisdiction is inapplicable here because Attorney General Paxton does not have the requisite "continuous and systematic" contacts with the District of Columbia. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 415–16 (1984). Specific jurisdiction is the only possible basis, but it does not comport with due process in this case either because Attorney General Paxton did not sufficiently direct his contacts to D.C.

The D.C. Circuit considers two factors when determining whether specific jurisdiction exists. First, the defendant must have "purposefully directed" conduct directed at the forum state "such that he should reasonably anticipate being haled into court there." *Lewis v. Mutond*, 62 F.4th 587, 591 (D.C. Cir. 2023) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). Second, "a plaintiff's claims must "aris[e] out of or relat[e] to the defendant's contacts with the forum." *Id.* (quoting *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 256 (2017)).

> i.   *Attorney General Paxton did not purposefully direct his conduct to the District of Columbia.*

Purposeful direction "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person." *Burger King Corp.*, 471 U.S. at 475 (internal citations omitted). Therefore, under the Supreme Court's *Walden* decision, "the plaintiff cannot be the only link between the defendant and the forum." *Walden*, 571 U.S. at 286.

Media Matters errs in citing *Walden* to argue that sending the CID and serving it in D.C. establish purposeful direction and foreseeability. ECF No. 4-1 at 21. And, the Court in *Walden* noted that contact with the forum state "through an agent, goods, mail, or some other means—is

certainly a *relevant* contact." *Walden,* 571 U.S. at 285 (emphasis added). Yet, *Walden* described the requisite contact as more substantial and sustained, such as "entering a contractual relationship that 'envisioned continuing and wide-reaching contacts'" or circulating magazines to 'deliberately exploi[t]' a market . . . ." *Id.* (first citing *Burger King Corp.*, 471 U.S. at 479–80, then citing *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 773–74 (1984)). To the extent that Attorney General Paxton had any contact with the District of Columbia, it was more attenuated than the type of ongoing business relationship described in *Walden*.

ii.    *Calder and the "effects test" are inapposite to this case.*

Media Matters' specific jurisdiction argument relies even more heavily on *Calder v. Jones*, 465 U.S. 783 (1984), which also points against a finding of personal jurisdiction here. In *Calder*, the Supreme Court found that a California Superior Court had jurisdiction over the Florida-based reporters for the *National Enquirer*, a nationally circulated magazine, after the magazine published an allegedly libelous article about a California actress. *Id.* at 791. Personal jurisdiction was appropriate because the magazine's "actions were expressly aimed at California." *Id.* at 789.

Some courts now apply *Calder* in a three-step "effects test": "(1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity." *See, e.g.*, *Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007); ECF No. 4-1 at 22.

However, *Calder* and the effects test are inapposite to this case. As explained above, subsection (a)(3) of the D.C. long-arm statute "stops short of the outer limits of due process" because both the tortious conduct *and* injurious effect must occur in the District of Columbia. *Moncrief*, 807 F.2d at 221; *see supra* at 12–14. Thus, a plaintiff in D.C. cannot rely on *Calder* to establish jurisdiction for tortious injury over non-resident defendants unless the complained-of

17

tortious act occurred in D.C. This case does not meet that threshold because General Paxton issued the CID in Texas. Indeed, the CID was lawfully issued under Texas's Deceptive Trade Practices Act, Tex. Bus. & Com. Code §§ 17.41-17.63 (DTPA). And, under the DTPA, a CID is not self-executing, and the Attorney General may enforce it only by filing a "petition" in State court for an "order of the court for enforcement" of the CID. *Id.* § 17.62(b). The fact that Media Matters claims that its speech has been chilled, is a voluntary response, and federal courts have held that the non-self-executing nature of a DTPA CID renders challenges identical to Media Matters' suit here as non-ripe. *See, e.g.*, *Twitter*, 56 F.4th at 1176.

    *iii.* *First Amendment concerns do not change the personal jurisdiction analysis.*

  *Calder* does apply to this case for a different reason—because the Court in *Calder* "reject[ed] the suggestion that First Amendment concerns enter into the jurisdictional analysis." *Moncrief*, 807 F.2d at 222. And in *Moncrief*, the D.C. Circuit extended *Calder*'s restriction on courts considering First Amendment concerns in the personal jurisdiction analysis even further. *Id.* at 223–24. Specifically, the court announced that the First Amendment does not affect the determination of whether speech-related activity falls under subsection (a)(4) of the District of Columbia long-arm statute. *Id.*

  Thus, First Amendment concerns do not change the analysis on whether this Court has personal jurisdiction over Attorney General Paxton. To the extent that Media Matters believes it experienced a heightened chill because Attorney General Paxton exercised the official powers of his office, that similarly does not affect the personal jurisdiction analysis. The default rule is that state agencies should not "have to defend [their] attempt to enforce [state] laws "—much less mere investigations under those laws—"in courts throughout the nation." *Stroman Realty v. Wercinski*, 513 F.3d 476, 487 (5th Cir. 2008); *accord Music Makers Holdings v. Sarro*, No. RWT-09-cv-1836, 2010 WL 2807805, at *5 (D. Md. July 15, 2010) ("[R]ecent out-of-circuit court of appeals

decisions have analyzed the issue in a variety of contexts and have uniformly held that cease-and-desist letters alone do not establish personal jurisdiction."). For the reasons explained above, personal jurisdiction is absent here.

## II.    Media Matters has not Suffered Justiciable Injury.

Even if the Court has jurisdiction and venue were proper, Media Matters has suffered no judicially cognizable injury.  The accepted rule since at least the Supreme Court's 1964 *Reisman v. Caplin* decision is that an agency's non-self-executing request for documents is not reviewable until the agency tries to enforce it. 375 U.S. 440 (1964). In *Reisman*, the recipient of an administrative request for documents was not obligated to produce anything until after the agency brought an "enforcement action" where the recipient would be afforded "a judicial determination" of the lawfulness of the request and the viability of any of his defenses. *Id.* at 446. That "opportunity for judicial review before any coercive sanctions may be imposed" was an adequate "remedy"; and the court would not permit the recipient of the request to short-circuit this process by preemptively seeking an injunction in federal court. *Id.* at 450. *Reisman* is now widely understood as having "announced a rule strongly disfavoring any pre-enforcement review of investigative subpoenas." *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334 (10th Cir. 1984); *see also United States v. Kulukundis*, 329 F.2d 197, 199 (2d Cir. 1964) (Friendly, J.) (explaining *Reisman* "seems to destroy the basis underlying decisions of this court which authorized applications to vacate [non-self-executing subpoenas] (and appeals from their denial) in advance of any judicial proceeding by the Government for their enforcement").

