# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

MEDIA MATTERS FOR AMERICA; ERIC HANANOKI

*Plaintiffs-Appellees,*

*v.*

WARREN KENNETH PAXTON, JR., IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF TEXAS,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of Columbia, No. 24-cv-147-APM
Before the Honorable Amit P. Mehta

## APPENDIX TO THE BRIEF FOR APPELLANT
## VOLUME II

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RYAN S. BAASCH
Chief, Consumer Protection Division

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

LANORA C. PETTIT
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

JOSEPH N. MAZZARA
Assistant Solicitor General

COY ALLEN WESTBROOK
Assistant Attorney General

Counsel for Attorney General Paxton

# TABLE OF CONTENTS

Reply to Response to Motion for TRO and Preliminary Injunction ...............JA0459

Surreply .......................................................................................................JA0569

Motion to Dismiss for Lack of Jurisdiction...................................................JA0577

Transcript of Hearing ....................................................................................JA0581

Response to Order of the Court for Supplemental Briefing Regarding
    *Ex Parte Young* by Attorney General Paxton.............................................JA0656

Plaintiffs' Response to Order of the Court for Supplemental Briefing Regarding
    *Ex Parte Young* .............................................................................................JA0664

Missouri Attorney General Bailey's Civil Investigative Demand and
    Petition ....................................................................................................JA0682

Memorandum Opinion ..................................................................................JA0780

Order of the Court Regarding the Memorandum Opinion ...........................JA0821

Notice of Appeal ..........................................................................................JA0824

# Reply to Response to motion for TRO and preliminary injunction

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, | |
| Plaintiffs, | Civil Action No. 24-cv-147-APM |
| v. | |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | |
| Defendant. | |

**PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

JA0460

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 2

    I.    This Court has specific personal jurisdiction over Paxton. ........................... 2

        A.    This Court has personal jurisdiction under D.C.'s long-arm statute ................... 2

        B.    Exercising personal jurisdiction over Paxton is consistent
             with due process. .................................................................... 12

    II.    Venue in the District of Columbia is proper. ............................................. 16

    III.    Plaintiffs' claims are ripe for adjudication. ................................................ 17

    IV.    The equities strongly favor issuing the requested preliminary injunction. ................. 24

CONCLUSION .................................................................................................. 25

CERTIFICATE OF SERVICE ............................................................................... 28

JA0461

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akhmetshin v. Browder*,
    275 A.3d 290 (D.C. 2022) ..................................................................11

*Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*,
    1 F.4th 180 (4th Cir. 2021) ..............................................................18

*Balsly v. W. Mich. Debt Collections, Inc.*,
    No. 3:11CV642-DJN, 2012 WL 628490 (E.D. Va. Feb. 27, 2012) ...............6, 7, 12

*Barnstead Broad. Corp. v. Offshore Broad. Corp.*,
    869 F. Supp. 35 (D.D.C. 1994) ............................................................3

*Brett v. Brennan*,
    404 F. Supp. 3d 52 (D.D.C. 2019) .....................................................3, 12

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ........................................................................11

*Calder v. Jones*,
    465 U.S. 783 (1984) ........................................................................14

*Chamber of Com. of the U.S. v. FEC*,
    69 F.3d 600 (D.C. Cir. 1995) ............................................................17

*Clark v. Libr. of Cong.*,
    750 F.2d 89 (D.C. Cir. 1984) .........................................................17, 23

*Constantine v. Rectors & Visitors of George Mason Univ.*,
    411 F.3d 474 (4th Cir. 2005) ............................................................25

*Cooksey v. Futrell*,
    721 F.3d 226 (4th Cir. 2013) .........................................................18, 19

*Crane v. Carr*,
    814 F.2d 758 (D.C. Cir. 1987) ............................................................8

*Dawson-Austin v. Austin*,
    968 S.W.2d 319 (Tex. 1998) ..............................................................24

*Def. Distributed v. Grewal*,
    971 F.3d 485 (5th Cir. 2020) ....................................................13, 14, 15

JA0462

*District of Columbia v. Exxon Mobil Corp.*,
  89 F.4th 144 (D.C. Cir. 2023) ...................................................................................10

*Dyson v. Dutko Ragen Homes & Investments*,
  No. 21-CV-02280, 2022 WL 1294484 (D.D.C. Apr. 27, 2022) ....................................7

*Edgar v. Haines*,
  2 F. 4th 298 (4th Cir. 2021) .........................................................................18, 19, 25

*Env't Rsch. Int'l, Inc. v. Lockwood Greene Eng'rs*,
  355 A.2d 808 (D.C. 1976) .......................................................................................4, 7

*Exelon Generation Co., LLC v. Grumbles*,
  380 F. Supp. 3d 1 (D.D.C. 2019) ...............................................................................17

*FTC v. Endo Pharms. Inc.*,
  82 F.4th 1196 (D.C. Cir. 2023) ....................................................................................3

*Google, Inc. v. Hood*,
  822 F.3d 212 (5th Cir. 2016) .....................................................................................21

*Guest v. Provident Funding Assocs.*,
  No. 3:12-CV-224, 2013 WL 1003524 (S.D. Ohio Mar. 13, 2013)................................6

*Gulf Ins. Co. v. Glasbrenner*,
  417 F.3d 353 (2d Cir. 2005)........................................................................................17

*Hamilton, Miller, Hudson & Fayne Travel Corp. v. Hori*,
  520 F. Supp. 67 (E.D. Mich. 1981)...............................................................................6

*Hartley v. Wilfert*,
  918 F. Supp. 2d 45 (D.D.C. 2013) ..............................................................................18

*Heller v. Nicholas Applegate Cap. Mgmt. LLC*,
  498 F. Supp. 2d 100 (D.D.C. 2007) ............................................................................12

*Hindu Am. Found. v. Viswanath*,
  646 F. Supp. 3d 78 (D.D.C. 2022)..................................................................2, 3, 8, 10

*IMark Mktg. Servs., LLC v. Geoplast S.p.A.*,
  753 F. Supp. 2d 141 (D.D.C. 2010) ..............................................................................8

*Jackson v. Loews Washington Cinemas, Inc.*,
  944 A.2d 1088 (D.C. 2008) ..........................................................................................4

*Johnson v. TheHuffingtonPost.com, Inc.*,
  21 F.4th 314 (5th Cir. 2021) .......................................................................................17

iv

**JA0463**

*Kalman v. Cortes*,
    646 F. Supp. 2d 738 (E.D. Pa. 2009) ...................................................................16

*Keeton v. Hustler Mag., Inc.*,
    465 U.S. 770 (1984) .............................................................................................14

*Kramer v. Grossman*,
    No. 13-cv-1745-ELH, 2014 WL 937146 (D. Md. Mar. 10, 2014) .........................19

*Laird v. Tatum*,
    408 U.S. 1 (1972) ...........................................................................................22, 23

*Leroy v. Great Western United Corp.*,
    443 U.S. 173 (1979) .............................................................................................17

*Lewy v. S. Poverty Law Ctr.*,
    723 F. Supp. 2d 116 (D.D.C. 2010) ..............................................................8, 10, 12

*Margoles v. Johns*,
    483 F.2d 1212 (D.C. Cir. 1973) ........................................................................5, 7

*Menken v. Emm*,
    503 F.3d 1050 (9th Cir. 2007) ............................................................................14

*Mouzavires v. Baxter*,
    434 A.2d 988 (D.C. 1981) ................................................................................4, 5

*Music Makers Holdings, LLC v. Sarro*,
    No. RWT 09cv1836, 2010 WL 2807805 (D. Md. July 15, 2010) .........................15

*Naartex Consulting Corp. v. Watt*,
    722 F.2d 779 (D.C. Cir. 1983) .............................................................................11

*Novack v. Nat'l Hot Rod Ass'n*,
    231 A.2d 22 (Md. 1967) .........................................................................................5

*Reisman v. Caplin*,
    375 U.S. 440 (1964) .........................................................................................21, 22

*Reporters Committee for Freedom of Press v. AT&T*,
    593 F.2d 1030 (D.C. Cir. 1978) ...........................................................................22

*Rusesabagina v. Republic of Rwanda*,
    No. CV 22-469, 2023 WL 2562692 (D.D.C. Mar. 16, 2023).................................4

*S.C. Citizens for Life, Inc. v. Krawcheck*,
    301 F. App'x 218 (4th Cir. 2008) ........................................................................19

v

**JA0464**

*S.C. State Conf. of NAACP v. Wilson*,
No. 2:23-CV-01121-DCN, 2023 WL 5207978 (D.S.C. Aug. 14, 2023) ................................18

*Schleit v. Warren*,
693 F. Supp. 416 (E.D. Va. 1988) ...............................................................................6, 7, 12

*Simon v. United States*,
644 F.2d 490 (5th Cir. 1981) ...........................................................................................6, 7

*Soundboard Ass'n v. FTC*,
888 F.3d 1261 (D.C. Cir. 2018) ........................................................................................18

*Steinberg v. Int'l Crim. Police Org.*,
672 F.2d 927 (D.C. Cir. 1981) .............................................................................................5

*Stroman Realty, Inc. v. Wercinski*,
513 F.3d 476 (5th Cir. 2008) .......................................................................................14, 15

*Trump v. Comm. on Ways & Means, U.S. House of Representatives*,
415 F. Supp. 3d 98 ...............................................................................................................11

*Turner v. Abbott*,
53 F. Supp. 3d 61 (D.D.C. 2014) .........................................................................................11

*Twitter v. Paxton*,
56 F.4th 1170 (9th Cir. 2022) ................................................................................19, 20, 21

*United States v. Ferrera*,
54 F.3d 825 (D.C. Cir. 1995) ..............................................................................................15

*Unity08 v. FEC*,
596 F.3d 861 (D.C. Cir. 2010) ............................................................................................19

*Van Wagenberg v. Van Wagenberg*,
215 A.2d 812 (Md. 1966) ......................................................................................................5

*Walden v. Fiore*,
571 U.S. 277 (2014)...............................................................................................12, 13, 14

**Statutes**

28 U.S.C. § 1391(b)(2) ...............................................................................................................16

D.C. Code § 13-423(a).........................................................................................................2, 4, 6

D.C. Code § 13-423(a)(1) .............................................................................................................2

D.C. Code § 13-423(a)(3) .........................................................................................................5, 7

**JA0465**

D.C. Code § 13-423(a)(4) ................................................................................8

Tex. Bus. & Com. Code Ann. § 17.45(8) .......................................................4

Tex. Bus. & Com. Code Ann. § 17.46 .............................................................4

Tex. Bus. & Com. Code Ann. § 17.47 .............................................................4

Tex. Bus. & Com. Code Ann. § 17.60 .............................................................4

Tex. Bus. & Com. Code Ann. § 17.61 ....................................................4, 7, 24

Tex. Bus. & Com. Code Ann. § 17.501 ...........................................................4

Va. Code § 8.01–328.1(A)(3) ..........................................................................6

**Other Authorities**

Tex. Const., art. IV, § 22 ................................................................................4

**JA0466**

## INTRODUCTION

Media Matters is a District of Columbia–based media organization currently subject to a retaliatory investigation and punitive civil investigative demand (the "Demand") issued by the Attorney General of Texas, despite having no meaningful connection to that state. In targeting Media Matters, Attorney General Paxton hired and dispatched an agent into the District of Columbia first to serve the Demand on Media Matters at its headquarters here, and then again to complete service on Media Matters's counsel. When he was asked if Paxton had "directed [his] investigation to Media Matters in D.C." during a hearing in a prior action, Paxton's counsel responded with one word: "Absolutely." Branch Decl., ECF No. 4–5, Ex. H, Tr. 22:18–20. And it is clear why: Media Matters is headquartered and has its only office in the District, and the vast majority of the documents sought by the overbroad Demand were generated, and are stored, here. Paxton has in every meaningful sense aimed his conduct towards, and imposed his authority on, the District of Columbia to retaliate against a D.C.-based non-profit, chilling its speech here in the process.

Rather than explain how his out-of-state investigation is lawful, Paxton's opposition focuses almost entirely on procedural arguments. But none have merit. The District of Columbia's long-arm statute provides several independently sufficient bases for exercising personal jurisdiction over Paxton, and doing so here comports with due process. Paxton's ripeness claims are also easily rejected. The law is clear that where a state actor's conduct threatens to chill, and is in fact chilling, protected speech and association—as Plaintiffs have shown Paxton's Demand does—Plaintiffs may bring a pre-enforcement challenge. Even *Twitter v. Paxton*, a case upon which Paxton heavily relies, *supports* finding that Plaintiffs' retaliation claim is ripe, and rejects much of Paxton's other case law. His remaining, largely half-hearted, arguments on venue and the balance of the equities are also unavailing and pose no obstacle to preliminary relief.

1

**JA0467**

At bottom, Plaintiffs' motion is about whether the First Amendment truly guarantees that reporters and media organizations are free to speak their minds about the issues of the day without fear that overreaching state officials will use the power of the state to retaliate, including by making unreasonable and ongoing demands for their documents and communications. As Plaintiffs have shown, such retaliation chills speech in a manner that makes it impossible for an organization like Media Matters—or a reporter like Eric Hananoki—to do their job. Because the First Amendment prohibits such interference, and because without an injunction Plaintiffs will continue to suffer the irreparable harm of an ongoing chill of their core protected speech and activities, the motion should be granted.

## ARGUMENT

### I.     This Court has specific personal jurisdiction over Paxton.

#### A.     This Court has personal jurisdiction under D.C.'s long-arm statute.

This Court has three separate grounds to exercise personal jurisdiction over Paxton under D.C.'s long-arm statute, D.C. Code § 13-423(a)(1), (3)–(4). *First*, Paxton has transacted and is currently transacting business in the District, permitting the Court's exercise of jurisdiction up to the limits of due process under subsection (a)(1). *See Hindu Am. Found. v. Viswanath*, 646 F. Supp. 3d 78, 92–93 (D.D.C. 2022) (Mehta, J.). *Second*, by sending his agent into the District to serve the Demand, Paxton effected a tortious act here that caused and continues to cause injury in D.C., bringing him within subsection (a)(3). *Third*, even if Paxton had not committed any tortious act in the District, jurisdiction still exists under subsection (a)(4) because Paxton caused tortious injury here and is engaged in a "persistent course of conduct" in the District.

**D.C. Code § 13-423(a)(1).** *First*, the Court has personal jurisdiction under subsection (a)(1) of the D.C. long-arm statute because Paxton is "transacting . . . business" in the District of Columbia. Plaintiffs' opening brief specifically identified subsection (a)(1) as a basis for

JA0468

jurisdiction, noting that this prong is congruent with the permissible limits of personal jurisdiction under the Due Process Clause. Pls.' Mem. 23, ECF No. 4-1 ("Mem"); *see also Viswanath*, 646 F. Supp. 3d at 92 (explaining where a defendant is transacting *any* business in the District of Columbia, "the long-arm statute and due process inquiry merge into one"). Paxton's response ignores this argument altogether, wrongly asserting that "Media Matters fails to specify the application of a particular subsection" of the long-arm statute, Def.'s Resp. 13, ECF No. 26 ("Opp'n"). "It is well-understood that 'if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded.'" *Brett v. Brennan*, 404 F. Supp. 3d 52, 59 (D.D.C. 2019) (quoting *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014)). By ignoring subsection (a)(1) where Plaintiffs expressly relied upon it, Paxton has forfeited any argument that his conduct is not within the scope of that subsection. *See FTC v. Endo Pharms. Inc.*, 82 F.4th 1196, 1206–07 (D.C. Cir. 2023) (personal jurisdiction is a waivable defense); *see also Barnstead Broad. Corp. v. Offshore Broad. Corp.*, 869 F. Supp. 35, 38–39 (D.D.C. 1994). The Court may therefore proceed directly to the constitutional analysis. *See infra* Section I.B.[1]

But, in any event, the Court has ample grounds to find that Paxton is "transacting . . . business" in the District of Columbia within the meaning of the statute. District of Columbia courts have long held that "the words 'transacting any business' should be given an expansive

---

[1] Paxton's failure to address subsection (a)(1) is particularly notable because Plaintiffs were not required to brief personal jurisdiction in the affirmative; that was Paxton's burden, as lack of personal jurisdiction is *his* affirmative defense. Plaintiffs explained why this Court has personal jurisdiction over Paxton in their brief because they knew that, despite having argued in a prior action filed in Maryland that Plaintiffs "could have instead sued in . . . the District of Columbia," Branch Decl., Ex. I at 24, Paxton was unwilling to stipulate to transfer and accordingly was likely to try to avoid responding to Plaintiffs' constitutional arguments by again disputing jurisdiction, *id.*, Ex. H, Tr. 24:15–17. That Paxton failed to comprehensively respond supports finding that he forfeited any argument as to subsection (a)(1)'s applicability.

interpretation." *Mouzavires v. Baxter*, 434 A.2d 988, 992 (D.C. 1981). Even "'a single act may be sufficient to constitute transacting business' so long as that contact is 'voluntary and deliberate, rather than fortuitous.'" *Jackson v. Loews Washington Cinemas, Inc.*, 944 A.2d 1088, 1093 (D.C. 2008) (quoting *Baxter*, 434 A.2d at 992, 995); *see also Env't Rsch. Int'l, Inc. v. Lockwood Greene Eng'rs*, 355 A.2d 808, 810–11 (D.C. 1976) (explaining that even a "small amount" of activity suffices). Whether business is transacted "in person or by an agent" does not change the analysis. *Rusesabagina v. Republic of Rwanda*, No. CV 22-469, 2023 WL 2562692, at *6 (D.D.C. Mar. 16, 2023); *see also* D.C. Code § 13-423(a) (granting courts personal jurisdiction "over a person[] who acts directly or by an agent").

As the Attorney General of Texas, Paxton's "business" includes exercising authority under the Texas Deceptive Trade Practices Act—the authority he asserts here—to issue civil investigative demands and enforce Texas's trade practices law. *See* Tex. Bus. & Com. Code Ann. §§ 17.45(8), 17.46–17.47, 17.501, 17.60–17.61. Paxton himself asserted that his investigation is *part of his business* as Attorney General, publicly stating he has a constitutional "obligation" to "look at any fraudulent activity of a corporation" and to "oversee charitable organizations." Branch Decl., Ex. D, Tr. 2:6–18; *see also* Tex. Const., art. IV, § 22. While Plaintiffs dispute the lawfulness of Paxton's D.C.-focused investigation, it is plain that by issuing the Demand to a D.C.-based media organization; serving it in the District of Columbia through an agent sent into the District; and ordering Media Matters to provide documents created and maintained here, Paxton is "transacting" his usual law-enforcement "business" in this jurisdiction.[2]

---

[2] It is immaterial that Paxton's investigative acts are not commercial in nature. Maryland's highest court explained that, under that state's substantively identical long-arm statute, the "transacting any business" prong is "not necessarily limited to acts which are a part of commerce or of

Paxton also "transact[ed] . . . business" in the District of Columbia, in the narrower sense of engaging in commercial activity, by engaging a process server as an agent to effectuate service. Paxton's employee, Assistant Attorney General Fuller, affirmed he hired "a professional process service" to serve the Demand "on Defendant's counsel" at an address within the District. Fuller Decl., ECF No. 26-1, ¶ 3 & Ex. B. And although Paxton omits mention of it, that same process server also attempted to serve the Demand at Media Matters's D.C. office, appearing at its front door and seeking admittance. Reese Decl., ¶ 4. It is "well-settled" that "the 'transacting any business' provision embraces those contractual activities of a nonresident defendant which *cause a consequence* here." *Baxter*, 434 A.2d at 992 (emphasis added). Paxton's contracting with a process server caused Media Matters to be served with the Demand, which has chilled its protected activities in D.C. *See* Mem. 26–33.

**D.C. Code § 13-423(a)(3).** *Second*, the Court has personal jurisdiction under subsection (a)(3) because Paxton is "causing tortious injury in the District of Columbia by an act" taken here. Paxton apparently does not dispute that Plaintiffs' alleged injuries resulting from his retaliatory conduct have been sustained, in substantial part, in the District, *see* Opp'n 13–14, instead arguing only that he has not taken any "act" in the District that contributed to those injuries. Opp'n 14–15.

---

transactions for profit, but include acts which constitute a purposeful activity within the State." *Novack v. Nat'l Hot Rod Ass'n*, 231 A.2d 22, 26 (Md. 1967); *see also Van Wagenberg v. Van Wagenberg*, 215 A.2d 812, 820–21 (Md. 1966) ("transacting business" prong "is not limited in terms to commercial transactions"). This Maryland precedent has been favorably cited by the D.C. Circuit. *See e.g.*, *Steinberg v. Int'l Crim. Police Org.*, 672 F.2d 927, 931 n.7 (D.C. Cir. 1981); *Margoles v. Johns*, 483 F.2d 1212, 1220–21 & n.14 (D.C. Cir. 1973). Judge Skelly Wright also adopted the reasoning of *Novack* in concluding that subsection (a)(1) of the D.C. long-arm statute provided personal jurisdiction over Interpol for conveying a criminal notification into the District of Columbia—facts similar to those here—noting the "identical Maryland provision covers purposeful activity within the state even if the acts are neither part of commerce nor for profit." *Steinberg*, 672 F.2d at 933 (Skelly Wright, J., concurring) (citing *Novack*, 231 A.2d at 26).

But that is false. He purposefully directed his agent into the District to serve the Demand on Media Matters here, an act that caused tortious injury in the District.

When an "alleged tort[]" is "'*effected* by service of process,'" courts have consistently held that the state where process was served has personal jurisdiction over the alleged tortfeasor. *Guest v. Provident Funding Assocs.*, No. 3:12-CV-224, 2013 WL 1003524, at *4 (S.D. Ohio Mar. 13, 2013) (quoting *Schleit v. Warren*, 693 F. Supp. 416, 419–22 (E.D. Va. 1988)); *see also, e.g.*, *Simon v. United States*, 644 F.2d 490, 498–99 (5th Cir. 1981) (exercising statutory personal jurisdiction over out-of-state defendant based on agent's in-state service of an improper subpoena ticket); *Hamilton, Miller, Hudson & Fayne Travel Corp. v. Hori*, 520 F. Supp. 67, 70 (E.D. Mich. 1981) ("Therefore, since it is alleged that the service of process in a maliciously instituted lawsuit was the tortious act, Defendants are properly within the jurisdiction of this Court.").

Courts applying Virginia's long-arm statute—in particular, Va. Code § 8.01–328.1(A)(3), which is materially identical to (a)(3) of D.C.'s long-arm statute—have held that they have personal jurisdiction "to hold an attorney liable for torts which originate with the attorney and are technically completed by service of process." *Schleit*, 693 F. Supp. at 420; *cf. Balsly v. W. Mich. Debt Collections, Inc.*, No. 3:11CV642-DJN, 2012 WL 628490, at *5 (E.D. Va. Feb. 27, 2012) (citing *Vishay Intertechnology, Inc. v. Delta Int'l Corp*, 696 F2d 1062, 1067 (4th Cir. 1982)). *Schleit* is directly on point. There, the court exercised statutory personal jurisdiction under Va. Code § 8.01–328.1(A)(3) based on out-of-state attorneys' in-state service of process. *Schleit*, 693 F. Supp. at 421. The court reasoned that because the process server was "the defendants' agent" and was "physically present in the state," the "'act' requirement of section (A)(3)" was met. *Id.*

Not only does the relevant Virginia long-arm provision mirror subsection (a)(3), but in enacting D.C. Code § 13-423(a), Congress intended to "provide the District with a long-arm statute

**JA0472**

equivalent in scope to those already in effect in Maryland and Virginia." *Env't Rsch. Int'l*, 355 A.2d at 810 & n.3 (collecting legislative history); *see also Margoles*, 483 F.2d at 1215–16 (similar). For that reason, "to the extent that [Virginia courts] have spoken on the reach of their long-arm statute[]," D.C. courts typically "welcome their guidance." *Env't Rsch. Int'l*, 355 A.2d at 810.

This Court should do the same and hold that Paxton's use of an agent to effect service in the District was "an act" "causing tortious injury" under subsection (a)(3). "Under the facts of the present case, the defendant['s] agent *was* physically present in the state, consequently nullifying the argument that the 'act' requirement of [subsection (a)(3)] was not fulfilled." *Schleit*, 693 F. Supp. at 421. Moreover, service of process "technically completed," *id.* at 420, Paxton's tortious act. A Texas civil investigative demand imposes duties upon the respondent only after the "demand is served." Tex. Bus. & Com. Code Ann. § 17.61(h); *see also id.* § 17.61 (a), (d), (i). Accordingly, service by Paxton's agent in the District was "a cause-in-fact, or substantial factor, in the tort." *Simon*, 644 F.2d at 498–99. That suffices for jurisdiction under subsection (a)(3).

To argue otherwise, Paxton cites *Dyson v. Dutko Ragen Homes & Investments*, but he mischaracterizes the holding of that case. *See* Opp'n 14–15. While this Court held there that "limited communications initiated from outside the District of Columbia" do not qualify as "an act 'in the District' for purposes of § 13-423(a)(3)," *Dyson*, No. 21-CV-02280 (APM), 2022 WL 1294484, at *4 (D.D.C. Apr. 27, 2022), the communications in question consisted of "one text message, a single email, and two phone calls," *id.*, rather than physically dispatching an agent *into* the forum to serve process in person. *See* Fuller Decl., ¶ 3. Courts have distinguished such physical service of process from mere phone calls or letters when finding that similar acts suffice for (a)(3)-equivalent jurisdiction. *See Schleit*, 693 F. Supp. at 421; *cf. Balsly*, 2012 WL 628490, at *5 ("[T]his

7

is not a case, as Defendants contend, where the Court must determine whether the mere use of the United States mails to serve pleadings supports jurisdiction." (quoting *Hori*, 520 F. Supp. at 70)).

**D.C. Code § 13-423(a)(4).** *Third*, even if all of Paxton's tortious activity occurred in Texas, the Court has personal jurisdiction under subsection (a)(4) because Paxton is "causing tortious injury" in the District while also engaged in a "persistent course of conduct" here. Subsection (a)(4)'s "persistent course of conduct 'plus factor' is satisfied by connections considerably less substantial than those it takes to establish general, all-purpose 'doing business'- or 'presence'-based jurisdiction." *Crane v. Carr*, 814 F.2d 758, 763 (D.C. Cir. 1987) (R.B. Ginsburg, J.). "The 'something more' or 'plus factor' does not itself supply the basis for the assertion of jurisdiction," but serves to "filter out cases in which the inforum impact is an isolated event." *Id.* Accordingly, this prong grants jurisdiction even where the defendant's conduct in D.C. is "unrelated" to the acts giving rise to plaintiffs' claims, *id.*, and courts consider "the totality of defendants' contacts," aggregating even contacts that do not relate to one another or to the subject matter of the claim over which jurisdiction is sought. *Lewy v. S. Poverty Law Ctr.*, 723 F. Supp. 2d 116, 126 (D.D.C. 2010) (collecting cases); *see also IMark Mktg. Servs., LLC v. Geoplast S.p.A.*, 753 F. Supp. 2d 141, 162 (D.D.C. 2010) (similar). The contacts simply must be "continuing in character" but "need not be great." *Viswanath*, 646 F. Supp. 3d at 94 (cleaned up).

Paxton again does not dispute the location of Plaintiffs' alleged injury, instead simply arguing that "there is no 'plus factor.'" Opp'n 15. But Paxton provides no analysis to support that claim; he just asserts in conclusory fashion that he "does not solicit or do business, engage in other persistent conduct, or derive any revenue from services in D.C." *Id.* In truth, Paxton has long been engaged in a persistent course of conduct in the District of Columbia, including through (i) regular speaking engagements and attending rallies in the District (both by Paxton himself and agents in

8

**JA0474**

his office), (ii) voluntary and frequent participation in litigation in D.C. courts, and (iii) numerous campaign-related activities, such as fundraising and disbursing campaign funds here.

First, Paxton routinely travels to the D.C. to promote the Texas Attorney General Office's work and related matters. For example, Paxton traveled to the District in April 2023 to speak at the Heritage Foundation's 50th anniversary summit about his office's work on election fraud. Dodge Decl., Ex. M; *see also id.*, Ex. N (prior example of Paxton speaking in-person at Heritage Foundation). Paxton also visited the District of Columbia on March 7, 2019, and November 18, 2017, to speak about his office's work at events organized by the Federalist Society. *Id.*, Ex. O. And he participated in a DOJ press conference to discuss state and federal responses to the opioid epidemic on February 27, 2018. *Id.*, Ex. P. Paxton also spoke at then-President Trump's January 6, 2021 rally at the U.S. Capitol, where he touted twelve separate lawsuits "his office pushed in Texas leading up to the election." *Id.*, Ex. Q. The day prior, Paxton lent his name to a robocall urging supporters to join him "in DC tomorrow 2 fight for the integrity of our elections!", *id.*, Ex. R, encouraging others to join him in the District to rally in support of the former President.

Paxton's agents also frequently visit D.C. to speak about his office's work—including the Texas Attorney General's Office's Consumer Protection Division and its work related to content moderation on social media platforms. *See, e.g.*, *id.*, Ex. S (former Texas Solicitor General Judd Stone speaking at Federalist Society event in October 2022). Assistant Attorney General Ryan Baasch, chief of the Consumer Protection Division—the same Division that issued the Demand to Plaintiffs—spoke at Federalist Society events in the District of Columbia at least twice in the past year alone, on May 30 and June 28, 2023. *Id.*, Exs. T, U. The topic of Baasch's June 28 remarks was content moderation on social media, and the title of the panel was "When Twitter Speaks: Control, Access, and the Role of States." *Id.*, Ex. U. In fact, just *two days ago* Paxton "assigned

9

**JA0475**

[his] First Assistant Attorney General . . . to testify in the United States Congress" about the so-called "Southern Border Invasion." Dodge Decl., Ex. V. This activity establishes "continuing" conduct, *Viswanath*, 646 F. Supp. 3d at 94, sufficient to serve as a "plus factor" for jurisdiction under subsection (a)(4). *See Lewy*, 723 F. Supp. 2d at 128 (finding a "persistent course of conduct" under subsection (a)(4) where defendant had been "sending employees to the District for conferences and meetings with nongovernmental organizations," among other contacts).

Second, Paxton is a frequent, voluntary participant in litigation in D.C. courts. As Attorney General, Paxton has filed *at least* nine amicus briefs in D.C. federal court,[3] directly intervened in at least five matters in courts here,[4] and been a petitioner or plaintiff in the District at least nine times.[5] In all, Paxton has chosen to litigate in this venue on dozens of occasions, not counting Supreme Court appearances and cases in this district naming him as a defendant. Paxton has even staked out views about the District of Columbia's own policy choices, including whether it could pursue actions under D.C. law in D.C. courts. *See District of Columbia v. Exxon Mobil Corp.*, 89 F.4th 144, 157 (D.C. Cir. 2023) (affirming remand to D.C. Superior Court of action filed against Exxon Mobil under D.C. Code, over federalism arguments raised by Paxton as amicus curiae).

---

[3] *See, e.g.*, *Cent. United Life Ins. Co. v. Burwell*, No. 15-5310 (D.C. Cir.); *Woodhull Freedom Found. v. United States*, No. 18-5298 (D.C. Cir.); *Home Care Ass'n of Am. v. Weil*, No. 15-5018 (D.C. Cir.); *Barker v. Conroy*, No. 17-5278 (D.C. Cir.); *Illinois v. Ferriero*, No. 21-5096 (D.C. Cir.); *Wrenn v. D.C.*, Nos. 16-7025, 16-7067 (D.C. Cir.); *In re Flynn*, No. 20-5143 (D.C. Cir.); *D.C. v. Exxon Mobil Corp.*, No. 22-7163 (D.C. Cir.); *J.D. v. Azar*, No. 18-5093 (D.C. Cir.).

[4] *See, e.g.*, *Sierra Club v. EPA*, No. 20-1121 (D.C. Cir.); *Am. Lung Ass'n v. EPA*, No. 19-1140 (D.C. Cir.); *Sierra Club v. EPA*, No. 15-1465 (D.C. Cir.); *Air All. Houston v. EPA*, No. 17-1155 (D.C. Cir.); *Clean Wisconsin v. EPA*, No. 18-1203 (D.C. Cir.).

[5] *See, e.g.*, *Arizona v. EPA*, No. 21-1159 (D.C. Cir.); *Util. Air Regul. Grp. v. EPA*, No. 12-1342 (D.C. Cir.); *Texas v. United States*, No. 14-5151 (D.C. Cir.); *Bd. of Cnty. Commissioners of Weld Cnty., Colorado v. EPA*, No. 22-1013 (D.C. Cir.); *EME Homer City Generation, L.P. v. EPA*, No. 11-1302 (D.C. Cir.); *New York v. Meta Platforms, Inc.*, No. 21-7078 (D.C. Cir.); *Wisconsin v. EPA*, No. 16-1406 (D.C. Cir.); *Murray Energy Corp. v. EPA*, No. 15-1385 (D.C. Cir.); *Mozilla Corp. v. FCC*, No. 18-1051 (D.C. Cir.).

This litigation conduct is a particularly strong "plus factor" for jurisdiction. After all, the "essential" concern of the Due Process Clause is that "the defendant purposefully avails [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Paxton has frequently availed himself of that privilege here to further his agenda as Attorney General, independently satisfying the plus factor requirement. *Cf. Trump v. Comm. on Ways & Means, U.S. House of Representatives*, 415 F. Supp. 3d 98, 108 n.4, 110 n.6 (D.D.C. 2019) (concluding "litigation activity in the District . . . arguably satisfies subsection (a)(1)" and explaining state Attorney General's appearance in nine cases showed she "may have engaged in a persistent course of conduct in the District" under subsection (a)(4) but finding no plausibly alleged tortious act); *Turner v. Abbott*, 53 F. Supp. 3d 61, 67 (D.D.C. 2014) (similar).[6]

Finally, Paxton regularly avails himself of the District of Columbia for his own campaign efforts. Since his first run for Attorney General, Paxton has raised over $1.5 million from D.C. residents and entities. Dodge Decl., Ex. W. This includes close to $1.2 million from the Republican Attorneys General Association ("RAGA"), a D.C.-based political action committee of which Paxton is a current member and former chair. *Id.*, Ex. X. Paxton has regularly disbursed campaign funds to vendors, hotels, and restaurants within the District during his time in office, including for events like "campaign reception[s]," "Meeting with donor," and "overnight lodging for

---

[6] Paxton's contacts with District of Columbia courts are not protected by the so-called "government contact" doctrine. The District of Columbia Court of Appeals recently held that doctrine does not apply to subsection (a)(4), even when the contacts involve "federal policy advocacy." *Akhmetshin v. Browder*, 275 A.3d 290, 296 (D.C. 2022) ("declin[ing]" to "construe the 'persistent course of conduct' requirement in § (a)(4) of the D.C. long-arm statute to exclude government contacts"). Moreover, Plaintiffs are not aware of any case in which that doctrine has been applied to contact with federal *courts* in the District of Columbia, as compared to federal *agencies*. *Cf. Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 786 (D.C. Cir. 1983) (explaining doctrine applies to "official contacts with the Congress and the executive branch").

fundraiser," showing that Paxton regularly avails himself of the District to raise funds, *id.*, Ex. Y, yet another basis for finding a persistent course of conduct, *see Lewy*, 723 F. Supp. 2d at 128 (considering solicitation and receipt of donations in D.C. in finding plus factor requirement met).

### B.   Exercising personal jurisdiction over Paxton is consistent with due process.

Plaintiffs' opening brief provided three separate bases for exercising jurisdiction over Paxton in a manner consistent with due process. *See* Mem. 21–22. Paxton's response does not even address the second basis—that Paxton's conduct is purposefully directed at the District because the Demand seeks "reams of documents stored, and in many cases created" in D.C.—and thus concedes the point. *See* Opp'n 15–19, *Brett*, 404 F. Supp. 3d at 59. With respect to the other two bases—that Paxton physically entered the District of Columbia for purposes of his investigation, and that the *Calder* "effects" test is satisfied—Paxton's arguments are either contrary to the facts or inconsistent with the relevant case law.

*First*, courts consistently have held that where a defendant sends a process server into a jurisdiction and the resulting claim flows from that effectuation of service, that jurisdiction may hear the claim consistent with due process. *See, e.g.*, *Schleit*, 693 F. Supp. at 422–23; *Balsly*, 2012 WL 628490, at *5–7 (explaining that "serving process in Virginia, alone, gives rise to personal jurisdiction" in view of "the defendant's physical presence in the forum state" through its agent). This makes sense—even "a single act, so long as it creates [a] 'substantial connection,' is sufficient" to confer personal jurisdiction. *Heller v. Nicholas Applegate Cap. Mgmt. LLC*, 498 F. Supp. 2d 100, 109–10 (D.D.C. 2007) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 475 (1984)). And "physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact" for purposes of personal jurisdiction. *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (citation omitted).

Paxton's only response is to suggest that *Walden* requires an "ongoing business relationship." Opp'n 17. That is incorrect. *Walden* stands for the rule that "the plaintiff cannot be the only link between the defendant and the forum." 571 U.S. at 286. Here, Plaintiffs are *not* the only link; Paxton's counsel described Paxton's activities as directed at the District of Columbia in his Maryland briefing, arguing that Maryland lacked jurisdiction specifically because the "CID was issued to, and served in, the District of Columbia." Branch Decl., Ex. I at 16; *see also id.* at 2 ("The CID was issued to Media Matters in the District of Columbia"); *id.* at 15 (same). Paxton's counsel admitted as much at the Maryland hearing:

```
18        THE COURT:  Are you saying kind of like the fact of
19   the matter is, you directed your investigation to Media Matters
20   in D.C. --
21        MR. LAVORATO:  Absolutely.
```

Branch Decl., Ex. H, Tr. 22:18–21.

*Second*, personal jurisdiction is also proper under the effects test. Mem. 22 (citing *Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007), and *Calder v. Jones*, 465 U.S. 783, 788–89 (1984)). Paxton concedes that "[s]ome courts" apply the effects test, Opp'n 17, and does not dispute this case satisfies that test. Paxton also never discusses, let alone distinguishes, *Defense Distributed v. Grewal*, 971 F.3d 485, 493 (5th Cir. 2020), a case from *his home circuit* which held that by sending a cease-and-desist letter to a Texas company in Texas, the New Jersey Attorney General had "projected himself across state lines and asserted a pseudo-national executive authority" more than sufficient to "constitute[] purposeful availment." *Id.* at 493–94. Paxton has done the same here.

The rejoinders Paxton does advance as to *Calder* are erroneous. He first suggests that *Calder* and the effects test "are inapposite" because "subsection (a)(3) of the D.C. long-arm statute 'stops short of the outer limits of due process.'" Opp'n 17 (citation omitted). But that *statutory*

13

**JA0479**

argument is irrelevant to the *constitutional* analysis—all Plaintiffs need to show for constitutional purposes is that they satisfy the effects test, which does not require a tortious act in the District. *See Walden*, 571 U.S. at 286 (explaining *Calder* "illustrates" how defendants may "create[] the necessary contacts with the forum" to satisfy due process). In any case, as Plaintiffs have explained, they also satisfy (a)(3)'s additional requirement of such an act. *See supra* Section I.A.

Paxton's remaining due process arguments are as confusing as they are irrelevant. Opp'n 18–19. Paxton seems to suggest that a plaintiff may not rely on a First Amendment injury to satisfy the harm element of the effects test under *Calder*. But *Calder* says the opposite: It rejects the suggestion that "the potential chill on protected First Amendment activity" is a reason to *restrict* personal jurisdiction (specifically, over libel and defamation cases). 465 U.S. at 790–91 (setting aside this concern in finding jurisdiction); *see also Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 780 n.12 (1984) (explaining *Calder* rejected notion that a "First Amendment" defense may defeat jurisdiction otherwise proper under the Due Process Clause" (emphasis added)). The location, not the substance, of the harm is what matters. *Menken*, 503 F.3d at 1058. In any event, unlike the defendant in *Calder*, Paxton does not argue that issuing his Demand is First Amendment activity at risk of chill from exercising jurisdiction here. *Calder*, 465 U.S. at 784–85.

Finally, Paxton cites *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476 (5th Cir. 2008), but that out-of-circuit decision does not help him. The same judge who authored *Stroman* later wrote *Defense Distributed* and distinguished *Stroman* in ways that also apply here. *See* 971 F.3d at 491–92. First, both here and in *Defense Distributed* the claims stem from the *direct* action the defendant took against the plaintiff in the forum—here, the Demand served in the District of Columbia, and in *Defense Distributed*, the New Jersey Attorney General's cease-and-desist letter sent into Texas. *Id. Stroman*, by contrast, held Texas lacked jurisdiction to hear a Texas company's *generalized*

14

challenge to "Arizona's regulatory scheme" for timeshare brokers. *Id.* (citing *Stroman*, 513 F.3d at 481). Second, *Stroman* concerned an Arizona public official's assertion of authority over "real estate transactions involving Arizona residents or property," *id.* (citing *Stroman*, 513 F.3d at 485–86), which the plaintiff had *admittedly* engaged in within Arizona, *Stroman*, 513 F.3d at 485–86 (noting Stroman "chose to deal in Arizona timeshares and with Arizona residents"). As the concurrence explained, the official in *Stroman* was "simply attempting to uniformly apply [Arizona's] laws" against a Texas-based company that "chose to market Arizona properties and transact business with Arizona residents." *Defense Distributed*, 971 F.3d at 497 (Higginson, J., concurring) (quoting *Stroman*, 513 F.3d at 486). This case is more akin to *Defense Distributed*, where the New Jersey Attorney General "asserted a pseudo-national executive authority" to "reach conduct" in Texas "that did not involve New Jersey residents or assets at all." *Id.* Indeed, Paxton claims a virtually unbound "discretion" regarding the "breadth and relevance" of materials he may demand without providing *any* reasonable basis for jurisdiction. Branch Decl., Ex. F.[7] *Stroman* is thus plainly distinct, as *Defense Distributed*—a case Paxton simply ignores—explains.[8]

---

[7] Although Paxton does not cite it, *Stroman* relied on *United States v. Ferrera*, 54 F.3d 825 (D.C. Cir. 1995). In *Ferrera*, an attorney licensed only in New Mexico was alleged to have committed an ethical violation while practicing as an Assistant U.S. Attorney in the District of Columbia. *Id.* at 826. After a New Mexico agency filed ethics charges, the United States sought an injunction in D.C. against the charging prosecutor, Ferrera. *Id.* The D.C. Circuit held there was no jurisdiction over Ferrera because her only tie to the District of Columbia was the New Mexico-licensed attorney's "unilateral decision to practice law in the District of Columbia." *Id.* at 829. Paxton, by contrast, has elected to target a D.C.-founded and D.C.-based media organization without showing that it has any preexisting ties to Texas. Padera Decl. ¶¶ 11–14, ECF No. 4-2.

[8] *Music Makers Holdings, LLC v. Sarro*, No. RWT 09cv1836, 2010 WL 2807805 (D. Md. July 15, 2010), is about private-party cease-and-desist letters sent to enforce a trademark. *Id.* at *1–2. Its holding that "cease-and-desist letters alone are not sufficient to invoke specific personal jurisdiction *in an action for trademark infringement*," *id.* at *6 (emphasis added), has no bearing on whether this Court has personal jurisdiction over claims arising from a government official's issuance of retaliatory, and judicially enforceable, investigatory demand on a media organization.

15

**JA0481**

## II.     Venue in the District of Columbia is proper.

Paxton is also wrong that Plaintiffs' theory of venue "depends on the plaintiff's residence rather than the defendant's residence." Opp'n 21. Plaintiffs have asserted that venue is proper in D.C. because "a substantial part of the events or omissions giving rise to the claim occurred" here. 28 U.S.C. § 1391(b)(2). Paxton nowhere disputes that.

Even if Paxton made such an argument, it would be meritless. Paxton has *repeatedly* stressed that the Demand "was issued to, and served in, the District of Columbia." Branch Decl., Ex. I at 16; *see also id.* at 2 ("The CID was issued to Media Matters in the District of Columbia"); *id.* at 15 (same). His declarant likewise admits the Demand was mailed to, and then physically served on Media Matters in the District of Columbia. Fuller Decl. ¶¶ 2–3. These admissions alone plainly show that a "substantial part of the events . . . giving rise to the claim"—service and issuance of the Demand inflicting chill on Plaintiffs—occurred in this district.

Venue is further appropriate in D.C. because many of the events giving rise to Paxton's retaliatory investigation occurred here. It is undisputed that Paxton's investigation was triggered by Hananoki's November 16 article, which was edited and reviewed by Media Matters's D.C.-based editorial team, including Media Matters's D.C.-based editor-in-chief. Dimiero Decl. ¶¶ 8– 10, ECF No. 4-4. Similarly, Plaintiffs have alleged that they are *injured* in the District of Columbia due to Paxton's conduct. Where, as here, a case is "brought on First Amendment grounds, [this] impact becomes the most important part" of the venue analysis because "[t]he suppression itself is a more 'substantial' event than the decision to suppress the speech." *Kalman v. Cortes*, 646 F. Supp. 2d 738, 742 (E.D. Pa. 2009). Plaintiffs "suffer[] harm . . . where the[ir] speech would have taken place," making such locations more appropriate venues than "the district in which the statute was written and the decision to restrict th[e] plaintiff's speech was made." *Id.*

16

Paxton argues that venue is only proper in Texas, relying solely on *Leroy v. Great Western United Corp.*, 443 U.S. 173 (1979), an outdated case which interprets a *superseded* venue statute under which venue was only appropriate in the district where a claim "arose." Opp'n 21–22. But "in 1990 Congress revamped the venue statute" and made clear "that venue can be appropriate in more than one district." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356 (2d Cir. 2005); *see also Exelon Generation Co., LLC v. Grumbles*, 380 F. Supp. 3d 1, 13 (D.D.C. 2019) (noting the 1990 amendments recognized venue can be appropriate "in multiple districts," making *Leroy* "academic"). "*Leroy* is of limited, if any, significance now." 14D Wright & Miller, *Fed. Prac. & Proc.* § 3802 (4th ed.). Because a substantial portion of the events giving rise to this suit indisputably occurred in D.C, venue is proper in this Court. *See, e.g.*, Compl. ¶¶ 14–17, 62–67.[9]

## III. Plaintiffs' claims are ripe for adjudication.

Plaintiffs' claims are ripe because Paxton's retaliatory conduct has already had its predictable and intended effect—chilling Plaintiffs from engaging in their constitutionally protected newsgathering and reporting activities. Plaintiffs are therefore "suffer[ing] a present, objective harm," namely "an objective chill of [their] first amendment rights." *Clark v. Libr. of Cong.*, 750 F.2d 89, 93 (D.C. Cir. 1984) (finding employee's claim for alleged objective chill of First Amendment rights due to retaliatory investigation justiciable); *cf. Chamber of Commerce of the U.S. v. FEC*, 69 F.3d 600, 603–04 (D.C. Cir. 1995) ("A party has standing to challenge, pre-enforcement, even the constitutionality of a statute if First Amendment rights are arguably chilled,

---

[9] Paxton's offhand suggestion that this case be transferred to the Northern District of Texas, Opp'n 22, is also meritless. The Northern District of Texas has no jurisdiction over Plaintiffs, as binding federal circuit precedent precludes the exercise of jurisdiction in a case where the targeted conduct consists of a story published online with no meaningful ties to Texas. *See Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 317–20 (5th Cir. 2021), *reh'g en banc denied*, 32 F.4th 488 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 485 (2022); *see also* Compl. ¶¶ 102–05, 115.

JA0483

so long as there is a credible threat of prosecution."). This ongoing chill more than suffices to show a ripe and cognizable injury, particularly since "ripeness requirements are . . . relaxed in First Amendment cases" due to the "special need to protect against any inhibiting chill." *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013); *see also Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1274 n.6 (D.C. Cir. 2018) (recognizing that "presence of constitutional claims may favor judicial review" under "prudential doctrine[]" of ripeness); *accord* 13B Wright & Miller, *Federal Practice and Procedure* § 3532.3 (3d ed. 2023) ("In a wide variety of settings, courts have found First Amendment claims ripe, often commenting directly on the special need to protect against any inhibiting chill.") (collecting cases).

Paxton's response turns almost exclusively on his choice to not (yet) enforce the Demand in Texas court. But Plaintiffs are harmed *now* by the objectively reasonable chill imposed by Paxton's retaliatory course of conduct. Such a claim is ripe once a plaintiff has "plausibly alleged" the defendant's conduct "require[s] them to self-censor," *Edgar v. Haines*, 2 F. 4th 298, 311 (4th Cir. 2021), *cert. denied* 142 S. Ct. 2737 (2022), such as by pleading a "non-speculative and objectively reasonable chilling effect" of their speech. *Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*, 1 F.4th 180, 188 (4th Cir. 2021) (quoting *Cooksey*, 721 F.3d at 236, 240–41); *also Hartley v. Wilfert*, 918 F. Supp. 2d 45, 53 (D.D.C. 2013) (alleging an objectively reasonable fear of engaging in future protected speech suffices to plead retaliation claim (citing *Surita v. Hyde*, 665 F.3d 860 (7th Cir. 2011))). Thus, the "fundamental question is whether plaintiffs have shown that" the retaliation "to which they are currently subject . . . . require[s] them to self-censor." *S.C. State Conf. of NAACP v. Wilson*, No. 2:23-CV-01121-DCN, 2023 WL 5207978, at *5 (D.S.C. Aug. 14, 2023) (quoting *Edgar*, 2 F.4th at 311). That is precisely what Plaintiffs have shown here based on extensive evidence that their First Amendment activities are presently chilled; indeed, the

Maryland district court strongly indicated it would likely "find subject matter jurisdiction" upon this showing. Branch Decl., Ex. H, Tr. 30:13–17, 4:13–17 (further explaining Plaintiffs had "pled enough" to show their claim is "ripe constitutionally").

It is irrelevant that "more discourse could occur" between Paxton and Plaintiffs, "or that [Paxton] ha[s] not yet made [his] final decision on th[e] issue" of enforcement. *Cooksey*, 721 F.3d at 241. A "First Amendment claim may be ripe for review even before the government has taken enforcement action" if the plaintiff alleges an objectively reasonable chill. *Kramer v. Grossman*, No. 13-cv-1745-ELH, 2014 WL 937146, at *8–9 (D. Md. Mar. 10, 2014); *see also S.C. Citizens for Life, Inc. v. Krawcheck*, 301 F. App'x 218, 221 (4th Cir. 2008) (similar); *cf. Unity08 v. FEC*, 596 F.3d 861, 865 (D.C. Cir. 2010) (expressing "reluctance to require parties to subject themselves to enforcement proceedings . . . where . . . First Amendment rights are implicated and arguably chilled by a 'credible threat of prosecution'" (cleaned up)). Here, where Paxton's invasive Demand has caused Plaintiffs to curtail their speech, including by causing them "not to write about certain topics because" of retaliation, their chill is "objectively reasonable." *Edgar*, 2 F.4th at 310; *see* Dimiero Decl. ¶¶ 16–22; Hananoki Decl. ¶¶ 26, 29–37, ECF No. 4-3; Supp. Hananoki Decl. ¶¶ 3-6. "Such self-censorship is enough." *Edgar*, 2 F. 4th at 310 (citation omitted).

Paxton's reliance on *Twitter, Inc. v. Paxton* is misplaced and misreads that decision. *See* Mem. 43–44. That case arose after Twitter removed former President Trump from the platform in the wake of January 6. *See* 56 F.4th 1170, 1172 (9th Cir. 2022). After Paxton issued a document demand to Twitter under the same Texas law at issue here, Twitter sued Paxton in California, alleging "its content moderation decisions are protected speech." *Id*. at 1172–73. Notably, the Ninth Circuit **rejected** Paxton's argument that Twitter's First Amendment challenge was not ripe "because the CID is not self-enforcing" and had not yet been enforced. *Id*. at 1174. It recognized

19

that Twitter was "not really making a pre-enforcement challenge" but rather alleging Paxton's retaliatorily conduct "targeted [Twitter] specifically with the CID and related investigation." *Id*. at 1175; *see also id*. ("[T]he subject of [Twitter's] challenge is not only some anticipated future enforcement action by OAG; Twitter claims OAG has already acted against it."). Accordingly, the Court "conclude[d] that the retaliatory framework"—the same framework Plaintiffs invoke here— "is the appropriate one under which to evaluate Twitter's standing." *Id*. at 1175.

Where Twitter ran into trouble—and why the Ninth Circuit ultimately found that its "allegations [were] not enough to establish constitutional standing and ripeness"—was "because Twitter *fail[ed] to allege any chilling effect* on its speech or any other legally cognizable injury." *Id*. (emphasis added). The court noted that Twitter's affiant did "not declare that the OAG's CID has actually chilled employees' speech or Twitter's content moderation decisions." *Id.*; *see also* Mem. 43–44. In contrast, Plaintiffs extensively describe how the Demand is chilling their speech, including by impacting their decisions about what to publish. Dimiero Decl., ¶¶ 16–23 (Plaintiffs have declined leads, withheld articles, and suffered from a slower, more burdensome publication process due to a "culture of fear" from retaliation); Hananoki Decl., ¶¶ 29–31 (explaining his work has been "curtail[ed]" and he is no longer publishing stories on X or Musk); *id*. ¶¶ 32–34 (describing additional story ideas he has not pursued for fear of retaliation).

Paxton attempts to recast *Twitter* as standing for the proposition that a plaintiff "does not suffer a cognizable injury, including any form of chilled speech, merely by virtue of receiving said CID." Opp'n 2. But he ignores that the Ninth Circuit expressly recognized that "a chilling effect on speech *can itself be the harm*" when a plaintiff brings a First Amendment claim in response to such a demand. 56 F.4th at 1178 (emphasis added). The Ninth Circuit further explained that once a plaintiff shows an objectively reasonable chill, "its constitutional injury has already occurred;

there is no way for [a plaintiff] to avoid that alleged injury by challenging the document request

later" when the CID is eventually enforced in state court. *Id.* at 1178–79. Paxton's reading is thus

at odds with the plain text of the opinion. Indeed, if the Ninth Circuit had meant to adopt the rule

that pre-enforcement challenges to civil subpoenas are *per se* unripe, as Paxton urges, it would

have had no occasion to discuss (at length) First Amendment retaliation principles and Twitter's

insufficiently pled chill. *Id.* at 1174–79. Instead, that court held that, "[i]n the First Amendment

context, 'the injury-in-fact element is commonly satisfied by a sufficient showing of self-

censorship, which occurs when a claimant is chilled from exercising his right to free expression.'"

*Id.* at 1174 (quoting *Edgar*, 2 F.4th at 310).[10]

Paxton also fails to inform the Court that *Twitter* expressly rejected much of his remaining

authority. The Ninth Circuit found Paxton's reliance on *Google, Inc. v. Hood*, 822 F.3d 212 (5th

Cir. 2016)—a case that concerned a pre-enforcement challenge to a CID under Mississippi law,

and which Paxton again cites here, Opp'n 20—misplaced because the case errantly "did not

recognize that Google could have suffered injury in the form of objectively reasonable chilling of

its speech or another legally cognizable harm from the CID even prior to the CID's enforcement,"

56 F.4th at 1178 n.3. That is the very injury Plaintiffs have shown here. Similarly, it explained that

*Reisman v. Caplin*, 375 U.S. 440, 442 (1964), did not "apply for two simple reasons: It's not about

the First Amendment nor ripeness." 56 F.4th at 1178. *Reisman* involved a civil demand issued by

the IRS to a couple's accountant that the couple alleged violated their rights against unreasonable

---

[10] Nor did *Twitter* hold that any chill from a CID is self-inflicted. After concluding Twitter failed
to allege chill, 56 F.4th at 1174–75, the court went on to say Twitter had "not allege[d] that it ha[d]
suffered *any other legally cognizable harm*," *id.* at 1175–76 (emphasis added). Specifically,
Twitter complained the CID "forced it to incur financial costs and divert employee time," but the
Court found *these* non-speech injuries were incurred "voluntarily in responding to the CID" since
"the enforceability of the CID remain[ed] an open question." *Id.* at 1176.

JA0487

seizure and self-incrimination. The Court dismissed for "want of equity"—not ripeness—finding the couple could challenge the request "on any appropriate ground" upon enforcement. 375 U.S. at 443, 449. Here, Plaintiffs' claim arises under the First Amendment and they have shown their speech is chilled *now*—not in the future when they may be compelled to turn over documents.[11]

*Reporters Committee for Freedom of Press v. AT&T*, 593 F.2d 1030 (D.C. Cir. 1978), also does not help Paxton. There, a coalition of journalists challenged AT&T's practice of turning over long-distance billing records to law enforcement, arguing it was required to first provide notice. *Id.* at 1036. Plaintiffs sought "extraordinary prospective relief by which they" would "be notified of any subpoena directed at their toll-call records." *Id.* at 1064. *No* document demand or subpoena, however, was actually pending against the plaintiffs. As a result, the Court found their claim sought relief tantamount to "an ongoing judicial audit of future government investigations in order to screen out [b]ad faith subpoenas." *Id.* at 1064. Here, Plaintiffs' claim does not concern the "mere possibility of future abridgment of rights," *id.* at 1070, but the *present* abridgment of such rights from a specific, ongoing investigation and intrusive Demand targeting their work.[12]

*Laird v. Tatum*, 408 U.S. 1 (1972), is irrelevant for similar reasons. The plaintiffs there challenged the Army's domestic data-gathering system but complained of "no specific action of the Army against them" and offered only "speculative apprehensiveness that the Army may at some future date misuse the information in some way that would cause" them harm. *Id.* at 9, 13.

---

[11] Unlike the couple in *Reisman,* Plaintiffs may *not* set aside the Demand on "any appropriate ground." As Paxton emphasized in his December 29 letter, Plaintiffs have only limited bases upon which to challenge his Demand. According to Paxton, he enjoys "broad discretion" to issue a document demand unbound "by the Texas Rules of Civil Procedure"—with no showing of cause or jurisdiction—and a recipient must establish "zero permissible justifications for the investigation" to avoid responding. Branch Decl., Ex. F.

[12] The Court "accept[ed] the notion that otherwise legitimate investigative techniques" such as subpoenas "may be abused" and "can abridge journalists' First Amendment rights." *Id.* at 1067. That, of course, is this case.

Here, in contrast, Plaintiffs are "presently [] subject" to the state-sponsored retaliation they are "challenging," *id.* at 11—there is nothing speculative about that retaliation's ongoing impact on Plaintiffs. *See Clark*, 750 F.2d at 93 & n.3 (explaining the "direct injury and objective chill incurred" by the plaintiff placed the case "outside the limitations imposed by *Laird*").

Paxton's assertion that a pre-enforcement CID can *never* chill speech or supply a ripe injury is also contrary to his own prior statements about the impact of such demands. He previously acknowledged that First Amendment activity is "chill[ed]" by a CID "hanging in the air" and "stifling . . . those seeking information [] to evaluate various viewpoints in [a] public policy debate." Branch Decl., Ex. J at 6. Indeed, Paxton's prior briefing to *three* federal courts—authored by his office on behalf of Texas and other states—argued that First Amendment challenges to pre-enforcement CIDs are cognizable solely on the basis that issuance of such demands can alone unlawfully chill speech—the opposite position he urges here. *See* Branch Decl., Exs. J at 6, K at 2, L at 10. In stark contrast to his current position, Paxton told those courts that such conduct imperiled "a fundamental guarantee of our Republic—the ability to have a viewpoint on a topic of public debate and not fear government retaliation for expressing it." Branch Decl., Ex. K at 2; *id.*, Ex. L at 10. Paxton makes no effort to reconcile these past statements with his current position.

Finally, Paxton notes that certain categories of untrue statements do not fall within the First Amendment and claims Plaintiffs cannot show "*on this record*" that their work "was protected First Amendment activity." Opp'n 22–23. But Paxton offers nothing beyond his bare say-so to prove that Hananoki's reporting would fall within that narrow exception. Indeed, Paxton admits he has *no idea* whether X's claims are true, nor reason to believe well-established constitutional protections for speech would not apply. *See id.* at 7, 10, 19. Plaintiffs, in contrast, offer affidavits attesting to the veracity of their reporting, their adherence to journalistic standards, plus undisputed

evidence that their reporting was consistent with *a year's worth of other media coverage* about the rise of extremism on X, including the repeated placement of advertisements next to such content. Compl. ¶¶ 27–39. Paxton's response conspicuously ignores this publicly available evidence.

## IV.   The equities strongly favor issuing the requested preliminary injunction.

Paxton argues that the equities do not weigh in favor of relief by: (1) criticizing Plaintiffs for not pursuing relief under Texas law; and (2) suggesting occasional television appearances from Media Matters's President undercuts Plaintiffs' ample showing of chill. Both points are meritless.

Paxton first claims Plaintiffs' harm is self-inflicted because they did not avail themselves of a procedure under Texas law for setting aside the Demand. But doing so would have run the risk of forfeiting Plaintiffs' jurisdictional defenses in Texas court. *See Dawson-Austin v. Austin*, 968 S.W.2d 319, 322 (Tex. 1998) (seeking affirmative action from court waives special appearance). Moreover, Paxton's December 29 letter not only confirms but underscores his position that baseline procedural safeguards are not available to Plaintiffs under Texas law— including the protections of the Texas Rules of Civil Procedure. Branch Decl., Ex. F; *see also* Opp'n 8 n.2 (noting Plaintiffs "do[] not have a right to understand" Paxton's "possible theories"). That is not a meaningful alternative pathway for Plaintiffs to vindicate federal constitutional rights they enjoy here in the District of Columbia.[13]

Second, the occasional television appearances by Media Matters's President noted by Paxton do not refute that the organization's editorial and reporting staff—including Hananoki— are presently self-censoring and making different journalistic decisions than they otherwise would

---

[13] Moreover, the Texas statute under which Paxton is proceeding contemplates challenges in the county where the target of the Demand "reside[s]," which—if the statute is read to apply to nonresidents—should permit challenges outside the state. Tex. Bus. & Com. Code Ann. § 17.61(g).

JA0490

have, including by deciding not to publish specific articles. Those are paradigmatic examples of chill. *See Edgar*, 2 F.4th at 310. Moreover, many of those appearances were intended specifically to defend Media Matters from the litany of allegations made against it in the wake of Musk's suits and Paxton's retaliatory campaign, such as Paxton's assertion that Media Matters is "a radical left-wing organization[] who would like nothing more than to limit freedom," Compl. ¶ 6. There is a qualitative difference between an organization's leader appearing on television to defend the group from slanderous attacks and the predictable chill suffered by beat reporters like Hananoki who wish to write *new* coverage of emerging events but are reasonably fearful of doing so for fear of further retaliation. *See* Supp. Hananoki Decl. ¶¶ 3–6.[14] More importantly, it is basic First Amendment law that "a plaintiff need not actually be deprived of her First Amendment rights in order to establish First Amendment retaliation." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). The First Amendment forbids retaliatory "conduct that tends to *chill* such activity, not just conduct that *freezes* it completely." *Id.* Plaintiffs readily show such irreparable harm here, which counsels in favor of immediate relief from this Court.

## CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs' motion for a preliminary injunction.

---

[14] Paxton claims Hananoki reposted a tweet discussing Paxton's investigation on November 21, allegedly "after the CID was issued to Media Matters." Opp'n 10. While the Demand was "issued" late the same day, Media Matters "first received the Demand on November 22, 2023 via FedEx at its Washington, D.C. office." Mem. 3 n.1 (citing Branch Decl. ¶ 4). Indeed, the tracking slip supplied by Paxton's *own declarant* confirms that Media Matters—never mind Hananoki—first received the Demand on November 22. Fuller Decl., Ex. A ("Nov. 22, 2023 07:48"). Hananoki therefore did not know at the time that Paxton would demand he turn over his private notes and communications. *Accord* Hananoki Decl. ¶¶ 33–39 (discussing impact of Demand).

Dated: February 1, 2024

Respectfully submitted,

*/s/ Aria C. Branch*

**ELIAS LAW GROUP LLP**
Aria C. Branch (DC 1014541)
Elisabeth C. Frost (DC 1007632)
Christopher D. Dodge[Δ] (DC 90011587)
Jacob D. Shelly[Δ] (DC 90010127)
Elena A. Rodriguez Armenta[Δ] (DC 90018798)
Daniela Lorenzo [Δ+]
Omeed Alerasool[Δ] (DC 90006578)
Samuel T. Ward-Packard[Δ] (DC 90005484)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
abranch@elias.law
efrost@elias.law
cdodge@elias.law
jshelly@elias.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
oalerasool@elias.law
swardpackard@elias.law

Abha Khanna*
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr. (DC 420440)
Jay P. Srinivasan**
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com
Email: jsrinivasan@gibsondunn.com

26

**JA0492**

Amer S. Ahmed (DC 500630)
Anne Champion**
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com
Email: achampion@gibsondunn.com

*Admitted *pro hac vice*
**Pro hac vice* application forthcoming
[Δ]Admitted *pro hac vice* and application for admission pending
[+]Admission to D.C. bar pending swearing in

*Counsel for Plaintiffs Media Matters for America and Eric Hananoki*

27

**CERTIFICATE OF SERVICE**

I hereby certify that this document will be served on the Defendant in accordance with Federal Rule of Civil Procedure 5(a).

*/s/ Aria C. Branch*
Aria C. Branch

JA0494

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*,<br><br>                        Plaintiffs,<br><br>           v.<br><br>WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas,<br><br>                        Defendant. | Civil Action No. 24-cv-147-APM |

**SUPPLEMENTAL DECLARATION OF ERIC HANANOKI
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Eric Hananoki, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I previously submitted a declaration in this lawsuit on January 18, 2024. Since then, I have again been deterred from pursuing additional story ideas due to concern about further legal retaliation from Paxton.

3.      In the two weeks since I submitted my declaration, I had at least seven story ideas that I wanted to pursue but did not because of the Demand. The story ideas were about: (1) scam advertising appearing on X, a subject I have covered previously; (2) white nationalists attacking Martin Luther King, Jr. on X; (3) North Dakota legislators sharing extremist, far-right content on X; (4) Holocaust denialism on X following Elon Musk's visit to the Auschwitz-Birkenau memorial and museum; (5) additional reporting following up on my investigation into recipients of X's

1

**JA0495**

advertisement revenue sharing program despite recent, critical attention of the program; (6) Musk's interactions on X with a user, previously covered by Media Matters, known to have denied the Holocaust; and, (7) Musk's interactions with an obscure account that posts white supremacist and antisemitic content. Each of these topics is well within my beat, and I have frequently reported on these and similar topics, individuals, and issues in the past.

4.      I have only published one article since I submitted my January 18 declaration, and I have only published three articles since Media Matters received the Demand on November 22.[1] Prior to the Demand, I published roughly one or two articles per week. In October 2023 alone, for instance, I wrote nine articles.

5.      My fear of additional legal retaliation as a result of Paxton's Demand has impacted the substance of the small handful of articles I have been able to publish. For example, my most recent article describes an interview of right-wing commentator Evan Kilgore, in which Kilgore claims the U.S. government is "Jewish-controlled" and advocates for a violent insurrection.[2] Stew Peters, who conducted the interview of Kilgore, is himself a known white nationalist and antisemite who has previously endorsed Holocaust denial, pro-Hitler propaganda, and violent behavior, as my article describes.

6.      I intentionally excluded from the article any mention of Peters' and Kilgore's activities on X, despite its relevance to the piece and my desire to cover the issue. For example, I did not write about how Peters is still allowed to be an active user on X despite engaging in extremist activities on the platform, and I specifically avoided reporting that paid advertisements

---

[1] My articles are generally available here: https://www.mediamatters.org/author/eric-hananoki.

[2] Eric Hananoki, *On Rumble, Stew Peters and TPUSA ambassador suggest violent insurrection against "Jewish-controlled" government*, Media Matters for America (Jan. 26, 2024), https://www.mediamatters.org/turning-point-usa/rumble-stew-peters-and-tpusa-ambassador-suggest-violent-insurrection-against.

JA0496

have appeared on X in close proximity to Peters' antisemitic content.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _____2/1/2024_____

Eric Hananoki

**JA0497**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, | |
| Plaintiffs, | Civil Action No. 24-cv-147-APM |
| v. | |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | |
| Defendant. | |

## DECLARATION OF EZRA W. REESE
## IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Ezra W. Reese, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I am a partner at Elias Law Group, a law firm headquartered in Washington, D.C. I am a member of the District of Columbia and Virginia bars. I am also a member of the bar of this Court.

3.      I have served as outside counsel to Media Matters for America, an organization incorporated and headquartered in Washington, D.C., for over a decade.

4.      On November 30, 2023, a process server called Media Matters's President. She was outside of Media Matters's Washington, D.C. office and wanted to serve legal process papers on Media Matters' President personally. Media Matters's President was not physically in the office that day.

1

**JA0498**

5.      Later that day, I reached out to the process server to find out what this was about and learned that she had been retained by the Texas Attorney General's Office to serve Media Matters.

6.      In a subsequent conversation that same day, I conveyed to the process server that I was authorized to accept service on behalf of Media Matters.

7.      On December 1, 2023, I met the process server in the lobby of my law firm's office at 250 Massachusetts Avenue NW in the District of Columbia. I accepted service of the Civil Investigative Demand at issue in this lawsuit on behalf of Media Matters.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _____2/1/2024_____

_Ezra Reese_

_____

Ezra W. Reese

**JA0499**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, | |
| Plaintiffs, | Civil Action No. 24-cv-147-APM |
| v. | |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | |
| Defendant. | |

**DECLARATION OF CHRISTOPHER D. DODGE
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Christopher D. Dodge, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I am a Counsel at Elias Law Group LLP in Washington, DC. I am a member of the bar in the District of Columbia, the State of New York, and the Commonwealth of Massachusetts. I am counsel for Media Matters for America and Eric Hananoki ("Plaintiffs") in this matter, and I have been admitted to practice before this Court *pro hac vice*.

3.      I submit this declaration in support of Plaintiffs' Motion for Preliminary Injunction in the above-captioned matter.

4.      Attached as **Exhibit M** is a true and correct copy of the April 21, 2023 article by the Epoch Times, "Conservative Leaders Fire Up Their Base at Heritage Foundation Summit," also available at: https://www.theepochtimes.com/us/conservative-leaders-fire-up-their-base-at-

**JA0500**

heritage-foundation-summit-5211431. Additionally, a video recording of Attorney General Paxton's speech at the Heritage Foundation's 50th Summit is available at: https://www.youtube.com/watch?v=4eTG32YC_Uw.

5.      Attached as **Exhibit N** is a true and correct copy of the February 25, 2015 news release by the Office of the Attorney General of Texas, "Attorney General Paxton Speaks at Heritage Foundation Discussion on the Case Against President Obama's Executive Amnesty," also available at: https://www.texasattorneygeneral.gov/news/releases/attorney-general-paxton-speaks-heritage-foundation-discussion-case-against-president-obamas.

6.      Attached as **Exhibit O** is a true and correct copy of Attorney General Paxton's Federalist Society profile, also available at: https://fedsoc.org/contributors/ken-paxton.

7.      Attached as **Exhibit P** is a true and correct copy of the February 27, 2018 news release by the Office of the Attorney General of Texas, "AG Paxton Joins U.S. AG Sessions at Press Conference Announcing DOJ's New Steps to Combat the Nation's Opioid Epidemic," also available at: https://www.texasattorneygeneral.gov/news/releases/ag-paxton-joins-us-ag-sessions-press-conference-announcing-dojs-new-steps-combat-nations-opioid.

8.      Attached as **Exhibit Q** is a true and correct copy of the January 6, 2021 article published by the Houston Chronicle, "Ken Paxton at Trump's D.C. rally: 'We will not quit fighting.'" The article is available at: https://www.houstonchronicle.com/politics/texas/article/Paxton-Trump-DC-rally-election-2020-georgia-15850073.php.

9.      Attached as **Exhibit R** is a true and correct copy of an October 16, 2021 article published by the Washington Post, "Publix heiress, funder of Jan. 6 rally, gave $150,000 to GOP attorneys general association," also available at: https://www.washingtonpost.com/investigations/publix-heiress-capitol-riot-wren/2021/10/16/34b7d55a-2481-11ec-a6ad-9ee7deda7f34_story.

JA0501

html.

10. Attached as **Exhibit S** is a true and correct copy of the event page for the Georgetown Law Federalist Society's October 27, 2022 event, "A Conversation with Texas Solicitor General Judd Stone," also available at: https://www.law.georgetown.edu/event/a-conversation-with-texas-solicitor-general-judd-stone/.

11. Attached as **Exhibit T** is a true and correct copy of the event page for the Federalist Society's May 30, 2023 event, "University of Virginia School of Law Alumni Reception," also available at: https://fedsoc.org/events/university-of-virginia-school-of-law-alumni-reception.

12. Attached as **Exhibit U** is a true and correct copy of the event page for the Federalist Society's June 28, 2023 event, "Panel 1: When Twitter Speaks: Control, Access, and the Role of States," as part of its "2023 Freedom of Thought Conference," also available at: https://fedsoc.org/conferences/2023-freedom-of-thought-conference?#agenda-item-panel-1-when-twitter-speaks-control-access-and-the-role-of-states.

13. Attached as **Exhibit V** is a true and correct copy of the January 30, 2024 press release by the Office of the Attorney General of Texas, "Texas First Assistant Attorney General to Testify at Congressional Hearing on Southern Border Invasion," also available at: https://www.texasattorneygeneral.gov/news/releases/texas-first-assistant-attorney-general-testify-congressional-hearing-southern-border-invasion.

14. Attached as **Exhibit W** is a true and correct copy of data from the Texas Ethics Commissions showing contributions to Attorney General Paxton from donors in the District of Columbia since he first ran for Attorney General in 2014. This data is available through the Texas Ethics Commission website: https://www.ethics.state.tx.us/search/cf/AdvancedSearch.php.

15. Attached as **Exhibit X** is a true and correct copy of the November 12, 2018 article

3

JA0502

published by Politico Pro, "Texas Attorney General Paxton named new RAGA chair," also available at: https://subscriber.politicopro.com/article/2018/11/texas-attorney-general-paxton-named-new-raga-chair-2185937.

16.     Attached as **Exhibit Y** is a true and correct copy of data from the Texas Ethics Commissions showing expenditures made by Attorney General Paxton in the District of Columbia since 2014. This data is available through the Texas Ethics Commission website: https://www.ethics.state.tx.us/search/cf/AdvancedSearch.php.


I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Christopher D. Dodge*
Christopher D. Dodge

**JA0503**

# Exhibit M

JA0504

US  >  US POLITICS

# Conservative Leaders Fire Up Their Base at Heritage Foundation Summit



Sen. Tim Scott (R-S.C.) speaks at the Heritage Foundation's Leadership Summit in National Harbor, Md., on April 20, 2023. (Terri Wu/The Epoch Times)



By Terri Wu
4/21/2023      Updated:   4/21/2023

A Å    🖨 Print

OXON HILL, Md.—Many conservative leaders spoke about the threats of woke ideology and the Chinese Communist Party (CCP), one or both,

**JA0505**

at the 50th-anniversary leadership summit of the Heritage Foundation, which started Thursday. Audience members said they were encouraged, hopeful, and cautiously looking forward to seeing action taken in the future.

"Welcome to the fight that will determine the next 15 years in the history of the conservative movement in the United States of America," said Kevin Roberts, president of the Heritage Foundation.

"We've learned the hard way that it's not enough for conservatives to hold power. We have to wield it, not for ourselves, but for the country and its future, for the everyday American," he added.

Story continues below advertisement

On Friday, Heritage will announce its new "Mandate for Leadership," a policy book representing the work of over 350 conservative leaders. Roberts described it as a "new plan for the next great conservative presidency" and "comprehensive agenda" that addresses two challenges: "dismantling the woke weaponized administrative state at home" and "defeating the Chinese Communist Party."

He praised that conservative leaders, despite being called "hopelessly fractured" by Washington insiders, formed "urgent consensus" in creating the policy book.

In addition to the CCP threat, various federal and state elected officials covered topics of education, gender identity, and the fiscal

responsibility of Congress.



Texas Attorney General Ken Paxton speaks at the Heritage Foundation's Leadership Summit in National Harbor, Md., on Apr. 20, 2023. (Terri Wu/The Epoch Times)

# Sen. Tim Scott Well Received

"America really seems to be at a crossroads. And to see them coming together at this point, to make that stand for conservatism in the country really matters," Jason McGuire, president of New Yorker's Family Research Foundation, a Christian educational organization, told The Epoch Times, referring to the conservative leaders.

McGuire said he enjoyed the speech of Sen. Tim Scott (R-S.C.), who announced his run for president in 2024. "I think he really gets it that the core of where we need to be is this: faith and freedom are tied together," McGuire added. "He certainly understands that as a people, if we go back to being a people of faith, then I think we'll see a whole different country than we have today."

Story continues below advertisement

AD

Scott told the audience he was happy growing up in a poor family because the household was "filled with love and with faith—there was always the joy of the Lord being your strength."

"If we're going to have a day where we have a new American sunrise, it starts with restoring confidence in who we are as Americans," he said to a room packed with attendees at the Gaylord National Resort and Convention Center, adding that the Founding Fathers should be celebrated and that America is the land of opportunity, not the land of oppression.

He ended his speech with: "The next American sunrise means the strength of our leader is more important than the strength of [China's] leader. Today we are losing the battle because the weakness of the president of the United States is always more important than the strength of President Xi and China. Get ready for another American sunrise."

McGuire said the senator's "new American sunrise" message was a "message of hope."

Story continues below advertisement

AD

JA0508

"I really look forward to hearing what Gov. DeSantis has to share tomorrow. I think we'll hear some great themes because of a lot of optimism about where we're going to be heading as a country."

Darren, a 34-year-old financial services professional from Dallas, Texas, found Scott a "compelling person in front of the room." "I loved his speaking style. I thought he was very inspiring in the way that he spoke," he told The Epoch Times. "I thought that he did a good job of reminding people that it's okay to be proud to be an American."

The self-identified conservative preferred not to disclose his last name.

## 'Find More Common Ground'

Darren said he identified a theme at the event about changing the relationship with China and "a call around the cultural separation that many feel in the United States."

"And I think that drumbeat is sometimes something that I agree with, and sometimes it isn't. I would like to see politics in the United States less of a versus conversation—we don't need to say 'kumbaya' to each other all the time—and just a more congenial and friendly conversation, if possible," he added.

Story continues below advertisement

AD

JA0509

His brother Nelson, who lives in St. Petersburg, Florida, shared the same view. Nelson said he dislikes "adversarial conversations" and doesn't think they are helpful. "We're really just all on the same team here. We're all part of the same country. I think that's an ugly way to start a conversation. It certainly doesn't bring new friends into the den," he told The Epoch Times.

In Darren's view, politicians sometimes find it useful to focus on the differences between people's ideas because "it is a way to fire up a base and get elected." "At the end of the day, I want us as a country to be able to find more common ground that I think we're finding now," he said.



Sen. Rick Scott (R-Fla.) speaks at the Heritage Foundation's Leadership Summit in National Harbor, Md., on April 20, 2023. (Terri Wu/The Epoch Times)

Darren said Sen. Rick Scott (R-Fla.) was "definitely the wonk in the room" and "in a positive way." "I loved his bluntness; I felt like Rick's

conversation with us was very frank about his way of approaching Washington. I liked him a lot."

## 'I Feel More Upbeat'

Susan Jellison, a retired nurse from Detroit Lakes, Minnesota, said she had a "marvelous time" at the event. Her top two issues—pro-life and education—were addressed by speakers. "America is going way too far off to the left," she told The Epoch Times, adding that Republican leaders would need to take actions and walk the talk.

Story continues below advertisement



AD

Susan's husband, David, a retired commercial real estate developer, shared that observation.

"Well, I think we came in this time, thinking that the United States is on its last legs. And I think you realize that we are really in major problems in this nation," he told The Epoch Times. "But you have a little bit of hope when you listen to people like Tim Scott, Rick Scott, Josh Hawley, and Kevin Roberts."



Sen. Josh Hawley (R-Mo.) speaks at the Heritage Foundation's Leadership Summit in National Harbor, Md., on April 20, 2023. (Terri Wu/The Epoch Times)

David got a sense of union from speaking to people and listening to the speakers at the event. He said the speakers "are on the right track."

Story continues below advertisement

AD

"I think Josh Hawley's statement at the end was that Republicans have got to wake up and realize the battles ahead of us. We just cannot be Mr. Nice Guy and give in anymore," he said. "They've got to stand up

for the truth and stand up for what they actually believe if they actually believe it. So I think all of that came out very strongly today."

"I feel more upbeat because of the senators and the congressmen we heard speak today. We've just got to hope that they can galvanize together to fight this as one force—not going all these different directions—to stick together," he added.

James Bray, a retired Hinsdale, Illinois physician, has attended Heritage's annual events for the past ten years. "It [the event] will hopefully stimulate people in their 30s and 40s to change their local communities and maybe instills conservatism back into America because things have changed dramatically in the past 20 years in the country," he told The Epoch Times.

# 'Empathy'

Thursday's afternoon event ended on a compassionate note. Former NBA player Enes Kanter Freedom made a surprise appearance. A vocal human rights critic, he spoke for the rights of Uyghurs, Tibetans, Hongkongers, Taiwanese, Mongolians, and Falun Gong practitioners.

When asked what policy would be his top priority, he said, "I just hope that people can have some empathy in their hearts because once you put yourself in their shoes—people with what they're going through the other side of the ocean, or the Middle East, or China, or whatever, you know there's no way that you can pick anything but your morals, values, and principles."

"I just hope people can have some empathy in their hearts."



Enes Kanter Freedom (R), a former professional NBA player, speaks at the Heritage Foundation's Leadership Summit in National Harbor, Md., on April 20, 2023. (Terri Wu/The Epoch Times)

**SHARE IT NOW**


### Terri Wu
Author

Terri Wu is a Washington-based freelance reporter for The Epoch Times covering education and China-related issues. Send tips to terri.wu@epochtimes.com.

### Author's Selected Articles

**Next Biden–Xi Call Is Likely in the Spring: US Official**

Jan 27, 2024



### Chinese Music Student Convicted of Stalking, Threatening Pro-Democracy Activist in Boston

Jan 25, 2024



### Federal Agencies in the Dark About China's US Farmland Purchase, New Report Reveals

Jan 19, 2024



### The House Panel Giving Washington a Reality Check on China

Jan 19, 2024



## RELATED TOPICS

Heritage Foundation

Copyright © 2000 - 2024 The Epoch Times Association Inc. All Rights Reserved.

Cookies Settings

# Exhibit N

JA0516



**February 25, 2015 | Immigration (/news/categories/immigration)**

# Attorney General Paxton Speaks at Heritage Foundation Discussion on the Case Against President Obama's Executive Amnesty

Texas Attorney General Ken Paxton today was joined by Nebraska Attorney General Doug Peterson at the Heritage Foundation for a discussion on the case against President Obama's lawless executive amnesty. Nebraska is part of a 26-state bipartisan coalition led by Texas fighting to stop the President's attempt to unilaterally grant amnesty to millions of illegal immigrants.

"The President of the United States is attempting to end-run Congress to impose and implement his own immigration laws. That's not at all what the country is all about. Our country was founded on the separation of powers, three branches of government each performing their duties as best they can, working in tandem to make a better country for us all.

"The question before us is whether any President should have the authority to circumvent Congress whenever a legislative battle proves too challenging. Texas, and 25 other states, have come

JA0517

together to say with one voice, that this is fundamentally wrong and entirely unacceptable.

"In any system of government, the rule of law is what stands between freedom and tyranny and we can't afford to waver in its defense," General Paxton said.

On February 16, a federal judge in the Southern District of Texas enjoined in full President Obama's unilateral November 2014 immigration action. The court's order prevents the Obama Administration from spending taxpayer dollars and taking major steps that would substantially harm Texas and would be difficult, if not impossible, to reverse. "This genie would be impossible to put back into the bottle," the ruling stated.

Joining Texas in the lawsuit are: Alabama, Arizona, Arkansas, Florida, Georgia, Idaho, Indiana, Kansas, Louisiana, Maine, Michigan, Mississippi, Montana, Nebraska, Nevada, North Carolina, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Utah, West Virginia, Wisconsin.

###

*The Heritage Foundation was founded in 1973 with a mission to formulate and promote conservative public policies based on the principles of free enterprise, limited government, individual freedom, traditional American values, and a strong national defense. Heritage is one of the nation's largest public policy research organizations. Its hundreds of thousands of individual members make it the most broadly supported think tank in America.*

Back to Top

JA0518

# Exhibit O

JA0519





# Hon. Ken Paxton

State Attorney General, Texas

Ken Paxton is the 51st Attorney General of Texas. He was elected on November 4, 2014, and sworn into office on January 5, 2015.

As the state's top law enforcement officer, Attorney General Paxton leads more than 4,000 employees in 38 divisions and 117 offices around Texas. That includes nearly 750 attorneys, who handle more than 30,000 cases annually – enforcing child support orders, protecting Texans against consumer fraud, enforcing open government laws, providing legal advice to state officials, and representing the state of Texas in court, among other things.

His first major initiative as attorney general was the formation of a special unit dedicated to combating human trafficking in Texas. During its first year of existence, the Human Trafficking and Transnational Organized Crime (HTTOC) section helped arrest the chief executive officer of Backpage.com, the largest online sex-trafficking marketplace in the United States.

JA0520

Under Attorney General Paxton's leadership, the agency's Child Support Division is recognized as the most successful and cost-effective program in the nation. In fiscal year 2016, the division collected $4.096 billion for Texas families – an unprecedented amount in one year by any state. This success helped spare the state and Texas taxpayers over $1 billion in public assistance costs.

Attorney General Paxton is focused on protecting Texans and upholding Texas laws and the Constitution. Fighting federal overreach, he filed 22 lawsuits against the Obama administration during a two-year stretch, of which five were heard in the U.S. Supreme Court. During his tenure in office, Attorney General Paxton has won major cases for Texas on immigration, school rights, EPA rules and religious freedom. Stopping the Environmental Protection Agency's "Regional Haze" rule averted higher energy rates for Texans. Businesses were protected and jobs preserved in Texas when Attorney General Paxton prevailed against the Department of Labor's "Overtime Rule."

In 2016, Attorney General Paxton secured a final settlement of $50 million in the state's lawsuit against VW over its emissions cheating scandal. Texas also stands to benefit from as much as $191 million from VW for projects designed to mitigate environmental harm done by the carmaker. Attorney General Paxton has been aggressive in his approach to protecting the health and safety of Texans from illegal synthetic drugs. His office has filed more than a dozen lawsuits to block the sale of synthetic cannabinoids (known as Kush and Spice) in Texas. A special section on the agency's website provides Texans with the information and resources they need to become fully informed about the dangers of synthetic drugs.

Attorney General Paxton graduated from Baylor University, where he served as student body president, earning a B.A. in psychology and an M.B.A. After receiving a law degree from the University of Virginia School of Law, he worked as an attorney at Strasburger & Price, LLP, in-house counsel for J.C. Penney Company, and headed up his own law firm for 14 years in McKinney.

First elected to the Texas House of Representatives in 2002, Attorney General Paxton represented House District 70 for 10 years, one of the fastest-growing regions in the state. In 2012, he was elected to the Texas state Senate,

JA0521

representing Senate District 8 in Collin and Dallas counties.

He met his wife Angela, a guidance counselor at Legacy Christian Academy in Frisco, while they were students at Baylor. The Paxtons have four children: Tucker, Abby, Mattie, and Katie. They are members of Prestonwood Baptist Church in Plano.
*****

*A person listed as a contributor has spoken or otherwise participated in Federalist Society events, publications, or multimedia presentations. A person's appearance on this list does not imply any other endorsement or relationship between the person and the Federalist Society. In most cases, the biographical information on a person's "contributor" page is provided directly by the person, and the Federalist Society does not edit or otherwise endorse that information. The Federalist Society takes no position on particular legal or public policy issues. All expressions of opinion by a contributor are those of the contributor.*

| PAST EVENTS | COMMENTARY |
|---|---|





*Sep*

# 10

2020

Thursday
2:00 p.m.
EST

---

## *States' Attorneys General: Defenders of the Bulwarks of Federalism*

### *South Carolina, Nebraska, and Houston Lawyers Chapter - Online Event*

Online Event

Speakers:

Miles Coleman · Ken Paxton · Doug Peterson · Alan Wilson

[ more ]

Topics:

Separation of Powers · State Governments · Federalism & Separation of Powers

Sponsors:

Charleston Lawyers Chapter · Columbia Lawyers Chapter · Greenville Lawyers Chapter · Houston Lawyers Chapter · Nebraska Lawyers Chapter

[ more ]

JA0523



*Apr*
27
2020

Monday
12:00 p.m.
EST

## Nationwide Injunctions

*Executive Branch Review Week Teleforum*

Teleforum

Speakers:

Scott Allen Keller · Ken Paxton · Beth A. Williams



This event has concluded.

## Mar
# 7
2019

Thursday
12:00 p.m.
EST

## March 2019 DC Lunch with Hon. Ken Paxton

### Washington, DC Lawyers Chapter

Tony Cheng's
619 H Street, N.W. (Gallery Place Metro)
Washington, DC 20001

Speakers:

Ken Paxton

Sponsors:

Washington DC Lawyers Chapter

In-Person Event

**JA0525**



*Nov*
18
2017

Saturday
11:00 a.m.
EST

---

## Using the Licensing Power of the Administrative State: Model Rule 8.4(g)

*2017 National Lawyers Convention*

The Mayflower Hotel - Chinese Room
1127 Connecticut Avenue NW
Washington, DC 20036

Speakers:

G. Barry Anderson • Paulette Brown • Stephen Gillers • Ken Paxton • Ronald D. Rotunda

more

Topics:

Professional Responsibility & Legal Education

Sponsors:

Professional Responsibility & Legal Education Practice Group

In-Person Event



This event has concluded.

## *May*
# 9
2017

Tuesday
2:00 p.m.

---

## *Litigation Update: Exxon Investigation*

Teleforum

Speakers:

Ken Paxton

Topics:

Federalism & Separation of Powers · Environmental Law & Property Rights · Corporations, Securities &

Sponsors:

Environmental Law & Property Rights Practice Group

In-Person Event

**JA0527**

View more

# Exhibit P

JA0529



February 27, 2018 | Opioids (/news/categories/opioids)

# AG Paxton Joins U.S. AG Sessions at Press Conference Announcing DOJ's New Steps to Combat the Nation's Opioid Epidemic

Texas Attorney General Ken Paxton and his counterparts from six other states joined U.S. Attorney General Jeff Sessions today as he announced new steps the Department of Justice (DOJ) is taking to combat the nation's opioid epidemic.

At a news conference in Washington, D.C., Attorney General Sessions praised Attorney General Paxton and his colleagues for their efforts. "Each of them has made combating opioid abuse a priority and has shown outstanding leadership," he said.

The U.S. experienced a record 64,000 fatal drug overdoses in 2016. That same year, there were an estimated 1,375 opioid-related deaths across Texas, affecting communities and families in every region of the state. Attorney General Paxton told the story of a family friend whose life was shattered after she lost her 23-year-old son to an opioid overdose.

JA0530

"I shouldn't have to tell another story like this one, nor should anyone else," Attorney General Paxton said. "The opioid crisis demands the attention of federal, state, local and private sector leaders. My office will continue to do everything it can to protect Texans from the opioid crisis."

Last year, Attorney General Paxton (https://www.texasattorneygeneral.gov/news/releases/ag-paxton-41-state-investigation-requests-documents-from-companies-that-man) and a bipartisan coalition of 40 other states served investigative subpoenas and additional requests on eight companies that manufacture or distribute highly addictive painkillers. The goal is to collect enough information so that the multi-state coalition can evaluate whether manufacturers and distributors engaged in unlawful practices in the marketing, sale and distribution of opioids.

In a recent announcement addressing the latest DOJ initiatives (https://www.justice.gov/opa/pr/attorney-general-sessions-announces-new-prescription-interdiction-litigation-task-force), Attorney General Sessions shared that a veteran federal prosecutor has been hired to lead anti-opioid efforts. With that, a new task force will target drug manufacturers and distributors whose overselling of prescription painkillers has contributed to an epidemic of fatal overdoses from opioids.

Back to Top

**JA0531**

# Exhibit Q

JA0532

www.houstonchronicle.com /politics/texas/article/Paxton-Trump-DC-rally-election-2020-georgia-15850073.php

# Ken Paxton at Trump's D.C. rally: 'We will not quit fighting.'

Benjamin Wermund : 2-3 minutes : 1/6/2021



Texas Attorney General Ken Paxton speaks Wednesday, Jan. 6, 2021, in Washington, at a rally in support of President Donald Trump called the "Save America Rally." (AP Photo/Jacquelyn Martin)

Jacquelyn Martin, STF / Associated Press

WASHINGTON — Hours before Congress was set to certify President-elect Joe Biden's election victory, Attorney General Ken Paxton touted his failed effort to overturn those results at a rally for President Donald Trump.

"One of the great things about the state of Texas is, we did not quit," Paxton told a crowd gathered outside the White House. "If you look at Georgia, they capitulated, they consented. We kept fighting in Texas."

Paxton led a failed lawsuit last month to have the U.S. Supreme Court toss out the results from four battleground states, which the court refused to consider.

Article continues below this ad

"They should've heard our case," Paxton said.

JA0533

The attorney general, who was joined on stage at the rally by his wife, state Sen. Angela Paxton, also touted "12 straight lawsuits related to mail-in ballots, related to signature verification" that his office pushed in Texas leading up to the election.

"We fought, we won every single one of those cases — and because of that, Donald Trump won Texas by over 600,000 votes," Paxton said.

Paxton's short speech — about a minute and a half at the podium where Trump is expected to speak later in the day — came just hours before Congress is scheduled to certify the presidential election results. Several Texas Republicans, led by U.S. Sen. Ted Cruz in the Senate, are planning to object to the results, an effort that will do little more than stall the final outcome: A loss for Trump.

Article continues below this ad

But the message at the Trump rally throughout Wednesday morning was that the fight must go on. Multiple speakers urged the crowd to stay engaged, reminding supporters that the midterms are just around the corner.

"What we have in President Trump is a fighter. And I think that's why we're all here," Paxton said. "We will not quit fighting. We're Texans, we're Americans, and the fight will go on."

ben.wermund@chron.com

Jan 6, 2021|Updated Jan 6, 2021 11:56 a.m.

# Exhibit R

JA0535

○ This article was published more than **2 years ago**

# The Washington Post

*Democracy Dies in Darkness*

INVESTIGATIONS

# Publix heiress, funder of Jan. 6 rally, gave $150,000 to GOP attorneys general association

By Beth Reinhard, Jacqueline Alemany and Tom Hamburger

October 16, 2021 at 9:34 a.m. EDT

A wealthy Trump donor who helped finance the rally in Washington on Jan. 6 also gave $150,000 to the nonprofit arm of the Republican Attorneys General Association, records show, funds that a person familiar with the contribution said were intended in part to promote the rally. The nonprofit organization paid for a robocall touting a march that afternoon to the U.S. Capitol to "call on Congress to stop the steal."

On Dec. 29, Julie Jenkins Fancelli, daughter of the founder of the Publix grocery store chain, gave the previously undisclosed contribution to RAGA's nonprofit Rule of Law Defense Fund, or RLDF, records reviewed by The Washington Post show. On the same day, the records show that Fancelli gave $300,000 to Women for America First, the "Stop the Steal" group that obtained a permit for the rally featuring former president Donald Trump.

Funding for the events in Washington that day is a focus of the House select committee investigating the violent riot at the U.S. Capitol that followed the rally. The panel is also interested in the role state officials, including attorneys general, played in encouraging people to go to Washington on Jan. 6 and in supporting Trump's efforts to overturn the election, according to people familiar with the committee's work.

The leaders of Women for America First have been subpoenaed by the committee, as has Caroline Wren, a Republican fundraiser who was listed on that group's permit as a "VIP ADVISOR." Both of Fancelli's donations were arranged by Wren, according to the records and the person with knowledge of the contributions, who like some others interviewed for this story spoke on the condition of anonymity due to the sensitivity of the matter.

"We have many questions about coordination and funding, and we are actively seeking records and testimony that will answer those questions," said committee spokesman Tim Mulvey. "Many witnesses are already engaging with the committee, and we expect cooperation to help us get the answers we're seeking."

The documents sought by the subpoenas sent to rally organizers were due Wednesday.

JA0536

Fancelli, who is not involved in Publix business operations, did not respond to multiple requests seeking comment, and it is unclear if she knew about the robocall ahead of time. In a statement to the Wall Street Journal, which reported in January that Fancelli had given approximately $300,000 to support the rally, she said: "I am a proud conservative and have real concerns associated with election integrity, yet I would never support any violence, particularly the tragic and horrific events that unfolded on January 6th."

Alex Jones, a far-right talk show host and conspiracy theorist who was involved in the Jan. 6 rally, has said that it cost "close to half a million dollars." He has also said a donor he did not identify paid for 80 percent of the rally.

In a statement to The Post, Wren's lawyer said: "Ms. Wren, in her role as an event planner, assisted many others in providing and arranging for a professionally produced and completely peaceful event at the White House Ellipse with hundreds of thousands of Americans who were in D.C. to lawfully exercise their first amendment rights, a primary pillar of American democracy. Ms. Wren was not present at the United States Capitol or the Capitol Grounds on January 6th."

Before the rally, the robocall showed that the effort to get people to march on the Capitol was backed not just by Trump activists but by a law-and-order organization in the GOP establishment.

After the riot, the robocall led to upheaval at RAGA. Then-executive director Adam Piper — who was also president of the RLDF, according to a source familiar with the organizations — resigned amid a furor. Several corporate donors said they would no longer support the group.

Piper was replaced in April by Peter Bisbee, who was executive director of RLDF at the time of the rally. Bisbee's ascension was followed by more than a half dozen resignations, many in protest, including that of then-finance director Ashley Trenzeluk. Trenzeluk's resignation letter, which was reported by Alabama Political Reporter, said Bisbee approved the robocall expenditure.

Georgia Attorney General Chris Carr stepped down as RAGA chairman after Bisbee was elected executive director, citing disagreements over the direction of the organization. Carr was also among the minority of Republican attorneys general who did not back Texas Attorney General Ken Paxton's failed effort at the U.S. Supreme Court to challenge Joe Biden's victory in four states, including Georgia.

"This fundamental difference of opinion began with vastly opposite views of the significance of the events of January 6," Carr wrote in his resignation letter. "The differences have continued as we have tried to restore RAGA's reputation internally and externally and were reflected once again during the process of choosing our next executive director."

Bisbee declined to comment for this story. A RAGA spokesman, Johnny Koremenos, did not respond to detailed questions about the robocall, including its cost, but said in a statement: "Over the last 10 months, the Republican Attorneys General Association and every Republican AG have repeatedly condemned the violence that took place on January 6. RLDF's participation in the events was limited to a robocall and those involved with those decisions are no longer with the organization."

JA0537

Piper did not respond to numerous calls and texts from The Post.

"What took place at the Capitol on Wednesday truly sickens me," he wrote in a Jan. 11 email to RAGA staffers that was obtained by The Post. "It is fully inconsistent with what I have spent my entire career fighting for — the preservation, promotion and protection of freedom and opportunity."

RLDF, a tax-exempt organization, is not required by the Internal Revenue Service to disclose its donors. The nonprofit "promotes the rule of law, federalism, and freedom in a civil society," according to its website.

"I'm calling for the Rule of Law Defense Fund with an important message," stated the robocall, which was first reported by Documented, a watchdog group that focuses on corporate influence. "The March to Save America is tomorrow in Washington D.C. at the Ellipse in President's Park between E St. and Constitution Avenue on the south side of the White House, with doors opening at 7 a.m. At 1 p.m., we will march to the Capitol building and call on Congress to stop the steal. We are hoping patriots like you will join us to continue to fight to protect the integrity of our elections. For more information, visit MarchtoSaveAmerica.com. This call is paid for and authorized by the Rule of Law Defense Fund, 202-796-5838."

The voice on the call belonged to an RLDF staffer, according to former RAGA staffers.

The website it mentioned was created by right-wing activist Ali Alexander's "Stop the Steal" team that was urging Congress to object to Biden's victory, according to a person familiar with the website and records reviewed by The Post. The website identified RAGA as a "coalition sponsor" on the morning of Jan. 3, and then later referred to RLDF as a "participating organization" in the run-up to Jan. 6, according to archived versions of the page that are no longer online.

The robocall was also promoted, along with the website, in a text sent out by American Principles Project, a Virginia-based conservative nonprofit. The text, which included a telephone number where callers could hear the RLDF robocall, called on supporters to join the president and Paxton "in DC tomorrow 2 fight for the integrity of our elections!" The Texas attorney general spoke at the rally.

Terry Schilling, executive director of the American Principles Project, declined to comment Friday. Paxton did not respond to requests for comment.

The Post was not able to determine how many people received the robocall or the text.

Fancelli, who goes by the first names Julie and Julia in public records, donated nearly $1 million to a joint account for the Trump campaign and Republican Party in 2019 and 2020, according to Federal Election Commission records.

She has been registered as a nonpartisan voter in Polk County, Florida since 2001, public records show.

Publix Super Markets has distanced itself from Fancelli, noting in a Jan. 30 tweet that she "is not involved in our business operations, nor does she represent the company in any way."

JA0538

After the 2020 election, many RAGA members joined with Trump in promoting baseless allegations of massive voter fraud. Seventeen of the 26 GOP attorneys general signed on to a brief asking the Supreme Court to reject the election results from four battleground states won by Biden.

After Jan. 6, however, Piper said in a statement that no Republican attorney general had "authorized the staff's decision" to promote the rally. "Organizationally and individually, we strongly condemn and disavow the events which occurred. Yesterday was a dark day in American history and those involved in the violence and destruction of property must be prosecuted and held accountable."

Alabama Attorney General Steve Marshall, who was then the chairman of RLDF, told reporters that decisions to support the rally were made without his knowledge and that he had ordered an internal review. "Every decision Adam made on behalf of RLDF was with the best of intentions and with the organization's best interests in mind," Marshall said in a underline statement at the time.

A handful of other Republican attorneys general expressed outraged. "I am shocked and angered by this unauthorized act by a rogue staffer, which I found out about through a press report," Ohio's Republican attorney general, Dave Yost, said in a Jan. 9 tweet. "It is the opposite of the rule of law and contrary to what I stand for."

RAGA has been a fundraising powerhouse in recent election cycles. But since Jan. 6, the organization's fundraising prowess has suffered. RAGA raised about $2 million less in the first half of 2021 than the $8.5 million it raised during the same period in 2019, according to IRS records.

A person familiar with RAGA funding said those numbers need to be considered in light of the pandemic, and noted that 2019 was an especially expensive year for the organization. Even so, after the group's role in the events of Jan. 6 was disclosed, several companies vowed to cut off donations, including Facebook and Lyft.

The U.S. Chamber of Commerce, which has supported RAGA substantially in the past, did not donate during the first half of this year.

Of the $6.7 million RAGA has received through June 2021, $2.5 million came from the Concord Group, a conservative organization founded in part by Federalist Society co-chairman Leonard Leo, according to published reports. Bisbee previously worked at the Federalist Society.

Amy Gardner, Josh Dawsey, Emma Brown and Alice Crites contributed to this report.

beth.reinhard@washpost.com

# Exhibit S

NEWS   EVENTS   CENTERS & INSTITUTES   LIBRARY   STUDENTS   FACULTY & STAFF   ALUMNI

# GEORGETOWN LAW

ADMISSIONS & AID   ACADEMICS   EXPERIENTIAL LEARNING   FACULTY RESEARCH   YOUR LIFE & CAREER

HOME / EVENTS

# A Conversation with Texas Solicitor General Judd Stone

McDonough 164 / October 27, 2022 / 12:00 pm - 1:30 pm

Organized by Federalist Society

SHARE —

A Conversation with Texas Solicitor General Judd Stone.

BACK TO EVENT LISTING



GEORGETOWN LAW

VISIT OUR CAMPUS   ABOUT   MAKE A GIFT   ACCESSIBILITY   ABA REQUIRED DISCLOSURE

600 NEW JERSEY AVENUE NW / WASHINGTON DC 20001 / 202.662.9000






JA0541

# Exhibit T

JA0542

# *University of Virginia School of Law Alumni Reception*



### *May*
# 30
2023

Tuesday
6:00 p.m.
EST

### In-Person Event

The Federalist Society's Rooftop
1776 Eye St NW
Washington, DC 20006

Join fellow alumni and current UVA students at a Federalist Society Rooftop Reception sponsored by the Freedom of Thought Project. This event will feature remarks by Hon. Ryan Baasch, Assistant Solicitor General of Texas, and Hon. Gregory Katsas, Judge, US Court of Appeals, DC Circuit.

*******

JA0543

*As always, the Federalist Society takes no position on particular legal or public policy issues; all expressions of opinion are those of the speaker.*

     

 Ryan Baasch

 Gregory G. Katsas

# Exhibit U



*State Power Review: Considering the Role of States in Preserving Freedom*

2023 Freedom of Thought Conference

**JUNE 28, 2023**

*Jun*
28
2023

Wednesday
9:00 a.m.
EST

In-Person Event

The Mayflower Hotel
1127 Connecticut Ave NW
Washington, DC 20036

| **Overview** | **6.28 Wednesday** ▶ |

9:00 a.m. – 10:30 a.m.
Panel 1: When Twitter Speaks: Control, Access, and the Role of States
State Power Review Conference



Palm Court

The Mayflower Hotel

1127 Connecticut Ave NW

Washington, DC 20036

## SHARE

## EVENT VIDEO



When Twitter Speaks: Control, Access, and the Role of States [Freedom …

## DESCRIPTION

Texas and Florida both recently adopted statutes that regulate content moderation by social media platforms. The statutes have been challenged in the Fifth and Eleventh Circuits, raising questions of how to balance the

dominant communication networks' right to exclude users and control their networks against the ability of states to require non-discriminatory treatment. To what extent is content moderation speech or expressive conduct, how should the states' power to regulate common carriers affect the constitutional analysis, and how is the Supreme Court likely to resolve these questions?

This panel will focus on the disagreement within the right we see in the competing analytical approaches from the Fifth and Eleventh Circuits.

**Featuring:**

- **Ryan Baasch**, Assistant Solicitor General, Texas Office of the Attorney General
- **Alan Gura,** Vice President for Litigation, Institute for Free Speech
- **Ray Treadwell**, Chief Deputy General Counsel, Executive Office of the Governor, State of Florida
- **Jonathan D. Urick,** Associate Chief Counsel, U.S. Chamber of Commerce Litigation Cente
- *Moderator:* **Hon. Chad A. Readler,** Judge, United States Court of Appeals, Sixth Circuit

# SPEAKERS



Ryan Baasch



Alan Gura



Chad A. Readler



Raymond Treadwell

**JA0549**



Jonathan D. Urick

 In-Person Event

---

10:45 a.m. - 12:15 p.m.
Panel 2: Corporate Power and State Power: Structural Protections for Liberty
State Power Review Conference



---

12:30 p.m. - 1:00 p.m.
Lunch
State Power Review Conference

---

1:00 p.m. - 1:45 p.m.
Fireside Chat: Corporate Power and the Rule of Law

**JA0550**

State Power Review Conference



⌄

---

2:00 p.m. - 3:30 p.m.
Panel 3: Corporate Speech and the First Amendment
State Power Review Conference



⌄

---

3:45 p.m. - 5:15 p.m.
Panel 4: Academic Freedom in Higher Education: The Role of States
Defending Freedom of Thought
State Power Review Conference



⌄

---

5:15 p.m. - 6:15 p.m.
Closing Reception
State Power Review Conference

⌄

---

Back to top

# Exhibit V

JA0552



KEN PAXTON
ATTORNEY GENERAL *of* TEXAS

()

**January 30, 2024 | Press Release**

# Texas First Assistant Attorney General to Testify at Congressional Hearing on Southern Border Invasion

Texas Attorney General Ken Paxton has assigned First Assistant Attorney General Brent Webster to testify in the United States Congress before the House Judiciary Subcommittee on the Constitution and Limited Government. First Assistant Webster will discuss Attorney General Paxton's litigation initiatives challenging the Biden Administration's unlawful immigration doctrine.

The hearing, titled "The Southern Border Crisis: The Constitution and the States," will begin at 9:00 a.m. Central Time on Tuesday, January 30, 2024. The subcommittee will "examine states' authority to secure the southern border when the federal executive fails to do so."

Attorney General Ken Paxton has been at the forefront of upholding Texas's right to defend itself against an historic invasion, routinely filing lawsuits to uphold law and order after the Biden Administration has abandoned its constitutional responsibilities. In addition to fighting Biden's open borders doctrine in federal courtrooms from Del Rio to D.C., Attorney General Paxton has rejected (https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-refuses-biden-administrations-demand-surrender-shelby-park-and-end) unlawful demand letters from the U.S. Department of Homeland Security ("DHS") on two separate occasions.

"Rather than addressing Texas's urgent requests for protection, President Biden has authorized DHS to send a threatening letter through its lawyers," Attorney General Paxton told (https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-responds-biden-administrations-demand-texas-cease-and-desist-securing) DHS. "But Texas has lawyers, too, and I will continue to stand up for this State's constitutional powers of self-defense. Instead of running to the U.S. Department of Justice in hopes of winning an injunction, you should advise your clients at DHS to do their job and follow the law."

To read more about the hearing and to watch live, click here (https://judiciary.house.gov/committee-activity/hearings/southern-border-crisis-constitution-and-states).

To read Mr. Webster's written testimony submitted to Congress, click here. (/sites/default/files/images/press/First%20Assistant%20Brent%20Webster%20Congressional%20Testimony%20FINAL.pdf)

JA0553

# Exhibit W

JA0554

# Texas Ethics Commission

## Contributions By FilerID 00051407 (COH)

### Paxton,W. Kenneth

Printed On Thu Feb 01 15:16:05 CST 2024

| REPNO | Report Type | Contributor Name | Amount ▲ | Description | Date | Employer | Occupation | City | State | Zip |
|---|---|---|---|---|---|---|---|---|---|---|
| 10086375 | RUNOFF | Judson ,Will | 1.00 | | 02-22-2022 | | Account Manager | Washington | DC | 20003 |
| 10089462 | SEMIJUL | Sartori ,Howard | 1.00 | | 06-24-2023 | Self-Employed | Engineer | Wash | DC | 20037 |
| 10089462 | SEMIJUL | Sartori ,Howard | 1.00 | | 06-23-2023 | Self-Employed | Engineer | Wash | DC | 20037 |
| 10089462 | SEMIJUL | Sartori ,Howard | 1.00 | | 06-22-2023 | Self-Employed | Engineer | Wash | DC | 20037 |
| 10089462 | SEMIJUL | Sartori ,Howard | 4.00 | | 06-27-2023 | Self-Employed | Engineer | Wash | DC | 20037 |
| 10850592 | E30DAYBEF | Sartori ,howard | 10.00 | | 01-09-2022 | | | Washington | DC | 75313 |
| 10850592 | E30DAYBEF | Sartori ,howard | 10.00 | | 01-19-2022 | | | Washington | DC | 75313 |
| 10089462 | SEMIJUL | Sartori ,Howard | 10.00 | | 06-24-2023 | Self-Employed | Engineer | Wash | DC | 20037 |
| 10089462 | SEMIJUL | Sartori ,Howard | 10.00 | | 06-21-2023 | Self-Employed | Engineer | Wash | DC | 20037 |
| 10086375 | RUNOFF | Connolly ,Ruth | 15.00 | | 03-02-2022 | | | Washington | DC | 20009 |
| 10089462 | SEMIJUL | Sartori ,Howard | 15.00 | | 06-23-2023 | Self-Employed | Engineer | Wash | DC | 20037 |

JA0555

| REPNO | Report Type | Contributor Name | Amount ▲ | Description | Date | Employer | Occupation | City | State | Zip |
|---|---|---|---|---|---|---|---|---|---|---|
| 10089462 | SEMIJUL | Sartori ,Howard | 15.00 | | 06-30-2023 | Self-Employed | Engineer | Wash | DC | 20037 |
| 10089462 | SEMIJUL | Sartori ,Howard | 15.00 | | 06-22-2023 | Self-Employed | Engineer | Washington | DC | 20037 |
| 10082937 | SEMIJUL | Bethell ,Donna | 25.00 | | 06-25-2021 | retired | | Washington | DC | 20016 |
| 10093835 | SEMIJAN | Gerstenfeld ,Roger | 25.00 | | 09-29-2023 | Retired | Retired | Washington | DC | 20016 |
| 643931 | SEMIJAN | NFIB Texas Safe Trust | 40.48 | Mailed members in support of campaign | 10-31-2014 | | | Washington | DC | 20004 |
| 10085011 | SEMIJAN | Novak ,Geraldine | 100.00 | | 09-12-2021 | retired | retired | Washington | DC | 20004 |
| 631291 | E08DAYBEF | Idelkope ,Julie Ann | 200.00 | | 10-15-2014 | Pfizer | Government Relations | Washington | DC | 20001 |
| 10085011 | SEMIJAN | Martin ,Ellen | 200.00 | | 09-21-2021 | Self | Self | Washington | DC | 20016 |
| 10068007 | SEMIJAN | Heyl ,Dean | 250.00 | | 11-15-2016 | | | Washington | DC | 20013 |
| 10086337 | RUNOFF | Martin ,Ellen | 250.00 | | 03-02-2022 | | | Washington | DC | 20016 |
| 10085533 | E08DAYBEF | Martin ,Ellen | 250.00 | | 02-16-2022 | Self | Self | Washington | DC | 20016 |
| 628740 | E30DAYBEF | Miller ,Andrew P. | 250.00 | | 08-08-2014 | | | Washington | DC | 20007 |
| 628740 | E30DAYBEF | Raman ,Sujit | 250.00 | | 08-11-2014 | | | Washington | DC | 20001 |
| 631291 | E08DAYBEF | Wessel ,Carlton | 250.00 | | 10-15-2014 | DLA Piper LLP | Partner | Washington | DC | 20008 |
| 10090530 | E08DAYBEF | Martin ,Ellen | 375.00 | | 10-07-2022 | | | Washington | DC | 20016 |
| 631291 | E08DAYBEF | Hyland ,James | 500.00 | | 10-20-2014 | The Pennsylvania Avenue Group | President & Counsel | Washington | DC | 20004 |

JA0556

| REPNO | Report Type | Contributor Name | Amount ▲ | Description | Date | Employer | Occupation | City | State | Zip |
|---|---|---|---|---|---|---|---|---|---|---|
| 100630095 | SEMIJUL | Nash ,Bernard | 500.00 | | 05-06-2016 | Cozen O'Connor | Attorney | Washington | DC | 20036 |
| 100755642 | SEMIJAN | Nash ,Bernard | 500.00 | | 12-06-2018 | Cozen O'Connor | Attorney | Washington | DC | 20036 |
| 100812191 | SEMIJAN | Strobel ,Kristin | 500.00 | | 09-25-2020 | | | Washington | DC | 20005 |
| 615379 | E08DAYBEF | APAC Texas Political Action Committe | 500.00 | | 05-14-2014 | | | Washington | DC | 20001 |
| 631291 | E08DAYBEF | Deloitte Federal Political Action Committee | 500.00 | | 10-20-2014 | | | Washington | DC | 20044 |
| 628740 | E30DAYBEF | Corkery ,Neil & Ann | 1,000.00 | | 07-28-2014 | Sudan Fund | Executive Director | Washington | DC | 20007 |
| 621621 | SEMIJUL | Dinh ,Viet | 1,000.00 | | 06-30-2014 | Bancroft PLLC | Attorney | Washington | DC | 20008 |
| 100905307 | E08DAYBEF | Domen ,Vic | 1,000.00 | | 10-12-2022 | Fulbright US LLP | Antitrust and Competition Counsel | Washington | DC | 20001 |
| 628740 | E30DAYBEF | Kalani ,Lori | 1,000.00 | | 07-22-2014 | Dickstein Shapiro | Partner | Washington | DC | 20006 |
| 100712712 | SEMIJUL | Nash ,Bernard | 1,000.00 | | 06-28-2018 | Cozen O'Connor | Attorney | Washington | DC | 20036 |
| 628740 | E30DAYBEF | Nash ,Bernard | 1,000.00 | | 07-22-2014 | Dickstein Shapiro | Partner | Washington | DC | 20006 |
| 100755810 | SEMIJUL | Nash ,Bernard | 1,000.00 | | 06-27-2019 | Cozen O'Connor | Attorney | Washington | DC | 20036 |
| 100755642 | SEMIJAN | Honeywell International PAC | 1,000.00 | | 11-02-2018 | | | Washington | DC | 20001 |
| 100755642 | SEMIJAN | Texas Transportation and Growth, a CRH Americas PAC | 1,000.00 | | 12-08-2018 | | | Washington | DC | 20001 |
| 100774281 | SEMIJAN | Hunton Andrews Kurth, LLP | 1,000.00 | | 09-03-2019 | | | Washington | DC | 20037 |
| 100774281 | SEMIJAN | Reed Smith, LLP | 1,000.00 | | 07-31-2019 | | | Washington | DC | 20005 |

JA0557

| REPNO | Report Type | Contributor Name | Amount ▲ | Description | Date | Employer | Occupation | City | State | Zip |
|---|---|---|---|---|---|---|---|---|---|---|
| 100680074 | SEMIJAN | Citizens United Political Victory Fund | 1,000.00 | | 11-29-2016 | | | Washington | DC | 20003 |
| 100724561 | E08DAYBEF | Citizens United Political Victory Fund | 1,000.00 | | 10-13-2018 | | | Washington | DC | 20003 |
| 631291 | E08DAYBEF | Texas Transportation and Growth; an Oldcastle | 1,000.00 | | 10-23-2014 | | | Washington | DC | 20001 |
| 631291 | E08DAYBEF | Citizens United Political Victory Fund | 1,000.00 | | 10-25-2014 | | | Washington | DC | 20003 |
| 628740 | E30DAYBEF | Career Education Corporation PAC | 1,000.00 | | 08-08-2014 | | | Washington | DC | 20013 |
| 628740 | E30DAYBEF | General Electric Political Action Commitee | 1,000.00 | | 09-18-2014 | | | Washington | DC | 20004 |
| 100712712 | SEMIJUL | Texas Transportation and Growth; an Oldcastle, Inc. | 1,000.00 | | 02-24-2018 | | | Washington | DC | 20001 |
| 100812191 | SEMIJAN | Cigna Corporation PAC | 1,500.00 | | 07-15-2020 | | | Washington | DC | 20004 |
| 628740 | E30DAYBEF | Gray .C. Boyden | 2,000.00 | | 09-08-2014 | Boyden Gray & Associates | Founding Partner | Washington | DC | 20007 |
| 100774281 | SEMIJAN | News Corp PAC | 2,000.00 | | 07-18-2019 | | | Washington | DC | 20001 |
| 643931 | SEMIJAN | Twenty-First Century Fox, Inc. | 2,000.00 | | 12-13-2014 | | | Washington | DC | 20001 |
| 100630095 | SEMIJUL | Altria Group, Inc. PAC | 2,000.00 | | 04-07-2016 | | | Washington | DC | 20001 |
| 100774281 | SEMIJAN | Gray .C. Boyden | 2,500.00 | | 12-31-2019 | Boyden Gray & Associates | Attorney | Washington | DC | 20007 |
| 100724561 | E08DAYBEF | American Resort Development Association | 2,500.00 | | 10-01-2018 | | | Washington | DC | 20005 |
| 100774281 | SEMIJAN | Altria Group, Inc. PAC | 2,500.00 | | 11-29-2019 | | | Washington | DC | 20001 |
| 100774281 | SEMIJAN | Citigroup, Inc. PAC | 2,500.00 | | 07-18-2019 | | | Washington | DC | 20004 |

JA0558

| REPNO | Report Type | Contributor Name | Amount ▲ | Description | Date | Employer | Occupation | City | State | Zip |
|---|---|---|---|---|---|---|---|---|---|---|
| 100680074 | SEMIJAN | Altria Group, Inc. PAC | 2,500.00 | | 12-10-2016 | | | Washington | DC | 20001 |
| 100876775 | E30DAYBEF | AMERICAN RESORT DEVELOPMENT | 2,500.00 | | 09-29-2022 | | | Washington | DC | 20005 |
| 100724561 | E08DAYBEF | Hewlett Packard Enterprise Company PAC | 2,500.00 | | 10-05-2018 | | | Washington | DC | 20001 |
| 615379 | E08DAYBEF | Deloitte Federal Political Action Committee | 2,500.00 | | 04-28-2014 | | | Washington | DC | 20044 |
| 631291 | E08DAYBEF | Dickstein Shapiro LLP | 2,500.00 | | 10-15-2014 | | | Washington | DC | 20006 |
| 628740 | E30DAYBEF | Dickstein Shapiro LLP | 2,500.00 | | 08-11-2014 | | | Washington | DC | 20006 |
| 628740 | E30DAYBEF | NFIB Texas Safe Trust | 2,500.00 | | 09-16-2014 | | | Washington | DC | 20004 |
| 100774281 | SEMIJAN | Phillips 66 PAC | 2,500.66 | | 07-01-2019 | | | Washington | DC | 20004 |
| 100774281 | SEMIJAN | Cigna Corporation PAC | 3,000.00 | | 12-04-2019 | | | Washington | DC | 20004 |
| 100690774 | SEMIJAN | Cigna Corporation PAC | 5,000.00 | | 08-17-2017 | | | Washington | DC | 20004 |
| 100774281 | SEMIJAN | The Home Depot, Inc. PAC | 5,000.00 | | 12-21-2019 | | | Washington | DC | 02004 |
| 100680074 | SEMIJAN | Google NETPAC | 5,000.00 | | 11-23-2016 | | | Washington | DC | 20001 |
| 100755642 | SEMIJAN | Altria Group, Inc. PAC | 5,000.00 | | 10-29-2018 | | | Washington | DC | 20001 |
| 100724561 | E08DAYBEF | Cigna Corporation PAC | 5,000.00 | | 10-05-2018 | | | Washington | DC | 20004 |
| 100722355 | E30DAYBEF | Citigroup, Inc. PAC | 5,000.00 | | 08-10-2018 | | | Washington | DC | 20004 |
| 621621 | SEMIJUL | Waste Management PAC | 5,000.00 | | 06-05-2014 | | | Washington | DC | 20004 |

JA0559

| REPNO | Report Type | Contributor Name | Amount ▲ | Description | Date | Employer | Occupation | City | State | Zip |
|---|---|---|---|---|---|---|---|---|---|---|
| [631291](#) | E08DAYBEF | Citigroup Inc. Political Action Committee | 5,000.00 | | 10-25-2014 | | | Washington | DC | 20004 |
| [628740](#) | E30DAYBEF | Google Inc. NetPAC | 5,000.00 | | 08-15-2014 | | | Washington | DC | 20007 |
| [643931](#) | SEMIJAN | Altria Group, Inc. Political Action Committee | 5,000.00 | | 12-11-2014 | | | Washington | DC | 20001 |
| [643931](#) | SEMIJAN | Altria Group, Inc. Political Action Committee | 5,000.00 | | 11-19-2014 | | | Washington | DC | 20001 |
| [10680074](#) | SEMIJAN | Gray ,C. Boyden | 5,400.00 | | 11-23-2016 | Boyden, Gray & Associates | Attorney | Washington | DC | 20007 |
| [10722355](#) | E30DAYBEF | Republican Attorneys General Association | 7,500.00 | campaign services | 08-23-2018 | | | Washington | DC | 20006 |
| [10712712](#) | SEMIJUL | Nextera Energy PAC | 7,500.00 | | 06-16-2018 | | | Washington | DC | 20004 |
| [10680074](#) | SEMIJAN | Republican Attorneys General Association | 8,025.50 | airfare to attend RAGA events at the RNC | 07-01-2016 | | | Washington | DC | 20006 |
| [10755642](#) | SEMIJAN | The Home Depot, Inc. PAC | 10,000.00 | | 10-30-2018 | | | Washington | DC | 20004 |
| [10724561](#) | E08DAYBEF | Anthem, Inc. PAC | 10,000.00 | | 10-17-2018 | | | Washington | DC | 20004 |
| [10790338](#) | SEMIJUL | ARDA ROC-PAC | 10,000.00 | | 02-27-2020 | | | Washington | DC | 20005 |
| [10722355](#) | E30DAYBEF | Kochpac - Koch Industries, Inc | 10,000.00 | | 09-27-2018 | | | Washington | DC | 20005 |
| [631291](#) | E30DAYBEF | Republican Attorneys General Association | 10,000.00 | | 10-15-2014 | | | Washington | DC | 20006 |
| [628740](#) | E08DAYBEF | Koch Industries Political Action Committee | 10,000.00 | | 09-02-2014 | | | Washington | DC | 20005 |
| [643931](#) | SEMIJAN | Union Pacific Corporation Fund for Effective | 10,000.00 | | 11-02-2014 | | | Washington | DC | 20005 |
| [643931](#) | SEMIJAN | Home Depot Inc. Political Action Committee | 10,000.00 | | 11-02-2014 | | | Washington | DC | 20004 |

JA0560

| REPNO | Report Type | Contributor Name | Amount ▲ | Description | Date | Employer | Occupation | City | State | Zip |
|---|---|---|---|---|---|---|---|---|---|---|
| 100638095 | SEMIJUN | Home Depot PAC | 10,000.00 | | 06-30-2016 | | | Washington | DC | 20004 |
| 100712712 | SEMIJUL | Kochpac - Koch Industries, Inc | 10,000.00 | | 04-20-2018 | | | Washington | DC | 20005 |
| 100724561 | E08DAYBEF | Republican Attorneys General Association | 14,000.00 | campaign polling | 10-16-2018 | | | Washington | DC | 20006 |
| 100712712 | SEMIJUL | Republican Attorneys General Association | 50,000.00 | | 06-27-2018 | | | Washington | DC | 20006 |
| 100674309 | SEMIJUL | Republican Attorneys General Association | 100,000.00 | | 06-28-2017 | | | Washington | DC | 20006 |
| 100829374 | SEMIJUL | Republican Attorneys General Association | 250,000.00 | | 06-29-2021 | | | Washington | DC | 20006 |
| 100850113 | SEMIJAN | Republican Attorneys General Association | 250,000.00 | | 12-31-2021 | | | Washington | DC | 20006 |
| 100724561 | E08DAYBEF | Republican Attorneys General Association | 500,000.00 | | 10-23-2018 | | | Washington | DC | 20006 |
| | | | | | | | | | | |

**JA0561**

# Exhibit X

JA0562

POLITICO PRO

# Texas Attorney General Paxton named new RAGA chair

By Daniel Strauss

11/12/2018 02:39 PM EST

Texas Attorney General Ken Paxton has been named the new chair of the Republican Attorneys General Association for the 2019 election cycle.

Paxton succeeds Arkansas Attorney General Leslie Rutledge as chair of the organization. Indiana Attorney General Curtis Hill will serve as vice chair.

"The trust of Texas voters, and of my fellow Republican attorneys general, must be earned," Paxton said in a statement. "I'm honored to receive their trust and excited to get to work as chairman. 2018 was a challenging year but the Republican Attorneys General Association is a formidable organization that has proven it can win in any political environment. I'm excited to build on that success, because we're going on offense in 2019 to elect rule of law champions in Kentucky, Mississippi as well as re-electing Attorney General Jeff Landry in Louisiana. I will pledge to always stand up for the law, to stand up for an individual's right to govern themselves."

Paxton was confirmed by the organization on Sunday. The other members of RAGA's executive committee for 2019 are Landry, Rutledge, Georgia Attorney General Chris Carr, Alabama Attorney General Steve Marshall, Nebraska Attorney General Doug Peterson, Utah Attorney General Sean Reyes, and Kansas Attorney General Derek Schmidt.

JA0563

# Exhibit Y

JA0564



# Texas Ethics Commission

## Selected Expenditures By Transaction Name Like

Printed On Thu Feb 01 16:10:06 CST 2024

| REPNO | FilerID | Filer Name ▽ | Expenditure | Amount | Description | Date | Expenditure Category | Schedule | City | State | Zip |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 100755810 | 51407 | Paxton ,W. Kenneth | Aramark, , | 116.16 | food and beverage for | 03-06-2019 | FOOD | F1 | Washington | DC | 20004 |
| 100690774 | 51407 | Paxton ,W. Kenneth | BLT Prime, , | 144.00 | campaign staff meal | 11-20-2017 | FOOD | F1 | Washington | DC | 20004 |
| 100674309 | 51407 | Paxton ,W. Kenneth | Blue Duck Tavern, , | 122.30 | campaign staff meeting | 02-27-2017 | FOOD | F1 | Washington | DC | 20037 |
| 100712712 | 51407 | Paxton ,W. Kenneth | Capital Grille, , | 118.44 | meeting to discuss | 04-25-2018 | FOOD | F1 | Washington | DC | 20004 |
| 631291 | 51407 | Paxton ,W. Kenneth | Capitol Hill Club, , | 7.66 | Meeting with donor | 10-15-2014 | FUNDRAISE | F1 | Washington | DC | 20003 |
| 100855336 | 51407 | Paxton ,W. Kenneth | Carroll Travel, , | 40.00 | campaign travel | 01-26-2022 | TRAVELOUT | F1 | Washington | DC | 20002 |
| 100855336 | 51407 | Paxton ,W. Kenneth | Carroll Travel, , | 40.00 | campaign travel | 01-25-2022 | TRAVELOUT | F1 | Washington | DC | 20002 |
| 100619439 | 51407 | Paxton ,W. Kenneth | Council for National Policy , | 2,600.00 | officeholder conference | 10-06-2015 | FEES | F1 | Washington | DC | 20005 |
| 100619439 | 51407 | Paxton ,W. Kenneth | Council for National Policy , | 1,000.00 | campaign reception | 10-06-2015 | EVENT | F1 | Washington | DC | 20005 |
| 100638476 | 51407 | Paxton ,W. Kenneth | Council for National Policy , | 1,000.00 | campaign reception | 10-06-2015 | EVENT | F1 | Washington | DC | 20005 |
| 100638476 | 51407 | Paxton ,W. Kenneth | Council for National Policy , | 2,600.00 | officeholder conference | 10-06-2015 | FEES | F1 | Washington | DC | 20005 |
| 100626673 | 51407 | Paxton ,W. Kenneth | Courtyard Marriott, , | 285.1 | hotel for RAGA conference | 01-31-2015 | TRAVELOUT | F1 | Washington | DC | 20009 |

JA0565

| REPNO | FilerID | Filer Name ▽ | Expenditure | Amount | Description | Date | Expenditure Category | Schedule | City | State | Zip |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 100755642 | 51407 | Paxton ,W. Kenneth | Del Frisco's Grille , | 135.86 | meeting to discuss | 12-06-2018 | FOOD | F1 | Washington | DC | 20004 |
| 100755810 | 51407 | Paxton ,W. Kenneth | Del Frisco's Grille , | 148.25 | food and beverage for | 03-05-2019 | FOOD | F1 | Washington | DC | 20004 |
| 100755810 | 51407 | Paxton ,W. Kenneth | Del Frisco's Grille , | 149.95 | food and beverage for | 04-29-2019 | FOOD | F1 | Washington | DC | 20004 |
| 100262673 | 51407 | Paxton ,W. Kenneth | Embassy Suites , | 524.41 | lodging for Chip Roy | 06-27-2015 | TRAVELOUT | F1 | Washington | DC | 20037 |
| 631291 | 51407 | Paxton ,W. Kenneth | Embassy Suites , | 319.46 | overnight lodging for fundraiser in | 10-17-2014 | FUNDRAISE | F1 | Washington | DC | 20037 |
| 100262673 | 51407 | Paxton ,W. Kenneth | Embassy Suites , | 50.00 | food expense | 02-27-2015 | FOOD | F1 | Washington | DC | 20037 |
| 100262673 | 51407 | Paxton ,W. Kenneth | Embassy Suites , | 786.63 | hotel for RAGA conference for | 02-27-2015 | TRAVELOUT | F1 | Washington | DC | 20037 |
| 100262673 | 51407 | Paxton ,W. Kenneth | Embassy Suites , | 786.63 | hotel for RAGA conference for | 02-27-2015 | TRAVELOUT | F1 | Washington | DC | 20037 |
| 628740 | 51407 | Paxton ,W. Kenneth | Mortons , | 2,847.86 | food/beverage for fundraising | 07-31-2014 | FUNDRAISE | F1 | Washington | DC | 20036 |
| 100774281 | 51407 | Paxton ,W. Kenneth | One Washington Circle Hotel , | 120.33 | lodging for campaign staff | 09-25-2019 | TRAVELOUT | F1 | Washington | DC | 20037 |
| 100262673 | 51407 | Paxton ,W. Kenneth | Park Hyatt , | 12.00 | Parking for staff for campaign | 02-24-2015 | TRAVELOUT | F1 | Washington | DC | 20037 |
| 100638095 | 51407 | Paxton ,W. Kenneth | Park Hyatt Washington DC , | 1,236.60 | hotel stay for campaign related | 02-25-2016 | TRAVELOUT | F1 | Washington | DC | 20037 |
| 100638095 | 51407 | Paxton ,W. Kenneth | Park Hyatt Washington DC , | 196.86 | RAGA event expense | 02-20-2016 | FOOD | F1 | Washington | DC | 20037 |
| 100638476 | 51407 | Paxton ,W. Kenneth | Ritz Carlton , | 1,010.00 | campaign reception | 10-06-2015 | EVENT | F1 | Washington | DC | 20037 |
| 100619439 | 51407 | Paxton ,W. Kenneth | Ritz Carlton , | 1,010.00 | campaign reception | 10-06-2015 | EVENT | F1 | Washington | DC | 20037 |
| 100674309 | 51407 | Paxton ,W. Kenneth | Supreme Court Historical Society , | 289.66 | auction item for Denton County | 02-28-2017 | DONATIONS | F1 | Washington | DC | 20543 |

**JA0566**

| REPNO | FilerID | Filer Name ▽ | Expenditure | Amount | Description | Date | Expenditure Category | Schedule | City | State | Zip |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 100673309 | 51407 | Paxton ,W. Kenneth | The Dubliner , | 127.89 | campaign staff meal | 03-01-2017 | FOOD | F1 | Washington | DC | 20001 |
| 100712712 | 51407 | Paxton ,W. Kenneth | The Ritz-Carlton , | 392.62 | lodging for campaign related travel | 02-24-2018 | TRAVELOUT | F1 | Washington | DC | 20037 |
| 631291 | 51407 | Paxton ,W. Kenneth | Uber , | 18.00 | (See travel info) | 10-07-2014 | TRAVELOUT | F1 | Washington | DC | 20036 |
| 100262673 | 51407 | Paxton ,W. Kenneth | Uber , | 60.23 | campaign related travel | 02-24-2015 | TRAVELOUT | F1 | Washington | DC | 20036 |
| 631291 | 51407 | Paxton ,W. Kenneth | Uber , | 121.00 | (See travel info) | 10-15-2014 | TRAVELOUT | F1 | Washington | DC | 20036 |
| 100638095 | 51407 | Paxton ,W. Kenneth | Uber , | 110.28 | campaign staff travel | 05-01-2016 | TRAVELOUT | F1 | Washington | DC | 20036 |
| 631291 | 51407 | Paxton ,W. Kenneth | Uber , | 12.00 | (See travel info) | 10-07-2014 | TRAVELOUT | F1 | Washington | DC | 20036 |
| 631291 | 51407 | Paxton ,W. Kenneth | Uber , | 24.00 | (See travel info) | 10-07-2014 | TRAVELOUT | F1 | Washington | DC | 20036 |
| 631291 | 51407 | Paxton ,W. Kenneth | Uber , | 19.00 | (See travel info) | 10-07-2014 | TRAVELOUT | F1 | Washington | DC | 20036 |
| 631291 | 51407 | Paxton ,W. Kenneth | Uber , | 29.00 | (See travel info) | 10-07-2014 | TRAVELOUT | F1 | Washington | DC | 20036 |
| 631291 | 51407 | Paxton ,W. Kenneth | Uber , | 14.00 | (See travel info) | 10-07-2014 | TRAVELOUT | F1 | Washington | DC | 20036 |
| 615379 | 51407 | Paxton ,W. Kenneth | United States Treasury , | 4,048.00 | payroll taxes | 04-22-2014 | OTHER | F1 | Washington | DC | 20220 |
| 631291 | 51407 | Paxton ,W. Kenneth | Uber , | 49.00 | (See travel info) | 10-07-2014 | TRAVELOUT | F1 | Washington | DC | 20036 |
| 100673309 | 51407 | Paxton ,W. Kenneth | Washington Marriott Georgetown , | 218.39 | campaign staff lodging | 02-25-2017 | TRAVELOUT | F1 | Washington | DC | 20037 |
| 100673309 | 51407 | Paxton ,W. Kenneth | Washington Marriott Georgetown , | 208.39 | lodging for campaign related travel | 02-25-2017 | TRAVELOUT | F1 | Washington | DC | 20037 |
| 631291 | 51407 | Paxton ,W. Kenneth | Whos Cooking , | 290.49 | food for 10/15 breakfast | 10-15-2014 | EVENT | F1 | Washington | DC | 20002 |

| REPNO | FilerID | Filer Name ▽ | Expenditure | Amount | Description | Date | Expenditure Category | Schedule | City | State | Zip |
|--------|---------|--------------|-------------|--------|-------------|------|---------------------|----------|------|-------|-----|
| 628740 | 51407 | Paxton ,W. Kenneth | Wilson Perkins Allen Opinion Research , | 2,100.00 | campaign survey | 09-08-2014 | POLLING | F1 | Washington | DC | 20003 |

JA0568

**Surreply**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:24-cv-147-APM |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | |
| Defendant. | |

**DEFENDANT'S SUR-REPLY TO PLAINTIFFS' REPLY BRIEF**

JA0570

**INTRODUCTION**

Defendant Ken Paxton in his official capacity as Attorney General of the State of Texas respectfully files this sur-reply in compliance with this Court's minute order of February 7, 2024, addressing the following issue:

> *Whether the Defendant's hiring of a process server to physically serve the Civil Investigation Demand (CID) in the District of Columbia supports a finding of personal jurisdiction under subsections (a)(1) and (a)(3) of the D.C. long-arm statute.*

**I.    Hiring a process server to deliver a CID to Media Matters in D.C. does not support a finding of personal jurisdiction under section (a)(1).**

Subsection (a)(1) requires a defendant to intentionally engage in a "commercial or business-related activity" directed toward D.C. persons.  *Capel v. Capel*, 272 F. Supp. 3d 33, 39 (D.D.C. 2017) (quoting *Holder v. Haarman & Reimer Corp.*, 779 A.2d 264, 270–71 (D.C. 2001)). Such activities include "negotiating or performing contracts," *Trump v. Comm. on Ways & Means, U.S. House of Reps.*, 415 F. Supp. 3d 98, 107 (D.D.C. 2019) (citing *Helmer v. Doletskaya*, 393 F.3d 201, 206–07 (D.C. Cir. 2004)) (compiling cases), contractual activities outside D.C. if they create consequences within D.C., *id.* (citing *Mouzavires v. Baxter*, 434 A.2d 988, 992 (D.C. 1981)), and advertising, *id.* (citing *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 330–32 (D.C. 2000) (en banc)).  But merely hiring a process server does not qualify.

D.C. courts have defined transacting business as to both the commercial and ongoing nature of the activity in question.  First, "under section 13-423(a)(1), the plaintiff must show that the defendant has purposefully engaged in some type of commercial or business-related activity directed at District residents."  *Holder*, 779 A.2d at 270–71; *see also West v. Holder*, 60 F. Supp. 3d 190, 195 (D.D.C. 2014), *aff'd sub nom. West v. Lynch*, 845 F.3d 1228 (D.C. Cir. 2017) (holding that "contacts falling under the 'transacting any business provision' usually must be commercial"). Second, "doing business" under subsection (a)(1) may include "any *continuing corporate presence*

in the forum state directed at advancing the corporation's objectives." *AMAF Int'l Corp. v. Ralston Purina Co.*, 428 A.2d 849, 851 (D.C. 1981) (emphasis added); *see also Price v. Griffin*, 359 A.2d 582, 586 (D.C. 1976) (emphasis added).  In contrast, claims alleging tortious injury, such as here, "do not fit that description." *Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987).  Here, Defendant Paxton has not engaged in any *commercial* activity, nor has he established a continuing corporate presence in D.C.  Thus, this Court does not have personal jurisdiction under subsection (a)(1).

Media Matters argues that "the 'transacting any business' prong is 'not necessarily limited to acts which are a part of commerce or transactions for profit'" by citing Maryland precedent in that regard.  Reply at 4–5 n.2 (ECF No. 28).  In reality, the two D.C. Circuit cases that Media Matters cites merely state that subsection (a)(1) and its statutory counterpart in Maryland are coextensive with the limits of due process—not that "transacting business" encompasses any non-commercial conduct.  *See Steinberg v. Int'l Crim. Police Org.*, 672 F.2d 927, 931 n.7 (D.C. Cir. 1981) ("The District of Columbia Court of Appeals has concluded that the 'transacting any business' provision of the Long Arm Statute is coextensive with the due process measure, but has not yet determined the limits of other sections."); *see also Margoles v. Johns*, 483 F.2d 1212, 1221 (D.C. Cir. 1973).

Moreover, Defendant Paxton was sued in his official capacity as the Attorney General of the State of Texas—not as an individual.  "[A] suit against a state official in his or her official capacity is not a suit against the official as an individual, but rather is a suit against the official's office." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).  Consequently, "States do not fall under D.C.'s long-arm statute, because the statute only allows the District to 'exercise personal jurisdiction over a person,'" defined as "an individual, his executor, administrator, or other personal representative, or a corporation, partnership, association, or any other legal or

commercial entity . . . ." *West*, 60 F. Supp. 3d at 195 (quoting D.C. CODE § 13-421); *see also* D.C. CODE § 13-421.  Courts in this district have held that "[t]he law is clear that a persistent course of conduct may be deemed to constitute the transaction of business for the assertion of personal jurisdiction *only* if that persistent conduct is undertaken in that person's *individual capacity* rather than an official capacity conducting business for his employer." *Pollack v. Meese*, 737 F. Supp. 663, 666 (D.D.C. 1990) (emphasis added).  And that conclusion finds further support in the D.C. Circuit's well-established holding that D.C.'s long-arm statute does not apply to States themselves. *United States v. Ferrera*, 54 F.3d 825, 831–32 (D.C. Cir. 1995).

Second, neither the D.C. Court of Appeals nor the D.C. Circuit has ever held that a claim of personal jurisdiction against a non-forum statewide official acting in his official capacity can be construed as a suit against that official in his individual capacity, which is what would be necessary for the long-arm statute to apply here at all.  *See Trump*, 415 F. Supp. 3d at 106; *West*, 60 F. Supp. 3d at 196.

Lastly, construing this suit as one against Attorney General Paxton in his individual capacity would be extraordinarily improper because Plaintiffs do not, and cannot, plead facts sufficient to claim individual liability.

## II.    Hiring a process server to deliver a CID to Media Matters in D.C. does not support a finding of personal jurisdiction under section (a)(3).

First, "limited communications initiated from outside the District of Columbia to a District resident do not qualify as an act 'in the District' for purposes of § 13-423(a)(3)." *Dyson v. Dutko Ragen Homes & Invs.*, No. 21-CV-02280 (APM), 2022 WL 1294484, at *4 (D.D.C. Apr. 27, 2022).  And use of a process server is simply a delivery mechanism akin to delivering a letter from

**JA0573**

Texas—not an invocation of agency on the part of the server.  Moreover, the act of hiring a process server is a governmental action, under the investigatory authority of the Texas Attorney General.[1]

Second, regardless of those realities, the hiring of a process server cannot constitute an "act or omission" within D.C., as required by subsection (a)(3).  That provision "stops short of the outer limits of due process" and requires "commit[ting] an act in the District which causes injury in the District."  *Forras v. Rauf*, 812 F.3d 1102, 1107 (D.C. Cir. 2016) (internal quotation marks omitted).  The import of Plaintiffs' claim that a process server was hired and delivered the CID in D.C. concerns personal jurisdiction, not a tort in and of itself, and for the reasons stated herein— that is not enough to establish personal jurisdiction.

Media Matters nonetheless relies on *Schleit v. Warren*, 693 F. Supp. 416 (E.D. Va. 1988), and various other Virginia precedents to argue that using a process server to serve the CID was tortious conduct that occurred in D.C.  But in *Schliet*, the service itself was tortious because the claim in question was service of *abusive* process.  693 F. Supp. at 418 ("The narrow issue before the court is whether a party's service of abusive process confers jurisdiction over that party in the forum where process is served . . . .").  Here, in contrast, service of the CID functioned as an **official act** of a state law enforcement officer as part of an investigation, specifically to compel document production.  And "the power to compel the production of the records of any organization, whether it be incorporated or not, arises out of the inherent and necessary power of the . . . state governments to enforce their laws."  *United States v. White*, 322 U.S. 694, 700–01 (1944).

But even if it were the act of serving papers within D.C. that Plaintiffs claim is an injurious act, simply retaining a process server to serve papers on a D.C. plaintiff is insufficient to establish

---

[1] Notably, CIDs are commonly issued by all U.S. State Attorneys General, and so the ramifications of this ruling would affect the entire regulatory authority in all States—not just Texas.

JA0574

personal jurisdiction.  *See Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1194 (D.C. Cir. 2013)

(holding "retain[ing] the professional services of a District of Columbia firm" is not enough).

Attorney General Paxton has taken no other action, and Plaintiffs have no evidence of additional

actions that are imminent.  Quite the contrary, they are speculative.  The D.C. Circuit rejects

"conclusory statements and intimations" as being sufficient to establish jurisdiction.  *GTE New

Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C. Cir. 2000).  Plaintiffs have not

pled facts that satisfy subsection (a)(3).

**III.    A finding of personal jurisdiction in this matter would be unprecedented, with long-
          reaching ramifications to every States' Attorneys General.**

The unprecedented character of Plaintiffs' argument also counsels against a holding that

this Court has personal jurisdiction over Attorney General Paxton based on Plaintiffs' claims.  It

is highly unusual for a court to exercise personal jurisdiction over an out-of-state government

official, as personal jurisdiction commonly concerns "commercial transactions," not investigatory

authority vested upon an Attorney General under a foreign State's statutory law.  *See, e.g., Kulko

v. Super. Ct.*, 436 U.S. 84, 97 (1978).  A number of D.C. cases have dealt with the issue of personal

jurisdiction over a government official, raising a serious concern over whether the D.C. long-arm

statute would even allow such a finding.  *See Kwok Sze v. Johnson*, 172 F. Supp. 3d 112, 123

(D.D.C. 2016) ("States are not considered to be 'legal or commercial entities' meaning they are

not included under [D.C.'s] long-arm statute."); *West*, 60 F. Supp. 3d at 194 (Bates, J.) (materially

similar); *Phillips v. Montana Comm'n on Character & Fitness*, No. 20-1982 (CKK), 2021 WL

1721601, at *6 (D.D.C. Apr. 30, 2021) (Kollar-Kotelly, J.) (materially similar).

For all of the reasons set forth herein, and in Defendant's opposition to Plaintiffs' motion

for preliminary injunction (ECF No. 26), the Court should deny Plaintiffs' motion.

**JA0575**

Dated: February 9, 2024

Respectfully submitted,

/s/ Gene C. Schaerr
GENE C. SCHAERR
  (D.C. Bar No. 416368)
KENNETH A. KLUKOWSKI
  (D.C. Bar No. 1046093)
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, D.C. 20006
gschaerr@schaerr-jaffe.com
kklukowski@schaerr-jaffe.com

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

CHRISTOPHER LAVORATO*
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4476
chris.lavorato@oag.texas.gov

REUBEN W. BLUM*
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4117
reuben.blum@oag.texas.gov

*Admitted *pro hac vice*

*Attorneys for Defendant Ken Paxton, Attorney General of the State of Texas*

**JA0576**

# Motion to dismiss for lack of jurisdiction

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:24-cv-147-APM |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | |
| Defendant. | |

**DEFENDANT'S MOTION TO DISMISS**

Defendant Ken Paxton in his official capacity as Attorney General of the State of Texas respectfully moves under Fed. R. Civ. P. 12(b)(1)-(3) to dismiss Plaintiffs' Complaint (ECF No. 1). Specifically, this Court lacks subject-matter jurisdiction over this case, the Court lacks personal jurisdiction over Defendant, and venue is improper, all for the reasons stated in Defendant's Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 26) and Sur-reply brief (ECF No. 30).

**JA0578**

Dated: February 9, 2024

/s/ Gene C. Schaerr
GENE C. SCHAERR
  (D.C. Bar No. 416368)
KENNETH A. KLUKOWSKI
  (D.C. Bar No. 1046093)
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, D.C. 20006
gschaerr@schaerr-jaffe.com
kklukowski@schaerr-jaffe.com

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

CHRISTOPHER LAVORATO*
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4476
chris.lavorato@oag.texas.gov

REUBEN W. BLUM*
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4117
reuben.blum@oag.texas.gov

*Admitted *pro hac vice*

*Attorneys for Defendant Ken Paxton, Attorney General of the State of Texas*

**JA0579**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MEDIA MATTERS FOR AMERICA, *et al.*,

      Plaintiffs,

   v.

WARREN KENNETH PAXTON JR., in his
official capacity as Attorney General of the
State of Texas,

      Defendant.

Civil Action No. 1:24-cv-147-APM

**[PROPOSED] ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

   This Court has considered Defendant's Motion to Dismiss, Plaintiffs' opposition to Defendant's Motion, and any replies thereto and for good cause shown Defendant's motion is **GRANTED.**

    **SO ORDERED** _____, 2024.

_____
Amit P. Mehta
UNITED STATES DISTRICT JUDGE

**JA0580**

# Transcript of hearing

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MEDIA MATTERS FOR AMERICA, ET AL., )
                                    )
          Plaintiffs,               )
                                    )   CV No. 24-00147
     vs.                            )   Washington, D.C.
                                    )   February 15, 2024
WARREN KENNETH PAXTON, JR.,         )   10:00 a.m.
                                    )
          Defendant.                )
_____ )


  TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING PROCEEDINGS
        BEFORE THE HONORABLE AMIT P. MEHTA
           UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff Media:          Aria C. Branch
                              Christopher Dooley Dodge
                              Samuel Ward-Packard
                              ELIAS LAW GROUP LLP
                              250 Massachusetts Avenue NW
                              Suite 400
                              Washington, D.C. 20001
                              (202) 968-4518
                              Email: abranch@elias.law

```
APPEARANCES CONTINUED:

For the Defendant:          Gene C. Schaerr
                            Kenneth A. Klukowski
                            SCHAERR JAFFE LLP
                            1717 K Street NW
                            Suite 900
                            Washington, D.C. 20006
                            (202) 787-1060
                            Email:
                            gschaerr@schaerr-jaffe.com

                            Christopher Lavorato
                            Reuben William Blum
                            OFFICE OF THE ATTORNEY GENERAL
                            General Litigation Division
                            P.O. Box 12548
                            MC-019-1
                            Austin, TX 78711
                            (512) 475-4476
                            Email:
                            Chris.lavorato@oag.texas.gov

Court Reporter:             William P. Zaremba
                            Registered Merit Reporter
                            Certified Realtime Reporter
                            Official Court Reporter
                            E. Barrett Prettyman CH
                            333 Constitution Avenue, NW
                            Washington, D.C. 20001
                            (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription
```

```
 1                    P R O C E E D I N G S
 2          COURTROOM DEPUTY:  This court is now in session;
 3   the Honorable Judge Amit P. Mehta presiding.
 4          THE COURT:  Good morning.  Please be seated,
 5   everyone.
 6          COURTROOM DEPUTY:  Good morning, Your Honor.
 7   We're on the record in Civil Case 24-147, Media Matters for
 8   America, et al., versus Warren Kenneth Paxton, Jr.
 9          We have Ms. Aria Branch, Christopher Dodge, and
10   Samuel Ward Packard for plaintiffs.
11          And we have Mr. Gene Schaerr, Kenneth Klukowski,
12   Chris Lavorato, and Reuben Blum for the defense.
13          THE COURT:  All right.  Good morning, Counsel.
14   Nice to be with all of you.
15          Okay.  So we're here this morning to discuss the
16   plaintiffs' motion for preliminary injunction.
17          So I've read the papers, but I'm happy to hear
18   further argument and have some questions for both sides.
19          So why don't we begin with the plaintiffs'
20   counsel.
21          MS. BRANCH:  Good morning, Your Honor, and may it
22   please the Court.
23          THE COURT:  Good morning.
24          MS. BRANCH:  Aria Branch for the plaintiffs.
25          Plaintiffs asked this Court to confirm that
```

1   members of the press can do their most essential work,

2   investigative journalism about powerful public figures,

3   without being threatened by high-ranking government

4   officials halfway across the country who disagree with their

5   politics and viewpoints.

6       Elon Musk declared war against my clients because

7   of their unflinching reporting, and he and his allies have

8   been going around publicly recruiting State Attorneys

9   General to help deliver his payback.

10      Texas Attorney General Ken Paxton answered the

11  call immediately.  But as he himself has said in amicus

12  briefing in the ExxonMobil case, which is cited in our

13  papers, State Attorney Generals certainly have power to

14  investigate, however, "this does not include the power to

15  engage in unrestrained investigative excursions to

16  promulgate a social ideology or chill the expressions of

17  points of view."

18      Yet that is precisely what Paxton has done here.

19  He has weaponized his state authority and issued a

20  wide-ranging demand for Media Matters to hand over its most

21  sensitive documents, internal documents, internal and

22  external communications, donor lists, and the list goes on.

23      In the press release announcing his investigation,

24  he did not hide his motive for commencing it.  He called

25  Media Matters a radical anti-free speech organization, and

1    he has not hidden his personal motive throughout the course

2    of this litigation.

3           Unsurprisingly, his harassment campaign is

4    working.  And the plaintiffs are self-muzzling out of fear

5    of further harassment and retaliation.  In legal parlance,

6    they are chilled.

7           There is no free press in America if high-ranking

8    government officials can invite themselves into a

9    journalist's place of business to open the drawers, to go

10   through computer drives and copy the donor lists of any

11   publisher in the country anytime an article is written that

12   they simply disagree with.

13          We ask that this Court enjoin Paxton's efforts to

14   do just that, and he has made clear that he will not stop

15   unless and until this Court tells him to.

16          I understand that the key disputes in this case

17   revolve around the where and the when of this lawsuit:  Can

18   plaintiffs sue here?  And can they sue now?  And the answer

19   to both questions is yes.

20          THE COURT:  Ms. Branch, if I could interrupt you.

21          Am I correct that you have -- you sued Mr. Paxton

22   in his official capacity, correct?

23          MS. BRANCH:  That is correct, Your Honor.

24          THE COURT:  And so would you also agree then I am

25   supposed to treat Mr. Paxton as if he is not an individual

1    but the State of Texas?

2              MS. BRANCH:  No, Your Honor.

3              And I would note that this argument that

4    Ken Paxton is not a person under the D.C. long-arm statute

5    is one that was raised in the defendant's surreply.  I don't

6    think it was properly raised because I don't think it was

7    responsive to and within the scope of Your Honor's order.

8              That said, this argument is also wrong.  The

9    plaintiffs sued Paxton and not the State of Texas because it

10   is Paxton who has unlawfully and unconstitutionally using

11   his office to retaliate against plaintiffs.

12             He is indisputably a person within the scope of

13   the long-arm statute.  And plaintiffs rely upon his conduct,

14   not any conduct of the State of Texas and not any separate

15   contacts of the State of Texas for personal jurisdiction in

16   this case.

17             THE COURT:  So, I mean, let's sort of get to the

18   heart of it for a moment, which is that -- I mean, it sounds

19   like you are asking me to essentially apply the

20   *Ex parte Young* fiction to the D.C. long-arm statute.

21             Is that a fair synopsis of what you're suggesting?

22             MS. BRANCH:  So I don't think that is necessary,

23   but I do think that is a way to resolve this question.

24             THE COURT:  So help me out then because I want to

25   understand how I get to where you want me to go, because,

1    one, I don't -- look, I think there are a couple of things

2    that really can't be disputed.

3              One is that he's being sued in his official

4    capacity.  And at least for immunity purposes, we treat that

5    as a -- we treat that as a suit against him -- we don't

6    treat -- typically, he is -- somebody who is sued in their

7    official capacity is essentially sued as the State, right?

8    I mean, that is the idea.

9              There is a carve-out under *Ex parte Young* for

10   constitutional violations in prospective relief, and that's

11   where we had ourselves, right?

12             So you haven't sued Texas.  You sued Ken Paxton in

13   his official capacity, *Ex parte Young*.  Great.  You're in

14   good shape there.  No immunity issue.

15             So there's two issues.

16             One is, D.C. Circuit clearly said that D.C.

17   long-arm statute does not reach states.  So what we're then

18   left with is this question, it seems to me -- or tell me if

19   you agree with this.

20             Do I then have to treat him as sort of this --

21   under this *Ex parte Young* fiction under the long-arm statute

22   in order to ensure that that inquiry is satisfied, separate

23   and apart from the constitutional inquiry?

24             MS. BRANCH:  So I think the plain text of the

25   long-arm statute under that -- I think Paxton is a person

 1  under that.  And we have sued Paxton and relied on his

 2  contacts with D.C., not the State of Texas.

 3         So I think he is a person, not only as a matter of

 4  plain language and common sense, but also under the logic of

 5  *Ex parte Young*.  *Young* recognizes --

 6         THE COURT:  Sorry to interrupt you.

 7         He can't be a person in the context of just a

 8  plain language, because he's being sued in his official

 9  capacity.  And so he's essentially being sued as the State.

10  I mean, I think that that goes without saying.  Judge Bates

11  recognized that in -- I can't remember what case it was --

12  West?  I can't remember.

13         MS. BRANCH:  *West v. Holder*.

14         THE COURT:  Right.

15         So I don't think there's any real dispute

16  about that.

17         I mean, I really do think you are sort of in a

18  place where you do have to rely on the *Ex parte Young*

19  fiction to apply under the long-arm.  And I guess the

20  question is:  Why should I read essentially what is a

21  judicial exception into a state statute or a local statute?

22         MS. BRANCH:  Well, Your Honor, as Your Honor has

23  recognized, under *Ex parte Young*, claims brought against

24  state officials acting in violation of the Constitution

25  strips that official of their official and representative

```
 1    capacity and subjects them to the consequences of their
 2    individual conduct, and that is precisely what we allege
 3    here, that Paxton has violated the Constitution.  We're
 4    suing for injunctive and prospective relief.
 5              And, you know, as Your Honor noted, several judges
 6    in this District have recognized that the logic of Young
 7    also extends to the long-arm statute.  And --
 8              THE COURT:  Well, I don't know that I'd go that
 9    far.  I think they've identified the issue.  I don't know
10    that they've said that Young actually will go that far.
11              Look, here's the other question, which is, that by
12    the logic you've put forward, isn't that essentially an end
13    run around the statute -- the fact that the statute doesn't
14    reach states?
15              In other words, if somebody who's sued in their
16    official capacity is always treated as an individual for
17    purposes of the long-arm, doesn't that then effectively get
18    around the long-arm's -- the fact that the long-arm doesn't
19    reach states?
20              MS. BRANCH:  I don't think it does, Your Honor,
21    because there's a reason why the Ex parte Young doctrine
22    exists, right?  It's that when an official-capacity
23    defendant -- yes, they're acting -- they're not acting in
24    their official capacity when they are -- when there are
25    plausible allegations that they have violated the
```

**JA0590**

 1    Constitution.

 2           And so in a case like this one where we have

 3    alleged that Paxton has violated our client's

 4    First Amendment rights, he doesn't get the protection of

 5    sovereign immunity; he doesn't get the protection of, you

 6    know, acting in the cloak of his official capacity.

 7           We're not suing the State of Texas.  We're suing

 8    him.  And all of the contacts that we've identified in our

 9    briefing are based on his contacts with the state, not the

10    state of Texas.  And I think --

11           THE COURT:  Is there any case that you're aware of

12    that has gone as far as you want me to go?  Because I can

13    tell you I have looked far and wide and have not found a

14    single one.

15           In fact, there is at least some language in a

16    Fifth Circuit case that suggests that I should not -- that

17    there is not a basis to sort of import the *Ex parte Young*

18    fiction into a long-arm statute.

19           This is *Stroman versus Wercinski*,

20    W-e-r-c-i-n-s-k-i, from the Fifth Circuit.  I'm not sure --

21    you're probably familiar with it.

22           Now, what the Fifth Circuit there said was

23    entirely in dicta, truth be told.  And the Fifth Circuit

24    itself even seemingly recognized that in a more recent case

25    called *Bulkley*, B-u-l-k-l-e-y, which is at 1 F.4th 346.  And

1    in a footnote, the last footnote in the opinion, it says,

2    "Don't believe the dicta that we used earlier."

3            There have been some District Courts that have

4    followed the *Stroman versus Wercinski* dicta.  But I have not

5    found a single case that applies *Ex parte Young* to a state

6    long-arm statute.

7            MS. BRANCH:  So, Your Honor, I would point you to

8    Chief Boasberg's language in the *Wisconsin Voters*

9    *Alliance v. Pence* case where he said, "It is true that in

10   certain limited cases, a suit against a state official in

11   her capacity may be considered a suit against her in her

12   individual capacity for purposes of the D.C. long-arm

13   statute."

14           And in that case, admittedly, the Court did not

15   find jurisdiction, but it recognized that this exception

16   applies; the logic of Ex parte Young exists.  And we know --

17           THE COURT:  I'm sorry.  What's the -- do you have

18   a citation, or can you just restate the --

19           MS. BRANCH:  I do.  That is *Wisconsin Voters*

20   *Alliance v. Pence.*  It's 2021 Westlaw 686359 at page 1.

21   That's a 2021 case, Your Honor.

22           THE COURT:  Okay.

23           MS. BRANCH:  And we know that the statute does

24   reach official-capacity defendants in part through the

25   general jurisdiction statute, which also uses the word

1    "person" and relies on the exact same definition of "person"

2    that applies to the specific jurisdiction statute.

3          And so, you know, we know that official-capacity

4    defendants can be subject to general jurisdiction in D.C.

5    I think to hold otherwise would lead to very absurd

6    consequences.

7          It would mean that individual defendants couldn't

8    even be persons under the District's general jurisdiction

9    statute which would, for example, bar Section 1983 suits

10   against D.C. police officers in their official capacity,

11   because such officers would no longer be persons.  But as

12   Your Honor knows, those types of suits are extremely common.

13         So, you know, I don't know that there is a case in

14   D.C. that specifically applies *Ex parte Young*.  But the

15   Wisconsin Alliance -- *the Wisconsin Voters Alliance* case --

16         THE COURT:  I'm sorry.

17         So your point is or what you suggested -- and

18   maybe this isn't even really going to come up -- but is

19   that, say, hypothetically, there's a Monell claim against

20   the District of Columbia.  You sue -- or you've sued the

21   chief of police in her official capacity, and the personal

22   jurisdictional analysis in that case would be general

23   jurisdiction, you think?

24         MS. BRANCH:  Yes, Your Honor.

25         THE COURT:  Because --

1          MS. BRANCH:  Because that -- the police officer is

2    presumably at home, basically at home in the District of

3    Columbia.  And the general jurisdiction statute, 13-422,

4    shares the same statutory definition of "person" as does the

5    specific jurisdiction statute.

6          And I think --

7          THE COURT:  Is there a case that sort of stands

8    for that proposition that -- you know, we could -- I mean,

9    say, hypothetically, the chief of police doesn't reside in

10   the District, lives in Virginia or Maryland; do you still

11   think that there would be general jurisdiction over the

12   chief of police?

13         MS. BRANCH:  I think so, Your Honor.

14         And I think we have identified a couple of cases

15   that I can reference.

16         THE COURT:  Okay.

17         MS. BRANCH:  I don't have them at my fingertips.

18         THE COURT:  I sort of say this to both sides, and

19   I don't want to be overly critical here.

20         This is sort of the key threshold issue.  And I

21   find it problematic that the defendants didn't raise it in

22   their opposition.

23         I mean, you didn't cite the sort of key

24   D.C. Circuit case on this issue until the surreply, which,

25   I mean, raises questions of whether you've even waived the

```
 1    issue altogether.  And so I'm really left with a set of
 2    briefs that do not really address what is the key issue
 3    here.
 4              I mean, you know, the Ferrara case clearly says
 5    that states aren't subject to the D.C. long-arm statute.
 6    That wasn't cited until I invited you to bring out a brief.
 7    And even then, you cited in a single line, in a single
 8    sentence.  It's really quite sort of astonishing to me that
 9    this wasn't vetted more thoroughly.  But here we are, in
10    any event.
11              MS. BRANCH:  Yeah, and, Your Honor, I think that
12    the defendants have waived the issue.  And I know, you know,
13    it is an important one.  And I think, you know, given the
14    case law that's out there, it would be -- you know, the
15    Court would be well within its bounds to reject it as
16    waived.  This is obviously a far-reaching and sequential
17    holding.
18              THE COURT:  I mean, I know that.
19              I think the difficulty I'm having with going that
20    route is that tomorrow I'll get a motion to dismiss from
21    them that raises the very same issue.
22              So, okay, you win in the short run, but we're
23    still going to need to address that issue tomorrow.
24              MS. BRANCH:  And, Your Honor, you raised the
25    Ferrara case, which I think is important here.
```

1          In that case, the D.C. Circuit -- the defendant in

2    that case was -- she was sued in her official copy.  And in

3    that case, the D.C. Circuit went forward and analyzed her

4    contacts with the District of Columbia without regard to

5    this "person" issue.

6          It was only when the plaintiffs argued that she

7    was acting in her capacity -- she was acting on behalf of

8    the State that the Court determined and, you know, stated

9    that states don't have -- states are not persons under the

10   long-arm statute.

11         So I think Your Honor could do the same thing

12   here, which is proceed with analyzing Paxton's contacts with

13   the District of Columbia because we have sued him, yes, in

14   his official capacity; but under *Ex parte Young*, he is

15   stripped of his official and representative sort of cloak

16   because of the plausible allegations that he has violated

17   the Constitution.

18         And just to go back to the point about the general

19   jurisdiction statute, it does say that the

20   District of Columbia court may exercise personal

21   jurisdiction over a person who maintains its principle place

22   of business in D.C.

23         So I think with respect to D.C. police officers,

24   that would be a basis to find that the Court has general

25   jurisdiction.  And certainly in constitutional 1983 suits,

```
 1    they're subject to jurisdiction -- to suit in D.C. with
 2    regularity.
 3              And at bottom, you know, I think this case is a
 4    unique case.  It is the reason why sort of Ex parte Young
 5    exists.  It's the reason why, you know, Ken Paxton should be
 6    treated as a person under the long-arm statute.  And I think
 7    to do so otherwise would have -- would lead to absurd
 8    consequences.
 9              It would mean that officials like Paxton could
10    never be held accountable in D.C. courts, no matter what
11    type of injury they impose on D.C. residents.  If they
12    direct their injury to D.C. residents, as they have done in
13    this lawsuit, he cannot be subject to suit here; and we have
14    to go to Texas or some other foreign jurisdiction to defend
15    our rights.
16              And I think this is, you know, really important in
17    this type of case where other Attorney Generals heard
18    Ken Paxton's call and may be interested in potentially, you
19    know, investigating Media Matters further.  What this would
20    mean is that Media Matters, my clients, would have to go to
21    defend themselves in courts around the country, despite the
22    fact that these demands are retaliatory, clearly
23    retaliatory, and are directed at them in the District of
24    Columbia.
25              They seek documents that are located in the
```

 1   District of Columbia.  It is clear that Media Matters is

 2   located here.  There's been no dispute about that.  And, in

 3   fact, when we were in Maryland, the way that the defendants

 4   defended against personal jurisdiction in Maryland was to

 5   say that we should have brought suit -- they essentially

 6   said that we should have brought suit in D.C.

 7               THE COURT:  Right.

 8               MS. BRANCH:  So here we are.

 9               THE COURT:  So help me then move past the

10   Ex parte Young long-arm issue, and let's say we get past

11   that and we're now focused on the question of minimum

12   contacts and satisfying due process.

13               Is it -- help me understand your position.  How is

14   it that you would say that Mr. Paxton has availed himself of

15   the protections of D.C. law?

16               MS. BRANCH:  So, I mean, I would first point

17   Your Honor to the statements that were made by defendant's

18   counsel in the Maryland proceedings.  When they were asked

19   whether or not they directed their investigation at

20   Media Matters in D.C., Mr. Lavorato, I believe, said, in

21   response to that question, "Absolutely."

22               In fact, the defendants pushed jurisdiction in

23   D.C. so much that Judge Xinis in Maryland thought that they

24   had conceded the issue, and they had to correct her on that.

25               So, you know, at the end of the day, personal

```
 1    jurisdiction really is about fairness.  It's about whether
 2    or not being subject to suit here offends traditional
 3    notions of fair play and substantial justice.
 4           And I would suggest, Your Honor, that it is
 5    absolutely not unfair for Ken Paxton to be subject to
 6    suit here.
 7           He serves the demand here in D.C. where
 8    Media Matters is located, where its documents are, and where
 9    it is suffering the injury.  He purposefully targeted his
10    tortious act at the District, and due process is absolutely
11    satisfied, which means --
12           THE COURT:  But, I'm sorry, but help me out again.
13    I want to go back to my question.
14           I understand what your arguments are with respect
15    to the conducting business here.  You're conducting business
16    or transacting business under (a)(1).  Your theory is that
17    by sending the subpoena into the District, that essentially
18    constitutes conducting business?
19           Am I right about that?
20           MS. BRANCH:  Correct, Your Honor.
21           THE COURT:  And then in terms of (a)(3), your
22    tortious interference is what you've just described; by
23    sending the subpoena into D.C., that that was a tort here
24    and has caused injury here.  That I got.
25           MS. BRANCH:  Correct.
```

1          THE COURT:  But I think the question is the one

2    I'm still grappling with that these Fifth Circuit cases

3    have -- or it seems to be really the only circuit that has

4    addressed this issue in terms of an out-of-state official

5    being brought into court in a different state -- in a

6    federal court and whether there are sufficient contacts.

7    And you all have cited the *Grewal* decision, which I'll ask

8    defense counsel about in a moment.

9          But help me out again.  Go back and just tell me

10   how you think Mr. Paxton has availed himself of the

11   protections of the District of Columbia by sending a

12   subpoena here.

13         MS. BRANCH:  Well, so the process server that he

14   sent directly to Media Matters' office, who had several

15   contacts within the District, including with counsel at my

16   law firm, was governed by state law, right, when she served

17   the demand.

18         And I think, you know, under each of the long-arm

19   statutes under (a)(1), (a)(3), (a)(4), Ken Paxton has, you

20   know, availed himself of D.C. law by serving the demand in

21   D.C.  She was governed by D.C. law when she did so.

22         THE COURT:  Are process servers licensed;

23   do you know?

24         MS. BRANCH:  I don't know if process servers are

25   licensed, but certainly --

```
 1              THE COURT:  I'm just curious.

 2          Go ahead.

 3              MS. BRANCH:  -- she completed an affidavit of

 4   service, which the Attorney General can rely on to, you

 5   know, if there's ever a dispute about whether or not service

 6   was effective.

 7              And so I think that by hiring the process server

 8   and serving the demand on Media Matters in D.C., the

 9   Attorney General availed himself of the

10   District of Columbia.

11              THE COURT:  Would it have made a difference in

12   this case if the subpoena was mailed as opposed to

13   personally served?

14              MS. BRANCH:  So the subpoena actually was

15   mailed first.

16              THE COURT:  Right.

17              MS. BRANCH:  It was first mailed.

18              THE COURT:  But if that was the only service --

19   say there was no personal sufferance; do you think that

20   would make a difference?

21              MS. BRANCH:  I think that would make a difference

22   with respect to the long-arm statute, at least with respect

23   to (a)(3), right, because the case law is clear that there

24   has to be an act that takes place in the District.

25              And there are cases that the defendants have
```

1  relied on to say that, you know, mail is the same as

2  in-person service.  And they're just inapposite.  The *Dyson*

3  case does not support that, and there's several cases that

4  we cited that indicate that personal service in the District

5  constitutes an act for purposes of (a)(3).

6          THE COURT:  Yeah, I mean, just to -- but to stick

7  with the minimum contacts, due-process issue, I mean, again,

8  there's this trio of Fifth Circuit cases -- I guess there's

9  really four of them.

10         But it's *Stroman*, *Grewal*, the more recent case of

11 *Bulkley*.  And in each of those cases, the out-of-state

12 official mailed a cease and desist order into the state of

13 Texas.  And in all of those cases except for in *Grewal*, the

14 Circuit said the mere mailing of a cease and desist order

15 that is intended to enforce state law isn't enough in terms

16 of minimum contacts.

17         So is it dispositive, in your view, the fact that

18 there was actually personal service here versus mail

19 service?

20         MS. BRANCH:  I do think that is an important fact,

21 both with respect to due process and the long-arm statute.

22         And I think that the ways in which the *Grewal* case

23 distinguished *Stroman* apply to this case as well.

24         And we briefed this.  But, you know, in the *Grewal*

25 case -- and I think that was authored by the same judge who

1    authored *Stroman*, but it came later.

2          THE COURT:  Right.

3          MS. BRANCH:  It was clear that, you know, he found

4    jurisdiction over the New Jersey Attorney General because he

5    projected himself across state lines, and he asserted a

6    pseudo-national executive authority.

7          And that was a cease and desist, right?  It was

8    about stopping specific conduct.

9          In *Stroman*, the issue was that the plaintiff had

10   actually availed -- the business, the plaintiff, had

11   actually availed itself of Arizona law, and the official

12   that was the defendant in *Stroman* was actually just trying

13   to enforce Arizona law.

14         Here we have a wide-ranging civil investigative

15   demand that doesn't just say stop doing certain things.  It

16   actually asks for all of their donors, their organizational

17   chart, internal and external communications.

18         It is creating an enormous chill on their

19   business, and we submitted declarations in support of that.

20   And so we think this case is on all fours with *Grewal* and

21   *Defense Distributed*.  And the fact that the demand was

22   actually served on our clients in the District of Columbia

23   makes it an even stronger case than *Grewal*.

24         What this required was Ken Paxton hiring the

25   process server, who went to the Media Matters office, who

```
 1   called our client, who wasn't present, but, you know, even

 2   that created chill, right?

 3           It was the process server standing outside of our

 4   client's office saying, "I'm here to serve you with

 5   something.  You've got reams of documents that are going to

 6   be due to the State of Texas in a matter of days.  And not

 7   only that, you don't have the protections of Texas civil

 8   procedure.  You can't argue that this demand is overbroad or

 9   that it's seeking irrelevant documents.  And in order to

10   defend yourself against this demand, you're going to have to

11   waive your -- or essentially waive your personal -- your

12   jurisdictional defenses by coming to the state of Texas to

13   defend yourself."

14           THE COURT:  Well, can I ask you a question?

15           What is your view on -- say Media Matters does

16   nothing and the Attorney General for the state of Texas

17   files suit in Texas state court to compel compliance with

18   the investigative demand -- if I've been saying "subpoena,"

19   sorry about that -- but civil investigative demand?  What is

20   your position on whether that could be accomplished?

21           MS. BRANCH:  So I think that --

22           THE COURT:  Let me just ask the question very

23   precisely:  Do you think a Texas state court would have

24   personal jurisdiction over Media Matters?

25           MS. BRANCH:  No.  And we've argued as such in the
```

 1   case that Twitter, X, has brought against Media Matters.  We

 2   filed a motion to dismiss in that case because Media Matters

 3   has no contacts with the state of Texas.  It doesn't have an

 4   office there.  It's not registered to do business there.  It

 5   has no registered agent there.  It has no business in Texas,

 6   which is why the investigative demand is so retaliatory.

 7           THE COURT:  And what's the status of the case in

 8   Texas brought by X or Mr. Musk or both?

 9           MS. BRANCH:  It is in the briefing of the motion

10   to dismiss phase.

11           THE COURT:  Okay.  So it hasn't been ruled on?

12           MS. BRANCH:  Correct, Your Honor.

13           THE COURT:  Okay.

14           MS. BRANCH:  And I think the difference between

15   that case and this one is that this is a demand for

16   documents immediately.

17           And if you look at the January 29th -- sorry,

18   December 29th letter that Ken Paxton sent, he's very clear

19   that he has broad discretion to enforce this demand.  He's

20   not interested in negotiating it.

21           And even if he were, Your Honor, you don't

22   negotiate with extortionists.  And that's akin to what's

23   happening here.  This is retaliatory conduct that our

24   clients should not be subject to this demand, and they

25   should not have to go to a foreign forum to defend

```
 1   themselves.

 2          THE COURT:  I think the Judge in Maryland broached

 3   this.  But let me just do the same, which is you talked

 4   about negotiating.  And is that something Media Matters has

 5   considered, whether it would be prepared to produce records

 6   with a narrower CID?

 7          MS. BRANCH:  Media Matters does not believe that

 8   it should be subject to this demand at all for the reasons

 9   that we've explained in our papers.  It is retaliatory.  It

10   violates their constitutional rights.  It is causing chill

11   right now.

12          And we don't believe that we should be required to

13   negotiate with the State of Texas because there is no basis

14   for this investigation.  This is akin to, you know, someone

15   coming to your house and searching around --

16          THE COURT:  Right.

17          MS. BRANCH:  -- and then justifying --

18          THE COURT:  Sorry interrupt you.

19          I understand your position and the lack of

20   authority or the lack of factual foundation for it or the

21   good-faith basis for the investigation.

22          That's not something I can resolve today.  I'm not

23   being asked to resolve that today.

24          And so, again, where I'm just sort of broaching

25   the question of whether Media Matters would be prepared to
```

```
 1   produce some documents in response to a narrowed CID and
 2   whether that discussion has been had at all.
 3            MS. BRANCH:  That discussion has not been had,
 4   Your Honor, because, you know, we believe that we're here
 5   asking Your Honor to enjoin enforcement of the demand
 6   because of its lack of good-faith basis.
 7            And, you know, we don't -- first of all, requiring
 8   us to negotiate would not alleviate the present harm of our
 9   First Amendment rights.
10            THE COURT:  I'm not requiring anything.  I'm just
11   asking.
12            MS. BRANCH:  Sure.
13            THE COURT:  I don't think I can require you to do
14   that, but I can ask at least.
15            MS. BRANCH:  But there is no basis for them to
16   exercise jurisdiction or process over us, and so there isn't
17   a reason to negotiate.
18            THE COURT:  Okay.
19            MS. BRANCH:  We shouldn't have to concede as much
20   by negotiating, which is what I think that would be
21   equivalent to.
22            THE COURT:  Okay.
23            I don't have any other questions, Ms. Branch, but
24   if there's additional argument you wish to make that we
25   haven't touched upon, I'm happy to hear it.
```

JA0607

1          MS. BRANCH:  No.  I think if Your Honor doesn't

2    have any further questions, I would, you know, like to have

3    rebuttal if Your Honor would like to hear that.

4          THE COURT:  Of course.

5          MS. BRANCH:  Thank you.

6          THE COURT:  I guess one more question, which is to

7    go back and complete the circle here, to go back to the

8    long-arm issue.

9          Well, let me ask you:  Would you agree with me

10    that your burden at this point is to establish personal

11    jurisdiction -- a substantial likelihood of success on

12    establishing personal jurisdiction?

13          MS. BRANCH:  Yes, Your Honor, I think that's

14    correct.

15          THE COURT:  That's the standard at this point.

16          And so have you done that on a set of briefs that

17    don't address the question that we talked about earlier and

18    have talked about a fair amount, which is that question of

19    this *Ex parte Young* exception or fiction being applied to a

20    long-arm statute?

21          MS. BRANCH:  I mean, as Your Honor noted, that

22    argument was raised very late.

23          And in response to the surreply, it was, I think,

24    a paragraph-and-a-half argument that they made in their

25    brief.  So, obviously, we didn't have a chance to respond to

```
 1    it in writing.  I've given the response that I have here --
 2              THE COURT:  No.  I appreciate it.
 3              MS. BRANCH:  -- today.
 4              THE COURT:  I don't mean to put you on the spot.
 5              MS. BRANCH:  If Your Honor would want additional
 6    briefing on that, we could certainly do that.
 7              THE COURT:  It is, to me at least, obviously,
 8    given the time and attention I've devoted to it, an
 9    important issue.  And the way this all unfolded, it didn't
10    get the airing that it ought to have.
11              And I'm a little reluctant to go down the road of
12    being the first court that I'm aware of to apply the
13    Ex parte Young exception to a state long-arm statute maybe
14    without some more fulsome explanation of why I should
15    do that.
16              MS. BRANCH:  Understood, Your Honor.
17              THE COURT:  Okay.  All right.  Well, we can talk
18    about next steps.
19              MS. BRANCH:  Okay.
20              THE COURT:  Thank you, Counsel.
21              MS. BRANCH:  Thank you.
22              THE COURT:  All right.  I'll hear from the
23    defense now.
24              MR. BLUM:  May it please the Court.  Reuben Blum,
25    Your Honor, for defendant.
```

```
 1                THE COURT:  Mr. Blum.

 2                MR. BLUM:  I'm just going to briefly respond to

 3     counsel.  And aside from that, I don't have a tremendous

 4     amount more to add that's not currently in our briefing.

 5                But I want to go through a few points counsel

 6     mentioned, and I would like to start where you began,

 7     Your Honor, on the long-arm statute and Ex parte Young.

 8                And you mentioned several cases.  I'd like to

 9     raise them again, starting with West v. Holder.

10                Not only are you correct that we agree we have not

11     been able to find any courts that apply Ex parte Young to a

12     long-arm statute; but in West v. Holder, the Court

13     specifically stated that the application of Ex parte Young

14     to an out-of-state official sued in official capacity is an

15     open question.  And that case was in 2014.

16                THE COURT:  Right.  That's why I'm being asked to

17     close it, resolve it.

18                MR. BLUM:  Yes.

19                THE COURT:  Tell me why you haven't waived the

20     issue.  I mean, you didn't raise it until I invited you to

21     file a surreply.  And even then, it wasn't an issue that you

22     flagged.

23                I mean, you did cite Ferrara, but you didn't then

24     sort of take the next step and discuss this Ex parte Young

25     issue.  So why isn't this entire discussion that I've been
```

1  having with plaintiffs' counsel waived?

2          MR. BLUM:  As an initial matter, we have not

3  waived the issue of personal jurisdiction because we've been

4  clear from the outset that --

5          THE COURT:  Well, fine, for purposes of this

6  motion.  I'm not saying that it's waived for all time.  But

7  what about for purposes of this motion?

8          MR. BLUM:  Sure.  For purposes of this motion,

9  we've been consistent in our position that there is no

10  personal jurisdiction in this Court.  And so --

11          THE COURT:  Right.

12          MR. BLUM:  -- we are not waiving the issue.

13          THE COURT:  I get that.  But you haven't made the

14  argument that is the one that we've been talking about,

15  which is Mr. Paxton is a state for purposes of this suit;

16  the long-arm statute doesn't apply to a state; and the

17  *Ex parte Young* fiction should not be applied to the long-arm

18  statute.

19          So that's the argument.  That should have been

20  Roman numeral I, Roman numeral I(a) in your brief, and it

21  wasn't.  And it wasn't even in your surreply.

22          I mean, this is something that has come up because

23  you cited *Ferrara*, thankfully, finally, and then I sort of

24  looked at the cases that followed on *Ferrara* and understood

25  that this was an issue.

1          So help me again understand why the argument

2     isn't waived.

3          MR. BLUM:  Sure.

4          Well, from the --

5          THE COURT:  Or why I should reach it today in the

6     context of this preliminary injunction motion and then save

7     resolving it, you know, for another day perhaps on a motion

8     to dismiss or in some other context.

9          MR. BLUM:  Sure.

10         Your Honor, from the outset of these briefings on

11    the preliminary injunction, we have been clear that

12    Attorney General Paxton was sued in his official capacity.

13         And then when we raised the issue specifically of

14    that being a suit against the State -- and as you're

15    correct, we did that in the surreply -- we reiterated that

16    that was because Attorney General Paxton was sued in his

17    official capacity.  And we did so specifically in reference

18    to the long-arm statute at issue here.

19         THE COURT:  Okay.

20         MR. BLUM:  And so as I mentioned, it's an open

21    question in this Circuit as to whether *Ex parte Young*

22    applies in these circumstances.

23         THE COURT:  It seems to be an open question

24    everywhere.

25         MR. BLUM:  Yes, but -- that's true.

1          THE COURT:  At least no Circuit has resolved

2     the issue.

3          MR. BLUM:  Correct.

4          And mentioning other Circuits, you know, I do want

5     to respond to the *Grewal* case that you mentioned.  And

6     I think *Defense Distributed v. Grewal* is importantly

7     distinguishable from *Stroman*.

8          THE COURT:  Here's another question I have for

9     you:  Why didn't you cite it in your brief?

10         MR. BLUM:  We were focused on --

11         THE COURT:  I mean, you know, you'll have to

12    forgive me, Counsel, and I don't want to be difficult here,

13    but the plaintiffs cited *Grewal* -- again, it's *"Grewal"* --

14    specifically said, *Grewal* is on all fours with this case.

15    It's squarely applicable.  One would have thought your

16    opposition brief would have told me why *Grewal* is

17    distinguishable.  And now I'm -- and you didn't.  You didn't

18    even cite the case.  So tell me why now you think it's

19    distinguishable.

20         MR. BLUM:  Sure.  I will tell you why it's

21    distinguishable.

22         I also want to mention that we were focused, A, on

23    the long-arm statute; and then, B, the discussion of

24    personal jurisdiction in *Grewal* is in relation to *Calder* and

25    the effects test.  And our discussion of *Calder* and the

1    effects test was on discrete and more-isolated issues.

2            But the reason that *Defense Distributed v. Grewal*

3    is distinguishable from *Stroman* is because that court did

4    not find personal jurisdiction because the statements by the

5    Attorney General of New Jersey in and around the cease and

6    desist letter went so much further than in *Stroman*, because

7    the Court said that the Attorney General of New Jersey was

8    trying to "close shop," in quotes, "on *Stroman*."

9            And that's not at all analogous to what's going on

10   in this case.  The CID was not issued with any intention

11   other than to investigate whether or not there was

12   fraudulent or misleading conduct.

13           And it was in no way analogous to the attempt in

14   *Grewal* to close shop on *Defense Distributed*, which was the

15   reason cited in that case.

16           THE COURT:  Can I ask you a question:  What's

17   Texas's interest here in regulating Media Matters?

18           MR. BLUM:  Well --

19           THE COURT:  There are -- Media Matters -- let me

20   say X is not headquartered in Texas.  It doesn't have --

21   it's not incorporated in Texas.  I understand there may be

22   some number of employees, although you haven't identified

23   how many.

24           So help me under why this isn't like *Grewal*,

25   because this seems a lot more like *Grewal* than not in the

1    sense that the plaintiff here hasn't directed any conduct to

2    Texas.  They're an online platform that publishes nation and

3    worldwide.

4           So help me understand why this is not like *Grewal*

5    in the sense that this is causing a chill, not just in

6    Texas, but everywhere.

7           And as far as I can tell, Mr. Paxton has not

8    really articulated a reason why folks in Texas, whether it's

9    X or somebody else, have been particularly harmed by this

10   article.

11          MR. BLUM:  Sure.

12          Well, there are several responses.

13          First of all, Your Honor, X is a major employer in

14   Texas.  It has offices in Texas.

15          THE COURT:  How many employees?

16          MR. BLUM:  And many Texans get --

17          THE COURT:  How many employees?

18          MR. BLUM:  I'd have to respond to that in

19   briefing, Your Honor.

20          But, nonetheless, many Texans separately get their

21   news from X.

22          And specifically with regard to this case, the

23   allegations that Media Matters made with regard to

24   anti-Semitic conduct that appeared next to advertisements on

25   X involved some --

```
 1            THE COURT:  Can I ask you a question?
 2            MR. BLUM:  Yes.
 3            THE COURT:  I'll just be direct:  How is this
 4   anything other than a proxy defamation fight?
 5            MR. BLUM:  Because the civil investigative demand
 6   is -- was issued from the Texas just to investigate whether
 7   or not --
 8            THE COURT:  Just, for example, do you think, for
 9   example, that a court in Texas or somewhere else would say
10   this is First Amendment-protected activity?  And if Texas is
11   going to attempt to use a state statute to regulate
12   First Amendment activity, you are going to be subject to the
13   New York Times v. Sullivan test, right?
14            MR. BLUM:  While not conceding that that is what
15   Attorney General Paxton is trying to do, sure.
16            THE COURT:  No, no, no.  Would you agree with me
17   that would be the legal construct?
18            MR. BLUM:  Yes.
19            THE COURT:  And you have reason to believe that
20   they have acted with actual malice?
21            MR. BLUM:  We would like to investigate that, and
22   that's the purpose of issuing the CID.
23            THE COURT:  And that's the purpose of an
24   Attorney General to do that as opposed to the person that's
25   allegedly defamed or the entity that's allegedly defamed?
```

```
 1              MR. BLUM:  Well, under the Texas Deceptive Trade
 2   Practices Act --
 3              THE COURT:  Has there ever been a CID issued to a
 4   media organization under the Texas State -- the Deceptive
 5   Trade Practices Act?  Has that ever happened?
 6              MR. BLUM:  It has happened, Your Honor, yes.
 7              THE COURT:  To a media organization?
 8              MR. BLUM:  In fact, to Twitter.  And my colleague,
 9   Mr. Lavorato, could speak in greater detail to the
10   Twitter case.
11              THE COURT:  Right.
12              MR. BLUM:  And it is in some ways analogous but in
13   other ways importantly distinguishable from the case at
14   bar today.
15              THE COURT:  Okay.
16              Right.  Go ahead.  I'm sorry.  I interrupted you.
17              MR. BLUM:  Yeah.  I just wanted to respond briefly
18   to a few more points that counsel made.
19              First, on this *Wisconsin Voters Alliance* case, the
20   District Court in D.C. actually stated in that case that it
21   must pause at personal jurisdiction.  It ended up resolving
22   the case on not finding likelihood to succeed on the merits.
23   So it didn't resolve the case on personal jurisdiction, but
24   it strongly suggested that there would not be personal
25   jurisdiction.
```

 1          And it said that, nonetheless, D.C. courts must

 2   find personal jurisdiction over each defendant.  So it's

 3   just not applicable to the facts at issue today with regard

 4   to personal jurisdiction and the long-arm statute under

 5   personal jurisdiction.

 6          And, finally, I wanted to speak to plaintiffs'

 7   raising of the hearing in Maryland, and we have a hearing

 8   transcript for Your Honor if you would like to take a look.

 9          THE COURT:  I've read it.  Don't worry about it.

10          MR. BLUM:  Sure.

11          THE COURT:  I'm not worried about the

12   characterizations of whether you conceded or didn't concede.

13   That's not for me to determine right now.

14          MR. BLUM:  Okay.

15          THE COURT:  Let me ask you a different question:

16   What is, in your sense, the fundamental violation of due

17   process?

18          Or let me put it differently:  What would be

19   unreasonable about hailing Attorney General Paxton into

20   court here?

21          Let me give you an example.  The Federal Rules of

22   Civil Procedure, if a subpoena under Rule 45 issues to a

23   non-party in a different state from where the litigation is

24   happening, that non-party is going to be subject to the

25   jurisdiction of the state where the federal court is located

```
 1    if the third party moves to quash the subpoena, right?

 2              MR. BLUM:  Correct.

 3              THE COURT:  So if the Federal Rules contemplate

 4    that scenario, why isn't it -- why is it unreasonable to

 5    hail Attorney General Paxton into court here when he

 6    effectively is sending a subpoena to an out-of-state

 7    party -- Counsel, this is to both sides.

 8              If those of you who are doing the whispering and

 9    posting want to argue, come on up.  I'll invite you to do

10    it.  But you've offered a lawyer to make the arguments, and

11    presumably they know what they're doing.  So let's go.

12              MR. BLUM:  I would be happy to hand it over to

13    Mr. Lavorato after I speak, but I'm going to answer that.

14              You know, first, plaintiff did have a statutory

15    remedy to move to quash the CID within two weeks, and

16    plaintiff did not take advantage of that statutory remedy.

17    Instead, we find ourselves here in court today.

18              Now, more specifically to the question in your

19    hypo, you know, presumably the potential witness being

20    brought into the Court in another state has some connection

21    with that lawsuit in a way that's separate from what's going

22    on here with the CID.  Attorney General Paxton issued the

23    CID from Texas to investigate whether or not there was

24    misrepresentation or fraudulent conduct.

25              THE COURT:  I don't understand your point; I don't
```

```
 1   understand the distinction you're making.
 2              I mean, say, hypothetically, there's a suit in the
 3   Southern District in New York.  The plaintiff in the
 4   Southern District of New York issues a document subpoena to
 5   a company that's in the District of Columbia, okay?  That
 6   company moves to quash the subpoena, right?
 7              MR. BLUM:  Yes.
 8              THE COURT:  Would you agree with me that the
 9   plaintiff would be subject to the jurisdiction of
10   this Court?
11              MR. BLUM:  I would have to agree, Your Honor.
12              THE COURT:  Okay.
13              So if that's the case in that scenario, why isn't
14   the case any different here?  It seems to me to be perfectly
15   reasonable if Attorney General Paxton wants to drop a
16   subpoena on a D.C. resident, that he ought to expect that
17   that D.C. resident would come to a court in his foreign
18   state to defend itself against the subpoena.  I don't see
19   why that's a problem from a due process standpoint.
20              MR. BLUM:  Well, an important difference between
21   your hypothetical and the statutory scheme of the CID here
22   is that the parties here, I don't believe, even dispute that
23   the CID is not self-executing and it follows on from that
24   that the alleged chill that plaintiff claims it is
25   experiencing is self-inflicted.
```

```
 1              THE COURT:  It's not alleged.

 2              I've got sworn declarations under penalty of

 3     perjury that they are chilled.  They have said that there

 4     are articles that have been written but not published.

 5     There are articles they would like to write that they have

 6     not pursued.

 7              It's not alleged.  There's evidence to support

 8     the chill, and you haven't presented any evidence to

 9     contradict it.

10              MR. BLUM:  So even assuming --

11              THE COURT:  I should correct that.  I take that

12     back.  You have identified some statements from the

13     President to suggest that there hasn't been a chill.

14              MR. BLUM:  Sure.

15              And, again, I can hand it over to my colleague,

16     Mr. Lavorato, to speak further on that issue as it relates

17     to their chilled speech, at least their claims to that

18     effect.

19              But, you know, nonetheless, when we discuss due

20     process, the due process analysis of personal jurisdiction,

21     plaintiffs have cited both *Walden* and *Calder* and taken them

22     wildly out of context, you know.

23              In fact, there is no purposeful direction here or

24     purposeful availment --

25              THE COURT:  Let me ask you this:
```

 1   Say Media Matters said we want to play ball.  We'll produce

 2   some documents.  We recognize you've sent us this CID.

 3         Hasn't the Attorney General, by issuing the CID

 4   here, committed himself to a course of conduct in the

 5   District of Columbia with respect to the CID?

 6         In other words, his lawyers from his office are

 7   going to be in regular communication with Media Matters and

 8   its counsel.  They are going to be receiving documents from

 9   the District of Columbia.  They are going to be negotiating

10   about the scope of the CID with the target which is in the

11   District of Columbia.  That's very different than simply

12   sending a cease and desist letter in and not contemplating

13   anything more than that.

14         I mean, I assume the Attorney General would like

15   the documents and so, therefore, is contemplating some

16   ongoing activity involving a District of Columbia resident.

17         MR. BLUM:  The Attorney General is absolutely

18   anticipating some ongoing activity and, in fact, has offered

19   to discuss and work with Media Matters around the contours

20   of the CID to agree on contours that might be more favorable

21   to what they would be willing to work with.

22         But as to the activity of the investigation once

23   that agreement is made, the brunt of the activity would

24   actually be in Texas and conducted in the offices of the

25   Attorney General in Texas.

1        THE COURT:  So there would be no activity in the

2   District of Columbia?  Or at least equal amount of activity

3   in the District of Columbia?

4        MR. BLUM:  I wouldn't concede that it would be

5   equal.

6        THE COURT:  Do you think -- is it your position

7   that a Texas federal or state court would have personal

8   jurisdiction over Media Matters?

9        MR. BLUM:  Well, assuming it's the same case,

10  Media Matters has sued my client, the Attorney General --

11       THE COURT:  No, no, no, no, no, no.

12       You're not happy.  They don't do anything.  The

13  Attorney General wants to enforce the CID.  Can you do it in

14  a Texas state court or a Texas federal court?

15       MR. BLUM:  In all likelihood, yes, our position

16  would be in that case were we acting as plaintiff suing in

17  Texas, there would be personal jurisdiction over the

18  defendant but we haven't briefed that.

19       THE COURT:  Based on what?

20       I know you haven't, but based on what?

21       MR. BLUM:  Based on, first of all, the Texas

22  long-arm statute is different than the D.C. long-arm

23  statute.  So the analysis would be wholly different as to

24  the degree of which under the circumstances Media Matters

25  would be engaging in Texas by sending the documents to

43

```
 1    Texas, by making phone calls to Texas.

 2              Under the D.C. long-arm statute, such activities

 3    from out of the District into the District, just like phone

 4    calls and emails, have been routinely held not to constitute

 5    either transacting business or --

 6              THE COURT:  What phone calls has Media Matters

 7    made into Texas?

 8              MR. BLUM:  Well, assuming we reach the point where

 9    the two parties are collaborating on the CID or at least

10    seeking to collaborate, that may --

11              THE COURT:  I don't think you can count those

12    contacts even under Texas law.  I would be surprised if

13    those contacts would count.  But maybe I'm --

14              MR. BLUM:  I would have to brief this issue

15    further on the facts as they developed in that situation.

16              THE COURT:  Fair enough.

17              Here's a further question:  Isn't the consequences

18    of your position that a media company could be subject to

19    50 CIDs and would have to go to each state in order to

20    challenge them?

21              MR. BLUM:  I can't definitively say that,

22    Your Honor, because our position has been based on the DTPA

23    which is Texas law.  And so it would have to be an analysis

24    based on the analogous statutes under each of the 50 states.

25              THE COURT:  No, but you're looking at it wrong.
```

1          You've now said that you can't be brought into

2     court here, right?  So, presumably, the only place you could

3     be brought into court is Texas, right?

4          MR. BLUM:  Absolutely, there would be general

5     jurisdiction.

6          THE COURT:  Okay.

7          So why wouldn't that be the case for every other

8     Attorney General in the land if they were to send a CID to a

9     D.C.-based media company?

10         I mean, why couldn't they come in and make the

11    same arguments you're making, which is the long-arm statute

12    doesn't reach us; we don't have enough contacts with the

13    District of Columbia; you've got to come to our home state?

14    I mean, that is the upshot of your argument.

15         MR. BLUM:  Under the facts at bar in this case,

16    absolutely, that's our argument.

17         So if you were to present to me a case with a

18    nearly identical Deceptive Trade Practices Act in another

19    state and a nearly identical isolated and really noncontact

20    by the process server and with no more, then it would be

21    hard for me to argue that another Attorney General under

22    those facts would be subject to personal jurisdiction here

23    in the District.

24         THE COURT:  I'll ask you another question, which

25    is:  Why isn't the act of sending a process server to serve

```
 1    the subpoena enough to satisfy minimum contacts for the
 2    reasons that plaintiff counsel has said?
 3              I mean, you hired somebody here.  Presumably, you
 4    paid that person.  That person acted on the
 5    Attorney General's behalf.  And if that person failed to
 6    act, presumably, you could have sued under the laws of
 7    District of Columbia to get money back.
 8              Why isn't that enough?
 9              MR. BLUM:  Well, first, I'll address that with
10    regard to the D.C. long-arm statute.
11              And plaintiffs cited a case out of Virginia
12    Schleit v. Warren, where they allege personal jurisdiction
13    was found with regard to a service of process.
14              But in that case, it was actually the tort of
15    abusive service of process based on service that was made
16    with false affidavits.  And then in the Schleit case, the
17    defendant only accepted reserve under duress.
18              So that's highly, highly distinguishable
19    from what's going on here.  That's on the long-arm
20    statute, right?
21              Then under due process, plaintiff has cited
22    Walden, as I mentioned a few moments ago.  But Walden
23    actually contemplates contacts that are far more sustained,
24    such as the facts in Burger King mentioned in Walden where
25    there was a contract with the foreign -- forum state and
```

```
 1    ongoing interaction based on that contact.
 2              THE COURT:  Right.  That's why I asked you about
 3    the ongoing interaction you're going to have to get
 4    documents.
 5              MR. BLUM:  Again, we'd have to see what the facts
 6    of such ongoing contact would be.  If it were to be raised
 7    to the level of Walden or Burger King, that would be a
 8    different analysis.
 9              THE COURT:  Look, would you agree with me that a
10    tort doesn't arise in this case until service is executed?
11              MR. BLUM:  Assuming, arguendo, that there even is
12    a tort?
13              THE COURT:  Right.
14              MR. BLUM:  A tort was the issue that --
15    hypothetical tort was the issuance of the CID, which
16    happened in Texas.  And then the process server merely
17    delivered the CID.
18              THE COURT:  Does the CID have any effect unless
19    it's served?
20              MR. BLUM:  No, but the nature of a legal document
21    is that it's delivered by service of process.  If this were
22    not such a legal document, it would be delivered by
23    U.S. Mail or another postal method, and there wouldn't even
24    be a physical entrance by a person into the District to make
25    such delivery.
```

1          THE COURT:  Okay.

2          All right.  Anything else, Counsel?

3          MR. BLUM:  Not unless you have any further

4    questions, Your Honor.  Thank you.

5          THE COURT:  I don't.  Thank you very much.

6          Ms. Branch?

7          MS. BRANCH:  Thank you, Your Honor.  Just a

8    couple points.

9          On the person issue that we've spent some time on

10   here, I just wanted to note for Your Honor that we have an

11   opposition to the motion to dismiss due next week, and we

12   can fully brief the "person" issue there since we didn't get

13   an opportunity to do so within the confines of the PI

14   briefing.

15         That said, it is our position that they have

16   waived that argument for purposes of this motion; and,

17   therefore, it should not prevent Your Honor from granting

18   preliminary injunctive relief, especially given the

19   extraordinary nature of this case and the chill that our

20   clients are under.

21         They also didn't separately brief the motion to

22   dismiss.  They filed a motion that appears to adopt the

23   arguments that they made in their PI briefing.  And so they

24   have waived this issue there as well.  And a reply brief,

25   I think, would be too late to raise it.

1          Your Honor, you asked a question earlier about a

2   case regarding a police officer sued under 1983 that I

3   raise, and I would point Your Honor to *Anderson versus*

4   *Reilly*.  The cite for that is 691 F.Supp.2d 89.

5          And in that case, the Court found specific

6   jurisdiction over the U.S. Parole Commissioner, who was sued

7   in his official capacity under 1983.  That can only be right

8   if that defendant, who's acting in his official capacity, is

9   a person under the long-arm statute and not the D.C.

10  government.

11         Your Honor asked -- and I think on the person

12  issue, there is a lack of precedent on this, because this is

13  extraordinary.  What's happened here for an out-of-state

14  Attorney General to so flagrantly exceed his jurisdiction by

15  coming into another state issuing these CIDs, I just -- that

16  doesn't happen frequently.

17         And so, you know, you have the *Grewal* case.  And

18  there are some that address this, but the long-arm statutes

19  are different.

20         THE COURT:  Can I ask you just to think through

21  this with me.

22         Say the defendant is right and that an individual

23  sued in their official capacity cannot -- is not a person

24  for purposes of the long-arm statute.  Does that mean no

25  federal defendant could be sued in a D.C. District Court?

```
 1          MS. BRANCH:  I think it might, Your Honor, unless

 2   there is some other statute that would provide jurisdiction

 3   over them, and that's something we can look into.

 4          THE COURT:  I mean, because you'd have to --

 5   I mean, I'm just sort of thinking.

 6          I suppose federal statutes that do grant the

 7   authority to sue, I suppose they are -- anyway, I'm sorry to

 8   sit here and pontificate, but go ahead.

 9          MS. BRANCH:  Sure.  It is a complicated issue.

10          Your Honor asked a couple of questions earlier

11   about due process.  And the one thing I wanted to point out

12   that I don't think I did before, but we certainly point it

13   out in our briefing, is that the (a)(1) section of the

14   long-arm statute is co-extensive with the limits of due

15   process.  And so the Mouzavires v. Baxter case says that

16   that, given that under (a)(1), the long-arm statute and the

17   due process analysis come -- collapse into a single inquiry.

18          And so we think that Your Honor could also resolve

19   this issue on due process under (a)(1), given that they have

20   clearly transacted business in the District by hiring the

21   process server who served our clients.  And defendant's

22   counsel just admitted that, absent service, the demand has

23   no effect.

24          THE COURT:  Can I just offer the following for

25   your consideration on that argument.  I mean, if I
```

1    understand, what you're saying is I can kind of ignore the

2    long-arm question.  There's a Circuit case, albeit

3    unpublished.  It's called *Collingsworth versus*

4    *Drummond Company*, 839 F.App'x 567 from 2021.  I'll just read

5    you what the Circuit wrote.

6            It's unpublished, but they said, "The plaintiffs

7    maintain the Court need not consider the text of the

8    long-arm statute at all because subsection (a)(1) is

9    coextensive with the due process clauses of the Constitution

10   of the United States, meaning the Court should skip straight

11   to the Constitutional inquiry.  As the D.C. Court of Appeals

12   has said, this interpretation cannot be correct.  While it

13   is true the 'transacting any business' provision reaches to

14   the constitutional limit in cases where it applies, this

15   means only that the provision covers any transaction of

16   business in the District of Columbia that can be reached

17   jurisdictionally without offending the Due Process Clause."

18           And that's citing the *Mouzavires* case that we were

19   just talking about.

20           MS. BRANCH:  Okay.

21           So we didn't find that case.

22           THE COURT:  That's okay.  I just wanted to make

23   sure you're aware of it.

24           MS. BRANCH:  Okay.  Thank you, Your Honor.

25           So the argument has been made that, you know, the

 1    Attorney General didn't transact business in the District

 2    because his activity wasn't commercial.

 3            And the definition of "commercial" that the

 4    defendants provide is consistent with the case law, which is

 5    contractual activities that cause an effect in the District.

 6    That's from the Baxter case as well.  That's precisely what

 7    happened here.  They engaged a process server who served our

 8    clients and caused a tort to occur in the District.

 9            Your Honor, the defendants have also tried to

10    distinguish the *Schleit* case based on the claim at issue in

11    that case.  But we really cited that for the language in

12    that case that makes clear that where an act -- where an

13    agent of the defendant is physically present in the state,

14    that nullifies the argument that the act requirement was not

15    fulfilled.  The *Schleit* case says that.  The *Balsly* case

16    that we also cite in our papers say that.

17            So it really didn't turn on the type of claim in

18    those cases.  We really were looking at the fact that

19    service of process constitutes an act under (a)(3).  And, of

20    course, that was the Virginia long-arm statute.  But that

21    has been interpreted -- the D.C. long-arm statute is based

22    off of that one.

23            THE COURT:  I mean, is the analysis, in your view,

24    essentially one and the same under (a)(1) and (a)(3) here?

25    In other words, your claim arises out of the hiring of and

```
 1    the service of the CID?  By the same token, your contention
 2    is that a tort was committed by virtue of the service of the
 3    CID in the District of Columbia?
 4              MS. BRANCH:  That's correct, Your Honor.
 5              THE COURT:  Okay.
 6              MS. BRANCH:  They're essentially the same.
 7              And we did point to some other cases in our
 8    briefing that involve service constituting in act that
 9    causes injury outside of the Schleit and abuse of process
10    types of claims.
11              I also wanted to discuss this idea that, you know,
12    we could go to Texas court to seek relief.  And, you know, I
13    discussed this a little bit earlier, but affirmatively
14    seeking relief there, I think, would potentially waive our
15    jurisdictional defenses.  And Paxton's own communications to
16    our clients have limited -- have indicated that the limits
17    of, you know, civil procedure don't apply there.  He has
18    said that we can't actually oppose the CID unless we have no
19    basis at all.  And so we basically have no --
20              THE COURT:  That's a public statement or just
21    something that's been said.
22              MS. BRANCH:  It is a letter that he sent to our
23    clients.  It's a December 29th letter.  I think it's in
24    the record.
25              THE COURT:  Okay.
```

1          MS. BRANCH:  But -- so, you know, basically he

2     holds all the cards, and we are subject to the demand

3     without the protections of civil procedure and other things

4     that would ordinarily apply.

5          And with respect to the chill and the Twitter

6     case, I think we have briefed this, unless Your Honor wants

7     to hear more on that.

8          But I will just emphasize the harm and the threat

9     that our clients are under.  This is affecting, as the

10    declarations state, every editorial decision that they make,

11    every document they create, every story they decide to

12    publish, every article that may implicate acts.

13         And so this is a real issue.  They are being

14    chilled now, and I don't think there's actually any dispute

15    about that.

16         With respect to the statements that

17    Angelo Carusone, who is the president of Media Matters, has

18    made, I mean, I think those are just completely

19    distinguishable.  He's made limited statements on cable news

20    really defending the organization against the attacks by X

21    and by Ken Paxton.  They are backward-looking.

22         They have no bearing on what the editorial

23    department is doing, no effect on the ability of the editors

24    and the reporters and the writers to actually do their jobs.

25    They are just unable, frankly, to do their jobs while this

1    CID is hanging in the air.

2            And it's remarkable, frankly, that Ken Paxton

3    argues that the plaintiffs are not chilled when he has taken

4    the exact opposite position in the *Exxon* case where he said,

5    you know, in quasi-criminal matters like this when a CID is

6    issued, it effectively hangs in the air and it chills

7    speech.  That is the position he took.  He takes the exact

8    opposite position here.  It is not consistent with the case

9    law or, frankly, the facts.

10           And just to quote, the letter -- the December 29th

11   letter that I referenced is on the docket as Document 4-5

12   filed on January 18th.

13           THE COURT:  I'm sorry.  Document 4?

14           MS. BRANCH:  4-5.

15           THE COURT:  Okay.

16           MS. BRANCH:  It was an exhibit to, I think,

17   our motion.

18           And in it, Attorney General Paxton says, "Indeed,

19   to resist the Attorney General's investigation,

20   Media Matters would have needed to establish that there were

21   zero permissible justifications for the investigation."  And

22   he cites two cases.  So I think this idea that he's willing

23   to negotiate and all of that is really sort of false.

24           I think that I have covered everything.  You know,

25   I can't sort of underscore enough the threat that our

1   clients feel.  And that's the reason why we moved for a TRO.

2   That's the reason why we moved for a preliminary injunction.

3            I think that, you know, as Your Honor recognized

4   earlier, this is akin to, you know, a Rule 45 subpoena

5   where, you know, Rule 45(d)(3)(A) would allow us to file a

6   motion to quash here in D.C. had this been a subpoena served

7   pursuant to the Federal Rules.

8            So, Your Honor, we would ask that you grant our

9   motion, enjoin enforcement of the demand, and declare it

10  unconstitutional.  Thank you.

11           THE COURT:  All right.  Thank you, Counsel.

12           MR. LAVORATO:  Your Honor, may I be heard briefly

13  just to respond to some of those comments?

14           THE COURT:  Umm ...

15           MR. LAVORATO:  I promise I won't take more than

16  five minutes.

17           THE COURT:  Okay.  Go ahead.

18           MS. BRANCH:  Your Honor --

19           THE COURT:  I'll give you a chance to rebut.

20           MR. LAVORATO:  She made some statements that

21  I think I just need to respond to.

22           Thank you, Your Honor.

23           Your Honor, if I may, if you would look at that

24  December 29th letter and read the last paragraph of it --

25  it's in the record -- and it specifically goes into

```
 1   invitations to the plaintiffs that we will work with them,
 2   tell us what the problem is with the CID that you have.  If
 3   it's too broad, let us know.  We'll work with you.
 4            That part they didn't mention to you.  They didn't
 5   put that piece into their brief.  That's the first thing
 6   that I wanted to mention.
 7            The second thing is, with regard to the waiver
 8   issue, Your Honor, they have the burden to show you and to
 9   use a clear showing here in this District that the relief
10   they're seeking is necessary.  They have the burden.
11            THE COURT:  That's true, but -- that's true, but
12   personal jurisdiction can be waived.
13            MR. LAVORATO:  Understood.
14            THE COURT:  And I don't know you haven't waived it
15   for all purposes or as a general matter, but it's also not
16   an argument that you've put forward.
17            MR. LAVORATO:  Understood, Your Honor.  And I
18   appreciate that.
19            On the other hand, if their pleadings in and of
20   themselves, if you go back to the complaint and you go back
21   to their motion, are deficient, then there's not a clear
22   showing in order to get to personal jurisdiction or to make
23   a finding of personal jurisdiction.  That's my only comment
24   with regard to that issue.  And I don't think that that has
25   happened here.
```

1          The only other thing I want to talk about is this

2   *Exxon* amicus brief, because, to some degree, I think they

3   think they have a gold nugget there.  But the *Exxon* amicus

4   brief had to do with the Attorney General of Texas making a

5   statement in connection with a global issue known as global

6   warming.

7          *Exxon* had made a statement that global warming

8   wasn't able to be proven scientifically at the time the

9   statement was made.  From that statement, which is a

10  political position statement, an Attorney General issued a

11  CID.  That's largely different than publicizing a particular

12  article about X where you say and you allege that X is

13  purposefully putting major advertisers like Oracle --

14  Oracle, by the way, is headquartered in Texas, in Austin --

15  next to anti-Semitic articles.

16         And that's exactly what they did.  That's a

17  specific target, an allegation against X, who, by the way,

18  it's no secret Elon Musk has a lot of business interests in

19  Texas, not to mention the fact that Tesla is there.

20         THE COURT:  Right, but --

21         MR. LAVORATO:  So it's hugely different.

22         THE COURT:  That may be, but that's not what we're

23  talking about.

24         MR. LAVORATO:  The last thing I'll say is the

25  Twitter case does lay out a framework for this particular

```
 1   case.  The Twitter case is the closest case you're going to
 2   find to this one.
 3           The only difference between Twitter and their case
 4   is that they have cited some particular chilled speech.  And
 5   I don't dispute that.  They have.
 6           But if you look at the retaliation framework in
 7   Twitter, which they don't dispute would apply in this case,
 8   it lays out:
 9           No. 1, an injury-in-fact.  They've alleged it.
10   I'll give them that.
11           2, sufficient causal connection between injury and
12   the conduct complained of.
13           The conduct complained of is this CID issuance,
14   right?  Well, there has to be causation.  If the CID is
15   issued for a proper purpose under statutory law, which it
16   was in Texas, and the Texas AG has a reasonable belief that
17   unlawful conduct has occurred, then guess what.  Their
18   injury is self-inflicted.  There's no causation there.  And
19   so, therefore, you wouldn't be able to find for a
20   preliminary injunction in this particular matter.
21           The last thing I'll say is --
22           THE COURT:  But that assumes that they lose on
23   the merits.
24           MR. LAVORATO:  I'm sorry?
25           THE COURT:  That assumes they lose on the merits.
```

1        In other words, your argument is based upon

2    the premise that they haven't made a First Amendment

3    retaliation claim.

4        MR. LAVORATO:  Yes, but at this point in time,

5    Your Honor, I don't think they've had --

6        THE COURT:  In other words, that the CID was not

7    motivated by their First Amendment expression, which

8    seemingly it was.  I mean, that's what the Attorney General

9    said when he issued a public statement about launching the

10   investigation.

11       MR. LAVORATO:  Understood, Your Honor.  I see

12   where you're going.

13       But that assumes that the First Amendment

14   expression is protected in the first place, because if it's

15   not protected, if it's a fraudulent statement or if it's a

16   misrepresentation --

17       THE COURT:  Right.  So now we're back to what I

18   said to your counsel, which is that this is a defamation or

19   a libel case by proxy -- during investigation, I should say,

20   but in any event.

21       MR. LAVORATO:  Well, it's not -- it's the Texas

22   Attorney General who is looking into the issue of whether or

23   not this public statement that affects not only Texas, by

24   the way, everybody that receives this kind of information,

25   and affects the folks like X and people who read the news in

 1    Texas and other advertisers that are in Texas -- it affects

 2    all those folks.

 3              So it is squarely in the realm of what the Texas

 4    AG would be concerned with.  Texas is concerned about

 5    protecting business interests in its -- within its sovereign

 6    borders.  And that's what this is all about.

 7              So to the extent that that CID was for a proper

 8    purpose -- and they don't have a clear showing that it

 9    wasn't, other than conclusory allegations and maybe a

10    temporal issue where the CID was issued a day or so after

11    Elon Musk made this statement about suing them.

12              But, Your Honor when was he supposed to issue the

13    CID?  Two weeks later?  I mean, it seems reasonable that he

14    would have issued the CID and launched the investigation at

15    or near the time of the article.  That's exactly what

16    he did.

17              And I don't think they've made a clear showing

18    that the purpose of that CID under statutory law within the

19    state of Texas was violated in any way.  And that's why they

20    didn't sue him in his individual capacity.  That would have

21    certainly been improper.

22              But, clearly, they can't get around the fact that

23    they've sued him in his official capacity, which, by and

24    large, does away with (a)(1) right away.  That's where you

25    stop at (a)(1).

61

 1          In any event, with regard to the *Exxon*, it's
 2    completely different issue there.  And I just wanted to make
 3    mention of that.
 4          Pending your questions --
 5          THE COURT:  Thank you, Your Honor.
 6          MR. LAVORATO:  -- I'll submit.  Thank you.
 7          THE COURT:  Ms. Branch, I'll give you an
 8    opportunity if you'd like.
 9          MS. BRANCH:  No.  Thank you, Your Honor.
10          THE COURT:  All right, everyone.  I want to just
11    think through how I want to manage this.  When is your
12    opposition due to the motion to dismiss?
13          MS. BRANCH:  I think it's due in, what,
14    eight days?
15          THE COURT:  Okay.
16          MS. BRANCH:  23rd, I believe.
17          THE COURT:  Okay.
18          MS. BRANCH:  A week from tomorrow.
19          THE COURT:  All right.
20          Let me give some thought about how I want to
21    handle this long-arm issue.  It's not an issue that's going
22    to go away.  So that in some sense may be a reason to try
23    and resolve it sooner rather than later, but I also
24    understand that it's not one that I think has been properly
25    put forward, at least in the context of this motion and

62

1    maybe even the motion to dismiss.  But let me think about

2    it, and I'll let you all know in short order, okay?

3               MR. LAVORATO:  Yes, Your Honor.

4               THE COURT:  Thank you, everyone.  Appreciate your

5    time, and I appreciate the briefing and presentations.

6               COURTROOM DEPUTY:  All rise.

7               This Court is adjourned.

8               (Proceedings concluded at 11:21 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

       I, William P. Zaremba, RMR, CRR, certify that
the foregoing is a correct transcript from the record of
proceedings in the above-titled matter.


Date:__February 15, 2024____  

        William P. Zaremba, RMR, CRR

**COURTROOM**
**DEPUTY: [3]** 3/2 3/6
62/6
**MR. BLUM: [52]** 28/24
29/2 29/18 30/2 30/8
30/12 31/3 31/9 31/20
31/25 32/3 32/10 32/20
33/18 34/11 34/16
34/18 35/2 35/5 35/14
35/18 35/21 36/1 36/6
36/8 36/12 36/17 37/10
37/14 38/2 38/12 39/7
39/11 39/20 40/10
40/14 41/17 42/4 42/9
42/15 42/21 43/8 43/14
43/21 44/4 44/15 45/9
46/5 46/11 46/14 46/20
47/3
**MR. LAVORATO: [13]**
55/12 55/15 55/20
56/13 56/17 57/21
57/24 58/24 59/4 59/11
59/21 61/6 62/3
**MS. BRANCH: [66]**
**THE COURT: [133]**

**'**

**'transacting [1]** 50/13

**0**

**00147 [1]** 1/4

**1**

**1060 [1]** 2/5
**10:00 [1]** 1/6
**11:21 [1]** 62/8
**12548 [1]** 2/9
**13-422 [1]** 13/3
**147 [1]** 3/7
**15 [2]** 1/5 63/7
**1717 [1]** 2/3
**18th [1]** 54/12
**1983 [4]** 12/9 15/25
48/2 48/7

**2**

**20001 [2]** 1/15 2/15
**20006 [1]** 2/4
**2014 [1]** 29/15
**202 [3]** 1/15 2/5 2/16
**2021 [3]** 11/20 11/21
50/4
**2024 [2]** 1/5 63/7
**23rd [1]** 61/16
**24-00147 [1]** 1/4
**24-147 [1]** 3/7
**250 [1]** 1/14
**29th [5]** 24/17 24/18
52/23 54/10 55/24

**3**

**3249 [1]** 2/16
**333 [1]** 2/13
**346 [1]** 10/25
**354-3249 [1]** 2/16

**4**

**4-5 [1]** 54/14
**400 [1]** 1/14
**422 [1]** 13/3
**4476 [1]** 2/10
**45 [3]** 37/22 55/4 55/5
**4518 [1]** 1/15
**475-4476 [1]** 2/10

**5**

**50 [1]** 43/24
**50 CIDs [1]** 43/19
**512 [1]** 2/10
**567 [1]** 50/4

**6**

**686359 [1]** 11/20
**691 F.Supp.2d 89 [1]**
48/4

**7**

**787-1060 [1]** 2/5
**78711 [1]** 2/10

**8**

**839 [1]** 50/4
**89 [1]** 48/4

**9**

**900 [1]** 2/4
**968-4518 [1]** 1/15

**A**

**a.m [2]** 1/6 62/8
**ability [1]** 53/23
**able [3]** 29/11 57/8
58/19
**about [35]** 4/2 8/16
15/18 17/2 18/1 18/1
18/19 19/8 20/5 22/8
23/19 25/4 27/17 27/18
28/18 30/7 30/14 37/9
37/11 37/19 41/10 46/2
48/1 49/11 50/19 53/15
57/1 57/12 57/23 59/9
60/4 60/6 60/11 61/20
62/1
**about that [1]** 8/16
**above [1]** 63/4
**above-titled [1]** 63/4
**abranch [1]** 1/16
**absent [1]** 49/12
**absolutely [6]** 17/21
18/5 18/10 41/17 44/4
44/16
**absurd [2]** 12/5 16/7
**abuse [1]** 52/9
**abusive [1]** 45/15
**accepted [1]** 45/17
**accomplished [1]**
23/20
**accountable [1]** 16/10
**across [2]** 4/4 22/5
**act [12]** 18/10 20/24
21/5 36/2 36/5 44/18
44/25 45/6 51/12 51/14
51/19 52/8
**acted [2]** 35/20 45/4

among [838] 11/23 11/25
9/23 10/6 15/7 15/7
42/16 48/8
**activities [2]** 43/2 51/5
**activity [9]** 35/10 35/12
41/16 41/18 41/22
41/23 42/1 42/2 51/2
**acts [1]** 53/12
**actual [1]** 35/20
**actually [15]** 9/10
20/14 21/18 22/10
22/11 22/12 22/16
22/22 36/20 41/24
45/14 45/23 52/18
53/14 53/24
**add [1]** 29/4
**additional [2]** 26/24
28/5
**address [5]** 14/2 14/23
27/17 45/9 48/18
**addressed [1]** 19/4
**adjourned [1]** 62/7
**admitted [1]** 49/22
**admittedly [1]** 11/14
**adopt [1]** 47/22
**advantage [1]** 38/16
**advertisements [1]**
34/24
**advertisers [2]** 57/13
60/1
**affecting [1]** 53/9
**affects [3]** 59/23 59/25
60/1
**affidavit [1]** 20/3
**affidavits [1]** 45/16
**affirmatively [1]** 52/13
**after [2]** 38/13 60/10
**AG [2]** 58/16 60/4
**again [9]** 18/12 19/9
21/7 25/24 29/9 31/1
32/13 40/15 46/5
**against [15]** 4/6 6/11
7/5 8/23 11/10 11/11
12/10 12/19 17/4 23/10
24/1 31/14 39/18 53/20
57/17
**agent [2]** 24/5 51/13
**ago [1]** 45/22
**agree [8]** 5/24 7/19
27/9 29/10 35/16 39/8
39/11 41/20 46/9
**agreement [1]** 41/23
**ahead [4]** 20/2 36/16
49/8 55/17
**aided [1]** 2/17
**air [2]** 54/1 54/6
**airing [1]** 28/10
**akin [3]** 24/22 25/14
55/4
**al [2]** 1/3 3/8
**albeit [1]** 50/2
**all [32]** 3/13 3/14 10/8
19/7 21/13 22/16 22/20
25/8 26/2 26/7 28/9
28/17 28/22 30/6 32/14
33/9 34/13 42/15 42/21
47/2 50/8 52/19 53/2
54/23 55/11 56/15 60/2

62/6
**All right [1]** 61/10
**allegation [1]** 57/17
**allegations [4]** 9/25
15/16 34/23 60/9
**allege [3]** 9/2 45/12
57/12
**alleged [5]** 10/3 39/24
40/1 40/7 58/9
**allegedly [2]** 35/25
35/25
**alleviate [1]** 26/8
**Alliance [5]** 11/9 11/20
12/15 12/15 36/19
**Alliance v [1]** 11/9
**allies [1]** 4/7
**allow [1]** 55/5
**also [13]** 5/24 6/8 8/4
9/7 11/25 32/22 47/21
49/18 51/9 51/16 52/11
56/15 61/23
**although [1]** 33/22
**altogether [1]** 14/1
**always [1]** 9/16
**am [5]** 5/21 5/24 18/19
**Amendment [7]** 10/4
26/9 35/10 35/12 59/2
59/7 59/13
**AMERICA [3]** 1/3 3/8
5/7
**amicus [3]** 4/11 57/2
57/3
**AMIT [2]** 1/9 3/3
**amount [3]** 27/18 29/4
42/2
**analogous [4]** 33/9
33/13 36/12 43/24
**analysis [7]** 12/22
40/20 42/23 43/23 46/8
49/17 51/23
**analyzed [1]** 15/3
**analyzing [1]** 15/12
**Anderson [1]** 48/3
**Angelo [1]** 53/17
**Angelo Carusone [1]**
53/17
**announcing [1]** 4/23
**another [8]** 31/7 32/8
38/20 44/18 44/21
44/24 46/23 48/15
**answer [2]** 5/18 38/13
**answered [1]** 4/10
**anti [3]** 4/25 34/24
57/15
**anti-free [1]** 4/25
**anti-Semitic [2]** 34/24
57/15
**anticipating [1]** 41/18
**any [21]** 5/10 6/14 6/14
8/15 10/11 14/10 26/23
27/2 29/11 33/10 34/1
39/14 40/8 46/18 47/3
50/13 50/15 53/14
59/20 60/19 61/1
**any event [1]** 14/10
**anything [5]** 26/10
35/4 41/13 42/12 47/2

**anytime [1]** 5/11
**anyway [1]** 49/7
**apart [1]** 7/23
**Appeals [1]** 50/11
**APPEARANCES [2]**
1/11 1/17
**appeared [1]** 34/24
**appears [1]** 47/22
**applicable [2]** 32/15
37/3
**application [1]** 29/13
**applied [2]** 27/19 30/17
**applies [6]** 11/5 11/16
12/2 12/14 31/22 50/14
**apply [9]** 6/19 8/19
21/23 28/12 29/11
30/16 52/17 53/4 58/7
**appreciate [4]** 28/2
56/18 62/4 62/5
**are [49]** 5/4 5/6 6/19
7/1 8/17 9/24 9/24 10/9
12/12 14/9 15/9 16/22
16/23 16/25 17/8 18/8
18/14 19/6 19/22 19/24
20/25 23/5 29/10 30/12
33/19 34/12 35/12 38/8
40/3 40/4 40/5 41/6
41/8 41/9 43/9 45/23
47/20 48/18 48/19 49/7
53/2 53/9 53/13 53/18
53/21 53/25 54/3 56/21
60/1
**aren't [1]** 14/5
**argue [3]** 23/8 38/9
44/21
**argued [2]** 15/6 23/25
**arguendo [1]** 46/11
**argues [1]** 54/3
**argument [7]** 3/18 6/3
6/8 26/24 27/22 27/24
30/14 30/19 31/1 44/14
44/16 47/16 49/25
50/25 51/14 56/16 59/1
**arguments [4]** 18/14
38/10 44/11 47/23
**Aria [3]** 1/12 3/9 3/24
**Aria Branch [1]** 3/24
**arise [1]** 46/10
**arises [1]** 51/25
**Arizona [2]** 22/11
22/13
**arm [46]** 6/4 6/13 6/20
7/17 7/21 7/25 8/19 9/7
9/17 9/18 10/18 11/6
11/12 14/5 15/10 16/6
17/10 19/18 20/22
21/21 27/8 27/20 28/13
29/7 29/12 30/16 30/17
31/18 32/23 37/4 42/22
42/22 43/2 44/11 45/10
45/19 48/9 48/18 48/24
49/14 49/16 50/2 50/8
51/20 51/21 61/21
**arm's [1]** 9/18
**around [9]** 4/8 5/17
9/13 9/18 16/21 25/15
33/11 38/11 43/16 62/2
**article [5]** 5/11 34/10

**A**

article... [3] 53/12 57/12 60/15
articles [3] 40/4 40/5 57/15
articulated [1] 34/8
as [46] 4/11 5/25 7/5 7/5 7/7 7/20 8/3 8/9 8/22 9/5 9/16 10/12 10/12 12/11 13/4 14/15 16/6 16/12 20/12 21/1 21/23 23/25 26/19 27/21 30/2 31/14 31/20 31/21 34/7 34/7 35/24 40/16 41/22 42/16 42/23 43/15 45/22 45/24 47/24 50/11 51/6 53/9 54/11 55/3 56/15 57/5
aside [1] 29/3
ask [13] 5/13 19/7 23/14 23/22 26/14 27/9 33/16 35/1 37/15 40/25 44/24 48/20 55/8
asked [8] 3/25 17/18 25/23 29/16 46/2 48/1 48/11 49/10
asking [3] 6/19 26/5 26/11
asks [1] 22/16
asserted [1] 22/5
assume [1] 41/14
assumes [3] 58/22 58/25 59/13
assuming [4] 40/10 42/9 43/8 46/11
astonishing [1] 14/8
attacks [1] 53/20
attempt [2] 33/13 35/11
attention [1] 28/8
ATTORNEY [35] 2/8 4/10 4/13 16/17 20/4 20/9 22/4 23/16 31/12 31/16 33/5 33/7 35/15 35/24 37/19 38/5 38/22 39/15 41/3 41/14 41/17 41/25 42/10 42/13 44/8 44/21 45/5 48/14 51/1 54/18 54/19 57/4 57/10 59/8 59/22
Attorney General [25] 4/10 20/4 20/9 22/4 33/5 33/7 35/15 35/24 38/5 38/22 39/15 41/3 41/14 41/17 41/25 42/10 42/13 44/8 44/21 48/14 51/1 54/18 57/4 57/10 59/8
Attorney General Paxton [3] 31/12 31/16 37/19
Attorney General's [2] 45/5 54/19
Attorneys [1] 4/8
Austin [2] 2/10 57/14
authored [2] 21/25 22/1

**B**

availed [6] 17/14 19/10 19/20 20/9 22/10 22/11
availment [1] 40/24
Avenue [2] 1/14 2/15
aware [3] 10/11 28/12 50/23
away [3] 60/24 60/24 61/22

**B**

B-u-l-k-l-e-y [1] 10/25
back [10] 15/18 18/13 19/9 27/7 27/7 40/12 45/7 56/20 56/20 59/17
backward [1] 53/21
backward-looking [1] 53/21
ball [1] 41/1
Balsly [1] 51/15
bar [3] 12/9 36/14 44/15
bar today [1] 36/14
Barrett [1] 2/14
based [12] 10/9 42/19 42/20 42/21 43/22 43/24 44/9 45/15 46/1 51/10 51/21 59/1
basically [3] 13/2 52/19 53/1
basis [7] 10/17 15/24 25/13 25/21 26/6 26/15 52/19
Bates [1] 8/10
Baxter [2] 49/15 51/6
be [82]
bearing [1] 53/22
because [34] 4/6 6/6 6/9 6/24 6/25 8/8 9/21 10/12 12/11 12/25 13/1 15/13 15/16 20/23 22/4 24/2 25/13 26/4 26/6 30/3 30/22 31/16 33/3 33/4 33/6 33/25 35/5 43/22 48/12 49/4 50/8 51/2 57/2 59/14
been [26] 4/8 11/3 17/2 23/18 24/11 26/2 26/3 29/11 29/25 30/3 30/9 30/14 30/19 31/11 34/9 36/3 40/4 40/13 43/4 43/22 50/25 51/21 52/11 55/6 60/21 61/24
before [2] 1/9 49/12
began [1] 29/6
begin [1] 3/19
behalf [2] 15/7 45/5
being [13] 4/3 7/3 8/8 8/9 18/2 19/5 25/23 27/19 28/12 29/16 31/14 38/19 53/13
belief [1] 58/16
believe [8] 11/2 17/20 25/7 25/12 26/4 35/19 39/22 61/16
between [4] 24/14 39/20 58/3 58/11

Blum [4] 2/7 3/12 28/24 29/1
Boasberg's [1] 11/8
borders [1] 60/6
both [7] 3/18 5/19 13/18 21/21 24/8 38/7 40/21
bottom [1] 16/3
bounds [1] 14/15
Box [1] 2/9
Branch [1] 1/12 3/9 3/24 5/20 26/23 47/6 61/7
brief [12] 14/6 27/25 30/20 32/9 32/16 43/14 47/12 47/21 47/24 56/5 57/2 57/4
briefed [3] 21/24 42/18 53/6
briefing [11] 4/12 10/9 24/9 28/6 29/4 34/19 47/14 47/23 49/13 52/8 62/5
briefings [1] 31/10
briefly [3] 29/2 36/17 55/12
briefs [2] 14/2 27/16
bring [1] 14/6
broached [1] 25/2
broaching [1] 25/24
broad [2] 24/19 56/3
brought [9] 8/23 17/5 17/6 19/5 24/1 24/8 38/20 44/1 44/3
brunt [1] 41/23
Bulkley [2] 10/25 21/11
burden [3] 27/10 56/8 56/10
Burger [2] 45/24 46/7
Burger King [1] 46/7
business [16] 5/9 15/22 18/15 18/15 18/16 18/18 22/10 22/19 24/4 24/5 43/5 49/20 50/16 51/1 57/18 60/5
business' [1] 50/13

**C**

cable [1] 53/19
Calder [3] 32/24 32/25 40/21
call [2] 4/11 16/18
called [4] 4/24 10/25 23/1 50/3
calls [3] 43/1 43/4 43/6
came [1] 22/1
campaign [1] 5/3
can [28] 4/1 5/8 5/17 5/18 10/12 11/18 12/4 13/15 20/4 23/14 25/22 26/13 26/14 28/17 33/16 34/7 35/1 40/15 42/13 43/11 47/12 48/7 48/20 49/3 49/24 50/1 50/16 56/12
can't [10] 7/2 8/7 8/11

52/18 54/25 60/22
cannot [3] 16/13 48/23 50/12
capacity [26] 5/22 7/4 7/7 7/13 8/9 9/1 9/16 9/22 9/24 10/6 11/11 11/12 11/24 12/3 12/10 12/21 15/7 15/14 29/14 31/12 31/17 48/7 48/8 48/23 60/20 60/23
cards [1] 53/2
Carusone [1] 53/17
carve [1] 7/9
carve-out [1] 7/9
case [89]
cases [14] 11/10 13/14 19/2 20/25 21/3 21/8 21/11 21/13 29/8 30/24 50/14 51/18 52/7 54/22
causal [1] 58/11
causation [2] 58/14 58/18
cause [1] 51/5
caused [2] 18/24 51/8
causes [1] 52/9
causing [2] 25/10 34/5
cease [5] 21/12 21/14 22/7 33/5 41/12
certain [2] 11/10 22/15
certainly [6] 4/13 15/25 19/25 28/6 49/12 60/21
Certified [1] 2/13
certify [1] 63/2
CH [1] 2/14
challenge [1] 43/20
chance [2] 27/25 55/19
characterizations [1] 37/12
chart [1] 22/17
chief [4] 11/8 12/21 13/9 13/12
Chief Boasberg's [1] 11/8
chill [10] 4/16 22/18 23/2 25/10 34/5 39/24 40/8 40/13 47/19 53/5
chilled [6] 5/6 40/3 40/17 53/14 54/3 58/4
chills [1] 54/6
Chris [1] 3/12
Chris Lavorato [1] 3/12
Chris.lavorato [1] 2/11
Christopher [3] 1/12 2/7 3/9
Christopher Dodge [1] 3/9
CID [36] 25/6 26/1 33/10 35/22 36/3 38/15 38/22 38/23 39/21 39/23 41/2 41/3 41/5 41/10 41/20 42/13 43/9 44/8 46/15 46/17 46/18 52/1 52/3 52/18 54/1 54/5 56/2 57/11 58/13 58/14 59/6 60/7 60/10 60/12 60/14 60/18

CIDs [2] 43/19 48/15
circle [1] 27/7
circuit [16] 7/16 10/16 10/20 10/22 10/23 13/24 15/1 15/3 19/2 19/3 21/8 21/14 31/21 32/1 50/2 50/5
Circuits [1] 32/4
circumstances [2] 31/22 42/24
citation [1] 11/18
cite [6] 13/23 29/23 32/9 32/18 48/4 51/16
cited [13] 4/12 14/6 14/7 19/7 21/4 30/23 32/13 33/15 40/21 45/11 45/21 51/11 58/4
cites [1] 54/22
citing [1] 50/18
civil [8] 3/7 22/14 23/7 23/19 35/5 37/22 52/17 53/3
claim [5] 12/19 51/10 51/17 51/25 59/3
claims [4] 8/23 39/24 40/17 52/10
Clause [1] 50/17
clauses [1] 50/9
clear [12] 5/14 17/1 20/23 22/3 24/18 30/4 31/11 51/12 56/9 56/21 60/8 60/17
clearly [5] 7/16 14/4 16/22 49/20 60/22
client [2] 23/1 42/10
client's [2] 10/3 23/4
clients [11] 4/6 16/20 22/22 24/24 47/20 49/21 51/8 52/16 52/23 53/9 55/1
cloak [2] 10/6 15/15
close [3] 29/17 33/8 33/14
closest [1] 58/1
co [1] 49/14
co-extensive [1] 49/14
coextensive [1] 50/9
collaborate [1] 43/10
collaborating [1] 43/9
collapse [1] 49/17
colleague [2] 36/8 40/15
Collingsworth [1] 50/3
COLUMBIA [22] 1/1 12/20 13/3 15/4 15/13 15/20 16/24 17/1 19/11 20/10 22/22 39/5 41/5 41/9 41/11 41/16 42/2 42/3 44/13 45/7 50/16 52/3
come [7] 12/18 30/22 38/9 39/17 44/10 44/13 49/17
coming [3] 23/12 25/15 48/15
commencing [1] 4/24
comment [1] 56/23
comments [1] 55/13

**C**

commercial [2] 51/2
51/3
Commissioner [1]
48/6
committed [2] 41/4
52/2
common [2] 8/4 12/12
communication [1]
41/7
communications [3]
4/22 22/17 52/15
company [5] 39/5 39/6
43/18 44/9 50/4
compel [1] 23/17
complained [2] 58/12
58/13
complaint [1] 56/20
complete [1] 27/7
completed [1] 20/3
completely [2] 53/18
61/2
compliance [1] 23/17
complicated [1] 49/9
computer [2] 2/17 5/10
computer-aided [1]
2/17
concede [3] 26/19
37/12 42/4
conceded [2] 17/24
37/12
conceding [1] 35/14
concerned [2] 60/4
60/4
concluded [1] 62/8
conclusory [1] 60/9
conduct [13] 6/13 6/14
9/2 22/8 24/23 33/12
34/1 34/24 38/24 41/4
58/12 58/13 58/17
conducted [1] 41/24
conducting [3] 18/15
18/15 18/18
confines [1] 47/13
confirm [1] 3/25
connection [3] 38/20
57/5 58/11
consequences [4] 9/1
12/6 16/8 43/17
consider [1] 50/7
consideration [1]
49/25
considered [2] 11/11
25/5
consistent [3] 30/9
51/4 54/8
constitute [1] 43/4
constitutes [3] 18/18
21/5 51/19
constituting [1] 52/8
Constitution [6] 2/15
8/24 9/3 10/1 15/17
50/9
constitutional [6] 7/10
7/23 15/25 25/10 50/11
50/14
construct [1] 35/17
contact [1] 46/1 46/6

contacts [1] 15/24
10/8 10/9 15/4 15/12
17/12 19/6 19/15 21/7
21/16 24/3 43/12 43/13
44/12 45/1 45/23
contemplate [1] 38/3
contemplates [1]
45/23
contemplating [2]
41/12 41/15
contention [1] 52/1
context [5] 8/7 31/6
31/8 40/22 61/25
CONTINUED [1] 2/1
contours [2] 41/19
41/20
contract [1] 45/25
contractual [1] 51/5
contradict [1] 40/9
contradict it [1] 40/9
copy [2] 5/10 15/2
correct [16] 5/21 5/22
5/23 17/24 18/20 18/25
24/12 27/14 29/10
31/15 32/3 38/2 40/11
50/12 52/4 63/3
could [13] 5/20 13/8
15/11 16/9 23/20 28/6
36/9 43/18 44/2 45/6
48/25 49/18 52/12
couldn't [2] 12/17 49/9
counsel [18] 3/13 3/20
17/18 19/8 19/15 28/20
29/3 29/5 30/1 32/12
36/18 38/7 41/8 45/2
47/2 49/22 55/11 59/18
count [2] 43/11 43/13
country [3] 4/4 5/11
16/21
couple [4] 7/1 13/14
47/8 49/10
couple points [1] 47/8
course [4] 5/1 27/4
41/4 51/20
court [44] 1/1 2/12
2/14 3/2 3/22 3/25 5/13
5/15 11/14 14/15 15/8
15/20 15/24 19/5 19/6
23/17 23/23 28/12
28/24 29/12 30/10 33/3
33/7 35/9 36/20 37/20
37/25 38/5 38/17 38/20
39/10 39/17 42/7 42/14
42/14 44/2 44/3 48/5
48/25 50/7 50/10 50/11
52/12 62/7
courts [5] 11/3 16/10
16/21 29/11 37/1
covered [1] 54/24
covers [1] 50/15
create [1] 53/11
created [1] 23/2
creating [1] 22/18
criminal [1] 54/5
critical [1] 13/19
CRR [2] 63/2 63/8
curious [1] 20/1
currently [1] 29/4

**D**

D.C [40] 1/5 1/15 2/4
2/15 6/4 6/20 7/16 8/2
11/12 12/4 12/10 12/14
14/5 15/22 15/23 16/1
16/10 16/11 16/12 17/16
17/15 17/20 17/23 18/7
18/23 19/20 19/21
19/21 20/8 36/20 37/1
39/16 39/17 42/22 43/2
45/10 48/9 48/25 51/21
55/6
D.C. [6] 7/16 13/24
15/1 15/3 44/9 50/11
D.C. Circuit [4] 7/16
13/24 15/1 15/3
D.C. Court [5] 50/11
D.C.-based [1] 44/9
Date [1] 63/7
day [3] 17/25 31/7
60/10
days [2] 23/6 61/14
December [4] 24/18
52/23 54/10 55/24
Deceptive [3] 36/1
36/4 44/18
decide [1] 53/11
decision [2] 19/7 53/10
declarations [3] 22/19
40/2 53/10
declare [1] 55/9
declared [1] 4/6
defamation [2] 35/4
59/18
defamed [2] 35/25
35/25
defend [6] 16/14 16/21
23/10 23/13 24/25
39/18
defendant [13] 1/7 2/2
9/23 15/1 22/12 28/25
37/2 42/18 45/17 48/8
48/22 48/25 51/13
defendant's [3] 6/5
17/17 49/21
defendants [10] 11/24
12/4 12/7 13/21 14/12
17/3 17/22 20/25 51/4
51/9
defended [1] 17/4
defending [1] 53/20
defense [7] 3/12 19/8
22/21 28/23 32/6 33/2
33/14
defense now [1] 28/23
defenses [2] 23/12
52/15
deficient [1] 56/21
definition [3] 12/1 13/4
51/3
definitively [1] 43/21
degree [2] 42/24 57/2
deliver [1] 4/9
delivered [3] 46/17
46/21 46/22
delivery [1] 46/25

demand [2] 16/20 16/21
19/17 19/20 20/8 22/15
22/21 23/8 23/10 23/18
23/19 24/6 24/15 24/19
24/24 25/8 26/5 35/5
49/22 53/2 55/9
demands [1] 16/22
department [1] 53/23
described [1] 18/22
desist [5] 21/12 21/14
22/7 33/6 41/12
despite [1] 16/21
detail [1] 36/9
determine [1] 37/13
determined [1] 15/8
developed [1] 43/15
devoted [1] 28/8
dicta [3] 10/23 11/2
11/4
did [13] 4/24 11/14
19/21 29/23 31/15
31/17 33/3 38/14 38/16
49/12 52/7 57/16 60/16
didn't [19] 13/21 13/23
27/25 28/9 29/20 29/23
32/9 32/17 32/17 36/23
37/12 47/12 47/21
50/21 51/1 51/17 56/4
56/4 60/20
difference [6] 20/11
20/20 20/21 24/14
39/20 58/3
different [12] 19/5
37/15 37/23 39/14
41/11 42/22 42/23 46/8
48/19 57/11 57/21 61/2
differently [1] 37/18
difficult [1] 32/12
difficulty [1] 14/19
direct [2] 16/12 35/3
directed [1] 16/23
17/19 34/1
direction [1] 40/23
directly [1] 19/14
disagree [2] 4/4 5/12
discrete [1] 33/1
discretion [1] 24/19
discuss [5] 3/15 29/24
40/19 41/19 52/11
discussed [1] 52/13
discussion [5] 26/2
26/3 29/25 32/23 32/25
dismiss [8] 14/20 24/2
24/10 31/8 47/11 47/22
61/12 62/1
dispositive [1] 21/17
dispute [7] 8/15 17/2
20/5 39/22 53/14 58/5
58/7
disputed [1] 7/2
disputes [1] 5/16
distinction [1] 39/1
distinguish [1] 51/10
distinguishable [8]
32/7 32/17 32/19 32/21
33/3 36/13 45/18 53/19
distinguished [1]
21/23

Distributed [4] 22/21
32/6 33/2 33/14
Distributed v [1] 32/6
DISTRICT [45] 1/1 1/1
1/10 9/6 11/3 12/20
13/2 13/10 15/4 15/13
15/20 16/23 17/1 18/10
18/17 19/11 19/15
20/10 20/24 21/4 22/22
36/20 39/3 39/4 39/5
41/5 41/9 41/11 41/16
42/2 42/3 43/3 43/3
44/13 44/23 45/7 46/24
48/25 49/20 50/16 51/1
51/5 51/8 52/3 56/9
District's [1] 12/8
Division [1] 2/8
do [34] 4/1 5/14 6/23
7/20 8/17 8/18 11/17
11/19 13/10 14/2 15/11
16/7 19/23 20/19 21/20
23/23 24/4 25/3 26/13
28/6 28/15 32/4 35/8
35/15 35/24 38/9 42/6
42/12 42/13 47/13 49/6
53/24 53/25 57/4
do that [1] 28/15
do you [1] 13/10
do you have [1] 11/17
do you know [1] 19/23
docket [1] 54/11
doctrine [1] 9/21
document [6] 39/4
46/20 46/22 53/11
54/11 54/13
Document 4-5 [1]
54/11
documents [13] 4/21
4/21 16/25 18/8 23/5
23/9 24/16 26/1 41/2
41/8 41/15 42/25 46/4
Dodge [1] 1/12 3/9
does [13] 4/14 7/17
9/20 11/23 13/4 15/19
21/3 23/15 25/7 46/18
48/24 57/25 60/24
doesn't [14] 9/13 9/17
9/18 10/4 10/5 13/9
22/15 24/3 27/1 30/16
33/20 44/12 46/10
48/16
doing [4] 22/15 38/8
38/11 53/23
don't [45] 3/19 6/5 6/6
6/22 7/1 7/5 8/15 9/8
9/9 9/20 11/2 12/13
13/17 13/19 15/9 19/24
23/7 24/21 25/12 26/7
26/13 26/23 27/17 28/4
29/3 32/12 37/9 38/25
38/25 39/18 39/22
42/12 43/11 44/12 47/5
49/12 52/17 53/14
56/14 56/24 58/5 58/7
59/5 60/8 60/17
done [4] 4/18 16/12
27/16
donor [2] 4/22 5/10

**D**

donors [1]  22/16
Dooley [1]  1/12
down [1]  28/11
drawers [1]  5/9
drives [1]  5/10
drop [1]  39/15
Drummond [1]  50/4
Drummond Company
 [1]  50/4
DTPA [1]  43/22
due [19]  17/12 18/10
21/7 21/21 23/6 37/16
39/19 40/19 40/20
45/21 47/11 49/11
49/14 49/17 49/19 50/9
50/17 61/12 61/13
due-process [1]  21/7
duress [1]  45/17
during [1]  59/19
Dyson [1]  21/12

**E**

each [5]  19/18 21/11
37/2 43/19 43/24
earlier [6]  11/2 27/17
48/1 49/10 52/13 55/4
editorial [2]  53/10
53/22
editors [1]  53/23
effect [5]  40/18 46/18
49/23 51/5 53/23
effective [1]  20/6
effectively [3]  9/17
38/6 54/6
effects [2]  32/25 33/1
efforts [1]  5/13
eight [1]  61/14
eight days [1]  61/14
either [1]  43/5
ELIAS [1]  1/13
elias.law [1]  1/16
Elon [3]  4/6 57/18
60/11
Elon Musk [3]  4/6
57/18 60/11
else [3]  34/9 35/9 47/2
Email [3]  1/16 2/5 2/11
emails [1]  43/4
emphasize [1]  53/8
employees [3]  33/22
34/15 34/17
employer [1]  34/13
end [2]  9/12 17/25
ended [1]  36/21
enforce [4]  21/15
22/13 24/19 42/13
enforcement [2]  26/5
55/9
engage [1]  4/15
engaged [1]  51/7
engaging [1]  42/25
enjoin [3]  5/13 26/5
55/9
enormous [1]  22/18
enough [6]  21/15
43/16 44/12 45/1 45/8
54/25

entire [1]  29/25
entirely [1]  10/23
entity [1]  35/25
entrance [1]  46/24
equal [2]  42/2 42/5
equivalent [1]  26/21
especially [1]  47/18
essential [1]  4/1
essentially [10]  6/19
7/7 8/9 8/20 9/12 17/5
18/17 23/11 51/24 52/6
establish [2]  27/10
54/20
establishing [1]  27/12
et [2]  1/3 3/8
et al [1]  3/8
even [17]  10/24 12/8
12/18 13/25 14/7 22/23
23/1 24/21 29/21 30/21
32/18 39/22 40/10
43/12 46/11 46/23 62/1
event [3]  14/10 59/20
61/1
ever [3]  20/5 36/3 36/5
every [5]  44/7 53/10
53/11 53/11 53/12
everybody [1]  59/24
everyone [3]  3/5 61/10
62/4
everything [1]  54/24
everywhere [2]  31/24
34/6
evidence [2]  40/7 40/8
Ex [23]  6/20 7/9 7/13
7/21 8/5 8/18 8/23 9/21
10/17 11/5 11/16 12/14
15/14 16/4 17/10 27/19
28/13 29/7 29/11 29/13
29/24 30/17 31/21
Ex parte Young [23]
6/20 7/9 7/13 7/21 8/5
8/18 8/23 9/21 10/17
11/5 11/16 12/14 15/14
16/4 17/10 27/19 28/13
29/7 29/11 29/13 29/24
30/17 31/21
exact [3]  12/1 54/4
54/7
exactly [2]  57/16 60/15
example [4]  12/9 35/8
35/9 37/21
exceed [1]  48/14
except [1]  21/13
exception [4]  8/21
11/15 27/19 28/13
excursions [1]  4/15
executed [1]  46/10
executing [1]  39/23
executive [1]  22/6
exercise [2]  15/20
26/16
exhibit [1]  54/16
exists [3]  9/22 11/16
16/5
expect [1]  39/16
experiencing [1]  39/25
explained [1]  25/9

explanation [1]  56/8
expression [2]  59/7
59/14
expressions [1]  4/16
extends [1]  9/7
extensive [1]  49/14
extent [1]  60/7
external [2]  4/22 22/17
extortionists [1]  24/22
extraordinary [2]
47/19 48/13
extremely [1]  12/12
Exxon [5]  54/4 57/2
57/3 57/7 61/1
ExxonMobil [1]  4/12

**F**

F.4th [1]  10/25
F.App'x [1]  50/4
F.Supp.2d [1]  48/4
fact [16]  9/13 9/18
10/15 16/22 17/3 17/22
21/17 21/20 22/21 36/8
40/23 41/18 51/18
57/19 58/9 60/22
facts [7]  37/3 43/15
44/15 44/22 45/24 46/5
54/9
factual [1]  25/20
failed [1]  45/5
fair [4]  6/21 18/3 27/18
43/16
fairness [1]  18/1
faith [3]  25/21 26/6
false [2]  45/16 54/23
familiar [1]  10/21
far [7]  9/9 9/10 10/12
10/13 14/16 34/7 45/23
far-reaching [1]  14/16
favorable [1]  41/20
fear [1]  5/4
February [2]  1/5 63/7
federal [9]  19/6 37/21
37/25 38/3 42/7 42/14
48/25 49/6 55/7
feel [1]  55/1
Ferrara [5]  14/4 14/25
29/23 30/23 30/24
few [3]  29/5 36/18
45/22
fiction [6]  6/20 7/21
8/19 10/18 27/19 30/17
Fifth [6]  10/16 10/20
10/22 10/23 19/2 21/8
Fifth Circuit [6]  10/16
10/20 10/22 10/23 19/2
21/8
fight [1]  35/4
figures [1]  4/2
file [2]  29/21 55/5
filed [1]  24/2 47/22
54/12
files [1]  23/17
finally [2]  30/23 37/6
find [10]  11/15 13/21
15/24 29/11 33/4 37/2
38/17 50/21 58/2 58/19
finding [1]  36/22 56/23

fingertips [1]  13/17
firm [1]  19/16
first [19]  10/4 17/16
20/15 20/17 26/7 26/9
28/12 34/13 35/10
35/12 36/19 38/14
42/21 45/9 56/5 59/2
59/7 59/13 59/14
First Amendment [6]
10/4 26/9 35/12 59/2
59/7 59/13
First
 Amendment-protecte
 d [1]  35/10
five [1]  55/16
flagged [1]  29/22
flagrantly [1]  48/14
focused [3]  17/11
32/10 32/22
folks [3]  34/8 59/25
60/2
followed [2]  11/4 30/24
following [1]  49/24
follows [1]  39/23
footnote [2]  11/1 11/1
foregoing [1]  63/3
foreign [4]  16/14 24/25
39/17 45/25
forgive [1]  32/12
forum [2]  24/25 45/25
forward [4]  9/12 15/3
56/16 61/25
found [5]  10/13 11/5
22/3 45/13 48/5
foundation [1]  25/20
four [1]  21/9
fours [2]  22/20 32/14
framework [2]  57/25
58/6
frankly [3]  53/25 54/2
54/9
fraudulent [3]  33/12
38/24 59/15
free [2]  4/25 5/7
frequently [1]  48/16
fulfilled [1]  51/15
fully [2]  47/12
fulsome [1]  28/14
fundamental [1]  37/16
further [9]  3/18 5/5
16/19 27/2 33/6 40/16
43/15 43/17 47/3

**G**

Gene [2]  2/2 3/11
general [43]  2/8 2/8 4/9
4/10 11/25 12/4 12/8
12/22 13/3 13/11 15/18
15/24 20/4 20/9 22/4
23/16 31/12 31/16 33/5
33/7 35/15 35/24 37/19
38/5 38/22 39/15 41/3
41/14 41/17 41/25
42/10 42/13 44/4 44/8
44/21 48/14 51/1 54/18
56/15 57/4 57/10 59/8
59/22

General's [2]  45/5
54/19
Generals [2]  4/13
16/17
get [16]  6/17 6/25 9/17
10/4 10/5 14/20 17/10
28/10 30/13 34/16
34/20 45/7 46/3 47/12
56/22 60/22
give [5]  37/21 55/19
58/10 61/7 61/20
given [6]  14/13 28/1
28/8 47/18 49/16 49/19
global [3]  57/5 57/5
57/7
go [25]  5/9 6/25 9/8
9/10 10/12 15/18 16/14
16/20 18/13 19/9 20/2
24/25 27/7 27/7 28/11
29/5 36/16 38/11 43/19
49/8 52/12 55/17 56/20
56/20 61/22
go ahead [4]  20/2
36/16 49/8 55/17
goes [3]  4/22 8/10
55/25
going [21]  4/8 12/18
14/19 14/23 23/5 23/10
29/2 33/9 35/11 35/12
37/24 38/13 38/21 41/7
41/8 41/9 45/19 46/3
58/1 59/12 61/21
gold [1]  57/3
gone [1]  10/12
good [8]  3/4 3/6 3/13
3/21 3/23 7/14 25/21
26/6
Good morning [3]  3/4
3/21 3/23
good-faith [2]  25/21
26/6
got [4]  18/24 23/5 40/2
44/13
governed [1]  19/16
19/21
government [3]  4/3 5/8
48/10
grant [2]  49/6 55/8
granting [1]  47/17
grappling [1]  19/2
Great [1]  7/13
greater [1]  36/9
Grewal [20]  19/7 21/10
21/13 21/22 21/24
22/20 22/23 32/5 32/6
32/13 32/13 32/14
32/16 32/24 33/2 33/14
33/24 33/25 34/4 48/17
GROUP [1]  1/13
gschaerr [1]  2/6
guess [4]  8/19 21/8
27/6 58/17

**H**

had [12]  7/11 17/24
17/24 19/14 22/9 22/10
26/2 26/3 55/6 57/4
57/7 59/5

**H**

hail [1] 38/5
hailing [1] 37/19
half [1] 27/24
halfway [1] 4/4
hand [4] 4/20 38/12
40/15 56/19
handle [1] 61/21
hanging [1] 54/1
hangs [1] 54/6
happen [1] 48/16
happened [6] 36/5
36/6 46/16 48/13 51/7
56/25
happening [2] 24/23
37/24
happy [4] 3/17 26/25
38/12 42/12
harassment [2] 5/3 5/5
hard [1] 44/21
harm [2] 26/8 53/8
harmed [1] 34/9
has [53] 4/11 4/18 4/19
5/1 5/14 6/10 8/22 9/3
10/3 10/12 15/16 15/24
17/14 18/24 19/3 19/10
19/19 20/24 24/1 24/3
24/5 24/5 24/19 25/4
26/2 26/3 30/22 32/1
34/7 34/14 36/3 36/5
36/6 38/20 41/18 42/10
43/6 43/22 45/2 45/21
49/22 50/12 50/25
51/21 52/17 53/17 54/3
56/24 57/18 58/14
58/16 58/17 61/24
hasn't [4] 24/11 34/1
40/13 41/3
have [105]
haven't [10] 7/12 26/25
29/19 30/13 33/22 40/8
42/18 42/20 56/14 59/2
having [2] 14/19 30/1
he [41] 4/7 4/11 4/19
4/24 4/24 5/1 5/14 5/14
5/25 6/12 7/6 8/3 8/7
10/4 10/5 11/9 15/14
15/16 16/13 18/7 18/9
19/13 22/3 22/4 22/5
24/19 24/21 38/5 39/16
52/17 52/22 53/1 54/3
54/4 54/7 54/7 54/22
59/9 60/12 60/13 60/16
he did [1] 60/16
he said [2] 11/9 54/4
he's [7] 7/3 8/8 8/9
24/18 24/19 53/19
54/22
headquartered [2]
33/20 57/14
hear [5] 3/17 26/25
27/3 28/22 53/7
heard [2] 16/17 55/12
hearing [3] 1/9 37/7
37/7
heart [1] 6/18
held [2] 16/10 43/4
help [9] 4/9 6/24 17/9

her [8] 11/11 11/11
11/11 12/21 15/2 15/3
15/7 17/24
here [52] 3/15 4/18
5/18 9/3 13/19 14/3
14/9 14/25 15/12 16/13
17/2 17/8 18/2 18/6
18/7 18/15 18/23 18/24
19/12 21/18 22/14 23/4
24/23 26/4 27/7 28/1
31/18 32/12 33/17 34/1
37/20 38/5 38/17 38/22
39/14 39/21 39/22
40/23 41/4 44/2 44/22
45/3 45/19 47/10 48/13
49/8 51/7 51/24 54/8
55/6 56/9 56/25
here's [3] 9/11 32/8
43/17
hidden [1] 5/1
hide [1] 4/23
high [2] 4/3 5/7
high-ranking [2] 4/3
5/7
highly [2] 45/18 45/18
him [7] 5/15 7/5 7/20
10/8 15/13 60/20 60/23
himself [7] 4/11 17/14
19/10 19/20 20/9 22/5
41/4
hired [1] 45/3
hiring [4] 20/7 22/24
49/20 51/25
his [30] 4/7 4/9 4/19
4/23 4/24 5/1 5/3 5/22
6/11 6/13 7/3 7/13 8/1
8/8 10/6 10/9 15/14
15/15 18/9 31/12 31/16
39/17 41/6 41/6 48/7
48/8 48/14 51/2 60/20
60/23
hold [1] 12/5
Holder [3] 8/13 29/9
29/12
holding [1] 14/17
holds [1] 53/2
home [3] 13/2 13/2
44/13
Honor [66]
Honor's [1] 6/7
HONORABLE [2] 1/9
3/3
house [1] 25/15
how [9] 6/25 17/13
19/10 33/23 34/15
34/17 35/3 61/11 61/20
however [1] 4/14
hugely [1] 57/21
hypo [1] 38/19
hypothetical [2] 39/21
46/15
hypothetically [3]
12/19 13/9 39/2

**I**

I also [3] 32/22 52/11

I am [1] 5/24
I assume [1] 41/14
I believe [2] 17/20
61/16
I can [8] 10/12 13/15
25/22 26/13 26/14 34/7
40/15 50/1
I can't [2] 43/21 54/25
I did [1] 49/12
I don't [21] 6/5 6/6 6/22
7/1 8/15 9/8 9/9 9/20
12/13 19/24 26/13
39/22 43/11 47/5 49/12
53/14 56/14 56/24 58/5
59/5 60/17
I don't have [3] 13/17
26/23 29/3
I guess [3] 8/19 21/8
27/6
I have [5] 10/13 11/4
28/1 32/8 54/24
I just [3] 36/17 50/22
55/21
I know [3] 14/12 14/18
42/20
I mean [25] 6/17 6/18
7/8 8/10 8/17 13/23
13/25 14/4 14/18 21/6
21/7 27/21 29/20 29/23
30/22 32/11 41/14
44/14 45/3 49/4 49/5
49/25 51/23 59/8 60/13
I should [5] 10/16
28/14 31/5 40/11 59/19
I think [38] 7/1 7/25
8/10 9/9 12/5 13/6
13/14 14/11 14/13
14/19 14/25 16/3 16/6
16/16 19/1 19/18 20/21
21/22 21/25 25/2 26/20
27/1 27/13 27/23 32/6
47/25 48/11 49/1 52/14
52/23 53/6 53/18 54/24
55/3 55/21 57/2 61/13
61/24
I understand [3] 5/16
18/14 33/21
I want [7] 6/24 18/13
29/5 57/1 61/10 61/11
61/20
I wanted [1] 37/6
I will [2] 32/20 53/8
I'd [3] 9/8 29/8 34/18
I'll [15] 14/20 19/7
28/22 35/3 38/9 44/24
45/9 50/4 55/19 57/24
58/10 58/21 61/6 61/7
61/20
I'm [29] 3/17 10/20
11/17 12/16 14/1 14/19
18/12 19/2 20/1 23/4
25/22 25/24 26/10
26/10 26/25 28/11
28/12 29/2 29/16 30/6
32/17 36/16 37/11
38/13 43/13 49/5 49/7
54/13 58/24

I'm just [4] 20/1 26/10
29/2 49/5
I'm not [4] 25/22 26/10
30/6 37/11
I'm not sure [1] 10/20
I'm sorry [6] 11/17
12/16 18/12 36/16 49/7
54/13
I've [7] 3/17 23/18 28/1
28/8 29/25 37/9 40/2
idea [3] 7/8 52/11
54/22
identical [2] 44/18
44/19
identified [5] 9/9 10/8
13/14 33/22 40/12
ideology [1] 4/16
ignore [1] 50/1
immediately [2] 4/11
24/16
immunity [3] 7/4 7/14
10/5
implicate [1] 53/12
import [1] 10/17
important [6] 14/13
14/25 16/21 20/2 28/9
39/20
importantly [2] 32/6
36/13
impose [1] 16/11
improper [1] 60/21
inapposite [1] 21/2
include [1] 4/14
including [1] 19/15
incorporated [1] 33/21
Indeed [1] 54/18
indicate [1] 21/4
indicated [1] 52/16
indisputably [1] 6/12
individual [7] 5/25 9/2
9/16 11/12 12/7 48/22
60/20
inflicted [2] 39/25
58/18
information [1] 59/24
initial [1] 30/2
injunction [6] 1/9 3/16
31/6 31/11 55/2 58/20
injunctive [2] 9/4 47/18
injury [8] 16/11 16/12
18/9 18/24 52/9 58/9
58/11 58/18
inquiry [4] 7/22 7/23
49/17 50/11
Instead [1] 38/17
intended [1] 21/15
intention [1] 33/10
interaction [2] 46/1
46/3
interest [1] 33/17
interested [2] 16/18
24/20
interests [2] 57/18
60/5
interference [1] 18/22
internal [3] 4/21 4/21
22/17

**Interpretation [1]**
50/12
interpreted [1] 51/21
interrupt [3] 5/20 8/6
25/18
interrupted [1] 36/16
investigate [5] 4/14
33/11 35/6 35/21 38/23
investigating [1] 16/19
investigation [10] 4/23
17/19 25/14 25/21
41/22 54/19 54/21
59/10 59/19 60/14
investigative [7] 4/2
4/15 22/14 23/18 23/19
24/6 35/5
invitations [1] 56/1
invite [2] 5/8 38/9
invited [1] 14/6 29/20
involve [1] 52/8
involved [1] 34/25
involving [1] 41/16
irrelevant [1] 23/9
is [205]
Is there [2] 10/11 13/7
isn't [12] 9/12 12/18
21/15 26/16 29/25 31/2
33/24 38/4 39/13 43/17
44/25 45/8
isn't waived [1] 31/2
isolated [2] 33/1 44/19
issuance [2] 46/15
58/13
issue [47] 7/14 9/9
13/20 13/24 14/1 14/2
14/12 14/21 14/23 15/5
17/10 17/24 19/4 21/7
22/9 27/8 28/9 29/20
29/21 29/25 30/3 30/12
30/25 31/13 31/18 32/2
37/3 40/16 43/14 46/14
47/9 47/12 47/24 48/12
49/9 49/19 51/10 53/13
56/8 56/24 57/5 59/22
60/10 60/12 61/2 61/21
61/21
issued [11] 4/19 33/10
35/6 36/3 38/22 54/6
57/10 58/15 59/9 60/10
60/14
issues [4] 7/15 33/1
37/22 39/4
issuing [3] 35/22 41/3
48/15
it [133]
it would be [5] 14/14
25/5 42/4 44/20 46/22
it's [41] 9/22 11/20
14/8 16/5 18/1 21/10
23/9 24/4 30/6 31/20
32/13 32/15 32/18
32/20 33/21 34/8 37/2
40/1 40/7 42/9 46/19
46/21 50/3 50/6 52/23
52/23 54/2 55/25 56/3
56/15 57/18 57/21
59/15 59/15 59/15
59/21 59/21 61/1 61/13

**I**

it's... [2] 61/21 61/24
its [8] 4/20 14/15 15/21
18/8 26/6 41/8 60/5
60/5
itself [3] 10/24 22/11
39/18

**J**

JAFFE [1] 2/3
jaffe.com [1] 2/6
January [2] 24/17
54/12
Jersey [3] 22/4 33/5
33/7
jobs [2] 53/24 53/25
journalism [1] 4/2
journalist's [1] 5/9
JR [2] 1/6 3/8
judge [6] 1/10 3/3 8/10
17/23 21/25 25/2
Judge Bates [1] 8/10
judges [1] 9/5
judicial [1] 8/21
jurisdiction [47] 6/15
11/15 11/25 12/2 12/4
12/8 12/23 13/3 13/5
13/11 15/19 15/21
15/25 16/1 16/14 17/4
17/22 18/1 22/4 23/24
26/16 27/11 27/12 30/3
30/10 32/24 33/4 36/21
36/23 36/25 37/2 37/4
37/5 37/25 39/9 40/20
42/8 42/17 44/5 44/22
56/12 56/22 56/23
jurisdictional [3] 12/22
23/12 52/15
jurisdictionally [1]
50/17
just [42] 5/14 8/7 11/18
15/18 18/22 19/9 20/1
21/2 21/6 22/12 22/15
23/22 25/3 25/24 26/10
29/2 34/5 35/3 35/6
35/8 36/17 37/3 43/3
47/7 47/10 48/15 48/20
49/5 49/22 49/24 50/4
50/19 50/22 52/20 53/8
53/18 53/25 54/10
55/13 55/21 61/3 61/21
justice [1] 18/3
justifications [1] 54/21
justifying [1] 25/17

**K**

Ken [11] 4/10 6/4 7/12
16/5 16/18 18/5 19/19
22/24 24/18 53/21 54/2
Ken Paxton [9] 6/4
7/12 16/5 18/5 19/19
22/24 24/18 53/21 54/2
Ken Paxton's [1] 16/18
KENNETH [1] 1/6 2/2
2/8 3/11
Kenneth Klukowski [1]
3/11

key [2] 45/16 46/20
kid [1] 14/2
kind [2] 50/1 59/24
King [2] 45/24 46/7
Klukowski [2] 2/2 3/11
know [59] 9/5 9/8 9/9
10/6 11/16 11/23 12/3
12/3 12/13 12/13 13/8
14/4 14/12 14/12 14/13
14/14 14/18 15/8 16/3
16/5 16/16 16/19 17/25
19/18 19/20 19/23
19/24 20/5 21/1 21/24
22/3 23/1 25/14 26/4
26/7 27/2 31/7 32/4
32/11 38/11 38/14
38/19 40/19 40/22
42/20 48/17 50/25
52/11 52/12 52/17 53/1
54/5 54/24 55/3 55/4
55/5 56/3 56/14 62/2
known [1] 57/5
knows [1] 12/12

**L**

lack [4] 25/19 25/20
26/6 48/12
land [1] 44/8
language [5] 8/4 8/8
10/15 11/8 51/11
large [1] 60/24
largely [1] 57/11
last [4] 11/1 55/24
57/24 58/21
late [2] 27/22 47/25
later [3] 22/1 60/13
61/23
launched [1] 60/14
launching [1] 59/9
Lavorato [6] 2/7 3/12
17/20 36/9 38/13 40/16
law [17] 1/13 14/14
17/15 19/16 19/16
19/20 19/21 20/23
21/15 22/11 22/13
43/12 43/23 51/4 54/9
58/15 60/18
laws [1] 45/6
lawsuit [3] 5/17 16/13
38/21
lawyer [1] 38/10
lawyers [1] 41/6
lay [1] 57/25
lays [1] 58/8
lead [2] 12/5 16/7
least [10] 7/4 10/15
20/22 26/14 28/7 32/1
40/17 42/2 43/9 61/25
left [2] 7/18 14/1
legal [4] 5/5 35/17
46/20 46/22
let [12] 23/22 25/3 27/9
33/19 37/15 37/18
37/21 40/25 56/3 61/20
62/1 62/2
let's [3] 6/17 17/10
38/11
letter [8] 24/18 33/6

13/23 14/2
level [1] 46/7
libel [1] 59/19
licensed [2] 19/22
19/25
like [19] 6/19 10/2 16/9
27/2 27/3 29/6 29/8
33/24 33/25 34/4 35/21
37/8 40/5 41/14 43/3
54/5 57/13 59/25 61/8
likelihood [3] 27/11
36/22 42/15
limit [1] 50/14
limited [3] 11/10 52/16
53/19
limits [2] 49/14 52/16
line [1] 14/7
lines [1] 22/5
list [1] 4/22
lists [2] 4/22 5/10
litigation [2] 2/8 5/2
37/23
little [2] 28/11 52/13
lives [1] 13/10
LLP [2] 1/13 2/3
local [1] 8/21
located [4] 16/25 17/2
18/8 37/25
logic [4] 8/4 9/6 9/12
11/16
long [47] 6/4 6/13 6/20
7/17 7/21 7/25 8/19 9/7
9/17 9/18 9/18 10/18
11/6 11/12 14/5 15/10
16/6 17/10 19/18 20/22
21/21 27/8 27/20 28/13
29/7 29/12 30/16 30/17
31/18 32/23 37/4 42/22
42/22 43/2 44/11 45/10
45/19 48/9 48/18 48/24
49/14 49/16 50/2 50/8
51/20 51/21 61/21
long-arm [45] 6/4 6/13
7/17 7/21 7/25 8/19 9/7
9/17 9/18 10/18 11/6
11/12 14/5 15/10 16/6
17/10 19/18 20/22
21/21 27/8 27/20 28/13
29/7 29/12 30/16 30/17
31/18 32/23 37/4 42/22
42/22 43/2 44/11 45/10
45/19 48/9 48/18 48/24
49/14 49/16 50/2 50/8
51/20 51/21 61/21
long-arm statute [1]
6/20
long-arm's [1] 9/18
longer [1] 12/17
look [8] 7/1 9/11 24/17
37/8 46/9 49/3 55/23
58/6
looked [2] 10/13 30/24
looking [4] 43/25
51/18 53/21 59/22
lose [2] 58/22 58/25
lot [2] 33/25 57/18

**M**

made [20] 5/14 17/17
20/11 27/24 30/13
34/23 36/18 41/23 43/7
45/15 47/23 50/25
53/18 53/19 55/20 57/7
57/9 59/2 60/11 60/17
mail [3] 21/1 21/18
46/23
mailed [4] 20/12 20/15
20/17 21/12
mailed first [1] 20/15
mailing [1] 21/14
maintain [1] 50/7
maintains [1] 15/21
major [2] 34/13 57/13
make [10] 20/20 20/21
26/24 38/10 44/10
46/24 50/22 53/10
56/22 61/2
makes [2] 22/23 51/12
making [4] 39/1 43/1
44/11 57/4
malice [1] 35/20
manage [1] 61/11
many [5] 33/23 34/15
34/16 34/17 34/20
Maryland [7] 13/10
17/3 17/14 17/18 17/23
25/2 37/7
Massachusetts [1]
1/14
matter [14] 8/3 16/10
23/6 30/2 56/15 58/20
63/4
matters [31] 1/3 3/7
4/20 4/25 16/19 16/20
17/1 17/20 18/8 20/8
22/25 23/15 23/24 24/1
24/2 25/4 25/7 25/25
33/17 33/19 34/23 41/1
41/7 41/19 42/8 42/10
42/24 43/6 53/17 54/5
54/20
Matters' [1] 19/14
may [12] 3/21 11/11
15/20 16/18 28/24
33/21 43/10 53/12
55/12 55/23 57/22
61/22
maybe [5] 12/18 28/13
43/13 60/9 62/1
MC [1] 2/9
MC-019-1 [1] 2/9
me [39] 6/19 6/24 6/25
7/18 7/18 10/12 14/8
17/9 17/13 18/12 19/9
19/9 23/22 25/3 27/9
27/9 28/7 29/19 31/1
32/12 32/16 32/18
33/19 33/24 34/4 35/16
37/13 37/15 37/18
37/21 39/8 39/14 40/25
44/17 44/21 46/9 48/21
61/20 62/1
mean [35] 6/17 6/18
7/8 8/10 8/17 12/7 13/8
13/23 13/25 14/4 14/18

46/9 16/20 17/16 21/6
21/7 27/21 28/4 29/20
29/23 30/22 32/11 39/2
41/14 44/10 44/14 45/3
48/24 49/4 49/5 49/25
51/23 53/18 59/8 60/13
meaning [1] 50/10
means [2] 18/11 50/15
mechanical [1] 2/17
media [36] 1/3 1/12 3/7
4/20 4/25 16/19 16/20
17/1 17/20 18/8 19/14
20/8 22/25 23/15 23/24
24/1 24/2 25/4 25/7
25/25 33/17 33/19
34/23 36/4 36/7 41/1
41/7 41/19 42/8 42/10
42/24 43/6 43/18 44/9
53/17 54/20
Media Matters [27]
4/20 4/25 16/19 16/20
17/1 17/20 18/8 20/8
22/25 23/15 23/24 24/1
24/2 25/4 25/7 25/25
33/17 33/19 34/23 41/7
41/19 42/8 42/10 42/24
43/6 53/17 54/20
Media Matters' [1]
19/14
MEHTA [2] 1/9 3/3
members [1] 4/1
mention [5] 32/22 56/4
56/6 57/19 61/3
mentioned [6] 29/6
29/8 31/20 32/5 45/22
45/24
mentioning [1] 32/4
mere [1] 21/14
merely [1] 46/16
Merit [2] 2/13
merits [3] 36/22 58/23
58/25
method [1] 46/23
might [2] 41/20 49/11
minimum [4] 17/11
21/7 21/16 45/1
minutes [1] 55/16
misleading [1] 33/12
misrepresentation [2]
38/24 59/16
moment [2] 6/18 19/8
moments [1] 45/22
Monell [1] 12/19
Monell claim [1] 12/19
money [1] 45/7
more [16] 10/24 14/9
21/10 27/6 28/14 29/4
33/1 33/25 36/18 38/18
41/13 41/20 44/20
45/23 53/7 55/15
more-isolated [1] 33/1
morning [6] 3/4 3/6
3/13 3/15 3/21 3/23
most [2] 4/1 4/20
motion [20] 3/16 14/20
24/2 24/9 30/6 30/7
30/8 31/6 31/7 47/11
47/16 47/21 47/22

**M**

motion... [17] 54/17 55/6 55/9 56/21 61/12 61/25 62/1
motivated [1] 59/7
motive [2] 4/24 5/1
Mouzavires [2] 49/15 50/18
Mouzavires v [1] 49/15
move [2] 17/9 38/15
moved [2] 55/1 55/2
moves [2] 38/1 39/6
Mr. [13] 3/11 5/21 5/25 17/14 17/20 19/10 24/8 29/1 30/15 34/7 36/9 38/13 40/16
Mr. Blum [1] 29/1
Mr. Gene Schaerr [1] 3/11
Mr. Lavorato [4] 17/20 36/9 38/13 40/16
Mr. Musk [1] 24/8
Mr. Paxton [6] 5/21 5/25 17/14 19/10 30/15 34/7
Ms. [5] 3/9 5/20 26/23 47/6 61/7
Ms. Aria Branch [1] 3/9
Ms. Branch [4] 5/20 26/23 47/6 61/7
much [4] 17/23 26/19 33/6 47/5
Musk [4] 4/6 24/8 57/18 60/11
must [2] 36/21 37/1
muzzling [1] 5/4
my [9] 4/6 13/17 16/20 18/13 19/15 36/8 40/15 42/10 56/23

**N**

narrowed [1] 26/1
narrower [1] 25/6
nation [1] 34/2
national [1] 22/6
nature [2] 46/20 47/19
near [1] 60/15
nearly [1] 44/18 44/19
necessary [2] 6/22 56/10
need [3] 14/23 50/7 55/21
needed [1] 54/20
negotiate [5] 24/22 25/13 26/8 26/17 54/23
negotiating [4] 24/20 25/4 26/20 41/9
never [1] 16/10
New [6] 22/4 33/5 33/7 35/13 39/3 39/4
New Jersey [3] 22/4 33/5 33/7
New York [3] 35/13 39/3 39/4
news [3] 34/21 53/19 59/25
next [5] 28/18 29/24

Nice [1] 3/14
no [43] 1/4 5/7 6/2 7/14 12/11 16/10 17/2 20/19 23/25 24/3 24/5 24/5 25/13 26/15 27/1 28/2 30/9 32/1 33/13 35/16 35/16 35/16 40/23 42/1 42/11 42/11 42/11 42/11 42/11 42/11 43/25 44/20 46/20 48/24 49/23 52/18 52/19 53/22 53/23 57/18 58/9 58/18 61/9
non [2] 37/23 37/24
non-party [2] 37/23 37/24
noncontact [1] 44/19
nonetheless [3] 34/20 37/1 40/19
not [93]
note [2] 6/3 47/10
noted [2] 9/5 27/21
nothing [1] 23/16
notions [1] 18/3
now [13] 3/2 5/18 10/22 17/11 25/11 28/23 32/17 32/18 37/13 38/18 44/1 53/14 59/17
nugget [1] 57/3
nullifies [1] 51/14
number [1] 33/22
numeral [2] 30/20 30/20
NW [3] 1/14 2/3 2/15

**O**

oag.texas.gov [1] 2/11
obviously [3] 14/16 27/25 28/7
occur [1] 51/8
occurred [1] 58/17
off [1] 51/22
offending [1] 50/17
offends [1] 18/2
offer [1] 49/24
offered [2] 38/10 41/18
office [7] 2/8 6/11 19/14 22/25 23/4 24/4 41/6
officer [2] 13/1 48/2
officers [3] 12/10 12/11 15/23
offices [2] 34/14 41/24
official [31] 4/15 5/22 7/3 7/7 7/13 8/8 8/25 8/25 9/16 9/22 9/24 10/6 11/10 11/24 12/3 12/10 12/21 15/2 15/14 15/15 19/4 21/12 22/11 29/14 29/14 31/12 31/17 48/7 48/8 48/23 60/23
official-capacity [3] 9/22 11/24 12/3
officials [4] 4/4 5/8 8/24 16/9

unnamed [2] 23/15 29/8
13/16 14/22 24/11 24/13 26/18 26/22 28/17 28/19 31/19 36/15 37/14 39/5 39/12 44/6 47/1 50/20 50/22 50/24 52/5 52/25 54/15 55/17 61/15 61/17 62/2
once [1] 41/22
one [17] 6/5 7/1 7/3 7/16 10/2 10/14 14/13 19/1 24/15 27/6 30/14 32/15 49/11 51/22 51/24 58/2 61/24
ongoing [5] 41/16 41/18 46/1 46/3 46/6
online [1] 34/2
only [14] 8/3 15/6 19/3 20/18 23/7 29/10 44/2 45/17 48/7 50/15 56/23 57/1 58/3 59/23
open [4] 5/9 29/15 31/20 31/23
opinion [1] 11/1
opportunity [2] 47/13 61/8
oppose [1] 52/18
opposed [2] 20/12 35/24
opposite [2] 54/4 54/8
opposition [4] 13/22 32/16 47/11 61/12
Oracle [2] 57/13 57/14
order [8] 6/7 7/22 21/12 21/14 23/9 43/19 56/22 62/2
ordinarily [1] 53/4
organization [4] 4/25 36/4 36/7 53/20
organizational [1] 22/16
other [22] 9/11 9/15 16/14 16/17 26/23 31/8 32/4 33/11 35/4 36/13 41/6 44/7 49/2 51/25 52/7 53/3 56/19 57/1 59/1 59/6 60/1 60/9
otherwise [2] 12/5 16/7
ought [2] 28/10 39/16
our [31] 4/12 10/3 10/8 10/15 22/22 23/1 23/3 24/23 25/9 26/8 29/4 30/9 32/25 42/15 43/22 44/13 44/16 47/15 47/19 49/13 49/21 51/7 51/16 52/7 52/14 52/16 52/22 53/9 54/17 54/25 55/8
our motion [1] 54/17
ourselves [2] 7/11 38/17
out [20] 5/4 6/24 7/9 14/6 14/14 18/12 19/4 19/9 21/11 29/14 38/6 40/22 43/3 45/11 48/13 49/11 49/13 51/25 57/25 58/8

outside [2] 23/3 52/9
over [13] 4/20 13/11 15/21 22/4 23/24 26/16 37/2 38/12 40/15 42/8 42/17 48/6 49/3
overbroad [1] 23/8
overly [1] 13/19
own [1] 52/15

**P**

P.O [1] 2/9
Packard [2] 1/13 3/10
page [1] 11/20
page 1 [1] 11/20
paid [1] 45/4
papers [4] 3/17 4/13 25/9 51/16
paragraph [2] 27/24 55/24
parlance [1] 5/5
Parole [1] 48/6
part [2] 11/24 56/4
parte [23] 6/20 7/9 7/13 7/21 8/5 8/18 8/23 9/21 10/17 11/5 11/16 12/14 15/14 16/4 17/10 27/19 28/13 29/7 29/11 29/13 29/24 30/17 31/21
particular [4] 57/11 57/25 58/4 58/20
particularly [1] 34/9
parties [2] 39/22 43/9
party [4] 37/23 37/24 38/1 38/7
past [2] 17/9 17/10
pause [1] 36/21
PAXTON [34] 1/6 3/8 4/10 4/18 5/21 5/25 6/4 6/9 6/10 7/12 7/25 8/1 9/3 10/3 16/5 16/9 17/14 18/5 19/10 19/19 22/24 24/18 30/15 31/12 31/16 34/7 35/15 37/19 38/5 38/22 39/15 53/21 54/2 54/18
Paxton's [4] 5/13 15/12 16/18 52/15
payback [1] 4/9
penalty [1] 40/2
Pence [2] 11/9 11/20
Pending [1] 61/4
people [1] 59/25
perfectly [1] 39/14
perhaps [1] 31/7
perjury [1] 40/3
permissible [1] 54/21
person [22] 6/4 6/12 7/25 8/3 8/7 12/1 12/1 13/4 15/5 15/21 16/6 21/2 35/24 45/4 45/4 45/5 46/24 47/9 47/12 48/9 48/11 48/23
personal [31] 5/15 12/21 15/20 17/4 17/25 20/19 21/4 21/18 23/11 23/24 27/10 27/12 30/3 30/10 32/24 33/4 36/21

46/23 36/24 37/2 37/4 37/5 40/20 42/7 42/17 44/22 45/12 56/12 56/22 56/23
personally [1] 20/13
persons [3] 12/8 12/11 15/9
phase [1] 24/10
phone [3] 43/1 43/3 43/6
physical [1] 46/24
physically [1] 51/13
PI [2] 47/13 47/23
piece [1] 56/5
place [6] 5/9 8/18 15/21 20/24 44/2 59/14
plain [3] 7/24 8/4 8/8
plaintiff [12] 1/12 22/9 22/10 34/1 38/14 38/16 39/3 39/9 39/24 42/16 45/2 45/21
plaintiffs [16] 1/4 3/10 3/24 3/25 5/4 5/18 6/9 6/11 6/13 15/6 32/13 40/21 45/11 50/6 54/3 56/1
plaintiffs' [4] 3/16 3/19 30/1 37/6
platform [1] 34/2
plausible [2] 9/25 15/16
play [2] 18/3 41/1
pleadings [1] 56/19
please [3] 3/4 3/22 28/24
point [13] 11/7 12/17 15/18 17/16 27/10 27/15 38/25 43/8 48/3 49/11 49/12 52/7 59/4
points [4] 4/17 29/5 36/18 47/8
police [7] 12/10 12/21 13/1 13/9 13/12 15/23 48/2
political [1] 57/10
politics [1] 4/5
pontificate [1] 49/8
position [13] 17/13 23/20 25/19 30/9 42/6 42/15 43/18 43/22 47/15 54/4 54/7 54/8 57/10
postal [1] 46/23
posting [1] 38/9
potential [1] 38/19
potentially [2] 16/18 52/14
power [2] 4/13 4/14
powerful [1] 4/2
Practices [3] 36/2 36/5 44/18
precedent [1] 48/12
precisely [4] 4/18 9/2 23/23 51/6
preliminary [7] 1/9 3/16 31/6 31/11 47/18 55/2 58/20
premise [1] 59/2

**P**

prepared [1] 25/5 25/25
present [4] 23/1 26/8 44/17 51/13
presentations [1] 62/5
presented [1] 40/8
president [2] 40/13 53/17
presiding [1] 3/3
press [3] 4/1 4/23 5/7
presumably [6] 13/2 38/11 38/19 44/2 45/3 45/6
Prettyman [1] 2/14
prevent [1] 47/17
principle [1] 15/21
probably [1] 10/21
problem [2] 39/19 56/2
problematic [1] 13/21
procedure [4] 23/8 37/22 52/17 53/3
proceed [1] 15/12
proceedings [5] 1/9 2/17 17/18 62/8 63/4
process [32] 17/12 18/10 19/13 19/22 19/24 20/7 21/7 21/21 22/25 23/3 26/16 37/17 39/19 40/20 40/20 44/20 44/25 45/13 45/15 45/21 46/16 46/21 49/11 49/15 49/17 49/19 49/21 50/9 50/17 51/7 51/19 52/9
produce [3] 25/5 26/1 41/1
produced [1] 2/17
projected [1] 22/5
promise [1] 55/15
promulgate [1] 4/16
proper [2] 58/15 60/7
properly [2] 6/6 61/24
proposition [1] 13/8
prospective [2] 7/10 9/4
protected [3] 35/10 59/14 59/15
protecting [1] 60/5
protection [2] 10/4 10/5
protections [4] 17/15 19/11 23/7 53/3
proven [1] 57/8
provide [2] 49/2 51/4
provision [2] 50/13 50/15
proxy [2] 35/4 59/19
pseudo [1] 22/6
pseudo-national [1] 22/6
public [4] 4/2 52/20 59/9 59/23
publicizing [1] 57/11
publicly [1] 4/8
publish [1] 53/12
published [1] 40/4
publisher [1] 5/11

publishes [1] 34/2

**purpose [5]** 35/22 35/23 58/15 60/8 60/18
purposeful [1] 40/23 40/24
purposefully [2] 18/9 57/13
purposes [11] 7/4 9/17 11/12 21/5 30/5 30/7 30/8 30/15 47/16 48/24 56/15
pursuant [1] 55/7
pursued [1] 40/6
pushed [1] 17/22
put [6] 9/12 28/4 37/18 56/5 56/16 61/25
putting [1] 57/13

**Q**

quash [4] 38/1 38/15 39/6 55/6
quasi [1] 54/5
quasi-criminal [1] 54/5
question [26] 6/23 7/18 8/20 9/11 17/11 17/21 18/13 19/1 23/14 23/22 25/25 27/6 27/17 27/18 29/15 31/21 31/23 32/8 33/16 35/1 37/15 38/18 43/17 44/24 48/1 50/2
questions [8] 3/18 5/19 13/25 26/23 27/2 47/4 49/10 61/4
quite [1] 14/8
quote [1] 54/10
quotes [1] 33/8

**R**

radical [1] 4/25
raise [5] 13/21 29/9 29/20 47/25 48/3
raised [6] 6/5 6/6 14/24 27/22 31/13 46/6
raises [1] 13/25 14/21
raising [1] 37/7
ranging [1] 4/20 22/14
ranking [1] 4/3 5/7
rather [1] 61/23
reach [7] 7/17 9/14 9/19 11/24 31/5 43/8 44/12
reached [1] 50/16
reaches [1] 50/13
reaching [1] 14/16
read [6] 3/17 8/20 37/9 50/4 55/24 59/25
real [2] 8/15 53/13
really [17] 7/2 8/17 12/18 14/1 14/2 14/8 16/16 18/1 19/3 21/9 34/8 44/19 51/11 51/7 51/18 53/20 54/23
realm [1] 60/3
Realtime [1] 2/13
reams [1] 23/5
reason [1] 9/21 16/4 16/5 26/17 33/2 33/15

investors [3] 55/11 61/22

**reasonable [1]** 39/15 58/16 60/13
reasons [2] 25/8 45/2
rebut [1] 55/19
rebuttal [1] 27/3
receives [1] 59/24
receiving [1] 41/8
recent [2] 10/24 21/10
recognize [1] 41/2
recognized [6] 8/11 8/23 9/6 10/24 11/15 55/3
recognizes [1] 8/5
record [4] 3/7 52/24 55/25 63/3
recorded [1] 2/17
records [1] 25/5
recruiting [1] 4/8
reference [2] 13/15 31/17
referenced [1] 54/11
regard [9] 15/4 34/22 34/23 37/3 45/10 45/13 56/7 56/24 61/1
regarding [1] 48/2
registered [3] 2/13 24/4 24/5
regular [1] 41/7
regularity [1] 16/2
regulate [1] 35/11
regulating [1] 33/17
Reilly [1] 48/4
reiterated [1] 31/15
reject [1] 14/15
relates [1] 40/16
relation [1] 32/24
release [1] 4/23
relied [2] 8/1 21/1
relief [5] 7/10 9/4 47/18 52/12 52/14 56/9
relies [1] 12/1
reluctant [1] 28/11
rely [3] 6/13 8/18 20/4
remarkable [1] 54/2
remedy [3] 38/15 38/16
remember [2] 8/11 8/12
reply [1] 47/24
Reporter [4] 2/12 2/13 2/13 2/14
reporters [1] 53/24
reporting [1] 4/7
representative [2] 8/25 15/15
require [1] 26/13
required [2] 22/24 25/12
requirement [1] 51/14
requiring [2] 26/7 26/10
reservice [1] 45/17
reside [1] 13/9
resident [3] 39/16 39/17 41/16
residents [2] 16/11 61/12

**resolve [7]** 6/23 25/22 25/23 29/17 36/23 49/18 61/23
resolved [1] 32/1
resolving [2] 31/7 36/21
respect [8] 15/23 18/14 20/22 20/22 21/21 41/5 53/5 53/16
respond [7] 27/25 29/2 32/5 34/18 36/17 55/13 55/21
response [4] 17/21 26/1 27/23 28/1
responses [1] 34/12
responsive [1] 6/7
restate [1] 11/18
retaliate [1] 6/11
retaliation [3] 5/5 58/6 59/3
retaliation claim [1] 59/3
retaliatory [5] 16/22 16/23 24/6 24/23 25/9
Reuben [3] 2/7 3/12 28/24
Reuben Blum [3] 3/12
revolve [1] 5/17
right [40] 3/13 7/7 7/11 8/14 9/22 17/7 18/19 19/16 20/16 20/23 22/2 22/7 23/2 25/11 25/16 28/17 28/22 29/16 30/11 35/13 36/11 36/16 37/13 38/1 39/6 44/2 44/3 45/20 46/2 46/13 47/2 48/7 48/22 55/11 57/20 58/14 59/17 60/24 61/10 61/19
rights [4] 10/4 16/15 25/10 26/9
rise [1] 62/6
RMR [2] 63/2 63/8
road [1] 28/11
Roman [2] 30/20 30/20
route [1] 14/20
routinely [1] 43/4
Rule [3] 37/22 55/4 55/5
Rule 45 [2] 55/4 55/5
ruled [1] 24/11
Rules [3] 37/21 38/3 55/7
run [2] 9/13 14/22

**S**

said [24] 4/11 6/8 7/16 9/10 10/22 11/9 17/6 17/20 21/14 32/14 33/7 37/1 40/3 41/1 44/1 45/2 47/15 50/6 50/12 52/18 52/21 54/4 59/9 59/18
same [12] 12/1 13/4 14/21 15/11 21/1 21/25 25/3 42/9 44/11 51/24

Samuel [2] 1/13 3/10

**Samuel Ward Packard [1]** 3/10
satisfied [2] 7/22 18/11
satisfy [1] 45/1
satisfying [1] 17/12
save [1] 31/6
say [22] 12/19 13/9 13/18 15/19 17/5 17/10 17/14 20/19 21/1 22/15 23/15 33/20 35/9 39/2 41/1 43/21 48/22 51/16 57/12 57/24 58/21 59/19
Say Media Matters [1] 41/1
saying [5] 8/10 23/4 23/18 30/6 50/1
says [5] 11/1 14/4 49/15 51/15 54/18
scenario [2] 38/4 39/13
schaerr [2] 2/2 2/3 2/6 3/11
schaerr-jaffe.com [1] 2/6
scheme [1] 39/21
Schleit [5] 45/12 45/16 51/10 51/15 52/9
Schleit v [1] 45/12
scientifically [1] 57/8
scope [2] 6/7 6/12 41/10
searching [1] 25/15
seated [1] 3/4
second [1] 56/7
secret [1] 57/18
section [2] 12/9 49/13
Section 1983 [1] 12/9
see [3] 39/18 46/5 59/11
seek [2] 16/25 52/12
seeking [4] 23/9 43/10 52/14 56/10
seemingly [2] 10/24 59/8
seems [6] 7/18 19/3 31/23 33/25 39/14 60/13
self [4] 5/4 39/23 39/25 58/18
self-executing [1] 39/23
self-inflicted [2] 39/25 58/18
self-muzzling [1] 5/4
Semitic [2] 34/24 57/15
send [1] 44/8
sending [7] 18/17 18/23 19/11 38/6 41/12 42/25 44/25
sense [5] 8/4 34/1 34/5 37/16 61/22
sensitive [1] 4/21
sent [4] 19/14 24/18 41/2 52/22
sentence [1] 14/8
separate [3] 6/14 7/22

**S**

separate... [1] 38/21
separately [2] 34/20 47/21
sequential [1] 14/16
serve [2] 23/4 44/25
served [7] 19/16 20/13 22/22 46/19 49/21 51/7 55/6
server [9] 19/13 20/7 22/25 23/3 44/20 44/25 46/16 49/21 51/7
servers [2] 19/22 19/24
serves [1] 18/7
service [17] 20/4 20/5 20/18 21/2 21/4 21/18 21/19 45/13 45/15 45/15 46/10 46/21 49/22 51/19 52/1 52/2 52/8
serving [2] 19/20 20/8
session [1] 3/2
set [2] 14/1 27/16
several [5] 9/5 19/14 21/3 29/8 34/12
shape [1] 7/14
shares [1] 13/4
she [8] 15/2 15/6 15/7 19/16 19/21 19/21 20/3 55/20
shop [2] 33/8 33/14
short [2] 14/22 62/2
should [17] 8/20 10/16 16/5 17/5 17/6 24/24 24/25 25/8 25/12 28/14 30/17 30/19 31/5 40/11 47/17 50/10 59/19
shouldn't [1] 26/19
show [1] 56/8
showing [4] 56/9 56/22 60/8 60/17
sides [3] 3/18 13/18 38/7
simply [2] 5/12 41/11
since [1] 47/12
single [5] 10/14 11/5 14/7 14/7 49/17
sit [1] 49/8
situation [1] 43/15
skip [1] 50/10
so [88]
so I think [7] 7/24 8/3 15/11 15/23 20/7 23/21 54/22
So it's [2] 37/2 57/21
so this is [1] 53/13
social [1] 4/16
some [25] 3/18 10/15 11/3 16/14 26/1 28/14 31/8 33/22 34/25 36/12 38/20 40/12 41/2 41/15 41/18 47/9 48/18 49/2 52/7 55/13 55/20 57/2 58/4 61/20 61/22
somebody [4] 7/6 9/15 34/9 45/3
someone [1] 25/14
something [6] 23/5 52/21

somewhere [1] 35/9
sooner [1] 61/23
sorry [11] 8/6 11/17 12/16 18/12 23/19 24/17 25/18 36/16 49/7 54/13 58/24
sort [17] 6/17 7/20 8/17 10/17 13/7 13/18 13/20 13/23 14/8 15/15 16/4 25/24 29/24 30/23 49/5 54/23 54/25
sounds [1] 6/18
Southern [2] 39/3 39/4
sovereign [2] 10/5 60/5
speak [4] 36/9 37/6 38/13 40/16
specific [5] 12/2 13/5 22/8 48/5 57/17
specifically [8] 12/14 29/13 31/13 31/17 32/14 34/22 38/18 55/25
speech [4] 4/25 40/17 54/7 58/4
spent [1] 47/9
spot [1] 28/4
squarely [2] 32/15 60/3
standard [1] 27/15
standing [1] 23/3
standpoint [1] 39/19
stands [1] 13/7
start [1] 29/6
starting [1] 29/9
state [55] 4/8 4/13 4/19 6/1 6/9 6/14 6/15 7/7 8/2 8/9 8/21 8/24 10/7 10/9 10/10 11/5 11/10 15/8 19/4 19/5 19/16 21/11 21/12 21/15 22/5 23/6 23/12 23/16 23/17 23/23 24/3 25/13 28/13 29/14 30/15 30/16 31/14 35/11 36/4 37/23 37/25 38/6 38/20 38/18 42/7 42/14 43/19 44/13 44/19 45/25 48/13 48/15 51/13 53/10 60/19
stated [3] 15/8 29/13 36/20
statement [10] 52/20 57/5 57/7 57/9 57/9 57/10 59/9 59/15 59/23 60/11
statements [6] 17/17 33/4 40/12 53/16 53/19 55/20
states [10] 1/1 1/10 7/17 9/14 9/19 14/5 15/9 15/9 43/24 50/10
status [1] 24/7
statute [49] 6/4 6/13 6/20 7/17 7/21 7/25 8/21 8/21 9/7 9/13 9/13 10/18 11/6 11/13 11/23

13/5 14/5 15/10 15/19 16/6 20/22 21/21 27/20 28/13 29/7 29/12 30/16 30/18 31/18 32/23 35/11 37/4 42/22 42/23 43/2 44/11 45/10 48/9 48/24 49/2 49/14 49/16 50/8 51/20 51/21
statute, [1] 45/20
statute, right [1] 45/20
statutes [4] 19/19 43/24 48/18 49/6
statutory [6] 13/4 38/14 38/16 39/21 58/15 60/18
stenography [1] 2/17
step [1] 29/24
steps [1] 28/18
stick [1] 21/6
still [3] 13/10 14/23 19/2
stop [3] 5/14 22/15 60/25
stopping [1] 22/8
story [1] 53/11
straight [1] 50/10
Street [1] 2/3
stripped [1] 15/15
strips [1] 8/25
Stroman [11] 10/19 11/4 21/10 21/23 22/1 22/9 22/12 32/7 33/3 33/6 33/8
stronger [1] 22/23
strongly [1] 36/24
subject [14] 12/4 14/5 16/1 16/13 18/2 18/5 24/24 25/8 35/12 37/24 39/9 43/18 44/22 53/2
subjects [1] 9/1
submit [1] 61/6
submitted [1] 22/19
subpoena [16] 18/17 18/23 19/12 20/12 20/14 23/18 37/22 38/1 38/6 39/4 39/6 39/16 39/18 45/1 55/4 55/6
subsection [1] 50/8
substantial [2] 18/3 27/11
succeed [1] 36/22
success [1] 27/11
such [7] 12/11 23/25 43/2 45/24 46/6 46/22 46/25
sue [5] 5/18 5/18 12/20 49/7 60/20
sued [24] 5/21 6/9 7/3 7/6 7/7 7/12 7/12 8/1 8/8 8/9 9/15 12/20 15/2 15/13 29/14 31/12 31/16 42/10 45/6 48/2 48/6 48/23 48/25 60/23
sufferance [1] 20/19
suffering [1] 18/9
sufficient [2] 19/6 58/11

suggest [2] 12/17 36/24
suggesting [1] 6/21
suggests [1] 10/16
suing [5] 9/4 10/7 10/7 42/16 60/11
suit [13] 7/5 11/10 11/11 16/1 16/13 17/5 17/6 18/2 18/6 23/17 30/15 31/14 39/2
suit here [1] 18/6
Suite [2] 1/14 2/4
suits [3] 12/9 12/12 15/25
Sullivan [1] 35/13
support [3] 21/3 22/19 40/7
suppose [2] 49/6 49/7
supposed [2] 5/25 60/12
sure [12] 10/20 26/12 30/8 31/3 31/9 32/20 34/11 35/15 37/10 40/14 49/9 50/23
surprised [1] 43/12
surreply [6] 6/5 13/24 27/23 29/21 30/21 31/15
sustained [1] 45/23
sworn [1] 40/2
synopsis [1] 6/21

**T**

take [5] 29/24 37/8 38/16 40/11 55/15
taken [2] 40/21 54/3
takes [2] 20/24 54/7
talk [2] 28/17 57/1
talked [3] 25/3 27/17 27/18
talking [3] 30/14 50/19 57/23
target [2] 41/10 57/17
targeted [1] 18/9
tell [8] 7/18 10/13 19/9 29/19 32/18 32/20 34/7 56/2
tells [1] 5/15
temporal [1] 60/10
terms [3] 18/21 19/4 21/15
Tesla [1] 57/19
test [3] 32/25 33/1 35/13
Texans [2] 34/16 34/20
Texas [62] 4/10 6/1 6/9 6/14 6/15 7/12 8/2 10/7 10/10 16/14 21/13 23/6 23/7 23/12 23/16 23/17 23/23 24/3 24/5 24/8 25/13 33/20 33/21 34/2 34/6 34/8 34/14 34/14 35/6 35/9 35/10 36/1 36/4 38/23 41/24 41/25 42/7 42/14 42/14 42/17 42/21 42/25 43/1 43/1 43/7 43/12 43/23 44/3

46/16 52/12 57/4 57/14 57/19 58/16 58/16 59/21 59/23 60/1 60/1 60/3 60/4 60/19
Texas's [1] 33/17
text [2] 7/24 50/7
than [12] 22/23 33/6 33/11 33/25 35/4 41/11 41/13 42/22 55/15 57/11 60/9 61/23
Thank [14] 27/5 28/20 28/21 47/4 47/5 47/7 50/24 55/10 55/11 55/22 61/5 61/6 61/9 62/4
Thank you [6] 27/5 28/21 47/4 55/10 55/22 61/6
Thank you very much [1] 47/5
thankfully [1] 30/23
that [410]
that's [50] 7/10 11/21 14/14 24/22 25/22 27/13 27/15 29/4 29/16 30/19 31/25 33/9 35/22 35/23 35/24 35/25 37/13 38/21 39/5 39/13 39/19 41/11 44/16 45/18 45/19 46/2 49/3 50/18 50/22 51/6 51/6 52/4 52/20 52/21 55/1 55/2 56/5 56/11 56/11 56/23 57/11 57/16 57/16 57/22 59/8 60/6 60/15 60/19 60/24 61/21
their [30] 4/1 4/4 4/7 7/6 8/25 9/1 9/15 9/24 12/10 13/22 16/12 17/19 22/16 22/16 22/18 25/10 27/24 34/20 40/17 40/17 47/23 48/23 53/24 53/25 56/5 56/19 56/21 58/3 58/17 59/7
them [13] 9/1 13/17 14/21 16/23 21/9 26/15 29/9 40/21 43/20 49/3 56/1 58/10 60/11
themselves [4] 5/8 16/21 25/1 56/24
then [21] 5/24 6/24 7/17 7/20 9/17 14/7 17/9 18/21 25/17 29/21 29/23 30/23 31/6 31/13 32/23 44/20 45/16 45/21 46/16 56/21 58/17
theory [1] 18/16
there [56] 5/7 7/1 7/9 7/14 9/24 10/11 10/15 10/17 10/22 11/3 12/13 13/7 13/11 14/14 19/6 20/19 20/23 20/25 21/18 24/4 24/4 24/5 25/13 26/15 26/16 30/9 33/11 33/19 33/21

**JA0653**

**T**

there... [27] 34/12 36/3 36/24 38/23 40/3 40/5 40/13 40/23 42/1 42/17 44/4 45/25 46/11 46/23 47/12 47/24 48/12 48/18 49/2 52/14 52/17 54/20 57/3 57/19 58/14 58/18 61/2

there's [16] 7/15 8/15 9/21 12/19 17/2 20/5 21/3 21/8 21/8 26/24 39/2 40/7 50/2 53/14 56/21 58/18

therefore [3] 41/15 47/17 58/19

these [5] 16/22 19/2 31/10 31/22 48/15

they [62] 5/6 5/12 5/18 9/24 9/25 16/11 16/11 16/12 16/25 17/5 17/18 17/19 17/23 17/24 24/24 27/24 35/20 38/11 40/3 40/3 40/5 40/5 41/8 41/9 41/21 45/12 47/15 47/21 47/22 47/23 47/23 49/7 49/19 50/6 51/7 53/10 53/11 53/11 53/13 53/21 53/22 53/25 56/4 56/4 56/8 56/10 57/2 57/3 57/16 58/4 58/5 58/7 58/22 58/25 59/2 60/8 60/19 60/22

they're [8] 9/23 9/23 16/1 21/2 34/2 38/11 52/6 56/10

they've [6] 9/9 9/10 58/9 59/5 60/17 60/23

thing [7] 15/11 49/11 56/5 56/7 57/1 57/24 58/21

things [3] 7/1 22/15 53/3

think [78]

thinking [1] 49/5

third [1] 38/1

this [122]

this Court [1] 39/10

thoroughly [1] 14/9

those [11] 12/12 21/11 21/13 38/8 43/11 43/13 44/22 51/18 53/18 55/13 60/2

thought [3] 17/23 32/15 61/20

threat [2] 53/8 54/25

threatened [1] 4/3

threshold [1] 13/20

through [5] 5/10 11/24 29/5 48/20 61/11

throughout [1] 5/1

time [7] 28/8 30/6 47/9 57/8 59/4 60/15 62/5

Times [1] 35/13

titled [1] 63/4

today [7] 25/22 25/23 38/17

token [1] 52/1

told [2] 10/23 32/16

tomorrow [3] 14/20 14/23 61/18

too [2] 47/25 56/3

took [1] 54/7

tort [8] 18/23 45/14 46/10 46/12 46/14 46/15 51/8 52/2

tortious [2] 18/10 18/22

touched [1] 26/25

Trade [3] 36/1 36/5 44/18

traditional [1] 18/2

transact [1] 51/1

transacted [1] 49/20

transacting [2] 18/16 43/5

transaction [1] 50/15

transcript [4] 1/9 2/17 37/8 63/3

transcription [1] 2/17

treat [5] 5/25 7/4 7/5 7/6 7/20

treated [2] 9/16 16/6

tremendous [1] 29/3

tried [1] 51/9

trio [1] 21/8

TRO [1] 55/1

true [5] 11/9 31/25 50/13 56/11 56/11

truth [1] 10/23

try [1] 61/22

trying [3] 22/12 33/8 35/15

turn [1] 51/17

Twitter [8] 24/1 36/8 36/10 53/5 57/25 58/1 58/3 58/7

Twitter case [1] 36/10

two [5] 7/15 38/15 43/9 54/22 60/13

TX [1] 2/10

type [3] 16/11 16/17 51/17

types [2] 12/12 52/10

typically [1] 7/6

**U**

U.S [1] 48/6

U.S. [1] 46/23

U.S. Mail [1] 46/23

Umm [1] 55/14

unable [1] 53/25

unconstitutional [1] 55/10

unconstitutionally [1] 6/10

under [42] 6/4 7/9 7/21 7/21 7/25 8/1 8/4 8/19 8/23 12/8 15/9 15/14 16/6 18/16 19/18 19/19 33/24 36/1 36/4 37/4 37/22 40/2 42/24 43/2 43/12 43/24 44/15

47/20 48/2 48/7 48/9 49/16 49/19 51/19 51/24 53/9 58/15 60/18

underscore [1] 54/25

understand [12] 5/16 6/25 17/13 18/14 25/19 31/1 33/21 34/4 38/25 39/1 50/1 61/24

understood [5] 28/16 30/24 56/13 56/17 59/11

unfair [1] 18/5

unflinching [1] 4/7

unfolded [1] 28/9

unique [1] 16/4

UNITED [3] 1/1 1/10 50/10

United States [1] 50/10

unlawful [1] 58/17

unlawfully [1] 6/10

unless [6] 5/15 46/18 47/3 49/1 52/18 53/6

unpublished [2] 50/3 50/6

unreasonable [2] 37/19 38/4

unrestrained [1] 4/15

Unsurprisingly [1] 5/3

until [5] 5/15 13/24 14/6 29/20 46/10

up [4] 12/18 30/22 36/21 38/9

upon [2] 6/13 26/25 59/1

upshot [1] 44/14

us [7] 26/8 26/16 41/2 44/12 55/5 56/2 56/3

use [2] 35/11 56/9

used [1] 11/7

uses [1] 11/25

using [1] 6/10

**V**

versus [6] 3/8 10/19 11/4 21/18 48/3 50/3

very [7] 12/5 14/21 23/22 24/18 27/22 41/11 47/5

vetted [1] 14/9

view [4] 4/17 21/17 23/15 51/23

viewpoints [1] 4/5

violated [5] 9/3 9/25 10/3 15/16 60/19

violates [1] 25/10

violation [2] 8/24 37/16

violations [1] 7/10

Virginia [3] 13/10 45/11 51/20

virtue [1] 52/2

Voters [4] 11/8 11/19 12/15 36/19

vs [1] 1/5

**W**

W-e-r-c-i-n-s-k-i [1]

waive [3] 23/11 23/11 52/14

waived [12] 13/25 14/12 14/16 29/19 30/1 30/3 30/6 31/2 47/16 47/24 56/12 56/14

waiver [1] 56/7

waiving [1] 30/12

Walden [5] 40/21 45/22 45/22 45/24 46/7

want [16] 6/24 6/25 10/12 13/19 18/13 28/5 29/5 32/4 32/12 32/22 38/9 41/1 57/1 61/10 61/11 61/20

wanted [8] 36/17 37/6 47/10 49/11 50/22 52/11 56/6 61/2

wants [3] 39/15 42/13 53/6

war [1] 4/6

Ward [2] 1/13 3/10

Ward-Packard [1] 1/13

warming [2] 57/6 57/7

WARREN [3] 1/6 3/8 45/12

was [65]

Washington [4] 1/5 1/15 2/4 2/15

wasn't [9] 14/6 14/9 23/1 29/21 30/21 30/21 51/2 57/8 60/9

way [9] 6/23 17/3 28/9 33/13 38/21 57/14 57/17 59/24 60/19

ways [3] 21/22 36/12 36/13

we [84]

we believe [1] 26/4

we will [1] 56/1

we'd [1] 46/5

We'll [2] 41/1 56/3

we're [11] 3/7 3/15 7/17 9/3 10/7 10/7 14/22 17/11 26/4 57/22 59/17

we've [7] 10/8 23/25 25/9 30/3 30/9 30/14 47/9

weaponized [1] 4/19

week [2] 47/11 61/18

weeks [2] 38/15 60/13

well [21] 8/22 9/8 14/15 19/13 21/23 23/14 27/9 28/17 30/5 31/4 33/18 34/12 36/1 39/20 42/9 43/8 45/9 47/24 51/6 58/14 59/21

went [3] 15/3 22/25 33/6

Wercinski [2] 10/19 11/4

were [14] 17/3 17/17 17/18 24/21 32/10 32/22 42/16 44/8 44/17 46/6 46/21 50/18 51/18 54/20

West [4] 8/12 8/13 29/9 29/12

West v [2] 29/9 29/12

Westlaw [1] 11/20

what [41] 4/18 6/21 7/17 8/11 8/20 9/2 10/22 12/17 14/2 16/10 16/19 18/14 18/22 22/24 23/15 23/19 26/20 30/7 35/14 37/16 37/18 38/11 41/21 42/19 42/20 43/6 46/5 50/1 50/5 51/6 53/22 56/2 57/16 57/22 58/17 59/8 59/17 60/3 60/6 60/15 61/13

What is [1] 23/15

what's [8] 11/17 24/7 24/22 33/9 33/16 38/21 45/19 48/13

when [17] 5/17 9/22 9/24 9/24 15/6 17/3 17/18 19/16 19/21 31/13 38/5 40/19 54/3 54/5 59/9 60/12 61/11

where [26] 5/17 6/25 7/11 8/18 10/2 11/9 16/17 18/7 18/8 18/8 25/24 29/6 37/23 37/25 43/8 45/12 45/24 50/14 51/12 51/12 54/4 55/5 57/12 59/12 60/10 60/24

whether [16] 13/25 17/19 18/1 19/6 20/5 23/20 25/5 25/25 26/2 31/21 33/11 34/8 35/6 37/12 38/23 59/22

which [33] 4/12 6/18 9/11 10/25 11/25 12/9 13/24 14/25 15/12 18/11 19/7 20/4 21/22 24/6 25/3 26/20 27/6 27/18 30/15 33/14 41/10 42/24 43/23 44/11 44/24 46/15 51/4 57/9 58/7 58/15 59/7 59/18 60/23

while [3] 35/14 50/12 53/25

whispering [1] 38/8

who [17] 4/4 6/10 7/6 15/21 19/14 21/25 22/25 22/25 23/1 38/8 48/6 49/21 51/7 53/17 57/17 59/22 59/25

who's [2] 9/15 48/8

wholly [1] 42/23

why [31] 3/19 8/20 9/21 16/4 16/5 24/6 28/14 29/16 29/19 29/25 31/1 31/5 32/9 32/16 32/18 32/20 33/24 34/4 34/8 38/4 38/4 39/13 39/19 44/7 44/10 44/25 45/8 46/2 55/1 55/2 60/19

wide [3] 4/20 10/13

# W

**wide...** [1] 22/14
**wide-ranging** [2] 4/20
22/14
**wildly** [1] 40/22
**will** [5] 5/14 9/10 32/20
53/8 56/1
**William** [4] 2/7 2/12
63/2 63/8
**willing** [2] 41/21 54/22
**win** [1] 14/22
**Wisconsin** [5] 11/8
11/19 12/15 12/15
36/19
**wish** [1] 26/24
**within** [8] 6/7 6/12
14/15 19/15 38/15
47/13 60/5 60/18
**without** [6] 4/3 8/10
15/4 28/14 50/17 53/3
**witness** [1] 38/19
**won't** [1] 55/15
**word** [1] 11/25
**words** [5] 9/15 41/6
51/25 59/1 59/6
**work** [5] 4/1 41/19
41/21 56/1 56/3
**working** [1] 5/4
**worldwide** [1] 34/3
**worried** [1] 37/11
**worry** [1] 37/9
**would** [83]
**wouldn't** [4] 42/4 44/7
46/23 58/19
**write** [1] 40/5
**writers** [1] 53/24
**writing** [1] 28/1
**written** [2] 5/11 40/4
**wrong** [2] 6/8 43/25
**wrote** [1] 50/5

# X

**Xinis** [1] 17/23

# Y

**Yeah** [3] 14/11 21/6
36/17
**yes** [14] 5/19 9/23
12/24 15/13 27/13
29/18 31/25 35/2 35/18
36/6 39/7 42/15 59/4
62/3
**Yet** [1] 4/18
**York** [3] 35/13 39/3
39/4
**you** [176]
**you know** [1] 38/19
**you'd** [2] 49/4 61/8
**you'll** [1] 32/11
**you're** [16] 6/21 7/13
10/11 10/21 18/15
23/10 31/14 39/1 42/12
43/25 44/11 46/3 50/1
50/23 58/1 59/12
**you've** [10] 9/12 12/20
13/25 18/22 23/5 38/10
41/2 44/1 44/13 56/16
**Young** [26] 6/20 7/9

8/23 9/6 9/10 9/21
10/17 11/5 11/16 12/14
15/14 16/4 17/10 27/19
28/13 29/7 29/11 29/13
29/24 30/17 31/21
**your** [101]
**Your Honor** [63] 3/6
3/21 5/23 6/2 8/22 8/22
9/5 9/20 11/7 11/21
12/12 12/24 13/13
14/11 14/24 15/11
17/17 18/4 18/20 24/12
24/21 26/4 26/5 27/1
27/3 27/13 27/21 28/5
28/16 28/25 29/7 31/10
34/13 34/19 37/8 39/11
43/22 47/10 47/17 48/1
48/3 48/11 49/1 49/10
49/18 50/24 51/9 52/4
53/6 55/3 55/8 55/12
55/18 55/22 55/23 56/8
56/17 59/5 59/11 60/12
61/5 61/9 62/3
**Your Honor's** [1] 6/7
**yourself** [2] 23/10
23/13

# Z

**Zaremba** [3] 2/12 63/2
63/8
**zero** [1] 54/21

**JA0655**

**Response to Order of the Court for supplemental briefing regarding *Ex parte Young* by Attorney General Paxton**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:24-cv-147-APM |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | |
| Defendant. | |

## DEFENDANT'S SUPPLEMENTAL BRIEFING ON *EX PARTE YOUNG*

JA0657

## INTRODUCTION

Defendant Ken Paxton in his official capacity as Attorney General of the State of Texas respectfully files this supplemental briefing in compliance with this Court's minute order of February 15, 2024 addressing the following issue:

> [W]hether, because Defendant Paxton is treated as sued in his individual capacity under *Ex Parte Young* for sovereign immunity purposes, the court should similarly treat him as sued in his individual capacity for purposes of applying the District of Columbia long-arm statute, D.C. Code 13-423.  Cf. United States v. Ferrara, *54 F.3d 825, 831 (D.C. Cir. 1995) (treating an out-of-state person sued in her official capacity as a "State" for purposes of the D.C. long-arm statute and holding that a '"State' is not a 'person' for its purposes").*

The answer is no.  As this Court has previously recognized, "*Ex parte Young* is a limited exception to sovereign immunity, and does not concern personal jurisdiction." *Gerber Products Co. v. Vilsack*, No. 16-CV-01696 (APM), 2016 WL 4734357, at *4 n.3 (D.D.C. Sept. 9, 2016).  That conclusion was right then, and it is equally right now, for at least the following three reasons.

## I.    *Ex Parte Young* does not enable individual capacity suits.

*First*, with respect to the Court's Minute Order, *Ex Parte Young*, 209 U.S. 123 (1908), authorizes suit against statewide officers in their *official* capacity when the facts that are being alleged are purely official acts, and does not permit suits against government defendants in their *individual* capacity.  *Ex Parte Young* instead allows litigants to enjoin State officers from violating federal rights without running into sovereign immunity problems.  The ability to overcome sovereign immunity under *Ex Parte Young* "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he *is not* the State *for sovereign-immunity purposes*." *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) (emphasis added).  But he nevertheless is sued in his "official capacity."  *See Vann v. U.S. Dep't of Interior*, 701 F.3d 927, 929 (D.C. Cir. 2012)

**JA0658**

(Kavanaugh, J.) ("The *Ex parte Young* doctrine allows suits for declaratory and injunctive relief against government officials in their *official capacities* . . . .") (emphasis added).

The distinctions between "official capacity" suits—which *Ex Parte Young* contemplates— versus "individual capacity" suits are also not merely technical and formalistic, but have highly substantive and practical implications.  Namely, "[o]fficial-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  In an official capacity suit, the agent and the State "are one and the same" under *Ex Parte Young*.  *Vann*, 701 F.3d at 929.  And an injunction against the agent is generally "binding" across the agent's entire office.  *Id.*  By contrast, "[p]ersonal-capacity suits seek to impose **personal** liability upon a governmental official for actions he takes."  *Graham*, 473 U.S. at 165.  In those cases, it is the agent himself—not the government—who is liable.  *Id.* at 166. But "the limits [the Supreme Court has] recognized [under *Young*] reflect the principle that the 'general criterion for determining when a suit is in fact against the sovereign is the *effect* of the relief sought[.]'"  *Stewart*, 563 U.S. at 256 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 107 (1984)) (emphasis in original).

Here, Plaintiffs seek an injunction "enjoining [Paxton], in his official capacity as Attorney General of the State of Texas, or his **officers, agents, servants, and employees**, from seeking to further enforce a civil investigative demand."  Mot. for TRO & PI at 1 (ECF No. 4).  So the "*effect* of the relief sought*" would be to shut down an investigation by the Office of the Attorney General. That is plainly an official-capacity suit that is functionally against the State.

## II.   The *Ex Parte Young* fiction cannot be used to extend the D.C. long-arm statute to reach a State officer in his official capacity.

*Second*, because *Ex Parte Young* contemplates only official capacity suits, its logic cannot be used to extend the D.C. long-arm statute to apply to an action against a State officer.  The D.C.

2

**JA0659**

long-arm statute does not apply to States themselves. *Ferrera*, 54 F.3d at 831–32. Rather, the statute permits courts in D.C. only to "exercise personal jurisdiction over a person." D.C. CODE § 13-423(a). And a "person" is defined as "an individual, his executor, administrator, or other personal representative, or a corporation, partnership, association, or any other legal or commercial entity," *id.* § 13-421. That definition does not include an official sued in his official capacity, because such person *is* considered the "State" for purposes of the D.C. long-arm statute. *Ferrara*, 54 F.3d at 831. Far from being in tension with *Ex Parte Young*, this conclusion is actually in perfect harmony with it.

The conclusion that a State Attorney General is not encompassed by the statute also follows from standard canons of textual interpretation. First is *expressio unius est exclusio alterius*: expressly including one item in a group is to exclude others not listed. *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1137 (D.C. Cir. 2022); *see also* ANTONIN SCALIA & BRYAN A. GARDNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 (2012) (referring to this principle as the negative-inference canon). A statewide official sued in an official capacity does not fit into any of those examples of "person," and so it is a conspicuous omission to leave "government official" off that list if the D.C. Council wanted to include them.

Relatedly is *noscitur a sociis*: under which "a word is known by the company it keeps." That is particularly relevant here, "'where a word is capable of many meanings in order to avoid the giving of unintended breadth.'" *McDonnell v. United States*, 579 U.S. 550, 569 (2016). Here, "individual" in Section 421 is surrounded by other human relationships like "executor," groups of natural persons like "partnership," or creatures of statute like "corporation." The occupant of a government office sued in an official capacity only is not like those included in Section 421's list.

JA0660

This has important practical ramifications.  Unlike *Ex Parte Young*, which is a gloss on a constitutional provision (sovereign immunity), the D.C. long-arm statute is just that—a statute.  It can be amended if the responsible legislators concluded that State officials *should* actually be subject to suit in D.C. for their official governmental acts.  Decisions from courts in this district have repeatedly held, however, that the long-arm statute does not reach such conduct.  *See Ferrera*, 54 F.3d at 831–32; *West v. Holder*, 60 F. Supp. 3d 190, 196 (D.D.C. 2014), *aff'd sub nom. West v. Lynch*, 845 F.3d 1228 (D.C. Cir. 2017); *Trump v. Comm. on Ways & Means, U.S. House of Reps.*, 415 F. Supp. 3d 98, 106 (D.D.C. 2019); *Pollack v. Meese*, 737 F. Supp. 663, 666 (D.D.C. 1990).  And the lack of amendment to the statute in the face of those decisions suggests a conscious choice *not* to reach State officials under the long-arm statute.

### III.    Using *Ex Parte Young*'s logic to broaden the D.C. long-arm statute would raise constitutional problems.

*Third*, courts are generally loathe to read statutes in a way that may create a constitutional problem.  And applying *Ex Parte Young* in some way that broadens the reach of the D.C. long-arm statute to reach official acts by Texas's Attorney General would at least raise serious federalism problems under the Constitution.

It is quite rare for State Attorneys General to be sued in federal courts outside their home State.  The reasons for that are fairly straightforward—*all* federal courts are presumed competent to adjudicate federal issues (like those Media Matters has presented here); so why create tricky personal jurisdiction issues by suing an Attorney General out-of-State when one can obviously obtain personal jurisdiction over him by suing him in his own State?  That at least in part explains why in the limited instances when the federal courts have addressed similar settings, they have ordinarily not found personal jurisdiction.  *See, e.g.*, *Stroman Realty v. Wercinski*, 513 F.3d 476,

4

**JA0661**

482–83 (5th Cir. 2008) (finding "no obvious rationale" for the Texas long-arm statute to reach "nonresident individuals sued solely in their official capacity under *Ex Parte Young*.").

Granted, as Plaintiffs note, at least one federal appeals court panel found personal jurisdiction over an out-of-State official. *Defense Distributed v. Grewal*, 971 F.3d 485 (5th Cir. 2020); *see* Reply at 13–15 (ECF No. 28). But that case is distinguishable from this one because in that case the court's decision to exercise personal jurisdiction was that the New Jersey Attorney General's assertion of legal authority was much broader than the assertion at issue in *Stroman* or the one at issue here. *See Grewal*, 971 F.3d at 492. Namely, the New Jersey Attorney General in that case was seeking to force a Texas-based entity to stop "publishing its materials *anywhere*," including in Texas, and had sought to advance that objective through a cease-and-desist letter. *Id.* at 493–94. By contrast, here Attorney General Paxton has had no remotely comparable effect on Washington D.C. He is not seeking to halt Media Matters' speech *at all*—much less halting it within D.C. Rather, he is merely investigating whether Media Matters' *past* speech was false, deceptive, or misleading. To claim personal jurisdiction over a sovereign State under such circumstances would be an extraordinary assertion of judicial authority with profound implications for federalism, and is certainly not authorized here by either statute or the Constitution. *See Stewart*, 563 U.S. at 260 (quoting *Alden v. Maine*, 527 U.S. 706, 727 1999) (quoting in turn *Hans v. Louisiana*, 134 U.S. 1, 18 (1890))).

JA0662

Dated: February 22, 2024

/s/ Gene C. Schaerr
GENE C. SCHAERR
  (D.C. Bar No. 416368)
KENNETH A. KLUKOWSKI
  (D.C. Bar No. 1046093)
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, D.C. 20006
gschaerr@schaerr-jaffe.com
kklukowski@schaerr-jaffe.com

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

CHRISTOPHER LAVORATO*
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4476
chris.lavorato@oag.texas.gov

REUBEN W. BLUM*
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4117
reuben.blum@oag.texas.gov

*Admitted pro hac vice

Attorneys for Defendant Ken Paxton, Attorney General of the State of Texas

JA0663

**Plaintiffs' response to Order
of the Court for supplemental briefing
regarding *Ex parte Young***

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, <br><br>              Plaintiffs, <br><br>   v. <br><br>WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, <br><br>            Defendant. | Civil Action No. 24-cv-147-APM |

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

**JA0665**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

STATUTORY BACKGROUND ........................................................................................ 1

ARGUMENT ...................................................................................................................... 2

    I.     Paxton is a "person" under the District of Columbia's civil-jurisdiction law. ............. 2

        A.  The civil-jurisdiction law reflects the settled principle that official-capacity
            defendants sued for prospective relief are sued "in their persons." ....................... 2

        B.  District of Columbia courts have long treated several important categories
            of official-capacity defendants as "persons" for jurisdictional purposes ................ 4

        C.  *United States v. Ferrara* treats an official-capacity defendant as a "person." ........ 7

    II.    Paxton has forfeited the argument that he is not a "person" for the entire case. .......... 9

CONCLUSION .................................................................................................................. 10

CERTIFICATE OF SERVICE .......................................................................................... 12

JA0666

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Afanasieva v. Washington Metropolitan Area Transit Authority*,
    588 F. Supp. 3d 99 (D.D.C. 2022) ............................................................................5

*Al Fayed v. Central Intelligence Agency*,
    229 F.3d 272 (D.C. Cir. 2000) ................................................................................5

*Alden v. Maine*,
    527 U.S. 706 (1999) ................................................................................................1

*Anderson v. Reilly*,
    691 F. Supp. 2d 89 (D.D.C. 2010) ..........................................................................6

*Barnstead Broadcasting Corp. v. Offshore Broadcasting Corp.*,
    869 F. Supp. 35 (D.D.C. 1994) ..............................................................................10

*Best v. District of Columbia*,
    743 F. Supp. 44 (D.D.C. 1990) ................................................................................7

*Bigelow v. Garrett*,
    299 F. Supp. 3d 34 (D.D.C. 2018) ..........................................................................5

*Black v. City of Newark*,
    535 F. Supp. 2d 163 (D.D.C. 2008) ........................................................................7

*Combs v. Dickenson-Wise Medical Group*,
    355 S.E.2d 553 (Va. 1987) ......................................................................................4

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014) ................................................................................................7

*Doe v. City of Boston*,
    No. CV 20-2948 (CKK), 2021 WL 2457961 (D.D.C. June 16, 2021) ....................7

*Erwin-Simpson v. AirAsia Berhad*,
    985 F.3d 883 (D.C. Cir. 2021) ................................................................................5

*Fay v. Humane Society of United States*,
    No. 20-CV-1893 (RCL), 2021 WL 184396 (D.D.C. Jan. 19, 2021) ......................9

*Fletcher v. District of Columbia*,
    370 F.3d 1223 (D.C. Cir.) ........................................................................................6

*George Washington University v. DIAD, Inc.*,
    96-301-LFO, 1996 WL 470363 (D.D.C. Aug. 9, 1996) ........................................10

*Gerber Products Co. v. Vilsack*,
    16-CV-01696 (APM), 2016 WL 4734357 (D.D.C. Sept. 9, 2016) ........................8

iii

**JA0667**

*Griffin v. County School Board of Prince Edward County*,
   377 U.S. 218 (1964) ................................................................................................3

*Hafer v. Melo*,
   502 U.S. 21 (1991) ..................................................................................................3

*Hedgepeth ex rel. Hedgepeth v. Washington Metropolitan Area Transit Authority*,
   386 F.3d 1148 (D.C. Cir. 2004) ......................................................................3, 4, 5

*Johns v. Newsmax Media, Inc.*,
   887 F. Supp. 2d 90 (D.D.C. 2012) ...........................................................................5

*Johnson v. Williams*,
   568 U.S. 289 (2013) ..............................................................................................10

*Jones v. Washington Metropolitan Area Transit Authority*,
   205 F.3d 428 (D.C. Cir. 2000) .................................................................................6

*Kentucky v. Graham*,
   473 U.S. 159 (1985) ............................................................................................1, 2

*Ex parte La Prade*,
   289 U.S. 444 (1933) ................................................................................................2

*Larson v. Domestic & Foreign Commerce Corp.*,
   337 U.S. 682 (1949) ................................................................................................5

*Maxwell v. Washington Metropolitan Area Transit Authority*,
   633 A.2d 924 (Md. Ct. App. 1993) ..........................................................................6

*Merck & Co. v. Reynolds*,
   559 U.S. 633 (2010) ................................................................................................3

*Mouzavires v. Baxter*,
   434 A.2d 988 (D.C. 1981) ....................................................................................4, 7

*Poindexter v. Greenhow*,
   114 U.S. 270 (1885) ................................................................................................2

*Pollack v. Hogan*,
   703 F.3d 117 (D.C. Cir. 2012) .................................................................................5

*Roy v. Fulwood*,
   No. 09-463 (HHK), 2010 WL 610275 (D.D.C. Feb. 22, 2010) ................................6

*Scheuer v. Rhodes*,
   416 U.S. 232 (1974) ................................................................................................2

*Shatsky v. Palestine Liberation Org.*,
   955 F.3d 1016 (D.C. Cir. 2020) ...............................................................................9

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966) ...........................................................................................8, 10

JA0668

*Steinberg v. Gray*,
   815 F. Supp. 2d 293 (D.D.C. 2011) ..................................................................2

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996) .......................................................................5

*United States v. Cooper Corp.*,
   312 U.S. 600 (1941) ......................................................................................5

*\*United States v. Ferrara*,
   54 F.3d 825 (D.C. Cir. 1995) ..................................................................7, 8, 9

*White Coat Waste Project v. Washington Metropolitan Area Transit Authority*,
   No. CV 23-1866 (JEB), 2024 WL 68256 (D.D.C. Jan. 5, 2024) ..........................6

*Will v. Michigan Department of State Police*,
   491 U.S. 58 (1989) ...................................................................................3, 4

*Wood v. Milyard*,
   566 U.S. 463 (2012) .....................................................................................10

*\*Ex parte Young*,
   209 U.S. 123 (1908) ..........................................................................1, 2, 3, 8

**Statutes**

42 U.S.C. § 1983 .............................................................................. *passim*

D.C. Code § 13-334 ..............................................................................5

D.C. Code § 13-402 ..............................................................................4

D.C. Code § 13-421 ........................................................................ *passim*

D.C. Code § 13-422 ........................................................................ *passim*

D.C. Code § 13-423 ........................................................................ *passim*

Va. Code § 8.01-328 .............................................................................4

**Other Authorities**

Federal Rule of Civil Procedure 4(k)(1) ...................................................5, 7

**JA0669**

## INTRODUCTION

For over a century, courts have recognized that suits seeking prospective relief against a State's officers are "not treated as actions against the State." *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985) (citing *Ex parte Young,* 209 U.S. 123 (1908)). Rather, such actions subject the officer "*in his person* to the consequences of his individual conduct." *Young*, 209 U.S. at 160 (emphasis added). And although the District of Columbia's civil-jurisdiction law limits D.C. courts' exercise of personal jurisdiction to cases against "person[s]," D.C. Code § 13-421, courts in the District have long assumed that they may treat officer defendants as "person[s]," rather than the governments they serve. Indeed, D.C. courts routinely hear cases against WMATA employees, who are state officers; against federal officers sued under 42 U.S.C. § 1983 for violations of D.C. statutes; and, of course, against D.C. officers of all sorts.

Paxton's half-hearted, twice-forfeited argument that he is not a "person" implies that all such officer suits stand upon jurisdictional quicksand. Worse, crediting Paxton's argument would mean that he, or indeed any other state officer, could inflict any injury upon D.C. residents and, no matter how grave, D.C. courts would lack any jurisdiction to supply a remedy. Such a result would cast severe doubt on the promise that "certain suits for declaratory or injunctive relief against state officers must . . . be permitted if the Constitution is to remain the supreme law of the land." *Alden v. Maine*, 527 U.S. 706, 747 (1999).

## STATUTORY BACKGROUND

The District of Columbia's civil-jurisdiction law grants its courts two kinds of personal jurisdiction: general and specific. D.C. Code §§ 13-422, -423. Section 13-422, the general jurisdiction statute, confers "personal jurisdiction over a person domiciled in, organized under the laws of, or maintaining his or its principal place of business in, the District of Columbia as to any claim for relief." D.C. Code § 13-422. Section 13-423, the specific jurisdiction statute, confers

1

**JA0670**

"personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from" various enumerated acts. *Id.* § 13-423(a)(1)–(7). Sections 13-422 and 13-423 share a statutory definition of "person": "an individual, his executor, administrator, or other personal representative, or a corporation, partnership, association or any other legal or commercial entity, whether or not a citizen or domiciliary of the District of Columbia and whether or not organized under the laws of the District of Columbia." *Id.* § 13-421.

## ARGUMENT

**I.   Paxton is a "person" under the District of Columbia's civil-jurisdiction law.**

### A.   The civil-jurisdiction law reflects the settled principle that official-capacity defendants sued for prospective relief are sued "in their persons."

The term "person" in § 13-421 includes state officers sued under *Ex parte Young*. In *Young*, the Supreme Court recognized that when an official act "violat[es] . . . the Federal Constitution," the officer taking the act is "stripped of his official or representative character and is subjected *in his person* to the consequences of his individual conduct." 209 U.S. at 159–60 (emphasis added); *see also Poindexter v. Greenhow*, 114 U.S. 270, 290 (1885) (holding that an official's unconstitutional act "is not the word or deed of the state, but [] the mere wrong [] of [] individual persons"); *Ex parte La Prade*, 289 U.S. 444, 455 (1933) (explaining that such suits are brought against officers "not as [] representative[s] of the state but to restrain [them] individually from . . . wrongfully subjecting plaintiff to [] unauthorized" acts). Thus, under *Young*, "an official-capacity suit for injunctive relief," like this one, "is a suit against a 'person' and not 'the State.'" *Steinberg v. Gray*, 815 F. Supp. 2d 293, 298 (D.D.C. 2011); *see also Graham*, 473 U.S. at 167 n.14.

By the time Congress enacted D.C.'s civil-jurisdiction law in 1970, it was "settled" that *Young* defendants are "person[s]." *Scheuer v. Rhodes*, 416 U.S. 232, 237 (1974) (internal quotation marks omitted). That should inform how this Court construes the term "person" today, as courts

"assume that, when Congress enacts statutes, it is aware of relevant judicial precedent." *Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010) (collecting cases). Congress would not have thought that it was stripping D.C. courts of jurisdiction over officer suits by using the term "person" (or the term "individual") in enacting the civil-jurisdiction law in 1970. To the contrary, the Supreme Court has confirmed that construing the statutory term "person" to include official-capacity defendants "would not have been foreign to the *19th–century Congress*." *Will v. Mich. Dep't of State Pol.*, 491 U.S. 58, 71 n.10 (1989) (collecting cases) (emphasis added). The same is plainly true of Congress in 1970, which by then had the added benefit of *Young* making it "settled law" that "suits against state [] officials to enjoin them from invading constitutional rights" could proceed. *Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty.*, 377 U.S. 218, 228 (1964).

The Supreme Court's construction of the term "person" in § 1983 also supports Plaintiffs' construction of that same term in § 13-421. The Court has explained that "state officials sued for injunctive relief in their official capacities are 'persons' subject to liability under § 1983." *Hafer v. Melo*, 502 U.S. 21, 24 (1991) (citing *Will*, 491 U.S. at 71 n.10). And that construction has been applied to officer defendants sued for injunctive relief in D.C. In *Hedgepeth ex rel. Hedgepeth v. WMATA*, 386 F.3d 1148, 1152 & n.3 (D.C. Cir. 2004), then-Circuit Judge John Roberts applied that holding to treat WMATA's general manager as a "person" under § 1983. Although "a state-level governmental entity" such as WMATA might not qualify as a "'person' subject to liability under 42 U.S.C. § 1983," the agency's official capacity *officers* are "person[s]" as that term is used in § 1983 "when sued for injunctive relief." *Id.* (quoting *Will*, 491 U.S. at 71).[1] Thus, to adopt

---

[1] In *Will*, the Supreme Court held that an official-capacity defendant sued for *damages* is a stand-in for the State under § 1983. 491 U.S. at 71. But the Court was quick to confirm that "[o]f course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Id.* at 71 n.10 (quoting *Graham*, 473 U.S. at 167 n. 14). That is this case.

3

JA0672

Paxton's view, the Court would need to conclude that Congress intended for the term "person" to apply to official-capacity defendants sued for injunctive relief under § 1983, but did not mean for that same term to apply to the same defendants under the later-adopted § 13-421. That would make little sense, as this case well illustrates.[2]

**B.     District of Columbia courts have long treated several important categories of official-capacity defendants as "persons" for jurisdictional purposes.**

A half-century of practice under § 13-421 confirms that Plaintiffs' construction of the term "person" is correct. Section 13-421's definition of that term underpins the civil-jurisdiction law's general-jurisdiction provision, not just the specific-jurisdiction provision. *See* D.C. Code § 13-422. Accordingly, any limits § 13-421 imposes on permissible defendants necessarily apply to all cases against official-capacity officer defendants in D.C. courts—not just cases against foreign-state officers like Paxton. Yet D.C. courts routinely exercise jurisdiction over cases seeking injunctive relief against officers, confirming that such officers are "person[s]."[3]

---

[2] The civil-jurisdiction law's ratification history also supports Plaintiffs' construction of the term "person." Congress enacted the law to grant D.C. courts "expanded bases of jurisdiction and modes of service identical to or reciprocal with those provided under the laws of . . . the adjacent State of Virginia and approximately 10 other States." *Mouzavires v. Baxter*, 434 A.2d 988, 992 (D.C. 1981) (quoting S. Rep. No. 405, 91st Cong. 1st Sess. 35 (1969)). District law therefore requires that "[w]hen the statutory language so permits" the civil-jurisdiction law must be "interpreted and construed as to make it uniform with the laws" of those jurisdictions. D.C. Code § 13-402. Virginia has adopted the same definition of "person," *see* Va. Code § 8.01-328, and its courts understand that term to be "all inclusive, sufficient to bring within the ambit of the statute every natural or fictitious entity capable of performing the acts, such as transacting business, which are made the basis for the exercise of personal jurisdiction over a nonresident," *Combs v. Dickenson-Wise Med. Grp.*, 355 S.E.2d 553, 554 (Va. 1987). That would necessarily include official-capacity defendants who—like Paxton here—have engaged in conduct falling under Virginia's long-arm statute.

[3] Section 13-422 appears to be one of only "[t]wo District of Columbia statutes [that] provide for general jurisdiction." *Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883, 889 (D.C. Cir. 2021); *see also Bigelow v. Garrett*, 299 F. Supp. 3d 34, 43 (D.D.C. 2018); *Johns v. Newsmax Media, Inc.*, 887 F. Supp. 2d 90, 95 (D.D.C. 2012). The other, D.C. Code § 13-334, is a narrow provision granting jurisdiction over "foreign corporation[s] doing business in the district." Plaintiffs have

4

**JA0673**

For starters, the federal government, like the States, is not ordinarily deemed a "person." *See, e.g.*, *United States v. Cooper Corp.*, 312 U.S. 600, 604 (1941) (term "person" ordinarily "construed to exclude" federal government); *Al Fayed v. CIA*, 229 F.3d 272, 273–76 (D.C. Cir. 2000) (similar). Yet suits seeking prospective relief against federal officials for unlawful acts are commonplace in the District under the *Larson–Dugan* rule. *See, e.g.*, *Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996) (explaining that in "suits alleging that [a federal] officer's actions were unconstitutional or beyond statutory authority," the defendant's acts "are considered individual and not sovereign actions" (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949))); *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012) (similar). By Paxton's logic, those suits should be understood as suits against the United States, and likely found jurisdictionally defective, even though *Larson* itself makes clear that "a suit directed against" such an officer's unlawful action "is not a suit against the sovereign." 337 U.S. at 689.

Likewise, courts within this District routinely take jurisdiction of cases against WMATA officials acting in their official capacities. *E.g.*, *Hedgepeth*, 386 F.3d at 1152 & n.3. WMATA is a "governmental agency" of Virginia, Maryland, and the District of Columbia, *see Afanasieva v. WMATA*, 588 F. Supp. 3d 99, 111 (D.D.C. 2022), and it is treated as a State for purposes of Eleventh Amendment sovereign immunity "to the same extent as" Maryland and Virginia, *Jones v. WMATA*, 205 F.3d 428, 432 (D.C. Cir. 2000); *see also, e.g.*, *Maxwell v. WMATA*, 633 A.2d 924, 928 (Md. Ct. App. 1993). As such, WMATA may not be sued directly under § 1983 because "a state, and hence also WMATA, is not a 'person'" under that law. *White Coat Waste Project v.*

---

looked for other statutes conferring D.C. courts with general jurisdiction and have found none. Nor are Plaintiffs aware of any case in which a D.C. federal court, in assessing its own jurisdiction under Rule 4(k)(1)(A), has invoked any other basis in D.C. law for exercising general jurisdiction. And even if such an alternative existed, Paxton's argument would still mean that D.C. courts lack long-arm jurisdiction over the categories of officer defendants discussed in this section.

JA0674

*WMATA*, No. CV 23-1866 (JEB), 2024 WL 68256, at *3 (D.D.C. Jan. 5, 2024). Nonetheless, courts routinely permit plaintiffs to pursue claims against WMATA by suing WMATA officials in their official capacity. *Id.* (citing *Young* as authority permitting injunctive suit against WMATA's general manager and collecting cases allowing similar suits).

Similarly, although federal officials are not generally proper defendants under § 1983, D.C. courts regularly find jurisdiction under § 13-423 to hear § 1983 claims against such officials when they act pursuant to an "Act of Congress applicable exclusively to the District of Columbia" because such a law is "considered a statute of the District of Columbia." 42 U.S.C. § 1983; *see e.g.*, *Roy v. Fulwood*, No. 09-463 (HHK), 2010 WL 610275, at *2 (D.D.C. Feb. 22, 2010) (exercising "long-arm personal jurisdiction" over Chairman of U.S. Parole Commission "in his official capacity for prospective . . . relief under 42 U.S.C. 1983"); *Anderson v. Reilly*, 691 F. Supp. 2d 89, 92 (D.D.C. 2010) (similar); *see also Fletcher v. District of Columbia*, 370 F.3d 1223, 1227 (D.C. Cir.), *judgment vacated on other grounds*, 391 F.3d 250 (D.C. Cir. 2004). These officials, too, must be "person[s]" under § 13-421 for such jurisdiction to be proper. Indeed, even § 1983 claims against *D.C. officials* may take as a premise that such suits are against "persons" for purposes of the civil-jurisdiction law because it is not settled whether the District is itself a "person" under § 13-421.[4] Under Paxton's view, all these categories of cases against official capacity defendants are jurisdictionally defective.

It follows that treating Paxton as anything other than a "person" would yield sweeping consequences for this Court's jurisdiction. "Federal courts ordinarily follow state law in

---

[4] Courts are divided as to whether municipalities are "persons" under § 13-421. *Compare Doe v. City of Boston*, No. CV 20-2948 (CKK), 2021 WL 2457961, at *4 (D.D.C. June 16, 2021) (assuming that City of Boston is a "person" under § 13-421 but observing that "authority from this jurisdiction is mixed"), *with Black v. City of Newark*, 535 F. Supp. 2d 163, 166 (D.D.C. 2008) (holding that "as a matter of law, Newark is not a 'person' under" the civil-jurisdiction law).

determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (citing Fed. R. Civ. P. 4(k)(1)(A)). Excepting the rare case where federal law expressly provides for personal jurisdiction, *see* Fed. R. Civ. P. 4(k)(1)(C), this District may not exercise jurisdiction over defendants who do not fall under D.C.'s civil-jurisdiction law. Thus, adopting Paxton's reading of the term "person" would preclude this Court's exercise of personal jurisdiction over numerous categories of public officials: state officials (*e.g.*, WMATA employees), federal officials enforcing District of Columbia statutes (*e.g.*, U.S. Parole Board commissioners), and federal officials acting contrary to federal law. Paxton's theory even raises the specter that D.C. officials may not be subject to D.C. courts' personal jurisdiction. Congress surely did not intend such absurd consequences when it vested D.C. courts with "expanded bases of jurisdiction . . . identical to or reciprocal with" those then existing in a dozen other states. *Baxter*, 434 A.2d at 992 (quoting S. Rep. No. 405, 91st Cong. 1st Sess. 35 (1969)).

### C. *United States v. Ferrara* treats an official-capacity defendant as a "person."

*United States v. Ferrara* also confirms that official capacity defendants are "persons" under D.C.'s civil-jurisdiction law. *See* 54 F.3d 825, 826–27 (D.C. Cir. 1995). In that case, the court first analyzed whether it had "jurisdiction over Ms. Ferrara" in her official capacity as Chief Counsel of the Disciplinary Board of the New Mexico Supreme Court based on "minimum contacts between Ms. Ferrara and the forum." *Id.* at 828–31. The court held it "lacked personal jurisdiction over Ms. Ferrara" because "her actions" were only incidentally aimed at D.C. *Id.* at 828, 830. Nowhere in its § 13-423(a)(1) analysis did the court suggest Ferrara was a "State" rather than a

7

"person." *See id.* at 828–31. Such a conclusion would have rendered unnecessary the court's lengthy inquiry into whether *her* personal conduct satisfied § 13-423(a)(1) and due process. *Id.*[5]

Given Ferrara's lack of personal contacts with D.C., the United States suggested, "[a]s an alternative," that the Court could forego the due process analysis altogether by treating Ferrara as a "proxy for the State of New Mexico," as States are not "person[s]" under the Due Process Clause. *Id.* at 831 (citing *South Carolina v. Katzenbach*, 383 U.S. 301, 323–24 (1966)). But that fallback argument failed to launch, because New Mexico—as a State—does not qualify as a "person" under § 13-421. *Id.* at 832. In reaching that holding, the court expressly stated that it was *not* deciding "whether a State official sued in his official capacity should be treated as if he were the State for jurisdictional purposes." *Id.* at 831. *Ferrara* thus did not "treat[] an out-of-state person sued in her official capacity as a 'State' for purposes of the D.C. long-arm statute." 2/15 Minute Order. Nor did it discuss whether *Young* affects the civil-jurisdiction law's definition of "person." It was enough to say that the United States could not evade Ferrara's lack of personal contacts with D.C. by substituting in New Mexico as a defendant.

Notably, the court's conclusion was bolstered by the United States's choice "to name Ms. Ferrara rather than the State of New Mexico as the defendant" and its concession at oral argument

---

[5] This Court's decision in *Gerber Products Co. v. Vilsack* is no obstacle here for similar reasons. *See* 16-CV-01696 (APM), 2016 WL 4734357, at *3–4 & n.3 (D.D.C. Sept. 9, 2016). As in *Ferrara*, the Court simply applied the civil-jurisdiction law to determine whether certain Virginia officials could be sued in D.C.; nowhere did it suggest they were not "person[s]" under § 13-421. *Id.* at *3–4. Jurisdiction was lacking because the Virginia officials' only contacts with D.C. were emails with a federal agency, which cannot establish jurisdiction under the "government contacts" doctrine. *Id.* at *4. The Court expressed concern about expanding its jurisdiction to cases premised solely on such contacts with federal agencies, *id.*, but Plaintiffs rely on no similar contacts to establish jurisdiction here and the government-contacts doctrine is not at issue. The Court's passing comment that *Young* itself did "not concern personal jurisdiction" is correct. *Id.* The point is that *Young* informs how Congress would have understood the scope of the term "person" in 1970, reinforced by the Supreme Court's observation that Congress employed the term "person" a *century* earlier—in § 1983—to include officers sued in their official capacity. *Supra* at 2–4.

"that it must establish personal jurisdiction over Ms. Ferrara in order to maintain its suit." *Ferrara*, 54 F.3d at 832. Those distinctions between Ferrara and New Mexico would make little sense if, as Paxton urges, States and their officers are interchangeable. *Ferrara* makes clear that determining whether a D.C. court has personal jurisdiction over an official-capacity defendant requires nothing more than the ordinary application of §§ 13-422 and 13-423. *See id.* at 828–29. Only when a plaintiff sues a State directly does the "person" problem arise. *See id.* at 832 (explaining "that a State is not a 'person' for [the] purpose" of § 13-421); *see also Fay v. Humane Soc'y of U.S.*, No. 20-CV-1893 (RCL), 2021 WL 184396, at *4 n.2 (D.D.C. Jan. 19, 2021) (distinguishing *Ferrara* in concluding town was a "person" under § 13-421 because a municipality—like an officer sued for prospective relief—"enjoys no sovereign immunity" and hence *Ferrara's* "rationale . . . does not apply"). *Ferrara* therefore stands only for the commonsense proposition that plaintiffs may not directly sue States or rely upon a State's contacts to establish jurisdiction over a specific official-capacity defendant. *See* 54 F.3d at 832.

Plaintiffs' theory of jurisdiction here is entirely consistent with *Ferrara*. Plaintiffs do not argue, as the plaintiff did in *Ferrara*, that Paxton "should be treated as if [he] were the State for purposes of due process considerations." *Id.* at 831. Plaintiffs have always maintained that jurisdiction is proper here based on Paxton's conduct alone. It is Paxton who seeks to interpose Texas as a shield for his personal, unlawful conduct—the exact opposite scenario from *Ferrara*, which presented the rare situation where the plaintiff, and specifically the United States, insisted it had sued a "State" to obtain a perceived, but illusory, litigation advantage.

## II.   Paxton has forfeited the argument that he is not a "person" for the entire case.

"[A] personal jurisdiction defense is both forfeitable and waivable." *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1031–32 (D.C. Cir. 2020). Paxton has forfeited the argument that he is not a person for purposes of the civil-jurisdiction law several times over. Paxton did not argue

9

**JA0678**

that he was not a "person" at any stage of the Maryland litigation, including at the hearing, which focused exclusively on personal jurisdiction. To the contrary, he repeatedly pressed constitutional due process arguments that are available *only* to persons. *See, e.g.*, ECF No. 4-5 at 104–07; *see also Katzenbach*, 383 U.S. at 323 ("The word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union."). Paxton took the same strategy in his opposition brief here. ECF No. 26 at 15–19. In fact, Paxton first asserted that he was not a person only at the *fourth* opportunity—in a sur-reply addressing a separate topic—and even then, he did so in only cursory fashion. This is textbook forfeiture. *See Johnson v. Williams*, 568 U.S. 289, 299 (2013). And, crucially, Paxton's forfeiture of the argument is effective for purposes of the entire case, not just the present motion. Personal jurisdiction arguments must be raised in a party's "'first defensive move,' which may or may not be the filing of an answer or a motion to dismiss." *Barnstead Broad. Corp. v. Offshore Broad. Corp.*, 869 F. Supp. 35, 38 (D.D.C. 1994) (citation omitted). Paxton's repeated failure to raise the point, despite having numerous opportunities to do so, is "fatal" to asserting it in his motion to dismiss, which itself does nothing more than incorporate the single paltry paragraph addressing the issue in his sur-reply. *George Washington Univ. v. DIAD, Inc.*, 96-301-LFO, 1996 WL 470363, at *1 (D.D.C. Aug. 9, 1996) (denying motion to dismiss because of failure to raise jurisdictional argument at injunctive hearing). By electing to defend against the preliminary injunction motion using arguments that are available only to persons, Paxton relinquished the argument that he is not one. And an "affirmative defense, once forfeited, is excluded from the case." *Wood v. Milyard*, 566 U.S. 463, 470 (2012) (cleaned up).

## CONCLUSION

For the reasons set forth above and in Plaintiffs' opening and reply briefs, the Court should grant the motion for a preliminary injunction.

Dated: February 22, 2024

Respectfully submitted,

*/s/ Aria C. Branch*

**ELIAS LAW GROUP LLP**
Aria C. Branch (DC 1014541)
Elisabeth C. Frost (DC 1007632)
Christopher D. Dodge*[Δ] (DC 90011587)
Samuel T. Ward-Packard*[Δ] (DC 90005484)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
abranch@elias.law
efrost@elias.law
cdodge@elias.law
swardpackard@elias.law

Abha Khanna*
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr. (DC 420440)
Jay P. Srinivasan**
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com
Email: jsrinivasan@gibsondunn.com

Amer S. Ahmed (DC 500630)
Anne Champion**
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com
Email: achampion@gibsondunn.com

*Admitted *pro hac vice*
**Pro hac vice* application forthcoming
[Δ]Admission to D.D.C. pending swearing in

*Counsel for Plaintiffs Media Matters for America and Eric Hananoki*

11

**JA0680**

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on the Defendant in accordance with

Federal Rule of Civil Procedure 5(a).

*/s/ Aria C. Branch*
Aria C. Branch

**JA0681**

# Missouri Attorney General Bailey's Civil Investigative Demand and Petition



250 Massachusetts Ave NW, Suite 400  |  Washington, DC 20001

March 29, 2024

**VIA ELECTRONIC FILING**

The Honorable Amit Mehta
United States District Court for the District of Columbia
E. Barrett Prettyman Courthouse
333 Constitution Avenue NW
Washington, D.C. 20001

> Re:     **Missouri Attorney General Bailey's Civil Investigative Demand and Petition**
>          (***Media Matters for America, et al. v. Paxton***, **No. 1:24-cv-147-APM**)

Dear Judge Mehta:

On behalf of Plaintiffs Media Matters for America ("Media Matters") and Eric Hananoki, I write to apprise the Court of a factual development relevant to Plaintiffs' pending motion for a preliminary injunction in the above matter. *See* ECF No. 4.

On March 25, 2024, Missouri Attorney General Andrew Bailey announced that he was serving a Civil Investigative Demand ("CID") on Media Matters and, at the same time, filing a Petition to enforce the CID in Missouri state court. *See* Ex. 1 ("Press Release"). By Bailey's own admission, this CID is "virtually identical" to the one that forms the basis for this litigation. *See* Ex. 2 ¶ 20 (Petition for Order to Enforce Civil Investigative Demand, *State of Missouri ex rel. Andrew Bailey, Attorney General v. Media Matters for America*, Case No. 24AC-CC-02291 (Cole Cnty. Ct., Mo.) (March 25, 2024)) ("Petition").

This retaliatory conduct, while baseless, did not come out of the blue. As explained in Plaintiffs' complaint, various public officials and media figures responded to Elon Musk's call for retaliation against Media Matters in the wake of its reporting about antisemitic content on X. *See* Compl. ¶¶ 46–48. This included a November 19, 2023, tweet from Bailey stating that his "team [was] looking into this matter." *Id.* ¶ 47. On December 11, 2023, Bailey followed up on this tweet by issuing a "Notice of Pending Investigation" to Media Matters, demanding that it preserve documents relevant to a forthcoming investigation.[1] The Notice was emailed to a generic email inbox at Media Matters (action@mediamatters.org) but was never formally served on the organization. One day after the Notice was issued, Plaintiffs filed suit against Attorney General

---

[1] *See* Attorney General Bailey, *Notice of Pending Investigation* (Dec. 11, 2023), https://ago.mo.gov/wp-content/uploads/2023.12.11-Notice-of-Investigation-MMFA-Final.pdf.

JA0683

March 29, 2023
Page 2

Ken Paxton in the District of Maryland, *see* Compl. ¶¶ 72–80, and in the months following that suit Bailey made no further effort to contact Media Matters and Mr. Hananoki or take further action against them.

This week, without warning or any communication with Media Matters, Bailey announced that he was serving a CID on Media Matters and, in the very same breath, suing Media Matters for failing to comply with that CID. *See* Ex. 1. The CID—which has yet to arrive to Media Matters as of this March 29 letter—has a return date of April 15, 2024, and demands that Media Matters turn over the same documents demanded by Paxton, as well as a "list of all donations of funds from donors located in the state of Missouri from January 01, 2023 through March 25, 2024." *See* Ex. 3 ("CID").

Bailey filed a Petition to enforce the CID immediately, before Media Matters even received the CID and weeks before its return date. *See* Ex. 2.[2] According to the Petition, this rush to court was warranted because "Media Matters has refused such efforts in other states and made clear that it will refuse any such efforts." *Id.* at 2. In support of this assertion, the Petition points to Media Matters's response to Paxton's CID and nothing else. *Id.* ¶ 20. The Petition ignores that Paxton agreed to forego further enforcement of his CID pending the resolution of Media Matters's motion for a preliminary injunction, *see* ECF No. 11, even though the Petition repeatedly acknowledges this ongoing litigation, *see* Ex. 2 ¶ 20; *id.*, Ex. 4 (Media Matters complaint).

On March 27, Bailey filed a Motion and Order for Appointment of Special Process Server in the Circuit Court of Cole County, *see* Ex. 4, which the court granted the same day, *id.* at 2. Yesterday, the process server appeared at Media Matters's Washington, DC headquarters and personally served the Petition and a summons on Cynthia Padera, Media Matters's Chief Operating Officer. *See* Ex. 2; *see also* ECF No. 4-2 (prior declaration of Ms. Padera). Media Matters must respond to the Petition within thirty days of this personal service. *See* Mo. Rev. Stat. § 509.260(1).

Bailey's actions starkly underscore the need for prompt injunctive relief in this matter. In addition to further chilling Plaintiffs' speech, and burdening them with yet more meritless litigation, Bailey's conduct illustrates the risk of finding that District of Columbia courts are powerless to provide relief to D.C. residents targeted by retaliatory state actors. The Court itself foresaw this problem. At the February 15 preliminary hearing, this Court asked Paxton's counsel if "the consequence[] of [their] position" would be "that a media company could be subject 50 CIDs and would have to go to each state in order to challenge them." Ex. 5 (excerpts of 2/15/24 Transcript) at 43:17–20. After pressing by the Court, Paxton's counsel acknowledged that "absolutely, that's our argument." *Id.* at 44:15–16.

---

[2] Under Missouri law, a CID recipient ordinarily has "twenty days after the civil investigative demand has been served" to ask a court to either "extend the return date . . . or to modify or set aside the civil investigative demand." Mo. Rev. Stat. § 407.070. The Attorney General may then ask a court to enforce the CID, but only if the recipient "fails to comply with any civil investigative demand duly served upon him." *Id.* § 407.090.

JA0684

March 29, 2023
Page 3


      Attorney General Bailey is now further testing that claim, preemptively suing Media Matters in a foreign court so that he may rifle through Media Matters's most sensitive materials without any showing of cause. Granting Plaintiffs their requested preliminary relief will go a long way towards staunching such retaliatory efforts, including by declaring that Paxton's CID, which Bailey claims to be "virtually identical" to his own, violates Plaintiffs' constitutional rights.


                    Respectfully,

                    */s/ Aria C. Branch*
                    Aria C. Branch
                    Partner, Elias Law Group

                    *Counsel to Plaintiffs Media Matters for America and Eric Hananoki*

# Exhibit 1

JA0686

3/29/24, 3:32 PM
Case 1:24-cv-00147-APM Document 36-1 Filed 03/29/24 Page 2 of 5
Attorney General Bailey Files Suit Against Media Matters for Refusal to Cooperate with Investigation | Attorney General Office of …









≡

Search ago.mo.gov | Search

JA0687



**Andrew Bailey**

Missouri Attorney General

Explore Section                                                            ☰

# Attorney General Bailey Files Suit Against Media Matters for Refusal to Cooperate with Investigation

**Home** » **Press Release** » Attorney General Bailey Files Suit Against Media Matters for Refusal to Cooperate with Investigation

JEFFERSON CITY, Mo. – Today, Missouri Attorney General Andrew Bailey filed suit against Media Matters to force the nonprofit to turn over documents related to his investigation into

**JA0688**

its fraudulent business practices. General Bailey launched his investigation in November 2023 after evidence came to light that Media Matters solicited donations from Missourians under false pretenses to target X, formerly known as Twitter, in direct violation of the Missouri Merchandising Practices Act.

"My office has reason to believe Media Matters used fraud to solicit donations from Missourians in order to bully advertisers into pulling out of X, the last social media platform dedicated to free speech in America, so we launched an investigation to get to the bottom of it," **said Attorney General Bailey.** "However, Media Matters has a sordid history of refusing to cooperate with investigations. I'm not going to let this activist group stonewall us. If there has been any attempt to defraud Missourians in order to trample on their free speech rights, I will root it out and hold bad actors accountable."

Media Matters came under fire after allegations surfaced that the organization deceitfully manipulated X's algorithm to place advertisers' content next to contrived controversial posts, causing X to suffer astronomical financial losses when affected advertisers pulled their money from the site. Media Matters has been outspoken in its attempts to defame X for its refusal to censor disfavored viewpoints.

**General Bailey's lawsuit details how**, "Media Matters, a self-styled not-for-profit 'progressive research and information center,' envisions itself monitoring, analyzing, and correcting 'conservative misinformation' in the U.S. media. In fact, this description falls far short of reality for this political activist organization. Instead, rather than passively 'monitoring,' Media Matters has used fraud to solicit donations from Missourians in order to trick advertisers into removing their advertisements from X, formerly Twitter, one of the last platforms dedicated to free speech in America."

**The suit further notes**, "Media Matters has pursued an activist agenda in its attempt to destroy X, because they cannot control it. And because they cannot control it, or the free speech platform it provides to Missourians to express their own viewpoints in the public square, the radical 'progressives' at Media Matters have resorted to fraud to, as Benjamin Franklin once said, mark X 'for the odium of the public, as an enemy to the liberty of the press.' Missourians will not be manipulated by 'progressive' activists masquerading as news outlets, and they will not be defrauded in the process."

**The suit asserts,** "Based on serious allegations of false and deceptive behavior, the Attorney General's Office has issued a Civil Investigative Demand ('CID'), as authorized by Missouri Law, to Media Matters to investigate possible violations of the Missouri Merchandising Practices Act. Because Media Matters has refused such efforts in other states and made clear that it will

**JA0689**

refuse any such efforts, the Attorney General seeks an order from the Court, 2 pursuant to section 407.090, compelling Media Matters to comply with the CID within 20 days."

The lawsuit can be read **here.**

The civil investigative demand can be read **here.**



**Quick Links**

- **Consumer Programs**
- **Contact Us**
- **Join Our Team**
- **Reports**

**Resources**

- **AG Opinions**
- **Missouri Laws**
- **Forms**
- **Proposed Rules**
- **Publications**

**About**

- **About AG Bailey**
- **About the Office**
- **Sunshine Law**



**Privacy Policy**          **Accessibility**

**Site Map**          **Mo Statutes**          CLICK HERE TO SAVE A LIFE

JA0690

# Exhibit 2

JA0691

**24AC-CC02291**

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

IN THE CIRCUIT COURT OF COLE COUNTY
STATE OF MISSOURI

STATE OF MISSOURI, ex rel. )
ANDREW BAILEY, ATTORNEY )
GENERAL, )
                          )
      Petitioner, )
                          )   Case No.
      v. )
                          )   Division:
MEDIA MATTERS FOR AMERICA, )
                          )
      Serve Registered Agent At: )
      Angelo Carusone )
      800 Maine Avenue SW )
      Suite 500 )
      Washington, DC  20024 )
                          )
      Respondent. )

## PETITION FOR ORDER TO ENFORCE
## <u>CIVIL INVESTIGATIVE DEMAND</u>

The State of Missouri, by and through Attorney General Andrew Bailey,

petitions the Court pursuant to Missouri Revised Statutes section 407.090, to

enforce its Civil Investigative Demand directed to Media Matters for America

(hereinafter "Media Matters"), and upon information and belief states in

support as follows:[1]

### INTRODUCTION

Media Matters, a self-styled not-for-profit "progressive research and

---

[1] All statutory citations are to RSMo 2016 unless otherwise noted.

1

**JA0692**

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

information center," envisions itself monitoring, analyzing, and correcting "conservative misinformation" in the U.S. media. In fact, this description falls far short of reality for this political activist organization. Instead, rather than passively "monitoring," Media Matters has used fraud to solicit donations from Missourians in order to trick advertisers into removing their advertisements from X, formerly Twitter, one of the last platforms dedicated to free speech in America.

Media Matters has pursued an activist agenda in its attempt to destroy X, because they cannot control it. And because they cannot control it, or the free speech platform it provides to Missourians to express their own viewpoints in the public square, the radical "progressives" at Media Matters have resorted to fraud to, as Benjamin Franklin once said, mark X "for the odium of the public, as an enemy to the liberty of the press." Missourians will not be manipulated by "progressive" activists masquerading as news outlets, and they will not be defrauded in the process.

Based on serious allegations of false and deceptive behavior, the Attorney General's Office has issued a Civil Investigative Demand ("CID"), as authorized by Missouri Law, to Media Matters to investigate possible violations of the Missouri Merchandising Practices Act. Because Media Matters has refused such efforts in other states and made clear that it will refuse any such efforts, the Attorney General seeks an order from the Court,

JA0693

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

pursuant to section 407.090, compelling Media Matters to comply with the CID within 20 days.

<strong>PARTIES</strong>

1.     Andrew Bailey is the Attorney General of the State of Missouri and files this petition in his official capacity pursuant to chapter 407 and section 27.060 of the Missouri Revised Statutes, as well as the authority granted to the Attorney General at common law.

2.     Respondent Media Matters is incorporated under the laws of, and has its principal place of business in the District of Columbia, and engages in media activity as well as fundraising throughout the United States, including in Missouri. Specifically, Media Matters engages in internet and email solicitations, phone solicitations, and in-person solicitations for fundraising–listing Missouri in its public financial disclosures as a state in which it "is registered or licensed to solicit contributions or has been notified it is exempt from registration."

<strong>JURISDICTION</strong>

3.     This Court has subject matter and personal jurisdiction over this action under the Missouri Constitution Article. V, § 14 and section 506.500.

<strong>VENUE</strong>

4.     This Court has authority over this action pursuant to section 407.090, which allows the Attorney General to file in the trial court of general

3

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

jurisdiction of a county or judicial district in which such person resides, is found, or transacts business, and serve upon such person a petition for an order of such court for the enforcement of such CID.

5.     Media Matters transacts business in this county.

## MISSOURI MERCHANDISING PRACTICES ACT

6.     Section 407.020 of the Missouri Merchandising Practices Act ("MMPA") provides in pertinent part:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri, is declared to be an unlawful practice… Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement, or solicitation.

7.     The words in the statute are "unrestricted, all-encompassing and exceedingly broad." *Ports Petroleum Co., Inc. of Ohio v. Nixon*, 37 S.W.3d 237, 240 (Mo. banc 2001). "[T]he literal words cover every practice imaginable and every unfairness to whatever degree." *Id.*

8.     "Person" is defined as "any natural person or his legal representative, partnership, firm, for-profit or not-for-profit corporation, whether domestic or foreign, company, foundation, trust, business entity or

**JA0695**

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof." § 407.010(5).

9.  "Merchandise" is defined as "any objects, wares, goods, commodities, intangibles, real estate, or services." § 407.010(4).

10.  "Trade" or "commerce" is defined as the "advertising, offering for sale, sale, or distribution, or any combination thereof, of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated. The terms 'trade' and 'commerce' include any trade or commerce directly or indirectly affecting the people of this state." § 407.010(7).

11.  Respondent Media Matters has engaged in trade or commerce within the meaning of section 407.010.

12.  Pursuant to section 407.145, the Attorney General has promulgated rules explaining and defining terms in sections 407.010-407.145 of the Merchandising Practices Act. The rules relevant to the Merchandising Practices Act allegations herein include the provisions of 15 CSR 60.

13.  Section 407.040 provides in pertinent part:

> When it appears to the attorney general that a person has engaged in or is engaging in any method, act, use, practice or solicitation declared to be unlawful by this chapter or when he believes it to be in the public interest that an investigation should be made to ascertain whether a

5

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

person in fact has engaged in or is engaging in any such method, act, use, practice or solicitation, he may execute in writing and cause to be served upon any person who is believed to have information, documentary material, or physical evidence relevant to the alleged or suspected violation, a civil investigative demand requiring such person to appear and testify, or to produce relevant documentary material or physical evidence or examination, at such reasonable time and place as may be stated in the civil investigative demand, concerning the advertisement, sale or offering for sale of any goods or services or the conduct of any trade or commerce or the conduct of any solicitation that is the subject matter of the investigation. Service of any civil investigative demand, notice, or subpoena may be made by any person authorized by law to serve process or by any duly authorized employee of the attorney general.

14.    Section 407.070 provides in pertinent part:

At any time before the return date specified in a civil investigative demand issued under section 407.040, or within twenty days after the civil investigative demand has been served, whichever period is shorter, a petition to extend the return date for, or to modify or set aside the civil investigative demand, stating good cause, may be filed in the circuit court of the county where the parties reside or in the circuit court of Cole County.

**ALLEGATIONS OF FACT**

15.    On March 25, 2024, the Office of the Missouri Attorney General served upon Media Matters, through its Registered Agent, Angelo Carusone, 800 Maine Avenue SW, Suite 500, Washington DC, 20024, Civil Investigative Demand Number ("Investigative Demand") CID No. 24-10. A true and accurate copy of the Investigative Demand is attached hereto as Exhibit 1 and

**JA0697**

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

incorporated herein. A true and accurate copy of proof of service is attached hereto as Exhibit 2 and incorporated herein.

16.     Pursuant to section 407.040, Investigative Demand No. CID No. 24-10 identified the statute of the suspected violation and the general subject matter of the investigation.

17.     Specifically, Investigative Demand CID No. 24-10 requests information relevant to whether Media Matters has engaged in or is engaging in any merchandising practices declared to be unlawful by section 407.020 with regard to Media Matters' fraudulent manipulation of data on X.com (formerly known as Twitter).

18.     The return date to produce all requested documentation and information and submit the Certification of Compliance to the Attorney General's Office is no later than 10:00 a.m. April 15, 2024.

19.     Media Matters has expressed its intent not to comply with CIDs like this one.

20.     For example, the State of Texas served on Media Matters a virtually identical civil investigative demand in December of 2023, which Media Matters refused to comply with and instead filed a lawsuit to block compliance and disclosure of information and materials. *See* Exhibit 3 (Texas CID); Exhibit 4 (Media Matters complaint); *see generally Media Matters for*

**JA0698**

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

*America, et al. v. Paxton*, 1:24-cv-00147-APM (United States District Court for the District of Columbia).

## COUNT I-REQUEST FOR ORDER ENFORCING INVESTIGATIVE DEMAND

21.    Petitioner incorporates all of the allegations contained in Paragraphs 1 through 20 above.

22.    The Attorney General has reason to believe that Media Matters has engaged in methods, acts, uses, or practices that violate chapter 407, and that it is in the public's interest that an investigation should be made. *See* § 407.040.1.

23.    Investigative Demand CID No. 24-10 meets all of the statutory requirements of section 407.040.2.

24.    The CID does not run afoul of the statutory prohibitions of section 407.040.3, RSMo, or of the Missouri or U.S. Constitutions.

25.    Media Matters has failed or will fail to comply with the Investigative Demand CID No. 24-10, as it has expressed that it will not comply with similar investigative demands.

26.    Accordingly, Petitioner is entitled to an order pursuant to section 407.090 requiring Media Matters to produce responses to Investigative Demand CID No. 24-10.

WHEREFORE, Petitioner State of Missouri ex rel. Attorney General Andrew Bailey, prays this Court for an Order enforcing the Civil Investigative

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

Demand, and ordering Media Matters to produce complete responses to Civil Investigative Demand No. 24-10 within twenty (20) days of the entry of its Order.

Respectfully submitted,

**ANDREW BAILEY**
Attorney General

*/s/ Jeremiah J. Morgan*
Jeremiah J. Morgan, MO 50387
Deputy Attorney General – Civil
Jeremiah.Morgan@ago.mo.gov
Steven Reed, MO 40616
Chief Counsel – Consumer Protection
Steven.Reed@ago.mo.gov
Kathryn Monroe, MO 76022
Assistant Attorney General
P.O. Box 899
Jefferson City, MO 65102
(573) 751-1800; Fax: (573) 751-0774

ATTORNEYS FOR PETITIONER

**JA0700**

**Exhibit 1**

**24AC-CC02291**

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM



ATTORNEY GENERAL OF MISSOURI

ANDREW BAILEY
ATTORNEY GENERAL

JEFFERSON CITY

65102

P.O. Box 899
(573) 751-3321

*In the Matter of:*

**Media Matters for America**

**CID NO. 24-10**

**Date:** March 25, 2024

INVESTIGATIVE DEMAND

THE ATTORNEY GENERAL TO:

*Served: U.S. Postal Service*
*Certified Mail*

**Media Matters for America**
**PO Box 44811**
**Washington, DC 20026**

The Attorney General of the State of Missouri believes it to be in the public interest that an investigation be made to ascertain whether **Media Matters for America (Subject)** has engaged in or is engaging in practices declared unlawful by § 407.020, RSMo.

The investigation will inquire into the activities of **Subject** in connection with the solicitation of funds for a charitable purpose, or the sale or advertisement of merchandise, §§ 407.020, 407.453, RSMo.

The Attorney General has reason to believe that the **Subject** has used deception, fraud, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of material fact in connection with the soliciting of funds for a charitable purpose or the sale or advertisement of merchandise in or from the State of Missouri, § 407.020, RSMo. Independently, the Attorney General also believes it to be in the public interest to investigate whether such acts have occurred.

The Attorney General believes you have information, documentary material or physical evidence relevant to the above-mentioned conduct.

**JA0701**

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

## <u>DEFINITIONS</u>

As used in this Demand, the following terms have the meanings described below:

**"Communication"** means any expression, statement, conveyance, or dissemination of any words, thoughts, statements, ideas, or information regardless of form, format, or kind. "Communication" includes but is not limited to oral or written communications of any kind, such as telephone conversations, discussions, meetings, notes, letters, agreements, emails or other electronic communications, facsimiles, and other forms of written or oral exchange that are recorded in any way, including video recordings, audio recordings, written notes, or otherwise. Any "Communication" that also falls within the definition of "Document" shall constitute both a Document and a Communication for purposes of this civil investigative demand.

**"Document"** means all written, printed, typed, and recorded matter of every kind and description, originals and copies, and all attachments and appendices thereto. Without limiting the foregoing, "documents" include all agreements, contracts, correspondence and other communications including notes, memoranda and marginal notations, records, reports, books, manuals, instructions, statistical data and data compilations, drafts, charts, graphs and tables, bills, statements and invoices, advertising, surveys, transcripts, microfilm and microfiche, electronic records that can be reproduced in paper form, recordings, film, tapes, photographs, electronic mail and Web pages, and all other computer-generated, computer-stored, or electronically-stored matter, however and by whomever produced, prepared, reproduced, disseminated, or made.

**"Identify"**, when used with respect to a **person or entity**, means information sufficient to allow employees of the Attorney General to ascertain the name, address, telephone number, and if not a natural person, the contact person of the entity or facility to be identified, as well as the relationship of that person or entity to you.

**"Identifying"**, when used with respect to a **fact or event**, means information sufficient to allow employees of the Attorney General to ascertain the fact or event with reasonable particularity, and to identify each person believed to have knowledge with respect to the fact or event and each document that refers or relates to the fact or event.

**JA0702**

"Relating to", "related to", "relate to" means to be relevant in any way to the subject matter in question, including without limitation all information that directly or indirectly contains, records, reflects, summarizes, evaluates, refers to, is pertinent to, indicates, comments upon, or discusses the subject matter; or that states the background of, or was the basis for, or that records, evaluates, comments, was referred to, relied upon, utilized, generated, transmitted, or received in arriving at any conclusion, opinion, estimate, position, decision, belief, policy, practice, course of business, course of conduct, procedure, or assertion concerning the subject matter.

"You", including your, means Media Matters for America, subsidiaries, partnerships, or any other entities related to Media Matters for America.

<u>DEMAND FOR INFORMATION</u>

Demand is hereby made upon you, under the authority granted by Section 407.040, RSMo, to produce in person or via mail to Michelle Starke, P.O. Box 899, Jefferson City, Missouri 65102 by April 15, 2024, the following documentary material and information that may be in your possession, custody or control, and permit the inspection and copying thereof:

1. A list or information identifying any and all donations of funds from donors located in the state of Missouri from January 01, 2023 through March 25, 2024.

   The list of donations should include, but is not limited to:
   - Identity of each individual or organization who donated funds;
   - Address of each individual or organization who donated funds;
   - Total amount spent per donation;
   - Date and time of each donation;
   - Payment method for each donation;
   - Identity of financial institution where funds were sent;
   - Contracts and/or agreements governing or related to each donation;

For each Demand for Information, you shall type the Demand and type your corresponding response. If you do not know the answer to a Demand for Information, you shall identify in your response the individual or business entity that has the answer to the Demand for Information. The document on

3

**JA0703**

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

which you type each Demand and your corresponding response shall be executed by you before a Notary Public.

<u>DEMAND FOR DOCUMENTS</u>

Demand is hereby made upon you, under the authority granted by Section 407.040, RSMo, to produce in person or via mail to Michelle Starke, P.O. Box 899, Jefferson City, Missouri 65102 by April 15, 2024, the following documentary material that may be in your possession, custody or control, and permit the inspection and copying thereof:

2.   All promotional or marketing information provided by you from January 1, 2023 to March 25, 2024 to any individual or organization for the purpose of soliciting donations.

3.   All documents or communications showing how solicited donations were used.

4.   All communications or materials relating to any policy, strategy or operation related to generating stories or content intended to cancel, deplatform, demonetize, or otherwise interfere with businesses located in Missouri, or utilized by Missouri residents.

5.   All communications, internal and external, regarding your strategy to pressure advertisers into pulling advertisements from the social media platform, X (formerly Twitter).

6.   Documents sufficient to identify your employee organizational chart.

7.   Documents sufficient to identify all your operational expenses in the state of Missouri.

8.   All documents discussing Elon Musk's purchase of X (formerly Twitter).

9.   All documents related to the article, or to the events described in the article, by Eric Hananoki entitled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM,Oracle, and Xfinity next to pro-Nazi content."

JA0704

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

10. All documents sufficient to identify X accounts owned, controlled, or authorized by you used to obtain the images in the article referenced in paragraph 9.

11. All documents sufficient to identify all X accounts followed by the X accounts identified in response to paragraph 10.

12. All communications with Apple, International Business Machine Corporation, Bravo Television Network, NBCUniversal, Oracle Corporation, Comcast Corporation, Lions Gate Entertainment Corporation, Warner Bros Discovery Inc., Paramount Pictures Corporation, or Sony Group Corporation from November 1, 2023, to March 25, 2024.

## NOTICE OF DEMAND FOR RETENTION OF RECORDS

You are hereby notified that all records, including communications, documents and things, relating to the above requests and the matters that are the subject of these requests for information are to be preserved during the pendency of this investigation.  This includes, but is not limited to, all related customer records, including recordings made of customers, all related correspondence and other communications with third parties, all related documents and things received from third parties, and all internal documents and things.

## COMPLIANCE

You may comply with this Investigative Demand by producing copies of the requested documents and information by regular mail or overnight delivery to **Michelle Starke, P.O. Box 899, Jefferson City, Missouri 65102.** The requested copies of documents and information should be received by the Office of the Attorney General **by 10:00 a.m. (Central) on April 15, 2024** and be accompanied by the attached Business Records Affidavit and Certification of Compliance.

You are advised that the Attorney General will not grant an extension of time or modification of the terms of the Demand except for good cause pursuant to the terms of Section 407.070, RSMo.  Your prompt response and provision of the requested information is requested.

**JA0705**

Your attention is respectfully called to the provisions of Section 407.080, RSMo, which makes certain acts done with the intent to avoid, evade or prevent compliance in whole or in part with any Investigative Demand served hereunder a Class A misdemeanor, which is punishable by a fine not to exceed $1,000.00 for individuals and $5,000.00 for corporations, or by imprisonment for a term of not more than one year, or both a fine and imprisonment.

Please direct all questions regarding this Investigative Demand to Jeremiah Morgan at 573-751-1800 or by e-mail to: Jeremiah.Morgan@ago.mo.gov.

Respectfully Submitted,

**ANDREW BAILEY**
Attorney General

*/s/ Jeremiah J. Morgan*
Jeremiah J. Morgan, #50387
Deputy Attorney General – Civil Litigation
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870; Fax: (573) 751-0774
Jeremiah.Morgan@ago.mo.gov

6

JA0706

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

STATE OF _____ )
                            ) SS.
COUNTY OF _____ )

## BUSINESS RECORDS AFFIDAVIT AND CERTIFICATE OF COMPLIANCE

Before me, the undersigned authority, personally appeared
_____, who, being by me duly sworn, deposed as follows:

My name is _____, I am of sound mind, capable of
making this affidavit, and personally acquainted with the facts herein stated:

I am the custodian of the records of _____.
Attached hereto are _____ pages of records from _____.
These _____ pages of records are kept by _____
in the regular course of business, and it was the regular course of business
of_____ for an employee or representative
of_____ with knowledge of the act, event, condition,
opinion, or diagnosis recorded to make the record or to transmit information
thereof to be included in such record; and the record was made at or near the
time of the act, event, condition, opinion or diagnosis. The records attached
hereto are the original or exact duplicate of the original.

I further certify that all documents and information required by Civil
Investigative Demand No. 24-10 which is in the possession, custody, control,
or knowledge of, _____ has been submitted to the
Missouri Attorney General as directed herein.

_____
        Affiant

Sworn to before me this _____ day of_____, 2024.

_____
Notary Public
Commission Expires:

7

**24AC-CC02291**

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

| Certified Mail Fee | $ |
| Extra Services & Fees *(check box, add fee as appropriate)* | |
| ☐ Return Receipt (hardcopy) | $ |
| ☐ Return Receipt (electronic) | $ |
| ☐ Certified Mail Restricted Delivery | $ |
| ☐ Adult Signature Required | $ |
| ☐ Adult Signature Restricted Delivery | $ |
| Postage | $ |

Media Matters for America
P.O Box 44811
Washington, DC 20026

MAR 25 2024

**JA0708**

Case 4:24-cv-00147-APM Document 36-12 Filed 03/29/24 Page 12 of 21
Case 1:24-cv-00147-APM Document 1-4 Filed 01/17/24 Page 12 of 21

24AC-CC02291
Exhibit 3

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM



OFFICE OF THE ATTORNEY GENERAL
CONSUMER PROTECTION DIVISION

# CIVIL INVESTIGATIVE DEMAND

**To:** **Media Matters for America**          *via FedEx 7741 8756 3037*
                                        **Return Date: December 12, 2023**

**c/o** **Angelo Carusone**
      **800 Maine Ave SW, Suite 500**
      **Washington, DC 20024**

Pursuant to this office's specific authority under § 17.61 of the Texas Deceptive Trade Practices – Consumer Protection Act, §§ 17.41-.63, Texas Business and Commerce Code ("DTPA"), Media Matters for America ("Media Matters") is hereby directed to produce the items listed in **"Exhibit A"** attached hereto.

You are to make available the documentary material described in **"Exhibit A"** to the undersigned Assistant Attorney General, or other authorized agent(s) identified by the Consumer Protection Division ("Division"), by the "Return Date" indicated above for inspection and copying. In lieu of producing the originals for inspection and copying at your principal place of business, you may deliver true copies of the requested documents to the Assistant Attorney General or Authorized Agent below at the Office of the Attorney General, 300 W 15th St, Austin, TX, 78701. **Contact one of the persons listed below upon receipt to discuss the logistics of producing the requested documents to the Division.**

The Division believes that Media Matters for America is in possession, custody, or control of documentary material relevant to the subject matter of an investigation of possible violations of §§ 17.46(a) and (b) of the DTPA, related to false, misleading, and/or deceptive practices in the State of Texas.

> **TAKE NOTICE THAT pursuant to section 17.62, Texas Business and Commerce Code, any person who attempts to avoid, evade, or prevent compliance, in whole or in part, with this directive by removing, concealing, withholding, destroying, mutilating, altering, or by any other means falsifying any documentary material may be guilty of a misdemeanor and on conviction is punishable by a fine of not more than $5,000.00 or by confinement in the county jail for not more than one year, or both.**

ISSUED THIS 21st day of November, 2023.

/s Levi Fuller                              **Authorized Agent**
Levi Fuller                                 Ryan Hanlan
Assistant Attorney General                  Investigator
(512) 936-1308                              (512) 936-3354

## Instructions

1. **Read These Instructions/Definitions.** Read these instructions and definitions carefully.

2. **Duty to Preserve Documents**. All documents and/or other data which relate to the subject matter or requests of this Civil Investigative Demand must be preserved. *Any ongoing, scheduled or other process of document or data destruction involving such documents or data must cease even if it is your normal or routine course of business for you to delete or destroy such documents or data and even if you believe such documents or data are protected from discovery by privilege or otherwise.* Failure to preserve such documents or data may result in legal action and may be regarded as spoliation of evidence under applicable law.

3. **Relevant Dates**. Unless otherwise noted, the requests in this Civil Investigative Demand require production of documents for each year from January 1, 2022 to the final date of your production of responsive documents, herein called "the relevant time period."

4. **Custody and Control.** In responding to this Civil Investigative Demand, you are required to produce not only all requested documents in your physical possession, but also all requested documents within your custody and control, including those within the possession of persons reasonably available to you or under your direction or control.

5. **Identification of Documents not in Custody or Control.** If any responsive document was, but no longer is, in your possession, custody or control, produce a description of each such document. The description shall include the following:

   a. The name of each author, sender, creator, and initiator of such document;

   b. the name of each recipient, addressee, or party for whom such document was intended;

   c. the date the document was created;

   d. the date(s) the document was in use;

   e. a detailed description of the content of the document;

   f. the reason it is no longer in your possession, custody or control; and

   g. the document's present whereabouts.

   If the document is no longer in existence, in addition to providing the information indicated above, state on whose instructions the document was destroyed or otherwise disposed of, and the date and manner of the destruction or disposal.

6. **Privileged Documents**. If any responsive document is withheld, in whole or in part, under any claim of privilege, provide a detailed privilege log that contains at least the following information for each document or partial document that you have withheld:

   a. the document's control numbers;

   b. all authors of the document;

   c. all addressees of the document;

   d. all recipients of the document or of any copies of the document, to the extent not included among the document's addressees;

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

**JA0710**

e. the date of the document;

f. a description of the subject matter of the document sufficient to determine the applicability of the privilege;

g. the nature or type of the privilege that is being asserted for the document (e.g., "attorney-client privilege");

h. the specification(s) of the Demand to which the document is responsive;

i. the document control number(s) of any attachments to the document, regardless of whether any privilege is being asserted for such attachment(s); and

j. whether the document has been produced in redacted form, and if so, the range of the control numbers for the document.

7. **Trade Secrets.** It is your responsibility to clearly designate which, if any, of the requested documents contain trade secrets, in accordance with Section 17.61(f) of the Texas Business and Commerce Code.

8. **Consult Before Producing Documents.** Before processing or making copies of hard copy documents or electronically stored information in response to this Civil Investigative Demand, consult with the designated representative(s) of the Office of the Attorney General, ("OAG") identified above and reach agreement on the format and method of production.

Likewise, before producing any *original* documents, consult with one of the designated representatives of the OAG identified above to obtain approval. If you produce original documents, the OAG cannot guarantee their return.

9. **You May Produce Copies.** Subject to the consultation requirement noted above, you may submit photocopies (with color photocopies where necessary to interpret the document) in lieu of original hard-copy documents, provided that such copies are accompanied by an affidavit of an officer of Media Matters for America stating that the copies are true, correct, and complete copies of the original documents, and (if appropriate) were generated and maintained in the ordinary course of your business, and provided that where the original contains colored text or images, a color copy must be provided.

10. **Non-identical Copies to be Produced.** Identical copies of responsive documents need not be produced. However, any copy of a document that differs in any manner, including but not limited to the presence of handwritten notations, different senders or recipients, etc. must be produced.

11. **No Redaction**. All materials or documents produced in response to this Civil Investigative Demand shall be produced, except as deemed privileged, in complete unabridged, unedited and unredacted form, even if portions may contain information not explicitly requested, or might include interim or final editions of a document.

12. **Documents to be Bates Numbered.** Mark each page or electronic medium (e.g., disk, tape, or CD) with individual or corporate identification and eight-digit consecutive document control numbers (e.g., DOE-12345678; CORP-12345678). Hardcopy bound pamphlets or books may be marked with a single identification and control number. Documents as to which privilege is asserted are to also receive identification and control number.

If your production will be more than one box or piece of electronic media, number each box or electronic media, as well as the total number of boxes/media (e.g., box 1 of 13) and mark each with the name(s) of the person(s) whose files are contained therein, the requests(s) to which they are responsive, and the document control numbers contained therein.

**JA0711**

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

13. **Document Organization.** *Each document and other tangible thing produced shall be clearly designated as to which request, and each sub-part of a request, that it satisfies. The documents produced shall be identified and segregated to correspond with the number and subsection of the request.*

14. **Production of Electronic Documents.** Unless otherwise agreed to in writing by the designated OAG representative, electronically stored information shall be produced in electronic form. Before you prepare documents or information for production in electronic form in order to comply with this Civil Investigative Demand (for example, before you attempt to process electronically stored information or image hard copy documents), you must consult with the designated representative(s) of the OAG identified above and reach agreement regarding the format and method of production.

15. **Questions.** Questions concerning this Civil Investigative Demand should be directed to Assistant Attorney General Levi Fuller at (512) 936-1308.

## Definitions

1. **"You," "your," "the business," "Media Matters for America,"** or **"Media Matters"** means Media Matters for America, their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and includes all persons and entities acting or purporting to act under the guidance or on behalf of any of the above. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership (25 percent or more) or control between the company and any other person or entity.

2. **"X," "X Corp.," "Twitter,"** or **"Twitter, Inc."** means X, their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and includes all persons and entities acting or purporting to act under the guidance or on behalf of any of the above.

3. **"Document"** means the original and all non-identical copies (whether different from the original because of notes, underlining, attachments, or otherwise) of all computer files, and all written, printed, graphic or recorded material of every kind, regardless of authorship. It includes communications in words, symbols, pictures, photographs, sounds, films, and tapes, as well as electronically stored information, computer files, together with all codes and/or programming instructions and other materials necessary to understand and use such systems. The term "computer files" includes information stored in or accessible through computers or other information retrieval systems and includes but is not limited to drafts of documents, metadata, embedded, hidden and other bibliographic or historical data describing or relating to documents created, revised, or distributed on computer systems, as well as spreadsheets and their underlying cell formulae and other codes. Thus, you should produce documents that exist in machine-readable form, including documents stored in personal computers, portable computers, workstations, minicomputers, phones, pagers, personal data/digital assistants, archival voice storage systems, group and collaborative tools, electronic messaging devices, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether on or off your premises. This definition covers electronic mail messages ("e-mail"), text messages, voice mail, and all other documents in the possession of you and/or your directors, officers, managers, or employees, whether located at their home or office, whether on work or personal devices. Notice: Unless otherwise specified, the term "document" excludes bills of lading, invoices in non-electronic form, customs declarations, purchase orders, and other similar documents of a purely transactional nature.

4. **"Communication"** means any exchange or transmission of words or ideas to another person or an entity, including without limitation conversations, discussions, letters, memoranda, meetings, notes, speeches, or other transfer of information, whether written, oral, or by any other means, whether direct or indirect, formal or informal, and includes any document which abstracts, digests, transcribes or records any such communication. This definition extends to and encompasses electronic communications on internal chat platforms such as Slack, Microsoft Teams, Google Chat, and other similar messaging platforms.

5. **"Entity"** means legal or business entity of any kind and includes, without limitation, corporations, partnerships, joint ventures, associations, governmental bodies, and trusts.

6. **"Evidencing"** means having any tendency to make the existence of any fact related to the request more probable than it would be without the evidence.

7. **"Identify"** means

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

**JA0713**

a. Regarding an individual, to identify that individual's:

    i. name;

    ii. current or last known telephone numbers at business and home; and

    iii. current or last known business and home addresses.

b. Regarding a person other than an individual, to identify:

    i. its full name;

    ii. the nature of its organization;

    iii. the address and telephone number of its principal offices and, if applicable, the state in which it is incorporated; and

    iv. its principal line of business or activity.

c. Regarding any other tangible thing, to identify:

    i. what it is, giving a reasonably detailed description thereof;

    ii. when, where, and how it was made, if applicable;

    iii. who made it, if applicable; and

    iv. its current custodian or the person that had last known possession, custody, or control thereof.

8. **"Including"** means including, but not limited to.

9. **"Person"** includes you and means any entity or natural person.

10. **"Relate," "related,"** and **"relating"** mean being in any way legally, logically, or factually connected with the subject matter of the request at issue.

11. The words **"and"** and **"or"** shall be construed either conjunctively or disjunctively as required by the context to bring within the scope of the request, any document(s) that might be deemed outside its scope by another construction.

12. Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

JA0714

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

# EXHIBIT A: DOCUMENTS TO BE PRODUCED

1. Produce documents sufficient to identify Media Matters for America's employee organizational chart.

2. Produce documents sufficient to identify all of Media Matters for America's sources of income originating in the State of Texas.

3. Produce documents sufficient to identify all of Media Matters for America's operational expenditures in the State of Texas.

4. Produce all documents related to internal and external communications by Media Matters for America regarding Elon Musk's purchase of X during the relevant time period.

5. Produce all documents related to internal and external communications by Media Matters for America regarding Linda Yaccarino during the relevant time period.

6. Produce documents sufficient to identify all current and past X accounts under the ownership, control, or operating at the behest of Media Matters for America.

7. Produce all documents related to internal and external communications relating to the article titled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" by Eric Hananoki.

8. Produce documents sufficient to identify all of Media Matters for America's owned, controlled, or authorized X accounts that were used to obtain, produce, or otherwise acquire the screenshot images contained in the article titled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" by Eric Hananoki.

9. Produce documents sufficient to identify all X accounts, profiles, and members followed by the X accounts identified in response to Demand Number 8, above.

10. Produce all of Media Matters for America's external communications with employees and representatives of X from November 1, 2023 to November 21, 2023.

11. Produce all of Media Matters for America's external communications with Apple Inc., International Business Machine Corporation (IBM), Bravo television network, NBCUniversal, Oracle Corporation, and Comcast Corporation, Lions Gate Entertainment Corporation, Warner Bros Discovery Inc., Paramount Pictures Corporation, and Sony Group Corporation from November 1, 2023 to November 21, 2023.

12. Produce documents sufficient to identify all direct and indirect sources of funding for all Media Matters for America operations involving X research or publications.

24AC-CC02291

Exhibit 1

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MEDIA MATTERS FOR AMERICA,
P.O. Box 44811,
Washington, D.C. 20026;

*and*,

ERIC HANANOKI,
Notice of address to be filed under seal
pursuant to LCvR 5.1(c)(1),

                Plaintiffs,

    v.

WARREN KENNETH PAXTON JR., in his
official capacity as Attorney General of the
State of Texas,
P.O. Box 12548,
Austin, TX 78711,

                Defendant.

Civil Action No. 24-cv-147

[CIVIL RIGHTS ACTION]

**COMPLAINT**

**(Rule 57 Speedy Hearing Request)**

## INTRODUCTION

1.     This case is a test of our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). At the heart of this commitment is the First Amendment's promise that the people and the press may discuss public matters—and criticize powerful people—"without . . . fear of subsequent punishment" from government officials. *Roth v. United States*, 354 U.S. 476, 488 (1957) (quoting *Thornhill v. State of Alabama*, 310 U.S. 88, 101–02 (1940)).

2.     Plaintiff Media Matters for America ("Media Matters") is a Washington, D.C. based organization dedicated to comprehensively monitoring, analyzing, and correcting

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

misinformation in the U.S. media. It employs over 60 reporters, writers, and researchers, who regularly publish news articles, analysis, research, and studies about a variety of issues of great public interest. Among them are Plaintiff Eric Hananoki, Media Matters's Senior Investigative Reporter, who for the past decade has specialized in reporting on extremism—including white nationalism, antisemitism, and Islamophobia—in the public square. For years, Media Matters and Mr. Hananoki have regularly published material that is critical of powerful figures, politicians, and elected officials. Their careful reporting and research work has been extensively cited and discussed by other media outlets—and even government agencies—as they have established themselves as important voices contributing to an ongoing and critical national discussion about extremism in our politics and media.

3.     Over the past year, as part of their long running work and mission, Plaintiffs have frequently reported on a major national news story—the disturbing rise of violent and extremist rhetoric on the popular social media platform X (formerly known as Twitter) since it was purchased by Elon Musk, reportedly the world's richest man, in late 2022. As Media Matters and countless others in the media have reported, as hateful rhetoric has continued to proliferate on the platform (often alongside Musk's own statements appearing to endorse extremist views and conspiracy theories), many advertisers have chosen to leave X. And much of Media Matters's reporting on the subject has come from Hananoki who, for nearly a year now, has been publishing a series of articles specifically about X's apparent inability to protect its advertisers from appearing alongside extremist content—despite X's repeated promises that it would do just that.

4.     This case arises out of an article that Media Matters and Hananoki published in November. That article was published on November 16, 2023, when Musk was in the middle of a veritable media storm resulting from his apparent endorsement on X of a fringe conspiracy theory

2

**JA0717**

that postulates that Jewish people have a "hatred against whites" and support "flooding the[]

country" with "hordes of minorities." That article was titled, "*As Musk endorses antisemitic

*conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-*

*Nazi content*," and, in it, Hananoki reported that at the same time Musk appeared to endorse this

antisemitic conspiracy theory, X was permitting the placement of advertisements next to pro-Nazi

content. His article published several examples, such as this image of an advertisement for Oracle

appearing next to an image of Adolf Hitler:



5.     Although the subject of the article—specifically X's consistent failure to protect

advertisers from their advertisements appearing alongside hate speech on the platform—had been

addressed in near-constant media coverage for over a year, Musk appeared to take personal offense

at the November 16 article, and shortly after it was published, tweeted to his 165 million followers

that X would be filing a "thermonuclear" lawsuit against Media Matters and anyone else involved

JA0718

with the article. A mere two days later, Musk made good on his threat, filing suit against Media Matters and Hananoki on November 20, 2023. *See X Corp. v. Media Matters for America, et al.*, No. 4:23-cv-1175, 2023 WL 8091661 (N.D. Tex. Nov. 20, 2023). Although Media Matters and Hananoki have no meaningful contacts with Texas, X chose to file this lawsuit in federal district court for the Northern District of Texas, in the face of binding precedent that merely having a website available in a state does not supply jurisdiction.

6. On the same day that X filed that lawsuit (indeed, within minutes of its filing), Defendant Texas Attorney General Ken Paxton—another prominent public figure about whom Hananoki and Media Matters have reported in the past—announced he was launching an investigation into Media Matters, purportedly under Texas's deceptive trade practices act. *See* Ex. A, *Att'y Gen. Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity*, Texas Att'y Gen.'s Office (Nov. 20, 2023). The press release announcing the investigation was four sentences long and identified no basis for the State of Texas to "investigate" Media Matters, a D.C.-based organization, for purported violation of Texas law. It does, however, repeatedly describe the investigation's target in troubling and nakedly partisan terms, calling Media Matters "a radical anti-free speech organization," and "a radical left-wing organization[] who would like nothing more than to limit freedom by reducing participation in the public square." It also admits that the sole bases for the "investigation" are X's own self-serving and unverified allegations about Media Matters's and Hananoki's reporting.

7. That the "investigation" was pretext to rifle through Media Matters' internal communications and chill the reporting of Media Matters and Hananoki was proved the following day, when Paxton issued a civil investigative demand ("Demand") to Media Matters. The Demand commanding Media Matters to "produce [] documentary material[s] and permit inspection and

4

copying" of a sweeping array of materials in both Media Matters's and Hananoki's possession, including documents and communications about their research and reporting, their communications with possible sources at X and its advertisers, and other sensitive materials related to Media Matters's operations, including information about the organization's funding. Ex. B, Civil Investigative Demand, Office of the Att'y Gen. (Nov. 21, 2023) at 7. Paxton did not pause for even a moment to consider other public reporting on the same topic, or materials clearly within his office's reach, to determine either whether there was a legitimate substantive or jurisdictional basis for the investigation, before demanding these extraordinarily invasive materials from Media Matters itself. The result has been to immediately and significantly chill Plaintiffs' newsgathering, research, and reporting activities on X or Musk, by asserting an immediate, seemingly unrestrained right to any and all related materials, from now until Paxton determines the investigation is over. Ex. B at 7. And, under Texas procedure, Paxton is entitled to enforce the Demand in Texas state court *at any time*, even though Plaintiffs have no relevant connection to Texas and have been afforded *zero* explanation as to how they may have violated Texas law.

8.      Paxton's retaliatory campaign has had its intended effect: Plaintiffs have not published any articles about how Musk's ownership has triggered a rise in political extremism on X since Paxton announced his investigation—despite a flood of tips identifying extremist content on the platform—for fear of further retaliation and harassment. Hananoki himself had two articles that were already researched and drafted—including one article that had gone through the entire editing process and was effectively ready for publication—at the time Media Matters received the Demand. But neither was published in the wake of the Demand. The chill on Hananoki's reporting is ongoing—he previously published one or two articles per week prior to receiving the Demand, but has published only two articles *altogether* since then, and none about Musk's handling of

5

political extremism on X. In the two articles Hananoki was able to publish, he has purposefully avoided commenting on X's content moderation policies, even where plainly relevant to the article.

9. "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Likewise, under the Fourth Amendment, it is "contrary to the first principles of justice to allow a search through [Plaintiffs'] records, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924) (Holmes, J.). Paxton's retaliatory investigation and Demand are "premised solely upon *legal* activity" and thus "the very type of 'fishing expeditions' that were the target of Justice Holmes's assault in *American Tobacco.*" *Major League Baseball v. Crist*, 331 F.3d 1177, 1187 (11th Cir. 2003) (suppressing civil investigative demand violating Fourth Amendment).

10. In view of Paxton's unlawful harassment and retaliation, Plaintiffs seek immediate declaratory and injunctive relief from this Court—in a jurisdiction where their constitutionally protected activities occur, where Media Matters is incorporated and has its office, where most of Media Matters's reporters and researchers live and work, and where Plaintiffs will be uniquely injured by being compelled to disclose information—to vindicate their fundamental right to gather news and hold the powerful to account. To the same end, Plaintiffs also respectfully request that the Court order a "speedy hearing" of this "declaratory-judgment" action. *See* Fed. R. Civ. P. 57.

**JURISDICTION & VENUE**

11. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 because Plaintiffs' federal constitutional claims arise under the First, Fourth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983, 1988. It has authority to grant Plaintiffs declaratory, injunctive, and other relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Court's own legal and equitable powers. It also has supplemental

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

**JA0721**

jurisdiction over any state law claims derived from a common nucleus of operative fact. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988).

12.     Subject matter jurisdiction further exists under Article III because Plaintiffs have suffered and will continue to suffer injuries-in-fact; there is a sufficient causal connection between Plaintiffs' injuries and Paxton's actions in pursuing his investigation and Demand, and a favorable decision from this Court granting Plaintiffs relief will redress those injuries. This dispute is ripe because Plaintiffs' rights are being violated already, and Plaintiffs will suffer further imminent invasions of those rights in the absence of relief from this Court. Plaintiffs have actual fear that the Demand will be enforced against them, which has already chilled their speech.

13.     This Court has personal jurisdiction over Defendant Paxton in his official capacity as Attorney General of Texas. The District of Columbia's long-arm statute is effectively congruent with the permissible limits of personal jurisdiction under the Due Process Clause. *See, e.g.*, *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 44 (D.C. Cir. 2020); *Mouzavires v. Baxter*, 434 A.2d 988, 993 (D.C. Cir. 1981). For constitutional purposes, specific personal jurisdiction exists where (1) the defendant has "purposefully directed" activity at residents of the forum and (2) the plaintiff's claims "arise out of or relate to the defendant's contacts with the forum." *Lewis v. Mutond*, 568 F. Supp. 3d 47, 52 (D.D.C. 2021) (first quoting *Burger King Corp v. Rudzewicz*, 471 U.S. 462, 472–73 (1985), and then quoting *Bristol-Myers Squibb v. Super. Ct. of Cal.*, 582 U.S. 255, 262 (2017)). Even "a single act, so long as it creates [a] 'substantial connection,' is sufficient." *Heller v. Nicholas Appelgate Cap. Mgmt. LLC*, 498 F. Supp. 2d 100, 109–10 (D.D.C. 2007) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 475, n.18 (1984)).

14.     The Court has at least three related bases to exercise jurisdiction over Paxton consistent with the demands of due process. First, Paxton procured the service of an agent—a

JA0722

process server—and directed that agent to enter the District of Columbia to serve the Demand upon Media Matters. It is well-settled that "physical entry into the State—either by the defendant in person *or through an agent*" is a "relevant contact" for purposes of personal jurisdiction. *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (emphasis added); *see also IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 113 (D.D.C. 2018). Second, Paxton's Demand seeks documents from Media Matters that are overwhelmingly located in the District, where Media Matters is headquartered and where Media Matters will have to undertake any effort to comply with the Demand. By demanding such documents, Paxton has unquestionably "directed" activity at Media Matters in D.C. And Plaintiffs' claims unquestionably "arise" from those contacts because three of their claims challenge the statutory and constitutional propriety of Paxton's Demand. *See infra* Counts II–IV. Third, Plaintiffs allege unlawful retaliation in violation of the First Amendment, an intentional tort. *See infra* Count I. In intentional-tort cases, "personal jurisdiction can be based upon: (1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered— and which the defendant knows is likely to be suffered—in the forum state." *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 29 (D.D.C. 2017) (quoting *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998)), *aff'd*, No. 17-7033, 2018 WL 4440459 (D.C. Cir. July 17, 2018); *see also Calder v. Jones*, 465 U.S. 783, 788–89 (1984). Here, jurisdiction is proper because Paxton has intentionally served a Demand on Media Matters in the District causing a substantial and predictable chill to Media Matters and its reporters, including Hananoki. Indeed, Paxton has conceded the Demand was "directed" at Media Matters in the District of Columbia. *See infra* ¶¶ 76–77 & note 28.

15.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Columbia. Paxton caused his

JA0723

Demand to be served in the District; Media Matters's compliance or noncompliance therewith will occur in the District; and the substantial chill to Plaintiffs has been suffered, in substantial part, in the District.

## PARTIES

16.     Plaintiff Media Matters for America ("Media Matters") is a not-for-profit research center and media watchdog dedicated to comprehensively monitoring, analyzing, and correcting misinformation in the media. Media Matters routinely investigates political extremism on media platforms in the United States and publishes articles and commentary on public figures who endorse or espouse such rhetoric. It has been incorporated under the laws of, and has had its principal place of business in, the District of Columbia since its founding over twenty years ago. Most of its reporters and employees live in and work from the Washington, D.C. metropolitan area, including in Maryland and Virginia, as well as the District itself. Nearly all of Media Matters's executive leadership lives and works in the District of Columbia. Any periodic in-person meetings, trainings, and other convenings are held at Media Matters's office space in the District of Columbia, where it also stores any physical documents.

17.     Plaintiff Eric Hananoki is a Senior Investigative Reporter at Media Matters. Hananoki resides in Maryland, just outside of Washington, D.C. For over a decade, Hananoki's beat for Media Matters has included investigating, researching, and reporting on political extremism in U.S. media, including on social media platforms like X. In his role as Senior Investigative Reporter, Hananoki has written many articles about extremism, white nationalism, and anti-Semitic rhetoric espoused by politicians and public figures. Hananoki's reporting has included numerous articles about social media platform X and its owner, Elon Musk. Hananoki generally researched and wrote his articles, including the November 16 article, from his residence

9

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

**JA0724**

in Maryland. Although Hananoki primarily works from his Maryland home, he occasionally visits the Media Matters office in Washington, D.C. as part of his job responsibilities.

18.     Defendant Warren Kenneth Paxton, Jr. is the Attorney General of the State of Texas and is sued in his official capacity. The Texas Deceptive Trade Practices Act ("DPTA"), Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*, grants Paxton various powers in his capacity as Attorney General through the consumer protection division of his office. This includes the power to issue a "civil investigative demand requiring" the recipient "to produce [] documentary material[s] and permit inspection and copying." Tex. Bus. & Com. Code Ann. § 17.61(a). Under Texas law, the Attorney General is not required to show any cause or even make a threshold determination that he has jurisdiction to issue a Demand—he may do so if he "believes" the recipient to be in possession of relevant material concerning a possible violation of the DPTA. Tex. Bus. & Com. Code Ann. § 17.61(a). Paxton "may use the documentary material or copies of it as [he] determines necessary" to enforce the DPTA, including before a court. Tex. Bus. & Com. Code Ann. § 17.61(f).

## FACTS

### A.     Media Matters and Hananoki have a long track record of reporting on political extremism, including on social media platforms like X.

19.     Since its founding in 2004, Media Matters has been dedicated to monitoring and correcting misinformation, including by publishing its own investigatory research and reporting on its website. Media Matters provides its reporters and researchers, including Hananoki, a powerful platform from which to reach the public, often in the form of research and reporting on current events and criticism of powerful public figures and politicians.

20.     Media Matters has over 100 employees—including over 60 reporters, writers, and researchers—most of whom work and reside within the Washington, D.C. metropolitan area where

10

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

Media Matters's sole office is located.[1] Media Matters does not have an office, or any other physical presence, in Texas. Media Matters does not transact any business in Texas and thus has never registered in the state. *See* Tex. Bus. Orgs. Ann. Code § 9.002(a). Media Matters is also not registered as a charity organization in Texas and does not have a registered agent in the state.

21.     Hananoki has worked at Media Matters since 2007 and is currently a Senior Investigative Reporter. Previously, Hananoki worked as a Researcher, Senior Researcher, Research Fellow, and Investigative Reporter at Media Matters. In his more than 16 years at the organization, Hananoki has researched and written countless reports and articles, often shedding light on public figures who espouse violent, extreme, or racist views. His articles and reports have been widely cited by a broad array of media outlets, including the Associated Press, CNN, Fox News, Los Angeles Times, MSNBC, New York Post, New York Times, Politico, USA Today, Wall Street Journal, and Washington Post.

22.     His long history of research and reporting has been relied upon by government officials, including under both Democratic and Republican leadership. Under President Trump, the Department of Justice cited Hananoki's research regarding a commentator who promoted and sold a bogus COVID-19 cure.[2] Special Counsel Robert Mueller cited Hananoki's reporting on

---

[1] Media Matters employees may request authorization to work remotely and, upon approval, may choose to do so from any location in the United States. Of Media Matters employees authorized to work remotely, only one employee has provided a residential address in Texas. That employee did not work with Mr. Hananoki on the November 16 article, nor any other of his articles related to X or otherwise, and works in an entirely different department. Nonetheless, since October 2023, that employee has only visited Texas for a short period during the holidays—where they only worked for a single day.

[2] *United States v. My Dr. Suggests LLC*, No. 2:20-CV-00279-DBB (D. Utah Apr. 27, 2020), Plaintiffs' Ex Parte Mot. and Mem. of Law for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue, Dkt. 2, at 13; *id.*, Decl. of Virginia Keys, Dkt. 2-1, ¶¶ 7, 28–29.

JA0726

Roger Stone in his report on Russian interference in the 2016 presidential election,[3] as did a bipartisan U.S. Senate Select Committee on Intelligence report regarding the same.[4] Numerous political organizations, including the National Republican Congressional Committee, have at various times withdrawn support for political candidates after Hananoki reported on racist or extremist rhetoric from those candidates.[5]

     23.     Attorney General Paxton himself has previously relied on Hananoki's work. In 2020, Hananoki uncovered "tweets filled with racist rhetoric, violent threats and coronavirus conspiracy theories" from an Assistant Attorney General in Paxton's office.[6] Paxton's office fired the employee in the wake of Hananoki's reporting.[7]

     24.     As part of his work at Media Matters, Hananoki has been reporting on X—and before that, Twitter—for years. His coverage of X has increased over the past year due to a marked

---

[3] Both reports cited a Media Matters article that included a video that Hananoki found and produced. *See* Report on the Investigation into Russian Interference in the 2016 Presidential Election, Volume I of II, Special Counsel Robert S. Mueller, III, March 2019, at 57 n.233, available at https://www.justice.gov/storage/report_volume1.pdf.

[4] Select Committee on Intelligence, Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume 5: Counterintelligence Threats and Vulnerabilities, at 246 n.1638, https://www.intelligence.senate.gov/sites/default/files/documents/report_volume5.pdf.

[5] *See, e.g.*, Jonathan D. Salant, "*House Republicans withdraw support of N.J. candidate after report says he shared racist screed*," NJ.com (July 10, 2018), https://www.nj.com/politics/2018/07/house_republicans_withdraw_support_of_nj_candidate.html (noting that NRCC chair "Stivers reacted to a report by the liberal watchdog group Media Matters about [the candidate] linking to the article that ran on a white supremacist website.").

[6] Eric Hananoki, "*A Texas assistant attorney general is a Qanon conspiracy theorist who tweets out violent threats and bigoted remarks*," Media Matters for America (Sept. 3, 2020), https://www.mediamatters.org/twitter/texas-assistant-attorney-general-nick-moutos-qanon-conspiracy-theorist-who-tweets-out.

[7] Trinady Joslin, "*Assistant Texas attorney general loses job after report surfaces racist tweets*," The Texas Tribune (Sept. 3, 2020), https://www.texastribune.org/2020/09/03/nick-moutos-texas-attorney-general; *see also* Taylor Goldenstein, "*Records: Texas assistant AG who lost job over tweets was fired, had been warned about social media*," Houston Chronicle (Sept. 11, 2020),

12

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

increase in extremist rhetoric on the platform since Musk took ownership, a disturbing trend widely reported on in the media, including by outlets other than Media Matters.

**B.** **Elon Musk purchases X and cuts back its content-moderation infrastructure.**

25. On October 27, 2022, Elon Musk completed his purchase of the social media platform then known as Twitter. Musk subsequently renamed the social media platform "X," though it continues to operate at its traditional twitter.com web address. Both before and after acquiring ownership of X, Musk frequently referred to the platform as a "digital town square" or "de facto town square" for public discussion.[8]

26. Almost immediately after his takeover, Musk began laying off key executives and content moderators at X responsible for removing hate speech and other violent rhetoric.[9] Indeed, within his first few months of ownership, Musk laid off approximately 80 percent of the company's staff, including its former CEO, general counsel, policy chief, and head of trust and safety.[10] He downsized or eliminated critical areas of the company responsible for overseeing policy, trust and safety, communications, and ethical AI, among others.[11] These deep workforce cuts raised

---

https://www.houstonchronicle.com/politics/texas/article/texas-assistant-ag-social-media-posts-fired-warned-15558487.php.

[8] Douglas Yeung, "*The 'Digital Town Square' Problem*," TheRANDBlog (Jan. 13, 2023), https://www.rand.org/pubs/commentary/2023/01/the-digital-town-square-problem.html.

[9] *See* Brian Fung & Clare Duffy, "*How a single year of Elon Musk turned Twitter into a husk of its former self,*" CNN (Oct. 27, 2023), https://www.cnn.com/2023/10/27/tech/elon-musk-twitter-x-one-year-changes/index.html [hereinafter *A single year of Elon Musk turned Twitter into a husk*]; *see also* "*Musk fires outsourced content moderators who track abuse on Twitter,*" MoneyWatch, CBS News (Nov. 14, 2022), https://www.cbsnews.com/news/elon-musk-twitter-layoffs-outsourced-content-moderators/.

[10] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

[11] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9; *see also* Rohan Goswami, "*X CEO Linda Yaccarino explains reason for getting rid of Twitter name,*" CNBC (Aug. 10, 2023), https://www.cnbc.com/2023/08/10/x-corp-ceo-linda-yaccarino-says-she-has-autonomy-under-elon-musk.html.

13

questions among U.S. lawmakers and regulators about the social media platform's ability to safely respond to security and privacy threats, misinformation, and hate speech—matters of significant public concern in view of Musk's claim that the platform should serve as a digital town square.[12] Lawmakers similarly expressed concern that, in the wake of Musk's ownership, the platform had ceased to comply with two consent decrees it had entered into with the Federal Trade Commission concerning safeguards for personal data and privacy.[13]

27. Musk also eliminated existing products and policies—many of which served to protect users from misinformation and violent content—under the auspices of promoting "free speech."[14] He reinstated suspended accounts of known white supremacists and conspiracy theorists while suspending the accounts of journalists who tracked his private air travel.[15]

28. Unsurprisingly, after the elimination of 80 percent of X's staff and the dismantling of much of X's content moderation infrastructure, extremist and racist rhetoric surged on X in the wake of Musk's takeover. Less than a month into Musk's ownership, the Brookings Institute reported that the platform had seen a "surge in hateful language" in the wake of Musk's purchase, including "a nearly 500% increase in use of the N-word in the 12-hour window immediately

---

[12] Brian Fung, "*First on CNN: US senators question Twitter's privacy compliance under Elon Musk*," CNN (June 5, 2023), https://www.cnn.com/2023/06/05/tech/twitter-compliance-musk-senators/index.html; *see also* Brian Fung, "*Elon Musk should be forced to testify on X's 'chaotic environment,' US regulator tells court*," CNN (Sept. 12, 2023), https://www.cnn.com/2023/09/12/tech/elon-musk-testify-privacy-probe/index.html.

[13] *See* Makena Kelly, "*Republicans defend Elon Musk in FTC's Twitter probe*," The Verge (July 14, 2023), https://www.theverge.com/2023/7/14/23794363/elon-musk-twitter-ftc-lina-khan-republicans; *see also* Cat Zakrzewski, "*Musk may have violated FTC privacy order, new court filing shows*," The Washington Post (Sept. 12, 2023), https://www.washingtonpost.com/technology/2023/09/12/elon-musk-consent-order-ftc/.

[14] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

[15] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

14

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

following the shift of ownership to Musk."[16] Similarly, within the first week of his ownership, use of the word "Jew" increased fivefold, with tweets that were antisemitic receiving the most engagement.[17] Academic researchers in the School of Communication and Media at Montclair State University published a report describing how "Hate Speech Spike[d] on Twitter After Elon Musk Acquire[d] the Platform."[18]

29.     Less than two months after Musk's takeover, the New York Times reported the following about the rising hate speech on the platform:

- "Before Elon Musk bought Twitter, slurs against Black Americans showed up on the social media service an average of 1,282 times a day. After the billionaire became Twitter's owner, they jumped to 3,876 times a day."

- "Slurs against gay men appeared on Twitter 2,506 times a day on average before Mr. Musk took over. Afterward, their use rose to 3,964 times a day."

- "[A]ntisemitic posts referring to Jews or Judaism soared more than 61 percent in the two weeks after Mr. Musk acquired the site."[19]

30.     A broad array of media outlets extensively reported on this disturbing trend in Musk's self-described "digital town square."

31.     This spike in hateful rhetoric on X caught the attention of the platform's advertisers, many of whom promptly ceased advertising on the platform in the months after Musk took over.

---

[16] Rashawn Ray and Joy Anyanwu, "*Why is Elon Musk's Twitter takeover increasing hate speech?*," Brookings (Nov. 23, 2022), https://www.brookings.edu/articles/why-is-elon-musks-twitter-takeover-increasing-hate-speech/.
[17] *Id.*

[18] "*Hate Speech Spikes on Twitter After Elon Musk Acquires the Platform,*" Montclair State University, (Nov. 1, 2022) https://www.montclair.edu/school-of-communication-and-media/wp-content/uploads/sites/20/2022/11/Montclair-State-SCM-Study-Increases-in-Twitter-Hate-Speech-After-Elon-Musks-Acquisition.pdf.

[19] Sheera Frenkel and Kate Conger, "*Hate Speech's Rise on Twitter Is Unprecedented, Researchers Find,*" N.Y. Times (Dec. 2, 2022), https://www.nytimes.com/2022/12/02/technology/twitter-hate-speech.html.

**JA0730**

Since "the early days of Musk's takeover, many of Twitter's largest advertisers—including the likes of General Mills and the Volkswagen Group—paused their spending over concerns about X's layoffs, content moderation capabilities and general uncertainty about the platform's future."[20]

32. The pullback of the company's largest advertisers led to precipitous drops in its revenue. In July 2023, Musk reported "a 50% decline in ad revenue and heavy debt load," while in September, he reported that advertising revenue in the U.S. was "still down 60%."[21]

33. More alarming still to X's advertisers was the fact that, after Musk's steep downsizing of company staff, the flood of hateful and violent rhetoric on the platform began appearing increasingly often alongside their advertising, creating a false association between their brands and vile hate speech. X's inability to control the appearance of extremist and violent rhetoric alongside its advertisers precipitated a broader exodus of advertisers from the platform.

34. Indeed, the media writ large has, for over a year, consistently reported on X and Musk's failure to protect advertisers from having their brands appear next to extremist, hateful, and violent rhetoric. Some examples include:

1. **Reuters**, "*Advertisers react to Twitter's new ownership*" (Nov. 18, 2022), https://www.reuters.com/technology/advertisers-react-twitters-new-ownership-2022-11-03/.

2. **The Washington Post**, "*Amazon, Uber, Snap ads appear on Twitter pages of white nationalists restored by Musk*," Faiz Siddiqui (Dec. 6, 2022), https://www.washingtonpost.com/technology/2022/12/06/twitter-ads-elon-musk/.

---

[20] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9; *see also* Alberto Chiumento, et al., *Advertisers react to Twitter's new ownership*, Reuters (Nov. 18, 2022), https://www.reuters.com/technology/advertisers-react-twitters-new-ownership-2022-11-03/; Alan Ohnsman, *GM, Ford Say They Aren't Running Twitter Ads As They Assess Changes Under Elon Musk*, Forbes (Oct. 28, 2022), https://www.forbes.com/sites/alanohnsman/2022/10/28/gm-ford-say-they-arent-running-twitter-ads-as-they-assess-changes-under-elon-musk/?sh=1ade964b2a19.

[21] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

JA0731

3. **ARS Technica**, "*Twitter running major brands' ads with extremist tweets—until they get flagged*," Ashley Belanger (Dec. 7, 2022), https://arstechnica.com/tech-policy/2022/12/amazon-among-brands-whose-ads-appeared-in-white-nationalist-twitter-feeds/.

4. **The Verge**, "*Twitter advertisers aren't happy with ads appearing on pages of white nationalists*," Jon Porter (Dec. 7, 2022), https://www.theverge.com/2022/12/7/23497928/twitter-advertisers-brand-safety-unbanned-accounts-white-nationalists.

5. **Center for Countering Digital Hate**, "*Toxic Twitter: How Twitter Generates Millions in Ad Revenue by Bringing Back Banned Accounts*," (Feb. 9, 2023), https://counterhate.com/wp-content/uploads/2023/02/Toxic-Twitter_FINAL.pdf.

6. **The Washington Post**, "*Extremist influencers are generating millions for Twitter, report says*," Taylor Lorenz (Feb. 9, 2023), https://www.washingtonpost.com/technology/2023/02/09/twitter-ads-revenue-suspended-account/.

7. **The Kansas City Star**, "*Mizzou ad appears on racist X page as social media site faces concerned advertisers*," Jonathan Shorman (Mar. 15, 2023), https://www.kansascity.com/news/politics-government/article280309284.html.

8. **Business Insider**, "*Disney, Microsoft, the NBA Had Twitter Ads Next to Neo-Nazi Propaganda*," Katherine Tangalakis-Lippert (June 18, 2023), https://www.businessinsider.com/disney-microsoft-nba-twitter-ads-next-to-neo-nazi-propaganda-2023-6.

9. **The N.Y. Post**, "*Disney, Microsoft ads on Twitter show up next to neo-Nazi propaganda as advertisers return: report*," Shannon Thaler (June 19, 2023), https://nypost.com/2023/06/19/disney-microsoft-ads-on-twitter-show-up-next-to-neo-nazi-propaganda-report/.

35.     None of these articles cited or otherwise indicated that they relied on research or reporting performed by Media Matters or Hananoki.

**C.     Hananoki and Media Matters investigate and report on the surge of extremist rhetoric on X, including alongside advertisements.**

36.     As part of its long-running mission to document and report extremist political rhetoric in media, Media Matters began investigating, researching, and reporting on the rise in

JA0732

political extremism and bigotry on X after Musk's changes to the platform. Hananoki, as a Senior Investigative Reporter whose beat included political extremism, was often assigned this work.

37. From February 10, 2023 to November 17, 2023, Media Matters published at least fourteen articles about the juxtaposition of advertisements alongside hateful content on the X platform. Eleven of these articles were researched and written by Hananoki. They include:

1. "**Under Elon Musk, Twitter is running corporate ads alongside tweets from Holocaust deniers,**" Media Matters for America (Feb. 10, 2023), https://www.mediamatters.org/twitter/under-elon-musk-twitter-running-corporate-ads-alongside-tweets-holocaust-deniers.

2. "**Linda Yaccarino just started as Twitter's new CEO, but Elon Musk already destroyed the platform for advertisers,**" Media Matters for America (June 8, 2023), https://www.mediamatters.org/twitter/linda-yaccarino-just-started-twitters-new-ceo-elon-musk-already-destroyed-platform.

3. "**Dish, Samsung, Wall Street Journal, and others are advertising on the Twitter account of a leading white nationalist group,**" Media Matters for America (June 22, 2023), https://www.mediamatters.org/twitter/dish-samsung-wall-street-journal-and-others-are-advertising-twitter-account-leading-white.

4. "**Update: Twitter placed ads for USA Today, National Women's Soccer League, and other major brands on a terrorism-linked neo-Nazi account,**" Media Matters for America (July 27, 2023), https://www.mediamatters.org/twitter/twitter-placed-ads-usa-today-national-womens-soccer-league-and-other-major-brands-terrorism.

5. "**Advertisers beware: Elon Musk and Linda Yaccarino are trying to lure you back by rebranding Twitter, but it's still a toxic cesspool,**" Media Matters for America (Aug. 8, 2023), https://www.mediamatters.org/twitter/advertisers-beware-elon-musk-and-linda-yaccarino-are-trying-lure-you-back-rebranding.

6. "**X Corp. CEO Yaccarino's interview on CNBC should alarm major advertising brands,**" Media Matters for America (Aug. 11, 2023), https://www.mediamatters.org/twitter/x-corp-ceo-yaccarinos-interview-cnbc-should-alarm-major-advertising-brands.

7. "**Update: Under Linda Yaccarino, X is placing ads for major brands on a verified pro-Hitler account,**" Media Matters for America (Aug. 16, 2023), https://www.mediamatters.org/twitter/update-under-linda-yaccarino-x-placing-ads-major-brands-verified-pro-hitler-account.

18

8. "**X is placing ads for brands like the NFL and MLB next to unhinged conspiracy theories about Jewish people and 9/11**," Media Matters for America (Sept. 11, 2023), https://www.mediamatters.org/twitter/x-placing-ads-brands-nfl-and-mlb-next-unhinged-conspiracy-theories-about-jewish-people-and.

9. "**X is placing major ads on a heavily followed antisemitic account that endorses killing politicians and LGBTQ advocates**," Media Matters for America (Sept. 12, 2023), https://www.mediamatters.org/twitter/x-placing-major-ads-heavily-followed-antisemitic-account-endorses-killing-politicians-and.

10. "**X is placing ads for the NFL on prominent white nationalist accounts**," Media Matters for America (Sept. 27, 2023), https://www.mediamatters.org/white-nationalism/x-placing-ads-nfl-prominent-white-nationalist-accounts.

11. "**X is placing ads for MLB, the NFL, and the Pittsburgh Steelers on antisemitic and Holocaust denial accounts**," Media Matters for America (Oct. 12, 2023), https://www.mediamatters.org/twitter/x-placing-ads-mlb-nfl-and-pittsburgh-steelers-antisemitic-and-holocaust-denial-accounts.

12. "**Pro-Hitler and Holocaust denier account: X has paid me $3,000 in ad revenue sharing**," Eric Hananoki, Media Matters for America (Nov. 13, 2023), https://www.mediamatters.org/twitter/pro-hitler-and-holocaust-denier-account-x-has-paid-me-3000-ad-revenue-sharing.

13. "**As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content**," Media Matters for America (Nov. 16, 2023), https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.

14. "**X is placing ads for Amazon, NBA Mexico, NBCUniversal, and others next to content with white nationalist hashtags**," Media Matters for America (Nov. 17, 2023), https://www.mediamatters.org/twitter/x-placing-ads-amazon-nba-mexico-nbcuniversal-and-others-next-content-white-nationalist.

38.  Media Matters's research and reporting echoed what was being reported widely elsewhere—that the platform was continuing to permit the placement of advertisements alongside extremist content. Hananoki and Media Matters thus joined in ongoing national conversations about an important news story—the surge of hateful and violent rhetoric in America's supposed "digital town square."

JA0734

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

39.    Hananoki's research and reporting sometimes looked specifically at what advertisements X's increasingly extremist user base might see on the platform. Following ordinary journalistic investigative practices, Hananoki used an existing X research account controlled by Media Matters to follow white supremacist content and gauge the advertising that X's computer algorithm would automatically generate in response. His research confirmed that the platform's system was continuing to permit advertisements next to violent and fringe content.

40.    Hananoki published some of his findings, along with a handful of examples, in his November 16 article. That article also reported on Musk's apparent endorsement of a widespread antisemitic conspiracy theory—that Jewish people are seeking to promote "hatred against whites" and are seeking to "flood[] the[] country" with "hordes of minorities"—which drew widespread condemnation and was extensively covered in the media.[22] Hananoki's article included screenshots of six advertisements from major corporate entities appearing with at least nine posts from X users. For example, below are images of an advertisement for Oracle appearing with a quote from Adolf Hitler, as well as an advertisement for the Bravo television network next to a post praising Hitler's Nazi Party, which were included in his article:

---

[22] *See, e.g.*, David Goldman, "*Elon Musk agrees with antisemitic X post that claims Jews 'push hatred' against White people*," CNN (Nov. 17, 2023), https://www.cnn.com/2023/11/15/media/elon-musk-antisemitism-white-people/index.html.

JA0735

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM



41.     Hananoki did not say in his article that X, or anyone associated with X, was intentionally placing advertisements next to such violent or fringe content. He simply reported truthfully that the platform permitted the placements of advertisements from some of the nation's biggest advertisers next to posts that touted Hitler or the Nazi party—which the platform's algorithm obviously did, as the examples he cited showed.

42.     Hananoki researched, factchecked, and drafted the November 16 article in accordance with Media Matters's policies and standards, using similar methods to those he has used throughout his long career in journalism, and mirroring common journalistic practices.

21

JA0736

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

**D.** **Attorney General Paxton retaliates against Media Matters and Hananoki for their coverage of extremist rhetoric on X.**

43.     Despite the robust and ongoing reporting by Media Matters and other news outlets about X's extremist content, Musk apparently took personal offense only at Hananoki's November 16 article discussing Musk's endorsement of an antisemitic conspiracy theory.

44.     Just two days after the article was published, Musk promised to file "a thermonuclear lawsuit against Media Matters." *See* @elonmusk, X.com (Nov. 18, 2023, 2:01 AM ET), https://perma.cc/X4HN-PLJ4. The post received hundreds of thousands of likes and comments, and tens of thousands of reposts. *Id.*



45.     Musk attached a message to the post referencing Hananoki's November 16 article and accusing Media Matters of manipulating X's algorithm to artificially force the placement of ads next to extremist content. *See* @elonmusk, X.com (Nov. 18, 2023, 2:01 AM ET), https://perma.cc/X4HN-PLJ4. Musk made no mention of the year-long parade of reports and documentation illustrating this endemic problem with the architecture of the X platform.

46.     Various media and political figures—many of whom have been the subjects of Media Matters reporting over the years—leapt to Musk's defense and urged retaliation against Media Matters. For example, on November 19, former adviser to President Donald Trump Stephen Miller, discussing Media Matters's article, declared, "There are 2 dozen+ conservative state Attorneys General," seemingly urging states to investigate Plaintiffs for their article. *See* @StephenM, X.com (Nov. 19, 2023, 11:48 AM ET), https://perma.cc/9E6L-FJGY.

JA0737

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

47.     Responding directly to Miller's call for retaliation, Missouri Attorney General Andrew Bailey announced that his "team [was] looking into" Plaintiffs' article. @AGAndrewBailey, X.com (Nov. 19, 2023, 4:46 PM ET), https://perma.cc/J463-656K.



48.     On November 20, 2023, Attorney General Paxton joined the fray, announcing via press release that he was launching an investigation into Media Matters. Ex. A. The four-sentence press release asserted that the Attorney General would "vigorously enforce" the Texas Business Organizations Code and the Deceptive Trade Practices Act but failed to explain how Media Matters—a D.C.-based non-profit media watchdog—or Hananoki—a Maryland-based reporter— were believed to have violated those laws directed at consumer protection in the carrying on of a trade or business. *Id.* Instead of providing any substantive basis that could justify the "investigation," Paxton's press release disparaged Media Matters as "a radical anti-free speech organization," and as a "radical left-wing organization[] who would like nothing more than to limit freedom by reducing participation in the public square[.]" *Id.*

49.     Paxton doubled down on his public attacks of Media Matters in subsequent interviews. In an interview with Charlie Kirk—a frequent subject of Media Matters's reporting[23]— on the Charlie Kirk Show, Paxton discussed his investigation into Media Matters, asserting that his office could "take away [Media Matters's] ability to do business in Texas[,]" and "go after"

---

[23] *See* "Charlie Kirk," Media Matters for America, https://www.mediamatters.org/charlie-kirk.

JA0738

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

Media Matters for large amounts of money—to which Kirk replied, "I love it."[24]

50.    In a subsequent interview, activist Benny Johnson framed Paxton's investigation as "devastating" to Media Matters and "com[ing] in concert with Elon Musk dropping ... [a] 'thermonuclear' lawsuit on Media Matters." *See* Ex. C, Nov. 28, 2023 "The Benny Show" Certified Tr. He asked Paxton if he "encourage[d] other Republican attorney generals to do this" and stated "we're so thankful that somebody is just standing up and doing something. Where are the rest of the Republican AGs? . . . Why are they so quiet on issues like this?" *See* Ex. C; *see also* @bennyjohnson, X.com (Nov. 28, 2023, 12:36 PM ET), https://perma.cc/JA55-6A8G.



51.    Paxton responded by encouraging other state attorneys general to investigate Media Matters, saying: "You know, that's a good question . . . I would encourage them to look at this. They may have just become aware of it. I mean it's a relatively new issue so hopefully over the

---

[24] RealAmericasVoice, "'*We have the right as the state of Texas to go after those damages.*' - AG *Ken Paxton*," Rumble (Nov. 21, 2023), https://rumble.com/v3x3aim-we-have-the-right-as-the-state-of-texas-to-go-after-those-damages.-ag-ken-p.html.

JA0739

next couple of weeks, you'll see other attorney generals [sic] look at this." Ex. C. Paxton neither

disputed nor qualified Johnson's framing. *Id.* Paxton later admitted in another interview that he

only even became aware of Media Matters's alleged conduct through Musk's litigation, rather than

any independent investigation or work by his office.[25]

52. On November 21, 2023, the day after Paxton announced his investigation, the office

of the Attorney General of Texas issued the Demand, which references and requests a broad swath

of documents related to Hananoki's November 16 article. Ex. B at 7. Plaintiffs first received the

Demand on November 22 via FedEx delivery at Media Matters's Washington, D.C. office. Paxton

later dispatched a process server, who attempted to serve the Demand on Media Matters at its

office in the District of Columbia on November 30, 2023. The Demand was subsequently served

on Media Matters's District of Columbia-based outside counsel at their Washington, D.C. office,

on December 1, 2023. The Demand has a return date of December 12, 2023. *Id.* at 1.

53. Paxton's Demand, like his press release, provides no explanation for how Media

Matters or Hananoki could have violated Texas's Deceptive Trade Practices Act, nor any

explanation for how Paxton could exercise the State's coercive power over them. *See generally*

Ex. A; Ex. B. To date, Paxton has provided no explanation at all for how Plaintiffs may have

violated Texas law, or are plausibly subject to Texas's jurisdiction, and has continued to point to

Musk's allegations as the sole basis of his investigation.

54. The overbroad Demand requests that Media Matters produce "all documents related

to internal and external communications relating to the article titled '*As Musk endorses antisemitic*

---

[25] *See also* Newsmax, "*Texas A.G. Ken Paxton probes Media Matters for 'Fraudulent Activity,'*"
Rumble (Nov. 21, 2023), available at https://rumble.com/v3x4olk-texas-a.g.-ken-paxton-probes-
media-matters-for-fraudulent-activity.html. *See id.* at 2:12 ("So we learned about this actually
through the actual lawsuit that Elon Musk filed and then the reporting of it.").

*conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*' by Eric Hananoki." Ex. B at 7. The Demand also requests documents sufficient to identify Media Matters's organizational structure; sources of income originating in Texas; operational expenditures in Texas; current and past X accounts, including those used to obtain the screenshots contained in the November 16 article; and direct and indirect sources of funding for operations involving X research and publications. *Id.*

55.     Paxton's Demand also requests that Media Matters produce—on an ongoing basis—all documents related to its internal and external communications, from as far back as January 1, 2022, regarding X CEO Linda Yaccarino and Musk's purchase of X; all internal and external communications regarding the November 16 article; external communications with employees and representatives of X, from November 1, 2023 to November 21, 2023; and external communications with ten corporate entities, from November 1, 2023 to November 21, 2023. *Id.* It is, in effect, an ongoing demand for virtually any materials Media Matters and Hananoki might generate as a result of future coverage of X and Musk.

56.     On December 12, as requested in the Demand, Media Matters responded to the Attorney General's Office, setting forth why it believed Paxton's conduct to be unlawful and raising objections to the Demand. Paxton's office responded on December 29. Paxton's letter confirms he intends to enforce the Demand without any showing of jurisdiction or cause. Texas law, he claims, grants him "broad discretion in the overall breadth and relevance of the materials that may be sought in the course of a pre-suit investigation" and requires him to provide his targets with only "the general subject matter of the investigation." Plaintiffs' rights in responding are constricted because "a CID issued by [Paxton] is not limited by the Texas Rules of Civil Procedure." Paxton reserves his "right to pursue appropriate legal action to enforce" the Demand

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

and asserts that Plaintiffs' only option to "resist the Attorney General's investigation" is "to establish that there were zero permissible justifications" for it. The letter requested an answer by January 4, at which point counsel for Media Matters responded to Paxton's December 29 correspondence to reassert all objections to the Demand, and reiterate that Defendant's office is without jurisdiction to conduct the investigation of Media Matters, and that Defendant's investigation constitutes unlawful retaliation in violation of the First Amendment.

**E.    Attorney General Paxton chilled, and continues to chill, Media Matters's and Hananoki's speech and reporting.**

57.    Paxton's investigation and Demand have chilled Media Matters's and Hananoki's speech and press activities. It has further resulted in a slew of threats against Media Matters and its staff. Hananoki has been harassed and has received hateful messages, requiring him to increase his home and personal security. Media Matters has been forced to retain an outside security firm to protect its employees in response.

58.    Hananoki's research and writing have been severely impaired and disrupted by Paxton's baseless investigation. Prior to Paxton's Demand, Hananoki published approximately one or two articles per week; in the eight weeks since Paxton issued the Demand, Hananoki has published only two articles altogether, or roughly one per month. Draft articles he intended to publish about extremism on X were cut for fear of generating documents that would be subject to Paxton's Demand and further retaliation from Paxton. In fact, since Paxton launched his investigation, Hananoki has not published any stories about the rise of extremist rhetoric in the wake of Musk's ownership after consistently doing so for months.

59.    Hananoki's diminished reporting output is not for lack of story ideas. Since Paxton's investigation began, Hananoki has continued generating potential story ideas regarding extremist content on X but has not pursued them for fear of retaliation. This includes coverage of

JA0742

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

the reinstatement of Alex Jones, a prominent conspiracy theorist, to the X platform by Musk, and the use of an Alex Jones-related hashtag alongside advertising; antisemitic hashtags targeting Jewish people appearing alongside advertising; and advertising appearing on the X account of Stew Peters, a white nationalist internet personality who has promoted violence, as well as antisemitism, racism, and homophobia. Hananoki fears that reporting on these topics will draw further retaliation towards himself, his employer, and his colleagues. These story ideas are well within Hananoki's long-running beat, yet he was nonetheless chilled from reporting on these topics, at least one of which received extensive national coverage in other publications.[26] Even where Hananoki has been able to publish work, he has self-censored on the topic related to X's content-moderation policies, limiting the scope of his articles. For example, on January 2, 2024, he published an article describing former General Mike Flynn's appearance on Alex Jones's show but omitted any discussion of Jones's recent reinstatement on X—a plainly relevant aspect of the story.

60.     Hananoki's chill is further compounded by the fear that any materials he generated in preparing such stories will end up in Paxton's hands, which calls for the ongoing production of any and all internal communications even touching upon Musk's purchase of X or X's CEO Linda Yaccarino, who has frequently made claims (undermined by Plaintiffs' reporting) that X provides

---

[26] Clare Duffy, *'The people have spoken': Elon Musk restores the X account of conspiracy theorist Alex Jones after poll*, CNN (Dec. 10, 2023), https://www.cnn.com/2023/12/09/business/alex-jones-restored-x-elon-musk-poll/index.html; Danielle Wallace, *Elon Musk reinstates Alex Jones on X*, Fox News (Dec. 10, 2023), https://www.foxnews.com/media/elon-musk-reinstates-alex-jones-x; Kate Conger, *Elon Musk Brings Conspiracy Theorist Alex Jones Back to X*, N.Y. Times (Dec. 9, 2023), https://www.nytimes.com/2023/12/09/technology/elon-musk-alex-jones-twitter-x.html.

JA0743

a safe platform for advertisers.[27] This same concern has even hampered Hananoki's ability to communicate internally with his editor—who is based in Washington, D.C.—for fear that their communications about story ideas will be turned over to the attorney general of a state with absolutely no connection to Hananoki's work.

61.     Prior to the Demand, Hananoki regularly posted commentary on X regarding his work, responded to other journalists' posts, and communicated with other journalists. Since Paxton issued the Demand, however, he no longer actively engages in such communications.

62.     As a direct result of Paxton's intrusive Demand, many other Media Matters reporters, writers, and researchers—many of whom live and work in the District of Columbia and surrounding suburbs—have also pared back reporting and publishing, particularly on any topics that could be perceived as relating to the Paxton investigation, fearful of being ensnared in Paxton's investigation, generating documents subject to Paxton's Demand, or publishing articles that would provoke additional legal action. These reporters and researchers are also aware that Media Matters's editorial team has been required to hold back stories about X and Musk due to these concerns. The Demand has effectively tied Media Matters's hands in reporting on these issues, even while it has received an outpouring of tips from people who continue to see extremist and violent content placed next to advertisements on X. Media Matters has not yet acted on these tips, afraid that under Paxton's Demand it could be compelled to turn over any work performed in response.

---

[27] *See, e.g.*, *Twitter-turned-X CEO Linda Yaccarino focuses on winning back big brands on Elon Musk's platform*, AP (Aug. 10, 2023), https://apnews.com/article/twitter-x-corp-ceo-linda-yaccarino-elon-musk-0131c61ac296955d424fd057f6b0196d; Jonathan Vanian, *Read Linda Yaccarino's message to X employees about Elon Musk's controversial DealBook interview*, CNBC (Nov. 30, 2023), https://www.cnbc.com/2023/11/30/read-linda-yaccarinos-message-to-x-employees-about-musk-interview.html.

JA0744

63.    Media Matters's executive and editorial team have also been forced to become more involved in the organization's publishing decisions since Attorney General Paxton launched his investigation to protect the organization against further retaliation. This has significantly slowed down Media Matters's publication process, as the organization must carefully assess whether a new article or report could impact existing legal proceedings or spark new ones.

64.    Media Matters's associations with other groups have also been impaired by Attorney General Paxton's investigation. Groups that previously worked closely with Media Matters have reevaluated doing so, afraid that communications may be turned over to the Attorney General or spark investigations into their own publications. And Media Matters employees are self-censoring when anything related to X comes up in communications with such groups, curtailing engagement with partner organizations out of concern over potential exposure. For example, Media Matters has refrained from actively participating in discussions as part of its membership in coalitions focused on issues of hate speech on X while the Demand remains pending. Media Matters's external affairs staff have also paused sharing research regarding X and its content moderation policies with longstanding partners, refraining even from directing partners to content it has *already published* about X, for fear that any conversations or aid may lead to further retaliation against Media Matters or its partners.

65.    Paxton's investigation has also caused Media Matters's department directors to hit pause on similar reporting on content moderation and advertisement placement issues for at least one other social media platform, besides X, out of fear such reporting will lead to further retribution.

66.    Attorney General Paxton's overbroad Demand—which on its face demands associational and journalistic materials protected from disclosure by the First Amendment—

JA0745

further harms Plaintiffs. Complying with the Demand would require Plaintiffs to turn over sensitive documents and communications, including materials Hananoki prepared to write his November 16 article, in addition to sensitive operational information about Media Matters's employees, donors, funding, expenditures, and confidential sources. With this Demand looming over them, Plaintiffs have been chilled from publishing, and in some cases generating, new research and investigatory work product that could be subject to compelled disclosure.

67.     The scope of the Demand extends far beyond any document requests Plaintiffs may receive in X's civil suit—should that matter proceed past the pleading stage and reach discovery. Whereas X's civil suit is focused exclusively on Plaintiffs' *past* coverage of X and Musk— specifically the November 16 and 17 articles written by Hananoki—Paxton's Demand requires ongoing production of materials pertaining to *future* articles that Plaintiffs may wish to prepare, chilling their speech indefinitely. Even if X's suit reaches discovery (and given X's choice of jurisdiction and binding precedent in that jurisdiction holding a lack of jurisdiction in a similar case, it very well may not), Plaintiffs can avail themselves of the full protections of the Federal Rules of Civil Procedure which, among other protections, limit document production to "nonprivileged matter[s]" that are "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). But according to Paxton, the Texas Civil Rules of Civil Procedure do not apply to his Demand—in other words, he may demand documents regardless of relevance, overbreadth, and proportionality.

68.     The onerous Demand is backed by the threat that, if Plaintiffs do not comply, Paxton is entitled to sue Plaintiffs in a Texas court to enforce the Demand. *See* Tex. Bus. & Com. Code Ann. § 17.62(b) (authorizing the Office of the Attorney General to "file . . . a petition for an order of the court for enforcement of" a Civil Investigative Demand under Section 17.61). Such a

JA0746

tribunal would be a foreign court to both Media Matters and Hananoki, who have no relevant contacts with Texas and who understandably fear having their constitutional rights adjudicated in jurisdictions with which they have no connection.

69.    Media Matters is not registered as a foreign corporation in Texas and does not "transact business" in Texas. Tex. Bus. Orgs. Code Ann § 9.002(a). It does not have a registered agent in Texas. Media Matters performs no "business practices" in Texas, Tex. Bus. & Com. Code Ann. § 17.44(a), and conducts no "trade" or "commerce" in Texas, Tex. Bus. & Com. Code Ann. §§ 17.45(6), .46(a). And, as explained, Hananoki's reporting that is the focus of Paxton's investigation occurred exclusively in Maryland and involved no contact with Texas. That Plaintiffs may be dragged to court in an unknown, unfamiliar, and untouched venue in Texas at the option of Attorney General Paxton further chills their speech.

70.    The Deceptive Trade Practices Act arms Paxton with a host of other powers with which to retaliate against Plaintiffs, including restraining orders, civil penalties, and sanctions. *See, e.g.*, Tex. Bus. & Com. Code Ann. §§ 17.47(a)–(b) (authorizing OAG to "bring an action in the name of the state" for injunctive relief), (c)–(d) (authorizing OAG to seek damages and restitution), (e)–(f) (authorizing OAG to seek monetary civil penalties for violations of injunctions).

71.    Paxton's own past words resolve any possible doubt about the uniquely injurious effects of his Demand that will be felt by Plaintiffs Hananoki and Media Matters. In 2016, alongside several other state attorneys general, Paxton filed an amicus brief excoriating Massachusetts for using its own deceptive trade practices law to serve a similar civil investigative demand on Exxon Mobil—which, notably, is involved in trade practices—regarding claims it misled consumers about the impact of its energy products on climate change. Ex. D, Brief of Amici

32

Curiae, *Exxon Mobil Corp. v. Healey*, No. 4:16-CV-00469-K (N.D. Tex. Sept. 8, 2016), ECF No.

63-2. Paxton, at that time, wrote:

> "The[] [First Amendment] protections afforded by the Constitution . . . . [are]
> threatened by the chill of subpoenas, like Massachusetts's CID, hanging in the air.
> Thus, not only is Massachusetts attempting to silence Exxon through the issuance
> and threat of compelling a response to the CID, this very action harms everyone[.]"

*Id.* at 6. He added that "[t]he authority attorneys general have to investigate fraud does not allow

them to encroach on the constitutional freedom of others to engage in an ongoing public . . .

debate." *Id.* at 3.

**F.     Plaintiffs sued Paxton to protect their First Amendment rights.**

72.     Plaintiffs filed suit against Paxton on December 12, 2023—the return date for the

Demand. *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 1.

Plaintiffs filed suit in Maryland because that is where Hananoki lives, works, and wrote the articles

giving rise to Paxton's unlawful investigation. The Demand—which targets Hananoki's work and

communications—sought documents created and stored at Hananoki's home in Maryland.

73.     Plaintiffs also moved for a preliminary injunction and temporary restraining order

the same day, seeking to enjoin further enforcement of the Demand. *Media Matters for America

v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF Nos. 2, 20. Plaintiffs' motion—refiled on

December 14, 2023 after completing service on Paxton—was fully briefed on January 2, 2024.

Paxton's response offered little defense on the merits, but raised ripeness, personal jurisdiction,

and venue objections.

74.     The District Court of Maryland (Xinis, J.) held a hearing on the motion on January

8. The court indicated that if it reached the question, it would likely find that Plaintiffs' claims are

ripe, explaining at the outset it believed Plaintiffs had "jumped the broom on subject matter

jurisdiction" and had "pled enough for this [matter] to be ripe constitutionally."

**JA0748**

75. The court expressed concern, however, about whether Maryland had personal jurisdiction over Paxton. The court's concern was rooted specifically in whether Paxton had awareness of Hananoki's connections to Maryland, coupled with the fact that the Demand had been formally served on Media Matters in Washington, D.C.

76. The court expressed little doubt, however, that the District of Columbia had specific jurisdiction over Paxton. It repeatedly stressed that Paxton had "served [the Demand] in D.C." and had "directed [his] investigation to Media Matters in D.C." The court even understood Paxton's "pleadings" to have "referenced that there is personal jurisdiction in D.C."[28]

77. The court's reading of Paxton's pleadings was well-founded—his opposition to Plaintiffs' motion stressed that his "conduct was not in any sense 'aimed' at Maryland—indeed, [the] CID was issued to, and served in, the District of Columbia, where Media Matters resides." *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 33, at 16. And counsel for Paxton made the same point at oral argument, explaining "the civil investigation demand[] *was directed as [sic] Media Matters, which is a . . . District of Columbia corporation.*"

78. The court did not rule on Plaintiffs' motion, or Paxton's personal jurisdiction argument, but indicated that if the parties "want a resolution that is fast and fair to both sides," they "would move it to D.C." either through "an agreement from both sides that personal jurisdiction exists in D.C." or through briefing a transfer motion. The court advised Paxton's counsel that, beyond transfer, Plaintiffs could simply "dismiss this case and refile immediately in D.C." and Paxton's counsel agreed Plaintiffs "could do that." Despite the court's offer and

---

[28] Although Paxton's prior briefing argues the District of Columbia is not the "proper venue" for this proceeding and that he is "not subject to personal jurisdiction there," he has also argued that Media Matters "could have instead sued in its home—the District of Columbia, where undersigned counsel, and other attorneys in OAG, are barred." *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 33, at 18 n.5, 24.

JA0749

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

Plaintiffs' willingness to transfer the matter to this District, Paxton's counsel demurred and insisted the issue "need[ed] to be briefed."

79.     Accordingly, without ruling on the pending motion, the court set a briefing schedule for Paxton's motion to dismiss, through which it would further evaluate the issue of jurisdiction and, upon finding jurisdiction, evaluate the merits of Plaintiffs' motion. It advised Plaintiffs that if "in the interim" they "would just prefer to file it in D.C.," then they "can do that."

80.     While Plaintiffs continue to believe Maryland has specific jurisdiction over Paxton, and that the District of Maryland is an appropriate venue for this case, given the urgency of the relief needed, they agree with Judge Xinis's conclusion that the "fast and fair" way to resolve this dispute is by moving this matter to the District of Columbia, which also has specific jurisdiction over Paxton, where venue is also appropriate, and where both Paxton and Judge Xinis appeared to agree that jurisdiction and venue more clearly lies. Plaintiffs therefore filed a notice of voluntary dismissal of their action in the District of Maryland and have promptly refiled their complaint in this District.

## CLAIMS FOR RELIEF

## COUNT I

### First Amendment Retaliation in Violation of Plaintiffs' Rights Under the First and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983)

81.     Plaintiffs incorporate paragraphs one through 80 above as if set forth fully herein.

82.     Attorney General Paxton violated, and continues to violate, Plaintiffs' First Amendment rights by launching an investigation and serving a burdensome Demand in retaliation for Plaintiffs' speech, press, and associational activities. Paxton's use of the power of his office is discouraging and will continue to discourage Plaintiffs from engaging in news coverage. The chill imposed by his retaliatory actions injures Plaintiffs' ability to investigate and publish news stories

35

JA0750

and further chills their ability to participate in a robust public discussion around political extremism on the X platform. Absent relief from this Court, that chill will continue so long as Paxton's investigation and Demand are—in Paxton's own words—"hanging in the air." Ex. D at 6.

83. "[T]he law is settled that . . . the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman*, 547 U.S. at 256. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).

84. The D.C. Circuit has long recognized First Amendment retaliation claims as "actionable because 'retaliatory actions may tend to chill individuals' exercise of constitutional rights.'" *Crawford-El v. Britton*, 93 F.3d 813, 846 (D.C. Cir. 1996) (Henderson, J., concurring) (quoting *ACLU of Md., Inc. v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993)); *see also Perry v. Sindermann,* 408 U.S. 593, 597 (1972). That cause of action for First Amendment retaliation arises under 42 U.S.C. § 1983, which "has long [been] interpreted . . . to permit suits against officials in their individual capacities" for constitutional violations. *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020). To prevail on their retaliation claim, Plaintiffs must show: "(1) [they] engaged in conduct protected under the First Amendment; (2) [Paxton] took some retaliatory action sufficient to deter a person of ordinary firmness in [Plaintiffs'] position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Plaintiffs satisfy each element.

85. *First*, Plaintiffs' investigative, newsgathering, and reporting activities are "legally protected interest[s]" under the First Amendment. *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227 (4th Cir. 2019) (recognizing right of local news website operator to "gather news"); *see also*

JA0751

*Flynt v. Rumsfeld*, 180 F. Supp. 2d 174, 175 (D.D.C. 2002) (explaining that "under the First Amendment the press is guaranteed a right to gather and report news"). Media Matters provides journalistic research and investigative reporting on a variety of matters and figures of public importance. Hananoki is a senior investigative reporter who for over a decade has published journalism about political extremism online, including on platforms like X. The "First Amendment applies in full force" to this newsgathering and commentary, and further "protect[s] a news outlet's editorial perspective [and] the way its beat reporters cover a given" public issue. *Washington Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019) (quoting *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974)); *cf. Nat'l Org. For Women, N.Y.C Chapter v. F.C.C.*, 555 F.2d 1002, 1010 (D.C. Cir. 1977) (explaining that "[t]he exercise of such editorial discretion, especially in connection with news reporting, sharply implicates First Amendment values"). Indeed, "the constitutional protection of the press reaches its apogee" where, as here, Plaintiffs are members of the press who investigate and write about "a public figure" or "on a matter of public concern." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (citing *New York Times Co.*, 376 U.S. 254); *see also Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) ("Speech on matters of public concern is at the heart of the First Amendment's protection.") (cleaned up); *Farah v. Esquire Mag.*, 736 F.3d 528, 539 (D.C. Cir. 2013) (similar).

86.     *Second*, Paxton has taken action adverse to Plaintiffs' protected activity in response to news coverage. His investigation and intrusive Demand have already chilled Plaintiffs' speech and reporting activities and will continue to do so absent relief. Paxton's retaliatory conduct would "deter a person of ordinary firmness in [Plaintiffs'] position from speaking again." *Aref*, 833 F.3d at 258, particularly given the suite of tools Texas law provides Paxton to further punish, harass, and restrain Plaintiffs' constitutionally protected conduct. *See, e.g.*, Tex. Bus. & Com. Code Ann.

JA0752

§§ 17.47, .60, .62. This chill is exacerbated by the fear Plaintiffs will be forced to defend their constitutional rights in a jurisdiction with which they have no meaningful connection.

87. *Third*, there is no serious dispute that Paxton's investigation and Demand are causally linked to Plaintiffs' coverage of X and Musk. Attorney General Paxton has publicly admitted as much. He announced his investigation into Plaintiffs on November 20, 2023, the same day that X filed a frivolous lawsuit against Plaintiffs for the very same coverage Paxton seeks to punish. Paxton issued his retaliatory Demand only a day after announcing his investigation. Since then, Paxton has encouraged other state Attorneys General to take retaliatory action against Plaintiffs under their own state consumer laws—regardless of any connection Plaintiffs have with those states. The material sought by Attorney General Paxton's Demand further confirms the causal connection, as it singles out documents and communications related to the November 16 article, as well as X and its officers.

88. Paxton's retaliatory campaign against Media Matters has injured Plaintiffs and will continue to do so absent relief from this Court. This harm will be redressed by an order declaring Paxton's conduct to be unlawful and enjoining him from further investigating Plaintiffs or enforcing his Demand. Such relief is appropriate under Section 1983. *Hedgepeth ex rel. Hedgepeth v. Washington Metro. Area Transit Auth.*, 386 F.3d 1148, 1152 n.3 (D.C. Cir. 2004); *Anderson v. Reilly*, 691 F. Supp. 2d 89, 92 (D.D.C. 2010).

## COUNT II
### Violation of Plaintiffs' Rights Under the First, Fourth, and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983)

89. Plaintiffs incorporate paragraphs one through 88 above as if set forth fully herein.

90. Attorney General Paxton's issuance of the overbroad and retaliatory Demand further violates Plaintiffs' First and Fourth Amendment rights by unreasonably requiring them to

38

turn over sensitive and privileged materials, including those that impinge upon their association with other organizations.

91. The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). The First Amendment provides Plaintiffs a privilege against disclosure of materials that would chill their constitutional rights. *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009). Where "the materials sought to be seized" by an administrative subpoena even "*may* be protected by the First Amendment," the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas*, 379 U.S. 476, 485 (1965)) (emphasis added).

92. Defendant Paxton has shown no such "scrupulous exactitude" in his Demand. Without any showing of cause or jurisdiction, Paxton has demanded that Plaintiffs produce a broad set of documents that implicate their core First Amendment rights.

93. The Demand seeks, for example, swathes of documents related to Plaintiffs' donors, funding sources, expenditures, and employees, all of which are protected from compelled disclosure under the First Amendment. *E.g.*, *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021); *NAACP v. Alabama*, 357 U.S. 449, 462 (1958).

94. Relatedly, the Demand seeks various kinds of "external communications" that would expose Plaintiffs' associations and collaborations with other groups, including on efforts like ongoing coalitions that include prominent civil rights organizations as well as technology experts and research organizations focused on the challenges of content moderation on X. "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

**JA0754**

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

action." *NAACP*, 357 U.S. at 462. Compelled disclosure of such associational materials must meet "exacting scrutiny." *Bonta*, 141 S. Ct. at 2383.

95.    The Demand further requires that Plaintiffs surrender internal communications and files regarding news articles, as well as communications with employees at X and its advertisers, again with no showing of cause. Paxton may not "rummage at large in newspaper files or [] intrude into or to deter normal editorial and publication decisions" under the First Amendment. *Zurcher*, 436 U.S. at 566; *see also Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012). Such "[b]road and sweeping state inquiries into these protected areas . . . discourage citizens from exercising rights protected by the Constitution." *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971) (plurality opinion).

96.    It provides no meaningful relief to Plaintiffs that Paxton is only authorized to enforce his Demand through a petition to Texas's courts. *See* Tex. Bus. & Com. Code Ann. § 17.62(b). Texas courts plainly lack personal jurisdiction over Plaintiffs, who should not be forced to subject themselves to foreign tribunals to defend their constitutionally protected rights.

97.    Plaintiff Media Matters is incorporated under the laws of, and has its principal place of business in, the District of Columbia. Plaintiff Eric Hananoki is domiciled in Maryland. Texas courts lack general jurisdiction over Plaintiffs. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024–25 (2021).

98.    Plaintiffs have not purposefully availed themselves of the privilege of conducting activities in Texas, nor would any cause of action stemming from the Demand arise out of or relate to such purposeful contacts, if they existed. Texas courts lack specific jurisdiction to enforce the Demand against Plaintiffs. *See Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 317–18 (5th Cir. 2021), *reh'g en banc denied*, 32 F.4th 488 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 485 (2022);

JA0755

*Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 140 (4th Cir. 2020); *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349–50 (D.C. Cir. 2000); *cf. Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 513, (D.C. Cir. 2002) (holding that website interacting and "entering into contracts with residents of a foreign jurisdiction" subject to personal jurisdiction (quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997))).

99. With the Demand's return date now past, Plaintiffs are now faced with the ongoing prospect of either surrendering constitutionally protected materials in violation of their First and Fourth Amendment rights to comply with the Demand, or risk subjecting themselves to state-level proceedings in foreign courts that plainly lack jurisdiction over them should they continue to resist the Demand. That is no true choice at all.

100. This ongoing violation of Plaintiffs' First and Fourth Amendment rights will be remedied by prompt injunctive relief from this Court setting aside the Demand.

### COUNT III

**Violation of Plaintiffs' Due Process Rights Under the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983)**

101. Plaintiffs incorporate paragraphs one through 100 above as if set forth fully herein.

102. The guarantee of due process in the Fourteenth Amendment "recognizes and protects an individual liberty interest" from being subjected to legal process in a jurisdiction with which a person has no contact, unless they willingly consent to such process. *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

103. For a state to exercise personal jurisdiction over a party in a manner consistent with due process, the party must have "'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Mere "foreseeability of causing *injury* in another State" is not a "'sufficient benchmark'

JA0756

for exercising personal jurisdiction." *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)). "Instead, 'the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 297).

104. Here, Defendant Paxton has purported to subject Plaintiffs to legal process under Texas law—and has the power to force Plaintiffs into Texas court to defend against enforcement of his Demand—despite Plaintiffs' having no minimum contacts with Texas and not being subject to either general or specific personal jurisdiction in that state. Plaintiffs do not avail themselves of Texas law and had no reason to ever foresee being subject to Texas's deceptive trade practices act. Media Matters's mere "operation of a website accessible in [Texas] is insufficient to satisfy the minimum-contacts requirement of the personal-jurisdiction inquiry" under the Due Process clause. *Fidrych*, 952 F.3d at 140.

105. Plaintiffs are injured by the ongoing imposition of Texas law on them by Defendant Paxton despite his clear lack of jurisdiction to do so, and will be further injured if Paxton hauls Plaintiffs into Texas state court to defend their constitutional rights in a jurisdiction with which they have no relevant contacts.

## COUNT IV
### Violation of Plaintiffs' Rights Under the District of Columbia's and Maryland's Reporters' Shield Laws

106. Plaintiffs incorporate paragraphs one through 105 above as if set forth fully herein.

107. Attorney General Paxton's Demand violates Plaintiffs' rights under the District of Columbia's and Maryland's shield laws by seeking to compel disclosure of statutorily protected,

JA0757

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

confidential sources. D.C. Code §§ 16-4702, 4703; Md. Cts. & Jud. Proc. Code Ann. § 9-112(b), (c).

108.    The D.C. shield law provides absolute protection against compelled disclosure of sources, D.C. Code § 16-4703(b), and qualified protection against compelled disclosure of other information, including "any news or information procured . . . in the course of pursuing [] professional activit[ies]," including notes, to the extent such information is not publicly disclosed, *id.* § 16-4702. *See also Grunseth v. Marriott Corp.*, 868 F. Supp. 333, 336 (D.D.C. 1994). The shield law protects media organizations and their employees acting within the scope of a contract in any "news gathering or news disseminating capacity." D.C. Code § 16-4702.

109.    Maryland's shield provides materially equivalent protections. *See* Md. Cts. & Jud. Proc. Code Ann. § 9-112(b)(3), (c)(2).

110.    To overcome even the qualified privilege for non-source information, both statutes provide that parties seeking news or information must establish by clear and convincing evidence that (1) the news or information is relevant to a significant legal issue before a party that has a power to issue a subpoena; (2) the news or information could not, with due diligence, be obtained by any alternative means; and (3) there is an overriding public interest in the disclosure. Still, courts have quashed subpoenas that seek information from news media, even when all three prongs of the qualified privilege apply. *See, e.g.*, *Bice v. Bernstein*, No. 93-CA-22258, 1994 WL 555379, at *1–*2 (Md. Cir. Ct. Apr. 20, 1994); *Grunseth*, 868 F. Supp. at 336.

111.    Attorney General Paxton's Demand is consequently infirm because its overbreadth will require that Plaintiffs turn over constitutionally protected sources. The Demand asks for any and all materials related to external *and internal* communications regarding Plaintiffs' November 16 article, as well as external communications between Plaintiffs and employees and

JA0758

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

representatives of X from November 1, 2023, to November 21, 2023. What is more, the Demand seeks numerous documents regarding Plaintiffs' organizational structure, as well as the specific X accounts used to obtain the screenshots contained in the November 16 article. In essence, the Demand functions as a boundless inquiry into Plaintiffs' organization and news gathering capacity—precisely the kind of pernicious subpoena that these shield laws were designed to combat.

112.    Attorney General Paxton's Demand not only seeks privileged material in violation of Plaintiff's First Amendment rights, but also chills Plaintiff's news gathering capacity. An order setting aside the Demand is the only legal mechanism to ensure that plaintiff's rights—protected by the Constitution and promulgated by state statute—are secure.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully ask for the following relief:

113.    Declare Paxton's Demand constitutes a First Amendment retaliatory action in violation of Plaintiffs' rights under the First and Fourteenth Amendments of the U.S. Constitution.

114.    Declare that Paxton's Demand violates Plaintiffs' rights under the First, Fourth, and Fourteenth Amendments of the U.S. Constitution.

115.    Declare that courts in the State of Texas cannot exercise personal jurisdiction over Plaintiffs in any imminent action to enforce the Demand.[29]

---

[29] It is neither unusual nor unprecedented for courts to determine whether other courts in other circuits have jurisdiction. *See, e.g.*, *Clark v. Busey*, 959 F.2d 808, 812 (9th Cir. 1992) ("Transfer is improper where the transferee court lacks jurisdiction and thus could not have originally heard the suit."); *Grondal v. United States*, 513 F. Supp. 3d 1262, 1275 (E.D. Wash. 2021); *In re Asbestos Prod. Liab. Litig. (No. VI)*, 965 F. Supp. 2d 612, 620 (E.D. Pa. 2013) ("Ohio's long-arm statute does not confer jurisdiction"). *See also* 28 U.S.C. § 1404(a) ("a district court may transfer any civil action to any other district or division where it might have been brought"); *id.* § 1631 ("the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court . . . in which the action or appeal could have been brought at the time it was filed or noticed").

**JA0759**

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

116.     Temporarily enjoin Paxton, his officers, agents, servants, and employees from initiating any action to enforce the Demand in violation of Plaintiffs' constitutional rights.

117.     Permanently and preliminarily enjoin Paxton, his officers, agents, servants, and employees from initiating any action to enforce the Demand or further investigating Plaintiffs in violation of their constitutional rights, as well as to the extent enforcement would require the disclosure of information protected by the Maryland and D.C. shield laws.

118.     Award Plaintiffs their costs, expenses, and reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, and any other applicable law.

119.     Grant Plaintiffs any and all other relief as the Court deems just and proper.

Dated: January 17, 2024

Respectfully submitted,

*/s/ Aria C. Branch*

**ELIAS LAW GROUP LLP**
Aria C. Branch (DC 1014541)
Elisabeth C. Frost (DC 1007632)
Jacob D. Shelly* (DC 90010127)
Elena A. Rodriguez Armenta* (DC 90018798)
Daniela Lorenzo*⁺
Omeed Alerasool* (DC 90006578)
Samuel T. Ward-Packard* (DC 90005484)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
abranch@elias.law
efrost@elias.law
jshelly@elias.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
oalerasool@elias.law
swardpackard@elias.law

Abha Khanna*
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law

45

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr. (DC 420440)
Jay P. Srinivasan*
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com
Email: jsrinivasan@gibsondunn.com

Amer S. Ahmed (DC 500630)
Anne Champion*
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com
Email: achampion@gibsondunn.com

*_Pro hac vice_ application forthcoming
†Admission to D.C. bar pending swearing in

_Counsel for Plaintiffs Media Matters for America and Eric Hananoki_

**JA0761**

# Exhibit 3

JA0762



ATTORNEY GENERAL OF MISSOURI

ANDREW BAILEY
ATTORNEY GENERAL

JEFFERSON CITY

65102

P.O. Box 899
(573) 751-3321

*In the Matter of:*

**Media Matters for America**

**CID NO. 24-10**
**Date:** March 25, 2024

## INVESTIGATIVE DEMAND

**THE ATTORNEY GENERAL TO:**

**Media Matters for America**
PO Box 44811
Washington, DC 20026

**Served:** *U.S. Postal Service*
*Certified Mail*

The Attorney General of the State of Missouri believes it to be in the public interest that an investigation be made to ascertain whether **Media Matters for America (Subject)** has engaged in or is engaging in practices declared unlawful by § 407.020, RSMo.

The investigation will inquire into the activities of **Subject** in connection with the solicitation of funds for a charitable purpose, or the sale or advertisement of merchandise, §§ 407.020, 407.453, RSMo.

The Attorney General has reason to believe that the **Subject** has used deception, fraud, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of material fact in connection with the soliciting of funds for a charitable purpose or the sale or advertisement of merchandise in or from the State of Missouri, § 407.020, RSMo. Independently, the Attorney General also believes it to be in the public interest to investigate whether such acts have occurred.

The Attorney General believes you have information, documentary material or physical evidence relevant to the above-mentioned conduct.

**JA0763**

<u>DEFINITIONS</u>

As used in this Demand, the following terms have the meanings described below:

**"Communication"** means any expression, statement, conveyance, or dissemination of any words, thoughts, statements, ideas, or information regardless of form, format, or kind.  "Communication" includes but is not limited to oral or written communications of any kind, such as telephone conversations, discussions, meetings, notes, letters, agreements, emails or other electronic communications, facsimiles, and other forms of written or oral exchange that are recorded in any way, including video recordings, audio recordings, written notes, or otherwise.  Any "Communication" that also falls within the definition of "Document" shall constitute both a Document and a Communication for purposes of this civil investigative demand.

**"Document"** means all written, printed, typed, and recorded matter of every kind and description, originals and copies, and all attachments and appendices thereto.  Without limiting the foregoing, "documents" include all agreements, contracts, correspondence and other communications including notes, memoranda and marginal notations, records, reports, books, manuals, instructions, statistical data and data compilations, drafts, charts, graphs and tables, bills, statements and invoices, advertising, surveys, transcripts, microfilm and microfiche, electronic records that can be reproduced in paper form, recordings, film, tapes, photographs, electronic mail and Web pages, and all other computer-generated, computer-stored, or electronically-stored matter, however and by whomever produced, prepared, reproduced, disseminated, or made.

**"Identify"**, when used with respect to a **person or entity**, means information sufficient to allow employees of the Attorney General to ascertain the name, address, telephone number, and if not a natural person, the contact person of the entity or facility to be identified, as well as the relationship of that person or entity to you.

**"Identifying"**, when used with respect to a **fact or event**, means information sufficient to allow employees of the Attorney General to ascertain the fact or event with reasonable particularity, and to identify each person believed to have knowledge with respect to the fact or event and each document that refers or relates to the fact or event.

**JA0764**

**"Relating to"**, "**related to**", "**relate to**" means to be relevant in any way to the subject matter in question, including without limitation all information that directly or indirectly contains, records, reflects, summarizes, evaluates, refers to, is pertinent to, indicates, comments upon, or discusses the subject matter; or that states the background of, or was the basis for, or that records, evaluates, comments, was referred to, relied upon, utilized, generated, transmitted, or received in arriving at any conclusion, opinion, estimate, position, decision, belief, policy, practice, course of business, course of conduct, procedure, or assertion concerning the subject matter.

**"You"**, including your, means Media Matters for America, subsidiaries, partnerships, or any other entities related to Media Matters for America.

## DEMAND FOR INFORMATION

Demand is hereby made upon you, under the authority granted by Section 407.040, RSMo, to produce in person or via mail to Michelle Starke, P.O. Box 899, Jefferson City, Missouri 65102 by April 15, 2024, the following documentary material and information that may be in your possession, custody or control, and permit the inspection and copying thereof:

1. A list or information identifying any and all donations of funds from donors located in the state of Missouri from January 01, 2023 through March 25, 2024.

   The list of donations should include, but is not limited to:
   - Identity of each individual or organization who donated funds;
   - Address of each individual or organization who donated funds;
   - Total amount spent per donation;
   - Date and time of each donation;
   - Payment method for each donation;
   - Identity of financial institution where funds were sent;
   - Contracts and/or agreements governing or related to each donation;

For each Demand for Information, you shall type the Demand and type your corresponding response. If you do not know the answer to a Demand for Information, you shall identify in your response the individual or business entity that has the answer to the Demand for Information. The document on

3

**JA0765**

which you type each Demand and your corresponding response shall be executed by you before a Notary Public.

## DEMAND FOR DOCUMENTS

Demand is hereby made upon you, under the authority granted by Section 407.040, RSMo, to produce in person or via mail to Michelle Starke, P.O. Box 899, Jefferson City, Missouri 65102 by April 15, 2024, the following documentary material that may be in your possession, custody or control, and permit the inspection and copying thereof:

2.   All promotional or marketing information provided by you from January 1, 2023 to March 25, 2024 to any individual or organization for the purpose of soliciting donations.

3.   All documents or communications showing how solicited donations were used.

4.   All communications or materials relating to any policy, strategy or operation related to generating stories or content intended to cancel, deplatform, demonetize, or otherwise interfere with businesses located in Missouri, or utilized by Missouri residents.

5.   All communications, internal and external, regarding your strategy to pressure advertisers into pulling advertisements from the social media platform, X (formerly Twitter).

6.   Documents sufficient to identify your employee organizational chart.

7.   Documents sufficient to identify all your operational expenses in the state of Missouri.

8.   All documents discussing Elon Musk's purchase of X (formerly Twitter).

9.   All documents related to the article, or to the events described in the article, by Eric Hananoki entitled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM,Oracle, and Xfinity next to pro-Nazi content."

JA0766

10. All documents sufficient to identify X accounts owned, controlled, or authorized by you used to obtain the images in the article referenced in paragraph 9.

11. All documents sufficient to identify all X accounts followed by the X accounts identified in response to paragraph 10.

12. All communications with Apple, International Business Machine Corporation, Bravo Television Network, NBCUniversal, Oracle Corporation, Comcast Corporation, Lions Gate Entertainment Corporation, Warner Bros Discovery Inc., Paramount Pictures Corporation, or Sony Group Corporation from November 1, 2023, to March 25, 2024.

## NOTICE OF DEMAND FOR RETENTION OF RECORDS

You are hereby notified that all records, including communications, documents and things, relating to the above requests and the matters that are the subject of these requests for information are to be preserved during the pendency of this investigation.  This includes, but is not limited to, all related customer records, including recordings made of customers, all related correspondence and other communications with third parties, all related documents and things received from third parties, and all internal documents and things.

## COMPLIANCE

You may comply with this Investigative Demand by producing copies of the requested documents and information by regular mail or overnight delivery to **Michelle Starke, P.O. Box 899, Jefferson City, Missouri 65102.** The requested copies of documents and information should be received by the Office of the Attorney General **by 10:00 a.m. (Central) on April 15, 2024** and be accompanied by the attached Business Records Affidavit and Certification of Compliance.

You are advised that the Attorney General will not grant an extension of time or modification of the terms of the Demand except for good cause pursuant to the terms of Section 407.070, RSMo.  Your prompt response and provision of the requested information is requested.

**JA0767**

Your attention is respectfully called to the provisions of Section 407.080, RSMo, which makes certain acts done with the intent to avoid, evade or prevent compliance in whole or in part with any Investigative Demand served hereunder a Class A misdemeanor, which is punishable by a fine not to exceed $1,000.00 for individuals and $5,000.00 for corporations, or by imprisonment for a term of not more than one year, or both a fine and imprisonment.

Please direct all questions regarding this Investigative Demand to Jeremiah Morgan at 573-751-1800 or by e-mail to: Jeremiah.Morgan@ago.mo.gov.

Respectfully Submitted,

**ANDREW BAILEY**
Attorney General


*/s/ Jeremiah J. Morgan*
Jeremiah J. Morgan, #50387
Deputy Attorney General – Civil Litigation
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870; Fax: (573) 751-0774
Jeremiah.Morgan@ago.mo.gov

**JA0768**

STATE OF _____      )
                                  ) SS.
COUNTY OF _____       )


## BUSINESS RECORDS AFFIDAVIT AND CERTIFICATE OF COMPLIANCE

Before me, the undersigned authority, personally appeared _____, who, being by me duly sworn, deposed as follows:

My name is _____, I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the custodian of the records of _____. Attached hereto are _____ pages of records from _____. These _____ pages of records are kept by _____ in the regular course of business, and it was the regular course of business of_____ for an employee or representative of_____ with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time of the act, event, condition, opinion or diagnosis. The records attached hereto are the original or exact duplicate of the original.

I further certify that all documents and information required by Civil Investigative Demand No. 24-10 which is in the possession, custody, control, or knowledge of, _____ has been submitted to the Missouri Attorney General as directed herein.

_____
          Affiant

Sworn to before me this ____ day of_____, 2024.

_____
Notary Public
Commission Expires:

7

**JA0769**

# Exhibit 4

JA0770

Electronically Filed - COLE CIRCUIT - March 27, 2024 - 08:52 AM

## IN THE CIRCUIT COURT OF COLE COUNTY
## STATE OF MISSOURI

| | | |
|---|---|---|
| STATE OF MISSOURI, ex rel. ANDREW BAILEY, ATTORNEY GENERAL | ) ) ) ) | |
| Plaintiff, | ) ) | Cause No. 24AC-CC02291 |
| vs. | ) ) | Division: 1 |
| MEDIA MATTERS FOR AMERICA, | ) ) ) | |
| Serve Registered Agent At: Angelo Carusone 800 Maine Avenue SW Suite 500 Washington, DC 20024 | ) ) ) ) ) ) | |
| Defendant. | ) | |

## MOTION AND ORDER FOR APPOINTMENT
## OF SPECIAL PROCESS SERVER

COMES NOW Plaintiff, State of Missouri, by and through its counsel,

Assistant Attorney General Jeremiah J. Morgan, and moves the Court to

approve and appoint a special process server pursuant to Missouri Supreme

Court Rule 54.14 and § 506.140, RSMo.

The State requests the following individual of lawful age be appointed

to serve process in this case:

Vincent Connors
Same Day Process
1413 K Street NW 7th Floor
Washington, DC 20005

1

**JA0771**

Electronically Filed - COLE CIRCUIT - March 27, 2024 - 08:52 AM

WHEREFORE, Plaintiff requests that the Court approve and appoint the individuals named in this motion as special process servers, and for all other orders as the Court deems just and proper.

SO ORDERED: _____   Date: _____03/27/2024_____

Respectfully submitted,

ANDREW BAILEY
Attorney General

*/s/ Jeremiah J. Morgan*
Jeremiah J. Morgan, MO 50387
Deputy Attorney General – Civil
Jeremiah.Morgan@ago.mo.gov
Steven Reed, MO 40616
Assistant Attorney General
Steven.Reed@ago.mo.gov
Kathryn Monroe, MO 76022
Assistant Attorney General
Kathryn.Monroe@ago.mo.gov
P.O. Box 899
Jefferson City, MO 65102
(573) 751-1800; Fax: (517) 751-0774

**JA0772**

# Exhibit 5

JA0773

```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA


MEDIA MATTERS FOR AMERICA, ET AL., )
                                   )
          Plaintiffs,              )
                                   )     CV No. 24-00147
       vs.                         )     Washington, D.C.
                                   )     February 15, 2024
WARREN KENNETH PAXTON, JR.,        )     10:00 a.m.
                                   )
          Defendant.               )
_____)


    TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING PROCEEDINGS
         BEFORE THE HONORABLE AMIT P. MEHTA
              UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff Media:        Aria C. Branch
                            Christopher Dooley Dodge
                            Samuel Ward-Packard
                            ELIAS LAW GROUP LLP
                            250 Massachusetts Avenue NW
                            Suite 400
                            Washington, D.C. 20001
                            (202) 968-4518
                            Email: abranch@elias.law
```

2

APPEARANCES CONTINUED:

For the Defendant:                Gene C. Schaerr
                                  Kenneth A. Klukowski
                                  SCHAERR JAFFE LLP
                                  1717 K Street NW
                                  Suite 900
                                  Washington, D.C. 20006
                                  (202) 787-1060
                                  Email:
                                  gschaerr@schaerr-jaffe.com

                                  Christopher Lavorato
                                  Reuben William Blum
                                  OFFICE OF THE ATTORNEY GENERAL
                                  General Litigation Division
                                  P.O. Box 12548
                                  MC-019-1
                                  Austin, TX 78711
                                  (512) 475-4476
                                  Email:
                                  Chris.lavorato@oag.texas.gov

Court Reporter:                   William P. Zaremba
                                  Registered Merit Reporter
                                  Certified Realtime Reporter
                                  Official Court Reporter
                                  E. Barrett Prettyman CH
                                  333 Constitution Avenue, NW
                                  Washington, D.C. 20001
                                  (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

**JA0775**

1    Texas, by making phone calls to Texas.

2              Under the D.C. long-arm statute, such activities

3    from out of the District into the District, just like phone

4    calls and emails, have been routinely held not to constitute

5    either transacting business or --

6              THE COURT:  What phone calls has Media Matters

7    made into Texas?

8              MR. BLUM:  Well, assuming we reach the point where

9    the two parties are collaborating on the CID or at least

10   seeking to collaborate, that may --

11             THE COURT:  I don't think you can count those

12   contacts even under Texas law.  I would be surprised if

13   those contacts would count.  But maybe I'm --

14             MR. BLUM:  I would have to brief this issue

15   further on the facts as they developed in that situation.

16             THE COURT:  Fair enough.

17             Here's a further question:  Isn't the consequences

18   of your position that a media company could be subject to

19   50 CIDs and would have to go to each state in order to

20   challenge them?

21             MR. BLUM:  I can't definitively say that,

22   Your Honor, because our position has been based on the DTPA

23   which is Texas law.  And so it would have to be an analysis

24   based on the analogous statutes under each of the 50 states.

25             THE COURT:  No, but you're looking at it wrong.

1          You've now said that you can't be brought into

2     court here, right?  So, presumably, the only place you could

3     be brought into court is Texas, right?

4          MR. BLUM:  Absolutely, there would be general

5     jurisdiction.

6          THE COURT:  Okay.

7          So why wouldn't that be the case for every other

8     Attorney General in the land if they were to send a CID to a

9     D.C.-based media company?

10         I mean, why couldn't they come in and make the

11    same arguments you're making, which is the long-arm statute

12    doesn't reach us; we don't have enough contacts with the

13    District of Columbia; you've got to come to our home state?

14    I mean, that is the upshot of your argument.

15         MR. BLUM:  Under the facts at bar in this case,

16    absolutely, that's our argument.

17         So if you were to present to me a case with a

18    nearly identical Deceptive Trade Practices Act in another

19    state and a nearly identical isolated and really noncontact

20    by the process server and with no more, then it would be

21    hard for me to argue that another Attorney General under

22    those facts would be subject to personal jurisdiction here

23    in the District.

24         THE COURT:  I'll ask you another question, which

25    is:  Why isn't the act of sending a process server to serve

1    maybe even the motion to dismiss.  But let me think about

2    it, and I'll let you all know in short order, okay?

3              MR. LAVORATO:  Yes, Your Honor.

4              THE COURT:  Thank you, everyone.  Appreciate your

5    time, and I appreciate the briefing and presentations.

6              COURTROOM DEPUTY:  All rise.

7              This Court is adjourned.

8              (Proceedings concluded at 11:21 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date:__February 15, 2024____ 

William P. Zaremba, RMR, CRR

# Memorandum opinion

JA0780

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                          )
**MEDIA MATTERS FOR AMERICA, et al.,**  )
                                          )
    **Plaintiffs,**                         )
                                          )
        **v.**                          )      **Civil No. 24-cv-147 (APM)**
                                          )
**WARREN KENNETH PAXTON,**              )
*Attorney General of the State of Texas*, )
                                          )
    **Defendant.**                          )
_____ )

## MEMORANDUM OPINION

## I.    INTRODUCTION

On November 16, 2023, Plaintiff Media Matters for America, Inc. ("Media Matters"), a District of Columbia-based media company, published an online article written by one of its long-time journalists, Plaintiff Eric Hananoki, which reported that advertisements for major corporations were appearing next to extremist content on X.com, the social media platform formerly known as Twitter ("November 16 Article"). The story depicted multiple images of the advertisements and posts at issue. The article showed images of Adolph Hitler alongside advertisements from Apple, Oracle, and IBM, and white nationalist tweets next to advertisements from Xfinity and Bravo. X's new owner, Elon Musk, responded that the November 16 Article was a "fraudulent attack on [the] company," and he promised to file "a thermonuclear lawsuit against Media Matters[.]"

Days later, the Attorney General for the State of Texas, Defendant Warren Kenneth Paxton, announced that he was opening an investigation into whether Media Matters' reporting about X had violated Texas' Deceptive Trade Practices Act ("DTPA"). According to a press release,

Defendant "was extremely troubled" by allegations that Media Matters had "fraudulently manipulated data on X.com" in its reporting. Defendant then issued a Civil Investigative Demand ("CID"), which sought from Media Matters a host of records, including its internal and external communications about Musk's purchase of X; the company's CEO, Linda Yaccarino; and the November 16th Article. It also sought records about the company's sources of income and expenditures in Texas. Defendant hired a process server who successfully served the CID on Media Matters in the District of Columbia.

Plaintiffs are before this court seeking an order that preliminarily enjoins Defendant from enforcing the CID. Their primary claim is that Defendant has retaliated against them for exercising their First Amendment rights, which caused substantial chilling effects such as self-censorship and other disruptions of their journalistic endeavors. For his part, Defendant urges the court to reject the requested relief on various grounds: (1) lack of personal jurisdiction, (2) failure to pursue an adequate legal remedy in Texas state court, (3) improper venue, (4) failure to demonstrate a likelihood of success on the merits, and (5) absence of irreparable harm.

As explained below, the court finds that Defendant is subject to personal jurisdiction in this court, and Plaintiffs have satisfied each of the preliminary injunction factors. The court therefore grants Plaintiffs' motion for preliminary relief.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    *Media Matters and Eric Hananoki*

Plaintiff Media Matters is a non-profit research and information center that monitors and reports on misinformation and political extremism in the U.S. media landscape. Compl., ECF No. 1, ¶ 2 [hereinafter Compl.]. Media Matters is incorporated in Washington, D.C. Pls.'

JA0782

Mot. for TRO & Prelim. Inj., ECF No. 4 [hereinafter Pls.' Mot.], Decl. of Cynthia Padera in Supp. of Pls.' Mot., Ex. 2, ECF No. 4-2, ¶ 7 [hereinafter Padera Decl.].  Its principal place of business and office space are in the District, as are its hard-copy records.  Padera Decl. ¶ 9.  Media Matters has no meaningful ties to the State of Texas.  Padera Decl. ¶¶ 10–14.

Plaintiff Eric Hananoki is a senior investigative reporter who has worked at Media Matters since 2007.  Pls.' Mot., Decl. of Eric Hananoki in Supp. of Pls.' Mot., Ex. 3, ECF No. 4-3, ¶ 2 [hereinafter Hananoki Decl.].  Hananoki resides in Maryland and works remotely from there, although he occasionally visits Media Matters' D.C. office.  *Id.* ¶ 3.  For more than a decade, Hananoki's work "has focused on documenting extremism—including white nationalism, antisemitism, and Islamophobia."  *Id.* ¶ 4.  As part of his reporting, Hananoki has covered the social media platform X.  *Id.* ¶ 9.  None of that work has involved speaking with Texas residents or businesses, and he has never traveled to Texas for business purposes.  *Id.* ¶ 21.

### 2.    *Media Matters Publishes the November 16 Article about X*

In 2022, Elon Musk acquired X.  In the wake of the ownership change, Hananoki observed a "sustained and significant surge" in extremist content on the platform.  *Id.* ¶ 10.  He reported, in nearly a dozen articles, that corporate advertisements on X were appearing alongside extremist content.  *Id.* ¶ 12 (listing articles).  Other media outlets published similar stories.  *Id.* ¶¶ 10, 13; Pls.' Mem. in Supp. of Pls.' Mot., ECF No. 4-1 [hereinafter Pls.' Mem.], at 6 (listing news stories).

One of Hananoki's articles gave rise to the present controversy.  On November 16, 2023, Media Matters published on its website an article written by Hananoki titled, "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" ("November 16 Article").  Hananoki Decl. ¶ 12.[1]  The story included

---

[1] Article available at https://perma.cc/HHX2-AT2N (last visited on April 12, 2024).

JA0783

multiple images of antisemitic tweets, in some cases depicting Hitler, next to advertisements by the companies identified in the article's title.  *Id.* ¶ 15.  The story also noted that the night before Musk had "endorsed the pernicious antisemitic conspiracy that Jewish people are supporting 'hordes of minorities' who are 'flooding' into the country to replace white people."  *Id.* ¶ 14.

Musk responded to the article swiftly and aggressively.  On November 18, 2023, he posted on his X account that "X will be filing a thermonuclear lawsuit" against Media Matters and others "who colluded in this fraudulent attack on our company."  *Id.* ¶ 16.  Then, on November 20, 2023, X filed suit against Media Matters and Hananoki, citing the November 16 Article and one other.  *Id.* ¶ 18.

       *3.*     *Defendant Launches an Investigation of Media Matters' Reporting on X*

Defendant Kenneth Paxton is the Attorney General for the State of Texas.  Texas has adopted a modified version of the Uniform Unfair and Deceptive Trade Practices Act, which prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce[.]"  Tex. Bus. & Com. Code § 17.46(a).  Deceptive trade practices include "disparaging the goods, services, or business of another by false or misleading representation of facts[.]"  *Id.* § 17.46(b)(8).  The DTPA authorizes the Consumer Protection Division of the Office of Attorney General to enforce the statute.  *See id.* § 17.61(a).

On November 20, 2023, the same day that X filed suit, Defendant issued a press release announcing that he was opening an investigation of Media Matters "for potential fraudulent activity" in violation of the DTPA.  Pls.' Mot., Ex. 5, Decl. of Aria C. Branch in Supp. of Pls.' Mot. [hereinafter Branch Decl.], Ex. B, ECF No. 4-5, at 13.[2]  The press release explained that Defendant "was extremely troubled by the allegations that Media Matters, a radical anti-free

---

[2] Page number references to the exhibits attached to the Branch Declaration are those generated by CM/ECF.

speech organization, fraudulently manipulated data on X.com (formerly known as Twitter)." *Id.* The press release quotes Defendant describing Media Matters as a "radical left-wing organization who would like nothing more than to limit freedom by reducing participation in the public square." *Id.*

Defendant talked to the press about the investigation. He told Newsmax that his office had learned about the controversy from Musk's lawsuit and press accounts. Pls.' Mem. at 10 n.6. Defendant said on CNBC that he had initiated the investigation because of the "information" that Media Matters had reported about X. Branch Decl., Ex. D, at 25. On a podcast called "The Benny Show," Defendant "encouraged" Attorneys General of both political parties to look into Media Matters' reporting, though he observed that Democratic Attorneys General "probably won't but they should because they should care about free speech as much as we do." *Id.*, Ex. C, at 17.[3] And, on another podcast a week later, Defendant described Media Matters as a "left-wing organization" and stated he was "pretty sure that they had put hit pieces out on [him]." Hananoki Decl. ¶ 25 (citing Tudor Dixon Podcast, Dec. 1, 2023).

> 4.    *Defendant Serves a Civil Investigative Demand on Media Matters*

The DTPA grants the Attorney General various tools to investigate violations of the Act. Among them are issuing a CID "requiring [a] person to produce [] documentary material and permit [its] inspection and copying." Tex. Bus. & Com. Code § 17.61(a). The statue permits service of the CID on out-of-state persons either by "delivering a duly executed copy of the demand to the principal place of business in the state of the person to be served" or, "if the person has no place of business in th[e] state," by "mailing by registered mail or certified mail a duly executed

---

[3] At least one Attorney General has followed Defendant's lead. On March 25, 2024, Missouri Attorney General Andrew Bailey announced that he was serving a "virtually identical" CID on Media Matters and filing a petition to enforce it in Missouri state court. Pls.' Notice of Mo. Att'y Gen. CID & Pet., ECF No. 36.

copy of the demand addressed to the person to be served . . . to his principal office or place of business." *Id.* § 17.61(d)(2), (3).  The CID's recipient may petition to "modify or set aside the demand, stating good cause," in "the district court in the county where the parties reside, or a district court of Travis County." *Id.* § 17.61(g).

The day after announcing his investigation, Defendant issued a CID, seeking a broad array of records from Media Matters.  Branch Decl., Ex. A, at 5.  The CID directed the company to produce records relating to the following:

- an employee organizational chart;

- sources of income originating in Texas;

- operational expenditures in Texas;

- internal and external communications regarding Musk's purchase of X;

- internal and external communications regarding the CEO of X, Linda Yaccarino;

- current and past X accounts under ownership or control of Media Matters;

- internal and external communications regarding the November 16 Article;

- the X accounts that Media Matters used to obtain the screenshot images used in the November 16 Article;

- the accounts, profiles, and members followed by Media Matters' X accounts referenced in November 16 Article;

- external communications with employees and representatives of X from November 1, 2023, to November 21, 2023;

- external communications with Apple, IBM, Bravo, and the various other companies identified in the November 16 Article; and,

JA0786

- direct and indirect sources of funding for all Media Matters operations involving X research or publications.

*Id.* at 11.  The CID set a return date of December 12, 2023.  *Id.* at 5.  It further instructed that Media Matters could produce responsive records directly to the designated Assistant Attorney General, "[i]n lieu of producing the originals for inspection and copying at your principal place of business[.]"  *Id.* And it directed Media Matters to contact the designated Assistant Attorney General "to discuss the logistics of producing the requested documents to the [Consumer Protection] Division."  *Id.*

Media Matters received the CID on November 22, 2023, via FedEx delivery at its office in the District.  Compl. ¶ 52.  Defendant also dispatched a process server who, on November 30, 2023, attempted to serve the CID upon Media Matters at its office.  *Id.*  The agent ultimately delivered the CID to Media Matters' outside counsel, the Elias Law Group, at their D.C. office on December 1, 2023.  Branch Decl. ¶ 4.

Media Matters responded on December 12, 2023, with objections to the CID and put Defendant on notice that it would seek preliminary injunctive relief in federal court in Maryland. Branch Decl., Ex. E, at 33–35.  Media Matters asserted that Defendant lacked jurisdiction to issue and enforce the CID, the CID violated the First Amendment, and the CID's scope was overly burdensome and broad.  *Id.*  Defendant responded on December 29, 2023.  He wrote that he had "broad discretion" in determining the breadth and relevance of materials sought in a pre-litigation investigatory demand.  Branch Decl., Ex. F, at 38–39.  He said that Media Matters would need "to establish that there were zero permissible justifications for the investigation" in order to "resist the Attorney General's investigation," and that Media Matters could seek relief in Texas state court under the DTPA.  *Id.*

**JA0787**

### B.    Procedural Background

Plaintiffs initially brought suit for injunctive relief against Defendant, in his official capacity, in the U.S. District Court for the District of Maryland on December 12, 2023.  *Media Matters for Am. v. Paxton*, No. 8:23-cv-3363 (PJX) (D. Md.), ECF Nos. 1–2.  That court held a hearing on January 8, 2024, which focused primarily on whether it could exercise personal jurisdiction over Defendant.  The court's comments suggested that it believed that personal jurisdiction in the District of Columbia might be less controverted, prompting Plaintiffs to voluntarily dismiss that action and refile suit here on January 17, 2024.  Pls.' Mem. at 19–20; Compl.

Plaintiffs assert four claims.  The first three are under 42 U.S.C. § 1983 for (1) retaliation in violation of the First Amendment (Count I); (2) an overbroad CID in violation of the First and Fourth Amendments (Count II); and (3) unlawful service of the CID in violation of the Due Process Clause (Count III).  Compl. at 35–42.  Plaintiffs' fourth cause of action is for violations of the D.C. and Maryland reporters' shield laws.  *Id.* at 42–44.  Plaintiffs also sought both a temporary restraining order and a preliminary injunction.  Pls.' Mot.  Defendant agreed that he would not seek to enforce the CID until the court ruled on the preliminary injunction motion, thereby mooting Plaintiffs' request for temporary relief.  Resp. to Order of the Ct., ECF No. 11; Minute Order, Jan. 23, 2024.

The parties' dispute centers primarily on whether the court can exercise personal jurisdiction over Defendant and whether Plaintiffs' suit is premature.  Pls.' Mem. at 21–23; Def.'s Opp'n to Pls.' Mot., ECF No. 26 [hereinafter Def.'s Opp'n], at 11–19; Pls.' Reply in Supp. of Pls.' Mot., ECF No. 28 [hereinafter Pls.' Reply], at 2–15.  As to the first issue, Defendant filed a sur-reply brief at the court's direction.  Minute Order, Feb. 7, 2024; Def.'s Sur-Reply to Pls.' Reply,

8

ECF No. 30 [hereinafter Def.'s Sur-Reply].  The court held a hearing on February 15, 2024.  Hr'g Tr., ECF No. 33.  At the court's request, the parties then submitted supplemental briefing on the discrete question of whether Defendant is a "person" for purposes of the D.C. long-arm statute. Def.'s Suppl. Briefing on *Ex Parte Young*, ECF No. 34 [hereinafter Def.'s Suppl. Br.]; Pls.' Suppl. Br. in Supp. of Pls.' Mot., ECF No. 35 [hereinafter Pls.' Suppl. Br.].

## III.   LEGAL STANDARD

Preliminary injunctive relief is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right."  *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal quotation marks and citations omitted).  A court may grant the "extraordinary remedy . . . [only] upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).

The preliminary injunction factors are well established: plaintiffs must show that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest."  *Id.* at 20 (citations omitted).  Courts in this jurisdiction evaluate these factors on a "sliding scale"—if a "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor."  *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009) (citation omitted). *Winter*, however, sparked disagreement over whether the "sliding scale" framework continues to apply, or whether a movant must make a positive showing on all four factors regardless. *See Archdiocese of Wash. v. WMATA*, 897 F.3d 314, 334 (D.C. Cir. 2018) (explaining that the D.C. Circuit "has not yet decided whether *Winter* . . . is properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned").

JA0789

Here, application of the sliding scale makes no difference because the court finds that Plaintiffs have met their burden even under a more stringent application of the traditional four-factor test.  *See infra* Part IV.

**IV.   DISCUSSION**

   **A.   Personal Jurisdiction**

The first factor—success on the merits—includes demonstrating a likelihood of successfully establishing jurisdiction.  *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913–14 (D.C. Cir. 2015).   The court thus begins with Defendant's personal jurisdictional challenge.  *See Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 510–14 (D.C. Cir. 2018) (holding that the court must determine whether it has personal jurisdiction over the defendant before reaching the merits).

To determine whether the court has personal jurisdiction over a non-resident, it engages in a two-part inquiry: "A court must first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process."  *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000).

   *1.    Whether Defendant Is a "Person" under the D.C. Long-Arm Statute*

The court starts with a threshold question regarding the applicability of the D.C. long-arm statute.  In his sur-reply brief, Defendant argued for the first time that, because he is sued in his official capacity, he should be treated as the State of Texas for jurisdictional purposes and that, because the D.C. Circuit has held that a State is not a "person" under the District's long-arm statute, the court cannot exercise specific jurisdiction over him.  Def.'s Sur-Reply at 2–3.

10

**JA0790**

That argument was far from well-developed.  Defendant made it in a single sentence with one accompanying citation.  *See id.* (citing *United States v. Ferrara*, 54 F.3d 825, 831–32 (D.C. Cir. 1995)).  Plaintiffs urge the court to treat the argument as forfeited.  Pls.' Suppl. Br. at 9–10.  The court declines to do so.  Given the threshold importance of the issue, and because the parties later fully briefed it at the court's request, the court will address the contention.  *See Smith v. United States*, No. 19-cv-324-BAH, 2022 WL 425059, at *33 (D.D.C. Feb. 11, 2022).

Defendant's argument rests on the D.C. Circuit's decision in *United States v. Ferrara*, 54 F.3d at 825.  In *Ferrara*, the United States brought suit in this court against the Chief Counsel of the Disciplinary Board of the New Mexico Supreme Court in her official capacity, seeking to enjoin her from taking disciplinary action against an Assistant United States Attorney barred in New Mexico.  *Id.* at 827–28.  The D.C. Circuit first held that personal jurisdiction over Ferrara was lacking under the "transacting business" prong of the long-arm statue, D.C. Code § 13-423(a)(1), whose reach is co-extensive with the Due Process Clause, because Ferrara lacked the requisite "minimum contacts" with the forum.  *Id.* at 828–31.

The court also rejected the United States' alternative argument—the one relevant here— that "due process considerations [were] inappropriate in this instance" because (1) a State is not a "person" under the Due Process Clause and (2) because Ferrara was sued in her official capacity, she should be treated as if she were the State of New Mexico for due process purposes, making constitutional considerations "not relevant to the question of jurisdiction[.]"  *Id.* at 831.  The D.C. Circuit avoided "determinin[g] whether a State official sued in his official capacity should be treated as if he were a State for jurisdictional purposes because the United States could not have established jurisdiction over the State of New Mexico in the District of Columbia regardless of whether due process considerations are relevant to the inquiry."  *Id.*  The court so concluded

JA0791

because it determined that a State is not a "person" within the meaning of the D.C. long-arm statute. *Id.* at 831–832.  That conclusion hinged on the Supreme Court's articulation of the principle in *Will v. Michigan Department of State Police* that "in common usage, the term 'person' does not include the sovereign, and statutes employing the word are ordinarily construed to exclude it[.]" *Id.* at 831. (quoting 491 U.S. 58, 64 (1989)).  The court in *Ferrara* also looked to the statutory definition of "person," which did not "clearly indicate" that a "person" included a State.  *See id.* at 832 (quoting and citing D.C. Code § 13-421).

Defendant reads *Ferrara* to mean that the court lacks jurisdiction over him.  He argues that, because he is sued in his official capacity, he should be treated as if he were the State of Texas, and therefore he is not a "person" under the long-arm statute.  Def.'s Suppl. Br. at 3.  Plaintiffs, on the other hand, contend that *Ferrara* explicitly declined to answer the question presented here. Pls.' Suppl. Br. at 8.  They maintain that the definition of "person" encompasses Defendant under the *Ex Parte Young* legal fiction, which permits suits against a state official when the relief sought is to enjoin a constitutional violation.  *See Id.* at 8–9.  That fiction permits litigants to avoid the Eleventh Amendment's sovereign immunity bar.  *See Vann v. Kempthorne*, 534 F.3d 741, 749 (D.C. Cir. 2008).  Applied here, Plaintiffs contend, the doctrine renders Defendant a "person" for purposes of the long-arm statute as well.  *See generally* Pls.' Suppl. Br.

The court agrees with Plaintiffs that *Ferrara* does not squarely address the question presented here, and other courts in this District have recognized the same.  *See West v. Holder*, 60 F. Supp. 3d 190, 196 (D.D.C. 2014), *aff'd sub nom. West v. Lynch*, 845 F.3d 1228 (D.C. Cir. 2017) (explaining that "[i]t is an open question in this circuit whether, under the D.C. long-arm statute, a court may exercise personal jurisdiction over an official sued under *Ex Parte Young*" and declining to answer the question); *Trump v. Comm. on Ways & Means, U.S. House of*

*Representatives*, 415 F. Supp. 3d 98, 106 (D.D.C. 2019) (noting same open question).  The court therefore must answer the question whether Defendant should be considered a "person" for purposes of the D.C. long-arm statute.

The court begins, as it must, with the statutory text.  As relevant here, a "person" under the long-arm statute includes "an individual . . . whether or not a citizen or domiciliary of the District of Columbia[.]"  D.C. Code § 13-421.  That text does not resolve whether a state official sued in their official capacity is an "individual," but historical context provides guidance.

The Supreme Court decided *Ex Parte Young* in 1908.  *See* 209 U.S. 123.  The Court in *Young* held that, "[i]f the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of the Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct."  209 U.S. 123, 159–60 (1908).  In other words, when a plaintiff seeks to enjoin an official defendant from acting unconstitutionally, such suit is "brought against the defendant not as a representative of the state but to restrain him individually from, as it is alleged, wrongfully subjecting plaintiff to such unauthorized prosecutions."  *Ex Parte La Prade*, 289 U.S. 444, 455 (1933).

When Congress enacted the D.C. long-arm statute in 1970, it would have understood that the term "person" included official-capacity defendants in suits involving injunctive relief.  *See Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010) (stating that courts must "assume that, when Congress enacts statutes, it is aware of relevant judicial precedent").  In *Will*, the Supreme addressed whether States and state officials acting in their official capacity are "persons" under § 1983.  491 U.S. at 60.  In holding that they were not, the Court explained, "in common usage, the term "person" ordinarily does not include the sovereign, and statutes employing the word are

ordinarily construed to exclude it." 491 U.S. at 58. The Court, however, recognized an exception for suits brought against "a state official in his or her official capacity, when sued for injunctive relief." 491 U.S. at 71 n.10. Such cases "would be [against] a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Id.* (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)). That distinction "would not have been foreign to the 19th-century Congress that enacted § 1983," the Court wrote, because it was "commonplace in sovereign immunity doctrine." *Id.* Thus, the Court in *Will* imported the longstanding *Ex Parte Young* fiction into its reading of § 1983. *See id.* If the post-Civil War Congress that enacted § 1983 would have understood the term "person" to include state officials sued for injunctive relief, the Congress that enacted the D.C. long-arm provision nearly a century later would have as well.

And so too would have the D.C. Circuit 25 years later in *Ferrara*. It relied on the "common usage" of the term "person," as articulated in *Will*, to interpret the D.C. long-arm statute not to reach States. *Ferrara*, 54 F.3d at 831 (citing *Will*, 491 U.S. at 64). It stands to reason that, if confronted with the question today, the D.C. Circuit would read the term "person" to include suits against an official-capacity defendant for injunctive relief, just as the Court did in *Will*.

As Plaintiffs point out, a contrary reading would upend years of settled jurisdictional understanding and significantly constrain plaintiffs' ability to sue federal officials for injunctive relief in this District Court. For instance, the term "person" also appears in the D.C. Code's general jurisdiction provision. D.C. Code § 13-422. If Defendant were correct, non-resident federal officials who maintain their primary place of business in the District would not be "persons" because they would be treated as the United States, which is not specifically enumerated as a "person" in § 13-421. Yet, it has long been understood that the court can exercise jurisdiction over

14

such federal officials under the District's general jurisdiction statute. *See Cameron v. Thornburgh*, 983 F.2d 253, 258 n.4 (D.C. Cir. 1993) (recognizing that the court had personal jurisdiction over the Director of the Bureau of Prisons under § 13-422 because his "office was located in the District"); *cf. Pollack v. Hogan*, 703 F.3d 117, 120–21 (D.C. Cir. 2012) (recognizing that sovereign immunity does not bar suits brought against federal officials for injunctive relief when the official is accused of acting beyond constitutional or statutory authority).

The same is true of a non-resident WMATA official, despite WMATA enjoying the same sovereign immunity as a State. In *Hedgepeth ex rel. Hedgepeth v. WMATA*, the D.C. Circuit rejected the WMATA general manager's assertion that he was not a "person" for purposes of § 1983 when sued only for injunctive relief because "official-capacity actions for prospective relief are not treated as actions against the State." 386 F.3d 1148, 1152 n.3 (D.C. Cir. 2004) (quoting *Will*, 491 U.S. at 71 n.10). Likewise, this court has exercised jurisdiction over federal officials acting under color of D.C. law under the same rationale. *See Roy v. Fulwood*, No. 09-cv-463-HHK, 2010 WL 610275, at *2 (D.D.C. Feb. 22, 2010) (exercising "long-arm personal jurisdiction" over the Chairman of the U.S. Parole Commission "with respect to his duties under the D.C. Revitalization Act") (citing *Fletcher v. District of Columbia*, 481 F. Supp. 2d 156, 169–71 (D.D.C. 2007).

When construing a statute, the court must read it to "avoid absurd results." *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998). The court must steer clear of outcomes that are both "contrary to common sense" and "absurd when considered in the particular statutory context." *Id.* Defendant's reading of the term "person" would produce "absurd results." Congress could not have intended to foreclose this District Court from hearing the types of cases described in the preceding paragraph, when for decades prior to 1970 the Supreme Court had recognized that

JA0795

"official-capacity actions for prospective relief are not treated as actions against the State." *Will*, 491 U.S. at 71 n.10.  The court will not read District of Columbia law in a way that would cast doubt on decades of federal court practice and jurisdictional reach.

Defendant maintains that Plaintiffs' suit cannot be construed as anything other than one against the State of Texas because of the "*effect* of the relief sought[.]"  Def.'s Suppl. Br. at 2 (quoting *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 256 (2011)).  He notes that the injunctive relief requested seeks to bind not only him but also "his officers, agents, servants, and employees," thus making this a "suit that is functionally against the State."  *Id.*  But the Court in *Ex Parte Young* said otherwise.  It explained that "the use of the name of the state to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity."  209 U.S. at 159.  "It is simply an illegal act upon the part of a state official . . . .  The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States."  *Id.* at 159–60 (citation omitted).  Put differently, when a federal court restrains a state official from pursuing an unconstitutional act, it is not proscribing state action, but the unlawful conduct of a person stripped of his official protections.  Thus, the fact that an injunction here would reach not only Defendant but also his agents and employees does not make this a suit against the State of Texas.

Defendant also resorts to statutory construction, asserting that the *expressio unius est exclusio alterius* ("the expression of one thing is the exclusion of the other") and *noscitur a sociis* ("it is known by its associates") canons apply to the definition of "person" to exclude a "statewide official," like the Texas Attorney General.  Def.'s Suppl. Br. at 3–4.  These canons, however, are of no help here.  The former is context-specific and applies only when circumstances support a "sensible inference that the term left out must have been meant to be excluded." *See Chevron*

*U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002). And the latter "requires some context cues indicating that the statutory text should be limited by its company," and "especially holds that words grouped in a list should be given related meanings." *United States v. Fischer*, 64 F.4th 329, 346 (D.C. Cir.), *cert. granted*, 144 S. Ct. 537 (2023) (internal quotation marks and citation omitted). The definition of "person" does not support a "sensible inference" of exclusion or contain any "context cues" of limitation. *See* D.C. Code § 13-421.

Finally, Defendant contends that reading "person" to reach him in this case "would at least raise serious federalism problems under the Constitution." Def.'s Suppl. Br. at 4. He notes that there are few cases of State Attorneys General being sued in out-of-state federal courts, and only one found the exercise of jurisdiction to be appropriate. *See id.* at 5 (citing *Def. Distrib. v. Grewal*, 971 F.3d 485 (5th Cir. 2020)). The court is sensitive to the federalism matters implicated here and does not take lightly the notion of enjoining a State Attorney General. But *Ex Parte Young* struck the federalism balance in favor of enforcing constitutional rights in federal court against state officials. As a panel of the Fifth Circuit observed (albeit in dicta):

> If the *Ex Parte Young* exception applies, sovereign immunity is unavailable—the official is an individual, not the State, so a sister-State court's exercising personal jurisdiction does not offend state sovereignty, even if the challenged conduct was enforcement of a state statute. This anomaly comes from the *Ex Parte Young* "fiction," not the sister State's personal-jurisdiction statute.

*Bulkley & Assocs., L.L.C. v. Dep't of Indus. Rels., Div. of Occupational Safety & Health of the State of Cal.*, 1 F.4th 346, 355 n.2 (5th Cir. 2021).[4] In other words, treating a foreign state official as a "person" under a long-arm statute poses no federalism problem because under *Ex Parte Young*

---

[4] This passage from *Bulkley* was a direct response to dicta in an earlier Fifth Circuit case, *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476 (5th Cir. 2008), suggesting that "the Texas [long-arm] statute offers no obvious rationale for including nonresident individuals sued solely in their official capacity under *Ex Parte Young*." *Id.* at 482–83.

**JA0797**

a federal court's exercise of jurisdiction over a state official does not infringe upon that state's sovereignty.[5]

## 2.    Grounds for Exercising Personal Jurisdiction

Having determined that Defendant is a "person" in this suit for purposes of the D.C. long-arm statute, the court now turns to the specific jurisdictional grounds asserted by Plaintiffs.  The D.C. long-arm statute provides, in relevant part, that "a District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's":

(1) transacting any business in the District of Columbia; . . .

(3) causing tortious injury in the District of Columbia by causing an act or omission in the District of Columbia;

(4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he [i] regularly does or solicits business, [ii] engages in any other persistent course of conduct, or [iii] derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

D.C. Code. § 13-423(a).   "Section (a)(1)'s 'transacting any business' clause generally has been interpreted to be coextensive with the Constitution's due process requirements[.]"   *GTE New Media*, 199 F.3d at 1347.  Section (a)(3), on the other hand, "is a precise and intentionally restricted tort section which stops short of the outer limits of due process."  *Forras v. Rauf*, 812 F.3d 1102, 1107 (D.C. Cir. 2016) (cleaned up).  Section (a)(4) likewise "stop[s] short of the outer limit of the constitutional space."  *Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987).

---

[5] Although rare, more than one court has found personal jurisdiction over a State Attorney General who projects himself into an outside forum.  *See Grewal*, 971 F.3d 491–96; *El Paso Water Utils.-Pub. Serv. Bd. v. Kenney*, No. EP-22-cv-460-DB, 2023 WL 4612549, at *5 (W.D. Tex. July 18, 2023); *Twitter, Inc. v. Paxton*, No. 21-cv-01644-MMC, 2021 WL 1893140, at *2–3 (N.D. Cal. May 11, 2021) (finding personal jurisdiction over Defendant in analogous case involving CID served on a California corporation); *but cf. Wercinski*, 513 F.3d at 482–487 (declining to exercise personal jurisdiction over a State Attorney General that did no more than mail a cease-and-desist letter to a Texas real estate agency about its marketing activities in the Attorney General's own state); *Bulkley & Assocs.*, 1 F.4th at 352–55 (same).

Plaintiffs claim to have established personal jurisdiction under subsections (a)(1), (a)(3), and (a)(4).  Pls.' Reply at 2.  The court agrees as to subsections (a)(1) and (a)(3) and thus does not reach subsection (a)(4).

a.  The "transacting business" prong

*1.  Minimum contacts analysis*

Because the "transacting business" prong has been interpreted to reach the fullest extent permitted by the Due Process Clause, the statutory and constitutional analyses "merge[s] into a single inquiry." *Ferrara*, 54 F.3d at 828.  Due process is satisfied if there are "minimum contacts" between the defendant and the forum such that the defendant "should reasonably anticipate being haled into court there[.]" *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1189 (D.C. Cir. 2013) (quoting *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 287, 297 (1980)).  "Such minimum contacts must show that 'the defendant purposefully avail[ed] [him]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  "Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with notions of 'fair play and substantial justice.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320, (1945)).[6]

First, the court finds that Defendant invoked the benefits and protections of the District's laws when he "caused" service of the CID in the District of Columbia "through a professional

---

[6] To satisfy subsection (a)(1), the "claim of relief" also must "aris[e] from" the person's transacting of business in the District.  D.C. Code § 13-423(b).  The D.C. Court of Appeals has interpreted the "arise from" language of § 13-423(b) "flexibly and synonymously with 'relate to' or having a 'substantial connection' with[.]'" *Shoppers Food Warehouse*

19

**JA0799**

process service." Def.'s Opp'n, Decl. of Ass't Att'y Gen. Levi Fuller, Ex. 1, ECF No. 26-1, ¶ 3 [hereinafter Fuller Decl.].  Courts have found that the hiring of a process server creates an agency relationship between the attorney and process server, and that relationship establishes the attorney's presence in the jurisdiction to satisfy the "minimum contacts" requirement. *See Schleit v. Warren*, 693 F. Supp. 416, 419–20 (E.D. Va. 1988) (so holding under Virginia law); *Balsly v. W. Michigan Debt Collections, Inc.*, No. 11-cv-642-DJN, 2012 WL 628490, at *5–7 (E.D. Va. Feb. 27, 2012) (same); *Hamilton, Miller, Hudson & Fayne Travel Corp. v. Hori*, 520 F. Supp. 67, 70 (E.D. Mich. 1981) (so holding under Michigan law).  Courts also have held that a person who arranges for personal delivery of process in a State "purposely avail[s] themselves of the privilege of serving process in [the State]." *Hori*, 520 F. Supp. at 70.  As one court has put it: "it [is] reasonable to conclude that a lawyer who knowingly serves abusive process in a jurisdiction . . . is 'purposely avail[ing] himself of the privilege of conducting activities within the forum State.'" *Schleit*, 693 F. Supp. at 422–23 (quoting *Luke v. Dalow Indus., Inc.*, 566 F. Supp. 1470, 1472 (E.D. Va. 1983)).  Defendant's hiring of a process server in the District of Columbia to effect service on Media Matters therefore created the requisite jurisdictional contacts with the District. *See Smith v. Jenkins*, 452 A.2d 333, 335 (D.C. 1982) ("Generally an agency relationship results when one person authorizes another to act on his behalf subject to his control, and the other consents to do so.") (citations omitted).

Second, Defendant reasonably should have anticipated being haled into court here because the CID established a future course of dealing with a D.C. resident. *Cf. Burger King*, 471 U.S. at 478 (eschewing "mechanical tests" to determine whether an agreement with a forum resident

---

*v. Moreno*, 746 A.2d 320, 335 (D.C. 2000).  Defendant does not make any argument about § 13-423(b).  But even if he had, Plaintiffs' suit plainly "relates to" or has a "substantial connection" with Defendant's hiring of a process server to personally serve the CID on Media Matters in the District.

creates the requisite contacts and looking instead at the contract terms and the parties' actual dealings).  Defendant knew that the CID would require negotiations with Media Matters' counsel, who is based in the District.  Branch Decl., Ex. F, at 38–40.  If Media Matters ultimately agreed to produce records, it could have elected to have Defendant's representatives come to the District to inspect and copy those records.  *See* Tex. Bus. & Com. Code § 17.61(e).  If the investigation continued beyond the CID, Defendant might have sought to interview Media Matters leadership or employees, with such interviews possibly occurring in the District.  And perhaps Defendant would have tried to compel sworn testimony.  *Id.* § 17.60(2) (authorizing the Attorney General to "examine under oath any person in connection with this alleged violation").  By targeting a D.C.-based entity for investigation and demanding records from it, Defendant committed himself to a potentially long course of dealing in the District.  In such circumstances, Defendant should have reasonably foreseen that he would be called into court here.[7]

Third, asserting jurisdiction here is reasonable "in the context of our federal system of government."  *World-Wide Volkswagen*, 444 U.S. at 293 (quoting *Int'l Shoe*, 326 U.S. at 317).  The Fifth Circuit's decision in *Grewal* provides a close analogy to this case.  There, the Fifth Circuit concluded that Texas state courts had personal jurisdiction over the Attorney General of New Jersey, who had sent a Texas-based business, which published "materials related to the 3D printing of firearms," a letter "threatening action if [it] published its files."  *Grewal*, 971 F.3d at 488–89, 497.  The court found that the letter created sufficient minimum contacts with the State of Texas because the Attorney General not only sought not merely to enforce New Jersey law but "halt [the company's] activity nationwide, including activity that had no connection to New Jersey

---

[7] Defendant's service of the CID is analogous to a subpoena served under Federal Rule of Civil Procedure 45, which permits the subpoena's recipient to quash or modify the subpoena in the federal district court where it resides.  *See* Fed. R. Civ. P. 45(d)(3).  Like a party that issues a Rule 45 subpoena to an out-of-state person, Defendant should have reasonably expected to appear in Media Matter's home forum.

JA0801

property or residents." *Bulkley & Assocs.*, 1 F.4th at 353–54 (citing *Grewal*, 971 F.3d at 492).

The court reasoned that "Grewal's letter had a chilling effect on the exercise of [the plaintiffs']

First Amendment rights . . . .   That chilling effect, in turn, caused [the plaintiffs] to cease

publication and reduced Texans' access to materials the plaintiffs seek to publish . . . .   In this

sense, Grewal created contacts with Texas and not just the plaintiffs."  *Grewal*, 971 F.3d at 495

(citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)).

That same rationale applies here.  Defendant promised to "vigorously enforce" the Texas

DTPA against Media Matters for "fraudulent acts" with no apparent connection to Texas.   Branch

Decl., Ex. B at 13.  His issuance of the CID had the effect of chilling Plaintiffs' expressive activities

nationwide, which deprived D.C. residents access to Plaintiffs' reporting.   The national

implications of Defendant's actions were compounded by his calling upon other Attorneys General

to investigate Media Matters.  *See id.*, Ex. C, at 17.  Thus, like the New Jersey Attorney General

in *Grewal*, Defendant "projected himself across state lines and asserted a pseudo-national

executive authority" that makes exercising jurisdiction over him reasonable and does not offend

principles of federalism.  *Grewal*, 971 F.3d at 493.

## 2.   *Defendant's contentions*

Defendant offers three main arguments as to why the "transacting business" prong is

inapplicable, but none is persuasive.  First, he argues that "transacting business" requires some

"'commercial or business-related activity' directed towards D.C. persons."  Def.'s Sur-Reply at 1

(quoting *Capel v. Capel*, 272 F. Supp. 3d 33, 39 (D.D.C. 2017)).  He concedes that "negotiating

or performing contracts" counts, *id.* (quoting *Trump*, 415 F. Supp. 3d 107), but declares without

citation that "hiring a process server does not qualify." *id.*

22

**JA0802**

"It is now well-settled that the 'transacting any business' provision embraces those contractual activities of a nonresident defendant which cause a consequence here." *Mouzavires v. Baxter*, 434 A.2d 988, 992 (D.C. 1981) (citation omitted).  Defendant's hiring of a process server to hand-deliver the CID did "cause a consequence here": it legally obligated Media Matters to produce records to Defendant absent court intervention.  Tex. Bus. & Com. Code § 17.61(h).  Such effect is not "too remote or too trivial to be regarded as a consequence" of Defendant's contractual activity.  *Cf. Cockrell v. Cumberland Corp.*, 458 A.2d 716, 718 (D.C. 1983) (holding that the plaintiff's "writing of a check on a District of Columbia bank" did not suffice to invoke § 13-423(a)(1)).

In any event, Defendant cites no appellate authority from the D.C. Circuit or the D.C. Court of Appeals for the proposition that only strictly commercial activity qualifies as "transacting business."  And persuasive authority from Maryland that pre-dates enactment of the D.C. long-arm statute rejects Defendant's narrow reading.  *See Mouzavires*, 434 A.2d at 991 (observing that "Congress intended to vest courts of the District with jurisdictional reach identical to that in effect in Maryland[.]").  In 1967, Maryland's highest court held that a non-profit had sufficient contacts with the state when it regularly employed an agent to inspect a racing track to certify it according to the organization's standards.  *Novack v. Nat'l Hot Rod Ass'n*, 231 A.2d 22, 23 (Md. 1967).  In so holding, the court observed that "acts done within a State which will support in personam jurisdiction as transacting 'any business' are not necessarily limited to acts which are a part of commerce or of transactions for profit, but include acts which constitute a purposeful activity within the State."  *Id.* (quoting *Van Wagenberg v. Van Wagenberg*, 215 A.2d 812, 821 (Md. 1966)).  The D.C. Circuit has since cited favorably to *Novack*.  *See Steinberg v. Int'l Crim. Police Org.*, 672 F.2d 927, 931 n.7 (D.C. Cir. 1981); *id.* at 932–33 (Wright, J., concurring) (citing *Novack* for

23

the proposition that "identical Maryland provision covers purposeful activity within the state even if the acts are neither part of commerce nor for profit"). Thus, the sole relevant appellate authorities interpreting the "transacting any business" prong have rejected the rigid commercial–non-commercial distinction Defendant proposes. *See id.* (Wright, J., concurring) (opining that Interpol's activities in the District of Columbia constituted "transacting any business").

Second, Defendant notes that he lacks "a continuing corporate presence" in the District. Def.'s Sur-Reply at 1–2 (citing *AMAF Int'l Corp. v. Ralston Purina Co.*, 428 A.2d 849, 851 (D.C. 1981). But an ongoing course of conduct is not necessary to satisfy § 13-423(a)(1). *See Jackson v. Loews Wash. Cinemas, Inc.*, 944 A.2d 1088, 1093 (D.C. 2008). Even "'a single act may be sufficient to constitute transacting business,' so long as the contact is 'voluntary and deliberate, rather than fortuitous.'" *Id.* at 1093 (quoting *Mouzavires*, 434 A.2d at 992, 995). Defendant's single act of hiring a process server to conduct his business in the District was "voluntary and deliberate." Fuller Decl. ¶ 3.

Finally, citing the D.C. Circuit's decision in *Thompson Hine LLP v. Taieb*, Defendant argues that "simply retaining a process server to serve papers on a D.C. plaintiff is insufficient to establish personal jurisdiction." Def.'s Sur-Reply at 4–5 (citing 734 F.3d 1187, 1194 (D.C. Cir. 2013)).[8] In *Thompson Hine*, the D.C. Circuit held that a non-resident who hired a law firm with a D.C. office, and whose lawyers in the District worked on the matter, without more, had not done business in the District. 734 F.3d at 1191–95. The court so held because of the "quality and nature" of the non-resident client's activities. That is, he never purposely availed himself of the privilege of conducting activities in the District. *Id.* at 1193–94. To buttress this conclusion, the

---

[8] Defendant makes this argument in connection with his discussion of subsection (a)(3), but *Thompson Hine* has nothing to do with that subsection. It is a "transacting business" case. *Thompson Hine*, 734 F.3d at 1189. So, the court addresses the argument here, where it belongs.

JA0804

court quoted from the D.C. Court of Appeals' opinion in *Environmental Research International, Inc. v. Lockwood*: "The mere fact that a nonresident has retained the professional services of a District of Columbia firm, thereby setting into motion the resident party's own activities within the jurisdiction, does not constitute an invocation by the nonresident of the benefits and protections of the District's laws." *Id.* (quoting 355 A.2d 808, 812 (D.C. 1976)).   Defendant bases his argument on his quote.  Def.'s Sur-Reply at 5.

*Thompson Hine* is inapposite, however.  In *Thompson Hine*, the non-resident client signed the retainer agreement outside the District, the engagement related to a matter in Oregon, and nothing in the retainer required the firm to perform work or receive payment in the District. 734 F.3d at 1192.  Further, the Oregon matter was supervised by Atlanta-based lawyers and the record contained no communications between the client and D.C.-based counsel.  *Id.*  Here, by contrast, Defendant contracted with the process server to carry out a specific task in the District of Columbia directed at a District resident and, presumably, directed the server's fee here.  That action was purposefully aimed at the District, and the work contracted for had a direct nexus to this forum, unlike the retainer agreement for legal services in *Thompson Hine*.  Defendant's business here was more than the "mere" retention of professional services.[9]

### b.   Causing tortious injury by an act in the District

The court also finds that it can exercise jurisdiction over Defendant under subsection (a)(3) of the long-arm statute, which reaches a non-resident who "caus[es] tortious injury in the District of Columbia by an act or omission in the District of Columbia[.]"   D.C. Code § 13-423(a)(3). Application of that provision is, in a sense, straightforward: Defendant's service of process,

---

[9] In passing, Defendant cites *Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987), to confusingly argue that claims alleging tortious injury "do not fit [the transacting business] description." Def.'s Sur-Reply at 2. But the "transacting business" prong requires no showing of injury in the District of Columbia, whether tortious or otherwise. And, even if it did, as will be discussed, Media Matters has made such showing.

through an agent, was an act in the District of Columbia that injured Plaintiffs' constitutionally protected interests.  And, although subsection (a)(3) falls short of the outer perimeter of the Due Process Clause, in the tort context, "minimum contacts exist where a defendant takes 'intentional and allegedly tortious[] actions' 'expressly aimed' at a jurisdiction," *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 48 (D.C. Cir. 2020) (quoting *Calder*, 465 U.S. at 789), and the effects of those actions in the District of Columbia are not "some 'fortuitous' or 'unilateral' choice of the plaintiff's," *id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 286 (2014)).  That is precisely the circumstance here, as Defendant's intentional service of the CID is the act that caused chilling effects in the District.  *Cf. Ferrara*, 54 F.3d at 829–30 (holding that *Calder* did not apply where the action arose from the attorney's "preexisting relationship" as a member of the New Mexico Bar).

Still, Defendant contends that he committed no act in the District of Columbia.  Def.'s Opp'n at 13–15.  That is not correct.  The process server's in-forum acts are imputed to him as his "agent."  D.C. Code § 13-423(a); *see also Walden*, 571 U.S. at 285.  For that reason, Defendant's reliance on cases involving limited telephonic or electronic communications with a District resident or the mere mailing of matters into the District is misplaced.  Def.'s Opp'n at 14 (citing *Slate v. Kamau*, No. 20-cv-3732 (BAH), 2021 WL 3472438, at * 6 (D.D.C. Aug. 6, 2021) (holding that such mailing is not an "act . . . in the District of Columbia" for purposes of subsection (a)(3)); *Dyson v. Dutok Ragen Homes & Invests.*, No. 21-cv-2280 (APM), 2022 WL 1294484, at *4 (D.D.C. Apr. 27, 2022) (holding that "one text message, a single email, and two phones calls" initiated from outside the District were not acts "in the District")).

The better analogy, as Plaintiffs submit, is to those cases holding that subsection (a)(3) is satisfied when abusive service of process causes injury within the forum.  Pls.' Reply at 6–7.  The

Fourth Circuit, for instance, has held that "if an out-of-state defendant causes abusive process to be served upon an in-state plaintiff, and the plaintiff subsequently sues the defendant in plaintiff's state . . . , personal jurisdiction exists over the out-of-state defendant." *Vishay Intertechnology, Inc. v. Delta Int'l Corp.*, 696 F.2d 1062, 1067 (4th Cir. 1982). Numerous district courts have held the same. *See, e.g.*, *Guest v. Provident Funding Assocs.*, No. 12-cv-224, 2013 WL 1003524 (WHR), at *4 (S.D. Ohio March 13, 2013); *MHA Fin. Corp. v. Varenko Invs. Ltd.*, 583 F. Supp. 2d 173, 178 (D. Mass. 2008); *Schleit*, 693 F. Supp. at 420–22; *Balsly*, 2012 WL 628490, at *6; *Hori*, 520 F. Supp. at 70.

Defendant resists the force of these authorities on the grounds that, in those cases, "the service itself was tortious because the claim in question was service of *abusive* process," whereas "the CID functioned as an ***official act*** of a state law enforcement officer as part of an investigation." Def.'s Sur-Reply at 4 (emphasis in original). The court finds that factual distinction unpersuasive. In both cases, it is the act of service that caused the alleged injury, whether ordinary tortious injury in the abuse-of-process cases or a constitutional one as alleged here. The fact that service here is an official act is not dispositive. It gave rise to Plaintiffs' claims and, under *Ex Parte Young*, Defendant enjoys no immunity for the act.

Next, Defendant cites *Forras v. Rauf*, 812 F.3d 1102 (D.C. Cir. 2016), for the proposition that under subsection (a)(3) the injury cannot be part of the tort "because such a theory would obliterate subsection (3)'s careful distinction between 'injury' and 'act.'" Def.'s Opp'n at 14 (quoting 812 F.3d at 1107). That principle has no application here. It arises only in the context of defamation or libel actions in which the alleged tortious act takes place outside the District, and the plaintiff claims that an act took place in the District because of a subsequent publication here. *Forras*, 812 F.3d at 1107. In such circumstances, subsection (a)(3) is inapplicable because the

27

tortious act and injury are one and the same.  *See id.*  That simply is not the case here, where there is an identifiable act (physically serving the CID on Media Matters) that is separate from the claimed injury (chilling of First Amendment rights).

### B.     No "Justiciable Injury"

Having determined that Plaintiffs are likely to be successful in establishing personal jurisdiction, the court turns to the remaining threshold issues.

Defendant contends that "Media Matters has suffered no judicially cognizable injury." Def.'s Opp'n at 19.  Defendant's argument is based on the Supreme Court's opinion in *Reisman v. Caplin*, 375 U.S. 440 (1964), which, he says, stands for the proposition that "an agency's non-self-executing request for documents is not reviewable until the agency tries to enforce it," Def.'s Opp'n at 19 (arguing that "*Reisman* is now widely understood as having 'announced a rule strongly disfavoring any pre-enforcement review of investigative subpoenas'") (quoting *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334 (10th Cir. 1984)).  He thus contends that *Reisman* forecloses Media Matters from "seek[ing] pre-enforcement review of the CID in federal court." Def.'s Opp'n at 20.  In the same section of his brief, Defendant quotes from the Ninth Circuit's decision in *Twitter, Inc. v. Paxton*, 56 F.4th 1170 (9th Cir. 2022), a similar case in which Twitter moved in federal court in California to oppose a CID that Defendant had served on it.  The Ninth Circuit wrote there that "Twitter has not suffered an Article III injury because the CID is not self-enforcing."  Def.'s Opp'n at 20 (quoting *Twitter*, 56 F.4th at 1176).  For that same reason, Defendant argues, "Media Matters has suffered [no] cognizable injury."  *Id.*

Defendant's argument conflates two distinct concepts: an adequate remedy at law and Article III standing.  The first is an equitable principle, and the latter a constitutional one.  *Reisman* concerns the adequacy of an alternative remedy and has nothing to do with justiciability.  *Twitter*,

28

by contrast, is about standing and has nothing to do with the adequacy of an alternative remedy. In any event, both arguments are wrong.

       1.     *Alternative Adequate Remedy at Law*

In *Reisman*, attorneys for two taxpayers sued the Internal Revenue Service ("IRS") Commissioner and an accounting firm that had been working on their client's financial records. *See* 375 U.S. at 440.  The IRS had issued summonses to the accounting firm calling for the accountants to provide testimony and to produce reports, correspondence, and other materials relating to the taxpayers. *Id.* at 441–42.  Their attorneys moved to enjoin the summonses, arguing that "the enforced production of" the requested papers was "an unlawful appropriation of [their] work product and trial preparation as well as an unreasonable seizure[.]" *Id.* at 442.  The Court concluded that the "comprehensive procedure of the [IRS] Code, which provides full opportunity for review," either before an administrative hearing officer or a district court, provided adequate remedies that did not warrant judicial interference where the IRS had done no more than issue the summonses. *Id.* at 450.  The Court would later make clear that *Reisman* had nothing to do with justiciability requirements.  In *Donaldson v. United States*, the Court said that it had held in *Reisman* "that the petitioner-attorneys possessed an *adequate remedy at law* and that the complaint, therefore, was subject to dismissal."  400 U.S. 517, 539 (1971) (emphasis added).

Thus, properly framed, Defendant's argument is as follows: *Reisman* compels dismissal both because his office has not sought to enforce the subpoena and because the Texas Code provides an adequate remedy, permitting Plaintiffs to file an action to modify or set aside the CID in state court in Travis County, Texas.  Def.'s Opp'n at 19–20 (citing Tex. Bus. & Com. Code § 17.61(g)).

*Reisman* is inapplicable for two reasons.  First, the sole alternative remedy identified here is judicial relief in a foreign forum.  According to Defendant, Media Matters, which is a D.C. resident, would have to go to Texas state court to obtain relief.  *See id.*  Defendant has not cited any authority holding that an exclusive remedy in foreign state court is an adequate remedy at law.  In *Reisman*, the remedy that the Court found to be sufficient involved review before an administrative hearing officer and, if the Commissioner moved to enforce the summons, before a district court "for the district *within which the person so summoned resides or is found*[.]"  375 U.S. at 447 n.7 (emphasis added).  The Texas Code contains no equivalent remedies for a non-resident challenging a CID.

Second, "[t]his case is different from *Reisman* because it involves the First Amendment, under which a chilling effect on speech can itself be the harm."  *Twitter*, 56 F.4th at 1178.  "The key to the holding in *Reisman*," the Ninth Circuit explained in *Twitter*, "was that there had not yet been an injury: The Court held that the remedy specified by Congress (to challenge the document request) 'suffer[ed] no constitutional invalidity."  *Id.* (quoting *Reisman*, 375 U.S. at 450).  Not so here.  As will be discussed below, Plaintiffs' constitutional injury—the chilling effect on their First Amendment rights—has occurred and is ongoing.  Plaintiffs cannot "avoid that alleged injury by challenging the document request" in Texas state court.  *Id.* at 1179.  *Reisman* thus does not compel denying injunctive relief.

### 2. *Cognizable Injury*

Defendant says this case is identical to *Twitter*.  Def.'s Opp'n at 20.  As in that case, Defendant argues, Plaintiffs have suffered no injury because the CID is not self-enforcing and, to the extent they claim a First Amendment injury, any such injury is "self-inflicted[.]"  *Id.* at 21

JA0810

(quoting *Twitter*, 56 F.4th at 1176) (internal quotation marks omitted).  Defendant is wrong on both counts.

Where, as here, a plaintiff brings a claim of First Amendment retaliation, "the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression."  *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 2737 (2022) (quoting *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013)) (internal quotation marks omitted); *see also Twitter*, 56 F.4th at 1174 (citing *Edgar*, 2 F.4th at 310); *Cooksey*, 721 F.3d at 236 (finding justiciable injury where a state official informed plaintiff that she had "statutory authority" to seek an injunction against him if he did not edit his diet-advice website and plaintiff alleged "speech-chilling uncertainty about the legality of private conversations and correspondence").  The chill must be "objectively reasonable."  *Edgar*, 2 F.4th at 310 (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)).

Through sworn affidavits, Plaintiffs have demonstrated the profound chilling impact that the CID has had on its news operations and journalistic mission.  Media Matters' Editor-in-Chief, Benjamin Dimiero, declares that the CID has "dramatically changed [his] team's editorial processes[.]"  Pls.' Mot., Decl. of Benjamin Dimiero in Supp. of Pls.' Mot., Ex. 4, ECF No. 4-4, ¶ 16 [hereinafter Dimiero Decl.].  Dimiero describes a "new culture of fear" amongst Media Matters staff about research and reporting.  *Id.*  For example, he avers that the editorial team and leadership now engage in "greater internal scrutiny and risk calculation" when approaching stories that they otherwise would have published after their normal vetting process, such as stories about media coverage of the Defendant's anti-abortion actions in Texas.  *Id.*  Dimiero further states that other stories, such as one concerning content moderation decisions made by X, "may go unreported on

31

**JA0811**

entirely." *Id.* "There is," he says, "a general sense among our team and organization that we must tread very lightly[] and be careful not to cross lines that would jeopardize our work or our employees' safety . . . because of concern that certain reporting could make us a target for further retaliation." *Id.*

According to Dimiero, since Defendant announced the investigation, "Media Matters's editorial leaders have pared back reporting and publishing, particularly on any topics that could be perceived as relating to the Paxton investigation." *Id.* ¶ 17.  Absent the CID, Media Matters would have coordinated follow up research and reporting on Hananoki's November 16 Article, as well as the one that appeared the next day.  *Id.* ¶ 18.  Media Matters, for instance, "received several tips from people who have seen advertisements for prominent brands placed alongside extremist content," but has limited the scope of its reporting on the subject "for fear of additional retaliation." *Id.*  Furthermore, Media Matters otherwise would have published at least two additional articles on the topics of Hananoki's reporting, but his team withheld them due to concerns of further legal action.  *Id.* ¶ 19.  Writers have expressed concerns that their investigations could serve as the basis for retaliatory legal action and that their work product might be subject to investigative demands. *Id.* ¶ 22; *see also* Padera Decl. ¶¶ 23–24 (same).  Media Matters' leadership and editorial team have since assumed a more significant role in publishing decisions, which "has significantly slowed down [their] editorial and publication process."  Dimiero Decl. ¶ 21.  Media Matters has been taking these steps out of fear of retaliation, not out of legitimate concerns about fairness or accuracy.  *Id.* ¶ 16.

The CID also has adversely impacted Hananoki.  According to Hananoki, the CID has forced him to curtail his investigation and coverage of X out of fear of harassment, threats, and retaliation.  Hananoki Decl. ¶ 29.  His editors explicitly have told him that, because of the

JA0812

investigation, Media Matters will not publish work that he already has prepared regarding Musk and extremism on X. *Id.* ¶ 30. That includes two pieces concerning X's placement of advertising alongside antisemitic, pro-Nazi accounts. *Id.* ¶ 31. And though he has generated story ideas on related topics, he has "self-censored," *id.* ¶ 34, and "not pursued them due to the fear of further legal retaliation," *id.* ¶ 32. According to Hananoki, the CID also has impeded his relationship with his editor and others at Media Matters, because of concern that their internal communications regarding story ideas could be subject to the CID. *Id.* ¶¶ 33, 35. As a result, Hananoki's reporting has appeared less frequently online. Media Matters used to publish Hananoki's work approximately once or twice a week. Dimiero Decl. ¶ 20. Between the CID's issuance on November 22, 2023, and mid-January 2024, Media Matters had published only two of his articles. *Id.*

Defendant has not challenged these concrete and particularized declarations, and they are what distinguish this case from *Twitter*. Whereas Twitter's complaint and declarations "[did] not quite show chilled speech," Plaintiffs here have offered ample evidence of the chilling effects of the investigation and CID. *Cf.* 56 F.4th at 1175. Moreover, the "self-inflicted" injuries the Ninth Circuit said were insufficient to establish standing were not about self-censorship, but about the "financial costs and diverted employee time" that Twitter expended to produce some records "voluntarily[.]" *Id.* at 1176. And the Ninth Circuit said that Twitter had "not suffered an Article III injury because the CID is not self-enforcing" in order to make the point that in the posture of that case, Twitter's claimed injuries were speculative and "may never occur." *Id.* Here, however, Plaintiffs have offered ample evidence of injury, so the fact that the CID is not self-enforcing is of no moment.

JA0813

The other cases to which Defendant cites are similarly inapposite.  In *Google v. Hood*, the Mississippi Attorney General issued an administrative subpoena, seeking information on Google's platforms, advertising practices, and efforts to police illegal content.  822 F.3d 212, 218–19 (5th Cir. 2016).  Google filed suit, seeking a preliminary injunction and alleging that the Attorney General's investigation violated Google's immunity under the Communications Decency Act and its Fourth and First Amendment rights.  *Id.* at 219–20.  Addressing the First Amendment claim, the Fifth Circuit observed: "A preliminary injunction is not appropriate [] unless the party seeking it can demonstrate that First Amendment interests are either threatened or in fact being impaired at the time relief is sought."  *Id.* at 227–28 (internal quotation marks omitted).  The Fifth Circuit did not have before it, as here, self-censorship and other chilling effects experienced by a media organization and journalist.  *See id.* at 228; *see also Twitter*, 56 F.4th at 1178 n.3 (explaining that the *Google v. Hood* "court did not recognize that Google could have suffered injury in the form of objectively reasonable chilling of its speech or another legally cognizable harm from the CID").

For this same reason, this case does not present the concern expressed by Judge Wilkey in *Reporters Committee for Freedom of Press*, and relied on by Defendant, that "[a]ny person can establish the existence of a First Amendment right and of an investigative technique that could possibly be employed in bad faith as to violate that right."  Def.'s Opp'n at 1 (quoting 593 F.2d 1030, 1070 (D.C. Cir. 1978)).  The "person" here is a press organization and a journalist, and they have presented the "real and imminent prospect" of harm that Judge Wilkey demanded.  *Reps. Comm. for Freedom of Press*, 593 F.2d at 1070.

Finally, *Laird v. Tatum*, 408 U.S. 1 (1972), offers Defendant no help.  *See* Def.'s Opp'n at 21.  There, the plaintiffs claimed that an Army data-gathering system chilled their First Amendment rights.  *Laird*, 408 U.S. at 13.  The Court rejected this claim because it amounted to

34

JA0814

a "disagree[ment] with the judgments made by the Executive Branch," and they had presented only an amorphous "subjective 'chill'" and not "a claim of specific present objective harm or a threat of specific future harm." *Id.* at 13–14.  Those are not the facts here.

Accordingly, there is no Article III impediment to the court hearing this case, and Plaintiffs are not required to turn to a state court in Texas for relief.

### C.    Venue

Defendant makes a half-hearted argument that venue is not proper in the District.  Def.'s Opp'n at 21–22.  Venue is proper here because a "substantial part of the events . . . giving rise to the claim," 28 U.S.C. § 1391(b)(2), occurred here: physical service of the CID on Media Matters and the chilling effect that ensued, *see Twitter, Inc. v. Paxton*, No. 21-cv-01644 (MMC), 2021 WL 1893140, at *2 (N.D. Cal. May 11, 2021) (same).

### D.    Likelihood of Success on the Merits

The court now turns to Plaintiffs' likelihood of success on the merits.  Although Plaintiffs argue that they have established a likelihood of success on all of their claims, Pls.' Mem. at 23–40, the court only addresses one: First Amendment retaliation.  To prevail on that claim, a plaintiff must show that (1) they engaged in conduct protected under the First Amendment; (2) "the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him."  *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).  On this record, Plaintiffs have proven each of these elements.

*Protected Conduct.*  Plaintiffs' reporting on matters of public concern are core First Amendment activities.  *See N.Y. Times v. Sullivan*, 376 U.S. 254, 269 (1971) ("The general proposition that freedom of expression upon public questions is secured by the First Amendment

JA0815

has long been settled by our decisions."); *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) ("Speech on matters of public concern is at the heart of the First Amendment's protection.") (cleaned up).

Defendant nevertheless contends that, because Hananoki's articles were "deliberately designed" to mislead, they are not "constitutionally protected."  Def.'s Opp'n at 23.  Oddly, he cites to a Lanham Act case and a Federal Trade Commission Act case for that proposition, which have no application here.  *Id.* (citing *Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.*, 966 F. Supp. 1250 (D.D.C. 1997); *Novartis Corp. v. FTC*, 223 F.3d 783 (D.C. Cir. 2000)).

*Objective Deterrence.*  Defendant's investigation of Media Matters is "retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again[.]" *Aref*, 833 F.3d at 258.  Defendant makes no contrary argument, Def.'s Opp'n at 23, so the court treats as conceded the sufficiency of Plaintiffs' proof as to this element, *see Day v. D.C. Dep't of Consumer & Regul. Affs.*, 191 F. Supp. 2d 154, 159 (D.D.C. 2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded."); *see also Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("[I]f a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded.").

Still, the court explains why Plaintiffs prevail regardless.  "[T]he threat of invoking legal sanctions" is sufficient to deter protected speech.  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963).  So, too, is the "threat of administrative and judicial intrusion into newsgathering and editorial process" that arises from official process and its possible enforcement.  *United States v. LaRouche Campaign*, 841 F.2d 1176, 1182 (1st Cir. 1988) (internal quotation marks omitted).  The Texas Code authorizes the Attorney General to seek restraint of future conduct and the imposition of civil penalties of up to $10,000 per violation in a Texas state court if he has "reason to believe"

36

JA0816

Plaintiffs violated the DTPA.  Tex. Bus. & Com. Code § 17.47(a), (c).  He also can seek to have Plaintiffs held in contempt in Texas state court for not complying with the CID.  *Id.* § 17.62(c). These potential punitive consequences, as well as possible judicial intervention to enforce the CID, make Plaintiffs' claim of chilled expression objectively reasonable.

There is more.  "The compelled production of a reporter's resource materials can constitute a significant intrusion . . . [that] may substantially undercut the public policy in favor of the free flow of information to the public[.]"  *United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980).  The CID seeks such records.  It demands "internal and external communications . . . regarding Elon Musk's purchase of X," X's CEO "Linda Yaccarino," and Hananoki's November 16 Article, as well as external communications with "employees and representatives of X" and the various companies that were the subject of the November 16 Article for a three-week period. Branch Decl., Ex. A, at 11.  The compelled disclosure of such "research materials poses a serious threat to the vitality of the newsgathering process."  *Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995).  And, of course, Plaintiffs' actual self-censorship in response to the announced investigation and the CID "provides some evidence of the tendency of [Defendant's] conduct to chill First Amendment activity."  *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 54 (D.D.C. 2013) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)). The court need not repeat that uncontested evidence here.

*Causation.*  To establish causal link, "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).  Defendant's initial press release establishes that Defendant opened an investigation of

JA0817

Media Matters in response to its protected media activities.  Branch Decl., Ex. B, at 13.  Also, Defendant's description of Media Matters as a "radical anti-free speech" and "radical left-wing organization" and his encouraging of other Attorneys General to look into Media Matters' reporting is evidence of retaliatory intent.  *See supra* Section II.A.3.

Defendant has not responded to Plaintiffs' causation evidence.  *See* Def.'s Opp'n at 22–23. Notably, he has not submitted a sworn declaration that explains his reasons for opening the investigation.  By remaining silent, he has conceded the requisite causal link.  *See Day*, 191 F. Supp. 2d at 159.

###     E.    Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (internal quotation marks omitted).  "A preliminary injunction is not appropriate, however, unless the party seeking it can demonstrate that First Amendment interests are either threatened or in fact being impaired at the time relief is sought."  *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991) (cleaned up).  In *National Employees Treasury Union*, the D.C. Circuit rejected a request for injunctive relief where nothing in the record evinced that the plaintiffs would have "cease[d] speaking or writing before the district court resolve[d] their constitutional challenges."  *Id.* at 1255.  There is no such absence of evidence here.  As discussed above, the investigation and the CID have caused Plaintiffs to self-censor when making research and publication decisions, adversely affected the relationships between editors and reporters, and restricted communications with sources and journalists.  Plaintiffs have amply "demonstrate[d]

some likelihood of a chilling effect on their rights" to justify preliminary injunctive relief. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006).

Defendant asserts that Plaintiffs' claimed harm is not irreparable because it is "self-inflicted," as they have not taken the "opportunity to avail themselves of a regulatory scheme [under the DTPA] to avoid the very harm for which they seek injunctive relief[.]"  Def.'s Opp'n at 24 (quoting *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012)).  But that argument fails to recognize that Plaintiffs are *already* suffering First Amendment harm in the form of chilled protected activities.  Plaintiffs' "constitutional injury has already occurred; there is no way for it to avoid that alleged injury by challenging the document request" in Texas state court. *Twitter*, 56 F.4th at 1179.  Only injunctive relief will "prevent the [ongoing] deprivation of free speech rights." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 301 (quoting *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349–50 (2d Cir. 2003)).

Defendant also contends that it is "factually untrue" that Media Matters has had its expression chilled, citing television appearances by Media Matters' President, in which he has defended the organization's reporting and "doubled down" on the accuracy of the X images contained the November 16 Article.  Def.'s Opp'n at 24; Fuller Decl., Exs. E & F, at 24–39.  But this argument asks too much of Plaintiffs.  They "need not show that the government action led them to stop speaking 'altogether,'" only that it would be "likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Edgar*, 2 F.4th at 310 (quoting *Benham* 635 F.3d at 135).  Therefore, the fact that Media Matters' President has publicly defended its work does not mean that Plaintiffs have not suffered irreparable harm.

JA0819

### F.      Balance of Equities and the Public Interest

The balance of equities and the public interest favor Plaintiffs.[10]   Defendant has not identified any resulting harms to his interests if the court imposes an injunction.  Def.'s Opp'n at 25.  And "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation[.]"   *Pursuing Am.'s Greatness*, 831 F.3d at 511. Defendant does not argue otherwise.  Def.'s Opp'n at 25.  The court thus finds that the final two *Winter* factors support awarding injunctive relief.

## V.      CONCLUSION

For the foregoing reasons, the court grants Plaintiffs' motion for a preliminary injunction, ECF No. 4.  The Order accompanying this Memorandum Opinion sets forth the terms of the injunction. Fed. R. Civ. P. 65(d).

Additionally, because Defendant has moved to dismiss on the very same grounds that he has opposed injunctive relief, Def.'s Mot. to Dismiss, ECF No. 31, that motion is denied.

Dated:  April 12, 2024

Amit P. Mehta
United States District Judge

---

[10] The court does not presume here that Defendant's interest and the public interest are one and same, *cf. Pursuing Am.'s Greatness*, 831 F.3d at 511, as federalism considerations may create some daylight between the two factors.

**JA0820**

# Order of the Court regarding the memorandum opinion

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*,<br><br>     Plaintiffs,<br><br>  v.<br><br>WARREN KENNETH PAXTON, JR., in his official capacity as Attorney General of the State of Texas,<br><br>     Defendant. | Civil Action No. 24-cv-147 |

## <u>PRELIMINARY INJUNCTION ORDER</u>

On January 18, 2024, Plaintiffs Media Matters for America ("Media Matters") and Eric Hananoki filed a motion for preliminary injunctive relief against Defendant Warren Kenneth Paxton, Jr., the Attorney General for the State of Texas, ECF No. 4.  After considering the parties' arguments and evidence submitted, and for the reasons stated in the accompanying Memorandum Opinion, ECF No. 37, the court grants the motion and enters the following Preliminary Injunction Order.  It is hereby:

**ORDERED** that Warren Kenneth Paxton, Jr., Attorney General of the State of Texas, together with his agents and employees within the Office of the Attorney General (collectively "Defendant Paxton"), is enjoined from enforcing the Civil Investigative Demand served on Media Matters on December 1, 2023; and, it is further

**ORDERED** that Defendant Paxton is enjoined from issuing any additional Demands, or taking steps purporting to mandate any action on behalf of Plaintiffs (including Media Matters' officers, employees and agents), in furtherance of the investigation of Media Matters announced by Defendant Paxton on November 20, 2023.

JA0822

This order shall remain in effect until a final judgment is entered in this matter, unless this Order is earlier dissolved by this court or by an appellate court.

_____
Amit P. Mehta
United States District Court Judge

# NOTICE OF APPEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*,<br><br>              Plaintiffs,<br><br>      v.<br><br>WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas,<br><br>              Defendant. | Civil Action No. 1:24-cv-147-APM |

## DEFENDANT'S NOTICE OF APPEAL

Pursuant to 28 U.S.C. § 1292(a)(1) and Rules 3(a)(l) and 4(a)(l)(A) of the Federal Rules of Appellate Procedure, notice is hereby given that Defendant Ken Paxton ("Attorney General Paxton"), in his official capacity as Attorney General of the State of Texas, appeals to the United States Court of Appeals for the District of Columbia Circuit from the April 12, 2024 Memorandum Opinion and Order, ECF Nos. 37 & 38, dated April 12, 2024, which granted Plaintiffs' Motion for Preliminary Injunction, and thus, is immediately appealable under 28 U.S.C. § 1292(a)(l). Defendant also hereby appeals from all subsidiary rulings incorporated in the Memorandum Opinion and Order.

A copy of the Memorandum Opinion and Order is attached hereto as Exhibit 1.

JA0825

DATED: April 22, 2024

/s/ Gene C. Schaerr
GENE C. SCHAERR
  (D.C. Bar No. 416368)
KENNETH A. KLUKOWSKI
  (D.C. Bar No. 1046093)
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, D.C. 20006
gschaerr@schaerr-jaffe.com
kklukowski@schaerr-jaffe.com

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

REUBEN W. BLUM*
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4117
reuben.blum@oag.texas.gov

*Admitted *pro hac vice*

*Attorneys for Defendant Ken Paxton, Attorney General of the State of Texas*

**JA0826**

# EXHIBIT 1

JA0827

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
**MEDIA MATTERS FOR AMERICA, et al.,**  )
                                                    )
   **Plaintiffs,**                                  )
                                                    )
         **v.**                                     )          **Civil No. 24-cv-147 (APM)**
                                                    )
**WARREN KENNETH PAXTON,**              )
*Attorney General of the State of Texas*,  )
                                                    )
   **Defendant.**                                   )
_____)

<u>**MEMORANDUM OPINION**</u>

## I.    INTRODUCTION

On November 16, 2023, Plaintiff Media Matters for America, Inc. ("Media Matters"), a District of Columbia-based media company, published an online article written by one of its long-time journalists, Plaintiff Eric Hananoki, which reported that advertisements for major corporations were appearing next to extremist content on X.com, the social media platform formerly known as Twitter ("November 16 Article"). The story depicted multiple images of the advertisements and posts at issue. The article showed images of Adolph Hitler alongside advertisements from Apple, Oracle, and IBM, and white nationalist tweets next to advertisements from Xfinity and Bravo. X's new owner, Elon Musk, responded that the November 16 Article was a "fraudulent attack on [the] company," and he promised to file "a thermonuclear lawsuit against Media Matters[.]"

Days later, the Attorney General for the State of Texas, Defendant Warren Kenneth Paxton, announced that he was opening an investigation into whether Media Matters' reporting about X had violated Texas' Deceptive Trade Practices Act ("DTPA"). According to a press release,

Defendant "was extremely troubled" by allegations that Media Matters had "fraudulently manipulated data on X.com" in its reporting. Defendant then issued a Civil Investigative Demand ("CID"), which sought from Media Matters a host of records, including its internal and external communications about Musk's purchase of X; the company's CEO, Linda Yaccarino; and the November 16th Article. It also sought records about the company's sources of income and expenditures in Texas. Defendant hired a process server who successfully served the CID on Media Matters in the District of Columbia.

Plaintiffs are before this court seeking an order that preliminarily enjoins Defendant from enforcing the CID. Their primary claim is that Defendant has retaliated against them for exercising their First Amendment rights, which caused substantial chilling effects such as self-censorship and other disruptions of their journalistic endeavors. For his part, Defendant urges the court to reject the requested relief on various grounds: (1) lack of personal jurisdiction, (2) failure to pursue an adequate legal remedy in Texas state court, (3) improper venue, (4) failure to demonstrate a likelihood of success on the merits, and (5) absence of irreparable harm.

As explained below, the court finds that Defendant is subject to personal jurisdiction in this court, and Plaintiffs have satisfied each of the preliminary injunction factors. The court therefore grants Plaintiffs' motion for preliminary relief.

## II.   BACKGROUND

### A.   Factual Background

#### 1.   *Media Matters and Eric Hananoki*

Plaintiff Media Matters is a non-profit research and information center that monitors and reports on misinformation and political extremism in the U.S. media landscape. Compl., ECF No. 1, ¶ 2 [hereinafter Compl.]. Media Matters is incorporated in Washington, D.C. Pls.'

**JA0829**

Mot. for TRO & Prelim. Inj., ECF No. 4 [hereinafter Pls.' Mot.], Decl. of Cynthia Padera in Supp. of Pls.' Mot., Ex. 2, ECF No. 4-2, ¶ 7 [hereinafter Padera Decl.].  Its principal place of business and office space are in the District, as are its hard-copy records.  Padera Decl. ¶ 9.  Media Matters has no meaningful ties to the State of Texas.  Padera Decl. ¶¶ 10–14.

Plaintiff Eric Hananoki is a senior investigative reporter who has worked at Media Matters since 2007.  Pls.' Mot., Decl. of Eric Hananoki in Supp. of Pls.' Mot., Ex. 3, ECF No. 4-3, ¶ 2 [hereinafter Hananoki Decl.].  Hananoki resides in Maryland and works remotely from there, although he occasionally visits Media Matters' D.C. office.  *Id.* ¶ 3.  For more than a decade, Hananoki's work "has focused on documenting extremism—including white nationalism, antisemitism, and Islamophobia."  *Id.* ¶ 4.  As part of his reporting, Hananoki has covered the social media platform X.  *Id.* ¶ 9.  None of that work has involved speaking with Texas residents or businesses, and he has never traveled to Texas for business purposes.  *Id.* ¶ 21.

### 2.    *Media Matters Publishes the November 16 Article about X*

In 2022, Elon Musk acquired X.  In the wake of the ownership change, Hananoki observed a "sustained and significant surge" in extremist content on the platform.  *Id.* ¶ 10.  He reported, in nearly a dozen articles, that corporate advertisements on X were appearing alongside extremist content.  *Id.* ¶ 12 (listing articles).  Other media outlets published similar stories.  *Id.* ¶¶ 10, 13; Pls.' Mem. in Supp. of Pls.' Mot., ECF No. 4-1 [hereinafter Pls.' Mem.], at 6 (listing news stories).

One of Hananoki's articles gave rise to the present controversy.  On November 16, 2023, Media Matters published on its website an article written by Hananoki titled, "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" ("November 16 Article").  Hananoki Decl. ¶ 12.[1]  The story included

---

[1] Article available at https://perma.cc/HHX2-AT2N (last visited on April 12, 2024).

JA0830

multiple images of antisemitic tweets, in some cases depicting Hitler, next to advertisements by the companies identified in the article's title. *Id.* ¶ 15. The story also noted that the night before Musk had "endorsed the pernicious antisemitic conspiracy that Jewish people are supporting 'hordes of minorities' who are 'flooding' into the country to replace white people." *Id.* ¶ 14.

Musk responded to the article swiftly and aggressively. On November 18, 2023, he posted on his X account that "X will be filing a thermonuclear lawsuit" against Media Matters and others "who colluded in this fraudulent attack on our company." *Id.* ¶ 16. Then, on November 20, 2023, X filed suit against Media Matters and Hananoki, citing the November 16 Article and one other. *Id.* ¶ 18.

### 3. *Defendant Launches an Investigation of Media Matters' Reporting on X*

Defendant Kenneth Paxton is the Attorney General for the State of Texas. Texas has adopted a modified version of the Uniform Unfair and Deceptive Trade Practices Act, which prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce[.]" Tex. Bus. & Com. Code § 17.46(a). Deceptive trade practices include "disparaging the goods, services, or business of another by false or misleading representation of facts[.]" *Id.* § 17.46(b)(8). The DTPA authorizes the Consumer Protection Division of the Office of Attorney General to enforce the statute. *See id.* § 17.61(a).

On November 20, 2023, the same day that X filed suit, Defendant issued a press release announcing that he was opening an investigation of Media Matters "for potential fraudulent activity" in violation of the DTPA. Pls.' Mot., Ex. 5, Decl. of Aria C. Branch in Supp. of Pls.' Mot. [hereinafter Branch Decl.], Ex. B, ECF No. 4-5, at 13.[2] The press release explained that Defendant "was extremely troubled by the allegations that Media Matters, a radical anti-free

---

[2] Page number references to the exhibits attached to the Branch Declaration are those generated by CM/ECF.

JA0831

speech organization, fraudulently manipulated data on X.com (formerly known as Twitter)." *Id.* The press release quotes Defendant describing Media Matters as a "radical left-wing organization who would like nothing more than to limit freedom by reducing participation in the public square." *Id.*

Defendant talked to the press about the investigation. He told Newsmax that his office had learned about the controversy from Musk's lawsuit and press accounts. Pls.' Mem. at 10 n.6. Defendant said on CNBC that he had initiated the investigation because of the "information" that Media Matters had reported about X. Branch Decl., Ex. D, at 25. On a podcast called "The Benny Show," Defendant "encouraged" Attorneys General of both political parties to look into Media Matters' reporting, though he observed that Democratic Attorneys General "probably won't but they should because they should care about free speech as much as we do." *Id.*, Ex. C, at 17.[3] And, on another podcast a week later, Defendant described Media Matters as a "left-wing organization" and stated he was "pretty sure that they had put hit pieces out on [him]." Hananoki Decl. ¶ 25 (citing Tudor Dixon Podcast, Dec. 1, 2023).

### 4.    *Defendant Serves a Civil Investigative Demand on Media Matters*

The DTPA grants the Attorney General various tools to investigate violations of the Act. Among them are issuing a CID "requiring [a] person to produce [] documentary material and permit [its] inspection and copying." Tex. Bus. & Com. Code § 17.61(a). The statue permits service of the CID on out-of-state persons either by "delivering a duly executed copy of the demand to the principal place of business in the state of the person to be served" or, "if the person has no place of business in th[e] state," by "mailing by registered mail or certified mail a duly executed

---

[3] At least one Attorney General has followed Defendant's lead. On March 25, 2024, Missouri Attorney General Andrew Bailey announced that he was serving a "virtually identical" CID on Media Matters and filing a petition to enforce it in Missouri state court. Pls.' Notice of Mo. Att'y Gen. CID & Pet., ECF No. 36.

JA0832

copy of the demand addressed to the person to be served . . . to his principal office or place of business." *Id.* § 17.61(d)(2), (3).  The CID's recipient may petition to "modify or set aside the demand, stating good cause," in "the district court in the county where the parties reside, or a district court of Travis County." *Id.* § 17.61(g).

The day after announcing his investigation, Defendant issued a CID, seeking a broad array of records from Media Matters.  Branch Decl., Ex. A, at 5.  The CID directed the company to produce records relating to the following:

- an employee organizational chart;

- sources of income originating in Texas;

- operational expenditures in Texas;

- internal and external communications regarding Musk's purchase of X;

- internal and external communications regarding the CEO of X, Linda Yaccarino;

- current and past X accounts under ownership or control of Media Matters;

- internal and external communications regarding the November 16 Article;

- the X accounts that Media Matters used to obtain the screenshot images used in the November 16 Article;

- the accounts, profiles, and members followed by Media Matters' X accounts referenced in November 16 Article;

- external communications with employees and representatives of X from November 1, 2023, to November 21, 2023;

- external communications with Apple, IBM, Bravo, and the various other companies identified in the November 16 Article; and,

**JA0833**

- direct and indirect sources of funding for all Media Matters operations involving X research or publications.

*Id.* at 11.  The CID set a return date of December 12, 2023.  *Id.* at 5.  It further instructed that Media Matters could produce responsive records directly to the designated Assistant Attorney General, "[i]n lieu of producing the originals for inspection and copying at your principal place of business[.]"  *Id.* And it directed Media Matters to contact the designated Assistant Attorney General "to discuss the logistics of producing the requested documents to the [Consumer Protection] Division."  *Id.*

Media Matters received the CID on November 22, 2023, via FedEx delivery at its office in the District.  Compl. ¶ 52.  Defendant also dispatched a process server who, on November 30, 2023, attempted to serve the CID upon Media Matters at its office.  *Id.*  The agent ultimately delivered the CID to Media Matters' outside counsel, the Elias Law Group, at their D.C. office on December 1, 2023.  Branch Decl. ¶ 4.

Media Matters responded on December 12, 2023, with objections to the CID and put Defendant on notice that it would seek preliminary injunctive relief in federal court in Maryland. Branch Decl., Ex. E, at 33–35.  Media Matters asserted that Defendant lacked jurisdiction to issue and enforce the CID, the CID violated the First Amendment, and the CID's scope was overly burdensome and broad.  *Id.*  Defendant responded on December 29, 2023.  He wrote that he had "broad discretion" in determining the breadth and relevance of materials sought in a pre-litigation investigatory demand.  Branch Decl., Ex. F, at 38–39.  He said that Media Matters would need "to establish that there were zero permissible justifications for the investigation" in order to "resist the Attorney General's investigation," and that Media Matters could seek relief in Texas state court under the DTPA.  *Id.*

**JA0834**

**B.      Procedural Background**

Plaintiffs initially brought suit for injunctive relief against Defendant, in his official capacity, in the U.S. District Court for the District of Maryland on December 12, 2023. *Media Matters for Am. v. Paxton*, No. 8:23-cv-3363 (PJX) (D. Md.), ECF Nos. 1–2. That court held a hearing on January 8, 2024, which focused primarily on whether it could exercise personal jurisdiction over Defendant. The court's comments suggested that it believed that personal jurisdiction in the District of Columbia might be less controverted, prompting Plaintiffs to voluntarily dismiss that action and refile suit here on January 17, 2024. Pls.' Mem. at 19–20; Compl.

Plaintiffs assert four claims. The first three are under 42 U.S.C. § 1983 for (1) retaliation in violation of the First Amendment (Count I); (2) an overbroad CID in violation of the First and Fourth Amendments (Count II); and (3) unlawful service of the CID in violation of the Due Process Clause (Count III). Compl. at 35–42. Plaintiffs' fourth cause of action is for violations of the D.C. and Maryland reporters' shield laws. *Id.* at 42–44. Plaintiffs also sought both a temporary restraining order and a preliminary injunction. Pls.' Mot. Defendant agreed that he would not seek to enforce the CID until the court ruled on the preliminary injunction motion, thereby mooting Plaintiffs' request for temporary relief. Resp. to Order of the Ct., ECF No. 11; Minute Order, Jan. 23, 2024.

The parties' dispute centers primarily on whether the court can exercise personal jurisdiction over Defendant and whether Plaintiffs' suit is premature. Pls.' Mem. at 21–23; Def.'s Opp'n to Pls.' Mot., ECF No. 26 [hereinafter Def.'s Opp'n], at 11–19; Pls.' Reply in Supp. of Pls.' Mot., ECF No. 28 [hereinafter Pls.' Reply], at 2–15. As to the first issue, Defendant filed a sur-reply brief at the court's direction. Minute Order, Feb. 7, 2024; Def.'s Sur-Reply to Pls.' Reply,

**JA0835**

ECF No. 30 [hereinafter Def.'s Sur-Reply].  The court held a hearing on February 15, 2024.  Hr'g Tr., ECF No. 33.  At the court's request, the parties then submitted supplemental briefing on the discrete question of whether Defendant is a "person" for purposes of the D.C. long-arm statute. Def.'s Suppl. Briefing on *Ex Parte Young*, ECF No. 34 [hereinafter Def.'s Suppl. Br.]; Pls.' Suppl. Br. in Supp. of Pls.' Mot., ECF No. 35 [hereinafter Pls.' Suppl. Br.].

### III.    LEGAL STANDARD

Preliminary injunctive relief is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal quotation marks and citations omitted).  A court may grant the "extraordinary remedy . . . [only] upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).

The preliminary injunction factors are well established: plaintiffs must show that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Id.* at 20 (citations omitted).  Courts in this jurisdiction evaluate these factors on a "sliding scale"—if a "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009) (citation omitted). *Winter*, however, sparked disagreement over whether the "sliding scale" framework continues to apply, or whether a movant must make a positive showing on all four factors regardless. *See Archdiocese of Wash. v. WMATA*, 897 F.3d 314, 334 (D.C. Cir. 2018) (explaining that the D.C. Circuit "has not yet decided whether *Winter* . . . is properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned").

**JA0836**

Here, application of the sliding scale makes no difference because the court finds that Plaintiffs have met their burden even under a more stringent application of the traditional four-factor test. *See infra* Part IV.

## IV.   DISCUSSION

### A.     Personal Jurisdiction

The first factor—success on the merits—includes demonstrating a likelihood of successfully establishing jurisdiction. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913–14 (D.C. Cir. 2015).   The court thus begins with Defendant's personal jurisdictional challenge. *See Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 510–14 (D.C. Cir. 2018) (holding that the court must determine whether it has personal jurisdiction over the defendant before reaching the merits).

To determine whether the court has personal jurisdiction over a non-resident, it engages in a two-part inquiry: "A court must first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process." *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000).

### *1.     Whether Defendant Is a "Person" under the D.C. Long-Arm Statute*

The court starts with a threshold question regarding the applicability of the D.C. long-arm statute.   In his sur-reply brief, Defendant argued for the first time that, because he is sued in his official capacity, he should be treated as the State of Texas for jurisdictional purposes and that, because the D.C. Circuit has held that a State is not a "person" under the District's long-arm statute, the court cannot exercise specific jurisdiction over him.   Def.'s Sur-Reply at 2–3.

**JA0837**

That argument was far from well-developed.  Defendant made it in a single sentence with one accompanying citation.  *See id.* (citing *United States v. Ferrara*, 54 F.3d 825, 831–32 (D.C. Cir. 1995)).  Plaintiffs urge the court to treat the argument as forfeited.  Pls.' Suppl. Br. at 9–10. The court declines to do so.  Given the threshold importance of the issue, and because the parties later fully briefed it at the court's request, the court will address the contention.  *See Smith v. United States*, No. 19-cv-324-BAH, 2022 WL 425059, at *33 (D.D.C. Feb. 11, 2022).

Defendant's argument rests on the D.C. Circuit's decision in *United States v. Ferrara*, 54 F.3d at 825.  In *Ferrara*, the United States brought suit in this court against the Chief Counsel of the Disciplinary Board of the New Mexico Supreme Court in her official capacity, seeking to enjoin her from taking disciplinary action against an Assistant United States Attorney barred in New Mexico.  *Id.* at 827–28.  The D.C. Circuit first held that personal jurisdiction over Ferrara was lacking under the "transacting business" prong of the long-arm statue, D.C. Code § 13-423(a)(1), whose reach is co-extensive with the Due Process Clause, because Ferrara lacked the requisite "minimum contacts" with the forum.  *Id.* at 828–31.

The court also rejected the United States' alternative argument—the one relevant here— that "due process considerations [were] inappropriate in this instance" because (1) a State is not a "person" under the Due Process Clause and (2) because Ferrara was sued in her official capacity, she should be treated as if she were the State of New Mexico for due process purposes, making constitutional considerations "not relevant to the question of jurisdiction[.]"  *Id.* at 831.  The D.C. Circuit avoided "determinin[g] whether a State official sued in his official capacity should be treated as if he were a State for jurisdictional purposes because the United States could not have established jurisdiction over the State of New Mexico in the District of Columbia regardless of whether due process considerations are relevant to the inquiry."  *Id.*  The court so concluded

**JA0838**

because it determined that a State is not a "person" within the meaning of the D.C. long-arm statute. *Id.* at 831–832. That conclusion hinged on the Supreme Court's articulation of the principle in *Will v. Michigan Department of State Police* that "in common usage, the term 'person' does not include the sovereign, and statutes employing the word are ordinarily construed to exclude it[.]" *Id.* at 831. (quoting 491 U.S. 58, 64 (1989)). The court in *Ferrara* also looked to the statutory definition of "person," which did not "clearly indicate" that a "person" included a State. *See id.* at 832 (quoting and citing D.C. Code § 13-421).

Defendant reads *Ferrara* to mean that the court lacks jurisdiction over him. He argues that, because he is sued in his official capacity, he should be treated as if he were the State of Texas, and therefore he is not a "person" under the long-arm statute. Def.'s Suppl. Br. at 3. Plaintiffs, on the other hand, contend that *Ferrara* explicitly declined to answer the question presented here. Pls.' Suppl. Br. at 8. They maintain that the definition of "person" encompasses Defendant under the *Ex Parte Young* legal fiction, which permits suits against a state official when the relief sought is to enjoin a constitutional violation. *See Id.* at 8–9. That fiction permits litigants to avoid the Eleventh Amendment's sovereign immunity bar. *See Vann v. Kempthorne*, 534 F.3d 741, 749 (D.C. Cir. 2008). Applied here, Plaintiffs contend, the doctrine renders Defendant a "person" for purposes of the long-arm statute as well. *See generally* Pls.' Suppl. Br.

The court agrees with Plaintiffs that *Ferrara* does not squarely address the question presented here, and other courts in this District have recognized the same. *See West v. Holder*, 60 F. Supp. 3d 190, 196 (D.D.C. 2014), *aff'd sub nom. West v. Lynch*, 845 F.3d 1228 (D.C. Cir. 2017) (explaining that "[i]t is an open question in this circuit whether, under the D.C. long-arm statute, a court may exercise personal jurisdiction over an official sued under *Ex Parte Young*" and declining to answer the question); *Trump v. Comm. on Ways & Means, U.S. House of*

**JA0839**

*Representatives*, 415 F. Supp. 3d 98, 106 (D.D.C. 2019) (noting same open question). The court therefore must answer the question whether Defendant should be considered a "person" for purposes of the D.C. long-arm statute.

The court begins, as it must, with the statutory text. As relevant here, a "person" under the long-arm statute includes "an individual . . . whether or not a citizen or domiciliary of the District of Columbia[.]" D.C. Code § 13-421. That text does not resolve whether a state official sued in their official capacity is an "individual," but historical context provides guidance.

The Supreme Court decided *Ex Parte Young* in 1908. *See* 209 U.S. 123. The Court in *Young* held that, "[i]f the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of the Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." 209 U.S. 123, 159–60 (1908). In other words, when a plaintiff seeks to enjoin an official defendant from acting unconstitutionally, such suit is "brought against the defendant not as a representative of the state but to restrain him individually from, as it is alleged, wrongfully subjecting plaintiff to such unauthorized prosecutions." *Ex Parte La Prade*, 289 U.S. 444, 455 (1933).

When Congress enacted the D.C. long-arm statute in 1970, it would have understood that the term "person" included official-capacity defendants in suits involving injunctive relief. *See Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010) (stating that courts must "assume that, when Congress enacts statutes, it is aware of relevant judicial precedent"). In *Will*, the Supreme addressed whether States and state officials acting in their official capacity are "persons" under § 1983. 491 U.S. at 60. In holding that they were not, the Court explained, "in common usage, the term "person" ordinarily does not include the sovereign, and statutes employing the word are

13

**JA0840**

ordinarily construed to exclude it." 491 U.S. at 58. The Court, however, recognized an exception for suits brought against "a state official in his or her official capacity, when sued for injunctive relief." 491 U.S. at 71 n.10. Such cases "would be [against] a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Id.* (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)). That distinction "would not have been foreign to the 19th-century Congress that enacted § 1983," the Court wrote, because it was "commonplace in sovereign immunity doctrine." *Id.* Thus, the Court in *Will* imported the longstanding *Ex Parte Young* fiction into its reading of § 1983. *See id.* If the post-Civil War Congress that enacted § 1983 would have understood the term "person" to include state officials sued for injunctive relief, the Congress that enacted the D.C. long-arm provision nearly a century later would have as well.

And so too would have the D.C. Circuit 25 years later in *Ferrara*. It relied on the "common usage" of the term "person," as articulated in *Will*, to interpret the D.C. long-arm statute not to reach States. *Ferrara*, 54 F.3d at 831 (citing *Will*, 491 U.S. at 64). It stands to reason that, if confronted with the question today, the D.C. Circuit would read the term "person" to include suits against an official-capacity defendant for injunctive relief, just as the Court did in *Will*.

As Plaintiffs point out, a contrary reading would upend years of settled jurisdictional understanding and significantly constrain plaintiffs' ability to sue federal officials for injunctive relief in this District Court. For instance, the term "person" also appears in the D.C. Code's general jurisdiction provision. D.C. Code § 13-422. If Defendant were correct, non-resident federal officials who maintain their primary place of business in the District would not be "persons" because they would be treated as the United States, which is not specifically enumerated as a "person" in § 13-421. Yet, it has long been understood that the court can exercise jurisdiction over

14

such federal officials under the District's general jurisdiction statute. *See Cameron v. Thornburgh*, 983 F.2d 253, 258 n.4 (D.C. Cir. 1993) (recognizing that the court had personal jurisdiction over the Director of the Bureau of Prisons under § 13-422 because his "office was located in the District"); *cf. Pollack v. Hogan*, 703 F.3d 117, 120–21 (D.C. Cir. 2012) (recognizing that sovereign immunity does not bar suits brought against federal officials for injunctive relief when the official is accused of acting beyond constitutional or statutory authority).

The same is true of a non-resident WMATA official, despite WMATA enjoying the same sovereign immunity as a State. In *Hedgepeth ex rel. Hedgepeth v. WMATA*, the D.C. Circuit rejected the WMATA general manager's assertion that he was not a "person" for purposes of § 1983 when sued only for injunctive relief because "official-capacity actions for prospective relief are not treated as actions against the State." 386 F.3d 1148, 1152 n.3 (D.C. Cir. 2004) (quoting *Will*, 491 U.S. at 71 n.10). Likewise, this court has exercised jurisdiction over federal officials acting under color of D.C. law under the same rationale. *See Roy v. Fulwood*, No. 09-cv-463-HHK, 2010 WL 610275, at *2 (D.D.C. Feb. 22, 2010) (exercising "long-arm personal jurisdiction" over the Chairman of the U.S. Parole Commission "with respect to his duties under the D.C. Revitalization Act") (citing *Fletcher v. District of Columbia*, 481 F. Supp. 2d 156, 169–71 (D.D.C. 2007).

When construing a statute, the court must read it to "avoid absurd results." *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998). The court must steer clear of outcomes that are both "contrary to common sense" and "absurd when considered in the particular statutory context." *Id.* Defendant's reading of the term "person" would produce "absurd results." Congress could not have intended to foreclose this District Court from hearing the types of cases described in the preceding paragraph, when for decades prior to 1970 the Supreme Court had recognized that

JA0842

"official-capacity actions for prospective relief are not treated as actions against the State." *Will*, 491 U.S. at 71 n.10.  The court will not read District of Columbia law in a way that would cast doubt on decades of federal court practice and jurisdictional reach.

Defendant maintains that Plaintiffs' suit cannot be construed as anything other than one against the State of Texas because of the "*effect* of the relief sought[.]"  Def.'s Suppl. Br. at 2 (quoting *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 256 (2011)).  He notes that the injunctive relief requested seeks to bind not only him but also "his officers, agents, servants, and employees," thus making this a "suit that is functionally against the State." *Id.*  But the Court in *Ex Parte Young* said otherwise.  It explained that "the use of the name of the state to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity." 209 U.S. at 159.  "It is simply an illegal act upon the part of a state official . . . . The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States." *Id.* at 159–60 (citation omitted).  Put differently, when a federal court restrains a state official from pursuing an unconstitutional act, it is not proscribing state action, but the unlawful conduct of a person stripped of his official protections.  Thus, the fact that an injunction here would reach not only Defendant but also his agents and employees does not make this a suit against the State of Texas.

Defendant also resorts to statutory construction, asserting that the *expressio unius est exclusio alterius* ("the expression of one thing is the exclusion of the other") and *noscitur a sociis* ("it is known by its associates") canons apply to the definition of "person" to exclude a "statewide official," like the Texas Attorney General.  Def.'s Suppl. Br. at 3–4.  These canons, however, are of no help here.  The former is context-specific and applies only when circumstances support a "sensible inference that the term left out must have been meant to be excluded." *See Chevron*

**JA0843**

*U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002).  And the latter "requires some context cues indicating that the statutory text should be limited by its company," and "especially holds that words grouped in a list should be given related meanings."  *United States v. Fischer*, 64 F.4th 329, 346 (D.C. Cir.), *cert. granted*, 144 S. Ct. 537 (2023) (internal quotation marks and citation omitted).  The definition of "person" does not support a "sensible inference" of exclusion or contain any "context cues" of limitation.  *See* D.C. Code § 13-421.

Finally, Defendant contends that reading "person" to reach him in this case "would at least raise serious federalism problems under the Constitution."  Def.'s Suppl. Br. at 4.  He notes that there are few cases of State Attorneys General being sued in out-of-state federal courts, and only one found the exercise of jurisdiction to be appropriate.  *See id.* at 5 (citing *Def. Distrib. v. Grewal*, 971 F.3d 485 (5th Cir. 2020)).  The court is sensitive to the federalism matters implicated here and does not take lightly the notion of enjoining a State Attorney General.  But *Ex Parte Young* struck the federalism balance in favor of enforcing constitutional rights in federal court against state officials.  As a panel of the Fifth Circuit observed (albeit in dicta):

> If the *Ex Parte Young* exception applies, sovereign immunity is unavailable—the official is an individual, not the State, so a sister-State court's exercising personal jurisdiction does not offend state sovereignty, even if the challenged conduct was enforcement of a state statute. This anomaly comes from the *Ex Parte Young* "fiction," not the sister State's personal-jurisdiction statute.

*Bulkley & Assocs., L.L.C. v. Dep't of Indus. Rels., Div. of Occupational Safety & Health of the State of Cal.*, 1 F.4th 346, 355 n.2 (5th Cir. 2021).[4]  In other words, treating a foreign state official as a "person" under a long-arm statute poses no federalism problem because under *Ex Parte Young*

---

[4] This passage from *Bulkley* was a direct response to dicta in an earlier Fifth Circuit case, *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476 (5th Cir. 2008), suggesting that "the Texas [long-arm] statute offers no obvious rationale for including nonresident individuals sued solely in their official capacity under *Ex Parte Young*."  *Id.* at 482–83.

JA0844

a federal court's exercise of jurisdiction over a state official does not infringe upon that state's sovereignty.[5]

### 2.     Grounds for Exercising Personal Jurisdiction

Having determined that Defendant is a "person" in this suit for purposes of the D.C. long-arm statute, the court now turns to the specific jurisdictional grounds asserted by Plaintiffs.  The D.C. long-arm statute provides, in relevant part, that "a District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's":

> (1) transacting any business in the District of Columbia; . . .
>
> (3) causing tortious injury in the District of Columbia by causing an act or omission in the District of Columbia;
>
> (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he [i] regularly does or solicits business, [ii] engages in any other persistent course of conduct, or [iii] derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

D.C. Code. § 13-423(a).  "Section (a)(1)'s 'transacting any business' clause generally has been interpreted to be coextensive with the Constitution's due process requirements[.]"  *GTE New Media*, 199 F.3d at 1347.  Section (a)(3), on the other hand, "is a precise and intentionally restricted tort section which stops short of the outer limits of due process."  *Forras v. Rauf*, 812 F.3d 1102, 1107 (D.C. Cir. 2016) (cleaned up).  Section (a)(4) likewise "stop[s] short of the outer limit of the constitutional space."  *Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987).

---

[5] Although rare, more than one court has found personal jurisdiction over a State Attorney General who projects himself into an outside forum.  *See Grewal*, 971 F.3d 491–96; *El Paso Water Utils.-Pub. Serv. Bd. v. Kenney*, No. EP-22-cv-460-DB, 2023 WL 4612549, at *5 (W.D. Tex. July 18, 2023); *Twitter, Inc. v. Paxton*, No. 21-cv-01644-MMC, 2021 WL 1893140, at *2–3 (N.D. Cal. May 11, 2021) (finding personal jurisdiction over Defendant in analogous case involving CID served on a California corporation); *but cf. Wercinski*, 513 F.3d at 482–487 (declining to exercise personal jurisdiction over a State Attorney General that did no more than mail a cease-and-desist letter to a Texas real estate agency about its marketing activities in the Attorney General's own state); *Bulkley & Assocs.*, 1 F.4th at 352–55 (same).

JA0845

Plaintiffs claim to have established personal jurisdiction under subsections (a)(1), (a)(3), and (a)(4).  Pls.' Reply at 2.  The court agrees as to subsections (a)(1) and (a)(3) and thus does not reach subsection (a)(4).

a.   The "transacting business" prong

<em>1.   Minimum contacts analysis</em>

Because the "transacting business" prong has been interpreted to reach the fullest extent permitted by the Due Process Clause, the statutory and constitutional analyses "merge[s] into a single inquiry." *Ferrara*, 54 F.3d at 828.  Due process is satisfied if there are "minimum contacts" between the defendant and the forum such that the defendant "should reasonably anticipate being haled into court there[.]"  *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1189 (D.C. Cir. 2013) (quoting *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 287, 297 (1980)).  "Such minimum contacts must show that 'the defendant purposefully avail[ed] [him]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'"  *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  "Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with notions of 'fair play and substantial justice.'"  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320, (1945)).[6]

First, the court finds that Defendant invoked the benefits and protections of the District's laws when he "caused" service of the CID in the District of Columbia "through a professional

---

[6] To satisfy subsection (a)(1), the "claim of relief" also must "aris[e] from" the person's transacting of business in the District.  D.C. Code § 13-423(b).  The D.C. Court of Appeals has interpreted the "arise from" language of § 13-423(b) "flexibly and synonymously with 'relate to' or having a 'substantial connection' with[.]'"  *Shoppers Food Warehouse*

**JA0846**

process service." Def.'s Opp'n, Decl. of Ass't Att'y Gen. Levi Fuller, Ex. 1, ECF No. 26-1, ¶ 3 [hereinafter Fuller Decl.].  Courts have found that the hiring of a process server creates an agency relationship between the attorney and process server, and that relationship establishes the attorney's presence in the jurisdiction to satisfy the "minimum contacts" requirement. *See Schleit v. Warren*, 693 F. Supp. 416, 419–20 (E.D. Va. 1988) (so holding under Virginia law); *Balsly v. W. Michigan Debt Collections, Inc.*, No. 11-cv-642-DJN, 2012 WL 628490, at *5–7 (E.D. Va. Feb. 27, 2012) (same); *Hamilton, Miller, Hudson & Fayne Travel Corp. v. Hori*, 520 F. Supp. 67, 70 (E.D. Mich. 1981) (so holding under Michigan law).  Courts also have held that a person who arranges for personal delivery of process in a State "purposely avail[s] themselves of the privilege of serving process in [the State]."  *Hori*, 520 F. Supp. at 70.  As one court has put it: "it [is] reasonable to conclude that a lawyer who knowingly serves abusive process in a jurisdiction . . . is 'purposely avail[ing] himself of the privilege of conducting activities within the forum State.'" *Schleit*, 693 F. Supp. at 422–23 (quoting *Luke v. Dalow Indus., Inc.*, 566 F. Supp. 1470, 1472 (E.D. Va. 1983)).  Defendant's hiring of a process server in the District of Columbia to effect service on Media Matters therefore created the requisite jurisdictional contacts with the District. *See Smith v. Jenkins*, 452 A.2d 333, 335 (D.C. 1982) ("Generally an agency relationship results when one person authorizes another to act on his behalf subject to his control, and the other consents to do so.") (citations omitted).

Second, Defendant reasonably should have anticipated being haled into court here because the CID established a future course of dealing with a D.C. resident.  *Cf. Burger King*, 471 U.S. at 478 (eschewing "mechanical tests" to determine whether an agreement with a forum resident

_____

*v. Moreno*, 746 A.2d 320, 335 (D.C. 2000).  Defendant does not make any argument about § 13-423(b).  But even if he had, Plaintiffs' suit plainly "relates to" or has a "substantial connection" with Defendant's hiring of a process server to personally serve the CID on Media Matters in the District.

creates the requisite contacts and looking instead at the contract terms and the parties' actual dealings).  Defendant knew that the CID would require negotiations with Media Matters' counsel, who is based in the District.  Branch Decl., Ex. F, at 38–40.  If Media Matters ultimately agreed to produce records, it could have elected to have Defendant's representatives come to the District to inspect and copy those records.  *See* Tex. Bus. & Com. Code § 17.61(e).  If the investigation continued beyond the CID, Defendant might have sought to interview Media Matters leadership or employees, with such interviews possibly occurring in the District.  And perhaps Defendant would have tried to compel sworn testimony.  *Id.* § 17.60(2) (authorizing the Attorney General to "examine under oath any person in connection with this alleged violation").  By targeting a D.C.-based entity for investigation and demanding records from it, Defendant committed himself to a potentially long course of dealing in the District.  In such circumstances, Defendant should have reasonably foreseen that he would be called into court here.[7]

Third, asserting jurisdiction here is reasonable "in the context of our federal system of government."  *World-Wide Volkswagen*, 444 U.S. at 293 (quoting *Int'l Shoe*, 326 U.S. at 317).  The Fifth Circuit's decision in *Grewal* provides a close analogy to this case.  There, the Fifth Circuit concluded that Texas state courts had personal jurisdiction over the Attorney General of New Jersey, who had sent a Texas-based business, which published "materials related to the 3D printing of firearms," a letter "threatening action if [it] published its files."  *Grewal*, 971 F.3d at 488–89, 497.  The court found that the letter created sufficient minimum contacts with the State of Texas because the Attorney General not only sought not merely to enforce New Jersey law but "halt [the company's] activity nationwide, including activity that had no connection to New Jersey

---

[7] Defendant's service of the CID is analogous to a subpoena served under Federal Rule of Civil Procedure 45, which permits the subpoena's recipient to quash or modify the subpoena in the federal district court where it resides.  *See* Fed. R. Civ. P. 45(d)(3).  Like a party that issues a Rule 45 subpoena to an out-of-state person, Defendant should have reasonably expected to appear in Media Matter's home forum.

JA0848

property or residents." *Bulkley & Assocs.*, 1 F.4th at 353–54 (citing *Grewal*, 971 F.3d at 492).

The court reasoned that "Grewal's letter had a chilling effect on the exercise of [the plaintiffs']

First Amendment rights . . . .  That chilling effect, in turn, caused [the plaintiffs] to cease

publication and reduced Texans' access to materials the plaintiffs seek to publish . . . .  In this

sense, Grewal created contacts with Texas and not just the plaintiffs." *Grewal*, 971 F.3d at 495

(citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)).

That same rationale applies here.  Defendant promised to "vigorously enforce" the Texas

DTPA against Media Matters for "fraudulent acts" with no apparent connection to Texas.  Branch

Decl., Ex. B at 13.  His issuance of the CID had the effect of chilling Plaintiffs' expressive activities

nationwide, which deprived D.C. residents access to Plaintiffs' reporting.  The national

implications of Defendant's actions were compounded by his calling upon other Attorneys General

to investigate Media Matters.  *See id.*, Ex. C, at 17.  Thus, like the New Jersey Attorney General

in *Grewal*, Defendant "projected himself across state lines and asserted a pseudo-national

executive authority" that makes exercising jurisdiction over him reasonable and does not offend

principles of federalism.  *Grewal*, 971 F.3d at 493.

### 2.    *Defendant's contentions*

Defendant offers three main arguments as to why the "transacting business" prong is

inapplicable, but none is persuasive.  First, he argues that "transacting business" requires some

"'commercial or business-related activity' directed towards D.C. persons."  Def.'s Sur-Reply at 1

(quoting *Capel v. Capel*, 272 F. Supp. 3d 33, 39 (D.D.C. 2017)).  He concedes that "negotiating

or performing contracts" counts, *id.* (quoting *Trump*, 415 F. Supp. 3d 107), but declares without

citation that "hiring a process server does not qualify." *id.*

"It is now well-settled that the 'transacting any business' provision embraces those contractual activities of a nonresident defendant which cause a consequence here." *Mouzavires v. Baxter*, 434 A.2d 988, 992 (D.C. 1981) (citation omitted).  Defendant's hiring of a process server to hand-deliver the CID did "cause a consequence here": it legally obligated Media Matters to produce records to Defendant absent court intervention.  Tex. Bus. & Com. Code § 17.61(h).  Such effect is not "too remote or too trivial to be regarded as a consequence" of Defendant's contractual activity.  *Cf. Cockrell v. Cumberland Corp.*, 458 A.2d 716, 718 (D.C. 1983) (holding that the plaintiff's "writing of a check on a District of Columbia bank" did not suffice to invoke § 13-423(a)(1)).

In any event, Defendant cites no appellate authority from the D.C. Circuit or the D.C. Court of Appeals for the proposition that only strictly commercial activity qualifies as "transacting business."  And persuasive authority from Maryland that pre-dates enactment of the D.C. long-arm statute rejects Defendant's narrow reading.  *See Mouzavires*, 434 A.2d at 991 (observing that "Congress intended to vest courts of the District with jurisdictional reach identical to that in effect in Maryland[.]").  In 1967, Maryland's highest court held that a non-profit had sufficient contacts with the state when it regularly employed an agent to inspect a racing track to certify it according to the organization's standards.  *Novack v. Nat'l Hot Rod Ass'n*, 231 A.2d 22, 23 (Md. 1967).  In so holding, the court observed that "acts done within a State which will support in personam jurisdiction as transacting 'any business' are not necessarily limited to acts which are a part of commerce or of transactions for profit, but include acts which constitute a purposeful activity within the State."  *Id.* (quoting *Van Wagenberg v. Van Wagenberg*, 215 A.2d 812, 821 (Md. 1966)).  The D.C. Circuit has since cited favorably to *Novack*.  *See Steinberg v. Int'l Crim. Police Org.*, 672 F.2d 927, 931 n.7 (D.C. Cir. 1981); *id.* at 932–33 (Wright, J., concurring) (citing *Novack* for

23

**JA0850**

the proposition that "identical Maryland provision covers purposeful activity within the state even if the acts are neither part of commerce nor for profit"). Thus, the sole relevant appellate authorities interpreting the "transacting any business" prong have rejected the rigid commercial–non-commercial distinction Defendant proposes. *See id.* (Wright, J., concurring) (opining that Interpol's activities in the District of Columbia constituted "transacting any business").

Second, Defendant notes that he lacks "a continuing corporate presence" in the District. Def.'s Sur-Reply at 1–2 (citing *AMAF Int'l Corp. v. Ralston Purina Co.*, 428 A.2d 849, 851 (D.C. 1981). But an ongoing course of conduct is not necessary to satisfy § 13-423(a)(1). *See Jackson v. Loews Wash. Cinemas, Inc.*, 944 A.2d 1088, 1093 (D.C. 2008). Even "'a single act may be sufficient to constitute transacting business,' so long as the contact is 'voluntary and deliberate, rather than fortuitous.'" *Id.* at 1093 (quoting *Mouzavires*, 434 A.2d at 992, 995). Defendant's single act of hiring a process server to conduct his business in the District was "voluntary and deliberate." Fuller Decl. ¶ 3.

Finally, citing the D.C. Circuit's decision in *Thompson Hine LLP v. Taieb*, Defendant argues that "simply retaining a process server to serve papers on a D.C. plaintiff is insufficient to establish personal jurisdiction." Def.'s Sur-Reply at 4–5 (citing 734 F.3d 1187, 1194 (D.C. Cir. 2013)).[8] In *Thompson Hine*, the D.C. Circuit held that a non-resident who hired a law firm with a D.C. office, and whose lawyers in the District worked on the matter, without more, had not done business in the District. 734 F.3d at 1191–95. The court so held because of the "quality and nature" of the non-resident client's activities. That is, he never purposely availed himself of the privilege of conducting activities in the District. *Id.* at 1193–94. To buttress this conclusion, the

---

[8] Defendant makes this argument in connection with his discussion of subsection (a)(3), but *Thompson Hine* has nothing to do with that subsection. It is a "transacting business" case. *Thompson Hine*, 734 F.3d at 1189. So, the court addresses the argument here, where it belongs.

**JA0851**

court quoted from the D.C. Court of Appeals' opinion in *Environmental Research International, Inc. v. Lockwood*: "The mere fact that a nonresident has retained the professional services of a District of Columbia firm, thereby setting into motion the resident party's own activities within the jurisdiction, does not constitute an invocation by the nonresident of the benefits and protections of the District's laws." *Id.* (quoting 355 A.2d 808, 812 (D.C. 1976)). Defendant bases his argument on his quote. Def.'s Sur-Reply at 5.

*Thompson Hine* is inapposite, however. In *Thompson Hine*, the non-resident client signed the retainer agreement outside the District, the engagement related to a matter in Oregon, and nothing in the retainer required the firm to perform work or receive payment in the District. 734 F.3d at 1192. Further, the Oregon matter was supervised by Atlanta-based lawyers and the record contained no communications between the client and D.C.-based counsel. *Id.* Here, by contrast, Defendant contracted with the process server to carry out a specific task in the District of Columbia directed at a District resident and, presumably, directed the server's fee here. That action was purposefully aimed at the District, and the work contracted for had a direct nexus to this forum, unlike the retainer agreement for legal services in *Thompson Hine*. Defendant's business here was more than the "mere" retention of professional services.[9]

b.   Causing tortious injury by an act in the District

The court also finds that it can exercise jurisdiction over Defendant under subsection (a)(3) of the long-arm statute, which reaches a non-resident who "caus[es] tortious injury in the District of Columbia by an act or omission in the District of Columbia[.]" D.C. Code § 13-423(a)(3). Application of that provision is, in a sense, straightforward: Defendant's service of process,

---

[9] In passing, Defendant cites *Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987), to confusingly argue that claims alleging tortious injury "do not fit [the transacting business] description." Def.'s Sur-Reply at 2. But the "transacting business" prong requires no showing of injury in the District of Columbia, whether tortious or otherwise. And, even if it did, as will be discussed, Media Matters has made such showing.

JA0852

through an agent, was an act in the District of Columbia that injured Plaintiffs' constitutionally protected interests.  And, although subsection (a)(3) falls short of the outer perimeter of the Due Process Clause, in the tort context, "minimum contacts exist where a defendant takes 'intentional and allegedly tortious[] actions' 'expressly aimed' at a jurisdiction," *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 48 (D.C. Cir. 2020) (quoting *Calder*, 465 U.S. at 789), and the effects of those actions in the District of Columbia are not "some 'fortuitous' or 'unilateral' choice of the plaintiff's," *id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 286 (2014)).  That is precisely the circumstance here, as Defendant's intentional service of the CID is the act that caused chilling effects in the District.  *Cf. Ferrara*, 54 F.3d at 829–30 (holding that *Calder* did not apply where the action arose from the attorney's "preexisting relationship" as a member of the New Mexico Bar).

Still, Defendant contends that he committed no act in the District of Columbia.  Def.'s Opp'n at 13–15.  That is not correct.  The process server's in-forum acts are imputed to him as his "agent."  D.C. Code § 13-423(a); *see also Walden*, 571 U.S. at 285.  For that reason, Defendant's reliance on cases involving limited telephonic or electronic communications with a District resident or the mere mailing of matters into the District is misplaced.  Def.'s Opp'n at 14 (citing *Slate v. Kamau*, No. 20-cv-3732 (BAH), 2021 WL 3472438, at * 6 (D.D.C. Aug. 6, 2021) (holding that such mailing is not an "act . . . in the District of Columbia" for purposes of subsection (a)(3)); *Dyson v. Dutok Ragen Homes & Invests.*, No. 21-cv-2280 (APM), 2022 WL 1294484, at *4 (D.D.C. Apr. 27, 2022) (holding that "one text message, a single email, and two phones calls" initiated from outside the District were not acts "in the District")).

The better analogy, as Plaintiffs submit, is to those cases holding that subsection (a)(3) is satisfied when abusive service of process causes injury within the forum.  Pls.' Reply at 6–7.  The

**JA0853**

Fourth Circuit, for instance, has held that "if an out-of-state defendant causes abusive process to be served upon an in-state plaintiff, and the plaintiff subsequently sues the defendant in plaintiff's state . . . , personal jurisdiction exists over the out-of-state defendant." *Vishay Intertechnology, Inc. v. Delta Int'l Corp.*, 696 F.2d 1062, 1067 (4th Cir. 1982). Numerous district courts have held the same. *See, e.g.*, *Guest v. Provident Funding Assocs.*, No. 12-cv-224, 2013 WL 1003524 (WHR), at *4 (S.D. Ohio March 13, 2013); *MHA Fin. Corp. v. Varenko Invs. Ltd.*, 583 F. Supp. 2d 173, 178 (D. Mass. 2008); *Schleit*, 693 F. Supp. at 420–22; *Balsly*, 2012 WL 628490, at *6; *Hori*, 520 F. Supp. at 70.

Defendant resists the force of these authorities on the grounds that, in those cases, "the service itself was tortious because the claim in question was service of *abusive* process," whereas "the CID functioned as an ***official act*** of a state law enforcement officer as part of an investigation." Def.'s Sur-Reply at 4 (emphasis in original). The court finds that factual distinction unpersuasive. In both cases, it is the act of service that caused the alleged injury, whether ordinary tortious injury in the abuse-of-process cases or a constitutional one as alleged here. The fact that service here is an official act is not dispositive. It gave rise to Plaintiffs' claims and, under *Ex Parte Young*, Defendant enjoys no immunity for the act.

Next, Defendant cites *Forras v. Rauf*, 812 F.3d 1102 (D.C. Cir. 2016), for the proposition that under subsection (a)(3) the injury cannot be part of the tort "because such a theory would obliterate subsection (3)'s careful distinction between 'injury' and 'act.'" Def.'s Opp'n at 14 (quoting 812 F.3d at 1107). That principle has no application here. It arises only in the context of defamation or libel actions in which the alleged tortious act takes place outside the District, and the plaintiff claims that an act took place in the District because of a subsequent publication here. *Forras*, 812 F.3d at 1107. In such circumstances, subsection (a)(3) is inapplicable because the

JA0854

tortious act and injury are one and the same.  *See id.*  That simply is not the case here, where there is an identifiable act (physically serving the CID on Media Matters) that is separate from the claimed injury (chilling of First Amendment rights).

### B.  No "Justiciable Injury"

Having determined that Plaintiffs are likely to be successful in establishing personal jurisdiction, the court turns to the remaining threshold issues.

Defendant contends that "Media Matters has suffered no judicially cognizable injury." Def.'s Opp'n at 19.  Defendant's argument is based on the Supreme Court's opinion in *Reisman v. Caplin*, 375 U.S. 440 (1964), which, he says, stands for the proposition that "an agency's non-self-executing request for documents is not reviewable until the agency tries to enforce it," Def.'s Opp'n at 19 (arguing that "*Reisman* is now widely understood as having 'announced a rule strongly disfavoring any pre-enforcement review of investigative subpoenas'") (quoting *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334 (10th Cir. 1984)).  He thus contends that *Reisman* forecloses Media Matters from "seek[ing] pre-enforcement review of the CID in federal court." Def.'s Opp'n at 20.  In the same section of his brief, Defendant quotes from the Ninth Circuit's decision in *Twitter, Inc. v. Paxton*, 56 F.4th 1170 (9th Cir. 2022), a similar case in which Twitter moved in federal court in California to oppose a CID that Defendant had served on it.  The Ninth Circuit wrote there that "Twitter has not suffered an Article III injury because the CID is not self-enforcing."  Def.'s Opp'n at 20 (quoting *Twitter*, 56 F.4th at 1176).  For that same reason, Defendant argues, "Media Matters has suffered [no] cognizable injury."  *Id.*

Defendant's argument conflates two distinct concepts: an adequate remedy at law and Article III standing.  The first is an equitable principle, and the latter a constitutional one.  *Reisman* concerns the adequacy of an alternative remedy and has nothing to do with justiciability.  *Twitter*,

**JA0855**

by contrast, is about standing and has nothing to do with the adequacy of an alternative remedy. In any event, both arguments are wrong.

>    1.    Alternative Adequate Remedy at Law

In *Reisman*, attorneys for two taxpayers sued the Internal Revenue Service ("IRS") Commissioner and an accounting firm that had been working on their client's financial records. *See* 375 U.S. at 440.  The IRS had issued summonses to the accounting firm calling for the accountants to provide testimony and to produce reports, correspondence, and other materials relating to the taxpayers.  *Id.* at 441–42.  Their attorneys moved to enjoin the summonses, arguing that "the enforced production of" the requested papers was "an unlawful appropriation of [their] work product and trial preparation as well as an unreasonable seizure[.]"  *Id.* at 442.  The Court concluded that the "comprehensive procedure of the [IRS] Code, which provides full opportunity for review," either before an administrative hearing officer or a district court, provided adequate remedies that did not warrant judicial interference where the IRS had done no more than issue the summonses.  *Id.* at 450.  The Court would later make clear that *Reisman* had nothing to do with justiciability requirements.  In *Donaldson v. United States*, the Court said that it had held in *Reisman* "that the petitioner-attorneys possessed an *adequate remedy at law* and that the complaint, therefore, was subject to dismissal."  400 U.S. 517, 539 (1971) (emphasis added).

Thus, properly framed, Defendant's argument is as follows: *Reisman* compels dismissal both because his office has not sought to enforce the subpoena and because the Texas Code provides an adequate remedy, permitting Plaintiffs to file an action to modify or set aside the CID in state court in Travis County, Texas.  Def.'s Opp'n at 19–20 (citing Tex. Bus. & Com. Code § 17.61(g)).

**JA0856**

*Reisman* is inapplicable for two reasons.  First, the sole alternative remedy identified here is judicial relief in a foreign forum.  According to Defendant, Media Matters, which is a D.C. resident, would have to go to Texas state court to obtain relief.  *See id.*  Defendant has not cited any authority holding that an exclusive remedy in foreign state court is an adequate remedy at law.  In *Reisman*, the remedy that the Court found to be sufficient involved review before an administrative hearing officer and, if the Commissioner moved to enforce the summons, before a district court "for the district *within which the person so summoned resides or is found*[.]"  375 U.S. at 447 n.7 (emphasis added).  The Texas Code contains no equivalent remedies for a non-resident challenging a CID.

Second, "[t]his case is different from *Reisman* because it involves the First Amendment, under which a chilling effect on speech can itself be the harm."  *Twitter*, 56 F.4th at 1178.  "The key to the holding in *Reisman*," the Ninth Circuit explained in *Twitter*, "was that there had not yet been an injury: The Court held that the remedy specified by Congress (to challenge the document request) 'suffer[ed] no constitutional invalidity."  *Id.* (quoting *Reisman*, 375 U.S. at 450).  Not so here.  As will be discussed below, Plaintiffs' constitutional injury—the chilling effect on their First Amendment rights—has occurred and is ongoing.  Plaintiffs cannot "avoid that alleged injury by challenging the document request" in Texas state court.  *Id.* at 1179.  *Reisman* thus does not compel denying injunctive relief.

### 2.    *Cognizable Injury*

Defendant says this case is identical to *Twitter*.  Def.'s Opp'n at 20.  As in that case, Defendant argues, Plaintiffs have suffered no injury because the CID is not self-enforcing and, to the extent they claim a First Amendment injury, any such injury is "self-inflicted[.]"  *Id.* at 21

JA0857

(quoting *Twitter*, 56 F.4th at 1176) (internal quotation marks omitted).  Defendant is wrong on both counts.

Where, as here, a plaintiff brings a claim of First Amendment retaliation, "the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression." *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 2737 (2022) (quoting *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013)) (internal quotation marks omitted); *see also Twitter*, 56 F.4th at 1174 (citing *Edgar*, 2 F.4th at 310); *Cooksey*, 721 F.3d at 236 (finding justiciable injury where a state official informed plaintiff that she had "statutory authority" to seek an injunction against him if he did not edit his diet-advice website and plaintiff alleged "speech-chilling uncertainty about the legality of private conversations and correspondence").  The chill must be "objectively reasonable." *Edgar*, 2 F.4th at 310 (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)).

Through sworn affidavits, Plaintiffs have demonstrated the profound chilling impact that the CID has had on its news operations and journalistic mission.  Media Matters' Editor-in-Chief, Benjamin Dimiero, declares that the CID has "dramatically changed [his] team's editorial processes[.]"  Pls.' Mot., Decl. of Benjamin Dimiero in Supp. of Pls.' Mot., Ex. 4, ECF No. 4-4, ¶ 16 [hereinafter Dimiero Decl.].  Dimiero describes a "new culture of fear" amongst Media Matters staff about research and reporting.  *Id.*  For example, he avers that the editorial team and leadership now engage in "greater internal scrutiny and risk calculation" when approaching stories that they otherwise would have published after their normal vetting process, such as stories about media coverage of the Defendant's anti-abortion actions in Texas.  *Id.*  Dimiero further states that other stories, such as one concerning content moderation decisions made by X, "may go unreported on

31

**JA0858**

entirely." *Id.* "There is," he says, "a general sense among our team and organization that we must tread very lightly[] and be careful not to cross lines that would jeopardize our work or our employees' safety . . . because of concern that certain reporting could make us a target for further retaliation." *Id.*

According to Dimiero, since Defendant announced the investigation, "Media Matters's editorial leaders have pared back reporting and publishing, particularly on any topics that could be perceived as relating to the Paxton investigation." *Id.* ¶ 17. Absent the CID, Media Matters would have coordinated follow up research and reporting on Hananoki's November 16 Article, as well as the one that appeared the next day. *Id.* ¶ 18. Media Matters, for instance, "received several tips from people who have seen advertisements for prominent brands placed alongside extremist content," but has limited the scope of its reporting on the subject "for fear of additional retaliation." *Id.* Furthermore, Media Matters otherwise would have published at least two additional articles on the topics of Hananoki's reporting, but his team withheld them due to concerns of further legal action. *Id.* ¶ 19. Writers have expressed concerns that their investigations could serve as the basis for retaliatory legal action and that their work product might be subject to investigative demands. *Id.* ¶ 22; *see also* Padera Decl. ¶¶ 23–24 (same). Media Matters' leadership and editorial team have since assumed a more significant role in publishing decisions, which "has significantly slowed down [their] editorial and publication process." Dimiero Decl. ¶ 21. Media Matters has been taking these steps out of fear of retaliation, not out of legitimate concerns about fairness or accuracy. *Id.* ¶ 16.

The CID also has adversely impacted Hananoki. According to Hananoki, the CID has forced him to curtail his investigation and coverage of X out of fear of harassment, threats, and retaliation. Hananoki Decl. ¶ 29. His editors explicitly have told him that, because of the

investigation, Media Matters will not publish work that he already has prepared regarding Musk and extremism on X.  *Id.* ¶ 30.  That includes two pieces concerning X's placement of advertising alongside antisemitic, pro-Nazi accounts.  *Id.* ¶ 31.  And though he has generated story ideas on related topics, he has "self-censored," *id.* ¶ 34, and "not pursued them due to the fear of further legal retaliation," *id.* ¶ 32.  According to Hananoki, the CID also has impeded his relationship with his editor and others at Media Matters, because of concern that their internal communications regarding story ideas could be subject to the CID.  *Id.* ¶¶ 33, 35.  As a result, Hananoki's reporting has appeared less frequently online.   Media Matters used to publish Hananoki's work approximately once or twice a week.   Dimiero Decl. ¶ 20.   Between the CID's issuance on November 22, 2023, and mid-January 2024, Media Matters had published only two of his articles. *Id.*

Defendant has not challenged these concrete and particularized declarations, and they are what distinguish this case from *Twitter*.  Whereas Twitter's complaint and declarations "[did] not quite show chilled speech," Plaintiffs here have offered ample evidence of the chilling effects of the investigation and CID.  *Cf.* 56 F.4th at 1175.  Moreover, the "self-inflicted" injuries the Ninth Circuit said were insufficient to establish standing were not about self-censorship, but about the "financial costs and diverted employee time" that Twitter expended to produce some records "voluntarily[.]"  *Id.* at 1176.  And the Ninth Circuit said that Twitter had "not suffered an Article III injury because the CID is not self-enforcing" in order to make the point that in the posture of that case, Twitter's claimed injuries were speculative and "may never occur."  *Id.*  Here, however, Plaintiffs have offered ample evidence of injury, so the fact that the CID is not self-enforcing is of no moment.

**JA0860**

The other cases to which Defendant cites are similarly inapposite.  In *Google v. Hood*, the Mississippi Attorney General issued an administrative subpoena, seeking information on Google's platforms, advertising practices, and efforts to police illegal content.  822 F.3d 212, 218–19 (5th Cir. 2016).  Google filed suit, seeking a preliminary injunction and alleging that the Attorney General's investigation violated Google's immunity under the Communications Decency Act and its Fourth and First Amendment rights.  *Id.* at 219–20.  Addressing the First Amendment claim, the Fifth Circuit observed: "A preliminary injunction is not appropriate [] unless the party seeking it can demonstrate that First Amendment interests are either threatened or in fact being impaired at the time relief is sought."  *Id.* at 227–28 (internal quotation marks omitted).  The Fifth Circuit did not have before it, as here, self-censorship and other chilling effects experienced by a media organization and journalist.  *See id.* at 228; *see also Twitter*, 56 F.4th at 1178 n.3 (explaining that the *Google v. Hood* "court did not recognize that Google could have suffered injury in the form of objectively reasonable chilling of its speech or another legally cognizable harm from the CID").

For this same reason, this case does not present the concern expressed by Judge Wilkey in *Reporters Committee for Freedom of Press*, and relied on by Defendant, that "[a]ny person can establish the existence of a First Amendment right and of an investigative technique that could possibly be employed in bad faith as to violate that right."  Def.'s Opp'n at 1 (quoting 593 F.2d 1030, 1070 (D.C. Cir. 1978)).  The "person" here is a press organization and a journalist, and they have presented the "real and imminent prospect" of harm that Judge Wilkey demanded.  *Reps. Comm. for Freedom of Press*, 593 F.2d at 1070.

Finally, *Laird v. Tatum*, 408 U.S. 1 (1972), offers Defendant no help.  *See* Def.'s Opp'n at 21.  There, the plaintiffs claimed that an Army data-gathering system chilled their First Amendment rights.  *Laird*, 408 U.S. at 13.  The Court rejected this claim because it amounted to

**JA0861**

a "disagree[ment] with the judgments made by the Executive Branch," and they had presented only an amorphous "subjective 'chill'" and not "a claim of specific present objective harm or a threat of specific future harm." *Id.* at 13–14.  Those are not the facts here.

Accordingly, there is no Article III impediment to the court hearing this case, and Plaintiffs are not required to turn to a state court in Texas for relief.

### C.    Venue

Defendant makes a half-hearted argument that venue is not proper in the District.  Def.'s Opp'n at 21–22.  Venue is proper here because a "substantial part of the events . . . giving rise to the claim," 28 U.S.C. § 1391(b)(2), occurred here: physical service of the CID on Media Matters and the chilling effect that ensued, *see Twitter, Inc. v. Paxton*, No. 21-cv-01644 (MMC), 2021 WL 1893140, at *2 (N.D. Cal. May 11, 2021) (same).

### D.    Likelihood of Success on the Merits

The court now turns to Plaintiffs' likelihood of success on the merits.  Although Plaintiffs argue that they have established a likelihood of success on all of their claims, Pls.' Mem. at 23–40, the court only addresses one: First Amendment retaliation.  To prevail on that claim, a plaintiff must show that (1) they engaged in conduct protected under the First Amendment; (2) "the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him."  *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).  On this record, Plaintiffs have proven each of these elements.

*Protected Conduct.*  Plaintiffs' reporting on matters of public concern are core First Amendment activities.  *See N.Y. Times v. Sullivan*, 376 U.S. 254, 269 (1971) ("The general proposition that freedom of expression upon public questions is secured by the First Amendment

35

has long been settled by our decisions."); *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) ("Speech on matters of public concern is at the heart of the First Amendment's protection.") (cleaned up).

Defendant nevertheless contends that, because Hananoki's articles were "deliberately designed" to mislead, they are not "constitutionally protected."  Def.'s Opp'n at 23.  Oddly, he cites to a Lanham Act case and a Federal Trade Commission Act case for that proposition, which have no application here.  *Id.* (citing *Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.*, 966 F. Supp. 1250 (D.D.C. 1997); *Novartis Corp. v. FTC*, 223 F.3d 783 (D.C. Cir. 2000)).

*Objective Deterrence.*  Defendant's investigation of Media Matters is "retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again[.]" *Aref*, 833 F.3d at 258.  Defendant makes no contrary argument, Def.'s Opp'n at 23, so the court treats as conceded the sufficiency of Plaintiffs' proof as to this element, *see Day v. D.C. Dep't of Consumer & Regul. Affs.*, 191 F. Supp. 2d 154, 159 (D.D.C. 2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded."); *see also Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("[I]f a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded.").

Still, the court explains why Plaintiffs prevail regardless.  "[T]he threat of invoking legal sanctions" is sufficient to deter protected speech.  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963).  So, too, is the "threat of administrative and judicial intrusion into newsgathering and editorial process" that arises from official process and its possible enforcement.  *United States v. LaRouche Campaign*, 841 F.2d 1176, 1182 (1st Cir. 1988) (internal quotation marks omitted).  The Texas Code authorizes the Attorney General to seek restraint of future conduct and the imposition of civil penalties of up to $10,000 per violation in a Texas state court if he has "reason to believe"

JA0863

Plaintiffs violated the DTPA.  Tex. Bus. & Com. Code § 17.47(a), (c).  He also can seek to have Plaintiffs held in contempt in Texas state court for not complying with the CID.  *Id.* § 17.62(c).  These potential punitive consequences, as well as possible judicial intervention to enforce the CID, make Plaintiffs' claim of chilled expression objectively reasonable.

There is more.  "The compelled production of a reporter's resource materials can constitute a significant intrusion . . . [that] may substantially undercut the public policy in favor of the free flow of information to the public[.]"  *United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980).  The CID seeks such records.  It demands "internal and external communications . . . regarding Elon Musk's purchase of X," X's CEO "Linda Yaccarino," and Hananoki's November 16 Article, as well as external communications with "employees and representatives of X" and the various companies that were the subject of the November 16 Article for a three-week period.  Branch Decl., Ex. A, at 11.  The compelled disclosure of such "research materials poses a serious threat to the vitality of the newsgathering process."  *Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995).  And, of course, Plaintiffs' actual self-censorship in response to the announced investigation and the CID "provides some evidence of the tendency of [Defendant's] conduct to chill First Amendment activity."  *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 54 (D.D.C. 2013) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)).  The court need not repeat that uncontested evidence here.

*Causation.*  To establish causal link, "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury.  Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).  Defendant's initial press release establishes that Defendant opened an investigation of

37

**JA0864**

Media Matters in response to its protected media activities.  Branch Decl., Ex. B, at 13.  Also, Defendant's description of Media Matters as a "radical anti-free speech" and "radical left-wing organization" and his encouraging of other Attorneys General to look into Media Matters' reporting is evidence of retaliatory intent.  *See supra* Section II.A.3.

Defendant has not responded to Plaintiffs' causation evidence.  *See* Def.'s Opp'n at 22–23.  Notably, he has not submitted a sworn declaration that explains his reasons for opening the investigation.  By remaining silent, he has conceded the requisite causal link.  *See Day*, 191 F. Supp. 2d at 159.

### E.    Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (internal quotation marks omitted).  "A preliminary injunction is not appropriate, however, unless the party seeking it can demonstrate that First Amendment interests are either threatened or in fact being impaired at the time relief is sought."  *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991) (cleaned up).  In *National Employees Treasury Union*, the D.C. Circuit rejected a request for injunctive relief where nothing in the record evinced that the plaintiffs would have "cease[d] speaking or writing before the district court resolve[d] their constitutional challenges."  *Id.* at 1255.  There is no such absence of evidence here.  As discussed above, the investigation and the CID have caused Plaintiffs to self-censor when making research and publication decisions, adversely affected the relationships between editors and reporters, and restricted communications with sources and journalists.  Plaintiffs have amply "demonstrate[d]

some likelihood of a chilling effect on their rights" to justify preliminary injunctive relief. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006).

Defendant asserts that Plaintiffs' claimed harm is not irreparable because it is "self-inflicted," as they have not taken the "opportunity to avail themselves of a regulatory scheme [under the DTPA] to avoid the very harm for which they seek injunctive relief[.]"  Def.'s Opp'n at 24 (quoting *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012)).  But that argument fails to recognize that Plaintiffs are *already* suffering First Amendment harm in the form of chilled protected activities.  Plaintiffs' "constitutional injury has already occurred; there is no way for it to avoid that alleged injury by challenging the document request" in Texas state court. *Twitter*, 56 F.4th at 1179.  Only injunctive relief will "prevent the [ongoing] deprivation of free speech rights." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 301 (quoting *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349–50 (2d Cir. 2003)).

Defendant also contends that it is "factually untrue" that Media Matters has had its expression chilled, citing television appearances by Media Matters' President, in which he has defended the organization's reporting and "doubled down" on the accuracy of the X images contained the November 16 Article.  Def.'s Opp'n at 24; Fuller Decl., Exs. E & F, at 24–39.  But this argument asks too much of Plaintiffs.  They "need not show that the government action led them to stop speaking 'altogether,'" only that it would be "likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Edgar*, 2 F.4th at 310 (quoting *Benham* 635 F.3d at 135).  Therefore, the fact that Media Matters' President has publicly defended its work does not mean that Plaintiffs have not suffered irreparable harm.

JA0866

**F.     Balance of Equities and the Public Interest**

The balance of equities and the public interest favor Plaintiffs.[10]   Defendant has not identified any resulting harms to his interests if the court imposes an injunction.  Def.'s Opp'n at 25.  And "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation[.]"   *Pursuing Am.'s Greatness*, 831 F.3d at 511. Defendant does not argue otherwise.  Def.'s Opp'n at 25.  The court thus finds that the final two *Winter* factors support awarding injunctive relief.

**V.     CONCLUSION**

For the foregoing reasons, the court grants Plaintiffs' motion for a preliminary injunction, ECF No. 4.  The Order accompanying this Memorandum Opinion sets forth the terms of the injunction.  Fed. R. Civ. P. 65(d).

Additionally, because Defendant has moved to dismiss on the very same grounds that he has opposed injunctive relief, Def.'s Mot. to Dismiss, ECF No. 31, that motion is denied.

Dated:  April 12, 2024

Amit P. Mehta
United States District Judge

---

[10] The court does not presume here that Defendant's interest and the public interest are one and same, *cf. Pursuing Am.'s Greatness*, 831 F.3d at 511, as federalism considerations may create some daylight between the two factors.

**JA0867**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>WARREN KENNETH PAXTON, JR., in his official capacity as Attorney General of the State of Texas,<br><br>　　　　Defendant. | Civil Action No. 24-cv-147 |

### PRELIMINARY INJUNCTION ORDER

On January 18, 2024, Plaintiffs Media Matters for America ("Media Matters") and Eric Hananoki filed a motion for preliminary injunctive relief against Defendant Warren Kenneth Paxton, Jr., the Attorney General for the State of Texas, ECF No. 4. After considering the parties' arguments and evidence submitted, and for the reasons stated in the accompanying Memorandum Opinion, ECF No. 37, the court grants the motion and enters the following Preliminary Injunction Order. It is hereby:

**ORDERED** that Warren Kenneth Paxton, Jr., Attorney General of the State of Texas, together with his agents and employees within the Office of the Attorney General (collectively "Defendant Paxton"), is enjoined from enforcing the Civil Investigative Demand served on Media Matters on December 1, 2023; and, it is further

**ORDERED** that Defendant Paxton is enjoined from issuing any additional Demands, or taking steps purporting to mandate any action on behalf of Plaintiffs (including Media Matters' officers, employees and agents), in furtherance of the investigation of Media Matters announced by Defendant Paxton on November 20, 2023.

**JA0868**

This order shall remain in effect until a final judgment is entered in this matter, unless this Order is earlier dissolved by this court or by an appellate court.

2024.04.12
17:53:05 -04'00'

_____
Amit P. Mehta
United States District Court Judge

JA0869