# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――

MEDIA MATTERS FOR AMERICA & ERIC HANANOKI,

*Plaintiffs-Appellees*

v.

WARREN KENNETH PAXTON, JR., IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF TEXAS,

*Defendant-Appellant*

―――――――

On Appeal from the
United States District Court for the District of Columbia
Case No. 1:24-cv-147
Hon. Amit P. Mehta

―――――――

## BRIEF FOR APPELLEES

Abha Khanna
**ELIAS LAW GROUP LLP**
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177
akhanna@elias.law

Aria C. Branch
Christopher D. Dodge
Samuel T. Ward-Packard
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
Telephone: (202) 968-4652
abranch@elias.law
cdodge@elias.law
swardpackard@elias.law

Theodore J. Boutrous, Jr.
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com

Amer S. Ahmed
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com

*Counsel for Appellees Media Matters for America and Eric Hananoki*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## I.     Parties

Media Matters for America and Eric Hananoki are the plaintiffs in the district court and the appellees in this Court. No parent company or publicly held company holds a 10% or greater ownership interest in Media Matters for America.

Ken Paxton, sued in his official capacity as Attorney General of Texas, is a defendant in the district court and the appellant in this Court.

Andrew Bailey, sued in his official capacity as Attorney General of Missouri, is a defendant in the district court and is not a party to this appeal.

## II.    Ruling Under Review

Paxton appeals the April 12, 2024, order of the United States District Court for the District of Columbia, the Honorable Amit P. Mehta presiding, preliminarily enjoining Paxton from:

(1)    enforcing a Civil Investigative Demand which Paxton served on Media Matters on December 1, 2023; and

(2)    issuing any additional demands or otherwise taking steps purporting to mandate action on behalf of Media Matters; its officers, employees, and agents; or Hananoki.

The District Court's Order is reproduced at JA822–23. The District Court's Memorandum Opinion is reproduced at JA781–820, is available on Westlaw at 2024 WL 1773197, and is slated for publication in the Federal Supplement, third series.

## III. Related Cases

This case has not previously been before this Court or any other court. There are no related cases as that term is defined by Circuit Rule 28(a)(1)(C).

/s/ *Aria C. Branch*
Aria C. Branch

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

ISSUES PRESENTED.......................................................................3

PERTINENT STATUTES...................................................................4

STATEMENT OF THE CASE..............................................................4

   I.   Factual Background......................................................................4

       A.   Media Matters and Hananoki reported on the rise in hate speech and antisemitism on Twitter after its purchase by Elon Musk..............4

       B.   An activist urged "conservative state Attorneys General" to punish Media Matters for its reporting about X and Musk, and Paxton answered the call. ...................................................................9

   II.   Procedural History.......................................................................12

       A.   Media Matters sued Paxton in Maryland but moved the case to D.C. after the Maryland court and Paxton both suggested that D.C. was the more appropriate forum. ................................................12

       B.   Media Matters moved for a preliminary injunction, and, after a hearing, the district court ordered additional briefing on whether Paxton was a "person" under the D.C. long-arm statute....................13

       C.   Missouri Attorney General Bailey served a duplicative demand on Media Matters, and Media Matters added him as a Defendant. .........14

       D.   The district court found that Paxton's Demand was inflicting an ongoing, substantial chill on Media Matters and preliminarily enjoined its enforcement. ..................................................15

SUMMARY OF THE ARGUMENT ....................................................18

STANDARD OF REVIEW ................................................................20

ARGUMENT ..................................................................................20

   I.   Paxton is subject to personal jurisdiction in D.C. ........................20

A.   Paxton is a "person" under the D.C. long-arm statute. .......................21

B.   Paxton's conduct satisfies three different prongs of the D.C. long-arm statute. ...................................................................31

C.   Paxton may be haled into D.C. court without violating due process. .........................................................................39

II.   D.C. federal court is a proper venue. ............................................44

III.  Media Matters's ongoing chill is a justiciable injury ripe for relief.............45

A.   Paxton misreads *Reisman*. .....................................................46

B.   Media Matters does not have an adequate alternative remedy. ..........47

C.   This case is justiciable. ...........................................................50

IV.   The District Court properly exercised its discretion in granting a preliminary injunction. .........................................................54

A.   Media Matters is likely to prevail on the merits of its First Amendment claim. ................................................................54

B.   Media Matters will suffer irreparable harm absent a preliminary injunction; Paxton will not. .....................................................59

C.   The public interest and balance of equities favor protecting D.C. journalists' First Amendment rights and D.C. residents' access to reporting. ...........................................................................60

CONCLUSION ..................................................................................61

CERTIFICATE OF COMPLIANCE ........................................................63

CERTIFICATE OF SERVICE ...............................................................63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anheuser-Busch, Inc. v. FTC*,
  359 F.2d 487 (8th Cir. 1966) ...............................................49

*Archer v. Chisholm*,
  870 F.3d 603 (7th Cir. 2017) ...............................................56

*Aref v. Lynch*,
  833 F.3d 242 (D.C. Cir. 2016)........................................55, 57

*Atlantic Richfield Co. v. FTC*,
  546 F.2d 646 (5th Cir. 1977) ...............................................49

*Balsly v. W. Mich. Debt Collections, Inc.*,
  No. 3:11DV642, 2012 WL 628490 (E.D. Va. Feb. 27, 2012) ...................36, 40

*Belle Fourche Pipeline Co. v. United States*,
  751 F.2d 332 (10th Cir. 1984) ...............................................51

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)...............................................42

*Calder v. Jones*,
  465 U.S. 783 (1984)...............................................43

*Cameron v. Thornburgh*,
  983 F.2d 253 (D.C. Cir. 1993)...............................................26

*CBA Pharma, Inc. v. Perry*,
  No. 22-5358, 2023 WL 129240 (6th Cir. Jan. 9, 2023) ...................51

*Centro Tepeyac v. Montgomery County*,
  722 F.3d 184 (4th Cir. 2013) ...............................................60

*Companhia Brasileira Carbureto de Calicio v. Applied Indus. Materials Corp.*,
  640 F.3d 369 (D.C. Cir. 2011) ...............................................31

*Crane v. Carr*,
  814 F.2d 758 (D.C. Cir. 1987) ...............................................37, 38, 39

*\*Def. Distributed v. Grewal*,
  971 F.3d 485 (5th Cir. 2020) ...............................................21, 43

*Donaldson v. United States*,
400 U.S. 517 (1971)........................................................................47

*Edgar v. Haines*,
2 F.4th 298 (4th Cir. 2021) ...........................................................50

*Erwin-Simpson v. AirAsia Berhad*,
985 F.3d 883 (D.C. Cir. 2021).......................................................28

*Giovani Carandola, Ltd. v. Bason*,
303 F.3d 507 (4th Cir. 2002) .........................................................61

*Google, Inc. v. Hood*,
822 F.3d 212 (5th Cir. 2016) .........................................................51

*Gulf Ins. Co. v. Glasbrenner*,
417 F.3d 353 (2d Cir. 2005) ..........................................................44

*Hamilton, Miller, Hudson & Fayne Travel Corp. v. Hori*,
520 F. Supp. 67 (E.D. Mich. 1981) ...........................................35, 40

*Hanson v. Denckla*,
357 U.S. 235 (1958).......................................................................41

*Hartman v. Moore*,
547 U.S. 250 (2006).......................................................................56

*United States ex rel. Heath v. AT&T, Inc.*,
791 F.3d 112 (D.C. Cir. 2015)...................................................37, 39

*Hedgepeth ex rel. Hedgepeth v. WMATA*,
386 F.3d 1148 (D.C. Cir. 2004)..................................................26, 27

*Hindu Am. Found v. Viswanath*,
646 F. Supp. 3d 78 (D.D.C. 2022)..................................................38

*Huisha-Huisha v. Mayorkas*,
27 F.4th 718 (D.C. Cir. 2022).............................................20, 44, 51

*Jackson v. Loews Washington Cinemas, Inc.*,
944 A.2d 1088 (D.C. 2008) ...........................................................32

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020)........................................................60

*Kramer v. Grossman*,
No. 13-cv-1745-ELH, 2014 WL 937146 (D. Md. Mar. 10, 2014)....................50

*Ex Parte La Prade,*
289 U.S. 444 (1933)................................................................23

*Laird v. Tatum,*
408 U.S. 1 (1972)..................................................................53

*Leroy v. Great Western United Corp.,*
443 U.S. 173 (1979)..............................................................44

*Lewy v. S. Poverty Law Ctr., Inc.,*
723 F. Supp. 2d 116 (D.D.C. 2010)...............................38, 39

*Merck & Co. v. Reynolds,*
559 U.S. 633 (2010)..............................................................23

*Moncrief v. Lexington Herald Leader Co.,*
807 F.2d 217 (D.C. Cir. 1986)..............................................36

*Mouzavires v. Baxter,*
434 A.2d 988 (D.C. 1981) ..............................................32, 33

*Murthy v. Vilsack,*
609 F.3d 460 (D.C. Cir. 2010)..............................................55

*Playboy Enters. v. Meese,*
639 F. Supp. 581 (D.D.C. 1986)...........................................58

*Pollack v. Meese,*
737 F. Supp. 663 (D.D.C. 1990)...........................................30

*Prysmian Cables & Sys. USA, LLC v. Szymanski,*
573 F. Supp. 3d 1021 (D.S.C. 2021) .....................................61

*Reed Enters. v. Corcoran,*
354 F.2d 519 (D.C. Cir. 1965)..............................................49

*Rehberg v. Paulk,*
611 F.3d 828 (11th Cir. 2010) ..............................................56

*Reisman v. Caplin,*
375 U.S. 440 (1964)............................................19, 45, 46, 47

*Reporters Comm. for Freedom of Press v. Am. Tel. & Tel. Co.,*
593 F.2d 1030 (D.C. Cir. 1978)............................................54

*Roth v. United States,*
354 U.S. 476 (1957)..............................................................57

*Roy v. Fulwood*,
No. 09-cv-463-HHK, 2010 WL 610275 (D.D.C. Feb. 22, 2010) .....................27

*Saline Parents v. Garland*,
88 F.4th 298 (D.C. Cir. 2023)..................................................................50, 51

*Schleit v. Warren*,
693 F. Supp. 416 (E.D. Va. 1988) ....................................................35, 40, 41

*SEC v. Johnson*,
650 F.3d 710 (D.C. Cir. 2011).................................................................45

*Shoppers Food Warehouse v. Moreno*,
746 A.2d 320 (D.C. 2000) ........................................................................33

*Sivella v. Township of Lyndhurst*,
No. 20-2342, 2021 WL 3356934 (3d Cir. Aug. 3, 2021) ...................................56

*Thompsen v. Hall*,
426 Fed. App'x 855 (11th Cir. 2011) .........................................................56

*Time, Inc. v. Hill*,
385 U.S. 374 (1967).................................................................................57

*Trump v. Comm. on Ways & Means*,
415 F. Supp. 3d 98 (D.D.C. 2019).........................................................22, 29

