**ORAL ARGUMENT NOT YET SCHEDULED**

**Appeal No. 24-7059**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

MEDIA MATTERS FOR AMERICA; ERIC HANANOKI,

*Plaintiffs-Appellees,*

v.

WARREN KENNETH PAXTON, JR., IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF TEXAS,

*Defendant-Appellant.*

On Appeal from the United States District Court for the District of
Columbia, Case No. 1:24-cv-00147 (Hon. Amit P. Mehta)

**BRIEF OF AMICUS CURIAE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS IN SUPPORT OF APPELLEES**

Bruce D. Brown
    *Counsel of Record*
Katie Townsend
Gabe Rottman
Grayson Clary
Emily Hockett
REPORTERS COMMITTEE FOR
    FREEDOM OF THE PRESS
1156 15th St. NW, Ste. 1020
Washington, DC 20005
bruce.brown@rcfp.org
(202) 795-9300
*Counsel for Amicus Curiae*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), amicus curiae Reporters Committee for Freedom of the Press ("Reporters Committee" or "Amicus"), certifies as follows:

A.   Parties and Amici

All parties, intervenors, and amici curiae appearing before the district court and in this Court as of the filing of this brief are listed in the brief for Appellant.

B.   Rulings Under Review

References to the rulings at issue appear in Appellant's brief.

C.   Related Cases

To the knowledge of Amicus's counsel, there are no other related cases within the meaning of Circuit Rule 28(a)(1)(C).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, the Reporters Committee certifies as follows:

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

# **TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.................................................................. i

CORPORATE DISCLOSURE STATEMENT.......................................... ii

TABLE OF AUTHORITIES ................................................. iv

STATUTES AND REGULATIONS ....................................... vii

STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE........................................................................... vii

RULE 29(a)(4)(E) CERTIFICATION.................................... viii

CERTIFICATE REGARDING SEPARATE BRIEFING ..................... viii

SUMMARY OF ARGUMENT................................................. 1

ARGUMENT ...................................................................... 4

    I.    The First Amendment prohibits the government from enforcing a preferred standard of editorial fairness............. 5

    II.    The First Amendment prohibits the government from repackaging editorial fairness as consumer fairness. ........... 9

CONCLUSION...................................................................14

CERTIFICATE OF COMPLIANCE .......................................15

CERTIFICATE OF SERVICE ..............................................16

# TABLE OF AUTHORITIES

**Cases**

*Boule v. Hutton*,
    328 F.3d 84 (2d Cir. 2003) .............................................................11

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011) ..................................................................... 8

*Bullfrog Films, Inc. v. Wick*,
    847 F.2d 502 (9th Cir. 1988)............................................................ 9

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980) ...................................................................11

*City Council of L.A. v. Taxpayers for Vincent*,
    466 U.S. 789 (1984) ..................................................................... 9

*Commodity Trend Serv., Inc. v. CFTC*,
    149 F.3d 679 (7th Cir. 1998)............................................................11

*Dex Media W., Inc. v. City of Seattle*,
    696 F.3d 952 (9th Cir. 2012)............................................................ 8

*Harris v. Quinn*,
    573 U.S. 616 (2014) ...................................................................11

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995) ...........................................................4, 7, 8, 13

*Iancu v. Brunetti*,
    588 U.S. 388 (2019) ..................................................................... 9

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974) ............................................. 1, 2, 5, 6, 7, 8, 13, 14

*Moody v. NetChoice, LLC*,
    No. 22-277, slip op. (U.S. July 1, 2024) ........................... 1, 4, 5, 8, 9, 12

*Nat'l Ass'n of Mfrs. v. SEC*,
    800 F.3d 518 (D.C. Cir. 2015)....................................................x, 3, 11

*Obsidian Fin. Grp., LLC v. Cox*,
  740 F.3d 1284 (9th Cir. 2014)..............................................12

*Passaic Daily News v. NLRB*,
  736 F.2d 1543 (D.C. Cir. 1984).......................................... 8

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
  413 U.S. 376 (1973) ......................................................... 3

*U.S. Postal Serv. v. Athena Prods., Ltd.*,
  654 F.2d 362 (5th Cir. 1981)..............................................11

