# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 20, 2024          Decided May 30, 2025

No. 24-7059

MEDIA MATTERS FOR AMERICA AND ERIC HANANOKI,
APPELLEES

v.

WARREN KENNETH PAXTON, JR., IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF TEXAS,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:24-cv-00147)

———

*Lanora C. Pettit*, Principal Deputy Solicitor General, Office of the Attorney General for the State of Texas, argued the cause for appellant. With her on the briefs were *Ken Paxton*, Attorney General, *Ryan S. Baasch*, Chief, Consumer Protection, *Aaron L. Nielson*, Solicitor General, *Joseph N. Mazzara*, Assistant Solicitor General, and *Coy Allen Westbrook*, Assistant Attorney General.

*Aria C. Branch* argued the cause for appellees. With her on the brief were *Abha Khanna*, *Christopher D. Dodge*, *Samuel T. Ward-Packard*, *Theodore J. Boutrous, Jr.*, and *Amer S.*

2

*Ahmed*.

*Bruce D. Brown*, *Katie Townsend*, *Gabe Rottman*, and *Grayson Clary* were on the brief for *amicus curiae* Reporters Committee for Freedom of the Press in support of appellees.

Before: HENDERSON and PAN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

Opinion concurring in the judgment filed by *Circuit Judge* HENDERSON.

EDWARDS, *Senior Circuit Judge*: This case involves a lawsuit filed by Media Matters for America ("Media Matters"), a non-profit media watchdog based in the District of Columbia, and Eric Hananoki, a senior investigative reporter with Media Matters ("Appellees"), against Warren Kenneth Paxton, Jr., in his official capacity as the Attorney General of the State of Texas. Appellees allege that the Texas Office of the Attorney General, which is headed by Paxton, pursued a retaliatory campaign against them because they published an unfavorable article about X.com ("X"), a social media platform owned by Elon Musk. Appellees' article first appeared online on November 16, 2023, and it reported that corporate advertisements on X appeared adjacent to antisemitic posts, and that Musk had endorsed an antisemitic conspiracy theory. Musk responded that the article was a "'fraudulent attack on [the] company,' and he promised to file 'a thermonuclear lawsuit against Media Matters[.]'" *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 8 (D.D.C. 2024) (alterations in original).

3

On November 20, 2023, X filed suit in the Northern District of Texas against Media Matters and Hananoki. On the same day that X filed suit, the Texas Office of the Attorney General launched an investigation into Media Matters for potential violations of the Texas Deceptive Trade Practices Act, TEX. BUS. & COM. CODE § 17.01 *et seq.* (Vernon 2023). In a press release and a subsequent interview, Paxton called Media Matters a "radical anti-free speech organization" and encouraged other state attorneys general to review Media Matters' conduct. Joint Appendix ("J.A.") 53, 189. The Texas Office of the Attorney General also issued a sweeping civil investigative demand ("CID"), requiring Media Matters to produce a slew of records. The scope of the CID includes all Media Matters' documents and communications dating back to January 1, 2022, regarding X CEO Linda Yaccarino or Musk's purchase of X; all Media Matters' communications with employees and representatives of X and ten other entities in November 2023; documents concerning Media Matters' internal operations, structure, expenditures, and reporting process; and sources of funding for reporting on X. Paxton sent the CID to Media Matters via FedEx and then arranged for a process server to deliver it to Appellees' attorneys in Washington, D.C.

Following receipt of the CID, Appellees filed suit against Paxton, in his official capacity, pursuant to 42 U.S.C. § 1983, alleging unlawful retaliation in violation of the First Amendment. Appellees claimed that Paxton's investigation and the issuance of the CID were in furtherance of an unlawful campaign of retaliation for their coverage of X and Elon Musk. They also alleged that Paxton's retaliatory actions have caused substantial adverse effects to their newsgathering and reporting activities, particularly with respect to online political extremism. They sought a preliminary injunction to bar enforcement of the CID.

4

The District Court granted Appellees' motion for a preliminary injunction and denied Paxton's motion to dismiss for improper venue and a lack of personal jurisdiction and subject matter jurisdiction. *See Media Matters*, 732 F. Supp. 3d at 8, 30. The court found that the investigation and CID constituted cognizable injuries sufficient to establish Appellees' standing. *See id.* at 24-27. On the merits, the court concluded that Appellees satisfied the requisite factors for a preliminary injunction. *Id.* at 8, 27-30. On appeal, Paxton argues that he is not subject to personal jurisdiction in the District of Columbia, that the District of Columbia is an improper venue for the action, and that Appellees have not raised a justiciable claim. He also contends that the District Court abused its discretion in issuing a preliminary injunction because Appellees failed to satisfy all of the elements of the requisite test. For the reasons explained below, we affirm the judgment of the District Court.

The First Amendment generally "prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022); *see, e.g.*, *Boquist v. Courtney*, 32 F.4th 764, 774 (9th Cir. 2022). As the District Court correctly recognized, Appellees' complaint is not focused merely on the chilling effects of the actions taken against them. Rather, the heart of Appellees' claim is that the actions taken by Paxton are justiciable and warrant relief because they involve concrete and felt acts of *retaliation* against a media company and one of its investigative reporters for having exercised their protected rights of free speech.

5

## I.  BACKGROUND

### A.  *Statutory Background*

The Texas Deceptive Trade Practices Act ("Act") "protect[s] consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty." TEX. BUS. & COM. CODE § 17.44(a). To that end, the Act proscribes "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," including "disparaging the goods, services, or business of another by false or misleading representation of facts." *Id.* § 17.46(a), (b)(8).

The Act also authorizes the Texas Office of the Attorney General ("Office") to investigate and enforce violations of its provisions. *See PPG Indus., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 84 (Tex. 2004); *State v. Lowry*, 802 S.W.2d 669, 672 n.4 (Tex. 1991). Specifically, the Office's consumer protection division may bring actions for injunctive relief and seek civil penalties of up to $10,000 per violation against persons believed to have violated the Act. TEX. BUS. & COM. CODE § 17.47(a), (c)(1). That division may also issue a CID if it "believes that any person may be in possession, custody, or control of … documentary material relevant to the subject matter of an investigation of a possible violation of" the Act. *Id.* § 17.61(a).

As relevant here, the recipient of a CID may file a petition in the Texas courts to modify or set aside a CID. *Id.* § 17.61(g). Otherwise, the recipient may refuse to comply with the CID and the consumer protection division may then bring an enforcement action. *Id.* § 17.62(b). With respect to penalties, a CID recipient's failure to comply with a final court order from the enforcement action is punishable by contempt. *Id.*

6

§ 17.62(c). A recipient who, with intent to avoid compliance with the CID, withholds or destroys any documentary material may also be charged with a misdemeanor, which is punishable by a fine or confinement. *Id.* § 17.62(a).

**B.** *Factual Background*

Media Matters is a non-profit research and information organization whose self-proclaimed mission is to "monitor[], analyz[e], and correct[] conservative misinformation in U.S. media." J.A. 146. It is incorporated under the laws of the District of Columbia ("District" or "D.C."), has its principal place of business in the District, and maintains its physical records in the District. Media Matters has no significant ties to the State of Texas.