The presence of a First Amendment claim changes nothing. As a respected D.C. Circuit judge put it, "[t]here is no person in the United States" who cannot allege some "First Amendment right" that an "investigative technique" has supposedly trampled on, and then seek an injunction against the investigation on that basis. *Reps. Comm. for Freedom of Press,* 593 F.2d at 1070

19

(Wilkey, J.). That "approach has no logical stopping-point" and, if ever entertained, would mire the federal courts in a flood of litigation to short-circuit investigations before the investigations can even determine whether the subject has broken the law. *Id.* No wonder the courts have rejected these kinds of actions for an injunction, even when the First Amendment is at issue. *See, e.g.*, *Google, Inc. v. Hood*, 822 F.3d 212, 226 (5th Cir. 2016) (concluding, in First Amendment context, that "administrative subpoena is not ripe for review" because it is not "self-executing"). Instead, as then-Judge Anthony Kennedy put it in a similar context, Media Matters "can properly litigate [its legal arguments] if and when the Attorney General attempts to enforce [state] law against [it] after the completion of his investigation." *Lewis v. Younger*, 653 F.2d 1258, 1260 (9th Cir. 1980). Or, Media Matters could take advantage of the procedures that the DTPA offers to challenge the CID. *See* Tex. Bus. & Com. Code § 17.61(g). But Media Matters cannot seek pre-enforcement review of the CID in federal court.

The Ninth Circuit's decision in *Twitter, Inc. v. Paxton* removes any conceivable doubt about whether Media Matters has suffered cognizable injury. 56 F.4th 1170. In that case, Twitter sought an injunction against this same Defendant—Attorney General Paxton—after he initiated a DTPA investigation and served a CID on Twitter. Twitter alleged materially similar First Amendment harm as Media Matters alleges here, *id.* at 1175 (Twitter declarant alleging "the CID and associated investigation chill Twitter's speech") and identified statements from Defendant that it believed showed retaliatory intent, *id.* at 1172 (Defendant stated Twitter was "the left's Chinese-style thought police" and vowed to "fight them with all I've got"). The court concluded, however, that "Twitter has not suffered an Article III injury because the CID is not self-enforcing." *Id.* at 1176. After all, Twitter—like Media Matters here—"never faced any penalties for its refusal to comply with the CID." *Id.* And all the actions Twitter claimed to have taken to self-censor in

response to the CID were—much like Media Matters' alleged actions here—"self-inflicted because the actions were voluntary." *Id.*; *Clapper v. Amnesty Int'l*, 568 U.S. 398, 418 (2013).

None of Media Matters' First Amendment authority supports a contrary outcome. By and large, courts adjudicate First Amendment "retaliation" cases only where "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature." *Laird v. Tatum*, 408 U.S. 1, 11 (1972). "In none of" the Supreme Court's cases does "the chilling effect arise merely from the individual's knowledge that a governmental agency was engaged in certain activities," *id.*, or from a non-self-executing CID. Media Matters' case citations (ECF No. 4-1 at 28–29) are illustrative.

## III.   Venue in the District of Columbia is Improper.

Venue is also improper here for similar reasons.

Media Matters claims "a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Columbia." Compl. ¶ 15 (citing 28 U.S.C. § 1391(b)(2)). Of course, like Media Matters' personal jurisdiction argument, this theory depends on the plaintiff's residence rather than the defendant's residence.

And, in any event, the Supreme Court has rejected this approach to venue. In *Leroy v. Great Western United Corp.*, a Texas corporation filed suit against Idaho officials in Texas federal court to challenge an Idaho statute that restricted activities in Texas. 443 U.S. 173 (1979). The corporation's claim was based on "action that was taken in Idaho by Idaho residents," namely "the enactment of the statute by the legislature, the review of [the Texas corporation's] filing, the forwarding of the comment letter by [an Idaho official], and the entry of the order postponing the effective date of the tender by [an Idaho official]—as well as the future action that may be taken in the State by its officials to punish or to remedy any violation of its law." *Id.* at 185–86. Based

**JA0403**

on these facts, the Court held that the suit had "only one obvious locus—the District of Idaho." *Id.* at 185. This case also has one obvious locus—Texas.[3]

That venue is proper in Texas alone is especially obvious here because *X already filed a lawsuit in Texas against Media Matters for the same conduct Defendant is investigating*. *X Corp. v. Media Matters*, No. 4:23-cv-01175 (N.D. Tex.). That case clearly involves a "related" set of facts, and courts commonly look to relatedness when determining where venue is proper. *See Zazzali v. Swenson*, 852 F. Supp. 2d 438, 448 (D. Del. 2012) ("A motion to transfer may also be granted if there is a related case which has been first filed or otherwise is the more appropriate vehicle to litigate the issues between the parties."); *Thompson v. Nat'l Football League*, No. 1:13-cv-367, 2014 WL 1646929, at *3 (W.D. Pa. Apr. 24, 2014) (same).[4] Moreover, it is quite likely that that court will eventually address all of the arguments Media Matters has made here if X Corp. seeks the same material in discovery.

## IV.    Media Matters has not Shown a First Amendment Violation.

Media Matters also cannot show that the Attorney General violated its First Amendment rights.

Media Matters admits (ECF No. 4-1 at 24) that, to succeed on its retaliation claim, it must show that it "engaged in conduct protected under the First Amendment" and that Defendant took responsive action in retaliation for that activity. But Media Matters cannot possibly show *on this record* that the activity at issue in the Attorney General's investigation was protected First

---

[3] Congress's amendment of the venue statute in 1990 (after *Leroy*) is irrelevant to this point because, while that amendment clarified that venue can be proper in multiple districts, the Court's decision in *Leroy* did not turn on "whether [the pre-amendment statute] adopt[ed] the occasionally fictive assumption that a claim may arise in only one district." *Leroy*, 443 U.S. at 384–85; *accord Bates v. C&S Adjusters, Inc.*, 980 F.2d 865, 867 (2d Cir. 1992) (observing, post-amendment, that "*Leroy* . . . remain[s] [an] important source[] of guidance").

[4] Transfer is unwarranted because, as explained *supra* at 19–21, this case is not justiciable in *any* federal court. But if the Court thinks this case is justiciable, then the Northern District of Texas is manifestly the proper place for it to be litigated.