*Twitter, Inc. v. Paxton*,
56 F.4th 1170 (9th Cir. 2022) ........................................47, 52, 53, 60

*United Presbyterian Church v. Reagan*,
738 F.2d 1375 (D.C. Cir. 1984).................................................................53

*United States v. Ferrara*,
54 F.3d 825 (D.C. Cir. 1995).............................................................21, 25, 29

*United States v. Kulukundis*,
329 F.2d 197 (2d Cir. 1964) .....................................................................49

*Urquhart-Bradley v. Mobley*,
964 F.3d 36 (D.C. Cir. 2020)............................................................32, 39, 43

*Walden v. Fiore*,
571 U.S. 277 (2014)................................................................................41

*West v. Holder*,
60 F. Supp. 3d 190 (D.D.C. 2014)..............................................................22

*Will v. Mich. Dep't of State Police,
491 U.S. 58 (1989)........................................................18, 24, 25, 29

World-Wide Volkswagen v. Woodson,
444 U.S. 286 ........................................................................41

*Ex Parte Young,
209 U.S. 123 (1908)................................................................23

**Statutes**

15 U.S.C. § 78aa .....................................................................45

26 U.S.C. § 7402(b) ..............................................................46, 47

28 U.S.C. § 1391(b)(2) ...............................................................19

42 U.S.C. § 1983 ..................................................................24, 29

D.C. Code § 11-723(a) ................................................................31

D.C. Code § 13-334 ..................................................................28

D.C. Code § 13-421 ..................................4, 13, 18, 21, 22, 23, 24, 26, 28, 29, 30

D.C. Code § 13-422 ........................................................4, 21, 22, 26, 28

D.C. Code § 13-423 ...........................................................13, 21, 22, 26

D.C. Code § 13-423(a)(1) ..................................................18, 20, 22, 31, 32

D.C. Code §13-423(a)(3) ...............................................18, 20, 22, 34, 35, 37

D.C. Code §13-423(a)(4) ................................................18, 20, 22, 35, 37

D.C. Code § 22-407 ..................................................................41

Tex. Bus. & Com. Code Ann. § 17.47.................................................58

Tex. Bus. & Com. Code § 17.61(e) ..................................................42

Tex. Bus. & Com. Code Ann. § 17.62................................................58

**Rules**

Fed. R. Civ. P. 4(i)(1)(B) .............................................................35

Fed. R. Civ. P. 4(e)(2)(a) .............................................................35

Fed. R. Civ. P. 4(k)(1)(A) ............................................................28

**Other Authorities**

Eric Hananoki, *As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*, Media Matters (Nov. 16, 2023).........................................................6, 7

14D Wright & Miller, *Fed. Prac. & Proc.* § 3802 (4th ed.)....................................45

## INTRODUCTION

Appellant Ken Paxton is right about one thing: this is a "remarkable" case. Appellant's Br. at 1 ("Br."). Paxton, the Attorney General of Texas, has launched a nakedly retaliatory investigation into Media Matters, a D.C.-based media watchdog with no connection whatsoever to Texas. Paxton asserts a boundless right to investigate Media Matters's allegedly "misleading" reporting on rising extremism and antisemitism on the social media platform X. But the circumstances of Paxton's investigation put the lie in that manufactured motive. Paxton announced his investigation just one day after a conservative activist called on state attorneys general to retaliate against Media Matters for reporting critically on X's owner, Elon Musk. Paxton immediately disparaged Media Matters as "a radical anti-free speech … left-wing organization." And Paxton even recruited a second state attorney general, Missouri's Andrew Bailey, to join his vendetta.

The vehicle of Paxton's retaliatory campaign is a civil investigative demand ("Demand") which he served on Media Matters in D.C. in late 2023. The Demand is expansive in scope: without providing any basis for jurisdiction, it requires Media Matters to produce confidential source information, sensitive internal communications, and privileged donor names and records; it operates, in effect, as an ongoing command that Media Matters turn over to Paxton *any* material

concerning its reporting on X or Musk. The Demand's service promptly chilled Media Matters and its reporters from their First Amendment–protected work, causing Media Matters to spike follow-up stories, limit its coverage of X and Musk, and change editorial processes.

To redress that chill, Appellees Media Matters and Eric Hananoki, a senior investigative reporter at Media Matters, sued Paxton to block the Demand's enforcement and moved for a preliminary injunction.[1] Plaintiffs assert claims under the First, Fourth, and Fourteenth Amendments and the D.C. and Maryland reporters' shield laws. After extensive briefing, detailed written testimony showing Media Matters's injuries, and a comprehensive hearing on the motion, the district court enjoined Paxton from enforcing the Demand. The court found that Media Matters was likely to prevail on, at a minimum, its First Amendment retaliation claim; that Media Matters's substantial, ongoing chill was an irreparable injury; and that the equities favored protecting the free press and D.C. residents' access to it.

Paxton now appeals that injunction. But he spills little ink pretending his investigation and Demand are legitimate. Instead, Paxton offers a litany of meritless gatekeeping theories. Although Paxton directed his agent into D.C. to commit a

---

[1] Unless otherwise specified, "Media Matters" refers to both Appellees.

constitutional tort, Paxton claims the D.C. courts lack personal jurisdiction over him. Although Paxton's Demand has chilled Media Matters from reporting about topics and actors it has covered for years, Paxton claims its injuries are not ripe for redress. And although a Texas proceeding would subject Media Matters to the jurisdiction of a foreign state court that cannot afford complete relief, Paxton claims that Media Matters has an adequate alternative remedy in Texas.

At bottom, Paxton claims that he enjoys nationwide jurisdiction to "investigate" media outlets and reporters he dislikes, while D.C. courts lack authority to redress constitutional torts carried out in D.C. against D.C. residents. Paxton is wrong on every count. D.C. courts have jurisdiction; this case is justiciable; and Media Matters has no obligation to go to Texas to protect rights it exercises here. This Court should affirm.

## ISSUES PRESENTED

1. Whether D.C. courts have personal jurisdiction over claims arising from Paxton's dispatch of an agent into the District to further a constitutional tort.

2. Whether venue is proper in the District.

3. Whether Media Matters has an adequate alternative remedy in Texas state court that precludes federal injunctive relief.

4. Whether Media Matters has stated a ripe claim for relief from a cognizable injury.

5. Whether the district court abused its discretion by granting a preliminary injunction after finding that Media Matters was likely to prevail on the merits

of its First Amendment retaliation claim.

## PERTINENT STATUTES

Except for the following, all pertinent statutes are contained in the Addendum to Brief for Appellant:

### D.C. Code §13-421. Definition of person.

As used in this subchapter, the term "person" includes an individual, his executor, administrator, or other personal representative, or a corporation, partnership, association, or any other legal or commercial entity, whether or not a citizen or domiciliary of the District of Columbia and whether or not organized under the laws of the District of Columbia.

### D.C. Code §13-422. Personal jurisdiction based upon enduring relationship.

A District of Columbia court may exercise personal jurisdiction over a person domiciled in, organized under the laws of, or maintaining his or its principal place of business in, the District of Columbia as to any claim for relief.

## STATEMENT OF THE CASE

### I. Factual Background

#### A. Media Matters and Hananoki reported on the rise in hate speech and antisemitism on Twitter after its purchase by Elon Musk.

In October 2022, Elon Musk—one of the world's richest men—purchased the social media platform then called Twitter. JA102. Musk promptly laid off around 80

percent of Twitter's staff, eliminating whole teams responsible for matters like content moderation, trust and safety, and platform policy. JA102. Musk also reinstated the accounts of white supremacists and conspiracy theorists. JA102. Through such measures, Musk purported to be guaranteeing "the future of civilization" by preserving humanity's "common digital square." JA102. Yet under Musk's stewardship of the platform he has since renamed "X," hate speech, antisemitism, and neo-Nazism have proliferated. JA102–03. Many advertisers have fled in response. JA103. Musk reported "a 50% decline in ad revenue" in July 2023, then reported that advertising revenue was "still down 60%" that September. JA103. X's inability to prevent advertisements from appearing alongside extremist content was a key driver of advertisers' flight from the platform. JA104. Dozens of different media outlets published countless stories about such occurrences. *See* JA104 (collecting stories).

For over two decades, Media Matters has monitored, investigated, and reported on extremism, misinformation, and bias in the media. Hananoki, a senior investigative reporter at Media Matters, focuses his reporting on extremism in media. JA153. He has covered X—and before that, Twitter—for nearly a decade. JA153. His reporting has been widely cited throughout the media and by government agencies. JA153. Notably, Hananoki's reporting on extremism has implicated

Paxton directly. In 2020, Hananoki published an investigation revealing that a Texas assistant attorney general in Paxton's employ had been tweeting racist and violent threats. JA154. Paxton's office fired the attorney shortly afterwards. JA154.

In 2023, Media Matters published over a dozen articles about X's placement of advertisements alongside hateful content. *See* JA155–57 (collecting articles). Hananoki researched and wrote most of those articles, and his reporting was consistent with what many other outlets had reported for well over a year. JA155. On November 16, 2023, Hananoki reported the results of his most recent investigation. Eric Hananoki, *As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*, Media Matters (Nov. 16, 2023).[2] The article included screen captures from X showing, for example, pro-Nazi posts alongside ads for Apple and Xfinity:

---

[2] Available at https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.



*Id.* In the same article, Hananoki reported on a tweet in which Musk endorsed an antisemitic conspiracy theory that Jewish people were working to replace white Americans with minority immigrants:



*Id.* Media Matters's article immediately drew Musk's ire. On November 18, Musk announced that he planned to file "a thermonuclear lawsuit against Media Matters." JA158. Two days later, X sued Media Matters in the Northern District of Texas. JA159.

**B. An activist urged "conservative state Attorneys General" to punish Media Matters for its reporting about X and Musk, and Paxton answered the call.**

Conservative figures rallied around Musk after he announced his suit against Media Matters. On November 19, 2023, Stephen Miller, an aide to former President Trump, implied that state attorneys general should exploit their authority to punish Media Matters:



Just one day after Miller called on attorneys general to retaliate on Musk's behalf, Paxton announced that his office had launched an investigation into Media Matters under Texas's Deceptive Trade Practices Act. JA185. Paxton's press release

announcing the investigation derided Media Matters as "a radical anti-free speech" and "radical left-wing" organization working "to limit freedom." JA185. Paxton also launched a media blitz to tout his retaliatory efforts. *E.g.*, JA65. Most notably, he encouraged other attorneys general to pile on Media Matters, telling conservative activist Benny Johnson that "hopefully over the next couple weeks, you'll see other attorney generals look at this." *Id.*

Two days after announcing his investigation, Paxton issued the Demand to Media Matters. He first mailed the Demand to Media Matters via FedEx but soon after elected to have it personally served. JA408–09. On November 30, Paxton's process server called Media Matters's president and informed him that she was outside Media Matters's headquarters in D.C. and wished to serve him. JA498. After Media Matters's president informed Paxton's server that he was not in the office, the server negotiated with Media Matters's attorneys to serve the Demand at their office—also in D.C. JA499; *see also* JA414–15.