**Other Authorities**

Brief of Amici Curiae the Reporters Committee for Freedom of the
  Press and the Media Law Resource Center in Support of
  Appellant, *Twitter, Inc. v. Paxton*, No. 21-15869
  (9th Cir. Apr. 11, 2022) ..................................................... ix

Brief of Amicus Curiae the Reporters Committee for Freedom of
  the Press in Support of Appellant, *Yelp Inc. v. Paxton*,
  No. 24-581 (9th Cir. Mar. 19, 2024) ................................... ix

Complaint,
  *X Corp. v. Media Matters for Am.*, No. 4:23-cv-01175
  (N.D. Tex. Nov. 20, 2023) .................................................. 5

David Ingram, *Elon Musk's X App Ran Ads on #whitepower and
  Other Hateful Hashtags*, NBC News (June 6, 2024),
  https://nbcnews.to/3zzM2PY .........................................3, 12

Eric Hananoki, *As Musk Endorses Antisemitic Conspiracy Theory,
  X Has Been Placing Ads for Apple, Bravo, IBM, Oracle, and
  Xfinity Next to Pro-Nazi Content*,
  Media Matters for America (Nov. 16, 2023),
  https://perma.cc/CUG5-RHKJ ............................................ 2

Leah Nylen et al., *Trump Pressures Head of Consumer Agency to
  Bend on Social Media Crackdown*, Politico (Aug. 21, 2020),
  https://perma.cc/4HP7-Q2RG .............................................13

Press Release, Fed. Trade Comm'n, Statement of Federal Trade Commission Chairman Timothy J. Muris on the Complaint Filed Today by MoveOn.org (July 19, 2004), https://perma.cc/X6X9-H8VM.............................................................13

Press Release, Ken Paxton, Att'y Gen. of Tex., AG Paxton Issues Civil Investigative Demands to Five Leading Tech Companies Regarding Discriminatory and Biased Policies and Practices (Jan. 13, 2021), https://perma.cc/BZ7A-GEHA ............................................................. 1

Press Release, Ken Paxton, Att'y Gen. of Tex., Attorney General Paxton Sues Yelp Over Discrimination Against Crisis Pregnancy Centers (Sept. 28, 2023), https://perma.cc/NC7N-H2MZ............................................................. 1

Press Release, Ken Paxton, Att'y Gen. of Tex., Attorney General Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity (Nov. 20, 2023), https://perma.cc/J5CF-2YBK............................................................. 5

Sheera Frenkel & Kate Conger, *Hate Speech's Rise on Twitter Is Unprecedented, Researchers Find*, N.Y. Times (Dec. 2, 2022), https://nyti.ms/4eW2U3C .................................................................... 3

William O. Douglas, *The Bill of Rights Is Not Enough*, *in* The Great Rights (Edmond Cahn ed., 1963).................................... 7

X Safety, *Stand with X to Protect Free Speech* (Nov. 18, 2023), https://perma.cc/28G2-NX3K ......................................................4, 10

## STATUTES AND REGULATIONS

All applicable statutes are contained in the brief for Appellant.

## STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE

Amicus the Reporters Committee for Freedom of the Press ("Reporters Committee") is an unincorporated nonprofit association of reporters and editors that works to safeguard the rights of journalists.

The Reporters Committee often appears as amicus curiae in federal courts to underline threats to the editorial independence of the news media, including in a string of cases where—as here—Appellant Attorney General of the State of Texas Warren Kenneth Paxton, Jr. ("Appellant" or "Attorney General Paxton") has attempted to stretch the law of consumer fraud and commercial speech to discourage the expression of views or distribution of information with which he disagrees. *See* Brief of Amicus Curiae the Reporters Committee for Freedom of the Press in Support of Appellant, *Yelp Inc. v. Paxton*, No. 24-581 (9th Cir. Mar. 19, 2024); Brief of Amici Curiae the Reporters Committee for Freedom of the Press and the Media Law Resource Center in Support of Appellant, *Twitter, Inc. v. Paxton*, No. 21-15869 (9th Cir. Apr. 11, 2022). The Reporters Committee has a keen interest

vii

in defending the District Court's well-founded conclusion that Appellant's position would chill "reporting on matters of public concern." J.A. 815.

Appellee consents to the filing of this brief; Appellant does not oppose the timely filing of an amicus brief. *See* Fed. R. App. P. 29(a)(2); Cir. R. 29(b).