On November 16, 2023, Media Matters published an article written by Hananoki titled, "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content." J.A. 156. This article was part of Hananoki's broader work to document political extremism in the public square, including on social media platforms. The article reported that corporate advertisements on X appeared beside antisemitic content from X users, and it showed images of antisemitic messages alongside advertisements. In addition, the article claimed that Musk had endorsed an "antisemitic conspiracy theory" that Jewish people are attempting to "promote 'hatred against whites'" and "'flood[] the[] country' with 'hordes of minorities.'" J.A. 157 (alterations in original).

Musk quickly responded. On November 18, he posted on his X account that X Corp. intended to file "a thermonuclear lawsuit against Media Matters and ALL those who colluded in this fraudulent attack" against the company. J.A. 23, 158. One

7

day later, Stephen Miller, who has been an advisor to President Donald Trump during both of his terms in office, posted on X that fraud is a civil and criminal violation and that there are numerous conservative state attorneys general. Musk then responded that Miller's post was interesting, and Andrew Bailey, the Attorney General for the State of Missouri, later replied that his team was looking into the matter.

On November 20, 2023, X Corp. filed suit against Appellees in a federal district court in Texas. And on the same day, the Office issued a press release announcing the launch of an investigation into Media Matters for potential fraudulent activity in violation of the Act. The press release described Paxton as being "extremely troubled by the allegations that Media Matters, a radical anti-free speech organization, fraudulently manipulated data on X.com." J.A. 53. It also noted that Paxton had stated that the Office wanted to "ensure that the public has not been deceived by the schemes of radical left-wing organizations who would like nothing more than to limit freedom by reducing participation in the public square." *Id.*

Soon after, the Office's consumer protection division issued a CID to Media Matters. It sought a wide-ranging set of records covering, *inter alia*, (1) Media Matters' sources of income and expenditures in Texas; (2) its sources of funding for its operations involving X research or publications; (3) its communications regarding Musk's acquisition of X and the November 16 article; and (4) its external communications with major corporate advertisers and X employees. Media Matters first received the CID, via FedEx delivery, at its office in the District. Paxton also dispatched a process server to the District to deliver the CID, resulting in the process server delivering it to Media Matters' local counsel.

8

Around the same time, Paxton participated in several interviews about the Office's investigation. In an interview on Newsmax, he remarked that the Office discovered Media Matters' activities through Musk's lawsuit and the resulting reports of the dispute. Similarly, in an interview with CNBC, he discussed the Office's interest in Media Matters' conduct, the goal of the Office's investigation, and Media Matters' potential liability under Texas law if X Corp.'s allegation that Media Matters manipulated data proved true. And in an interview on "The Benny Show," Paxton urged other state attorneys general to review and investigate Media Matters' conduct.

## C. *Procedural History*

In January 2024, Appellees filed an action in the District Court against Paxton in his official capacity as the Attorney General of Texas. They initially sued Paxton in the U.S. District Court for the District of Maryland, but later voluntarily dismissed the action and refiled in the District Court. As relevant here, Appellees assert a First Amendment retaliation claim under 42 U.S.C. § 1983, alleging that Paxton's investigation and service of an intrusive CID was in retaliation for the exercise of their First Amendment rights. They claim that Paxton's retaliatory actions have chilled and continue to chill their investigative, newsgathering, and reporting activities.

Appellees subsequently moved for a preliminary injunction, seeking to enjoin Paxton from enforcing the CID or engaging in similar retaliatory conduct. They also submitted evidence of adverse effects from the allegedly retaliatory investigation, such as sworn affidavits recounting the self-censorship of reporters on political extremism topics, disruptions to their normal editorial practices, and reduced

9

collaboration with other journalists and associations. Paxton then moved to dismiss the action for a lack of personal jurisdiction and subject matter jurisdiction, and for improper venue. Paxton did not dispute that the investigation and CID were retaliatory; and Paxton did not contest Appellees' claim that a retaliatory investigation raises a cognizable cause of action.

Ultimately, the District Court granted Appellees' motion for a preliminary injunction and denied Paxton's motion to dismiss. *See Media Matters*, 732 F. Supp. 3d at 30. The District Court first held that Paxton was subject to specific personal jurisdiction in the District. *Id.* at 18. The court found that Paxton was a "person" under the D.C. long-arm statute for purposes of an official-capacity suit for injunctive relief, and that jurisdiction was permissible under subsections (a)(1) and (a)(3) of the long-arm statute. *Id*. at 13-23. It explained that, *inter alia*, Paxton invoked the benefits and protections of the District's laws by hiring a process server to deliver the CID in the District, and that the CID established a future course of dealing with Media Matters. *Id.* at 18-20.

The District Court additionally concluded that the evidence offered by Appellees was sufficient to show cognizable injuries, *i.e.*, Paxton's retaliatory campaign had objectively discernable adverse effects on Appellees' news operations and journalistic mission. *Id.* at 24-27.

The District Court further determined that venue was proper in the District because physical service of the CID in furtherance of Paxton's retaliatory campaign against Appellees and the ensuing adverse effects on Appellees' rights of free speech occurred in the District. *Id.* at 27.

10

The District Court concluded that a preliminary injunction was warranted because all factors of the *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), test weighed in Appellees' favor. *Id.* at 27-30.

As to the likelihood of success on the merits, the District Court found that, on the record before it, Appellees have proven each element of their First Amendment retaliation claim. *Id.* at 27. The court reasoned that Appellees' reporting on matters of public concern were core First Amendment activities, that Paxton's campaign against Media Matters with administrative and judicial intrusions into the newsgathering process were retaliatory actions sufficient to deter protected speech, that Paxton launched his retaliatory campaign against Appellees because of their pursuit of protected activities, and that Appellees presented sufficient evidence of Paxton's retaliatory motive. *Id.* at 27-29. With respect to irreparable harm, the District Court explained that Paxton's campaign of retaliation impaired Appellees' First Amendment interests by, *inter alia*, intruding into the workings of their media operation, causing them to self-censor their reporting, and restricting communications with their sources and other journalists. *Id.* at 29. For the balance of equities and the public interest, the court determined that those factors favored Appellees due to the strong public interest in the exercise of free speech rights and Paxton's failure to identify any harm to his interests from an injunction. *Id.* at 29-30.

Paxton now appeals the District Court's judgment and grant of a preliminary injunction in favor of Appellees.

11

## II. ANALYSIS

### A. *Standard of Review*

"A preliminary injunction is an 'extraordinary remedy never awarded as of right.'" *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1324 (D.C. Cir. 2024) (quoting *Winter*, 555 U.S. at 24). Rather, to obtain a preliminary injunction, a party "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 727 (D.C. Cir. 2022) (quoting *Winter*, 555 U.S. at 20). We review the District Court's weighing of those factors for abuse of discretion, its legal conclusions *de novo*, and factual findings for clear error. *Alpine Sec.*, 121 F.4th at 1324; *Huisha-Huisha*, 27 F.4th at 726-27. We review Article III standing questions and the District Court's assertion of personal jurisdiction *de novo*. *Iowaska Church of Healing v. Werfel*, 105 F.4th 402, 411-12 (D.C. Cir. 2024); *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1036 (D.C. Cir. 2020).

### B. *Paxton Is Subject to Personal Jurisdiction in D.C. Courts*

As a threshold matter, Paxton argues that the District Court lacks personal jurisdiction over him in his official capacity as the Attorney General of Texas. We disagree.