Amendment activity. Instead, it is well-established that, under laws like Texas's DTPA, a party can constitutionally be liable for statements that, while "literally true," are "nevertheless likely to mislead or confuse consumers." *Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.*, 966 F. Supp. 1250, 1268 (D.D.C. 1997). *See also Novartis Corp. v. FTC*, 223 F.3d 783, 787 & n.3 (D.C. Cir. 2000). And X Corp.'s lawsuit lays out a fact pattern that is suggestive of speech not merely "likely" to deceive viewers, but deliberately designed to do so. If that is the case, then it is hard to see how that same speech is constitutionally protected.

The Attorney General does not unreservedly take X Corp.'s allegations against Media Matters at face value, and he does not ask this Court to do so. But that is the point of Defendant's *investigation*. Among other things, Defendant's investigation will shed significant light on whether Media Matters' speech was actually First Amendment-protected—*i.e.*, whether it was likely, or deliberately designed, to mislead. Media Matters' suit functionally asks the Court to assume the conclusion of that investigation in a way that will be favorable to Media Matters. But the appropriate course is to see what the investigation actually yields.[5]

---

[5] Media Matters' other merits arguments (ECF No. 4-1 at 35-39) also do not support its request that the Court enjoin Defendant. Media Matters can litigate whether Defendant's demand is "overbroad, unreasonable" or "seeks to pry into matters protected by the First Amendment" under the procedures the DTPA provides. Tex. Bus. & Com. Code § 17.61(g). Or, like any other party, it can meet and confer with Defendant about the overbreadth, etc., in an attempt to narrow the requests. And at least some requests are ***plainly*** not overbroad, unreasonable, or seeking First Amendment protected material. *See, e.g.*, Branch Decl., Ex. A at 7 No. 9 (narrowly tailored request for a mere three weeks of "external communications" between Media Matters and X Corp); *id.* No. 10 (similar request for communications between Media Matters and advertisers). So, the sweeping relief that Media Matters seeks cannot be granted on these arguments.

Media Matters' argument about whether it is subject to personal jurisdiction in Texas fares no better. Defendant's investigation is intended in part to evaluate that exact question. *See supra* at 8–9 (explaining how some requests are intended to evaluate the breadth of Media Matters' contacts with Texas). In that respect, the CID accomplishes much the same purpose as jurisdictional discovery. Just like when jurisdictional discovery is ordered, it would make no sense here to conclude Media Matters is not subject to jurisdiction in Texas without first flushing out the facts necessary to determine whether that is true.

JA0405

## V.      Media Matters Could Have Avoided Any Harm, and its Litigation Conduct is Inequitable.

Media Matters' arguments about irreparable harm also are not equitable. And its meritless harm argument, coupled with various other misrepresentations and lack of candor, raises serious questions about its good faith.

As to the alleged harm: "It is well-settled that a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted." *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012) (quotations omitted). "In analogous circumstances, plaintiffs who decline the opportunity to avail themselves of a regulatory scheme to avoid the very harm for which they seek injunctive relief have been denied the [injunctive] relief." *Id.* Here, of course, Media Matters "decline[d] the opportunity" to use the DTPA's "regulatory scheme," *id.*, to set aside Defendant's CID. If there were merit to Media Matters' substantive arguments, those procedures would have provided Media Matters full relief against the harm it now characterizes as "irreparable." In addition, it is factually untrue that Media Matters contends it "ha[s] been chilled from publishing additional criticism or coverage of X or Musk since [Defendant] announced his investigation," Motion at 9, and that there is a "culture of fear within Media Matters" to "speak[] on any topic related to the subject of the investigation," Padera Decl. ¶ 23. Someone evidently forgot to tell this to Media Matters' President, because he has been on TV at least four times since the Attorney General announced his investigation, where he has made materially the same—and even more aggressive—claims against X and Musk as those made in the November 16 document. *See supra* at 9–10. Media Matters' President, for example, doubled down on the November 16 document ("things [on X] appeared exactly the way we said, that ads were running alongside Nazi content"), and even asserted that the Nazi content was a "reflection of [Musk's] own worldview," *see supra* at 9–10. It is not apparent how Media Matters can possibly

24

**JA0406**

square that with its assertion here that it has been chilled from criticizing X or Musk, or that it does

not want to speak on matters related to the Attorney General's investigation.

## CONCLUSION

The Court should deny Plaintiffs' Motion.

Dated: January 25, 2024

/s/ Gene C. Schaerr
GENE C. SCHAERR
  (D.C. Bar No. 416368)
KENNETH A. KLUKOWSKI
  (D.C. Bar No. 1046093)
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, D.C. 20006
gschaerr@schaerr-jaffe.com
kklukowski@schaerr-jaffe.com

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

CHRISTOPHER LAVORATO*
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4476
chris.lavorato@oag.texas.gov

REUBEN W. BLUM*
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4117
reuben.blum@oag.texas.gov

*Admitted pro hac vice

Attorneys for Defendant Ken Paxton, Attorney General of the State of Texas

JA0407

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, | |
| Plaintiffs, | Civil Action No. 1:24-cv-147-APM |
| v. | |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | |
| Defendant. | |

**DECLARATION OF ASSISTANT ATTORNEY GENERAL**
**LEVI FULLER**

I Levi Fuller declare that,

1.      I am a lawyer duly licensed to practice law in the State of Texas. I am over 21 years of age and fully competent in all respects to make this declaration. I am one of the attorneys responsible for Defendant's investigation into Plaintiff Media Matters for America (Media Matters). I have personal knowledge of the matters herein stated:

2.      On November 21, 2023, I issued through FedEx a "Civil Investigative Demand" (CID) to Media Matters addressed to its President and registered agent, Angelo Carusone, at 800 Maine Avenue, SW, Suite 500, Washington, DC. Attached hereto as **Exhibit A** is a true and correct copy from FedEx of the "proof of delivery" for this CID.

3.      On November 30, 2023, I caused to be served an additional, duplicative version of the November 21, 2023 CID on Defendant's counsel at 250 Massachusetts Ave Suite 400, Washington, DC 20001 through a professional process service. I received confirmation from the process server on December 1, 2023 that the CID had been received and accepted by an attorney

1

**JA0408**

at Media Matters' retained law firm. A true and correct copy of that confirmation is attached as **Exhibit B**.