The Demand is remarkably broad in scope. JA177–83. It requires that Media Matters produce on an ongoing basis all documents and communications dating back to January 1, 2022, regarding X, Musk, or X CEO Linda Yaccarino. JA178, 183. The Demand also requires Media Matters to produce all communications with employees and representatives of X and ten other entities; documents concerning

Media Matters's internal operations, structure, expenditures, and reporting process; and sources of funding for reporting on X. JA183.

Media Matters responded to Paxton's Demand on its return date, objecting to the Demand in full as infringing on its free speech and press rights, its due process rights, and its rights under the Maryland and D.C. reporters' shield laws. JA205. Media Matters also explained how the Demand was substantially chilling its First Amendment–protected journalism. JA205; *see also infra* §II.D. (district court's detailed findings as to Media Matters's chill). Paxton, in turn, responded by letter on December 29, asserting unconstrained authority to investigate Media Matters. JA210–12. According to Paxton, "a CID issued by the Attorney General's Consumer Protection Division is not limited by the Texas Rules of Civil Procedure"; Texas law grants him "broad discretion in the overall breadth and relevance of the materials that may be sought in the course of a pre-suit investigation"; and to set aside the Demand in any Texas enforcement proceeding, Media Matters would need to "establish that there were zero permissible justifications for the investigation." JA210.

## II. Procedural History

### A. Media Matters sued Paxton in Maryland but moved the case to D.C. after the Maryland court and Paxton both suggested that D.C. was the more appropriate forum.

On December 12, 2023, the Demand's return date, Media Matters and Hananoki sued Paxton in the District of Maryland and swiftly moved for a preliminary injunction. *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md. Dec. 12, 2023), ECF Nos. 1, 2, 20. Media Matters selected that venue because Hananoki resides and wrote the November 16 article in Maryland. At a hearing in January, the court first indicated that Media Matters had "pled enough for this [matter] to be ripe constitutionally" and likely established "subject matter jurisdiction," JA221, but expressed concerns about whether Maryland courts had personal jurisdiction over Paxton. The court recommended that, to obtain a resolution "that is fast and fair to both sides," the parties should "move [the case] to D.C." JA240. The court pointed out that Paxton had "served [the Demand] in D.C," JA228, had "directed [his] investigation to Media Matters in D.C," JA239, and appeared to have indicated "in [his] pleadings" that "there is personal jurisdiction in D.C," JA241.

The court's interpretation was well founded. Paxton argued that his "conduct was not in any sense 'aimed' at Maryland—indeed, [the Demand] was issued to, and

served in, the District of Columbia, where Media Matters resides." JA278. And he suggested that Media Matters "could have instead sued in its home—the District of Columbia." JA286. To obtain prompt relief, Media Matters accepted Paxton's and the Maryland court's suggestion: on January 17, it dismissed the Maryland action and refiled in D.C. JA02.

### B. Media Matters moved for a preliminary injunction, and, after a hearing, the district court ordered additional briefing on whether Paxton was a "person" under the D.C. long-arm statute.

Media Matters moved for a TRO and preliminary injunction one day after filing the D.C. complaint. JA84–87. After Paxton agreed not to enforce the Demand while the court considered the preliminary injunction, JA376, the district court dismissed the TRO request as moot.

The court held a hearing on the preliminary injunction motion on February 15, 2024. JA582. At that hearing, Paxton chiefly pressed an argument he had raised in passing in his sur-reply: that he was not a "person" under the D.C. long-arm statute, D.C. Code §§13-421, -423, and thus not subject to personal jurisdiction in D.C. The district court called out Paxton's inadequate briefing and pressed Paxton's counsel at length about whether the argument had been waived. JA611–12. But the court concluded that the issue was "not an issue that's going to go away" as the case progressed, JA642, and so ordered supplemental briefing limited to the "person"

question. *See* JA657–81.

**C. Missouri Attorney General Bailey served a duplicative demand on Media Matters, and Media Matters added him as a Defendant.**

Meanwhile, on March 25, 2024, with Media Matters's motion against Paxton still pending, Attorney General Bailey copied Paxton's playbook by issuing a civil investigative demand of his own (the "Missouri Demand"). Bailey described the Missouri Demand as "virtually identical" to Paxton's Demand. JA698. And like Paxton, Bailey derided Media Matters and its reporters as "radical 'progressives'" and "'progressive' activists masquerading as [a] news outlet[]." JA693. Bailey also confirmed that he and Paxton are coordinating with one another, admitting in an interview: "Yeah, certainly we've coordinated with Texas. Texas has launched a similar investigation and we're in talks with other states as well. This is a new front in the war, in the fight for free speech." ECF No. 46 at 10–11; *see also* ECF No. 64 at 4.

After the District Court resolved the preliminary injunction motion against Paxton (discussed below), Media Matters filed a supplemental complaint adding Bailey as a Defendant. A preliminary injunction motion against Bailey is fully briefed, and the district court heard argument on June 6. The motion remains pending.

**D.** **The district court found that Paxton's Demand was inflicting an ongoing, substantial chill on Media Matters and preliminarily enjoined its enforcement.**

The district court preliminarily enjoined Paxton from enforcing the Demand on April 12, 2024. JA822–23. The court made extensive factual findings about the injuries the Demand was inflicting on Media Matters. These findings were based primarily on sworn affidavits from Hananoki and Ben Dimiero, Media Matters's Editor-in-Chief. Looking to this testimony—which, the district court ruled, was "concrete and particularized," and which Paxton "ha[d] not challenged"—the court found that the Demand had chilled Appellees in several discrete ways. JA860.

*First*, the Demand has chilled and continues to chill further coverage of X and Musk, subjects at the core of Media Matters's work. "Absent the [Demand], Media Matters would have coordinated follow up research and reporting on Hananoki's November 16 Article, as well as the one that appeared the next day … but has limited the scope of its reporting on the subject 'for fear of additional retaliation.'" JA812 (quoting Dimiero). In particular, "Media Matters … would have published at least two additional articles on the topics of Hananoki's reporting," including "X's placement of advertising alongside antisemitic, pro-Nazi accounts," but "withheld them due to concerns of further legal action." JA812–13. Going forward, "other stories, such as one concerning content moderation decisions made by X, 'may go

unreported on entirely.'" JA811–12 (quoting Dimiero).

*Second*, the Demand has disrupted Media Matters's editorial processes. Media Matters's "editorial team and leadership now engage in 'greater internal scrutiny and risk calculation' when approaching stories that they otherwise would have published after their normal vetting process, such as stories about media coverage of [Paxton's] anti-abortion actions in Texas." JA811 (quoting Dimiero). Specifically, "since [Paxton] announced the investigation, 'Media Matters's editorial leaders have pared back reporting and publishing, particularly on any topics that could be perceived as relating to the Paxton investigation.'" JA812 (quoting Dimiero). And "Media Matters' leadership and editorial team have since assumed a more significant role in publishing decisions, which 'has significantly slowed down their editorial and publication process.'" JA812 (quoting Dimiero) (alteration accepted). Crucially, Media Matters took "these steps out of fear of retaliation, not out of legitimate concerns about fairness or accuracy." JA812.

*Third*, the Demand has forced Hananoki in particular "to curtail his investigation and coverage of X out of fear of harassment, threats, and retaliation." JA812. Although Hananoki "has generated story ideas on related topics, he has 'self-censored,' and 'not pursued them due to the fear of further legal retaliation.'" JA813 (quoting Hananoki) (internal citations omitted). The Demand also impeded

Hananoki's "relationship with his editor and others at Media Matters, because of concern that their internal communications regarding story ideas could be subject to the [Demand]." JA813. Media Matters used to publish Hananoki's work "approximately once or twice a week," but between "the [Demand's] issuance on November 22, 2023, and mid-January 2024, Media Matters had published only two of his articles." JA813. And other writers at Media Matters "have expressed concerns that their investigations could serve as the basis for retaliatory legal action and that their work product might be subject to investigative demands." JA812.

In all, the court found that Media Matters had "demonstrated the profound chilling impact that the [Demand] has had on its news operations and journalistic mission." JA811. The court further found each of these "claim[s] of chilled expression objectively reasonable." JA817.

On the law, the district court rejected all of Paxton's shotgun-style threshold arguments: that D.C. courts lacked jurisdiction over Paxton under the long-arm statute or Due Process Clause; that venue was improper; that Media Matters could not seek federal relief because it had an adequate remedy in Texas state court; and that the case was not justiciable. The district court devoted particular attention to personal jurisdiction, reviewing the history of the D.C. long-arm statute and explaining why its definition of "person" includes state officials sued for injunctive

relief. *See* JA790–98. After finding that Media Matters had satisfied all the *Winter* requirements, JA815–20, the district court granted a preliminary injunction and denied Paxton's motion to dismiss. JA820, 822–23.

Paxton noticed this appeal on April 22. JA825.

## SUMMARY OF THE ARGUMENT

I. D.C. courts have personal jurisdiction over Paxton. Paxton is a "person" under D.C. Code §13-421 because that term encompasses state officers sued for injunctive relief. That is how the term would have been understood when the statute was enacted and how the Supreme Court has interpreted another congressional enactment that uses the same term in a similar context. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989). Moreover, any other holding would deprive D.C. courts of jurisdiction over many officer suits they have long entertained.

As a "person," Paxton is subject to D.C. courts' long arm jurisdiction on three separate grounds: because he "transact[ed] … business" in the District by directing a process server's activities here, D.C. Code §13-423(a)(1); because he caused "tortious injury" in D.C. "by an act or omission in [D.C.]," *id.* §13-423(a)(3); and because he caused such injury while engaged in a "persistent course of conduct" here, *id.* §13-423(a)(4). Subjecting him to personal jurisdiction comports with due

process for the same reasons.

II. Venue is proper in D.C. because "a substantial part of the events … giving rise to the claim" occurred here: service of the Demand on Media Matters and the chilling effect that ensued. 28 U.S.C. §1391(b)(2).

III. Media Matters's ongoing chill permits federal injunctive relief. None of the doctrines or cases Paxton clumps together under the heading of *Reisman v. Caplin*, 375 U.S. 440 (1964), suggests otherwise. Under *Reisman* itself, equitable relief is proper because Media Matters has no other "adequate remedy." *Id.* at 443. The Texas remedy Paxton proffers would not allow Media Matters to bring all its claims or obtain complete relief. And none of the other doctrines Paxton conflates— ripeness, cognizable injury, and *Younger* abstention—precludes an injunction, because Media Matters's chill is a cognizable First Amendment injury ripe for relief.

IV. The district court did not abuse its discretion by granting preliminary relief. Media Matters is likely to succeed on the merits of its retaliation claim, as Paxton concedes by failing to dispute the claim's elements on appeal. Media Matters's chill is an irreparable injury, and Paxton does not argue that the district court committed clear error in its findings about the scope or severity of that chill. And the balance of equities and public interest favor protecting the First Amendment rights of journalists in D.C.