## RULE 29(a)(4)(E) CERTIFICATION

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), Amicus certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person— other than Amicus, its members, or counsel—contributed money that was intended to fund preparing or submitting the brief.

## CERTIFICATE REGARDING SEPARATE BRIEFING

Pursuant to Circuit Rule 29(d), Amicus certifies that this brief is necessary to provide broader context for the consequences that Attorney General Paxton's theory of commercial speech, if adopted, would have on news coverage of private industry—consequences that would extend well beyond the facts of this particular case. *See Nat'l Ass'n of Mfrs. v.*

*SEC*, 800 F.3d 518, 521 n.8 (D.C. Cir. 2015) (emphasizing the risk, that under an overbroad definition of commercial speech, even "business section news reporting" would face diminished First Amendment protection (citation omitted)).

## SUMMARY OF ARGUMENT

Among the First Amendment's most vital safeguards for a free press is its protection for "the exercise of editorial control and judgment," *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974): a speaker's choices about what to say and what not to say about "public issues and public officials—whether fair or unfair," *id.* As the Supreme Court reaffirmed just this month, the state has no legitimate interest in commandeering that process to impose choices it finds fairer, better balanced, or more "responsible." *Id.* at 256; *see Moody v. NetChoice, LLC* ("*NetChoice*"), No. 22-277 (U.S. July 1, 2024), slip op. at 27 ("[A] State may not interfere with private actors' speech to advance its own vision of ideological balance."). But with the apparent aim of evading that constraint, Appellant has pioneered efforts to repackage ideological fairness as consumer fairness to chill the publication of information and the expression of views with which he disagrees.[1]

---

[1] *See* Press Release, Ken Paxton, Att'y Gen. of Tex., AG Paxton Issues Civil Investigative Demands to Five Leading Tech Companies Regarding Discriminatory and Biased Policies and Practices (Jan. 13, 2021), https://perma.cc/BZ7A-GEHA (investigating social media firms); Press Release, Ken Paxton, Att'y Gen. of Tex., Attorney General Paxton Sues Yelp Over Discrimination Against Crisis Pregnancy Centers (Sept. 28, 2023), https://perma.cc/NC7N-H2MZ (investigating Yelp).

Such efforts pose a grave threat to the First Amendment rights of the news media, and while Attorney General Paxton's campaign began in Silicon Valley, it knows no geographic or industry limits and creeps closer and closer to the heartland of the press function. In this case, Appellant took aim at an analysis by Media Matters for America ("MMFA" or "Media Matters") describing extreme content that ran alongside advertisements on the social media platform X. *See* Eric Hananoki, *As Musk Endorses Antisemitic Conspiracy Theory, X Has Been Placing Ads for Apple, Bravo, IBM, Oracle, and Xfinity Next to Pro-Nazi Content*, Media Matters for America (Nov. 16, 2023), https://perma.cc/CUG5-RHKJ. As Appellant's papers candidly explain, he does not contend any of those claims were *false*, only that they may reflect an "artificial" rather than an "organic" experience on the platform. Appellant's Br. at 5. In other words, he objects that Media Matters' portrayal of X was "unfair." *Tornillo*, 418 U.S. at 258.

The First Amendment flatly prohibits Appellant's effort to impose a government standard of fair-dealing in political discourse that would sweep in—as the District Court rightly warned—"reporting on matters of public concern." J.A. 815. As the opinion below observed, Attorney

General Paxton's gambit relies on quietly stretching the law of *commercial* speech to reach speech substantially similar to the journalism that any number of media organizations publish every day—including about X.[2]  Amicus writes to emphasize the extraordinary danger that theory poses to press freedom.  *See Nat'l Ass'n of Mfrs.*, 800 F.3d at 521 n.8 (noting the risk that even "business section news reporting would be commercial speech" under an overbroad definition (citation omitted)).  If Appellant's sleight of hand were to succeed, news outlets, "from the selection of news stories to the choice of editorial position[,] would be subject to regulation" whenever they report on private industry.  *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 385 (1973).

The District Court, recognizing that risk, correctly blocked Appellant's fishing expedition.  To uphold core First Amendment principles on which a free press depends, this Court should affirm.