There are two bases for a court to exercise personal jurisdiction over a defendant: "general or all-purpose jurisdiction, and specific or conduct-linked jurisdiction." *Shatsky*, 955 F.3d at 1036 (citation omitted). In its exercise of general jurisdiction, a court may "hear any and all claims against the defendant." *Urquhart-Bradley v. Mobley*, 964 F.3d

12

36, 43 (D.C. Cir. 2020) (internal quotation marks and citation omitted). And "[w]here the defendant is an individual, 'the paradigm forum for the exercise of general jurisdiction is the individual's domicile[.]'" *Id.* (alteration in original) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011)). General jurisdiction is not at issue here because Paxton resides and works in Texas. Appellees also do not advance such a claim.

Specific jurisdiction, however, demands "a relationship among the defendant, the forum, and the litigation." *Shatsky*, 955 F.3d at 1036 (citation omitted). To establish specific personal jurisdiction over a defendant, we must determine that (1) jurisdiction is authorized under the District's long-arm statute, and (2) that such an exercise of jurisdiction comports with the Due Process Clause. *Urquhart-Bradley*, 964 F.3d at 44. Both prongs are satisfied here.

1.  *Paxton is a "person" under the D.C. long-arm statute*

In pertinent part, the D.C. long-arm statute authorizes D.C. courts to "exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's" transacting any business in the District. D.C. CODE § 13-423(a)(1). And it defines a "person" as including "an individual … whether or not a citizen or domiciliary of the District of Columbia." *Id.* § 13-421. At bottom, the plain meaning of the term "individual" clearly encompasses Paxton, who is a single human being. *See Individual*, THE OXFORD ENGLISH DICTIONARY, https://perma.cc/B6AY-8L6Y (last visited Apr. 23, 2025) ("A single human being, as distinct from a particular group, or from society in general."). Accordingly, he is a "person" within the meaning of the statute.

13

Paxton contends that he is not a "person" because Appellees sued him in his official capacity. In his view, it is well established that a state is not a "person" under the statute, and, therefore, a state official sued in his official capacity is likewise not a "person" because the case functionally remains a suit against the state. We disagree.

First, *Ex parte Young*, 209 U.S. 123 (1908), and its progeny permit actions for declaratory and injunctive relief against state officials in their official capacities, notwithstanding sovereign immunity under the Eleventh Amendment. *Reed v. Goertz*, 143 S. Ct. 955, 960 (2023). Under *Ex parte Young*, such suits for prospective relief are against the official rather than the state. *Vann v. Kempthorne*, 534 F.3d 741, 749-50 (D.C. Cir. 2008). This is so because if a state official acts unconstitutionally, he "comes into conflict with the superior authority of [the] Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." *Ex parte Young*, 209 U.S. at 159-60 (allowing a party to pursue an injunction against a state attorney general to bar enforcement of a state statute).

In *Will v. Michigan Department of State Police*, the Supreme Court noted that state officials sued in their official capacities for injunctive relief, rather than monetary relief, are "person[s]" under § 1983 because official-capacity suits for prospective relief are not actions against the state. 491 U.S. 58, 71 n.10 (1989); *see also Hedgepeth ex rel. Hedgepeth v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148, 1152-53 n.3 (D.C. Cir. 2004) (relying on *Will* to find that the General Manager of the Washington Metropolitan Area Transit Authority was a person under § 1983). The Court further observed that such a distinction was "commonplace in sovereign immunity doctrine … and would not have been foreign to the 19th-

14

century Congress that enacted § 1983." *Will*, 491 U.S. at 71 n.10 (citation omitted).

The principles from *Will* control our application of the D.C. long-arm statute. It is safe to assume that Congress was aware of sovereign immunity precedent when it enacted the long-arm statute in 1970 – that is, that official-capacity actions for injunctive relief are treated as actions against an individual officer instead of the state. *See Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 648 (2010) ("We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent."). In this case, with respect to their First Amendment retaliation claim, Appellees are suing Paxton in his official capacity for injunctive relief for allegedly unconstitutional conduct. *Will* makes abundantly clear that such an action against a state official for injunctive relief is not an action against the state.

Second, we are also assured that Appellees' request for prospective relief is not an attempt to evade sovereign immunity and effectively bring an action against a state. To be sure, the Supreme Court has established that the *Ex parte Young* doctrine cannot be invoked to obtain "injunction[s] requiring the payment of funds from the State's treasury" or "order[s] for specific performance of a State's contract." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 256-57 (2011) (citations omitted). Neither circumstance is present here. Indeed, the complaint and preliminary injunction motion plainly show that Appellees are primarily seeking to enjoin enforcement of the CID as part of Paxton's continued campaign of retaliation.

Third, the main case upon which Paxton relies, *United States v. Ferrara*, 54 F.3d 825 (D.C. Cir. 1995), does not compel a different result. There, a New Mexico state official

15

initiated disciplinary action against an attorney licensed in New Mexico based on his employment activities in the District, and the attorney sought to enjoin the disciplinary proceedings. *Ferrara*, 54 F.3d at 826-27. We held that the state official was not subject to personal jurisdiction in the District due to her lack of minimum contacts with the District. *Id.* at 828-31. And while we found that D.C. courts would not have jurisdiction over the State of New Mexico because a sovereign was not a "person" under the long-arm statute, we expressly declined to "determine whether a State official sued in his official capacity should be treated as if he were the State for jurisdictional purposes." *Id.* at 831-32. Importantly, we were merely responding to the government's alternative argument that the official's minimum contacts with the forum were unnecessary for personal jurisdiction since (1) the State was not a "person" under the Due Process Clause and not entitled to its protection, and (2) state officials should be treated as the State. *See id.* Ultimately, there was no need to reach that Due Process Clause issue due to our conclusion that D.C. courts could not exercise jurisdiction over New Mexico because a state was not a "person" under the long-arm statute. *See id.* at 831. As such, *Ferrara* is of no help to Paxton.

In short, nothing precludes us from considering Paxton – even in his official capacity – as a "person" under the long-arm statute.

    2.   *Jurisdiction is permissible under subsection (a)(1) of the D.C. long-arm statute*

Turning to subsection (a)(1), we find that jurisdiction over Paxton is proper under that subsection, and that such an exercise of jurisdiction comports with the Due Process Clause. While Appellees also invoke subsections (a)(3) and (a)(4) of the long-arm statute as additional grounds for personal

16

jurisdiction, we have no reason to pursue our analysis beyond subsection (a)(1).

As noted above, D.C. courts may exercise jurisdiction over any nonresident who "transact[s] any business in the District," directly or by an agent. D.C. CODE § 13-423(a)(1). It is well established that this provision "embraces those contractual activities of a nonresident defendant which cause a consequence here," and that "a nonresident defendant need not have been physically present in the District." *Mouzavires v. Baxter*, 434 A.2d 988, 992 (D.C. 1981) (citations omitted). *Mouzavires* emphasizes the breadth of the "transacting any business" provision and explains that the provision "embraces" contractual activities which cause a consequence in the forum state. *Id.* Importantly, it does not limit the broad provision to solely contractual activities. Rather, as *Mouzavires* explains, the focus is on the in-forum consequences that flow from the nonresident's activities. In addition, "a single act may be sufficient to constitute transacting business … so long as that contact is voluntary and deliberate, rather than fortuitous." *Jackson v. Loews Wash. Cinemas, Inc.*, 944 A.2d 1088, 1093 (D.C. 2008) (internal quotation marks and citation omitted). Nonetheless, "a connection [to the District] that is related to the claim in suit" is required. *Forras v. Rauf*, 812 F.3d 1102, 1106 (D.C. Cir. 2016) (cleaned up) (citations omitted).