4.       A true and correct copy of Media Matters' webpage dated November 25, 2023 and titled "On MSNBC, Angelo Carusone explains why Elon Musk's own behavior will keep advertisers away from X" is attached as **Exhibit C.**

5.       A true and correct copy of Media Matters' webpage dated November 26, 2023 and titled "Angelo Carusone discusses Elon Musk and X on MSNBC: 'No matter how you slice it, the fact is their brand safety tools were not operating in the way that they claim they should have been'" is attached as **Exhibit D.**

6.       A true and correct copy of Media Matters' webpage dated December 3, 2023 and titled "Angelo Carusone discusses Musk and X on MSNBC: 'The pen is supposed to be mightier than the sword – and this is an area where they're trying to take away the pen from any critics'" is attached as **Exhibit E.**

7.       A true and correct copy of Media Matters' webpage dated December 18, 2023 and titled "On MSNBC, Angelo Carusone discusses how free speech is on the line in Media Matters' lawsuit against Texas AG Ken Paxton" is attached as **Exhibit F.**

8.       A true and correct copy of screen shot reflecting Eric Hananoki reposting a message originally sent by a "Matthew Gertz" on November 21, 2023, concerning the Texas Attorney General's office and a termination of a prior Assistant Attorney General. The date of the reposting is after the CID was issued to Media Matters and is attached as **Exhibit G.**

9.       A true and correct copy of screen shot reflecting Angelo Carusone reposting an article published by NBC News titled, "Media Matters sues Texas attorney general over response to Elon Musk dispute."  The date of the posting is December 12, 2023. See **Exhibit H.**

JA0409

10.     A true and correct copy of screen shot reflecting Angelo Carusone reposting a social media posting originally posted by a "Aaron Reichlin-Melnick" on December 13, 2023, concerning an amicus brief from 2016 drafted by the Texas OAG. See **Exhibit I**.

11.     A true and correct copy of screen shot reflecting Angelo Carusone reposting a social media posting from NBC News concerning Media Matters lawsuit against Texas Attorney General Paxton, dated December 12, 2023. See **Exhibit J**.

12.     A true and correct copy of screen shot reflecting Angelo Carusone reposting two social media postings dated November 22, 2023, concerning the underlying facts of this case, and an interview of Carusone by "msnbc.com" concerning the underlying facts of this case. See **Exhibit K and L**.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, January 24, 2024.

_/s/ Levi Fuller_
Levi Fuller
Assistant Attorney General
Consumer Protection Division

3

**JA0410**

# EXHIBIT A

JA0411

Dear Customer,

The following is the proof-of-delivery for tracking number: 7741 8756 3037

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered To: | |
| Signed for by: | Signature release on file | Delivery Location: | |
| Service type: | FedEx First Overnight | | |
| Special Handling: | Deliver Weekday | | WASHINGTON, DC, |
| | | Delivery date: | Nov 22, 2023 07:48 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 7741 8756 3037 | Ship Date: | Nov 21, 2023 |
| | | Weight: | 0.5 LB/0.23 KG |

| Recipient: | | Shipper: | |
|---|---|---|---|
| WASHINGTON, DC, US, | | AUSTIN, TX, US, | |

| | | |
|---|---|---|
| Purchase Order | Enter Case # or N/A Below | |
| Invoice | n/a | |
| Department Number | 10097 | |

Proof-of-delivery details appear below; however, no signature is available for this FedEx Express shipment because a signature was not required.

Thank you for choosing FedEx

**JA0412**

# EXHIBIT B

JA0413

| | |
|---|---|
| **From:** | Levi Fuller |
| **To:** | Pauline Sisson |
| **Cc:** | Erica Moreno |
| **Subject:** | FW: [ServeManager] Job #10016580 Served |
| **Date:** | Friday, December 1, 2023 2:58:35 PM |

---

**From:** Missy Lord <Missy.Lord@oag.texas.gov>
**Sent:** Friday, December 1, 2023 2:08 PM
**To:** Levi Fuller <Levi.Fuller@oag.texas.gov>
**Subject:** Fw: [ServeManager] Job #10016580 Served

---

**From:** Ashleigh Howard <notifications@mail.servemanager.com>
**Sent:** Friday, December 1, 2023 2:03 PM
**To:** Missy Lord <Missy.Lord@oag.texas.gov>
**Subject:** [ServeManager] Job #10016580 Served

# Served

Ashleigh Howard shared a service notification with you:

## Details

**Process Server:** Alex Grabowski

**Date & Time:** Dec 1, 2023, 2:00 pm EST

**Service Type:** Authorized

**Description of Service:**

## Recipient

Recipient: Ezra Reese

Age:        45

Ethnicity:  Caucasian

Gender:     Male

Weight:     180

Height:     6'2"

Hair:       Brown

**JA0414**

Eyes:      Brown

**Description of Recipient:** Attorney Ezra Reese accepted service for Angelo

## Service Address

250 Massachusetts Ave Suite 400, Washington, DC 20001

## GPS Data

**Mobile Device:** Safari version 17 on iOS (iPhone) 17.1.1

**GPS Coordinates:** 38.89829719, -77.01811821

**GPS Timestamp:** 1701456566999

---

# Job & Case

**Job:** 10016580

**Priority: Rush**

**Job Type:** Standard

**Due Date:** Nov 30, 2023

**Client Job:** AG-11-Media Matters for America c/o Angelo Carusone

**Recipient:** Media Matters for America c/o Angelo Carusone

**Case:** [not provided]

**Plaintiff:** OFFICE OF THE TEXAS ATTORNEY GENERAL CONSUMER PROTECTION DIVISION

**Defendant:** MEDIA MATTERS FOR AMERICA

**Court:** [not provided]

**County:**

**Documents:** Civil Investigative Demand

---

**Shared with you by:**

Ashleigh Howard
Process to Process Deliveries
info@estp2p.com
832-954-4676

# EXHIBIT C

JA0417

Case 1:24-cv-00147-APM   Document 26-1   Filed 01/25/24   Page 11 of 51
Case 8:23-cv-03363-PX   Document 33-1   Filed 12/30/23   Page 13 of 41

On MSNBC, Angelo Carusone explains why Elon Musk's own behavior...          https://www.mediamatters.org/angelo-carusone/msnbc-angelo-carusone...