## STANDARD OF REVIEW

This Court reviews the district court's "decision to grant the Plaintiffs' request for a preliminary injunction for abuse of discretion, its legal conclusions de novo, and its findings of fact for clear error." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 726 (D.C. Cir. 2022).

## ARGUMENT

## I.    Paxton is subject to personal jurisdiction in D.C.

Paxton staked most of his argument below on personal jurisdiction, a strategy he repeats on appeal. Like the district court, this Court should reject Paxton's gambit. Statutory context and case law confirm that Paxton is a "person" under the D.C. long-arm statute; any other holding would uproot decades of precedent and leave the equity jurisdiction of the D.C. courts in tatters. Because Paxton is a "person," D.C. courts have several bases to exercise long-arm jurisdiction. First, Paxton hired an agent—a process server—and directed that agent's activities towards Media Matters in D.C. That was "transacting … business" sufficient to create personal jurisdiction under D.C. Code §13-423(a)(1). Second, Paxton directed an intentional tort at Media Matters in D.C. That creates jurisdiction under §13-423(a)(3) and (a)(4). For the same reasons, exercising jurisdiction over Paxton comports with due process. Paxton "purposefully availed" himself of this forum by directing his agent's activities here,

committing to a course of dealing here, and committing a tort here. Paxton's self-serving appeals to "federalism" do not change this calculus. To the contrary, his claim of the right to investigate any journalist in the United States asserts "a pseudo-national executive authority" that offends any proper notion of federalism. *Def. Distributed v. Grewal*, 971 F.3d 485, 493 (5th Cir. 2020).

### A. Paxton is a "person" under the D.C. long-arm statute.

The district court rightly held that, because this lawsuit seeks prospective injunctive relief, it renders Paxton a "person" amenable to the D.C. courts' long-arm jurisdiction. JA790–98; *see* D.C. Code §§13-421, -423. That conclusion follows from the long-arm statute's text and historical context, this Court's reasoning in *United States v. Ferrara*, 54 F.3d 825 (D.C. Cir. 1995), and the practical effects a contrary holding would have on an array of officer suits in D.C. courts. Paxton's arguments for reversal on this point are thin gruel. He misstates case law, ignores the district court's thorough analysis of the ruinous effect Paxton's reading would have on D.C. courts' jurisdiction, and falls back on inapplicable statutory canons and vague notions of federalism.

### 1. Section 13-421's definition of "person" limits the scope of the D.C. courts' entire civil jurisdictional scheme.

D.C.'s long-arm statute grants its courts two kinds of personal jurisdiction: general and specific. D.C. Code §§13-422, -423. Section 13-422, the general-

jurisdiction statute, confers "personal jurisdiction over a person domiciled in, organized under the laws of, or maintaining his or its principal place of business in, the District of Columbia as to any claim for relief." *Id.* §13-422. Section 13-423, the specific-jurisdiction statute, confers "personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from" various enumerated acts. *Id.* §13-423(a)(1)–(7). Both provisions share a statutory definition of "person": "an individual, his executor, administrator, or other personal representative, or a corporation, partnership, association or any other legal or commercial entity, whether or not a citizen or domiciliary of the District of Columbia and whether or not organized under the laws of the District of Columbia." *Id.* §13-421.

Paxton's threshold objection to jurisdiction is that neither provision may reach him because he is not a "person." Paxton's argument thus implicates a longstanding "open question" as to whether a D.C. court may "exercise personal jurisdiction over [a state] official sued under *Ex Parte Young*" on the theory that such a defendant is a "person." *West v. Holder*, 60 F. Supp. 3d 190, 196 (D.D.C. 2014); *see also, e.g.*, *Trump v. Comm. on Ways & Means*, 415 F. Supp. 3d 98, 106 (D.D.C. 2019).

Based on Supreme Court and Circuit precedent, the district court concluded that state officers sued under *Young* are "persons" under §13-421, and so may be subject to D.C. courts' personal jurisdiction where one of the long-arm statute's

substantive provisions is satisfied.

> **2.  State officers sued under *Ex Parte Young* are "persons" subject to D.C.'s long-arm jurisdiction.**

For several related reasons, the District Court was correct in concluding that *Young* defendants are "persons" under §13-421.

***Text and context.*** Read against its historical context, the text of §13-421 clearly reaches *Young* defendants. That text extends the jurisdiction of the D.C. courts to, among other defendants, "person[s]" and "individual[s]." Over a century ago, the Supreme Court explained in *Young* that when an a "state attorney general" seeks to take an action that would be "a violation of the Federal Constitution, the officer … comes into conflict with the superior authority of the Constitution, and he is in that case stripped of his official or representative character and is subjected *in his person* to the consequences of his individual conduct." *Ex Parte Young*, 209 U.S. 123, 159–60 (1908) (emphasis added). Suits like this one are thus understood to be "brought against [the] defendant not as a representative of the state but to restrain him *individually*." *Ex Parte La Prade*, 289 U.S. 444, 455 (1933) (emphasis added). And courts must "assume that, when Congress enacts statutes, it is aware of relevant judicial precedent." *Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010).

By 1970, when Congress enacted §13-421, Congress "would have understood that the term 'person' included official-capacity defendants in suits involving

injunctive relief." JA793. Such had been the rule, at that juncture, for over half a century. Absent a *clear* indication that Congress intended to strip D.C. courts of such jurisdiction—and Paxton has not identified any such indication—the most natural reading of the term "person" in §13-421 encompasses *Young* action defendants.

**Case law.** Case law from the Supreme Court bolsters this reading. In 1989, the Supreme Court held that *when sued for damages*, official-capacity state-officer defendants are not "persons" as that term is used in 42 U.S.C. §1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989). But the Court made clear in the very same passage that, under *Young*, "*when sued for injunctive relief*," a state official acting in an official capacity "*would be a person* under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Id.* at 71 n.10 (emphasis added) (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985), and citing *Young*, 209 U.S. at 159–60). The Supreme Court labeled this distinction based on the nature of the relief sought "commonplace" and one that "would not have been foreign to the 19th-century Congress that enacted § 1983." *Id.* (citations omitted).

*Will* applied the logic of *Young* to conclude that the term "person" in a statute enacted by Congress, §1983, reached official capacity defendants. It follows that "person" should be read the same way in §13-421, another statute enacted by

Congress. After all, *Will* makes clear that Congress has understood "person" to encompass such defendants for well over a century. As the district court put it, "[i]f the post-Civil War Congress that enacted § 1983 would have understood the term 'person' to include state officials sued for injunctive relief, the Congress that enacted the D.C. long-arm provision nearly a century later would have as well." JA794.

Case law from this Court is in accord. In 1995, this Court applied *Will* to hold the United States could not "establish jurisdiction over New Mexico" because States are not "persons" under the statute. *Ferrara*, 54 F.3d at 831–32. But the Court expressly stated it did not need to reach whether "a State official sued in his official capacity should be treated as if he were the State for jurisdictional purposes." *Id.* at 831. In fact, the bulk of the opinion was spent assessing whether Ms. Ferrara—an official-capacity defendant—satisfied §13-423(a)(1). *Id.* at 828–31. While this Court determined that she did not as a factual matter, *id.* at 830, its analysis assumed that official capacity defendants may sometimes satisfy the long-arm statute. The Court's differing treatment of New Mexico—not a "person" subject to the long-arm statute—and New Mexico's officer, Ms. Ferrara—subject to, but not satisfying, the long-arm statute—perfectly reflects the holding in *Will*. *See* 491 U.S. at 71 & n.10. Accordingly, the district court here had no difficulty reconciling *Will* with *Ferrara*—it applied the portion of *Will*'s analysis of the term "person" that this Court in

*Ferrara* assumed without adopting. JA793–95.

**Practical effects.** Any other reading of "person" would leave D.C. courts in a jurisdictional quagmire. As noted above, §13-421's definition of person underpins D.C.'s entire civil jurisdictional scheme, not just the specific jurisdiction statute. *See* D.C. Code §§13-422, -423. As the district court recognized, adopting Paxton's reading of "person" would "upend years of settled jurisdictional understanding." JA841. For instance, D.C. courts would lose jurisdiction over federal officials who maintain primary places of business in the District.[3] That cannot be right—as this Court knows well, such exercise of jurisdiction is routine. For example, this Court has confirmed that D.C. courts have *general* jurisdiction under §13-422 over the Director of the Federal Bureau of Prisons, whose "office [is] located in the District." *Cameron v. Thornburgh,* 983 F.2d 253, 257 n.4 (D.C. Cir. 1993).

The problems do not stop there. Under Paxton's reading, D.C. courts would also lose jurisdiction over the officials of certain local government agencies, such as WMATA. Yet in *Hedgepeth ex rel. Hedgepeth v. WMATA*, this Court held, consistent with *Will*, that such officials may be sued for injunctive relief even though WMATA otherwise enjoys sovereign immunity. 386 F.3d 1148, 1152 n.3 (D.C. Cir.

---

[3] The federal government, like the states, is not a "person."

2004) (Roberts, J.). As then-Judge Roberts explained, although "a state level governmental entity" such as WMATA might not qualify as a "'person' subject to liability under 42 U.S.C. § 1983," the agency's official-capacity *officers* are "person[s]" as that term is used in §1983 "when sued for injunctive relief." *Id.* (quoting *Will*, 491 U.S. at 71 (n.10)). Such suits would be rendered jurisdictionally invalid if official-capacity defendants sued for injunctive relief were "persons" under §1983 but not the long-arm statute. Similarly, D.C. courts would lose the D.C. version of the §1983 injunctive jurisdiction sanctified in *Will*—injunctive jurisdiction over federal officials acting under color of D.C. law. *See, e.g.*, *Roy v. Fulwood*, No. 09-cv-463-HHK, 2010 WL 610275, at *2 (D.D.C. Feb. 22, 2010) (exercising "long-arm personal jurisdiction" over the Chairman of the U.S. Parole Commission "with respect to his duties under the D.C. Revitalization Act"). For decades, courts deciding these classes of cases have assumed that the defendant officers were "person[s]" subject to D.C. jurisdiction. Paxton proposes to throw these cases out of D.C.'s courts. The district court properly refused to invite such "absurd results." JA795 (quoting *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998)).

In fact, the ramifications of adopting Paxton's rule would be even more absurd than the district court recognized. The court assumed that the jurisdiction-stripping

effect of Paxton's crabbed construction of "person" would be limited to suits against "non-resident" officials. JA841–42. But no D.C. statute creates any such limit. Section 13-422 is one of only "[t]wo District of Columbia statutes [that] provide for general jurisdiction." *Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883, 889 (D.C. Cir. 2021). The other, D.C. Code §13-334, is a narrow provision granting jurisdiction over "foreign corporation[s] doing business in the district." And Media Matters has located no case in which a D.C. federal court, in assessing its own jurisdiction under Rule 4(k)(1)(A), has invoked any D.C.-law basis for general jurisdiction other than sections 13-422 or -334. Thus, where it exists, D.C. courts' personal jurisdiction over even *officers who reside in the District* appears to arise only under sections 13-421 and -422—both of which require the defendant to be a "person." In his rush to avoid judicial oversight of his retaliatory campaign, Paxton is asking this Court to gut the equity jurisdiction of the D.C. courts.