---

[2]      *See, e.g.*, Sheera Frenkel & Kate Conger, *Hate Speech's Rise on Twitter Is Unprecedented, Researchers Find*, N.Y. Times (Dec. 2, 2022), https://nyti.ms/4eW2U3C; David Ingram, *Elon Musk's X App Ran Ads on #whitepower and Other Hateful Hashtags*, NBC News (June 6, 2024), https://nbcnews.to/3zzM2PY.  A number of other examples are found in the complaint Media Matters filed in the District Court.  J.A. 17–18.

# ARGUMENT

"On the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *NetChoice*, No. 22-277, slip op. at 27–28. This case is just one of a string in which Attorney General Paxton has attempted to circumvent that principle by invoking the state's authority to "prescribe what shall be orthodox in commercial advertising," *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (citation omitted), stretching the law of "commercial speech" and consumer protection well beyond their boundaries, Appellant's Br. at 2. A net so broad could catch not just Media Matters, but also any number of traditional news outlets whose editorial judgments regarding what to report about private industry the state disfavors. *Cf.* X Safety, *Stand with X to Protect Free Speech* (Nov. 18, 2023), https://perma.cc/28G2-NX3K (noting, in the blog post that prompted Attorney General Paxton's investigation, "attacks" on X from both Media Matters and "legacy media outlets"). This Court should reject that transparent effort

to evade the Constitution's safeguards for editorial judgment and journalistic freedoms.

## I.  The First Amendment prohibits the government from enforcing a preferred standard of editorial fairness.

The basis for Appellant's investigation of Media Matters is his professed concern that the organization's findings fail to capture "what typical X users experience on the platform," Appellant's Br. at 5 (quoting Complaint ¶ 1, *X Corp. v. Media Matters for Am.*, No. 4:23-cv-01175 (N.D. Tex. Nov. 20, 2023)), and his alleged conviction that Media Matters, by criticizing the platform, aimed to "limit freedom by reducing participation in the public square," Press Release, Ken Paxton, Att'y Gen. of Tex., Attorney General Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity (Nov. 20, 2023), https://perma.cc/J5CF-2YBK.  But the First Amendment protects a speaker's choice—"fair or unfair"—of which perspectives on "public issues" to share with an audience, *Tornillo*, 418 U.S. at 258, and the way the Constitution promotes participation in the public square "is not by licensing the government to stop *private actors* from speaking as they wish and preferring some views over others," *NetChoice*, No. 22-277, slip op. at 27.  The Supreme Court decisively established those

fundamental principles fifty years ago in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), a decision that remains of central importance to a free press, and reaffirmed it as recently as this month.

In *Tornillo*, the Supreme Court unanimously affirmed that the First Amendment forbids governmental interference in a private speaker's editorial decisionmaking when it held unconstitutional Florida's "right of reply" statute, which "grant[ed] a political candidate a right to equal space to reply to criticism and attacks on his record by a newspaper." *Tornillo*, 418 U.S. at 243, 258. The Court made clear that state control of the "choice of material" to include in a speaker's own message to its audience cannot be "exercised consistent with First Amendment guarantees," *id.* at 258, and that this principle applies with all the more force when an editorial decision deals with the "treatment of public issues . . . whether fair or unfair," *id.* That bar on "government tampering" with "news and editorial content" is necessary to ensure a free and unfettered press. *Id.* at 259 (White, J., concurring).

The Court's decision in *Tornillo* did not turn on a rosy view of how either the *Miami Herald* in particular or the press in general exercised the editorial judgment that the Constitution protects. To the contrary,

in the first half of the Court's opinion, Chief Justice Burger summarized, with sympathy, concerns that powerful media corporations "too often hammer[] away on one ideological or political line using [their] monopoly position not to educate people, not to promote debate, but to inculcate in [their] readers one philosophy, one attitude—and to make money." *Tornillo*, 418 U.S. at 253 (quoting William O. Douglas, *The Bill of Rights Is Not Enough*, *in* The Great Rights 124–25 (Edmond Cahn ed., 1963)). "But the balance struck by the First Amendment with respect to the press is that society must take the risk that occasionally debate on vital matters will not be comprehensive and that all viewpoints may not be expressed," *id.* at 260 (White, J., concurring), because the risks posed by the alternative— assigning the government the power to shape debate on matters of public concern until its own sense of fairness is satisfied—are graver.