Once we determine Appellees' claims fall under subsection (a)(1), which authorizes jurisdiction to the full extent allowed by the Due Process Clause, the statutory and constitutional inquiries merge. *Mills v. Anadolu Agency NA, Inc.*, 105 F.4th 388, 395-96 (D.C. Cir. 2024). Thus, the overarching question is whether a plaintiff's claims ''arise[] out of or relate[] to'' his contacts with the District. *Id.* at 396 (citation omitted). Put simply, due process is satisfied "if there are minimum contacts between the defendant and the forum such that the defendant

17

should reasonably anticipate being haled into court there.'' *Urquhart-Bradley*, 964 F.3d at 44 (cleaned up) (citation omitted). In other words, the defendant must have "purposefully availed himself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1189 (D.C. Cir. 2013) (cleaned up) (citation omitted). Moreover, "minimum contacts exist where a defendant takes 'intentional, and allegedly tortious, actions' 'expressly aimed' at a jurisdiction." *Urquhart-Bradley*, 964 F.3d at 48 (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)). "Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (citation omitted) (describing factors).

Here, personal jurisdiction over Paxton is proper because he hired both FedEx and a process server to deliver his CID to Media Matters in the District, and Appellees' First Amendment retaliation claim arises from Paxton's conduct. Furthermore, Paxton's actions were expressly aimed at Media Matters in the District – thereby establishing minimum contacts with the District.

To start, the Supreme Court's decision in *Calder* is instructive on the issue. There, the Court held that a California court had jurisdiction over Florida defendants in a libel suit arising from the defendants' publication of an article about a California celebrity. *Calder*, 465 U.S. at 784-86. In particular, the Court explained that the "focal point" of the libelous story – *i.e.*, the California activities of a California resident and drawn from California sources – and of the harm suffered – *i.e.*,

18

damage to the plaintiff's reputation and her emotional distress
– was California. *Id.* at 788-89. It also observed that copies of
the national newspaper were sold in California. *Id.* at 784-85.
As such, the Court found that jurisdiction was appropriate due
to the "effects" of the defendants' Florida-based conduct in
California. *Id.* at 789. And it stressed that the defendants should
have anticipated being summoned into California courts
because they wrote an article knowing it "would have a
potentially devastating impact upon" the plaintiff and knowing
"that the brunt of that injury would be felt by" the plaintiff in
California, which is where she worked and the newspaper was
circulated. *Id.* at 789-90.

Since *Calder*, the Court has clarified the scope of the
"effects" test. In *Walden v. Fiore*, the Court explained that the
inquiry focuses on the contacts that the defendant creates with
the forum state, and not just with the plaintiff. 571 U.S. 277,
287, 291 (2014). Specifically, it noted:

> The crux of *Calder* was that the reputation-based
> "effects" of the alleged libel connected the defendants
> to California, not just to the plaintiff. The strength of
> that connection was largely a function of the nature of
> the libel tort …. [T]he reputational injury caused by
> the defendants' story would not have occurred but for
> the fact that the defendants wrote an article for
> publication in California that was read by a large
> number of California citizens. Indeed, because
> publication to third persons is a necessary element of
> libel, … the defendants' intentional tort actually
> occurred *in* California …. In this way, the "effects"
> caused by the defendants' article—*i.e.*, the injury to
> the plaintiff's reputation in the estimation of the
> California public—connected the defendants'
> conduct to *California*, not just to a plaintiff who lived

19

there. That connection, combined with the various facts that gave the article a California focus, sufficed to authorize the California court's exercise of jurisdiction.

*Id.* at 287-88 (citations omitted).

In this case, the District is the focal point of Paxton's allegedly retaliatory investigation and CID, and of the harm suffered by Appellees. Paxton is investigating the publication activities of a District-based organization, and he intentionally caused the delivery of the CID to the District via FedEx and a process server. Further, Appellees claim that they are suffering substantial adverse effects on their First Amendment rights from the mailing and service of the CID in the District, including self-censorship on articles about Musk and political extremism.

As noted above, Paxton has failed to contest that his campaign against Appellees is retaliatory. And the District Court found sufficient evidence of Paxton's retaliatory animus and of the profound adverse effects from the CID. This alleged harm has also plausibly impacted other D.C. residents, who are deprived of Appellees' reporting. *See Def. Distributed v. Grewal*, 971 F.3d 485, 495 n.9 (5th Cir. 2020) ("Censorship, like libel, is damaging not just to the speaker, but to surrounding audiences. And like libel, censorship's harm occurs not just where it originates, but where it arrives.").

Indeed, as irony would have it, Paxton has readily acknowledged in a different litigation that a state's attempt to silence a company through the issuance and threat of compelling a response to a CID "harms everyone," including "those seeking information in order to evaluate various viewpoints in [a] public policy debate." Br. of Texas *et. al.* as

20

*Amici Curiae* in Support of Plaintiff's Motion for Preliminary Injunction [hereinafter Br. of Texas] at 6, *Exxon Mobil Corp. v. Healey*, No. 4:16-CV-00469 (N.D. Tex. filed Sept. 8, 2016), J.A. 77.

The point is that the censorship-based effects of the alleged retaliatory investigation has connected Paxton to the District, rather than to just Appellees. *See Def. Distributed*, 971 F.3d at 495-96 (determining that Texas courts had jurisdiction over the New Jersey Attorney General based on a cease-and-desist letter he sent to a Texas business because of the alleged adverse effects on its First Amendment rights, which also affected Texans' access to the company's materials).

In sum, Appellees claim that Paxton intentionally reached into the District (via FedEx and a process server) to retaliate against them for exercising their First Amendment rights, and they allege that he intended for the CID to cause adverse effects on their reporting. These acts of retaliation are the foundation of Appellees' suit. Paxton should have reasonably anticipated being summoned into court in the District because he knew that the CID and investigation would "have a potentially devastating impact" on Appellees and others who benefit from their reporting, and "knew that the brunt of [the] injury would be felt by" Appellees in the District. *Calder*, 465 U.S. at 789-90.

Moreover, Paxton's physical entry into the District, via the process server and mailing of the CID, is an additional relevant contact that supports jurisdiction. *See Walden*, 571 U.S. at 285 ("[P]hysical entry into the State—either by the defendant in person or through an *agent*, goods, *mail*, or some other means—is certainly a relevant contact." (emphases added)). Taken together, we hold that Paxton has the requisite minimum contacts with the District to properly subject him to the

21

jurisdiction of the D.C. courts.

### 3. *Paxton's arguments to the contrary lack merit*

Paxton contends that subsection (a)(1) does not apply because hiring a process server does not constitute transacting business in the District. We reject Paxton's argument. As discussed above, the D.C. Court of Appeals in *Mouzavires* explained that the "transacting any business" provision in (a)(1) "embraces those contractual activities of a nonresident defendant which cause a consequence" in the District of Columbia. 434 A.2d at 992. *Mouzavires* does not limit the provision to contractual activities. It merely explains that such activities fall within the broad scope of subsection (a)(1) when they cause a consequence in the District. In this case, Paxton purposefully dispatched FedEx and a process server to the District to deliver the CID to Media Matters, which caused adverse effects on Media Matters in the District and obligated the organization to produce voluminous records absent a court order. *See* TEX. BUS. & COM. CODE § 17.61(h). Those are obvious and significant consequences.