**DONATE TO MEDIA MATTERS' YEAR-END FUNDRAISER**

**MEDIAMATTERS**
F O R   A M E R I C A

# On MSNBC, Angelo Carusone explains why Elon Musk's own behavior will keep advertisers away from X

*Carusone: "this just isn't worth the brand risks to be associated with something where the rot goes all the way to the top"*

**WRITTEN BY   MEDIA MATTERS STAFF**

**PUBLISHED   11/25/23 8:01 PM EST**

JA0418

On MSNBC, Angelo Carusone explains why Elon Musk's own behavior...                    https://www.mediamatters.org/angelo-carusone/msnbc-angelo-carusone...



**JA0419**

*ANGELO CARUSONE (PRESIDENT, MEDIA MATTERS): I think the thing that is important to note, and you certainly got there, is he is certainly not suing us for publishing anything that they say is false, in fact their own complaint acknowledges that everything that we reported was accurate, that the things appeared exactly the way that we said, that ads were running alongside Nazi content. The thing that I would just emphasize is that this is just one report of many that we've been publishing over months, and it they also illustrates the same issue, which might help explain why they are having problems with advertisers in addition to Elon Musk's own behavior, is that they promised a suite of new ad tools that were supposed to prevent these things from happening so they've sort of given up on the idea that the platform is going to be a safe haven for Nazis and pro-Hitler content. And what they've basically been telling advertisers is don't worry, even though the toxicity has gotten worse on our platform, we have special tools that will make sure that you never get embarrassed. So all of these reports basically illustrate one thing. That the mechanisms that they say exist, to prevent ads from running alongside pro-Nazi content, are not working the way that they claim, and I think that's the important thing here is that fundamentally, and they acknowledge it, the ads did run as we said, and so have other ads in the same way as you seem reporting not just from us. NBC has been making the same reports.*

Case 1:24-cv-00147-APM   Document 26-1   Filed 01/25/24   Page 14 of 51
Case 8:23-cv-03363-PX   Document 33-1   Filed 12/30/23   Page 16 of 41

On MSNBC, Angelo Carusone explains why Elon Musk's own behavior...          https://www.mediamatters.org/angelo-carusone/msnbc-angelo-carusone...

*ALICIA MENENDEZ (HOST): You will understand the spirit in which I asked this question, which is, if you don't care about Media Matters and you don't really care about X, why should you care about what is unfolding?*

*ANGELO CARUSONE: I think the thing that's worth considering is two things. One, the way in which, where they filed the lawsuit, they sort of chose a jurisdiction that was going to be maximally beneficial for them, which I sort of understand but when you consider that this lawsuit is part of a series of things that they are doing at the same time, so taking up Stephen Miller's recommendation to enlist Republican attorney generals to sort of run parallel to Elon Musk's lawsuit, investigations of other attempts to criminally punish Media Matters for reporting the thing that was accurate about X in retaliation, that's when you start to have to worry about what does this mean for the future. Because Elon Musk took that call from Stephen Miller, obviously put a bunch of money into the litigation, but then said yeah whose game to do this, and state Attorney Generals, and a few of them took up the mantle, and started running with these investigations. So why should people care? Because it's a small window into the future where you can basically retaliate and punish media outlets for reporting accurate things, simply because you don't like them and not only will those outlets suffer, the real effect is that most places are going to stop doing things that might get them in trouble like this, because they just don't want to deal with the consequences or it has a chilling effect. So that's why people should care because it's the next iteration of a little bit of an authoritarian slide, and a stifling of good information.*

**JA0421**

*ALICIA MENENDEZ: Do you think that the exodus of advertisers holds?*

*ANGELO CARUSONE: Yes, I do. And I think that a big contributing factor to that is that Elon Musk's own behavior, which as you noted in your intro, he didn't just engage with an anti-semitic conspiracy theory, the great replacement theory, that somehow Jews in America are funding mass immigration in order to dilute white power, he responded by saying, "the actual truth." It's very hard to say oh I was just misinterpreting it, I think his own conduct, helps reinforce why the advertiser exodus state because what it shows to advertisers and prospective business partners is a lens through which they can think through all the things happening on X. "Why does it seem like there's so much more Nazi content, why does it seem like that platform is getting more extreme, why does it seem like the tools they are promising us, the brand safety tools are not working the way they should." It's because when you look at it through the lens of the key decision-maker there Elon Musk, he doesn't really see a problem or at least seemingly, with a lot of this content because it's also a reflection of his own worldview. So if you are a business person, and you're an advertiser you are saying, this just isn't worth the brand risks to be associated with something where the rot goes all the way to the top.*

JA0422

On MSNBC, Angelo Carusone explains why Elon Musk's own behavior...        https://www.mediamatters.org/angelo-carusone/msnbc-angelo-carusone...

*ALICIA MENENDEZ: We've got about a minute left but I want to ask you Angelo, everything you are saying about the platform itself, about the role that GOP attorneys general are playing in carrying Musk's water, why it matters when you are 11 months out from an increasingly consequential presidential election?*

*ANGELO CARUSONE: That's really the key factor here. You know X and Twitter, all these social media platforms play a role in our information ecosystem, an increasing role. And even though X has had a diminished presence since Elon Musk took it over, it still provides at this point a safe haven for extremists an disinformation, it's algorithms allow for recommendations for connecting power on the fringes, and that ties in with the Republican strategy which is to build power, political power on what used to be considered the fringes. And so if you can take a platform like X, and you can then not just have it not working or cater to antisemitism, extremism, hate, or disinformation, but you can turn those tools to facilitate and support that worldview and that ideology, to help build power, that's where the consequences really start to become magnified. So it's far beyond X, it actually provides a beachhead and a launchpad for disinformation, for extremism that will be directly tied into not just people's civic participation in elections, but in the aftermath. And we saw how consequential that was last election cycle.*

*ALICIA MENENDEZ: That's why even if you are not an X user, you need to care.*

12/25/2023, 1:38 PM

# EXHIBIT D

JA0424

Case 1:24-cv-00147-APM   Document 26-1   Filed 01/25/24   Page 18 of 51
Case 8:23-cv-03363-PX   Document 33-1   Filed 12/30/23   Page 20 of 41

Angelo Carusone discusses Elon Musk and X on MSNBC: "No matter ...          https://www.mediamatters.org/angelo-carusone/angelo-carusone-discuss...