### 3. Paxton's contrary arguments fail.

Paxton musters little to justify sowing such chaos, or to refute the district court's thorough analysis. Remarkably, he says *not one word* about the dire practical consequences his theory would have in other cases. *See* Br.15–20 (ignoring this issue). Paxton cannot demand that this Court transform the civil jurisdiction of the D.C. courts without even considering practical implications of his novel theory.

And what little Paxton does say about the definition of "person" falls apart on inspection. Paxton first asserts that *Young* is "a gloss on an immunity," while the D.C. long-arm statute is just "a statute." Br.19. But as shown above, §I.A.2, *Will* employed *Young*'s "gloss" to interpret another statute—42 U.S.C. §1983—that uses the same term: "person." Tellingly, although Paxton's brief cites *Will* on the very same page, Br.19, he omits any mention of *Will*'s application of *Young* to conclude a "a state official in his or her official capacity, when sued for injunctive relief, *would be a person under § 1983*," *Will*, 491 U.S. at 71 n.10 (emphasis added). Instead, he selectively quotes *Will*'s analysis of *damages* suits as if the passage in question concerned *injunctive* suits. Br.16 (quoting *Will*, 491 U.S. at 71). This calculated excerpting of *Will* ignores its discussion distinguishing the two kinds of suits *in the very same passage*. *See Will*, 491 U.S. at 71 n.10. Paxton cannot plausibly claim to have overlooked that discussion—it was the crux of the district court's analysis. *See* JA793–94 (quoting *Will*, 491 U.S. at 71 n.10).

Paxton next claims that courts "have held for decades" that the D.C. long-arm statute "does not reach the conduct of … state officials"—but cites three cases that did not decide whether state officials are "persons" under §13-421. Br.19; *see Ferrara*, 54 F.3d at 831–32 (holding that New Mexico was not a "person"); *Trump*, 415 F. Supp. 3d at 106 (noting an "open question" about whether *Young* defendants

are "persons" under the long-arm statute); *Pollack v. Meese*, 737 F. Supp. 663, 666 (D.D.C. 1990) (not discussing the "person" requirement at all). Why Paxton thinks these cases help his argument is a mystery.

Paxton also invokes two "canons of textual interpretation," Br.17, which the district court rightly found to be "of no help here." JA796–97. The first, *expressio unius*, is irrelevant. That canon does not clarify the meaning of included terms—here, "person" and "individual"—it just excludes unincluded terms. The district court held that the terms "person" and "individual" encompassed *Young* defendants, rendering the canon inapplicable. The second, *noscitur a sociis*, directs courts to determine the meaning of an *ambiguous* term from surrounding terms, but the district court rightly concluded that the statute's use of "person" was not ambiguous. If anything, *noscitur a sociis* supports the district court's construction of the statute. Section 13-421's recitation of those it reaches is a comprehensive list of possible civil defendants: it includes *any* "*individual*, his executor, administrator, or other personal representative, or a corporation, partnership, association, or *any other legal or commercial entity*." D.C. Code §13-421 (emphasis added).

Grasping at straws, Paxton closes his analysis of the term "person" with vague concerns about federalism. Br.19–20. Such arguments shed no light on statutory meaning. And *Paxton* is the only actor whose conduct in this case threatens the

"'usual constitutional balance' among sovereigns." Br.19. *Paxton* asserts a boundless form of nationwide jurisdiction, seeking to misuse a Texas consumer-protection statute to punish a news organization in D.C. for D.C.-based reporting. As the district court explained, given Paxton's territorial overreach, exercising jurisdiction over him in this case is "reasonable 'in the context of our federal system of government.'" JA801 (quoting *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 293(1980)). [4]

### B. Paxton's conduct satisfies three different prongs of the D.C. long-arm statute.

#### 1. Paxton transacted business in D.C., satisfying subsection (a)(1).

D.C. Code §13-423(a)(1) creates jurisdiction over claims "arising from" a person's "transacting any business" in D.C. either "directly or by an agent." This prong provides "jurisdiction to the full extent allowed by the Due Process Clause."

---

[4] If the Court is inclined to agree with Paxton's construction of the long-arm statute, it should certify a question to the D.C. Court of Appeals. *See* D.C. Code §11-723(a). This Court certifies questions "when 'District of Columbia law is genuinely uncertain' and the question is of 'extreme public importance.'" *Companhia Brasileira Carbureto de Calicio v. Applied Indus. Materials Corp*., 640 F.3d 369, 373 (D.C. Cir. 2011) (Kavanaugh, J.) (citation omitted) (certifying a question about long-arm jurisdiction). This is such a case, as Paxton's construction would significantly alter the jurisdiction of D.C. courts and raise doubts about longstanding precedent. *See supra* §I.A.2.

*Urquhart-Bradley v. Mobley*, 964 F.3d 36, 44 (D.C. Cir. 2020) (citation omitted). Thus, the Court may proceed directly to the due-process analysis if it determines that Media Matters's claims arise out of Paxton's transacting of business here.

The D.C. Court of Appeals has instructed that the "words 'transacting any business' should be given an expansive interpretation." *Mouzavires v. Baxter*, 434 A.2d 988, 992 (D.C. 1981). The provision embraces *any* "contractual activities of a nonresident defendant which cause a consequence" in D.C. *Id.* Even "'a single act may be sufficient to constitute transacting business' so long as that contact is 'voluntary and deliberate, rather than fortuitous.'" *Jackson v. Loews Washington Cinemas, Inc.*, 944 A.2d 1088, 1093 (D.C. 2008) (quoting *Mouzavires*, 434 A.2d at 992, 995).

Paxton concedes that he hired an agent—a process server—and dispatched that agent into D.C. to serve his retaliatory Demand, the subject of this lawsuit, on Media Matters at its D.C. headquarters. That agent presented herself at Media Matters's D.C. office, called the organization's president, and attempted to serve him personally. JA498–99. Paxton's agent then conferred several times with Media Matters's D.C.-based outside counsel, agreeing eventually to serve the Demand at counsel's D.C. offices. *Id.* The district court held that was "transacting … business" under (a)(1), JA802–05, and that such conduct gave rise to Media Matters's claims,

*see, e.g.*, JA08–10, JA26, JA35–39; *accord Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 335 (D.C. 2000). That conclusion was well founded: Paxton's hiring and dispatch of an agent to D.C. was a "contractual activit[y] … which cause[d] a consequence" here, *Mouzavires*, 434 A.2d at 992, namely the chilling of Media Matters's protected speech.

Paxton offers little to suggest his conduct does not bring him within (a)(1)'s ambit. First, he asserts that "transacting business" requires an activity "like selling someone something." Br.27. Yet he concedes the opposite just a paragraph later, correctly acknowledging that "this Court has established that 'transacting business' can encompass non-commercial conduct." Br.27; *see also* JA803–04 (collecting authority). In any case, contracting with a process server by exchanging money for services is commercial conduct.

Paxton next asserts that "mail and wire communications" do not count as transacting business under (a)(1). Br.27. Maybe so, but that is not this case—Paxton dispatched his agent directly into D.C. and that process server's "in-forum acts are imputed to [Paxton] as his 'agent.'" JA806 (quoting D.C. Code §13-423(a)). The cases Paxton cites do not say otherwise.

Finally, Paxton faults the district court for relying on several abuse-of-process cases. Br.28–29. But the district court did not rely on these cases to construe the

phrase "transacting any business" in the D.C. statute. Rather, the district court found the abuse-of-process cases persuasive authority as to two points: "[1] that the hiring of a process server creates an agency relationship between the attorney and process server, and [2] that relationship establishes the attorney's presence in the jurisdiction *to satisfy the 'minimum contacts' requirement*" under the Due Process Clause. JA800 (emphasis added) (discussing authority). Paxton's observation that some of these cases involved long-arm language that does not resemble (a)(1) misses the point.

Because Paxton plainly "transacted … business" in D.C. that gave rise to Media Matters's claims, the Court may turn to the due process analysis without considering other long-arm provisions. *Infra* §I.C.

### 2. Paxton caused tortious injury in D.C, satisfying subsections (a)(3) and (a)(4).

Paxton's retaliatory conduct also "caus[ed] tortious injury" in D.C., satisfying two further prongs of the long-arm statute. As the district court determined, Paxton's conduct satisfies (a)(3) because he caused "tortious injury in the District of Columbia by an act or omission in the District of Columbia[.]" D.C. Code §13-423(a)(3); *see* JA852–55. And although the district court had no cause to reach it, Paxton's conduct also satisfies (a)(4), which extends jurisdiction to a defendant who causes tortious injury in D.C. "by an act or omission *outside*" D.C. provided he "engages in *any* …

persistent course of conduct" here. D.C. Code §13-423(a)(4) (emphasis added).

***Section 13-423(a)(3).*** Application of this provision to Paxton is "straightforward." JA805. Paxton's agent committed an act here: serving the Demand. That act caused a tortious injury here: the chilling of Media Matters's First Amendment activities. Both cause and effect are imputed to Paxton, the principal who directed the agent's acts. JA806 (citing D.C. Code §13-423(a)). And the district court properly relied on other cases where defendants used process to inflict injury, as those cases consistently find long-arm jurisdiction on equivalent facts because the agent's inforum "act" is imputed to the principal. JA807 (collecting cases).

Paxton argues that he committed no act within D.C. because he "printed the [Demand] outside D.C. and *mailed* it to Media Matters *via a process server*." Br.23 (emphasis added). That argument ignores a distinction from first-year civil procedure: Authorizing personal service of process is not the same thing as mailing something. *See, e.g.*, Fed. R. Civ. P. 4(e)(2)(a), (i)(1)(B). A person authorizing service is "physically present in [the] jurisdiction" through an agent. *Schleit v. Warren*, 693 F. Supp. 416, 421 (E.D. Va. 1988); *see also, e.g.*, *Hamilton, Miller, Hudson & Fayne Travel Corp. v. Hori*, 520 F. Supp. 67, 70 (E.D. Mich. 1981); *Balsly v. W. Mich. Debt Collections, Inc.*, No. 3:11DV642, 2012 WL 628490, at *6 (E.D. Va. Feb. 27, 2012). Paxton's attempt to equate his conduct with the

circumstances in *Moncrief v. Lexington Herald Leader Co.*, 807 F.2d 217, 218 (D.C. Cir. 1986), where an allegedly defamatory article was "delivered by mail" to D.C., Br.23, ignores this same distinction.