Since *Tornillo*, the Supreme Court has repeatedly affirmed that the force of that insight—that the government has no legitimate role in displacing expressive choices that it finds "misguided"—is not "restricted to the press." *Hurley*, 515 U.S. at 574; *see also Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 964 (9th Cir. 2012) ("That

protection of newspapers was a driving force behind the adoption of the First Amendment does not limit the scope of the amendment's coverage."). Instead, *Tornillo* provides a structural check on government wherever it seeks to police how speakers decide which speech is fit to share with their audiences, an independence that is shared "by business corporations generally and by ordinary people engaged in unsophisticated expression as well as by professional publishers." *Hurley*, 515 U.S. at 574. As the Supreme Court explained in *NetChoice*, the rule that "[t]he government may not, in supposed pursuit of better expressive balance, alter a private speaker's own editorial choices" is one of "'the basic principles' of the First Amendment [that] 'do not vary'" from one footing to another. No. 22-277, slip op. at 19–20 (quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011)).

Where it applies, *Tornillo* states a *per se* rule, holding that "any such compulsion to publish that which 'reason' tells [an editor] should not be published is unconstitutional." 418 U.S. at 256; *see also, e.g.*, *Passaic Daily News v. NLRB*, 736 F.2d 1543, 1557 (D.C. Cir. 1984) ("The Supreme Court has implied consistently that newspapers have absolute discretion to determine the contents of their newspapers.").

And for good reason: The government's decision to displace an editor's point of view in favor of its own—even a notionally 'balanced' one—is *always* viewpoint based. *See Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 509 & n.11 (9th Cir. 1988) (describing as "flawed" the argument that balance mandates "are not viewpoint-based because rather than forbidding particular viewpoints, they forbid all points of view"). That objective is "so plainly illegitimate" as to "immediately invalidate" any state action that aims at it. *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984). Like any other case of "viewpoint bias," then, a finding that the state deliberately aims to usurp a speaker's editorial role "end[s] the matter." *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019). And in light of those settled First Amendment principles, Appellant's investigation—from its inception and on its face—violates the Constitution's bedrock prohibition on state-enforced "ideological balance." *NetChoice*, No. 22-277, slip op. at 27.

## II. The First Amendment prohibits the government from repackaging editorial fairness as consumer fairness.

In an effort to avoid the clarity of those precedents, Attorney General Paxton maintains that Media Matters' analysis can amount to consumer fraud because it is "commercial speech." Appellant's Br. at 2.

In that respect, this action is just one of several in which Appellant has worked to stretch those ideas beyond their limits, an effort that—as the District Court recognized—now encroaches on the core press function of "reporting on matters of public concern." J.A. 815. The threat is stark: There is nothing in the position advanced by Appellant in this case that would preclude his launching similar investigations into any of the legions of traditional news outlets whose coverage of private industry a public official dislikes or disagrees with. After all, the complaint from X that spurred Attorney General Paxton's investigation here objected not just to Media Matters' analysis of the company's practices, but also to the extensive reporting of "legacy media outlets." *Stand With X, supra.* Thankfully, however, the First Amendment bars Attorney General Paxton's effort to repackage editorial fairness as consumer fairness.

The Supreme Court has made clear that commercial speech is a narrow category, confined to expression that "does no more than propose a commercial transaction," *Harris v. Quinn*, 573 U.S. 616, 648 (2014) (citation omitted), or that "relate[s] solely to the economic interests of the speaker and its audience," *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980). That

definition falls well short of encompassing all "factual speech on a commercial subject, or else business section news reporting would be commercial speech." *Nat'l Ass'n of Mfrs.*, 800 F.3d at 521 n.8 (citation omitted); *see also U.S. Postal Serv. v. Athena Prods., Ltd.*, 654 F.2d 362, 366 (5th Cir. 1981) (contrasting "commercial speech" with "news reporting"). As common sense makes clear, reporting about a company's product or service does not propose a transaction with the reader, "[j]ust like a restaurant review does not propose a transaction between the individual reader and the restaurant." *Commodity Trend Serv., Inc. v. CFTC*, 149 F.3d 679, 686 (7th Cir. 1998). As a result, even in the presence of "strong evidence" that an allegedly misleading exposé has "damaged the commercial interests" of a business, other courts have expressed "little hesitation" in concluding that news coverage is "not commercial speech." *Boule v. Hutton*, 328 F.3d 84, 91 (2d Cir. 2003).