Paxton also asserts that mail and wire communications, including transmitting formal legal documents, do not alone provide a basis for jurisdiction under subsection (a)(1). And he claims that his use of the mail and related communications do not constitute purposeful availment of the District's benefits and protections. These arguments, however, ignore *Mouzavires* and *Calder*, which are not merely based on a defendant's entry into the forum state via mail and wire communications, but on the consequences and effects of the defendant's conduct. Tellingly, Paxton also minimizes the point that he dispatched a process server into the District to deliver the CID.

22

### C. *Appellees' Complaint Raises a Justiciable Action*

Paxton additionally argues that Appellees' complaint should be dismissed because it does not raise a justiciable claim. We disagree. Paxton has elided the compelling evidence of the campaign of retaliation against Appellees so as to mischaracterize the action before the court. This case is not simply about a pre-enforcement challenge to a non-self-executing CID, as Paxton would have it. Rather, Appellees have alleged present, concrete, and objective harms (not merely "chilling effects") resulting from retaliatory government actions that have adversely affected their newsgathering activities and media business operations. Accordingly, Appellees have satisfied the injury-in-fact requirement of standing and may pursue injunctive relief for their First Amendment retaliation claim.

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Essentially, a plaintiff needs a "personal stake" or "standing" in the outcome of the case for a case or controversy to exist under Article III. *Id.* (citation omitted). Ripeness, in turn, is a doctrine "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Saline Parents v. Garland*, 88 F.4th 298, 306 (D.C. Cir. 2023) (citation omitted). It "precludes premature adjudication of 'abstract disagreements' and instead reserves judicial power for resolution of concrete and 'fully crystalized' disputes." *VanderKam v. VanderKam*, 776 F.3d 883, 888 (D.C. Cir. 2015) (citation omitted). The constitutional dimension of ripeness "is subsumed into the Article III requirement of standing," *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 403 (D.C. Cir. 2020), because the doctrines "originate from the same Article III

23

limitation," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014) (internal quotation marks and citation omitted).

To establish Article III standing, a plaintiff "must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423 (citation omitted).

Appellees clearly have standing to pursue this action. They are the targeted victims of a campaign of retaliation; the harms inflicted on Appellees have been caused by Paxton and the Texas Office of the Attorney General that he directs; and the injuries that are the subject of Appellees' complaint will be redressed by the injunction that they seek. In addition, the case is ripe for review because the campaign of retaliation is ongoing. Moreover, Paxton's challenge to Appellees' complaint is not really focused on standing and ripeness. Rather, Paxton has focused on challenging the efficacy of Appellees' cause of action. Paxton's principal claim is that "this case is not justiciable [because] … federal courts do not hear pre-enforcement challenges to non-self-executing CIDs." Br. for Appellant 11. The problem with Paxton's argument is that it misconstrues Appellees' complaint and thus ignores the body of law that prohibits government officials from subjecting individuals to retaliatory actions for exercising their rights of free speech.

The Supreme Court, in a unanimous opinion, has explained the applicable law as follows:

> [A]s a general matter, the First Amendment prohibits
> government officials from subjecting individuals to

24

> retaliatory actions after the fact for having engaged in
> protected speech.

*Hous. Cmty. Coll. Sys.*, 595 U.S. at 474. Several circuits have amplified the framework for First Amendment retaliation claims. *See, e.g.*, *Boquist*, 32 F.4th at 774; *Rudd v. City of Norton Shores*, 977 F.3d 503, 512 (6th Cir. 2020).

Tellingly, Paxton has not offered any argument to dispute that the investigation was retaliatory. Nor has he claimed, until this appeal, that a retaliatory investigation is not a cognizable cause of action. *See* Oral Arg. Tr. at 20-22. Regardless, the District Court found ample evidence of Paxton's retaliatory motive including: (1) the Office's press release establishing that Paxton opened the investigation in response to Media Matters' reporting; (2) his description of Media Maters as a "radical anti-free speech" and "radical left-wing organization"; and (3) his encouragement of other state attorneys general to investigate Media Matters. J.A. 817-18. And Paxton elsewhere concedes that a state attorney general's subpoena power can be abused to target viewpoints, chill speech, and silence and intimidate organizations. *See* Br. of Texas at 3-9, J.A. 74-80.

Appellees' allegation that they are targets of a retaliatory government investigation is a claim regarding concrete harm. And this harm is distinct from any resulting chilling effects. In distinguishing between "good faith" and "bad faith" investigations, this court has explained that "all investigative techniques are subject to abuse and can conceivably be used to oppress citizens and groups," and that bad faith use of investigative techniques can abridge journalists' First Amendment rights. *Reps. Comm. for Freedom of the Press v. AT&T*, 593 F.2d 1030, 1064 (D.C. Cir. 1978). In addition, we have recognized that the First Amendment "protect[s] [information-gathering] activities from official harassment,"

25

and that "official harassment [of the press] places a *special* burden on information-gathering, for *in such cases the ultimate, though tacit, design is to obstruct rather than to investigate, and the official action is proscriptive rather than observatory in character.*" *Id.*

A number of our sister circuits have issued judgments making it clear that First Amendment retaliation claims are justiciable. *See, e.g.*, *Anderson v. Davila*, 125 F.3d 148, 159-60 (3d Cir. 1997) (describing the government's retaliatory surveillance of the plaintiff as a "specific present harm"); *Dixon v. Brown*, 38 F.3d 379, 379 (8th Cir. 1994) ("Because the retaliatory filing of a disciplinary charge strikes at the heart of an inmate's constitutional right to seek redress of grievances, the injury to this right inheres in the retaliatory conduct itself."); *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) ("In a retaliation claim such as this, however, the harm suffered is the adverse consequences which flow from the inmate's constitutionally protected action. Instead of being *denied* access to the courts, the prisoner is penalized for actually exercising that right."); *Bennett v. Hendrix*, 423 F.3d 1247, 1254-56 (11th Cir. 2005) (noting that a plaintiff's allegations that a defendant's retaliatory acts adversely affected him "is an injury sufficiently adverse to give rise to Article III standing"); *Boquist*, 32 F.4th at 780-85 (finding that the plaintiff plausibly alleged a First Amendment retaliation claim); *Rudd*, 977 F.3d at 513-17 (same).

As the court enunciated in *Bennett*: "A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." 423 F.3d at 1254. "The objective 'ordinary firmness' test requires plaintiffs to allege that the retaliatory acts of the defendants adversely affected them." *Id.* (citation omitted). Appellees have made this

26

showing. In particular, they have alleged facts that a jury could find would deter persons of ordinary firmness from exercising their First Amendment rights.

As indicated above, Media Matters is the target of a government campaign of retaliation, including an investigation, a press release, and a sweeping CID. Such a campaign of retaliation in response to Appellees' exercise of their First Amendment rights reflects concrete and present harm. And as the target of an arguably bad-faith investigation, Appellees are also experiencing special burdens on their newsgathering activities and operation of their media company. *See, e.g.*, J.A. 149-50 (chief operating officer says staff are unwilling to speak internally on topics related to the investigation; outside groups have limited their collaboration with Media Matters; and Media Matters has paused similar reporting for at least one other media platform); J.A. 161-64 (Hananoki says his editors declined to publish two of his articles; he declined to pitch ideas for related reporting; and he left out relevant details in some articles being published); J.A. 170-72 (editor in chief says Media Matters has changed its review process; pared back its reporting; and declined to pursue follow-up on the challenged article). Even though Paxton has not yet filed an action to enforce the CID, Media Matters reasonably altered its behavior to avoid creating evidence or materials that it would be forced to turn over if the CID were enforced.