DONATE TO MEDIA MATTERS' YEAR-END FUNDRAISER

MEDIA**MATTERS**
F O R   A M E R I C A

# Angelo Carusone discusses Elon Musk and X on MSNBC: "No matter how you slice it, the fact is their brand safety tools were not operating in the way that they claim they should have been"

WRITTEN BY   MEDIA MATTERS STAFF

PUBLISHED   11/26/23 9:13 AM EST

Angelo Carusone discusses Elon Musk and X on MSNBC: "No matter ...          https://www.mediamatters.org/angelo-carusone/angelo-carusone-discuss...



From the November 26, 2023, edition of MSNBC's *The Katie Phang Show*

JA0426

*KATIE PHANG (HOST): Since the richest man in the world bought Twitter – now known as X – over a year ago, Elon Musk has struggled to keep advertisers on the platform. Now, the self-proclaimed free speech absolutist has found someone else to blame. On Monday, Musk sued progressive media watchdog group Media Matters over an investigative report Musk claims is costing him major ad dollars. It's interesting to note that Musk sued in federal court in Texas, despite being headquartered in California and Media Matters being based in Washington, DC; and X's lawyers for this lawsuit? Two former top lieutenants to Texas AG Ken Paxton, who has launched an investigation into Media Matters, which he calls a radical anti-free speech organization. Let that irony sink in for a second there. The lawsuit comes after Media Matters discovered that ads for major corporations were placed next to posts promoting antisemitic content on Musk's social media platform. Musk alleges that Media Matters investigation was manipulated in order to intentionally hurt X's advertising sales. However, the reality is major companies have suspended advertising on acts including Airbnb, Coca-Cola, Microsoft, Netflix, and MSNBC parent company Comcast. And according to internal documents viewed by The New York Times, excludes as much as $75 million in advertising revenue by the end of this year. Joining me now, Angelo Carusone, president and CEO of Media Matters. Angelo, it's always good to see you. Look, Elon Musk's suit claims that your investigative report, cherry-picked accounts that followed extreme fringe content and major advertisers to get your results. I looked at the lawsuit. Paragraphs seven and ten of the complaint say that you manipulated algorithms and that you endlessly scrolled and*

*refreshed to be able to get what you got. But let's be clear here, Angelo, and I think this is absurd about this lawsuit. It doesn't reject the truth, which is the antisemitic content was next to the ads, right?*

*ANGELO CARUSONE (MEDIA MATTERS): That's right. And that's really what started this series of reports. We've been writing about this specific topic since August, when as part of the efforts to bring advertisers back to the platform, Linda Yaccarino, who is the CEO, had sort of rolled out or announced a series of what they were describing as brand safety protections. So they kind of acknowledged and sort of gave up on the idea that the platform was not going to become a safe haven or an increasing cesspool for extremism, things like pro-Hitler content or pro-Nazi content. But what they actually said to advertisers, don't worry, we have these new mechanisms in place much more robust than they were that will sort of prevent your ads from ever even appearing alongside this stuff. So you don't have to worry. And so these reports and this was just one of many all were illustrating something that was at play here, which is that the tools that they claimed were in place to protect brands were not operating. So that's that's really the core here. You know, we didn't place the ads. We didn't, you know, photoshop in the pictures of the ads. What we did was use Twitter the way a normal user would and then and then log the advertisements that were received. And that's the issue – no matter how you slice it, the fact is their brand safety tools were not operating in the way that they claim they should have been.*

JA0428

*PHANG: Yeah. Angelo, let's be clear. X's problem with advertisers began long before Media Matters did this report and before this lawsuit as early as this summer. Advertising on that platform was down nearly 60%. Do you think Musk is just using this lawsuit as a scapegoat for his own poor management of his company?*

JA0429

*CARUSONE: Yeah, And I think not only the mismanagement in terms of gutting the brand safety and the trust teams, to your point, advertisers have been leaving. A lot of them left very early on before he even really made big changes here because he signaled that he was going to roll back a lot of brand safety. So I think that's part of it. And I think the other part we shouldn't forget this is that this lawsuit came and this advertiser exodus came not only on the heels of the report that we put out, but on Elon Musk's own behavior where he wasn't just, you know, engaging with some pretty extreme, you know, antisemitic, great replacement theory. He responded to this notion that, you know, that the thing that people were chanting in Charlottesville, that Jews in America are somehow funding mass immigration in order to dilute white power. He responded to that great replacement theory, claiming the actual truth on his own platform. So if you're an advertiser, you're looking at the increased rise in extremism and toxicity. We're putting out reports showing that they're sharing ad revenue with these Hitler stan accounts, get thousands of dollars of ad revenue. Then Elon Musk does that, then other reports come out showing the juxtaposition of ads next to extreme content. And if you're an advertiser, when you put it all together, you're like the rot goes all the way to the top and they're never going to really be able to put in place the kinds of mechanisms that make it good for business, at least from an advertiser's perspective.*

JA0430

# EXHIBIT E

JA0431

Angelo Carusone discusses Musk and X on MSNBC: "The pen is suppo...        https://www.mediamatters.org/angelo-carusone/angelo-carusone-discus...

**DONATE TO MEDIA MATTERS' YEAR-END FUNDRAISER**

MEDIA**MATTERS**
F O R   A M E R I C A

# Angelo Carusone discusses Musk and X on MSNBC: "The pen is supposed to be mightier than the sword – and this is an area where they're trying to take away the pen from any critics"

*"We're identified as the enemy, but we're not going to be the only ones"*

**WRITTEN BY   MEDIA MATTERS STAFF**

**PUBLISHED   12/03/23 11:11 AM EST**

12/25/2023, 1:47 PM

JA0432

Angelo Carusone discusses Musk and X on MSNBC: "The pen is suppo...          https://www.mediamatters.org/angelo-carusone/angelo-carusone-discus...



From the December 2, 2023, edition of MSNBC's
*American Voices with Alicia Menendez*

*ALICIA MENENDEZ (HOST): By now, you have
likely seen Elon Musk's very public meltdown
over advertisers fleeing his social media
company, X, formerly known as Twitter. At this
week's DealBook Summit in New York, Musk
insinuated that these companies were
committing blackmail. Most of his ire was
directed at Disney CEO Bob Iger, who was at the
conference. Disney is among the corporations
that pulled advertising from X after Musk
amplified an antisemitic conspiracy.*

...

12/25/2023, 1:47 PM

**JA0433**

Angelo Carusone discusses Musk and X on MSNBC: "The pen is suppo...          https://www.mediamatters.org/angelo-carusone/angelo-carusone-discus...