Paxton's remaining arguments on this point are nonsensical. He suggests that he "was not using service to establish personal jurisdiction over Media Matters but to obtain information about … whether Texas could exercise jurisdiction." Br.23. But he does not say why that matters under (a)(3). Similarly, he suggests both that "[u]nder D.C. law, delivery by a mail carrier is adequate for service," Br.23, and— a paragraph later—that "if there were a question of deficient service of process with respect to the [Demand], Texas law would clearly apply," Br.24. Even ignoring the obvious tension, neither assertion bears on the (a)(3) analysis. Whether Paxton needed to effectuate personal service of the Demand or not, he chose to do so. What Paxton actually did—regardless of what he *might* have done—is what controls personal jurisdiction.

Finally, Paxton contends that Media Matters may not rely upon its "injury" as the tortious "act" that creates jurisdiction. Br.25 (quoting *Forras v. Rauf*, 812 F.3d 1102, 1107 (D.C. Cir. 2016)). It has not. The act is service; the injury is the documented chill. JA858–60, 865–66; *see supra* §1.B.1. As the district court explained, Paxton committed "an identifiable act (physically serving the [Demand]

on Media Matters) that is separate from the claimed injury (chilling of First Amendment rights)." JA808. Subsection (a)(3) thus confers jurisdiction.

*Section 13-423(a)(4).* Even assuming Paxton's tortious acts occurred exclusively in Texas, D.C. courts have long-arm jurisdiction over him because Paxton is "causing tortious injury" in the District while also engaged in a separate "persistent course of conduct" here. D.C. Code §13-423(a)(4). The district court did not reach (a)(4) given the other strong bases for long-arm jurisdiction; nonetheless, this Court may affirm on "any basis adequately preserved in the record below." *U.S. ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 123 (D.C. Cir. 2015). Here, Media Matters developed a sufficient record to establish jurisdiction under (a)(4). JA474–75. Paxton's brief—which leads with this prong, even though the district court did not reach it—misstates that record and the law.

Under (a)(4), the "persistent course of conduct" requirement "is satisfied by connections considerably less substantial than those it takes to establish general, all-purpose 'doing business'- or 'presence'-based jurisdiction." *Crane v. Carr*, 814 F.2d 758, 763 (D.C. Cir. 1987) (R.B. Ginsburg, J.). "The 'something more' or 'plus factor' does not itself supply the basis for the assertion of jurisdiction," but rather serves to "filter out cases in which the inforum impact is an isolated event." *Id.* Accordingly, courts consider "the totality of defendants' contacts," aggregating even

contacts that do not relate to one another or to the subject matter of plaintiffs' claims. *Lewy v. S. Poverty Law Ctr., Inc.*, 723 F. Supp. 2d 116, 126 (D.D.C. 2010) (collecting cases). The contacts must be "continuing in character" to permit jurisdiction, but "need not be great." *Hindu Am. Found v. Viswanath*, 646 F. Supp. 3d 78, 94 (D.D.C. 2022) (cleaned up).

Extensive record evidence showed Paxton engages in a persistent course of conduct in D.C. through "(i) regular speaking engagements and attending rallies in the District (both by Paxton himself and agents in his office), (ii) voluntary and frequent participation in litigation in D.C. courts, and (iii) numerous campaign-related activities, such as fundraising and disbursing campaign funds." JA474–75. On the first point, Media Matters identified at least nine events in recent years in which Paxton or his deputies voluntarily availed themselves of D.C. for speaking engagements—including two separate engagements concerning content moderation on social media, the topic of Media Matters's reporting that led to this case. JA475. On the second point, Paxton often avails himself of the privilege of participating in litigation in D.C.'s courts as an amicus or intervenor; he has "even staked out views about the District of Columbia's own policy choices, including whether it could pursue actions under D.C. law in D.C. courts." JA476 (citing Paxton's amicus participation in *District of Columbia v. Exxon Mobil Corp.*, 89 F.4th 144, 157 (D.C.

Cir. 2023)). Paxton cannot complain about being subjected to the D.C. courts' jurisdiction when he routinely visits the District as suits his agenda.

Paxton refutes none of this. *See* Br.21 (ignoring the detailed analysis of Paxton's D.C. contacts in the record below, JA474–78). Instead, he argues only that the persistent course of conduct must be "relevant to this case" for (a)(4) to apply. Br.21. That is simply not true: the plus factor "does not itself supply the basis for the assertion of jurisdiction." *Crane*, 814 F.2d at 763; *see also* Br.21 (quoting only the second half of this sentence). Moreover, courts regularly hold that conduct akin to Paxton's satisfies the "plus factor" requirement. *See Lewy*, 723 F. Supp. 2d at 128.

While the Court need not reach (a)(4) to affirm, Paxton's failure to engage with the record or governing law supplies a ready basis to do so. *Heath*, 791 F.3d at 123.

### C. Paxton may be haled into D.C. court without violating due process.

Because Paxton's conduct brings him within three discrete prongs of the long-arm statute, personal jurisdiction exists so long as "the exercise of personal jurisdiction comports with the Due Process Clause." *Urquhart-Bradley*, 964 F.3d at 44. The district court correctly found that both Paxton's transaction of business here, JA799–802, and his tortious conduct here, JA805–08, provided the necessary "minimum contacts" between Paxton and the forum such that he "should reasonably

[have] anticipate[d] being haled into court" here, JA846 (quoting *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1189 (D.C. Cir. 2013)). These contacts confirm that Paxton "purposefully avail[ed] [him]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Id.* (quoting *Thompson Hine*, 734 F.3d at 1187).

### 1. Paxton's transacting of business in D.C. was purposeful availment.

The district court properly held that Paxton's transacting of business in D.C. through his agent constituted purposeful availment of this forum for two independently sufficient reasons. JA846–49. First, courts consistently hold that service of process in a forum subjects the person authorizing the service to claims arising therefrom. *See, e.g.*, *Balsly*, 2012 WL 628490, at *5–7; *Schleit*, 693 F. Supp. at 419–20; *Hori*, 520 F. Supp. at 70. *Balsly* held that minimum contacts existed where defendants "hired a process server and instructed him to serve" an abusive lawsuit at the plaintiff's Virginia place of employment. 2012 WL 628490, at *6. *Schleit* similarly concluded that "a lawyer who knowingly serves abusive process in a jurisdiction may expect to be haled into court where service was effectuated, since by such action he is 'purposely availing himself of the privilege of conducting activities within the forum State.'" 693 F. Supp. at 422–23 (quoting *Luke v. Dalow Indus., Inc.*, 566 F. Supp. 1470, 1472 (E.D. Va. 1983)).

This rule makes good sense. One should "reasonably anticipate being haled into court," *World-Wide Volkswagen*, 444 U.S. at 297, where one's agent establishes a physical presence. After all, "physical entry into the State—either by the defendant in person or *through an agent* … is certainly a relevant contact," *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (emphasis added). And process servers operating in D.C. enjoy "the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). For instance, a host of civil and criminal laws shield process servers working in D.C. from threats, assault, or other acts of retaliation by the subjects of their service attempts. *See, e.g.*, D.C. Code §22-407.

Paxton, for his part, cites no case holding that directing an agent to serve process in a forum does *not* establish constitutionally adequate minimum contacts. Br.27–29. And, as explained, Paxton mistakenly understands the district court to have relied on service-of-process cases to discern the scope of the D.C. long-arm statute. Br.28–29. He therefore fails to distinguish the *minimum-contacts analysis* in those cases—the analysis the court actually adopted.

Second, Paxton's service of the Demand "established a future course of dealing with a D.C. resident." JA800 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985)). As the district court pointed out, JA800–01, Texas law entitles Media Matters to produce records subject to the Demand "for inspection and

copying during normal business hours at the[ir] principal office or place of business." Tex. Bus. & Com. Code §17.61(e). Such production (and ensuing inspection) would have occurred at Media Matters's D.C. headquarters. Paxton's brief ignores this inconvenient fact, although it was clearly a "contemplated future consequence[]" of his choice to serve the Demand here. *Burger King*, 471 U.S. at 479. Because his service of the Demand committed him to "a potentially long course of dealing in the District," Paxton should have "foreseen that he would be called into court here." JA801.

Although Paxton asserts that exercising jurisdiction here raises "constitutional concerns," Br.29, he fails to explain those concerns in detail. Instead, he cites yet more cases concerning "use of the mails." Br.31 (quoting *Rambo v. Am S. Ins. Co.*, 839 F.2d 1415, 1418 (10th Cir. 1988)). As discussed above, at 35–36, such cases are inapposite.

### 2. Paxton's directing of a tort at D.C. was purposeful availment.

Paxton's tortious conduct directed at D.C. provides an independent basis to hold that he may be subjected to personal jurisdiction here consistent with due process. *See* JA806. In intentional-tort cases, "minimum contacts exist where a defendant takes 'intentional and allegedly tortious actions' 'expressly aimed' at a jurisdiction." *Urquhart-Bradley*, 964 F.3d at 48 (quoting *Calder v. Jones*, 465 U.S.

783, 789 (1984)); *see also Calder*, 465 U.S. at 788–89.

Under this standard, Paxton's own home Circuit has held that Texas could exercise personal jurisdiction over New Jersey's attorney general for claims arising from a demand letter he sent into Texas. *Grewal*, 971 F.3d at 496–97. By doing so, he "projected himself across state lines and asserted a pseudo-national executive authority" to inflict harmful "intended effects on the plaintiffs" in Texas. *Id.* at 493. The Fifth Circuit reasoned that the New Jersey attorney general had purposefully availed himself of Texas because he "intentionally mailed the cease-and-desist letter into Texas," and because "that contact alone gave rise to distinct tort causes of action." *Id.* at 495. The Fifth Circuit held those facts, on their own, constituted minimum contacts. *Id.* So too here—Paxton intentionally served a retaliatory Demand on Media Matters in D.C., and that contact gave rise to Media Matters's tort claims. Indeed, the basis for jurisdiction here is even stronger; unlike in *Grewal*, Paxton directed an agent into D.C., not just a letter.

Paxton offers no response whatsoever to this basis for personal jurisdiction, although the district court discussed it at length. JA806. Elsewhere, Paxton purports to distinguish *Grewal* on the grounds that the New Jersey attorney general was seeking to prevent the Texas entity from publishing its materials anywhere, while he is "just inquiring into *whether* Media Matters has made false, deceptive, or

misleading statements that were aimed at Texas." Br.20. The district court found otherwise: Paxton's Demand is chilling Media Matters from publishing about Musk and X, and Paxton intended for the Demand to cause that effect. JA815–19. Paxton identifies no basis to conclude those findings were clear error. *See Huisha-Huisha*, 27 F.4th at 726. Nor does he explain how this assertion—which concerns the merits and appears at the end of his discussion of the statutory term "person"—could possibly distinguish *Grewal*'s due-process analysis. It cannot.

## II.    D.C. federal court is a proper venue.

D.C. is a proper venue for this case because "a 'substantial part of the events … giving rise to the claim' occurred here: physical service of the [Demand] on Media Matters and the chilling effect that ensued." JA815 (quoting 28 U.S.C. §1391(b)(2)). Paxton himself cited such ties to argue that D.C. was the appropriate venue in the Maryland proceeding. *Supra* Statement, §II.A.