Any other result would have an obvious chilling effect on vital newsgathering and reporting in the public interest. Even relatively trivial corporate conduct "can constitute matters of public concern," *Obsidian Fin. Grp., LLC v. Cox*, 740 F.3d 1284, 1292 (9th Cir. 2014) (collecting examples), and the subject matter of this case is hardly

trivial:  The practices of social media platforms like X, including the

editorial decisions *they* make as to which speech should be distributed,

"create unparalleled opportunities and unprecedented dangers,"

*NetChoice*, No. 22-277, slip op. at 2.  And if the mere fact that Media

Matters' commentary about X's decisions might affect X's business

interests were enough to diminish First Amendment protections for

Media Matters' speech, then the vast body of reporting and commentary

that touches in some way on private business would likewise be

vulnerable.  Indeed, any number of news organizations have published

statements substantially similar to the ones that Appellant hopes to

place under the government's microscope here.  *See, e.g.*, Ingram, *supra*

("A review by NBC news found X running ads on 20 racist and

antisemitic hashtags more than 18 months after Musk said that he

would demonetize hate posts.").  An objection that such reporting is

"unfair," *Tornillo*, 418 U.S. at 258, could, in Appellant's preferred world,

provide the basis for costly, chilling consumer-fraud litigation.

    That result would be flatly inconsistent with the First

Amendment's core purpose, "which is to shield just those choices of

content that in someone's eyes"—here, the state's eyes—"are

misguided." *Hurley*, 515 U.S. at 574.  For just that reason, the Federal Trade Commission (whose authority Appellant maintains is "very similar" to his own, Appellant's Br. at 46) has steadfastly refused to be drawn into efforts to use consumer-protection legislation to police public discourse, in the press and beyond.  *See, e.g.*, Press Release, Fed. Trade Comm'n, Statement of Federal Trade Commission Chairman Timothy J. Muris on the Complaint Filed Today by MoveOn.org (July 19, 2004), https://perma.cc/X6X9-H8VM (rejecting complaint asking the FTC to judge whether Fox News's claim to be fair and balanced is a deceptive trade practice); Leah Nylen et al., *Trump Pressures Head of Consumer Agency to Bend on Social Media Crackdown*, Politico (Aug. 21, 2020), https://perma.cc/4HP7-Q2RG (noting the FTC's refusal to investigate whether perceived "political bias in social media" is a deceptive trade practice).  This Court should hold that same line here.

At base, while Attorney General Paxton may disagree with the information and commentary Media Matters provides to the public, there is no role for his office in enforcing a preferred conception of editorial fairness, whether repackaged as consumer protection or not. *See Tornillo*, 418 U.S. at 256 ("A responsible press is an undoubtedly

desirable goal, but press responsibility is not mandated by the Constitution and like many other virtues it cannot be legislated."). Doubtless Texas's Deceptive Trade Practices Act generally serves laudable goals, but it may not be used to mandate a government standard of fair-dealing in the realm of political discourse. The District Court rightly enjoined Appellant's effort to do just that.

## CONCLUSION

For all these reasons, Amicus respectfully urges this Court to affirm the District Court's preliminary injunction.

Dated: July 17, 2024

Respectfully submitted,

*/s/Bruce D. Brown*
Bruce D. Brown
  *Counsel of Record*
Katie Townsend
Gabe Rottman
Grayson Clary
Emily Hockett
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Ste. 1020
Washington, DC 20005
bruce.brown@rcfp.org
(202) 795-9300

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because the brief contains 3,050 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: July 17, 2024
Washington, D.C.

*/s/ Bruce D. Brown*
Bruce D. Brown
*Counsel of Record for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I certify that on July 17, 2024, I electronically filed the foregoing brief with the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.  All parties are registered CM/ECF users, and service upon them will be accomplished by the appellate CM/ECF system.

*/s/ Bruce D. Brown*
Bruce D. Brown
*Counsel of Record for*
*Amicus Curiae*

Dated:  July 17, 2024