These adverse effects are neither abstract nor contingent on a future government action. And they suffice to establish injury in fact. In addition, it is apparent that Appellees' injury is traceable to Paxton's campaign of retaliation and that their injury is redressable through injunctive relief.

27

The principal cases cited by Paxton to challenge the justiciability of Appellees' complaint are inapposite because they involve plaintiffs claiming a chilling injury based on their fear that general government policies might apply to them. *See, e.g.*, *Laird v. Tatum*, 408 U.S. 1, 2-3 (1972) (challenging the Army's domestic surveillance system); *Saline*, 88 F.4th at 300 (challenging a memorandum from the Attorney General that directed law enforcement to investigate the issue of threats of violence against school personnel); *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1377-78 (D.C. Cir. 1984) (challenging a presidential executive order that authorized intelligence activities by the executive branch). In these and other such cases there was no evidence that the government was investigating or imminently planning to investigate the plaintiffs; instead, the challenged government action was strictly speculative. *See Laird*, 408 U.S. at 9-10 (noting that the plaintiffs alleged a chilling effect from "the mere existence" of the surveillance system and "'admit[ted] that they complain of no specific action of the Army against them'" (quoting *Tatum v. Laird*, 444 F.2d 947, 953 (D.C. Cir. 1971))); *Saline*, 88 F.4th at 305 (observing that nothing indicated that the plaintiffs were the targets of the investigation); *United Presbyterian Church*, 738 F.2d at 1379-80 (concluding that the plaintiffs failed to allege that any government surveillance was threatened or contemplated against them, and that their contentions that they were more likely to be surveilled than the general public were speculative).

This case is quite different. Appellees in this case are not challenging a general government policy; rather, they are the specific targets of a retaliatory government investigation. Indeed, as noted above, Paxton readily declared that he was targeting Media Matters for investigation in a press release and interviews. Shortly thereafter, he then served the CID on Media

28

Matters as part of the investigation. Thus, there is no hypothetical harm or a threatened future enforcement action because the retaliatory investigation has already begun.

Likewise, Paxton's reliance on *Twitter, Inc. v. Paxton*, 56 F.4th 1170 (9th Cir. 2022), is misplaced. In Paxton's view, *Twitter* stands for the proposition that an Article III injury does not exist when a CID is not self-enforcing. We disagree. In *Twitter*, the Office issued a similar CID to Twitter, Inc., ("Twitter") following its ban of President Trump from the social media platform. 56 F.4th at 1172. However, before the Office tried to enforce the CID in the Texas courts, Twitter sued Paxton for First Amendment retaliation. *Id.* at 1172-73. At the outset, the Ninth Circuit acknowledged that the case was not a pre-enforcement challenge because Twitter claimed that Paxton had already acted against it with the issuance of the CID and related investigation. *Id.* at 1174-75. However, the court rejected Twitter's claim on the merits because it had failed to adequately demonstrate chilled speech. *See id.* at 1174-75. Specifically, the court recognized that self-censorship may count as an injury in fact, but it concluded that Twitter's claims of chilling effects were too vague and conclusory. *Id.* Thus, the Ninth Circuit recognized that a claim of retaliation – if supported by sufficient evidence of chilled speech – would provide Article III standing.

*Twitter* is easily distinguishable because, as detailed above, Appellees in this case have supported their claims of adverse effects to their news operations and journalistic mission with detailed affidavits. And the District Court found ample evidence of the harm caused by the retaliatory investigation and CID. *Media Matters*, 732 F. Supp. 3d at 26.

Finally, Paxton invokes *Reisman v. Caplin,* 375 U.S. 440 (1964), to challenge the justiciability of Appellees' action. In

29

*Reisman*, tax attorneys sought to enjoin the enforcement of a summons issued by the Internal Revenue Service ("IRS") to an accounting firm regarding their client's taxes. 375 U.S. at 442-44. Ultimately, the Supreme Court dismissed the action for "want of equity," holding that the plaintiffs had "an adequate remedy at law." *Id.* at 443. Specifically, it explained that the summons was only enforceable if the IRS sought relief in federal court, and that a party only faced coercive penalties if it refused to comply with a court order or did not challenge the summons in good faith. *Id.* at 445-47. Further, the Court emphasized that a party could contest the summons "on any appropriate ground" in such a judicial proceeding, that a party "would suffer no injury while testing the summons," and that "the remedy specified by Congress work[ed] no injustice and suffer[ed] no constitutional invalidity." *Id.* at 449-50. Paxton claims that *Reisman* forecloses Appellees' suit just because the CID is not self-executing. We disagree.

Tellingly, *Reisman* did not concern First Amendment retaliation. And *Reisman* does not govern this case because Appellees are suffering ongoing injuries due to the campaign of retaliation against them. *See Twitter*, 56 F.4th at 1178-79 (declining to apply *Reisman* for the same reasons). As such, the *Reisman* Court's statement that a party would not suffer an injury while challenging a subpoena is inapplicable here. Appellees' injuries are ongoing, so they cannot get meaningful redress by challenging the CID later.

**D.  *The District Is a Proper Venue***

Turning to the final preliminary issue, Paxton argues that venue is improper in the District because all of the relevant conduct giving rise to Appellees' claim occurred in Texas. We reject this claim and hold that venue is proper here.

30

Under the current venue statute, civil actions may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2). Here, a substantial part of the events giving rise to Appellees' First Amendment retaliation claim occurred in the District. Paxton hired a D.C. process server, physical service of the CID on Media Matters' counsel occurred in the District, and the ensuing adverse effects from the CID and investigation occurred primarily in the District. In addition, the CID requires Media Matters to either make available the requested records for inspection and copying at its principal place of business or deliver copies of the documents to the Office in Texas; therefore, Media Matters' potential compliance with the CID will occur in the District, where its principal place of business and physical records are located.

Paxton relies on *Leroy v. Great Western United Corp.*, 443 U.S. 173 (1979), for the proposition that the only appropriate venue for this action is where the state actor took the regulatory and enforcement actions, not where the plaintiff felt the impact of those actions. This argument is unavailing.

In *Leroy*, the Supreme Court held that Texas was an improper venue for an action – brought by a Texas corporation against Idaho officials – challenging the constitutionality of an Idaho statute that prevented the corporation from taking over an Idaho company. 443 U.S. at 175, 183-86. Specifically, the Court concluded that Idaho was the locus of the claim because the action involved an Idaho statute, administrative reviews and actions regarding the company's filings occurred in Idaho, and the majority of the relevant evidence and witnesses would be in Idaho. *Id.* at 185-86. The Court rejected the corporation's argument that its claim arose in Texas since it would initiate its

31

tender offer for the Idaho company from Texas, and it felt the impact of the statute in Texas. *Id.* at 186-87.

*Leroy* is not on point here. First, the Court decided *Leroy* under an earlier version of the venue statute, where venue was appropriate *only* in the judicial district "in which the claim arose." 28 U.S.C. § 1391(b) (1976); *see also Bates v. C & S Adjusters, Inc.*, 980 F.2d 865, 867 (2d Cir. 1992) (noting that while the factors in *Leroy* are useful for "distinguishing between two or more plausible venues," they are "less significan[t]" because the new venue statute does not require a district court to determine the best venue); 14D CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD D. FREER, FEDERAL PRACTICE & PROCEDURE § 3802, Westlaw (database updated Apr. 2025) ("*Leroy* is of limited, if any, significance now."). Second, unlike in *Leroy*, Appellees are not directly challenging a state statute. And the bulk of the relevant evidence and a majority of the witnesses are not located outside the District.