*MENENDEZ: His public exchange, of course, very revealing. And here's the thing. This is bigger than Musk, bigger than X, bigger than Twitter. It's part of the national debate over whether free speech means speech without consequences. Washington Post national correspondent Philip Bump writes: "This was the core of the backlash against pre-Musk Twitter's efforts to police abuse and misinformation: that they had a right to say those things and Twitter had no right to keep them from doing so." Philip joins us now. He is also the author of the book The Aftermath. Also with us, Angelo Carusone, the president and CEO of Media Matters. Philip, expand on that idea for us.*

**JA0434**

*PHILIP BUMP (WASHINGTON POST): Yeah, I think it's really important to recognize that when Elon makes these comments about the importance of Twitter and how it's this bastion of free speech, really what he's doing is he is being the most obvious manifestation of this very prevalent idea on the right that you are not allowed to face any consequences for the things that you say. We see this in a lot of different formats. We see, you know, any time there is any sort of attempt to moderate social media conversations, the response is, I have free speech. You can't tell me what I can and cannot say. You know, this whole idea about cancel culture, that people are facing consequences for things that they say. All of this is about having people who in a broad sense, often feel as though they are – they have status anxiety. They're worried about their position in American culture. This is a way in which that manifests, that people feel as though now even Twitter is keeping me from being the real man that I want to be and saying the things that I want to say. When the reality, of course, is that Twitter as a private company, pre-Elon Musk in particular, was allowed to do that, was allowed to say, hey, look, you can't be abusive on our platform; you can't say antisemitic things on our platform. Those are not okay. It was an example of consequences being applied to speech. But now this idea that consequences are being applied to speech is framed in this broad argument on the right where this status anxiety exists that people feel like, oh, you can't tell me what I can and cannot do because that's an imposition on me.*

*MENENDEZ: Well, Angelo, I have to imagine there's a corollary there with Musk trying to sort of say that he's being blackmailed or referencing this idea of being blackmailed. I'm like, this is just how a free market works; companies get to choose how they spend their dollars.*

*ANGELO CARUSONE (MEDIA MATTERS CEO): That's exactly right. I mean, it is obviously – it's a total conflation, right, of the idea of blackmail and which is the standard, as you point out, what a marketplace is. The whole point is for a company like this and for most commercial media, right,  to produce a product so that you get an audience and then advertisers want to reach that audience. And, you know, his response, I think reinforces that. And to try to invert that, to say you must support these ideas, otherwise, you're the bad guy. And beyond that, and Philip sort of alluded to this, is like you're then going to start to activate your audiences to not just express outrage and indignation, but from my perspective, increasingly then gin them up to take more extreme means because they feel like they're on the margins. It's sort of this ends justify the means, might-makes-right style of approach wrapped in this idea that you're advocating for some sort of big value. And Linda Yaccarino reinforced that the next day when she talked about the fact that advertising partners need to really align with the values of what X is trying to do here, even going one step further to say those that are suggesting that those that are remaining are really buying into this larger worldview. And that's never been the idea behind advertising. It's never been to endorse the program. It's been to align with the – or try to get to that audience but to also avoid, you know, basic controversies or extremes.*

**JA0436**

*MENENDEZ: Philip, I want to sort of zoom out and I want to think about the conversation that we're having because, listen, we have viewers that don't use X, They may not be thinking about Elon Musk. This is all happening in the broader environment, as you said, where the conservative movement is trying to say that – trying to make the First Amendment something that it is not. It's also happening against the backdrop of the very real possibility of a second Trump term, where Trump is telling us exactly what it is he will do. And part of his effort is to undermine the institutions that would be there to hold him to account.*

**JA0437**

*BUMP: Yeah. Yeah, that's exactly right. Yeah. I mean, if you showed the piece that I wrote this week that looked at all of the, you know, the warnings we get about him setting the DOJ against his enemies or, you know, taking over the military. He already tried to do those things. He already had this entire investigation spurred by William Barr, the Durham investigation, that was trying to get dirt on the people who launched the Russia investigation. Right? You know, I really think it's important to contextualize that when we talk about this Elon Musk thing. His arguments are incredibly stupid. They're very stupid arguments. But what they depend on is that you're on team Musk, you're on team right side, you're on team, you know, we are the conservatives. It depends on this fostering of a sense of where we are, the opponents of the bad guys on the left, which is exactly what Donald Trump has done. Elon Musk is Donald Trump, except in the business world, right? Instead of politics. That is what Donald Trump has done. You are on my team or you are the enemy. And that's what Musk is doing with his Twitter fight. That's how Donald Trump frames his politics increasingly obvious ways. And so when we think about the prospect of him becoming president again in January 2025 and implementing those things, he is now more prepared than he was even in 2020 to deploy federal power against his enemies, which is what his base has been inculcated to want.*

*MENENDEZ: And so I've got less than a minute left. But you find yourself in these crosshairs.*

JA0438

*CARUSONE: Yeah, without a doubt. And I think that one of the things that's so sort of, you know, that has been clarifying at this moment is that we've always sort of had this impression that, you know, when you – and this started with the birth of Fox News, this idea of fair and balanced is that everything else is the left and increasingly the enemy. And we're going to sort of balance that out. So it's okay if we fib a little bit because that's how you sort of balance the scales from their perspective, its ends justify the means. And now that's taken to extremes. Now their way of advocating or claiming they advocate for free speech is to go one step further and to use the actual institutions of government power to punish all of those that they identify as the enemy so that then they can sort of purify and have clarity. So we're identified as the enemy, but we're not going to be the only ones. Anyone that tells you that is engaged in sort of any kind of reporting or criticism will be I mean, it's a cliche for a reason, but it's true. The pen is supposed to be mightier than the sword – and this is an area where they're trying to take away the pen from any critics, especially as you noted in your previous segment, we increasingly start to slide into authoritarianism. It's a real dangerous time.*

*MENENDEZ: Indeed. Thank you for this context. Angelo and Philip, as always.*

# EXHIBIT F

JA0440

On MSNBC, Angelo Carusone discusses how free speech is on the line...                    https://www.mediamatters.org/angelo-carusone/msnbc-angelo-carusone...

**DONATE TO MEDIA MATTERS' YEAR-END FUNDRAISER**

**MEDIAMATTERS**
F O R   A M E R I C A

# On MSNBC, Angelo Carusone discusses how free speech is on the line in Media Matters' lawsuit against Texas AG Ken Paxton

*"We're sort of the canary in the coal mine here. This is the new reality for the future is that you don't just flood the zone with extremism and lies. You also then try to cut off the truth tellers."*

**WRITTEN BY   MEDIA MATTERS STAFF**

**PUBLISHED   12/18/23 11:19 AM EST**

JA0441

On MSNBC, Angelo Carusone discusses how free speech is on the line...                    https://www.mediamatters.org/angelo-carusone/msnbc-angelo-carusone-...