Paxton relies on *Leroy v. Great Western United Corp.*, 443 U.S. 173, 185–86 (1979), yet admits, Br.32, that *Leroy* was decided before Congress revised the venue statute to make clear "that venue can be appropriate in more than one district," *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356 (2d Cir. 2005). "*Leroy* is of limited, if any, significance now." 14D Wright & Miller, *Fed. Prac. & Proc.* §3802 (4th ed.). Paxton's only contrary authority is a one-paragraph unpublished order from the

Ninth Circuit. *See* Br.33 (citing *Dedication & Everlasting Love to Animals v. Pa. Bureau of Charitable Orgs.*, 101 F. App'x 224 (9th Cir. 2004) (mem.)).[5]

## III. Media Matters's ongoing chill is a justiciable injury ripe for relief.

Granting Media Matters relief in this case requires nothing more than the application of settled principles. The ongoing, irreparable chill of Media Matters's First Amendment activities is a justiciable injury ripe for relief. And a federal injunction is an appropriate remedy to that injury. Paxton's contrary argument based on *Reisman v. Caplin*, 375 U.S. 440 (1964), invents "a general rule" that challenges to "non-self-executing-request[s] for documents" are not "justiciable in a pre-enforcement posture." Br.34. That so-called rule appears nowhere in *Reisman* itself. And Paxton himself is careful not to be too specific about the precise doctrinal principle he thinks *Reisman* stands for, conflating distinct concepts of justiciability, ripeness, alternative remedies, and *Younger* abstention under the banner of a convoluted "*Reisman* doctrine" that does not exist. The district court was not fooled, and neither should this Court be. *Reisman* itself is about equity, not justiciability, and is satisfied here. And Media Matters's concrete and well-documented injury

---

[5] *SEC v. Johnson*, 650 F.3d 710 (D.C. Cir. 2011), is irrelevant. That case relied on *Leroy*'s discussion of venue under "the special venue section of the Securities Exchange Act," 15 U.S.C. §78aa, and nowhere suggests *Leroy* controls the current version of 28 U.S.C. §1391(b)(2). *Johnson*, 650 F.3d at 714–15.

distinguishes the other cases Paxton clumps together under the *Reisman* heading.

## A. Paxton misreads *Reisman*.

The key premise of Paxton's strained *Reisman* theory is that the case established a categorical rule against the justiciability of pre-enforcement subpoena challenges. *Reisman* did nothing of the sort. In *Reisman*, the IRS issued summonses to an accounting firm directing it to testify and produce certain documents related to a couple's taxes. 375 U.S. at 441–42. Attorneys for the couple sought to enjoin the accountants from complying with the summons. *Id.* To enforce the summons, the IRS had to bring an action under §7402 of the Internal Revenue Code, *id.* at 445–46, which authorizes enforcement by the district court in which the person subject to the summons "resides or may be found," 26 U.S.C. §7402(b). At the time petitioners sued, no such enforcement action had been brought. *Reisman*, 375 U.S. at 444. The Court ruled that because the petitioners had "an adequate remedy at law"—making all the same arguments in a federal district court in their home jurisdiction—their action was "subject to dismissal for want of equity." *Id.* at 443.

Paxton presents *Reisman* as a case about "justiciability." Br.43. As the foregoing summary makes clear, it is not. The Supreme Court in *Reisman* never used that term, nor did it discuss ripeness, mootness, or the political question doctrine. The only justiciability doctrine mentioned in *Reisman* at any point is "standing"—

just once, when the Court recited issues it did not need to reach. 375 U.S. at 442–43.

Instead, *Reisman* is a case about *equity*. Adequate alternative remedy is an equitable doctrine, and the Court's mandate to dismiss was "for want of equity," not for want of subject-matter jurisdiction. *Id.* Paxton's failure to acknowledge this fatal flaw in his theory of *Reisman* is inexplicable because the district court pointed out the same flaw below: "*Reisman* concerns the adequacy of an alternative remedy and has nothing to do with justiciability." JA808; *see also Donaldson v. United States*, 400 U.S. 517, 525 (1971) (confirming that *Reisman* was about "adequate remed[ies] at law," not justiciability doctrines); *cf. Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1178 (9th Cir. 2022) (explaining that *Reisman* did not concern ripeness).

### B. Media Matters does not have an adequate alternative remedy.

Media Matters does not have an adequate alternative to this case, so *Reisman*—properly understood—does not bar relief. If anything, it does the opposite. *Reisman* suggests that the equitable forum for contesting an investigative subpoena prior to its enforcement is a proceeding in "the district court" where the person under investigation "resides or is found." 26 U.S.C. §7402(b); *see Reisman*, 375 U.S. at 445–46. *That remedy is this case.*

By contrast, Paxton's proposed alternative remedy—resisting the Demand in a Texas state-court proceeding—would be inadequate in at least four respects. First,

unlike in *Reisman*, where there "had not yet been an injury," JA810, Media Matters is already suffering an ongoing injury to its First Amendment rights, JA810–13; *see also infra* §IV.B. It therefore cannot wait for Paxton to enforce; if it does, the intolerable, ongoing chill of its First Amendment rights will persist unremedied until Paxton elects to enforce in Texas court. A remedy that requires a media organization to sit under the sword of Damocles is not "adequate."

Second, to take matters into its own hands by filing an affirmative set-aside action in Texas, Media Matters would need to consent to personal jurisdiction in Texas. Yet one of Media Matters's claims is that it is not subject to Texas's jurisdiction. A remedy that requires a party to forfeit a meritorious claim is not "adequate."

Third, Paxton is not the only defendant in this action. Missouri Attorney General Bailey, who says he is coordinating with Paxton, is facing all the same claims. And Media Matters could not litigate against Bailey in Texas (nor against Paxton in Missouri). Only by suing at home in D.C. is Media Matters able to get *complete* relief, in a single forum, from Paxton and Bailey's coordinated campaign of retaliation. A remedy that requires a party to sue in two separate foreign jurisdictions is not "adequate." *Cf. Reed Enters. v. Corcoran*, 354 F.2d 519, 520 (D.C. Cir. 1965).

Fourth, Paxton himself represents that the relief available in Texas would be very limited. He purports to enjoy "broad discretion" unbounded even "by the Texas Rules of Civil Procedure" to demand documents in any Texas proceeding. JA210. And he claims that under Texas law a demand recipient must establish "zero permissible justifications for the investigation" to evade compliance. JA210. Taking Paxton at his word, a Texas remedy would be no remedy at all.

More broadly, Paxton has never identified any case—not below and not, for all his dissembling about *Reisman*'s "progeny," in this Court—holding that "an exclusive remedy in *foreign state court* is an adequate remedy at law." JA810 (emphasis added). Like *Reisman*, both *Anheuser-Busch, Inc. v. FTC*, 359 F.2d 487, 490 (8th Cir. 1966), and *Atlantic Richfield Co. v. FTC*, 546 F.2d 646, 648–49 (5th Cir. 1977), concerned pre-injury challenges in cases where an alternative remedy was available in a federal court with jurisdiction over the subject of the investigation. And *United States v. Kulukundis*, 329 F.2d 197, 198–99 (2d Cir. 1964), involved the same tax-enforcement provisions as *Reisman* itself. None of these cases suggests that subjecting oneself to a foreign state court is an adequate remedy. As for Paxton's remaining citations, those cases turn out to be about distinct doctrines, as explained in the following section.

**C.     This case is justiciable.**

Media Matters has made a ripe claim for relief from a cognizable First Amendment injury. Under Article III, a "claim is premature and therefore unripe for judicial review if it depends on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Saline Parents v. Garland*, 88 F.4th 298, 306 (D.C. Cir. 2023) (quoting *Trump v. New York*, 592 U.S. 125, 131 (2020)). To assess ripeness, this Court evaluates "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)). In the First Amendment context, "a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression," is cognizable in federal court. *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021) (cleaned up). Such a "First Amendment claim may be ripe for review even before the government has taken enforcement action" if the plaintiff alleges an objectively reasonable chill. *Kramer v. Grossman*, No. 13-cv-1745-ELH, 2014 WL 937146, at *8–9 (D. Md. Mar. 10, 2014).

The district court rightly found that Media Matters had already suffered substantial hardship in the absence of a judicial adjudication of its retaliation claim. JA811–13, 818–20. In particular, the court found that Media Matters had suffered

and would continue to suffer from a "profound chilling impact" sufficient to constitute irreparable harm. JA811. This Court reviews that finding for clear error, *Huisha-Huisha*, 27 F.4th at 726, and Paxton offers no basis to disturb it, *see infra* §IV.B. The same facts that show Media Matters's substantial hardship also establish the "fitness of the issues for judicial decision." *Saline Parents*, 88 F.4th at 306. The relevant facts—Paxton's retaliatory motive in issuing the Demand and Media Matters's injuries—are alleged concretely in the complaint and established by the record, not "contingent" allegations about the future. *Id.* They are therefore fit for decision, and Media Matters's First Amendment claim is ripe for relief.

This analysis distinguishes many of the cases Paxton mistakenly treats as "*Reisman*" cases. *See Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334 (10th Cir. 1984) (deciding "whether the dispute is sufficiently developed or 'ripe' to create subject matter jurisdiction"); *Google, Inc. v. Hood*, 822 F.3d 212, 226 (5th Cir. 2016) (deciding whether a "non-self-executing subpoena" is "ripe for review"); *CBA Pharma, Inc. v. Perry*, No. 22-5358, 2023 WL 129240, at *3 (6th Cir. Jan. 9, 2023) (deciding "whether a pre-enforcement challenge is ripe"); *Saline Parents*, 88 F.4th at 307. Although several of these cases reject pre-enforcement challenges to investigative subpoenas, none is remotely similar to this case on the facts. In particular, none involved an already-realized First Amendment injury. The

decisive fact here is that "Plaintiffs' constitutional injury—the chilling effect on their First Amendment rights—has occurred and is ongoing." JA810.

Although Paxton relied heavily on it below, he backs away from *Twitter, Inc. v. Paxton*, 56 F.4th 1170, on appeal—no doubt because it bolsters Media Matters's ripeness argument. *Twitter*, like this case, concerned a challenge to a civil investigative demand issued by Paxton's office. The Ninth Circuit found that Twitter's allegations did "not *quite* show chilled speech" because they were "vague and refer[red] only to a general possibility of retaliation." *Id.* at 1175 (emphasis added). At most, the allegations suggested "financial costs and divert[ed] employee time," which are not injuries to speech or expression. *Id.* at 1179. The Ninth Circuit therefore affirmed dismissal. *Id.* at 1176; *see also* JA813. Here, the facts are very different—Media Matters's complaint alleged chill in concrete detail with specific illustrations, its preliminary injunction evidence confirmed those allegations, and the injury in question is to its speech. *Twitter* is therefore distinct with respect to cognizable injury. And in all other respects, the Ninth Circuit's analysis in *Twitter* supports granting relief here. In particular, the Ninth Circuit made quick work of the *Reisman* argument Paxton has recycled here. The court explained that *Reisman* is irrelevant where the alleged "constitutional injury has already occurred" because "there is no way for [the plaintiff] to avoid that alleged injury by challenging the

document request later." *Id.* at 1178–79. And it agreed with the district court's conclusion that "injury in the form of [an] objectively reasonable chilling of [] speech" is actionable even "prior to [a] CID's enforcement." *Id.* at 1178 n.3.