**E.** **_The District Court Did Not Err In Issuing A Preliminary Injunction_**

Finally, we hold that the District Court did not err in granting the preliminary injunction because Appellees have met each element of the test enunciated in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).

First, Appellees have demonstrated a likelihood of success on the merits of their First Amendment retaliation claim. "In First Amendment cases, the likelihood of success will often be the determinative factor." *Green v. U.S. Dep't of Just.*, 54 F.4th 738, 745 (D.C. Cir. 2022) (citation omitted). To prevail on the merits of their First Amendment retaliation claim, Appellees must prove: "(1) [they] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory

32

action sufficient to deter a person of ordinary firmness in [their] position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against'' them. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (citation omitted). Paxton has forfeited a challenge to the second and third elements by failing to adequately contest them on appeal. *See Khine v. U.S. Dep't of Homeland Sec.*, 943 F.3d 959, 967-68 (D.C. Cir. 2019) ("[I]t is not enough merely to mention a possible argument in the most skeletal way." (citation omitted)); *Shands v. Comm'r of Internal Revenue*, 111 F.4th 1, 9 (D.C. Cir. 2024) ("[A]rguments raised for the first time in a reply brief are forfeited." (citation omitted)).

As to the first element, Appellees – a media organization and news reporter – are obviously engaged in conduct protected under the First Amendment. Indeed, the underlying incident that precipitated their claim involved their news reporting on a public figure and alleged political extremism on a popular social media platform. Their reporting on public issues are quintessential First Amendment activities. *See Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("'[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." (citation omitted)); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) ("The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions."); *see also Roth v. United States*, 354 U.S. 476, 484 (1957) ("The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.").

On appeal, Paxton now argues that Appellees cannot succeed on the merits because a retaliatory investigation is not a cognizable claim. However, he has forfeited this argument by

33

failing to raise the issue before the District Court. *See Salazar ex rel. Salazar v. District of Columbia*, 602 F.3d 431, 437 (D.C. Cir. 2010) ("Generally, an argument not made in the trial court is forfeited and will not be considered absent exceptional circumstances." (cleaned up)).

In addition, Paxton's contention that Appellees' conduct is not constitutionally protected because their articles were deliberately designed to mislead consumers about X is meritless. The record is utterly devoid of evidence to support such a claim.

Second, Appellees have shown that they would suffer irreparable harm without an injunction. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (internal quotation marks and citations omitted). Still, to obtain a preliminary injunction, a party must show that their "First Amendment interests are either threatened or in fact being impaired at the time relief is sought." *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254-55 (D.C. Cir. 1991) (cleaned up) (citations omitted).

As discussed above, the District Court found significant evidence of ongoing adverse effects to Appellees' First Amendment rights due to the CID and investigation, including current self-censorship in their reporting. We find no error in this conclusion. Furthermore, Appellees are suffering from a campaign of retaliation against them in response to their exercise of their First Amendment rights. That is also an irreparable injury. *See Cate v. Oldham*, 707 F.2d 1176, 1188-89 (11th Cir. 1983) (holding that direct government retaliation for the exercise of First Amendment rights is an irreparable injury).

34

Third, Appellees have established that the balance of the equities and the public interest weigh in their favor. It is well settled that the balance of equities and public interest factors merge if the government is the opposing party. *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020). In other words, ''[w]hen a private party seeks injunctive relief against the government,'' we must ''weigh[] the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined." *Huisha-Huisha*, 27 F.4th at 734 (citation omitted).

In this case, there is uncontested evidence of Paxton's retaliatory motive in investigating Media Matters. Although Paxton certainly has an interest in enforcing a Texas law designed to protect Texas consumers, the government may not "act unlawfully even in pursuit of desirable ends." *Huisha-Huisha*, 27 F.4th at 734 (citations omitted); *see also Karem*, 960 F.3d at 668 (explaining that the Constitution does not allow the government to prioritize policy goals over the Due Process Clause). And "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional" government action. *Pursuing Am.'s Greatness*, 831 F.3d at 511 (citation omitted). On the record before us, it is clear that the balance of equities and public interest favor Appellees.

### III. CONCLUSION

For the reasons set forth above, we affirm the judgment of the District Court, including its issuance of a preliminary injunction in favor of Appellees.

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring in the judgment: Because Article III standing requires a non-self-inflicted injury, and chilled speech from a non-self-enforcing civil investigative demand *is* self-inflicted, many of the harms Media Matters asserts cannot establish its standing. In my view, standing may be satisfied here only because Media Matters asserts that its "associations with other groups" have "been impaired" as those groups reevaluate their work with Media Matters in light of Attorney General Ken Paxton's investigation. J.A. 31. Paxton does not challenge that injury, which is plainly not self-inflicted and thus can provide a basis for standing.

The exercise of judicial power requires that the plaintiff satisfy the "constitutional minimum of standing." *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The plaintiff bears the burden of showing a cognizable injury causally connected to a defendant's conduct that is redressable by the court. *Id.* An injury in fact must be both concrete and particularized and "actual or imminent, not conjectural or hypothetical." *Id.* (cleaned up). A causal connection must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (cleaned up). Hence, much of the harm Media Matters asserts depends upon if and when its First Amendment rights are sufficiently "chilled" to constitute an injury traceable to government action.

In *United Presbyterian*, we noted that "[a]ll of the Supreme Court cases employing the concept of 'chilling effect' involve situations in which the plaintiff has unquestionably suffered some concrete harm (past or immediately threatened) apart from the 'chill' itself." *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984). This conclusion drew from the United States Supreme Court's holding that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective

2

harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972).

Granted, the precedent reviewed in *United Presbyterian* differs from this case in that Media Matters has been directly targeted by Paxton. In *Clapper v. Amnesty International USA*, the Supreme Court found that individuals and organizations whose work required engaging in sensitive and occasionally privileged communications abroad lacked standing to challenge a foreign intelligence law in part because they could "only speculate as to how the [government] will exercise [its] discretion in determining which communications to target." 568 U.S. 398, 412 (2013). By contrast, Media Matters *knows* Paxton's civil investigative demand (CID) is directed to it.

But the targeted communications were not the only speculative matters at issue in *Clapper*. In addition to targeting, respondents speculated as to whether the government would seek to use its investigative power at all and whether a "court will authorize such surveillance." *Id.* at 412–13. Those questions arise here. Paxton cannot act upon the CID unless (1) he seeks enforcement by a state court and (2) that court obliges. *See* Tex. Bus. & Com. Code § 17.62(b) (West 2023). Because Paxton cannot enforce the CID until a court has both established jurisdiction of Media Matters and rejected Media Matters' First Amendment claims, its injury is too speculative to be constitutionally ripe. *See e.g.*, *Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 425 (D.C. Cir. 2007) (finding an injury—regulatory approval of a nuclear storage facility where further agency action precluded construction—too speculative to be ripe); *see also Clapper*, 568 U.S. at 413 ("[W]e have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment."); *cf. NTEU v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (ripeness "shares the constitutional

3

requirement of standing that an injury in fact be certainly impending"). Put differently, the injury threatened by enforcement of the CID is not "certainly impending" and so cannot "constitute injury in fact." *Clapper*, 568 U.S. at 410 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Like the plaintiffs in *Clapper*, Media Matters attempts to overcome the ripeness obstacle by asserting that it is "suffering ongoing injuries [including chilled speech] that are fairly traceable" to Paxton's CID *today*. *Id.* at 415. But to the extent these harms result from a "reasonable reaction [by Media Matters] to a risk of harm" the CID poses, I find that argument "unavailing." *Id.* at 416. Media Matters "cannot manufacture standing merely by inflicting harm on [itself] based on [its] fears of hypothetical future harm that is not certainly impending." *Id.* (citations omitted).