From the December 17, 2023, edition of MSNBC's *American Voices*

*JULIAN CASTRO (GUEST HOST): Last week, Media Matters filed a lawsuit against the attorney general of Texas. The media watchdog group says Ken Paxton violated its First Amendment rights when he launched an investigation into their coverage of the social media platform X, formerly known as Twitter. In the complaint, Media Matters is asking a judge to rule that Paxton, on behalf of Texas, violated their free speech rights. They're calling Paxton's investigation retaliatory. Paxton has not commented on the Media Matters lawsuit. Last month, Paxton launched the investigation after Media Matters reported ads from major corporations on X could be seen next to Nazi and white nationalist posts on the platform. Since then, many of those companies – Disney, Apple, Comcast, which is the parent company of MSNBC – all of them pulled their ads from the platform. Elon Musk, who owns X, is also suing Media Matters over the report. With me now, the president of Media Matters, Angelo Carusone. Angelo, thank you for joining me. So explain to me why you felt a lawsuit against the Texas attorney general was the right path for Media Matters.*

**JA0442**

On MSNBC, Angelo Carusone discusses how free speech is on the line...                https://www.mediamatters.org/angelo-carusone/msnbc-angelo-carusone...

*ANGELO CARUSONE (MEDIA MATTERS): In some respects, it was really our only path because the alternative would be to do nothing and have him continue to barrel ahead with this investigation, which he says could be both civil and criminal. And the effects of that are more than just a nuisance. There are harmful effects of it because, as you noted in your opening, this all stems from a report that was put out by one of our investigative reporters that looks at what's happening on the platform. And he responded to that report by launching this investigation. The intent there is it is specter and cloud to chill our speech, to slow us down from engaging.*

*...*

*CASTRO: Talk to me about this relationship between Elon Musk and Texas Attorney General Ken Paxton, who, by the way, also headed up Donald Trump's reelection effort in Texas a couple of years back.*

12/25/2023, 1:47 PM

JA0443

Case 1:24-cv-00147-APM   Document 26-1   Filed 01/25/24   Page 37 of 51
Case 8:23-cv-03363-PX   Document 33-1   Filed 12/30/23   Page 39 of 41

On MSNBC, Angelo Carusone discusses how free speech is on the line...           https://www.mediamatters.org/angelo-carusone/msnbc-angelo-carusone...

CARUSONE: Yeah, I think the genesis of this is very significant because what happened is that, you know, Elon Musk threatens to sue us. He obviously follows through with it. But in the context of those threats, he engaged with an idea from a Stephen Miller, a former Trump adviser, where he said, you know, in addition to suing Media Matters, you should pursue – state attorney generals, Republican state attorney generals should pursue fraud investigations into them as well. And so Elon Musk promoted that idea. And almost right away, you started to see people like the Missouri AG and Ken Paxton take up that call and initiate these actions. And what's significant about it is when you dig into the complaint, it's pretty clear that, you know, he didn't even attempt to explain how we violated the acts that he's claiming, you know, he has the powers to exercise on here. It very much appears, at minimum, that he was just responding to this very broadside public appeal from Elon Musk to do something to further slow us down or take us down.

CASTRO: Well, it's important to note that your reporting about ads appearing next to extremist content on Twitter came the same week Elon Musk amplified an antisemitic trope on X. That post was also an important factor for advertisers leaving the platform. What do we know about the financial situation at X and its ad revenue since then?

12/25/2023, 1:47 PM

**JA0444**

*CARUSONE: I mean, the ad revenue for this year so will be will be down somewhere between 50 and 65%. You know, the numbers have been variously reported. Just to put that in real numbers, that somewhere around a little more than $2 billion of straight revenue for the platform. So it is a very significant amount. And a lot of this is the result of Elon Musk's own behavior. And then the types of investigative reporting that we've done, that other news outlets have done, that researchers have done that chronicle the descent of X now into a sort of a supercharged engine of radicalization. So it is more impactful than just the users on Twitter. It actually has a spillover effect for our entire country. That's why this work is so significant.*

*CASTRO: Well, let's talk about that spillover effect. Put this in the broader context of free speech and the state of our democracy. Do you see your organization and this moment as part of that equation?*

JA0445

*CARUSONE: Yes, I think that that is you know, as much as it seems self-serving, it's just it also happens to be true. In some respects when we've seen the increase of attacks and threats against media outlets from MAGA Republicans, from Trumpworld, from elected officials. This is a Nevada-based corporation, X, that operates in California, suing a DC-based organization in the north District of Texas. And, I mean, then subsequently helped ginning up a Republican official to take retaliatory actions against us and to slow them down from speaking. And Ken Paxton has filed with the court to defend ExxonMobil from other AG investigations, making the same argument that when you issue these types of very broadside letters, the only effect can be chilling speech. So he knows what he's doing by his own words. It's not just us. We're sort of the canary in the coal mine here. This is the new reality for the future is that you don't just flood the zone with extremism and lies. You also then try to cut off the truth tellers. And so we won't be the only ones that will be in the barrel. This will be the new normal.*

*CASTRO: Angelo Carusone of Media Matters. Thank you.*

JA0446

# EXHIBIT G

JA0447



1/7/24, 5:59 PM

image2.png

https://mail.google.com/mail/u/0/#inbox/FMfcgzGwJcffDcjGQjzGcfcsGXdxhVrR?projector=1&messagePartId=0.2

1/1

**JA0448**

# EXHIBIT H

JA0449

⊡ facebook.com

← Angelo S. Carusone                              🔍

🖼 Photos        🥸 Avatars        ★ Life events

Posts



Angelo S. Carusone                              ⋯
Dec 12, 2023 · 🌐

https://www.nbcnews.com/news/amp/rcna129402



NBCNEWS.COM
**Media Matters sues Texas attorney general over response to Elon Musk dispute**
In a complaint filed in federal court Monday, Medi...

👍😮❤ 8

👍 8              💬 1              ↪

# EXHIBIT I

JA0451



# EXHIBIT J

JA0453



# EXHIBIT K

JA0455



# EXHIBIT L

JA0457