Paxton's remaining authorities all concern non-particularized facial challenges to broad government policies. For instance, *Laird v. Tatum*, 408 U.S. 1 (1972), dismissed a class action attempting to challenge "the Department of the Army's alleged 'surveillance of lawful and peaceful civilian political activity.'" *Id.* at 2. But the plaintiffs pointed to "no specific action of the Army against them" and offered only "speculative apprehensiveness that the Army may at some future date" surveil them. *Id.* at 9, 14. Unlike in *Laird*, Media Matters's chill does not "arise merely from [its] knowledge that a governmental agency was engaged in certain activities." *Id.* at 11. It arises, instead, because Media Matters is "presently [] subject" to the state-sponsored retaliation it is "challenging." *Id.* Similarly, *United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984), concerned a challenge to an executive order that issued "no commands or prohibitions to [the] plaintiffs." Paxton's Demand issues a host of such commands, and the resulting chill is particular to Media Matters. Accordingly, granting relief here will not open the floodgates for every "person in the United States" to challenge any "investigative technique" on First Amendment grounds. *Contra Reporters Comm. for Freedom of*

*Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030, 1070 (D.C. Cir. 1978) (op. of Wilkey, J.) (declining to issue "extraordinary prospective relief" based on claims of "mere possibility of future abridgment of rights"). Paxton's extraordinary conduct, including his gross territorial overreach and candid motives, limits the effect of any holding here to similarly exceptional circumstances.[6]

## IV.   The District Court properly exercised its discretion in granting a preliminary injunction.

The District Court properly analyzed the *Winter* factors and concluded that a preliminary injunction was necessary to preserve the status quo. That decision was not an abuse of discretion. Paxton only passingly contends otherwise. Br.45–49.

### A.   Media Matters is likely to prevail on the merits of its First Amendment claim.

Media Matters is likely to prevail on the merits of its First Amendment retaliation claim. Paxton's argument that "retaliatory investigation" is not a valid claim is both wrong and forfeited. And Media Matters has already made a strong showing on the merits even at this early stage in the litigation—so strong, in fact, that Paxton does not bother to contest two of the three retaliation elements.

---

[6] *Younger* abstention is inapplicable here because, as Paxton admits, there is no ongoing state enforcement proceeding. Br.45.

### 1. Media Matters has pleaded a valid First Amendment claim.

Issuance and service of a civil investigative demand to retaliate against speech violates the First Amendment. This Court should reject Paxton's claim that such conduct is not actionable. *See* Br.45–46. For starters, Paxton did not preserve the argument. Paxton's likelihood-of-success briefing below—which took up a single page—did not question whether retaliatory investigation is actionable, nor did it cite any cases suggesting otherwise. JA404–05. The district court did not abuse its discretion by failing to consider an argument Paxton never made. *See Murthy v. Vilsack*, 609 F.3d 460, 465 (D.C. Cir. 2010).

Paxton is wrong regardless. To make out a retaliation claim, Media Matters must show (i) that it engaged in "conduct protected under the First Amendment;" (ii) that Paxon took "some retaliatory action" grave enough to "deter a person of ordinary firmness" from speaking again; and (iii) "a causal link between the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Paxton does not rely on any case holding that issuance and service of an invasive and baseless civil investigative demand may not be the "retaliatory action" that satisfies the second element of this test. Nor would such a rule make sense. The precise mechanism by which an official inflicts a retaliatory injury may bear on causation, but nothing in the First Amendment or Supreme Court precedent

justifies categorically exempting investigations from constitutional scrutiny.

Paxton's assertion that "several courts of appeals have foreclosed such a claim" is breathtaking in its inaccuracy. *See* Br.46. All four cases he cites concern qualified immunity—they hold only that, in various fact-bound contexts, the right to be free from the specific sort of retaliatory investigation at issue was not clearly established. *See Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017); *Rehberg v. Paulk*, 611 F.3d 828, 850–51 (11th Cir. 2010); *Thompsen v. Hall*, 426 Fed. App'x 855, 858–59 (11th Cir. 2011) (per curiam); *Sivella v. Township of Lyndhurst*, No. 20-2342, 2021 WL 3356934, at *2 (3d Cir. Aug. 3, 2021). Qualified immunity is irrelevant here, as this is an appeal from a grant of injunctive relief in a case with no damages claims. And two of Paxton's four cases are not even precedential, so they could not have "foreclosed" anything at all. Most importantly, as Paxton admits, the Supreme Court's decision in *Hartman v. Moore*, 547 U.S. 250, 262 n.9 (2006), expressly holds open the possibility that retaliatory investigation may be actionable in certain circumstances.

### 2. Media Matters has made a strong showing on the merits.

The strength of Media Matters's likelihood of success follows directly from the district court's detailed factual findings. To reiterate, the elements of a retaliation claim are (i) conduct protected under the First Amendment; (ii) a retaliatory action

that would deter a person of ordinary firmness from speaking again; and (iii) causation. *Aref*, 833 F.3d at 258. The preliminary injunction record shows that Media Matters is likely to establish each element.

***Protected First Amendment conduct.*** Media Matters is a non-profit media watchdog that publishes original analysis and investigative reporting. Those are core First Amendment–protected activities. "The protection given speech and press" by the First Amendment "assure[s] [an] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957). This protection serves society at large as well as the media: "A broadly defined freedom of the press assures the maintenance of our political system and an open society." *Time, Inc. v. Hill,* 385 U.S. 374, 389 (1967). Here, the journalism that precipitated Paxton's retaliatory campaign informed the public about a powerful public figure—Musk—and issues of grave importance, such as extremism on social media. This plainly satisfies *Aref*'s first element.

Paxton halfheartedly suggests that Media Matters's speech was not protected because it was "mislead[ing]." Br.46–47. But Paxton did not put anything in the record to support that assertion, so he cannot rely on it on appeal to refute Media Matters's likelihood of success.

***Deterrence.*** The mere "threat of invoking legal sanctions and other means of

coercion, persuasion, and intimidation" is often sufficient to chill protected speech. *Playboy Enters. v. Meese*, 639 F. Supp. 581, 585 (D.D.C. 1986) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). Texas law vests Paxton with broad authority to punish Media Matters for noncompliance with the Demand. *See, e.g.*, Tex. Bus. & Com. Code Ann. §§17.47, 17.62. The district court found that such authority, along with the breadth and invasive nature of the Demand, satisfied the deterrence element. JA816–17. Paxton made "no contrary argument" below, JA816, and says nothing about this element on appeal, *see* Br.46–47.

*Causation.* The district court properly determined that Media Matters met its burden to show but-for causation. JA817–18. The evidence on this point was overwhelming: Paxton's press release tied the investigation directly to Media Matters's reporting about Musk and X, Paxton himself launched the investigation by labeling Media Matters "a 'radical anti-free speech' and 'radical left-wing organization,'" and Paxton encouraged other attorneys general to launch retaliatory investigations of their own—an invitation one of them accepted. JA817–18; *see also* JA785 n.3. Paxton did not engage with this causation evidence below, nor did he make out a sworn declaration to explain "his reasons for opening the investigation." JA818. And as with the deterrence element, he waives this element for purposes of the appeal by failing to press any argument about it. *See* Br.46–47.

- 58 -

**B.    Media Matters will suffer irreparable harm absent a preliminary injunction; Paxton will not.**

Paxton's retaliatory Demand has inflicted irreparable harm on Media Matters and will continue to do so absent injunctive relief. That district court's finding on this score was amply supported by affidavits describing how Media Matters, in response to Paxton's Demand, has refrained from publishing about certain topics, has adopted much more cautious editorial practices, and is operating in a climate of fear and self-censorship. JA811–13; *supra* Statement §II.D.

The district court did not clearly err by crediting these submissions. Paxton has never contested the truth of Media Matters's "concrete and particularized declarations." JA813. And the only refutation evidence Paxton has mustered is a handful of media appearances by Media Matters's *president*—not a reporter or editor—in which he briefly discussed X's lawsuit and Paxton's Demand, defended the accuracy of the reporting, and indicated that Media Matters would vigorously contest both cases. *See* Br.48–49; JA418–46. A public defense by an organization's apex executive in the face of a multifront legal attack does not mean that the outlet's line reporters or editors have not been chilled. Indeed, Hananoki has submitted several affidavits extensively documenting his chill and Paxton has never offered anything at all to refute his testimony.

Paxton's argument that Media Matters's irreparable harm is "self-inflicted,"

because they have not filed a set-aside action in Texas, Br.48, ignores the vital First Amendment context. The district court found that Media Matters was "*already suffering First Amendment harm in the form of chilled protected activities.*" That injury was inflicted as soon as Paxton served the Demand—at that point, it was already too late for Media Matters to avoid the injury "by challenging the document request." *Twitter*, 56 F.4th at 1179.

Paxton's own claim to be irreparably injured, on behalf of "the State of Texas and its citizens," Br.47, is hollow. The citizens of Texas will not suffer any injury if their Attorney General is prevented from harassing a media organization that has no link to Texas and is headquartered over a thousand miles away.

### C. The public interest and balance of equities favor protecting D.C. journalists' First Amendment rights and D.C. residents' access to reporting.

The remaining equitable factors favor Media Matters. Both are "established when there is a likely First Amendment violation." *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013). And if "enforcement of an unconstitutional law is always contrary to the public interest," *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020), so too is enforcement of an unconstitutional civil investigative demand. Paxton, for his part, "cannot legitimately claim to be 'harmed' as a result of being restrained from illegal conduct." *Prysmian Cables & Sys. USA,*

*LLC v. Szymanski*, 573 F. Supp. 3d 1021, 1044–45 (D.S.C. 2021) (collecting cases).

"If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason,* 303 F.3d 507, 521 (4th Cir. 2002).

## CONCLUSION

This Court should affirm the decision and order of the District Court.

Dated: July 10, 2024

**ELIAS LAW GROUP LLP**

By: /s/ *Aria C. Branch*

Aria C. Branch
Christopher D. Dodge
Samuel T. Ward-Packard
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
Telephone: (202) 968-4652
abranch@elias.law
cdodge@elias.law
swardpackard@elias.law

Abha Khanna
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177
akhanna@elias.law

**GIBSON, DUNN & CRUTCHER LLP**

Theodore J. Boutrous, Jr.
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com

Amer S. Ahmed
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com

# CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B). From Introduction through Conclusion, excluding the Pertinent Statutes, this brief contains 12,944 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6). This brief is set in 14-point Times New Roman, a proportionally spaced typeface.

*/s/ Aria C. Branch*
Aria C. Branch


# CERTIFICATE OF SERVICE

On July 10, 2024, I filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Aria C. Branch*
Aria C. Branch