In *Twitter, Inc. v. Paxton*, 56 F.4th 1170 (9th Cir. 2022), the Ninth Circuit addressed a challenge similar to the one Media Matters mounts. True, one of the bases of that decision is that Twitter's allegations were too "vague" to satisfy pleading standards, in that its "naked assertion that its speech ha[d] been chilled [was] 'a bare legal conclusion' upon which it [could not] rely to assert injury-in-fact." *Id.* at 1175 (quotation omitted). By contrast, here the district court found Media Matters' declarations "concrete and particularized," *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 26 (D.D.C. 2024), and the majority rightly differentiates *Twitter* on that basis. Maj. Op. 28. But my colleagues mistakenly assert that the Ninth Circuit "recognized that self-censorship may count as an injury in fact." *Id.* Instead, the *Twitter* court went on to declare that "the enforceability of the CID remains an open question" and so any costs Twitter incurred in adjusting its speech were "incurred [] voluntarily." *Twitter*, 56 F.4th at 1176. It concluded that "to the extent Twitter argues that any

4

actions it has taken in response to the CID create an Article III injury, those injuries are self-inflicted because the actions were voluntary;" and, as a result, "Twitter has not suffered an Article III injury because the CID is not self-enforcing." *Id.* (citing *Clapper*, 568 U.S. at 418). The opinion does not rest on Twitter's insufficient pleading but instead on its declaration that the case was "constitutionally unripe." *Id.* at 1179.

The majority again sweeps too broadly in declaring that "our sister circuits have issued judgments making it clear that First Amendment retaliation claims are justiciable." Maj. Op. 25. Of course *some* are but the inquiry does not stop there. Retaliation claims, like all others, must still meet standing requirements. Many of the injuries Media Matters asserts are, in my view, insufficient to establish standing.[1] The objective "ordinary firmness" test, which requires the plaintiff to show "the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again," does not supersede standing requirements. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Nor do our sister circuits' decisions hold otherwise.

All of the cases—with one exception—cited by the majority to support its broad assertion address allegations that plainly satisfy standing. *See Anderson v. Davila*, 125 F.3d 148, 159–60 (3d Cir. 1997) (alleging that defendants conducted ongoing, targeted surveillance of plaintiff); *Thaddeus-X v. Blatter*, 175 F.3d 378, 384 (6th Cir. 1999) (alleging that prison guards deliberately denied prisoners materials to pursue a lawsuit, served one prisoner cold food and reassigned another

---

[1] Unlike the majority, I find that any alterations Media Matters made to its own behavior "to avoid creating evidence or materials that it would be forced to turn over if the CID were enforced," Maj. Op. 26, are self-inflicted and, as the Ninth Circuit put it, "voluntary," *Twitter*, 56 F.4th at 1176.

5

prisoner to a worse cell); *Bennett v. Hendrix*, 423 F.3d 1247, 1249 (11th Cir. 2005) (alleging that officers "engaged in a campaign of retaliation," including active surveillance, roadblocks and false traffic citations); *Boquist v. Courtney*, 32 F.4th 764, 771, 782 (9th Cir. 2022) (alleging that defendant imposed "12-hour notice rule" requiring plaintiff to provide notice before visiting state capitol); *Rudd v. City of Norton Shores*, 977 F.3d 503, 515 (6th Cir. 2020) (alleging that defendants weaponized an expired protection order, breached confidentiality rules and detained plaintiff without probable cause). The one outlier is *Dixon v. Brown*, 38 F.3d 379 (8th Cir. 1994). There, the Eighth Circuit found that the filing of a false disciplinary charge against a prisoner could satisfy the injury requirement—even when that charge resulted in no punishment—provided it was filed in retaliation for the prisoner's exercise of his First Amendment rights. *Id.* But this short opinion falls short of establishing that retaliation *simpliciter* suffices to establish standing. Having asserted a First Amendment retaliation claim, Media Matters must still satisfy standing.

Excluding its self-inflicted harms, Media Matters alleges little to establish a cognizable injury. Changing the articles selected for publication or research, J.A. 161–62 (Hananoki Decl. ¶¶ 29–32), 170–71 (Dimiero Decl. ¶¶ 16–18), adjusting the article review process, *id.*, refraining from sharing certain research with partners, *id.* at 150 (Padera Decl. ¶ 25), or adjusting internal communications processes, *id.* 172 (Dimiero Decl. ¶ 21), are all self-inflicted by Media Matters to avoid harm related to a CID "that is not certainly impending." *Clapper*, 568 U.S. at 416. Nonetheless, I believe Media Matters alleges one injury that does pass muster.

The complaint alleges that "Media Matters's associations with other groups have . . . been impaired by Attorney General

6

Paxton's investigation. Groups that previously worked closely with Media Matters have reevaluated doing so . . . ." J.A. 31; *see also* J.A. 150 (Padera Decl. ¶ 25) (same). Paxton has not challenged this injury but we must nevertheless assure ourselves of its sufficiency to support standing.[2] On its face, it is an injury allegedly caused by the CID that is ongoing—not contingent or attenuated—and not self-inflicted. And, although it is "substantially more difficult to establish" standing "where a causal relation between injury and challenged action depends upon the decision of an independent third party[,] . . . standing is not precluded." *California v. Texas*, 593 U.S. 659, 675 (2021) (cleaned up). At later stages of this litigation, Media Matters will have to proffer evidence showing that groups that have reevaluated their professional relationship with Media Matters did so because of "the predictable effect of Government action on [their] decisions." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (states had standing to challenge U.S. census form because census question would deter noncitizens from responding and thereby limit states' entitlement to federal funds). But "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," *Lujan*, 504 U.S. at 561, and here Media Matters has alleged an injury "fairly traceable to [Paxton's] challenged action," *Clapper*, 568 U.S. at 409. Taking the allegation as true, as we must at this stage, I believe it constitutes a plausible basis for standing.

But Paxton rests his entire injury-in-fact challenge on the broader assertion that this case is not "justiciable" because the CID is not self-executing. Appellant Br. at 34–45. This argument goes only so far. The insufficiency of a non-self-

---

[2] "[S]tanding is jurisdictional and it can never be forfeited or waived." *Bauer v. Marmara*, 774 F.3d 1026, 1029 (D.C. Cir. 2014) (citation omitted).

7

executing CID is not that it automatically precludes any related cause of action but that it does not provide sufficiently imminent support for an asserted injury in fact. Nor can current self-inflicted harm—which is harm "based on . . . fears of hypothetical future harm that is not certainly impending"— provide an alternative basis for injury in fact. *Clapper*, 568 U.S. at 416. With future injury from such a CID insufficiently ripe and current injuries self-inflicted, a party *may* lack standing and a case *may* not be justiciable. But that is not this case. I believe the alleged current impairment of Media Matters' professional associations and collaborations with third parties can support its standing. Accordingly, I concur in the judgment.